**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | | |
|---|---|---|
| GREEN OCEANS, a Rhode Island non-profit corporation, 362 Seapowet Avenue, Tiverton, RI 02878; RESPONSIBLE OFFSHORE DEVELOPMENT ALLIANCE, a D.C. non-profit corporation, P.O. Box 66704, Washington, DC 20035; SAVE RIGHT WHALES COALITION, an unincorporated organization, 287 Parker Hill Road, Lyman, NH 03585; NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION, a Maine non-profit corporation, 14 Old Town Road, Orris Island, ME 04066; BAT WORLD SANCTUARY, a Texas non-profit corporation, 299 Hight Point Road, Weatherford, TX 76088; CHRIS BROWN, a resident of Rhode Island, 290 Columbia Street, Wakefield, RI 02879; RALPH CRAFT, a resident of Rhode Island, 2327 E Main Road, Portsmouth, RI 02871; MURRAY DANFORTH, a resident of Rhode Island, 17 Lloyd Lane, Providence, RI 02906; RICH HITTINGER, a resident of Rhode Island, 326 Thames Avenue, Warwick, RI 02886; LAUREN KNIGHT, an individual, 71 Olde Knoll Road, Marion, MA 02738; ELIZABETH QUATTROCKI KNIGHT, M.D., PH.D., a resident of Massachusetts and owner of a Rhode Island Property, 82A Warren's Point Road, Little Compton, RI 02837; GARY MATARONAS, a resident of Rhode Island; ERIC PHILIPPI, a resident of Rhode Island, 52 Warrens Point Road, Little Compton, RI 92837; BENJAMIN RIGGS, a resident of Rhode Island, 15 Harrington Street, Unit D, Newport, RI 02840; ALAN SHINN, a resident of New Jersey, 905 Route 35, Belmar, NJ 07719; CORNWALL LODGE LLC, a Rhode Island limited liability company, 205 Ocean Avenue, Newport, RI 02840; LEDGES 66 LLC, a Rhode Island limited liability company, 66 Ocean Avenue, Newport, RI 02840; 226 OCEAN AVENUE MOONWATCH, LLC, 226 Ocean Avenue, Newport, RI 02840; DEE AND RICHARD GORDON, residents of Rhode Island, 81 Ocean Avenue, Newport, RI 02840; KATHRYN K. AND JEROME R. KIRBY, residents of Rhode Island, 18 Chartier Circle and 20 Chartier Circle, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. _____ |

1

Newport, RI 02840; CHARLOTTE DUHAMEL, a    )
resident of Rhode Island, 581 West Main Road,    )
Little Compton, RI 02837; DOUG AND    )
VIRGINIA MARZONIE, residents of Rhode    )
Island, 27 Atlantic Drive, Little Compton, RI    )
02837; ANDREW AND KRISTIN MCKEE,    )
residents of Rhode Island, 9 Kempton Place, Little    )
Compton, RI 02837; BEN AND LEIGH    )
CARPENTER, residents of Rhode Island, 37    )
Grinnell Road, Little Compton, RI 02837; VETER    )
ET NOVA TRUST, 501 Indian Avenue,    )
Middletown, RI 02842; STEVEN GEWIRZ AND    )
KATRINA HAMILTON GEWIRZ, residents of    )
Rhode Island, 225 Indian Avenue, Middletown, RI    )
02842; KAREN BLANCHARD, a resident of    )
Rhode Island, 61 Ledge Road, Unit B, Newport, RI    )
02840; MARY CUSHING COLEMAN, a resident    )
of Rhode Island, 5 Prices Neck, Newport, RI    )
02840; LISA FOLEY, a resident of Rhode Island,    )
61 Ledge Road, Unit A, Newport, RI 02840;    )
STEPHEN LEWINSTEIN, a resident of Rhode    )
Island, 61 Ledge Road Units G, I, J, Newport, RI    )
02840; ALUMNI EAST ASSOCIATES, a Rhode    )
Island limited partnership, 57 Ledge Road, Unit 1,    )
Newport, RI 02840; EC PROPERTIES, LLC, a    )
Rhode Island limited liability company, 0, 51, 55    )
Ledge Road, Newport, RI 02840; WAVES S, LLC,    )
a Rhode Island limited liability company, 61 Ledge    )
Road Unit S, Newport, RI 02840; PANAGAKIS    )
FAMILY TRUST, 61 Ledge Road, Unit C,    )
Newport, RI 02840; PIERONI FAMILY    )
REVOCABLE TRUST, 61 Ledge Road, Unit D,    )
Newport, RI 02840,    )
   )
   )
                   *Plaintiffs*,    )
   )
         v.    )
   )
UNITED STATES DEPARTMENT OF THE    )
INTERIOR, 1849 C Street NW, Washington, DC    )
20240; DEB HAALAND, in her official capacity as    )
the Secretary of the Interior, 1849 C Street NW,    )
Washington, DC 20240; BUREAU OF OCEAN    )
ENERGY MANAGEMENT, 1849 C Street NW,    )
Washington, DC 20240; LIZ KLEIN, in her official    )

capacity as the Director of the Bureau of Ocean            )
Energy Management, 1849 C Street NW,                      )
Washington, DC 20240; NATIONAL MARINE                    )
FISHERIES SERVICE, 1315 East-West Highway                )
Silver Spring, MD 20910; JANET COIT, in her              )
official capacity as the Administrator of the            )
National Marine Fisheries Service, 1315 East-West        )
Highway Silver Spring, MD 20910; UNITED                  )
STATES ARMY CORPS OF ENGINEERS, 441 G                    )
Street NW, Washington, DC 20314; LT. GEN.                )
SCOTT SPELLMON, in his official capacity as              )
Chief of Engineers and Commanding General of             )
the United States Army Corps of Engineers, 441 G         )
Street NW, Washington, DC 20314,                         )
                                                         )
                          *Defendants*.                  )
_____)

**COMPLAINT TO REVERSE AND SET ASIDE FINAL AGENCY ACTION**

To implement a massive new program to generate electrical energy by constructing thousands of turbine towers offshore on the Atlantic Outer Continental Shelf and laying hundreds of miles of high-tension electrical cables undersea, the United States has shortcut the statutory and regulatory requirements that were enacted to protect our Nation's environmental and natural resources, its industries, and its people.

On January 18, 2022, the United States Bureau of Ocean Energy Management ("BOEM") approved the Construction and Operations Plan for the South Fork Wind Project,[1] a 13,700-acre wind farm to be constructed by South Fork Wind LLC offshore Rhode Island by issuing a Record of Decision. This final agency approval, together with BOEM's approval of a Final Environmental Impact Statement[2] for the Project and a collection of other various permits from

---

[1] Bureau of Ocean Energy Management, *South Fork Record of Decision* (Nov. 24, 2021), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision%20South%20Fork_0.pdf (South Fork Record of Decision).
[2] Bureau of Ocean Energy Management, *South Fork Final Environmental Impact Statement* (Aug. 16, 2021), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SFWF%20FEIS.pdf.

other federal agencies provides South Fork Wind LLC, the company that will construct South Fork Wind, authorization to begin construction. These approvals by BOEM and other federal agencies are final agency actions under the Administrative Procedure Act.

On August 21, 2023, the United States Bureau of Ocean Energy Management ("BOEM") approved the Construction and Operations Plan for the Revolution Wind Project,[3] an 83,798-acre wind farm to be constructed by Revolution Wind LLC offshore Rhode Island by issuing a Record of Decision. This final agency approval, together with BOEM's approval of a Final Environmental Impact Statement for the Project[4] and a collection of other various permits from other federal agencies provides Revolution Wind LLC, the company that will construct Revolution Wind, authorization to begin construction. These approvals by BOEM and other federal agencies are final agency actions under the Administrative Procedure Act.[5]

In authorizing these Projects, Defendants failed to comply with numerous statutes and their implementing regulations:[6] Administrative Procedure Act,[7] National Environmental Policy Act,[8] Endangered Species Act,[9] Marine Mammal Protection Act,[10] Migratory Bird Treaty Act,[11]

---

[3] Bureau of Ocean Energy Management, *Revolution Wind Record of Decision* (Aug. 21, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf (Revolution Wind Record of Decision).

[4] Bureau of Ocean Energy Management*, Revolution Wind Final Environmental Impact Statement* (July 23, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1_0.pdf (Revolution Wind Final Environmental Impact Statement).

[5] 5 U.S.C. § 702.

[6] Plaintiffs have sent a 60-day notice of their intent to sue under OCSLA, the Clean Water Act, and the Endangered Species Act and will amend this Complaint to add these causes of action when the 60 days expires.

[7] 5 U.S.C. §§ 701-706.

[8] 42 U.S.C. §§ 4321-4370h.

[9] 16 U.S.C. §§ 1540(g)(1)(A), (B).

[10] 16 U.S.C. § 1371.

[11] 16 U.S.C. § 703.

Coastal Zone Management Act,[12] National Historic Preservation Act,[13] Outer Continental Shelf Lands Act,[14] and Clean Water Act.[15]

In this suit, Plaintiffs ask this Court to invalidate those putative approvals of the South Fork Wind and Revolution Wind Projects until and unless the Federal Government complies with the relevant statutes and regulations.

**Parties**

1.      Plaintiff, Green Oceans, is a Rhode Island nonpartisan non-profit corporation comprised of citizens dedicated to combating climate change without sacrificing the ocean's biodiversity and health. Green Oceans strives "to protect the ocean by informing the public about imminent threats, including the impact of offshore wind on the marine ecosystem. Protecting the ocean and biodiversity ensures our own survival. A healthy ocean is one of our best defenses against climate change."[16] Green Oceans is actively organizing opposition to the Revolution Wind Project, South Fork Project, and all offshore development on Cox Ledge by engaging with local stakeholders and spearheading a petition to stop offshore development on Cox Ledge and off the coasts of Rhode Island and Massachusetts. On October 26, 2023, Green Oceans submitted 1,526 signatures to NOAA in support of NOAA's proposed regulation declaring Cox Ledge a Habitat Area of Particular Concern. Through engagement with local stakeholders, Green Oceans aims to prevent irreversible damage to the marine ecosystem and Rhode Island communities. Green Oceans believes that the Federal Government's rushed environmental review process is sacrificing the health of our nation's oceans, biodiversity, and local economies. Green Oceans

---

[12] 16 U.S.C § 1451.
[13] 54 U.S.C. §§ 300101-307101.
[14] 43 U.S.C. § 1349(a)(2)(A).
[15] 33 U.S.C. § 1365(b).
[16] Green Oceans, *About Us*, https://green-oceans.org/ (last visited Dec. 1, 2023).

also submitted comments to BOEM on the Gulf of Maine call area, the Sunrise Wind Draft Environmental Impact Statement, the scoping for Beacon Wind, South Coast Wind Draft Environmental Impact Statement, Revolution Wind Draft Environmental Impact Statement, Sunrise Wind Draft Environmental Impact Statement, and the New England Wind Draft Environmental Impact Statement. In addition, Green Oceans has demonstrated a concern about marine mammals and has submitted comments to NOAA and BOEM on the Draft Strategy for the North Atlantic right whale and to NOAA on the Incidental Take Requests for multiple projects including, Revolution Wind, Atlantic Shores, Vineyard Northeast, Ocean Wind II, New England Wind, and Sunrise Wind.

2.     Plaintiff, Responsible Offshore Development Alliance (the "Alliance"), is a District of Columbia nonprofit corporation whose membership includes major Atlantic and Pacific fishing associations, dealers, seafood processors, and affiliated businesses, in addition to over 120 vessels across fourteen states operating in more than 30 different fisheries. The Alliance directly collaborates with relevant federal and state regulatory agencies (e.g., National Marine Fisheries Service, Bureau of Ocean Energy Management, U.S. Coast Guard, fishery management councils, and state agencies), offshore developers, science experts, and others to coordinate science and policy approaches to managing development of the Outer Continental Shelf in a way that minimizes conflicts with existing traditional and historical fishing. On March 25, 2019, the Alliance executed a ten-year Memorandum of Understanding with the National Marine Fisheries Service and the Bureau to collaborate on the science and process of offshore wind energy development on the Atlantic Outer Continental Shelf. The Alliance's mission is to:

- Provide a unified voice regarding issues of mutual interest to the commercial fishing industry related to the siting and operations of new and proposed offshore developments to promote seafood sustainability;

- Act as a bridge between developers and fishermen to mandate, design, and implement a fair, equitable, and effective fisheries mitigation framework addressing potential direct and indirect fisheries impacts;
- Coordinate among existing local, project-specific, and state advisory groups to streamline advice and minimize duplication of effort, and increase awareness of the need for improved interagency coordination on matters related to ocean planning and development;
- Work to achieve adequate funding for scientific research to inform leasing processes, support mitigation programs, and guide future offshore development planning; and
- Serve as a clearinghouse of scientific information and project updates for a better-informed industry and to communicate with Fishery Management Councils and others regarding industry needs and concerns.

3.       Plaintiff, Save Right Whales Coalition, is an alliance of grassroots environmental and community organizations, scientists, and conservationists working to protect the North Atlantic right whale and other marine life from the industrialization of the ocean habitat through large-scale offshore wind energy development. Their members consist of Deep Sea Defenders, Defend Brigantine Beach, Fenwick Island Environmental Committee, Green Oceans, Environmental Progress, Keep Our Oceans Ocean, Kent Conservation and Preservation Alliance, Nantucket Residents Against Turbines, Protect Our Coast NJ, Save the Horseshoe Crab, WindAction, and fourteen individuals. Save Right Whales Coalition engages with local stakeholders to advocate for preserving and conserving the North Atlantic right whale.

4.       Plaintiff, New England Fishermen's Stewardship Association, is a bipartisan, nonprofit organization committed to preserving seafood resources in the waters of New England. The Association is an alliance of wild harvesters of the waters off New England dedicated to educating the public about how best to manage seafood resources through sound science and best conservation practices used by fishermen, with a view toward economic well-being, ecosystem sustainability, and US food security. The Association actively engages with local stakeholders,

fishing and environmental organizations, and state, local, and federal governments to advocate for fishermen and the environment.

5.    Plaintiff, Bat World Sanctuary, is a Texas 501c3 non-profit corporation that works to rescue and protect non-releasable bats. Founded in 1994, the organization has rescued thousands of bats from around the world. Bat World Sanctuary has been involved in countless conservation and rescue efforts over the last thirty years, including providing workshops to bat rehabilitators around the world and collaborating with other bat rescue organizations, North American Universities, the U.S. Center of Disease Control, Idaho Fish and Game, Louisiana Department of Wildlife and Fisheries, Texas Parks and Wildlife, and various state agencies throughout the United States.

6.    Plaintiff, Chris Brown, is a commercial fisherman in Rhode Island. Brown has been fishing for decades and is deeply interested in preserving the ocean and fisheries for future generations. In 2012, he became a founding member of the Seafood Harvesters of America, which focuses on accountability, stewardship, and sustainability in fishing practices, science, and management. Brown was also recognized at the White House with a "Champions of Change" sustainable seafood award in 2016. He was also a member of the Rhode Island Fishermen's Advisory Board. He resigned, along with the other board members, in protest of the Rhode Island Coastal Resource Management Commission's decision to approve the third offshore wind project (Revolution Wind, South Fork Wind, and Sunrise Wind) and find federal consistency without incorporating the recommendations of the Fishermen's Advisory Board.

7.    Plaintiff, Ralph Craft, is a recreational fisherman and owner of Crafty One Customs, a brick-and-mortar store in Portsmouth, Rhode Island, that builds and creates specialty and custom fishing rods and fishing equipment.

8.    Plaintiff, Murray Danforth, is a Rhode Island resident and a recreational sailor who sails within the Revolution Wind and South Fork lease areas. Murray Danforth is also a pilot and an owner of a small plane and he flies in and around the Revolution Wind and South Fork lease areas.

9.    Plaintiff, Rich Hittinger, is a commercial fisherman in Rhode Island. He serves as the Vice President of the Rhode Island Saltwater Anglers Association and served as a member of the Rhode Island Fishermen's Advisory Board until his resignation on August 28, 2023. He resigned, along with the other board members, in protest of the Rhode Island Coastal Resource Management Commission's decision to approve the third offshore wind project (Revolution Wind, South Fork Wind, and Sunrise Wind) and find federal consistency without incorporating the recommendations of the Fishermen's Advisory Board.

10.    Plaintiff, Lauren Knight, is a resident of Marion, Massachusetts and a recreational sailor who sails within the Revolution Wind and South Fork lease areas.

11.    Plaintiff, Elizabeth (Lisa) Quattrocki Knight, M.D., Ph.D., owns a home in Little Compton, Rhode Island. She is co-founder and President of Green Oceans, an Assistant Psychiatrist at McLean Hospital, and a Lecturer at Harvard Medical School. She is a conservationist and scientist and submitted comments to BOEM regarding Revolution Wind's Draft Environmental Impact Statement.

12.    Plaintiff, Gary Mataronas, is a commercial lobster fisherman who operates in Rhode Island. He is a member of the Little Compton Harbor Commission and the Little Compton Town Council. He was also a member of the Rhode Island Fishermen's Advisory Board. He resigned, along with the other board members, in protest of the Rhode Island Coastal Resource Management Commission's decision to approve the third offshore wind project (Revolution

Wind, South Fork Wind, and Sunrise Wind) and find federal consistency without incorporating the recommendations of the Fishermen's Advisory Board.

13.     Plaintiff, Eric Philippi, is a resident of Rhode Island and a conservationist and steward of the endangered piping plover, which is an endangered bird that will be impacted by the Revolution Wind and South Fork Projects.

14.     Plaintiff, Benjamin Riggs, is a Rhode Island resident and a former retired Naval Aviator with a background in aeronautical engineering. He also had a second career as CEO of several manufacturing companies and has taught and lectured on the global environment at a local Rhode Island University. As a resident of Newport, Rhode Island, Mr. Riggs sees the ocean on a daily basis. He is worried that his view of the ocean and the recreational activities he engages in that relate to the ocean will be significantly degraded by the Revolution Wind and South Fork Wind Projects. Mr. Riggs also flies and has flown planes in and around the South Fork Wind and Revolution Wind lease areas. He has spoken out against rapid construction of wind energy off the coast of Rhode Island and has commented to the state regarding several projects.

15.     Plaintiff, Alan Shinn, operates Miss Belmar Whale Watching and Fishing Trips, which is a New Jersey corporation. Alan Shinn has fished the waters off the New Jersey Coast his entire life and has been safely running boats as a captain since he was 19. Mr. Shinn has over 40 years of experience as a captain and fisherman fishing in the waters of the mid-Atlantic. Miss Belmar, the company Shinn operates, has four captains, one naturalist, and two ships. Miss Belmar charters whale watching trips, fishing trips, and cruises off the coast of New Jersey and the waters of the mid-Atlantic and New England. Miss Belmar is a member of Whale Sense, which is a voluntary recognition program offered to commercial whale-watching companies that

practice responsible ecotourism. As part of Whale Sense, Alan Shinn, the other captains, and

Miss Belmar follow a specific set of criteria to ensure that whales are protected. Alan Shinn is

heavily dependent and relies on the health of the ocean and the fish and marine mammals that

live within it to operate his business.

16.     Plaintiffs, Cornwall Lodge LLC, Ledges 66 LLC (Howard G. Cushing III), 226

Ocean Avenue Moonwatch LLC, Richard and Dee Gordon, Kathryn K. and Jerome R. Kirby, and

Mary Cushing Coleman, own properties within the Ocean Avenue Historic District in Newport,

Rhode Island, otherwise known as "Ocean Drive." Each plaintiff owns property in the landmark

district and each property is listed in Rhode Island's historic property register.

17.     Plaintiff, Charlotte DuHamel, owns the Mill property at 581 West Main Road in

Little Compton, Rhode Island. This property is eligible to be placed on the National Register.[17]

18.     Plaintiffs, Doug and Virginia Marzonie, Kristin and Andrew McKee, and Ben and

Leigh Carpenter, own properties within the Warren Point Historic District.

19.     Plaintiff, Veter et Nova Trust (Sandra Craig), owns a property within the

Stoneybrook Estate Historic District. This property is listed on the National Register of Historic

Places.

20.     Plaintiffs, Steven Gewirz and Katrina Hamilton Gewirz, own a property within

the Indian Avenue Historic District.

21.     Plaintiffs, Waves S, LLC, Alumni East Associates, EC Properties, Stephen

Lewinstein, Lisa Foley, Pieroni Family Revocable Trust (Michael and Paige), Karen Blanchard,

---

[17] State of Rhode Island Historic Property Search, *Search: 581 West Main Road*,
https://www.ri.gov/preservation/search/view.php?idnumber=LTCO00042 (last visited Jan. 11,
2024).

and the Panagakis Family Trust (Randy Panagakis), own property within the Bellevue Avenue Historic Landmark District.

22.     Defendant, the United States of America, is a republic whose powers are defined and limited by the Constitution and statutes of the United States. The United States acts through its various departments, agencies, instrumentalities, and officials.

23.     Defendant, the United States Department of the Interior, is an agency of the federal Government that plays a central role in how the United States stewards its public lands and waters, increases environmental protections, and pursues environmental justice. The agency's mission is to protect and manage the Nation's natural resources and provide scientific and other information about those resources. The Department of the Interior prioritizes investing in climate research and environmental innovation to incentivize the rapid deployment of clean energy solutions while reviewing existing programs to restore balance on America's public lands and waters to benefit current and future generations. The Department of the Interior is authorized to grant a lease, easement, or right-of-way on the Outer Continental Shelf for activities that produce or support the production of energy from oil, gas, and other sources.[18]

24.     Defendant, Deb Haaland, is the Secretary of the United States Department of the Interior and is responsible for overseeing the Nation's Outer Continental Shelf lands and oceans, including those selected for offshore wind projects. Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Secretary Haaland is sued in her official capacity as Secretary of the Interior.

25.     Defendant, Bureau of Ocean Energy Management ("BOEM"), is a federal agency within the Department of Interior established in 2010 to oversee the energy development of the

---

[18] 16 U.S.C. § 1337(p)(1)(C).

Outer Continental Shelf. BOEM's mission "is to manage the development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."[19] BOEM evaluates the resources of the Outer Continental Shelf and leases portions of it. BOEM also supervises and approves any oil, gas, or renewable energy projects conducted within Outer Continental Shelf leases.

26.     Defendant, Liz Klein, is the Director of BOEM. She issued the final agency decisions challenged here—the approvals of South Fork Wind's Construction and Operations Plan and Revolution Wind's Construction and Operations Plan. Director Klein is sued in her official capacity as Director of the Bureau of Ocean Energy Management.

27.     Defendant, the National Marine Fisheries Service, is a federal agency founded in 1871 and placed within the National Oceanic and Atmospheric Administration (NOAA) in 1970. The Service oversees national marine resources, conserves fish species, and manages fisheries, promoting sustainability and preventing overfishing, species decline, and habitat destruction. The Service also implements and enforces the Endangered Species Act with regard to marine organisms and authorizes the incidental take and harassment of listed species, and also administers the Marine Mammal Protection Act and authorizes the incidental harassment of whales and other marine mammals.

28.     Defendant, Janet Coit, is the Administrator of the National Marine Fisheries Service. She is ultimately responsible for the Biological Opinion, Incidental Take Statement, Letter of Authorization, and Incidental Harassment Authorization challenged here. Administrator Coit is sued in her official capacity as Director of the Service.

---

[19] U.S. Department of the Interior: Bureau of Ocean Energy Management, *About Us* https://www.boem.gov-about-boem (last visited Aug. 16, 2023).

29.     Defendant, United States Army Corps of Engineers (the "Corps"), is a division of the United States Department of the Army. The Corps' mission is to serve as combat engineers, oversee military construction, and construct civil works like canals and dams. Under the Clean Water Act, the Corps is charged with issuing permits to discharge and dredge fill material into the waters of the United States, including the Outer Continental Shelf.

30.     Defendant, Lieutenant General Scott A. Spellmon, is the Chief of Engineers and Commanding General of the United States Army Corps of Engineers. He oversees the Army Corps of Engineers and is responsible for all aspects of the Corps' Civil Works program, including programs for conservation and development of the Nation's water and wetland resources, flood control, navigation, and aquatic ecosystem restoration, and permitting decisions.

**Jurisdiction and Venue**

31.     The United States has waived its sovereign immunity, and this Court has jurisdiction of this case under the Administrative Procedure Act,[20] National Environmental Policy Act,[21] Endangered Species Act,[22] Marine Mammal Protection Act,[23] Migratory Bird Treaty Act,[24] National Historic Preservation Act,[25] Outer Continental Shelf Lands Act,[26] and Clean Water Act.[27]

32.     The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. § 702 (Administrative Procedure Act or "APA").

---

[20] 5 U.S.C. §§ 701-706.
[21] 42 U.S.C. §§ 4321-4370h.
[22] 16 U.S.C. §§ 1540(g)(1)(A), (B).
[23] 16 U.S.C. § 1371.
[24] 16 U.S.C. § 703.
[25] 54 U.S.C. §§ 300101-307101.
[26] 43 U.S.C. § 1349(a)(2)(A).
[27] 33 U.S.C. § 1365(b).

33.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(2) because all of the Federal Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

34.     Plaintiffs have exhausted all administrative remedies, the agency actions challenged in this suit are final and ripe for review, and Plaintiffs have standing because they are injured in fact by the federal Defendants' actions or omissions, and this court has the power to redress those injuries.

35.     An actual, justiciable case or controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201 because Defendants' approval of Revolution Wind's Construction and Operations Plan, the issuance of the Incidental Harassment Authorization and incidental take permits, approval of the Final Environmental Impact Statement for the Project, and grant of an easement are final agency actions under the Administrative Procedure Act.

36.     An actual, justiciable case or controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201 because Defendants' approval of South Fork Wind's Construction and Operations Plan, the issuance of the Incidental Harassment Authorization and incidental take permits, approval of the Final Environmental Impact Statement for the Project, and grant of an easement are final agency actions under the Administrative Procedure Act.

Statement of Facts

37.     Rhode Island's coast consists of more than one hundred square miles of estuarine and marine shoreline waters.[28] These waters are home to several transition zones from freshwater to salt water, which are "highly productive ecosystems that provide nursery habitat for important commercial and recreational fisheries."[29] The health of these estuaries and coastal waters is vital because "[m]ore than 70% of Rhode Island's recreationally and commercially important finfish species depend on estuaries for a portion of their life cycle."[30] Narragansett Bay, which lies in the center of Rhode Island, is an estuary that covers 147 square miles and is a "vital natural resource [that] supports a diversity of recreational activities and is integral to [Rhode Island's] economy including commercial fisheries, tourism, transportation, and industry."[31]

38.     Rhode Island's economy is heavily dependent on the Ocean. A 2020 report funded by the University of Rhode Island and incorporated into several reports by NOAA[32] found that $2.8 billion of Rhode Island's GDP and 45,494 jobs relate to the ocean: $128.9 million came from commercial fishing, aquaculture, fish hatcheries, and seafood markets; $22.4 million came from beach nourishment and harbor dredging; $304.6 million came from deep sea freight, marine passenger transportation, pipeline transportation, search and navigation equipment, and warehousing; $40.6 million came from oil and gas exploration and sand and gravel mining; $591

---

[28] Department of Environmental Protection, *Bay and Coastal Waters*, https://dem.ri.gov/environmental-protection-bureau/water-resources/waters-wetlands/bay-and-coastalwaters#:~:text=Rhode%20Island's%20coastal%20waters%20consist,important%20commercial%20and%20recreational%20fisheries. (last visited November 29, 2023).
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] National Oceanic and Atmospheric Administration, *Valuing Rhode Island's Blue Economy*, https://coast.noaa.gov/digitalcoast/stories/blue-economy.html (last visited Nov. 29, 2023).

million came from ship and boat building and repair; and $1.7 billion came from tourism and recreation.[33]

39.     Rhode Island has a long-standing history of commercial and recreational fishing that spans hundreds of years.[34] Commercial fishing is a massive industry in Rhode Island, and in 2021 and 2022, commercial fishing generated $103.3 million and $100.6 million, respectively.[35] With 22 active fishing ports, Rhode Island is home to some of the highest-producing and highest-value ports on the East Coast[36] and a significant portion of the landings and harvesting come into Rhode Island from federal waters.[37] Commercial fisheries harvest dozens of species each year, including longfin squid, shortfin squid, Atlantic sea scallop, American lobster, quahog, scup, summer flounder, black sea bass, whelk, silver hake, Atlantic herring, little skate, winter skate, and Atlantic mackerel.[38] Commercial fishing vessels in Rhode Island are diverse and include trawl, rod/reel, pot, gill net, fix net, dredge, and other gear types. These commercial vessels annually take around 30,000 trips into Rhode Island and federal waters from Rhode Island ports.[39]

40.     Recreational and for-hire fishing are also extremely popular in Rhode Island, with the state issuing over 35,000 licenses in 2022.[40] In 2022 alone, 2,732,516 recreational fishing

---

[33] McCann, et. al., *The Value of Rhode Island's Blue Economy* at I-5, https://web.uri.edu/wp-content/uploads/sites/916/ri-blue-economy-report-2020.pdf.
[34] Rhode Island Department of Environmental Management Division of Marine Fisheries, *Rhode Island Annual Fisheries Report 2022* at 5, https://dem.ecms.ri.gov/sites/g/files/xkgbur861/files/2023-07/AnnualRpt_2022.pdf.
[35] *See id.* at 3; *see also* Rhode Island Department of Environmental Management Division of Marine Fisheries, *Rhode Island Annual Fisheries Report 2021* (May 2022) at 2, https://dem.ri.gov/sites/g/files/xkgbur861/files/2022-08/AnnualRpt_2021.pdf.
[36] *Id.* (citing NOAA 2022 Report).
[37] *Id.*
[38] *Id.*
[39] *Id.* at 30.
[40] *Id.* at 45.

trips were taken into Rhode Island and federal waters from Rhode Island ports. These trips consisted of trips from the shore, party boats, charter boats, and private/rental boats. Recreational fishermen caught millions of fish in 2022, and the top species of interest were scup, black sea bass, tautog, striped bass, fluke, bluefish, cod, and winter flounder.

41.     The coastal waters of Rhode Island are home to critical marine habitats. One such habitat, Cox Ledge, is off the coast of Rhode Island, where the South Fork Wind and Revolution Wind Projects are sited. Cox Ledge is an area with extensive "complex benthic habitat that supports several commercially and recreationally important species."[41] It is primarily known for the "spawning activity for Atlantic cod, [which is] a species of biological, ecological, economic, and cultural significance to this region."[42] This spawning cod stock is reproductively isolated from the rest of New England's cod stock. Other than cod, Cox Ledge is home to finfish, shellfish, crustaceans, marine mammals, sea turtles, and birds.[43] Recognizing its importance, the Rhode Island Coastal Management Council identified Cox Ledge as "having the highest ecological value of anywhere in the 1,467 square mile study area."[44]

42.     The National Oceanic and Atmospheric Administration has acknowledged Cox Ledge's importance as a valuable habitat for marine fauna and essential fish habitat.[45] It has been recognized that the area is essential for all life stages of Atlantic cod.[46] The New England Fishery

---

[41] Revolution Wind Final Environmental Impact Statement *supra* note 4 at 3.13-75; *see also id.* at 3.13-61 ("Cox Ledge, is known to support cod spawning aggregations.").
[42] *Id.* at Appendix L-164, Comment BOEM-2022-0045-0100 (National Marine Fisheries Service Comment).
[43] Rhode Island Coastal Resources Management Council, *Coastal Effects for South Fork Wind*, http://www.crmc.ri.gov/meetings/2021_0525semipacket/2021_0525_CoastalEffectsAnalysis_SFW.pdf.
[44] *Id.* at 4.
[45] *Id.* at 10.
[46] *Id.* at 27.

Management Council has designated Cox Ledge as a habitat management area to help protect the high-value cod habitat in the area. And recently, the National Marine Fisheries Service and the National Oceanic Atmospheric Administration recognized the importance of Cox Ledge for cod spawning habitats and complex habitats in their proposed rule to designate Cox Ledge as a Habitat Area of Particular Concern.[47] Habitat Areas of Particular Concern

> highlight specific types or areas of habitat within EFH that may be particularly vulnerable to human impacts. HAPC designations should be based on one or more of the following criteria: (1) The importance of the ecological function provided by the habitat, including both the historical and current ecological function; (2) the extent to which the habitat is sensitive to human-induced environmental degradation; (3) whether, and to what extent, development activities are, or will be, stressing the habitat type; and (4) the rarity of the habitat type.[48]

43.     The waters offshore Rhode Island also provide habitat for many species listed under the Endangered Species Act, including the blue, fin, sei, sperm, or North Atlantic right whales or the Northwest Atlantic DPS of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley or leatherback sea turtles, shortnose sturgeon, any of the five DPSs of Atlantic sturgeon, corals, the Gulf of Maine DPS of Atlantic salmon, Gulf sturgeon, Nassau Grouper, the Northeast Atlantic DPS of loggerhead sea turtles, Oceanic whitetip shark, and smalltooth sawfish. It is also home to critical habitat designated for the North Atlantic right whale and the Northwest Atlantic DPS of loggerhead sea turtles.

44.     Rhode Island is also home to numerous federal and state recognized historic property districts and landmarks. Newport, Rhode Island is home to more than a dozen National Historic Landmarks and Districts, including the Bellevue Avenue Historic District and the Ocean

---

[47] *Fisheries of the Northeastern United States Framework Adjustments to Northeast Multispecies, Atlantic Sea Scallop, Monkfish, Northeast Skate Complex, and Atlantic Herring Fisheries; Southern New England Habitat Area of Particular Concern Designation*, 88 Fed. R. 65944 (Sept. 26, 2023).
[48] *Id.*

Avenue Historic District. The Ocean Avenue Historic District is a National Landmark and is one of the most iconic Historic Districts in the Country. The Bellevue Avenue Historic District is located along Bellevue Avenue in Newport, Rhode Island, and includes several historic gilded-age mansions.

45.     Little Compton, Rhode Island is home to seven properties on the National Register of Historic Places and several properties eligible for listing on the National Register. It is also home to the Warren Point Historic District, which is recognized by the State of Rhode Island.

46.     Middletown, Rhode Island is home to the Indian Avenue Historic District and the Stoneybrook Historic District.

**Federal Offshore Wind Program**

47.     Congress enacted the Outer Continental Shelf Lands Act (OCSLA) in 1953, authorizing the Secretary of the Interior to oversee mineral exploration and development on the Outer Continental Shelf by granting oil and gas leases through a competitive bid process managed by the Department of Interior.[49] The Act "establishe[d] a procedural framework under which Interior may lease areas of the [Outer Continental Shelf] for purposes of exploring and developing the oil and gas deposits of the [Outer Continental Shelf submerged lands."[50]

48.     In 2005, Congress amended OCSLA, placing regulatory authority for renewable energy projects in the Minerals Management Service, an agency within the Department of Interior, and authorizing the Minerals Management Service to grant leases for offshore renewable energy projects.[51] That amendment declared the policy underlying OCSLA:

---

[49] 43 U.S.C. §§ 1331-1356.
[50] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).
[51] *See* § 1337(p)(1)(C); 76 Fed. Reg. 64,432, 64,434, 64,459 (Oct. 18, 2011).

It is hereby declared to be the policy of the United States that . . . this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected; . . . the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs; . . . since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments. . . .[52]

49.     In 2011, the Minerals Management Service (BOEM's predecessor agency) revised its offshore wind energy leasing regulations to implement the Government's new "Smart from the Start" policy. This policy was designed to "speed offshore wind energy development off the Atlantic Coast"[53] after the failed Cape Wind Project. These revisions streamlined the review and approval of leases, allowing BOEM's predecessor to bypass the multiple public comment periods that existed before 2011. Before the revisions to the regulations, the issuance of a lease and approval of development had four phases: (1) planning and analysis, (2) lease issuance, (3) site Assessment Plan approval, and (4) Construction and Operation Plan approval. The 2011 revisions merged the first three steps into one, leaving only one opportunity for public comment and removing any pre-bid opportunities for public comment on lease locations, on-site evaluations of environmental impacts, or reasonable uses before lease issuance. These new regulations allowed for most of the details of these projects—lease location, size, distance from land—to be determined before the release of the project information and before any notice and

---

[52] 43 U.S.C. § 1332.
[53] U.S. Dept. of Interior, Press Release: *Salazar Launches 'Smart from the Start Initiative to Speed Offshore Wind Energy Development off the Atlantic Coast* (Nov. 23, 2020), https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.

comment, depriving citizens of the opportunity to participate in the planning of projects that have significant impacts on their lives and livelihoods, the economy, and the ecology of the Atlantic coast of the United States.

50.     On August 18, 2011, the Minerals Management Service published a "Call for commercial leasing for wind power on the OCS [outer continental shelf] Offshore Rhode Island and Massachusetts."[54] During the comment period, the Minerals Management Service received eight indications of interest from companies interested in participating in an offshore wind project.[55]

51.     On October 1, 2011, the Department of Interior created the Bureau of Ocean Energy Management ("BOEM") to take the place of the Minerals Management Service and transferred all regulatory authority of the Minerals Management Service to BOEM. BOEM became "responsible for managing development of the nation's offshore resources in an environmentally and economically responsible way."[56] BOEM also became responsible for leasing, plan administration, environmental studies, NEPA analysis, resource evaluation, economic analysis, and the renewable energy program.[57]

52.     In March 2021, the Government announced its goal of deploying 30 gigawatts of offshore wind energy projects by 2030 and announced it was taking "coordinated steps to support rapid offshore wind deployment."[58]

---

[54] 76 Fed. Reg. 51,383
[55] *See* Revolution Wind Record of Decision *supra* note 3 at 2.
[56] Bureau of Ocean Energy Management, *Reorganization of the Former MMS*, https://www.boem.gov/about-boem/reorganization/reorganization-former-mms (last visited Sept. 18, 2023).
[57] *Id.*
[58] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (March 29, 2021), https://www.whitehouse.gov/briefing-

**The Revolution Wind Project**

53.     In February 2012, BOEM announced the creation of the Rhode Island/Massachusetts Wind Energy Area, which consisted of 164,750 acres. Later that year, in August 2012, BOEM met with the Rhode Island and Massachusetts Task Force to discuss leases in the Wind Energy Area. On December 3, 2012, BOEM published a Proposed Sale Notice requesting public comment on the proposed sale of several lease areas.[59]

54.     On June 5, 2013, BOEM published a final sale notice to auction two leases in the Rhode Island/Massachusetts Wind Energy Area for commercial wind energy development.[60] On July 31, 2013, BOEM auctioned the two leases, announcing Deepwater Wind New England LLC as the winner of both. The lease area consisted of 97,498 acres off Rhode Island.

55.     Deepwater Wind New England LLC filed a site assessment plan for the lease area in April 2016 and revised it several times during that year. In October of 2017, BOEM approved the site assessment plan for the lease area.

56.     On January 10, 2020, BOEM received a request to segregate the lease area to accommodate both the Revolution Wind Project and the South Fork Wind Farm, which BOEM approved in March 2020. Following the segregation, 83,798 acres were allocated to the Revolution Wind Project.

57.      Revolution Wind submitted its Construction and Operations Plan in March 2020 and revised it several times throughout 2021. Revolution Wind updated this Construction and Operations Plan in 2022 and 2023.

---

room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.
[59] 77 Fed. Reg. 71,612.
[60] 78 Fed. Reg. 33,898.

58.     On April 29, 2021, BOEM published a Notice of Intent to prepare an Environmental Impact Statement for Revolution Wind's proposed facility.[61] BOEM corrected the notice in June because the original notice misstated the energy capacity of the wind farm and its distance from the shore.[62]

59.     BOEM published the Revolution Wind Project Draft Environmental Impact Statement for public review and comment on September 2, 2022.[63]

60.     In May 2023, the U.S. Fish and Wildlife Service issued a letter of concurrence and a Biological Opinion for the Revolution Wind Project, as required by the Endangered Species Act. On July 21, 2023, the National Marine Fisheries Service issued a Biological Opinion following a Section 7 Consultation considering all effects of the Revolution Wind Project on Endangered Species Act listed species and critical designated habitat.[64] The National Marine Fisheries Service concluded that the Project would not jeopardize any Endangered Species Act-listed species.

61.     On July 21, 2023, BOEM published its Notice of Availability of a Final Environmental Impact Statement for the Revolution Wind Project and released the Final Environmental Impact Statement. On August 15, 2023, BOEM published an errata sheet that included several edits to the summary of impacts in the alternative's tables and to species specific impact determinations for the North Atlantic Right Whale, as requested by the National Oceanic and Atmospheric Administration.

---

[61] 86 Fed. Reg. 22,972.
[62] Revolution Wind Record of Decision *supra* note 3 at 3.
[63] 87 Fed. Reg. 54,248.
[64] 88 Fed. Reg. 41,171.

62.     BOEM then issued its Record of Decision approving the Revolution Wind Project on August 21, 2023. The U.S. Army Corps of Engineers and the National Marine Fisheries Service joined in that opinion, approving Revolution Wind's Clean Water Act Permits and an Incidental Harassment Authorization.[65]

63.     Following the approval of the Record of Decision, BOEM published a letter approving Revolution Wind's Construction and Operations Plan and the Conditions of Approval for the Project on November 17, 2023.[66]

**The South Fork Wind Project**

64.     On January 16, 2020, BOEM received a request from Deepwater Wind New England, LLC to assign a portion of OCS-A 0486 to Deepwater South Fork, LLC. On March 24, 2020, BOEM granted Deepwater South Fork, LLC Lease Area OCS-A 0517, which comprises 13,700 acres.

65.     South Fork Wind submitted its Construction and Operations Plan in June 2018. South Fork Wind updated this Construction and Operations Plan in 2019, 2020, and 2021.

66.     On October 19, 2018, BOEM published a Notice of Intent to prepare an Environmental Impact Statement for South Fork Wind's proposed facility.[67]

67.     BOEM published the South Fork Wind Project Draft Environmental Impact Statement for public review and comment on January 8, 2021.[68]

---

[65] Revolution Wind Record of Decision *supra* note 3; *see also Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind Farm Project Offshore Rhode Island*, 88 Fed. Reg. 72562 (October 20, 2022).
[66] Bureau of Ocean Energy Management, *Revolution Wind COP Approval Letter* (Nov. 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/COP%20Appv%20Ltr_REV%20OCS-A%200486.pdf.
[67] 83 Fed. Reg. 53,104.
[68] 86 Fed. Reg. 1520.

68.     On October 1, 2021, the National Marine Fisheries Service issued a Biological Opinion following a Section 7 Consultation considering all effects of the South Fork Wind Project on Endangered Species Act listed species and critical designated habitat. The National Marine Fisheries Service concluded that the Project would not jeopardize any Endangered Species Act-listed species. In November 2021, NMFS made several minor corrections to the Biological Opinion after conferring with BOEM.

69.     On August 20, 2021, BOEM published its Notice of Availability of a Final Environmental Impact Statement for the South Fork Wind Project and released the Final Environmental Impact Statement.[69]

70.     BOEM then issued its Record of Decision approving the South Fork Wind Project on November 24, 2021. The U.S. Army Corps of Engineers and the National Marine Fisheries Service joined in that opinion, approving South Fork Wind's Clean Water Act Permits and an Incidental Harassment Authorization.[70]

71.     Following the approval of the Record of Decision, BOEM published a letter approving South Fork Wind's Construction and Operations Plan and the Conditions of Approval for the Project on January 18, 2022.[71]

**First Cause of Action**
**Violation of the Administrative Procedure Act**

72.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

---

[69] 86 Fed. Reg. 46,879.
[70] South Fork Record of Decision *supra* note 1.
[71] Bureau of Ocean Energy Management, *South Fork Wind COP Approval Letter* (January 18, 2022), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SFWF-COP-Approval-Letter.pdf.

73.     The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[72] The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[73]

74.     An agency's action is arbitrary and capricious within the meaning of the Administrative Procedure Act if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[74]

75.     BOEM's January 18, 2022, approval of the South Fork Construction and Operations plan is arbitrary, capricious, and not in accordance with law for all the reasons stated in this Complaint, including violations of the National Environmental Policy Act,[75] Endangered Species Act,[76] Marine Mammal Protection Act,[77] Migratory Bird Treaty Act,[78] Outer Continental Shelf Lands Act,[79] Clean Water Act,[80] and the National Historic Preservation Act.

---

[72] 5 U.S.C. § 702.
[73] 5 U.S.C. § 706.
[74] *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983).
[75] 42 U.S.C. §§ 4321-4370h.
[76] 16 U.S.C. §§ 1531-1544.
[77] 16 U.S.C. §§ 1361-1423(h).
[78] 16 U.S.C. § 703.
[79] Plaintiffs have sent a 60-day notice of their intent to sue under OCSLA and the Clean Water Act and will amend this Complaint to add the OCSLA and CWA causes of action when the 60 days expire.
[80] 33 U.S.C. § 1365(b).

76.     The National Marine Fisheries Service's decision to publish its Incidental Harassment Authorization for the South Fork Wind Project on January 6, 2022, was arbitrary, capricious, and not in accordance with the law, as more fully detailed in Plaintiffs' Third and Fourth Causes of Action.

77.     BOEM's November 17, 2023 approval of the Revolution Wind Construction and Operations Plan is arbitrary, capricious, and not in accordance with law for all the reasons stated in this Complaint, including violations of the National Environmental Policy Act,[81] Endangered Species Act,[82] Marine Mammal Protection Act,[83] Migratory Bird Treaty Act,[84] Outer Continental Shelf Lands Act,[85] Clean Water Act,[86] and the National Historic Preservation Act.

78.     The National Marine Fisheries Service's decision to publish its final Incidental Take Regulations and issue a Letter of Authorization for the Revolution Wind Project on August 21, 2023, and its subsequent publication of the Letter of Authorization and Incidental Take Regulations on October 20, 2023, were arbitrary, capricious, and not in accordance with the law, as more fully described in Plaintiffs' Third and Fourth Causes of Action.

79.     This Court should therefore reverse and set aside these approvals and permits and remand this matter to the agencies for further consideration in accordance with the relevant statutes and the Administrative Procedure Act.

---

[81] 42 U.S.C. §§ 4321-4370h.
[82] 16 U.S.C. §§ 1531-1544.
[83] 16 U.S.C. §§ 1361-1423(h).
[84] 16 U.S.C. § 703.
[85] Plaintiffs have sent a 60-day notice of their intent to sue under OCSLA and the Clean Water Act and will amend this Complaint to add the OCSLA and CWA causes of action when the 60 days expire.
[86] 33 U.S.C. § 1365(b).

**Second Cause of Action**
**Violation of the National Environmental Policy Act**
**and the Administrative Procedure Act**

80.     NEPA serves as our "basic national charter for the protection of the

environment"[87] and requires "the federal government to identify and assess in advance the likely

environmental impact of its proposed actions, including its authorization or permitting of private

actions" like the South Fork Wind and Revolution Wind Projects.[88] NEPA achieves its purpose

by "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental

consequences" of their proposed actions.[89] NEPA's "hard look" requires federal agencies to

analyze and consider "any adverse environmental effects which cannot be avoided."[90] To comply

with NEPA, agencies must consider "[b]oth short- and long-term effects . . . [b]oth beneficial and

adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate

Federal . . . law protecting the environment."[91]

81.     Under NEPA, agencies must "identify and develop methods and procedures . . .

which will ensure that presently unquantified environmental amenities and values may be given

appropriate consideration in decision-making along with economic and technical

considerations."[92] Specifically, NEPA requires federal agencies to prepare a "detailed statement

[for all major agency actions] significantly affecting the quality of the human environment,"[93]

known as an Environmental Impact Statement.

[87] 40 C.F.R. § 1500.1(a).
[88] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015).
[89] *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 350 (1989).
[90] 42 U.S.C. § 4332(C)(ii).
[91] 42 U.S.C. § 4332(C)(ii).
[92] 42 U.S.C. § 4332(B).
[93] 42 U.S.C. § 4332(C).

82.     The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects.[94] NEPA

> ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.[95]

83.     The August 20, 2021, Final Environmental Impact Statement prepared by BOEM and NMFS for the South Fork Wind Project was incomplete, inaccurate, and failed to comply with multiple requirements of NEPA. And because those agencies failed to comply with NEPA by failing to take a hard look at the environmental impacts of the South Fork Wind Project, their January 18, 2022 final agency actions approving the Project's Construction and Operations Plan, Letter of Authorization, and Clean Water Act permits were arbitrary, capricious, and not in accordance with law—and should be set aside.

84.     The July 21, 2023, Final Environmental Impact Statement prepared by BOEM and NMFS for the Revolution Wind Project was incomplete, inaccurate, and failed to comply with multiple requirements of NEPA. And because those agencies failed to comply with NEPA by failing to take a hard look at the environmental impacts of the Revolution Wind Project, their November 17, 2023, final agency actions approving the Project's Construction and Operations Plan, Letter of Authorization, and Clean Water Act permits were arbitrary, capricious, and not in accordance with law—and should be set aside.

---

[94] *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97 (1983); *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 143 (1981).
[95] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

**BOEM Violated NEPA By Failing to Provide Complete Analyses and Disclose the Impacts of the Projects**

85.     NEPA requires a detailed statement analyzing a major federal action's impacts on the environment. BOEM created such a statement for Revolution Wind and South Fork Wind, but those statements are missing crucial pieces of analysis and information. BOEM even identified the information that is missing from its analysis. The following are instances where BOEM failed to fully analyze the impacts of the Revolution Wind Project:

- **Benthic Habitat and Invertebrates**
  - BOEM notes that "the available information on invertebrate sensitivity to electromagnetic fields (EMFs) is equivocal (Hutchinson et al. 2020), and sensitivity to sound pressure and particle motion effects is not well understood for all species (e.g., squid sensitivity to vibration effects transmitted through sediments)."[96]

  - There is also "broader uncertainty about the long-term effects of changes in biological productivity resulting from the creation of new habitat types on the mid-Atlantic Outer Continental Shelf (OCS) in the form of a distributed network of artificial reefs."[97]

  - "The nature and significance of secondary synergistic effects, such as changes in diet and predator-prey interactions resulting from habitat modification in combination with other IPFs, are not fully known."[98]

  - Additionally, "the nature, extent, and significance of potential spillover effects on broader ecosystem functions, such as larval dispersal, are not fully understood (van Berkel et al. 2020)."[99]

- **Birds**
  - "Bird mortality data are available for onshore wind facilities, and based on a number of assumptions (described in Section 3.7 of the EIS) regarding their applicability to offshore environments, these data were used to inform the analysis of bird mortality associated with the offshore WTGs analyzed in the EIS.

---

[96] *Id.* at C-2.
[97] *Id.* at C-3.
[98] *Id.* at C-3.
[99] *Id.* at C-3.

However, uncertainties exist regarding the use of the onshore bird mortality rate to estimate offshore bird mortality rate because of differences in species groups present, the life history and behavior of species, and the differences in the offshore marine environment compared to onshore habitats."[100]

- **Commercial Fisheries and For-Hire Recreational Fishing**
  - "Fisheries are managed in the context of an incomplete understanding of fish stock dynamics and effects of environmental factors on fish populations."[101]

- **Finfish and Essential Fish Habitat**
  - Broad "uncertainty remains about the long-term effects of changes in biological productivity resulting from the creation of new habitat types along the Atlantic OCS in the form of a distributed network of artificial reefs."[102]

  - There is also "uncertainty regarding the spatial and temporal occurrence of finfish and essential fish habitat (EFH) throughout the entire finfish and EFH geographic analysis area. This is especially true for Atlantic cod (Gadus morhua) use of the Coxes Ledge area, which is part of an ongoing study funded by BOEM examining the movements of commercial fish species in southern New England (National Oceanic and Atmospheric Administration [NOAA] 2020a)."[103]
  - Additional uncertainty exists regarding "behavioral effects from each IPF individually and cumulatively (e.g., operational noise effects on Atlantic cod communication during spawning)."[104]

- **Marine Mammals**
  - There is "some uncertainty regarding the temporal distribution of marine mammals and periods during which they might be especially vulnerable to Project disturbance[.]"[105]

  - There is also "some uncertainty regarding the impacts on marine mammals from EMF produced by submarine cables."[106] Namely, "no scientific studies have been conducted to examine the effects of altered EMF on marine mammals."[107]

---

[100] *Id.* at C-3 and C-4.
[101] *Id.* at C-4.
[102] *Id.* at C-6.
[103] *Id.* at C-6.
[104] *Id.* at C-6.
[105] *Id.* at C-7.
[106] *Id.*
[107] *Id.* at C-8.

- "Some uncertainty also exists regarding the cumulative acoustic impacts associated with pile-driving activities."[108] "At this time, it is unclear if marine mammals would cease feeding and when individuals would resume normal feeding, migrating, breeding, etc., behaviors once daily pile-driving activities cease, or if secondary indirect impacts would persist."[109] For the North Atlantic right whale in particular, relies "on specialized feeding strategies that appear to be sensitive to disruption (van der Hoop et al. 2019). These findings suggest that short-term behavioral disturbance could contribute to energy deficits that ultimately lead to reduced fitness (Fortune et al. 2013; van der Hoop et al. 2019)."[110]

- There is also uncertainty regarding "certain potential impacts on marine mammals resulting from the long-term presence of offshore wind structures in the environment."[111] Likewise, there is "broader uncertainty about how large whales will respond to the presence of extensive networks of novel offshore wind structures on the Atlantic OCS."[112]

- "BOEM determined that the overall costs of obtaining the missing information for or addressing uncertainty of the above topics for marine mammals are exorbitant or that the means to obtain it are not known."[113]

- **Navigation and Vessel Traffic**
  - "The five Rhode Island and Massachusetts offshore wind leaseholders, including [South Fork and] Revolution Wind, have proposed a collaborative regional layout for wind turbines (1 × 1 nm apart in fixed east–west rows and north–south columns, with 0.7-nm theoretical transit lanes oriented northwest– southeast) across their respective BOEM leases (Geijerstam et al. 2019), which meets the layout rules set forth in the MARIPARS report recommendations. Although the USCG attached to the MARIPARS Federal Register docket the Responsible Offshore Development Alliance proposal (Hawkins 2020), which recommends additional transit corridors through the Lease Areas, the MARIPARS report concludes that if the layout in the recommendations was implemented, the USCG would likely not pursue additional formal or informal routing measures."[114]

---

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.* at C-9.

[113] *Id.* at C-9.

[114] *Id.* at C-10.

- **Recreation and Tourism**
  - "There is a lack of quantitative data related to recreational not-for-hire fishing in the recreation and tourism geographic analysis area; therefore, quantitative analysis for this resource is not possible at this time."[115]
- **Sea Turtles**
  - "Some uncertainty exists about the effects of certain IPFs on sea turtles and their habitats. For example, sea turtle sensitivity to potential EMF effects from the Project is not fully understood. Sea turtles are known to use the earth's magnetic field to orient in space and navigate between habitats (Irwin and Lohmann 2005; Courtillot et al. 1997)."[116]

  - "More broadly, considerable uncertainty remains about how sea turtles would interact with long-term changes in biological productivity and community structure resulting from the development of an extensive network of artificial reefs across the geographic analysis area."[117]

86.     The following are instances where BOEM failed to fully analyze the impacts of

the South Fork Wind Project:

- **Benthic Habitat, Essential Fish Habitat, Invertebrates, and Finfish**
  - BOEM states that "there is some uncertainty regarding the temporal distribution of benthic resources and periods during which they might be especially vulnerable to disturbance[.]"[118]

  - "Some uncertainty also exists about the effects of some impact-producing factors (IPFs) on benthic resources."[119]

  - "For example, the available information on invertebrate sensitivity to electromagnetic fields (EMFs) is equivocal (Hutchinson et al. 2020), and sensitivity to sound pressure and particle motion effects is not well understood for all species (e.g., low-level acoustic effects on Atlantic cod communication)."[120]

  - "There is broader uncertainty about the long-term effects of changes in biological productivity resulting from the creation of new habitat types on the mid-Atlantic OCS in the form of a distributed network of artificial reefs."[121]

---

[115] *Id*. at C-10.
[116] *Id*. at C-11.
[117] *Id.* at C-12.
[118] South Fork Final Environmental Impact Statement *supra* note 2 at J-2.
[119] *Id.*
[120] *Id.*
[121] *Id.*

- "The nature and significance of secondary synergistic effects, such as changes in diet and predator-prey interactions resulting from habitat modification in combination with other IPFs, are not fully known."[122]

- "[T]he nature, extent, and significance of potential spillover effects on broader ecosystem functions, such as larval dispersal, are not fully understood."[123]

- "There is uncertainty regarding the spatial and temporal occurrence of finfish, invertebrates, and essential fish habitat throughout the entire analysis area. This is especially true for Atlantic cod use of the Cox Ledge area, which is part of an ongoing study funded by BOEM examining the movements of commercial fish species in southern New England[]."[124]

- "There is also uncertainty regarding behavioral effects from each IPF individually and cumulatively."[125]

- **Marine Mammals**
  - "There is still some uncertainty regarding the impacts on marine mammals from EMF produced by submarine cables. This uncertainty is due in part to difficulties in evaluating population-scale impacts around these deployments (Taormina et al. 2018), and the large size and high mobility of marine mammals, in addition to other logistical constraints, make experimental studies infeasible. As a result, no scientific studies have been conducted examining the effects of altered EMF on marine mammals."[126]

  - "Some uncertainty also exists regarding the cumulative acoustic impacts associated with pile-driving activities."[127]

  - "Under the cumulative impact scenario, individual whales may be exposed to acoustic impacts from multiple projects in 1 day or to acoustic impacts from one or more projects over the course of multiple days. The consequences of these exposure scenarios have been analyzed with the best available information, but a lack of real world observations on species' responses to pile driving result in

---

[122] *Id.*
[123] *Id.*
[124] *Id.* at J-3.
[125] *Id.*
[126] *Id.* at J-4.
[127] *Id.*

uncertainty. Additionally, it is currently unclear how sequential years of construction of multiple projects would impact marine mammals."[128]

- "There is also uncertainty about certain potential impacts on marine mammals resulting from the long-term presence of offshore wind structures in the environment. For example, operational wind turbine generators will generate low-frequency underwater noise that may exceed the established minimum threshold for potential behavioral and auditory masking impacts within a short distance (e.g., approximately 120 feet) from each foundation under some circumstances."[129]

- "The implications of long-term operational noise impacts and structure presence on marine mammal behavior, particularly the behavior of large whale species, are unclear. These potential impacts are topics of ongoing research."[130]

- "There is broader uncertainty about how large whales will respond to the presence of extensive networks of novel offshore wind structures on the Atlantic OCS. Under the cumulative impact scenario, up to 2,547 new structures (i.e., WTGs) could be constructed across the geographic analysis area. Although the planned spacing of structures would not obstruct whale movement between structures, the potential synergistic effects of structure presence and low-level operational noise are uncertain. There is also some uncertainty around reef effect and hydrodynamic impacts on prey and forage availability and predator prey interactions. These impacts would combine and interact with ongoing changes in marine species distribution and community composition driven by climate change. The potential consequences of these impacts on the Atlantic OCS are unknown. Monitoring studies would be able to track these changes and observe how they may influence whale behavior. At present, BOEM has no basis to conclude that these IPFs would result in significant adverse impacts on any marine mammal species."[131]

- **Sea Turtles**
  - "Some uncertainty exists about the effects of certain IPFs on sea turtles and their habitats. For example, the effects of EMF on sea turtles are not completely understood. Although there are no data on impacts on sea turtles from EMFs generated by underwater cables, the preponderance of evidence summarized in the BOEM-sponsored report by Normandeau (2011) indicate that sea turtles are unlikely to detect most of the EMF impacts resulting from the Project.[132]

---

[128] *Id.*
[129] *Id.* at J-5.
[130] *Id.*
[131] *Id.*
[132] *Id.* at J-6.

36

- "Similar to marine mammals, data are also not available to evaluate potential changes to normal movements of juvenile and adult sea turtles due to elevated suspended sediments."[133]

- "There is also uncertainty relative to sea turtle responses to construction activities on the Atlantic OCS."[134]

- "[I]t is currently unclear whether concurrent construction of multiple projects, increasing the extent and intensity of impacts over a shorter duration or spreading out project construction, and associated impacts over multiple years would result in the least potential harm to sea turtles."[135]

- "There is also uncertainty regarding the cumulative acoustic impacts associated with pile-driving activities. At this time, it is unclear if sea turtles that have ceased feeding during multiple construction activities would resume normal feeding, migrating, breeding, etc. behaviors once daily pile-driving activities cease or if secondary impacts would continue."[136]

- "More broadly, considerable uncertainty remains about how sea turtles would interact with the long-term changes in biological productivity and community structure resulting from the development of an extensive network of artificial reefs across the geographic analysis area."[137]

- "Information pertaining to the identification of historic properties within certain portions of the marine archaeology area of potential effects will not be available until after the record of decision is issued and the COP is approved."[138]

**Defendants Have Violated NEPA by Impermissibly Segmenting the Multiple Areas of the Offshore Wind Program and Ignoring the Cumulative Environmental Impacts of Thousands of Turbines on Millions of Acres of Ocean that BOEM Will Approve in the Near Future**

87.     NEPA requires that an Environmental Impact Statement include within its scope

"[c]umulative actions [that] when viewed with other proposed actions have cumulatively

---

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.* at J-7.

significant impacts and should therefore be discussed in the same impact statement"[139] and "[s]imilar actions [that] when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together."[140] This cumulative impact requirement ensures that agencies consider the collective effects of individually minor but related actions over time when analyzing the environmental impacts of a proposed government action.[141]

88.     NEPA is

in large measure, an attempt by Congress to instill in the environmental decision-making process a more comprehensive approach so that long-term and cumulative effects of small and unrelated decisions could be recognized, evaluated, and either avoided, mitigated, or accepted as the price to be paid for the major federal action under consideration.[142]

89.     The Council on Environmental Quality defines cumulative effects as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."[143]

90.     NEPA's implementing regulations require an Environmental Impact Statement for any action that "[i]s likely to have significant effects"[144] on the environment. Alternatively, any action that "is not likely to have significant effects or the significance of the effects is unknown" requires only an environmental assessment.[145]

---

[139] 40 C.F.R. § 1508.25(a)(2).
[140] 40 C.F.R. § 1508.25(a)(3).
[141] 40 C.F.R. § 1508.7.
[142] *Nat. Res. Def. Council, Inc. v. Callaway,* 524 F.2d 79, 88 (2d Cir. 1975).
[143] 40 C.F.R. § 1508.7.
[144] 40 C.F.R. § 1501.3(a).
[145] *Id.*

91.     When considering whether effects are significant, agencies "analyze the potentially affected environment and the degree of the effects of the action," and consider connected actions as well.[146] When preparing an environmental assessment, an agency must take a hard look toward "connected actions" within the same environmental assessment, including actions that are "interdependent parts of a larger action and depend on the larger action for justification."[147]

92.     Agencies must also consider "[b]oth short- and long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate Federal . . . law protecting the environment"[148] when determining the degree of the action's effects.

93.     The United States has set a target of producing 30 Gigawatts (30,000 megawatts) of Offshore Wind by 2030:

> To position the domestic offshore wind industry to meet the 2030 target, DOI's Bureau of Ocean Energy Management . . . plans to advance new lease sales and complete review of at least 16 Construction and Operations Plans (COPs) by 2025, representing more than 19 GW[gigawatts]  of new clean energy for our Nation. . . . Achieving this target also will unlock a pathway to 110 GW by 2050. . . ."[149]

Defendants acknowledged the offshore wind program's interrelated and cumulative effects in 2007 when they produced a Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental

---

[146] 40 C.F.R. § 1501.3(b).
[147] *See* 40 C.F.R. § 1508.25.
[148] *Id*.
[149] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (March 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

Shelf.[150] Defendants intended this Programmatic Environmental Impact Statement to provide a "baseline analysis that helps to satisfy the requirements of NEPA for offshore renewable energy leasing,"[151] because "many wind energy projects will have similar environmental impacts."[152] This Programmatic Environmental Impact Statement does not satisfy NEPA's cumulative impacts requirement today because Defendants have significantly altered and expanded their offshore wind program, rendering the Programmatic Environmental Impact Statement's analysis of cumulative environmental impacts inaccurate and outdated and requiring a supplemental or new Environmental Impact Statement analyzing the current program as it now exists.

94.     Revolution Wind and South Fork are two of twelve projects slated to be constructed off the coasts of Rhode Island and Massachusetts and two of 35 within the East Coast. Combined, these projects will consist of hundreds of wind turbines off the coast of these two states.

95.     Defendants' Final Environmental Impact Statements fail to take a hard look at the cumulative impacts of the Revolution Wind Project and the South Fork Wind Project in combination with the ten other adjacent offshore wind projects that have already been leased, relegating all mention of them to an appendix discussing project dimensions only. BOEM thus fails to analyze the combined impacts of the thousands of proposed offshore wind turbines, covering thousands of acres of pristine seabed and open ocean, on the human and natural environment.

---

[150] Bureau of Ocean Energy Management, United States Department of the Interior, *Guide to the OCS Alternative Energy Final Programmatic Environmental Impact Statement,* https://www.boem.gov/ renewable-energy/guide-ocs-alternative-energy-final-programmatic-environmental-impact-statement-is.
[151] *Id.* at 7.
[152] *Id.*

96.     The Final Environmental Impact Statements also fail to adequately analyze the "No-Action Alternative," as required by NEPA, by failing to analyze the environmental impacts (and benefits) of not constructing the Project and by minimizing those impacts as minor additions to the anticipated forest of giant turbines to be built under the government's offshore wind program.

97.     Further, when BOEM issued the South Fork Wind and Revolution Wind Leases, it conducted Environmental Assessments but did not prepare Environmental Impact Statements. By failing to prepare an Environmental Impact Statement for Revolution Wind, South Fork Wind, or any other offshore wind project, prior to leasing, BOEM failed to consider a reasonable range of alternative locations for wind energy construction and disregarded its duty to "[e]valuate reasonable alternatives to the proposed action . . . ."[153]

98.     Additionally, by issuing only an environmental assessment at the leasing stage, BOEM guaranteed that the only stage where impacts to fisheries, the marine environment, and marine mammals were analyzed was in the Environmental Impact Statement, issued only a month before the Record of Decision—when it was far too late to redesign and relocate Project components to avoid unnecessary impacts on the environment. This caused BOEM to restrict its range of alternatives analyzed in the EIS to the lease area already selected—nearly a decade earlier—and to the results of the decisions already made by BOEM long before drafting the Environmental Impact Statement, rather than objectively evaluating the feasibility of the range of alternatives.

99.     In failing to prepare Environmental Impact Statements before issuing the leases, BOEM relied on Revolution Wind LLC's and South Fork Wind LLC's assertions of infeasibility

---

[153] 40 C.F.R. § 1502.14(a).

and adopted mitigation measures that were voluntarily proposed by the Developers instead of objectively evaluating alternatives identified in public comment. By segmenting their offshore wind program and analyzing the environmental impacts of the Revolution Wind Project and the South Fork Wind Project in isolation, Defendants unlawfully failed to analyze and consider the cumulative environmental impacts of the other multiple offshore wind projects that BOEM has approved or is considering for approval. In doing so, BOEM improperly segmented its NEPA analysis by "divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration."[154] Defendants' failure to analyze the cumulative environmental impacts of its offshore wind program, as NEPA requires, is arbitrary, capricious, and not in accordance with law—and should be invalidated and set aside.[155]

### Defendants Impermissibly Narrowed the Project Description, Unlawfully Limiting Their Analysis of Alternatives

100.    When BOEM defined Revolution Wind's and South Fork Wind's purpose and need and project descriptions, BOEM narrowed the possibility of alternatives to those that were offshore wind projects in the lease areas that produced the required amount of energy. By creating such a narrow project description, BOEM violated NEPA and gutted the possibility of a true alternatives analysis.

101.    NEPA requires that the agency "specify the underlying purpose and need for the proposed action."[156] This identification of the purpose and need for the Project then allows the

---

[154] *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).
[155] 5 U.S.C. § 706.
[156] 40 C.F.R. § 1502.13.

agency to identify and analyze reasonable alternatives to the proposed Project that may be less environmentally damaging.

102.    Under NEPA, government agencies are not permitted to limit their analysis of reasonable alternatives "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives," nor can they lawfully "craft a purpose and need statement so narrowly drawn as to foreordain approval of" a project proposed by a private party.[157]

103.    NEPA further requires that the Environmental Impact Statement provide a "detailed statement . . . on . . . alternatives to the proposed action . . . ."[158] and that the agency "[s]tudy, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[159] The Environmental Impact Statement must include consideration of "[a]lternatives, which include the no-action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action)"[160] in an agency's environmental review of an action under consideration. In considering alternatives for mitigation, agencies must follow a stepwise approach:

a.    Avoid[] the impact altogether by not taking a certain action or parts of an action.
b.    Minimiz[e] impacts by limiting the degree or magnitude of the action and its implementation.
c.    Rectify[] the impact by repairing, rehabilitating, or restoring the affected environment.
d.    Reduc[e] or eliminate [e] the impact over time by preservation and maintenance operations during the life of the action.

[157] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).
[158] 42 U.S.C. § 4332(2)(C).
[159] *Id.* § 4332(2)(E).
[160] 40 C.F.R. § 1501.9(E)(2).

e. Compensat[e] for the impact by replacing or providing substitute resources or environments.[161]

104. Contrary to NEPA's requirements, Defendants narrowly defined the purpose of the South Fork Wind and Revolution Wind Projects to ensure that the Environmental Impact Statement supported Revolution Wind LLC's and South Fork Wind LLC's proposals to construct and operate offshore wind energy facilities in their respective lease areas so as to meet the contractual obligations of private parties. Defendants violated NEPA by allowing Revolution Wind's and South Fork Wind's existing private contracts with the states of Connecticut and Rhode Island to define the need for the Project, thereby impermissibly limiting the available reasonable alternatives to the Projects—predetermining the outcome of their review and acting in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

105. Defendants then limited all the alternatives to those that would provide the output needed to meet the Developer's contractual demands, with the only significant differences being that the alternatives had fewer turbines, more space between project sites, different cable placement routes, or less space between turbines. Defendants excluded any possible alternative that had a different location. In the Environmental Impact Statement and in the Record of Decision, Defendants admitted that they rejected all the alternatives—even one that was an environmentally preferred alternative—because they would not meet the energy outputs required for the Project.

106. Even though there were alternatives in each Project that would reduce the impact on the complex benthic organisms in the area and reduce navigation and safety issues,

---

[161] 40 C.F.R § 1508.20.

44

Defendants rejected them because they would not meet the Developers of South Fork's and Revolution Wind's contractual requirements. Instead of developing and modifying alternatives to the proposed Projects, inside and outside of the lease areas, which would avoid, minimize, reduce, and compensate for the environmental impacts of the Projects, the Defendants opted to only consider alternatives that the Developers said were feasible, thereby shirking its duty under NEPA.

107.    Defendants' Environmental Impact Statements for Revolution Wind and South Fork acknowledge that the Projects will cause serious, adverse environmental impacts, including:

- Significant adverse impacts to benthic habitats and organisms, including significant adverse impacts to Cox Ledge;

- Significant adverse impacts to finfish and spawning habitats;

- Significant adverse impacts to commercial fisheries and for-hire recreational fishing;

- Significant adverse impacts to more than 100 identified cultural and historic resources;

- Significant adverse impacts to the North Atlantic right whale and other marine mammals;

- Significant adverse impacts on safety, navigation, and Coast Guard Search and Rescue operations; and

- Significant adverse impacts on research and surveys.

108.    Despite the known impacts of approving the South Fork Wind Project and the Revolution Wind Project in their lease areas, Defendants impermissibly and summarily

dismissed significant, concrete, well-justified, and reasonable alternatives to reduce the number of turbines and to improve the turbine placement within the lease areas.

109.    BOEM's failure to consider alternatives that would avoid, minimize, and mitigate impacts caused by the South Fork Wind and Revolution Wind Projects was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and without observance of procedure required by law.

**Failure to Properly Analyze the No-Action Alternative**

110.    NEPA requires that the agency's Environmental Impact Statement analyze the No-Action alternative. The No-Action alternative analysis is an agency's analysis of what would happen if the proposed action was not built.[162] The purpose of this analysis is to allow the agency to evaluate the effects of not approving the Project.[163]

111.    Even though the No-Action Alternative was one of the environmentally preferred options in Revolution Wind and South Fork Wind,[164] Defendants' Final Environmental Impact Statements and Records of Decision summarily reject the No-Action Alternative "because it would not allow for the development of DOI-managed resources and would not meet the purpose and need."[165]

112.    If the agencies had properly defined the Projects' purpose and need, they would have been able to properly analyze the environmental impacts of not approving these Projects as designed and proposed.

---

[162] 43 C.F.R. § 46.30.
[163] *Id.*
[164] Revolution Wind Record of Decision *supra* note 3 at 36.
[165] *Id.* at 23.

113.     In defining the Projects' purpose and need to preclude the No-Action Alternative, contrary to NEPA's requirements, Defendants' approvals were arbitrary, capricious, and not in accordance with law and should be invalidated and set aside.

**Failure to Analyze Less Environmentally Damaging Alternatives in the South Fork and Revolution Wind Projects**

114.     The Final Environmental Impact Statements confirmed that the South Fork Wind Project and the Revolution Wind Project as approved will harm the ecosystem, bats, benthic resources, birds, sea turtles, coastal habitat and fauna, commercial fisheries and for-hire recreational fishing, cultural resources, demographics, employment, and economics, finfish, invertebrates, and essential fish habitats, land use and coastal infrastructure, marine mammals, navigation and vessel traffic, national security and military, aviation and air traffic, scientific research, recreation and tourism, scenic and visual resources, water quality, and wetlands.[166] Harms identified in the Final Environmental Impact Statement include the following:

- The Projects' construction will impact navigation and vessel traffic and include "increased vessel traffic near the RWF, offshore RWEC, and ports used by the Project[s]; obstructions to navigation; delays within or approaching ports; increased navigational complexity; changes to navigation patterns; detours to offshore travel or port approaches; or increased risk of incidents such as allisions."[167]

- The addition of dozens of turbines on the Outer Continental Shelf will "increase navigational complexity and therefore the risk of collision, allision, and potential spills. Additional structures could also interfere with marine radars and aircraft engaging in search and rescue efforts."[168]

- Fishing vessels operating near the offshore wind facilities will "experience radar clutter and shadowing."[169]

---

[166] *See generally* Revolution Wind Final Environmental Impact Statement *supra* note 4 at Section 3.
[167] *Id.* at 3.16-18.
[168] *Id.* at 3.16-20.
[169] *Id.* at 3.9-61.

- Bats and birds will experience "[d]isplacement and avoidance behavior due to habitat loss and alteration, equipment noise, and vessel traffic,"[170] and "[i]ndividual mortality due to collisions with operating wind turbine generators."[171] Cable transmissions and installations will cause "injury or mortality of individual bats, particularly juveniles as they are unable to flush from a roost if occupied by bats at the time of the [disturbance]."[172] Almost four acres of mixed oak/white pine forest will be removed during onshore construction, resulting  "in the loss of potentially suitable roosting and/or foraging habitat for bats."[173] "Collisions between bats and vehicles or construction equipment could cause injury and/or mortality."[174] The presence of structures and construction-related noise could "flush birds in the path of vessels," displacing the birds from the area.[175] Further, "[t]he presence and operation of the offshore facilities may result in displacement of waterbirds, waterfowl, seabirds, and phalaropes that use the area for foraging, resting, or nighttime roosting."[176]

- The presence of structures in the lease areas will "result in the direct disturbance of benthic habitats."[177] "Disturbance of complex benthic habitat during seafloor preparation could change benthic habitat composition by relocating boulders and cobbles and exposing soft substrates. . . . the presence of structures would therefore result in a long-term moderate adverse effect on benthic habitat."[178] During the Projects, there will be "long-term to permanent habitat disturbance effects on an estimated 1,740 acres of large-grained complex and complex habitats from vessel anchoring, cable installation, and cable protection, seafloor preparation for foundation installation, and the presence of foundation and scour protection."[179] The construction, operations and maintenance, and decommissioning of the Projects will disturb "soft-bottom benthic habitat [and] would flatten sand ripples, pits, and depressions and kill or displace habitat-forming invertebrates living on and in the seafloor within the impact footprint."[180]

- The Projects will cause significant adverse impacts to Cox Ledge, which is "an area of complex benthic habitat that supports several commercially and

---

[170] *Id.* at I-10.
[171] *Id.* at I-1.
[172] *Id.*
[173] *Id.* at 3.5-24.
[174] *Id.* at 3.5-20.
[175] *Id.* at 3.7-26.
[176] *Id.* at 3.7-29.
[177] *Id.* 3.6-36.
[178] *Id.* at 3.6-37.
[179] *Id.* at 3.6-83.
[180] *Id.* at 3.6-37.

recreationally important species."[181] The Projects will cause "expected long-term and permanent effects that would occur on a regional scale to the extensive complex habitats in this lease area on Cox Ledge,"[182] which should be classified as "major adverse impacts."[183]

- The Projects' construction, operations and maintenance, and decommissioning will adversely impact "recreational offshore uses such as boating, fishing, diving, and wildlife and whale watching."[184] Cable installation will "affect fish and mammals of interest for recreational fishing and sightseeing through dredging and turbulence."[185] Recreational boaters will avoid the Projects' lease areas during construction due to the noise.[186] "Project vessels w[ill] noticeably add to disturbances of marine species and their habitats important to recreational fishing and could require recreational and tourism vessels to navigate around moving construction-related vessels while in transit."[187]

- More than one billion fish eggs will be exposed to entrainment impacts during construction,[188] causing long-term habitat alteration.[189] Finfish near or "within the construction footprint would be exposed to the risk of displacement, crushing, and burial during seafloor preparation of cable corridors, cable installation, placement of cable protection, and vessel anchoring."[190] "Finfish within these construction footprints would be directly exposed to disturbance. Juvenile and adult fish are mobile and would likely avoid being harmed or killed by construction equipment and materials placement."[191]

- "The Project[s] substantially overlap[] with extensive highly complex and diverse habitats on Cox Ledge as well as known spawning activity for Atlantic cod, a species of biological, ecological, economic, and cultural significance to this region,"[192] will cause "regional-scale adverse impacts to habitants on Cox Ledge

---

[181] *Id.* at 3.13-75; *see also id.* at 3.13-61 ("Cox Ledge, is known to support cod spawning aggregations.").
[182] *Id.* at Appendix L-68, Comment 0100.
[183] *Id.*
[184] *Id.* at 3.18-20.
[185] *Id.* at 3.18-20.
[186] *Id.*
[187] *Id.* at 3.18-28.
[188] *Id.* at 3.13-54.
[189] *Id.* at 3.17-78.
[190] *Id.* at 3.13-50.
[191] *Id.*
[192] *Id.* at Appendix L-68, Comment 0100.

and population-level impacts to Atlantic cod in Southern New England," and will "not protect Atlantic cod spawning."[193]

- Marine Mammals will suffer "[d]isplacement, disturbance, and avoidance behavior due to habitat loss and alteration, equipment noise, vessel traffic, increased turbidity, and sediment deposition during construction, and installation and [operations and maintenance],"[194] as well as "[t]emporary loss of current ambient acoustic habitat and increased potential for vessel strikes."[195] BOEM estimates that at least 63 North Atlantic right whales, or 18.3% of the population, will experience behavioral effects.[196]

- "The presence of construction-related vessels and additional recreational vessels would add to conflict or collision risks for military and national security vessels and could increase demand for SAR operations."[197] Military vessels will experience course changes and "increase[s] [in] navigational complexity and risk of collisions."[198]

- The Projects, by themselves and cumulatively, will "adversely impact commercial fisheries and for-hire recreational fishing due to potential increased space-use conflicts that may result in navigational hazards, allisions, and gear loss/damage."[199]

115.    South Fork Wind, together with Revolution Wind, and other offshore projects, "when combined with past, present, and reasonably foreseeable activities would result in long-term" major negative impacts to National Register Historic properties and National Register-eligible properties and those viewsheds.[200]

116.    BOEM acknowledged that South Fork Wind and Revolution Wind will have major impacts on visual resources and viewsheds.[201] However, BOEM provided misleading

---

[193] *Id.* at Appendix L-68, Comment 0100.
[194] *Id.*
[195] *Id.*
[196] *Id.* at 3.15-37.
[197] *Id.*
[198] *Id.* at 3.17-18.
[199] *Id.* at 3.9-88.
[200] *Id.* at 3.10-58.
[201] *See id.*

information and simulations to the public during the environmental review. BOEM prepared two distinct visual simulations and released one to the public and made the other confidential. The failure of BOEM to disclose both simulations during its environmental review misled the public.

117. Despite knowing Revolution Wind and South Fork Wind's extensive environmental impacts, Defendants opted not to evaluate any alternative located outside of the Project area or seriously consider any of the alternatives. The alternatives analyzed in the Final Environmental Impact Statements, alternatives with fewer turbines were rejected by Defendants solely because they incorporated plans that the Developers said were not economically feasible.

118. Instead of following the stepwise approach required by NEPA, BOEM opted to authorize some monetary compensation for impacts to the fishing industry, historic properties, and cultural resources without adequately evaluating alternatives to avoid, minimize, and reduce environmental impacts rather than allowing the Projects' sponsors to pay for them.

119. The lack of a legitimate alternatives analysis and the failure to consider alternatives that would avoid, minimize, or mitigate impacts was arbitrary, capricious, an abuse of discretion, and otherwise unlawful.

**Failure to Adequately Analyze Climate Change Effects of Constructing and Operating the Projects**

120. The Final Environmental Impact Statements do not sufficiently evaluate the Revolution Wind and South Fork Projects' impacts on greenhouse gas emissions and climate change. The analysis focuses on partial, project-specific climate impacts in the nearby geographic area but attempts to quantify only emissions offsets from the Projects, with limited qualitative descriptions of emissions generated from construction.

121.    There is no evaluation of the activities associated with the supply chain, such as minerals sourcing, component fabrication, and eventual disposal of turbine components in landfills, which would not occur under the No Action Alternatives and differ among other alternatives BOEM did or should have considered.

122.    The Final Environmental Impact Statements only compare the Projects' climate benefits with "fossil-fuel power generating stations[,]" and do not compare the Projects' climate impacts with other alternative renewable energy sources or project locations and designs.

123.    Nor is there any cumulative-level analysis of climate impacts (positive or negative) associated with the proposed scale of offshore wind development.

124.    Because Defendants' Environmental Impact Statements fail to adequately analyze the impacts on the human environment of the South Fork Wind Project and Revolution Wind Project, Defendants' authorizations and permits that rely on those Environmental Impact Statements are arbitrary, capricious, and otherwise not in accordance with law, and therefore should be declared unlawful and set aside.

**Third Cause of Action**
**Violation of the Endangered Species Act and**
**the Administrative Procedure Act**

125.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

126.    The Endangered Species Act provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and provides] a program for the conservation of such endangered species and threatened species."[202] The Act requires all Federal departments and agencies to "conserve endangered species and threatened

---

[202] 16 U.S.C. § 1531(b).

species and shall utilize their authorities in furtherance of the purposes."[203] Congress's intent in enacting the Endangered Species Act "was to halt and reverse the trend toward species extinction, whatever the cost[,]"[204]—even when doing so is inconvenient or counter to Government-created goals.

127. Section 7 of the ESA requires that:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species. . . .[205]

128. In the words of the Supreme Court, Section 7 is a plain, affirmative command that admits of no exception:

> One would be hard-pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to ensure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of habitat of such species. . . ." This language admits of no exception.[206]

129. The regulations promulgated to implement ESA Section 7 require that an action agency—in this case, BOEM—first must determine whether the action "may affect" an endangered or threatened species.[207] If so, the action agency must consult with the National Marine Fisheries Service, which has responsibility for marine species under the ESA.[208] The Section 7 consultation concludes when the National Marine Fisheries Service issues a Biological Opinion determining whether the proposed action does or does not jeopardize the species: "[T]he

---

[203] 16 U.S.C. § 1531(b).
[204] *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978).
[205] 16 U.S.C. § 1536(a).
[206] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (quoting 16 U.S.C. § 1536 (1976)).
[207] 50 C.F.R. § 402.14(a).
[208] *Id.*

Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."[209]

130.     During the Section 7 consultation, the parties cannot make "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures."[210]

131.     The Service's determination that the South Fork Wind Project does not jeopardize the North Atlantic right whale and its decision to authorize the Project's owner to take 13 right whales in one year are not based on the best available science and are arbitrary, capricious, and otherwise contrary to law.

132.     The Service's determination that the Revolution Wind Project does not jeopardize the North Atlantic right whale and its decision to authorize the Project's owner to take 56 right whales in the first five years of the Project,[211] are not based on the best available science and are arbitrary, capricious, and otherwise contrary to law.

133.     The North Atlantic Right whale is one of the most endangered marine mammals in the world, with fewer than 350 individuals remaining alive, including only about 70 breeding females capable of reproduction.[212] The Service reports an "overall abundance decline between

---

[209] 16 U.S.C. § 1536(d).
[210] 16 U.S.C. § 1536(d).
[211] 88 Fed. Reg. 72,630 (Oct. 20, 2023).
[212] *Id.*

2011 and 2020 of 29.7%,"[213] and that between December 2022 and August 2023, the Service

estimated that the population had decreased to 338 individuals.[214]

134.     BOEM's announced plans for offshore wind development along the Atlantic

coast, including the South Fork Wind and Revolution Wind projects, encompass the same area

that constitutes the annual migration path of the endangered North Atlantic right whale, which

breeds in the waters offshore New England and then travels along the Atlantic coast to the

Bahamas to give birth, reversing this migration pattern each year. The most recent right whale

habitat modeling shows a considerable increase in right whale habitat use of southern New

England waters during recent years, including the area in and around the South Fork Wind and

Revolution Wind Projects. Consequently, the Service has designated coastal New England as

critical habitat for the North Atlantic right whale.

135.     Although they are migratory, the Biological Opinions reports that right whales

occupy the project areas of South Fork Wind and Revolution Wind nearly full time: "Right

whales have been observed nearly year round in the area south of Martha's Vineyard and

Nantucket, with highest sightings rates between December and May."[215] Yet, the Service has

intentionally limited its jeopardy analysis to the lease areas, deliberately ignoring the threats

posed by the construction and operation of the thousands of additional wind farm turbines that

BOEM plans to authorize all along the Atlantic coast. Only by ignoring the cumulative effects of

these other offshore wind projects can the Service reach the unsupported and arbitrary conclusion

---

[213] National Marine Fisheries Service, *Revolution Wind Biological Opinion* at 58 (July 21, 2023).
[214] National Marine Fisheries Service, *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments 2022* at 2 (June 2023), https://media.fisheries.noaa.gov/2023-08/Final-Atlantic-and-Gulf-of-Mexico-SAR.pdf.
[215] Revolution Wind Biological Opinion National Marine Fisheries Service, *Revolution Wind Biological Opinion* at 55 (July 21, 2023).

that Atlantic offshore wind farms, including Revolution Wind and South Fork Wind, pose no

jeopardy to the species.

136.    Recognizing the threat offshore wind creates for this endangered species, in

October 2022, BOEM and the Service published a Draft North Atlantic right whale and Offshore

Wind Strategy, in which they stated: "Due to the declining status of NARWs [North Atlantic

right whales], the resilience of this population to stressors affecting their distribution, abundance,

and reproductive potential is low. The species faces a high risk of extinction." "[T]he loss of

even one individual a year may reduce the likelihood of recovery and of the species' achieving

optimum sustainable population.'"[216] Consequently, the Offshore Wind Strategy determined that

offshore wind "development (from siting to decommissioning) must be undertaken responsibly. .

. necessitating precaution to ensure that OSW [offshore wind] development is carried out in a

way that minimizes the potential for adverse effects to the species and the ecosystems on which

it depends."[217] But the South Fork Wind and Revolution Wind Biological Opinions ignore—and

do not even mention—this strategy.

137.    The Service's no-jeopardy determinations are contradicted by other portions of

the South Fork Wind Biological Opinion and the Revolution Wind Biological Opinion, which

find that:

---

[216] *See* BOEM and NOAA's Draft Strategy on the North Atlantic Right Whale and Offshore Wind,
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NARW_OSW_Strategy.pd
[217] *Id.*

- "The species faces a high risk of extinction and the population is small enough for the death of any individual to have measurable effects in the projections on its population status, trend, and dynamics[;]"[218]

- Pile driving and unexploded ordinance will adversely impact 34 individual right whales;[219]

- "The resilience of [North Atlantic right whales] to stressors that would impact the distribution, abundance, and reproductive potential of the population is low."[220]

- "Baleen Whales, such as the North Atlantic right whale, seem generally unresponsive to vessel sounds, making them more susceptible to vessel collisions[;]"[221]

- NMFS "expect[s] an increase in risk proportional to the increase in vessel traffic."[222]

138.    The Service's determination that North Atlantic right whales will not be at greater risk of vessel strikes due to offshore wind development is contradicted by NMFS's finding that construction of the Revolution Wind Project alone will generate an additional 1,404 vessel trips, and construction of the South Fork Wind Project will generate an additional 155 vessel trips[223]— not to mention the many thousands of additional vessel trips required for the construction,

---

[218] Revolution Wind Biological Opinion *supra* note 213 at 397-398; National Marine Fisheries Service, *South Fork Wind Biological Opinion* (Oct. 1, 2021) at 375, https://media.fisheries.noaa.gov/2021-12/SFW_BiOp_OPR1.pdf.
[219] Revolution Wind Biological Opinion *supra* note 213 at 40.
[220] Revolution Wind Biological Opinion *supra* note 213 at 397; South Fork Wind Biological Opinion *supra* note 218 at 375.
[221] Revolution Wind Biological Opinion *supra* note 213 at 268; South Fork Wind Biological Opinion *supra* note 218 at 258.
[222] Revolution Wind Biological Opinion *supra* note 213 at 272; *see* also South Fork Wind Biological Opinion *supra* note 218 at 274.
[223] Revolution Wind Biological Opinion *supra* note 213 at 268; South Fork Wind Biological Opinion *supra* note 218 at 252.

operation, and maintenance of the dozens of other offshore wind projects BOEM has slated for approval along the whales' Atlantic coast migration path.

139.    Vessel strikes that injure or kill these endangered whales are particularly likely because "Baleen whales, like the North Atlantic right whale, seem generally unresponsive to vessel sound, making them more susceptible to vessel collisions."[224] Presently, the "minimum rate of serious injury or mortality resulting from vessel interactions is 2.0/year for right whales"[225]—an unsustainable rate of loss that will inevitably increase with thousands of additional vessel trips per year to construct, operate, and maintain the thousands of projected wind turbines BOEM has planned for the Atlantic coast from Maine to North Carolina. Based on the information in the South Fork Wind and Revolution Wind Biological Opinions, North Atlantic right whales will be at an increased risk of collision with vessels and vessel strikes, and NMFS's determination that the increased risk will not jeopardize a single North Atlantic right whale is arbitrary and capricious.

140.    The Service's determination to allow vessel speeds up to 10 knots in the Revolution Wind and South Fork Wind lease areas is arbitrary and capricious and jeopardizes these endangered whales. The Service's own Biological Opinions for Revolution Wind and South Fork Wind report that when vessels travel above 8.6 knots, there is a significantly higher probability that a collision with a whale will be lethal.[226]

141.    While the Service should have found that Revolution Wind and South Fork Wind jeopardize the North Atlantic right whale, it again falls short of protecting the species through its

---

[224] Revolution Wind Biological Opinion *supra* note 213 at 268; South Fork Wind Biological Opinion *supra* note 218 at 258.
[225] Revolution Wind Biological Opinion *supra* note 213 at 146.
[226] *Id.* at 268; South Fork Wind Biological Opinion *supra* note 213 at 259.

required mitigation measures. Three of the Service's mitigation measures fall far short of protecting the North Atlantic right whale:

(1)  The Service requires vessels to reduce their speed to 10 knots or less in seasonal management areas and dynamic management areas when a right whale is spotted. But that speed reduction is not enough to reduce vessel strike mortality and a study cited by the Service in the South Fork Wind and Revolution Wind Biological Opinions stated that vessel speeds of 8.6 knots or higher increase the probability of a strike being lethal from 21% to 79%.[227]

(2) The Biological Opinions require measures to reduce the potential exposure of North Atlantic right whales to noise from pile driving and UXO/MEC detonations in May and December.[228] Yet BOEM's conditions of approval fail to require pile driving or detonation prohibitions in May.

(3) The Service relies on bubble curtains, which do not reduce low-frequency noises that right whales can hear. While the Service requires the lessee to identify additional noise attenuation measures to reduce sounds, the Service provides no examples of measures that reduce these low-frequency sounds—making this so-called mitigation measure futile for North Atlantic right whales.

(4) A recently published study has also rendered the Service's requirement that South Fork Wind and Revolution Wind deploy Passive Acoustic Monitoring in the construction area for only one hour before commencing pile-driving activities inadequate. This study found that detections of marine mammals, in particular the North Atlantic right whale, decrease

---

[227] Revolution Wind Biological Opinion *supra* note 213 at 269; South Fork Wind Biological Opinion *supra* note 218 at 259.
[228] Revolution Wind Biological Opinion *supra* note 213 at 449.

as monitoring time decreases.[229] In particular, the study found that monitoring only one hour before pile driving provides "only a 4% likelihood of hearing" a North Atlantic right whale.[230] This same study found that when passive monitoring is used for extended periods of time prior to pile driving, there is a higher likelihood of hearing a North Atlantic right whale: 100% when monitoring for 24 hours prior and 74% when monitoring for 18 hours prior.[231]

142.     The Service's and BOEM's flawed analysis of the impacts on the North Atlantic right whale and the "No Jeopardy" finding are arbitrary and capricious and violate the Endangered Species Act. To remedy the violations, BOEM must re-initiate consultation with the Service to ensure that the impacts of South Fork Wind and Revolution Wind on the North Atlantic right whale are adequately considered, evaluated, and consistent with NOAA and BOEM's statements regarding the dire state of the species.

**BOEM Must Request to Re-Initiate the Section 7 Consultation Because New Information Is Available that May Affect Listed Species**

143.     Section 7 consultation must be reinitiated when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."[232] Since the issuance of South Fork Wind's Biological Opinion in 2021 and Revolution Wind's Biological Opinion in July 2023, new findings have been made about endangered species in the South Fork Wind and Revolution Wind lease areas and protected

---

[229] Davis et al., *Upcalling Behavior and Patterns in North Atlantic Right Whales, Implications for Monitoring Protocols During Wind Energy Development*, ICES Journal of Marine Science (Nov. 3, 2023), https://academic.oup.com/icesjms/advance-article/doi/10.1093/icesjms/fsad174/7341838?login=false.
[230] *Id.* at 12.
[231] *Id.*
[232] 50 C.F.R. § 402.16.

habitats: (1) the Service proposed designating Cox Ledge as a habitat area of particular concern and (2) a new study found 60 minutes of Passive Acoustic Monitoring prior to pile driving or UXO detonations insufficient and inadequate in finding nearby whales.

144.    Reinitiation "is required and shall be requested" when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."[233] Because of this new information, BOEM must request reinitiation, and the Service must accept BOEM's request.

145.    The National Marine Fisheries Service and the National Oceanic Atmospheric Administration recently proposed to designate Cox Ledge as a Habitat Area of Particular Concern.[234] When an area receives this status, special attention is paid to the potential "adverse effects on habitats within areas of particular concern from various activities (e.g., fishing, offshore wind energy.)"[235] The Service's Biological Opinions do not analyze Revolution Wind's or South Fork Wind's impacts on Cox Ledge as a habitat area of particular concern and the impacts on endangered species that live within the habitat area. Reinitiation is required to determine whether additional mitigation measures are required to protect endangered species living within Cox Ledge.

146.    In addition, a November 3, 2023, study found that monitoring for only one hour before pile driving provides "only a 4% likelihood of hearing" a North Atlantic right whale.[236] This same study found that when passive monitoring is used for extended periods of time before

---

[233] 50 C.F.R. § 402.16.
[234] *Fisheries of the Northeastern United States Framework Adjustments to Northeast Multispecies, Atlantic Sea Scallop, Monkfish, Northeast Skate Complex, and Atlantic Herring Fisheries; Southern New England Habitat Area of Particular Concern Designation*, 88 Fed. R. 65944 (Sept. 26, 2023).
[235] *Id.*
[236] *Id.* at 12.

pile driving, there is a higher likelihood of hearing a North Atlantic right whale: 100% when monitoring for 24 hours prior and 74% when monitoring for 18 hours prior.[237] As required by the Biological Opinion and Incidental Take Statement and as incorporated in BOEM's conditions of approval, the Project will deploy Passive Acoustic Monitoring equipment in the construction area only one hour before commencing pile-driving or detonations. Based on the November study, one hour of monitoring will more likely than not fail to identify when a North Atlantic right whale is in the area. BOEM must request re-initiation of Section 7 consultation so that the Service can consider additional monitoring measures and require additional monitoring times. Without requiring more extended monitoring periods, the Service and BOEM are putting North Atlantic right whales and other marine mammals at greater risk for injury and death.

147.    BOEM is under a continuing obligation to request re-initiation when new information reveals additional effects that may affect endangered species.[238] Without re-initiation, BOEM's approval is arbitrary, capricious, and violates the ESA.

**BOEM Violated the ESA By Failing to Incorporate All Requirements from the Incidental Take Statement in its Final Approval**

148.    When the Service issues a Biological Opinion and an Incidental Take Statement outlining the requirements and conditions that must be met, that constitutes a permit authorizing the action agency's permittees (here, Revolution Wind LLC and South Fork Wind, LLC) to take the endangered species, provided that it respects and adopts the terms and conditions of the Incidental Take Statement.[239] However, if the action agency fails to incorporate all the requirements outlined in the Biological Opinion and Incidental Take Statement in its final

---

[237] *Id.*
[238] 50 C.F.R. § 402.16.
[239] *See Bennet v. Spear*, 520 U.S. 154, 170 (1997).

approval of a project, then any incidental take is a prohibited take and in violation of the Endangered Species Act.

149.    On July 21, 2023, the National Marine Fisheries Service issued its Biological Opinion, concluding that it is "our Biological Opinion that the proposed action is likely to adversely affect but is not likely to jeopardize the continued existence of blue, fin, sei, sperm, or North Atlantic right whales or the Northwest Atlantic DPS of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley or leatherback sea turtles, shortnose sturgeon, or any of the five DPSs of Atlantic sturgeon. The proposed action is not likely to adversely affect giant manta rays, hawksbill sea turtles, Rice's whale, or critical habitat designated for the New York Bight DPS of Atlantic sturgeon. We have determined that the Project will have no effect on any species of ESA-listed corals, the Gulf of Maine DPS of Atlantic salmon, Gulf sturgeon, Nassau Grouper, the Northeast Atlantic DPS of loggerhead sea turtles, Oceanic whitetip shark, smalltooth sawfish, or critical habitat designated for the North Atlantic right whale, or the Northwest Atlantic DPS of loggerhead sea turtles."[240]

150.    The Service's finding of no jeopardy is dependent on an incidental take statement with various mitigation requirements for BOEM and a warning that "[a] failure to implement the proposed action as identified in Section 3 of this Opinion would be a change in the action that may render the conclusions of this Opinion and the take exemption inapplicable to the activities carried out and may necessitate reinitiation of consultation."[241] Despite that warning, BOEM failed to incorporate all of the incidental take statement's requirements into its approval of the

[240] National Marine Fisheries Service, *Revolution Wind Biological Opinion* at 424 (July 21, 2023).
[241] *Id.* at 430.

Construction and Operations Plan for the South Fork Wind and Revolution Wind Projects,[242] invalidating the Service's conclusion that the Project would not jeopardize the North Atlantic right whale and other endangered species.

151.    BOEM's conditions included in its approved Construction and Operations Plan omitted several incidental take statement requirements of the Biological Opinion, including:

- Revolution Wind's Biological Opinion requires Revolution Wind to document and report the number of vessel calls to the Paulsboro Marine Terminal and comply with the conditions of the Paulsboro Biological Opinion.[243] Neither the Record of Decision's Conditions of Approval nor BOEM's final Conditions of Construction and Operations Plan Approval from November 17, 2023, require this requirement as a condition, contrary to the requirement of the ESA.

- Revolution Wind's Biological Opinion requires the agencies to "work with the lessee to develop a construction schedule that further reduces potential exposure of North Atlantic right whales to noise from pile driving and UXO/MEC [unexploded ordinance] detonations including expanding the time of year restriction on UXO/MEC detonations to include May and avoiding impact pile driving in May and December."[244] BOEM's final Conditions of Construction and Operations Plan Approval of November 17 prohibits UXO detonation from

---

[242] U.S. Department of the Interior, *Conditions of Construction and Operations Plan Approval Lease Number OCS-A 0486* (Nov. 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cond%20of%20COP%20Appr_REV%20OCS-A%200486_0.pdf.
[243] Revolution Wind Biological Opinion *supra* note 213 at 435.
[244] *Id.* at 449.

"December 1 to April 30 to reduce impacts to [North Atlantic right whales],"[245] but fails to include May in that prohibition, as required by the incidental take statement of the Biological Opinion.

- Revolution Wind's Biological Opinion requires BOEM and Revolution Wind to implement the requirements of RPM 4, and to facilitate monitoring of the incidental take exemption for sea turtles. BOEM, BSEE, USACE, and NMFS must meet twice annually to review sea turtle observation records. These meetings/conference calls will be held in September (to review observations through August of that year) and December (to review observations from September to November) and will use the best available information on sea turtle presence, distribution, and abundance, project vessel activity, and observations to estimate the total number of sea turtle vessel strikes in the action area that are attributable to project operations.[246]

  Neither the Record of Decision's Conditions of Approval nor BOEM's final Conditions of Construction and Operations Plan Approval from November 17, 2023, contain this requirement as a condition, contrary to the ESA.

152.   BOEM's failure to include all of the Incidental Take Requirements identified in the Biological Opinion and Incidental Take Statement as conditions for approval of Revolution Wind's Construction and Operations Plan renders BOEM's approval of Revolution Wind

---

[245] U.S. Department of the Interior, *Conditions of Construction and Operations Plan Approval Lease Number OCS-A 0486* (Nov. 17, 2023),
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cond%20of%20COP%20Appr_REV%20OCS-A%200486_0.pdf.
[246] Revolution Wind Biological Opinion *supra* note 213 at 440.

arbitrary, capricious, and otherwise not in accordance with the requirements of the Endangered

Species Act.

**The Service Has Violated the ESA Because the Construction and Operations Plan, Conditions of Approval, and the Federal Permits Fail to Protect Endangered Species**

153.    The Service's determination that these projects will adversely affect, but not

jeopardize, more than a dozen protected endangered species is arbitrary and capricious. The

approved location of both South Fork Wind and Revolution Wind falls directly within one of the

most densely traveled areas for blue, fin, sei, sperm, and North Atlantic right whales, Northwest

Atlantic DPS of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley

sea turtles, leatherback sea turtles, shortnose sturgeon, and all of the five DPSs of Atlantic

sturgeon.[247] These endangered animals live and travel within the area and corridor off the coasts

of Rhode Island and Massachusetts, where Revolution Wind, South Fork Wind, and ten other

federal offshore wind projects will sit. The construction, pile driving, detonations, underwater

noise, increased risk of vessel strikes, collisions, and allisions, and the disruption of habitats and

food resources will result in behavioral changes, damage to species, injuries and even death. The

Record of Decision and the Biological Opinion violate the Endangered Species Act because they

fail to adequately consider the impacts of the Project, the cumulative impacts of the offshore

wind program, and the best scientific data.

154.    The Projects' approvals and the Service's finding of no jeopardy for any

endangered species rely on a series of failures.

155.    First, the Service failed to consider how South Fork Wind and Revolution Wind,

combined with the cumulative effects of the entire offshore wind program, will affect the

endangered species. No analysis is provided on how the loss of space due to South Fork Wind,

---

[247] *See id.* at 424.

Revolution Wind, and the other offshore wind projects will impact these endangered species and their habitats, food sources, behavior, and migration patterns. In fact, there is no analysis on the cumulative effects of any other offshore wind project in the South Fork Wind and Revolution Wind Biological Opinions—or any other Biological Opinion, for that matter—because the Service does not believe it has a duty to analyze the cumulative effects of other offshore wind projects when making a jeopardy determination.[248] The Service has interpreted the definition of cumulative effects to exclude effects of offshore development that involve federal activities, which includes other offshore wind energy development activities; undersea transmission lines, gas pipelines, and other submarine cables tidal energy projects; marine minerals use and ocean-dredged material disposal; military use; Federal fisheries use and management, and, oil and gas activities.[249] This interpretation removes any opportunity for environmental analysis on how, when combined, federally approved and permitted projects affect endangered species that are impacted by several projects. This interpretation allows for the Service to make findings of no jeopardy for standalone projects, even when the combined impacts from other projects may jeopardize a species. For example, the Service has yet to make a finding of jeopardy for the North Atlantic right whale for any individual offshore wind project. However, in approving the offshore wind projects off New Jersey, New York, Rhode Island, and Massachusetts, the Service has approved the take/harassment of at least 275 individuals, or 81% of the entire species[250]—a number that surely would warrant a finding of jeopardy. For the Service to make an informed decision, it must assess how the thousands of turbines along hundreds of miles of ocean will

---

[248] *See id.* at 355.
[249] *See id.* at 355; *see also* 50 C.F.R. § 402.02.
[250] *See* Public Comments Received on Ocean Wind 1 Proposed Action, *Comment from Clean Ocean Action*, https://www.fisheries.noaa.gov/s3/2023-09/OceanWind1-FinalRule-PubComments-OPR1.pdf (emphasis added).

impact protected species and the environment. Without that information, the Service will continue to shirk its duties under the Endangered Species Act.

156.    The Service also failed to use the best available science when considering required mitigation measures. The Biological Opinion requires the use of bubble curtains, which help to reduce high-frequency underwater sounds above 200 Hz, to reduce underwater noises that impact whales and other marine mammals. While reducing noises some whales find harmful, BOEM and the Service have admitted that these bubble curtains do nothing to reduce noises below 200 Hz, which are noises that baleen whales, such as the endangered North Atlantic right whale, blue whale, fin whale, and sei whale, find harmful. The Service's reliance on this one-size-fits-all mitigation measure is faulty, leaving some incredibly vulnerable species unprotected.

157.    The Service also failed to thoroughly analyze how the increase in vessel traffic will affect the endangered species. Construction and operations will bring an influx of vessels to the area, including tugboats and barge cranes, many of which would be substantially larger and faster than fishing and recreational vessels. Overall, the National Marine Fisheries Service anticipates that there will be 1,404 vessel trips between ports and Revolution Wind during construction and 155 vessel trips between ports and South Fork Wind during construction.[251] Very little analysis is included of how this increase in vessels, some hundreds of feet in length, will impact the endangered whale species and other endangered marine species. Nor is there any analysis of how the hundreds of turbines across the twelve Rhode Island and Massachusetts projects will impact these endangered species' travel patterns and behavioral patterns. If there are wind projects in the surrounding hundreds of thousands of acres of ocean, where will these

---

[251] Revolution Wind Biological Opinion *supra* note 213 at 257; South Fork Wind Biological Opinion *supra* note 218 at 252.

endangered species retreat to avoid increased vessels, construction noises, explosions, and destruction or displacement of their food and habitats? The Service has yet to provide an answer or any analysis answering that question, which indicates the Service's failure to utilize the best available science and data to formulate its Opinion.

**Fourth Cause of Action**
**Violation of the Marine Mammal Protection Act**
**and the Administrative Procedure Act**

158.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

159.    The Marine Mammal Protection Act (MMPA) was the first national legislation to mandate an ecosystem-based approach to marine resource management. Under the Marine Mammal Protection Act, Congress directed that the primary objective of marine mammal management should be to maintain the health and stability of the marine ecosystem and, when consistent with that primary objective, to obtain and maintain optimum sustainable populations of marine mammals. In 2018, Congress enacted a general moratorium on the take of marine mammals without a permit: "There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases. . . ."[252]

160.    The permit exception to this moratorium provides that "upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than

---

[252] 16 U.S.C. 1371(a)(1).

five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population stock" if the Secretary "finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock. . . ."[253]

161.    The Marine Mammal Protection Act also prohibits persons or vessels subject to the jurisdiction of the United States from taking any marine mammal in waters or on lands under the jurisdiction of the United States or on the high seas.[254] The baseline under the MMPA is that "no permit may be issued for the taking of any marine mammal."[255] That said, the Service is permitted to authorize the incidental take of only "small numbers of marine mammals of a species or population stock."[256] Under the MMPA, "take" means to "harass, capture, hunt, kill, or attempt to harass, capture, hunt, or kill any marine mammal."[257]

162.    The National Marine Fisheries Service has further defined "harassment" as consisting of two types: Level A harassment, which "means any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild"; and Level B harassment, which "means any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns . . . but which does not have the potential to injure a marine mammal or marine mammal stock in the wild."[258]

---

[253] 16 U.S.C. 1371(5)(a).
[254] 16 USC 1372(a)(l)-(2).
[255] 16 U.S.C. § 1371.
[256] 16 U.S.C. § 1371.
[257] 16 U.S.C. § 1362(13).
[258] 50 C.F.R. § 216.3.

163.     Exposure of marine mammals to anthropogenic underwater sound may constitute "take" if the pressure level of the received sounds has the potential to cause injury or behavioral disturbance and the Service predicts that "marine mammals are likely to be behaviorally harassed in a manner considered to be Level B harassment when exposed to underwater anthropogenic noise" above one of two criteria thresholds, depending on the source sound category.[259] Continuous sound sources like vibratory pile driving or drilling are considered as takes when the root-mean-square sound pressure level is above 120 dB.[260] Intermittent sound sources are considered takes when the sound pressure level is above 160 dB.[261]

164.     In deciding whether to issue an Incidental Take Authorization under the Marine Mammal Protection Act, the Secretary of Commerce is required to "give full consideration to all factors which may affect the extent to which such animals may be taken[,]"[262] including:

> (1) [E]xisting and future levels of marine mammal species and
> population stocks;
>
> *        *        *
>
> (3) [T]he marine ecosystem and related environmental considerations;
> (4) [T]he conservation, development, and utilization of fishery
> resources; and
> (5) [T]he economic and technological feasibility of implementation.[263]

---

[259] 87 Fed. Reg. at 79,110.
[260] *Id.*
[261] *Id.*
[262] 16 U.S.C. § 1373(b).
[263] 16 U.S.C. § 1373(b)(1), (3)-(5).

71

165.    On January 6, 2022, the Service issued an Incidental Harassment Authorization, valid from November 15, 2022, to November 14, 2023, for the South Fork Wind Project authorizing the incidental take by Level A harassment and Level B harassment of marine mammals during the construction of South Fork Wind.[264] The Incidental Harassment Authorization authorized the take of up to thirteen North Atlantic right whales, eleven fin whales, 32 mink whales, and more than 5,000 other marine mammals. South Fork Wind did not seek an additional Incidental Harassment Authorization for after November 14, 2023.[265]

166.    On August 23, 2023, the National Marine Fisheries Service issued its Record of decision, and on September 15, 2023, issued its final Incidental Take Regulations and Letter of Authorization, authorizing the take and harassment of North Atlantic right whales, blue whales, fin whales, humpback whales, sei whale, mink whales, sperm whale, Atlantic white-sided dolphin, Atlantic spotted dolphin, common bottlenose dolphin, long-finned pilot whale, Risso's dolphin, Short-beaked common dolphin, harbor porpoise, gray seal, and harbor seal for the Revolution Wind Project.

**The Service Authorized the Take of More Than a Small Number of Marine Mammals**

167.    In total, the Service authorized the take of 7,602 marine mammals for the Incidental Harassment Authorization for the South Fork Wind Project.

168.    For the Revolution Wind Project, the Service authorized a maximum of 13,929 harassment takes in any one-year and 19,301 takes over the course of the five-year permit.[266] Of the marine mammals where harassment takes were authorized, five are species listed under the

---

[264] National Marine Fisheries Service, *Incidental Harassment Authorization* (Jan. 6, 2022), https://media.fisheries.noaa.gov/2021-12/SFW_IHA_issued_OPR1.pdf.
[265] *Id.* at 29.
[266] 88 Fed. Reg. 72,628 (Oct. 20, 2023).

Endangered Species Act: North Atlantic right, blue, fin, sei, and sperm whales. For the North Atlantic right whale, the Service authorized a maximum of 44 annual takes a year and 56 overall.[267] The Service also approved annual takes of 8,119 of common dolphins, 1,263 harbor porpoises, and 2,325 gray seals. Even though the maximum number of harassments is several in the thousands, the Service classifies these incidental harassments as small.

169.    The Service's final decisions to issue Incidental Harassment Authorization in South Fork Wind and a Letter of Authorization and implementing Regulations in Revolution Wind were arbitrary, capricious, and not in accordance with law because they fail to comply with the Marine Mammal Protection Act and its implementing regulations, allow the take of a substantial, non-negligible, number of marine mammals, including North Atlantic right whales, bottlenose dolphins, and harbor seals; fail to use the best available science; fail to analyze the cumulative effects of other approved and proposed offshore wind projects; fail to analyze the vessel strikes caused by the two Projects' obstructions; and fail to analyze take resulting from interference with migration routes, breeding, feeding, and calving.

---

[267] 88 Fed. Reg. 72,630.

170.    The Environmental Impact Statements supporting the Service's final decisions state in addition to the temporary impacts of pile driving noise from the Project, the placement of structures in the Project would have a long-term, negative impact on marine mammals, including the endangered North Atlantic right whale. In particular, Revolution Wind's Environmental Impact Statement states that "[t]he presence of structures could also concentrate recreational fishing around foundations, potentially increasing the risk of marine mammal entanglement in both lines and nets and increasing the risk of injury and mortality due to infection, starvation, or drowning (Moore and van der Hoop 2012)."[268]

171.    By authorizing the take of 56 North Atlantic right whales over five years in Revolution Wind and 13 North Atlantic Right whales during South Fork Wind's construction—a species whose population has dwindled in the last two years from 368 to 338—during construction for Projects that are anticipated to have significant adverse impacts to the North Atlantic right whale, the Service failed to ensure that the level of takes will "have a negligible impact" on North Atlantic right whales, in violation of the Marine Mammal Protection Act and Administrative Procedure Act. Defendants' purported authorizations of these takes of marine mammals is arbitrary, capricious, and otherwise not in accordance with law and should be ruled unlawful and set aside.

**The Service Failed to Accurately Account for the Impacts of Anthropogenic Noise on Marine Mammal Stress**

172.    While the Incidental Take Regulations for Revolution Wind discuss the potential for temporary or permanent hearing damage due Revolution Wind's construction over five years,

---

[268] Revolution Wind Final Environmental Impact Statement *supra* note 4 at 3.15-23.

the Service makes the arbitrary and capricious assumption that the Project will not induce stress because the noise will be intermittent.

173.    Recent research demonstrates that exposure to intermittent or continuous anthropogenic noise has the potential to induce a state of chronic stress in marine mammals.[269] Chronic stress can have adverse health consequences on marine mammals, including higher mortality and morbidity, reduced reproductive success, immuno-suppression, heart disease, depressed reproductive rates, physical malformations, and birth defects.[270] By extension, chronic stress induced by exposure to anthropogenic sound can have a detrimental impact on marine mammal populations by affecting fertility, mortality and growth rates.[271]

174.    Even though the Service recognizes that chronic stress has adverse population effects, it asserts that the Project is not expected "to produce conditions of long-term and continuous exposure to noise leading to long-term physiological stress responses in marine mammals that could affect reproduction or survival."[272] This assertion lacks any rational basis and is contrary to the best available science that suggests that lower-level sounds generated by pile-driving, even when "intermittent," can still mask communications and "cause distraction,

---

[269] *See* J.W. Wright et al., *Concerns Related to Chronic Stress in Marine Mammals*, IWC SCI. COMM. DOC. IWC/SC/61/E16 (2009).

[270] *See* A.J. Wright et al., *Do marine mammals experience stress related to anthropogenic noise?*, 20 *Int'l J. Comparative Psychology* 274 (2007).

[271] *See id.*; see also 87 Fed. Reg. at 79,102 ("Chronic disturbance can cause population declines through reduction of fitness (e.g., decline in body condition) and subsequent reduction in reproductive success, survival, or both.").

[272] 88 Fed. Reg. 72,646.

limiting detection of biologically relevant communication or predator sounds."[273] These effects are known to induce chronic stress in marine mammals.[274]

175.     Even with these known effects, the Incidental Take Regulations fail to meaningfully consider the fact that even the purportedly intermittent noise from impact pile driving may cause stress beyond a Level B take. The Incidental Take Regulations underestimate the actual extent of the take and fail to consider a factor that is highly relevant to the Service's determination to issue a permit.

**The Service's Incidental Take Regulations and Permit Fail to Examine the Effects of Habitat Displacement on the North Atlantic Right Whale**

176.     North Atlantic right whales habituate in the Project area year-round and their habitat will be impacted by the Project in ways that the Service failed to address.

177.      The habitat in the Project area is vital to the North Atlantic right whale's life history functions, which include feeding and migration[275] and the Project overlaps with a Seasonal Management Area which was established to reduce the risk of vessel strikes.[276] The best available science establishes that the North Atlantic right whale is extremely sensitive to low-frequency continuous noise and the impacts of masking.[277] Populations that are resident or seasonally resident to a particular area, like the North Atlantic right whale, are intensely vulnerable to population-level effects as a result of the cumulative nature of the noise exposure

---

[273] T. Aran Mooney et al., *Acoustic Impacts of Offshore Wind Energy on Fishery Resources: An Evolving Source and Varied Effects Across a Wind Farm's Lifetime*, 33 OCEANOGRAPHY 82 (2020).
[274] *See* OCEANOGRAPHY 82 (2020). These effects are known to induce chronic stress in marine mammals. Rosalind M. Rolland et al., *Evidence that ship noise increases stress in right whales*, PROCEEDINGS OF THE ROYAL SOCIETY B: BIOLOGICAL SCIENCES (2012).
[275] 87 Fed. Reg. 79,088-89.
[276] 73 Fed. Reg. 60,173 (Oct. 10, 2008).
[277] Christopher W. Clark et al., *Comments on Arctic Ocean Draft EIS* at 2 (Feb. 28, 2012), available at https://tinyurl.com/5fsfmwst.

and the additional harm that may be caused by habitat displacement.[278] In fact, even temporary displacement increases energetic costs as the whales search for new (and possibly less productive) foraging areas and in turn, "could lead to increased susceptibility to other stressors (e.g., a shift in distribution can change the overlap with vessel traffic and fishing activities)."[279]

178.    Here, the Service acknowledges that Revolution Wind and South Fork Wind may result in the displacement of North Atlantic right whales from the Project area and its surrounding vicinity,[280] yet fails to engage in any meaningful quantitative or qualitative analysis of the effects of such displacement. Instead, the Service simply asserts that the affected individuals will use another habitat. This cursory statement does not equate to an evaluation of the effects on individuals and the population that may result from the abandonment of *this* habitat.

179.    The Service does not analyze how the whales' abandonment of the habitat in the Revolution Wind and South Fork Wind lease areas, would push the species further into a vessel traffic corridor, thereby elevating the risk to the species. Nor does the Service consider the additive effects of the Projects and other planned activities—including the exponential expansion of wind energy development—expected to occur throughout the region and impacting the same North Atlantic right whales. Taken together, Revolution Wind, South Fork Wind, and other planned activities may result in widespread displacement—or even abandonment—of important

---

[278] *See* K.A. Forney et al., *Nowhere to go: noise impact assessments for marine mammal populations with high site fidelity*, 32 ENDANGERED SPECIES RES. 391 (2017).
[279] *See* BOEM and NOAA's Draft Strategy on the North Atlantic Right Whale and Offshore Wind,
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NARW_OSW_Strategy.pdf.
[280] 87 Fed. Reg. at 79,154.

habitat in the region, which would have devastating impacts on the viability and resilience of North Atlantic right whales.

180.    Defendants' actions are arbitrary, capricious, and contrary to law, and have deprived the Plaintiffs of the procedural and substantive protections of the Marine Mammal Protection Act and threaten to irreparably harm the Plaintiffs' interests.

**Fifth Cause of Action**
**Violation of the Migratory Bird Treaty Act**
**and the Administrative Procedure Act**

181.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

182.    The Migratory Bird Treaty Act[281] prohibits the take—the killing, capturing, selling, trading, and transportation—of protected migratory bird species.[282] The Act applies broadly to the killing of any migratory bird "at any time, by any means or in any manner."[283]

183.    The lease areas of Revolution Wind and South Fork Wind sit within the Atlantic Flyway, which "is an important migratory pathway for up to 164 species of waterbirds."[284] Rhode Island is also home to the Norman Bird Sanctuary and the Sachuest Point National Wildlife Refuge—both located only 15 miles away from these lease areas—which provide vital stopovers and wintering areas for migratory birds. Over 55 species of birds, including four endangered species (Piping Plover, Red Knot, Roseate Tern, and Black Capped Petrel) and two threatened eagle species (the Golden Eagle and the Bald Eagle), will encounter turbines in the lease area, causing increases in bird mortality, decreases in fitness, and other adverse health

---

[281] 16 U.S.C. § 703.
[282] *Id.*
[283] 16 U.S.C. § 703(a).
[284] Revolution Wind Final Environmental Impact Statement *supra* note 4 at 3.7-20.

effects through the "the accidental release of fuel, hazmat, and trash and debris from vessels associated with construction and installation."[285]

184.    In approving the Construction and Operations Plan, BOEM failed to adequately consider the impact the Revolution Wind Project and the South Fork Wind Project will have on migratory birds, consider and adopt mitigation measures, and alter the Project to avoid injuring or killing migratory birds. As such, the decision to approve the Construction and Operations Plans was arbitrary, capricious, and not in accordance with the law.

185.    Because the Revolution Wind Project and the South Fork Wind Project will take migratory birds, in clear violation of the Migratory Bird Treaty Act, Defendants' approval of the Project is arbitrary, capricious, and not in accordance with the law. This approval should therefore be invalidated and set aside.

186.    Defendants' actions have deprived Plaintiffs of the substantive and procedural protections in the Migratory Bird Treaty Act and will irreparably harm Plaintiffs' interests.

**Sixth Cause of Action**
**Violation of the Coastal Zone Management Act**
**and Administrative Procedure Act**

187.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

188.    The Coastal Zone Management Act ("CZMA") requires that "[e]ach federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs."[286] The Coastal Zone Management Act further requires

---

[285] *Id.* at 3.7-25.
[286] 16 U.S.C. § 1456(c)(1).

that, for federal activities in the Outer Continental Shelf, "all federal license or permit activities . . . which affect any coastal use or resource are conducted in a manner consistent with approved management programs."[287] Violations of the CZMA by Federal agencies are reviewed under the Administrative Procedure Act.

189.    The State of Rhode Island has adopted, and the federal government has approved, the Rhode Island Ocean Special Area Management Plan as a comprehensive state coastal management plan under CZMA. The Plan is a comprehensive set of regulations to control and evaluate uses and development involving 1,500 square miles of Rhode Island and federal waters. Those regulations promote and enhance existing uses of cultural and historic resources, fisheries, recreation, tourism, and marine transportation.[288]

190.    The Ocean Special Area Management Plan's purpose is to foster[] a functioning ecosystem that is both ecologically sound and economically beneficial[,]"[289] and the Plan ensures a rigorous review of all ocean development so that Rhode Island and its agencies meet their public trust responsibilities.[290] Any evaluation of ocean development in Rhode Island must include consideration of ecology, global climate change, cultural and historic resources, commercial and recreational fisheries, recreation and tourism, and—only when consistent with the state's Special Area Management Plan goals—renewable energy.[291]

191.    Rhode Island's Special Area Management Plan sets forth the following requirements for all developments in the waters offshore Rhode Island:

---

[287] 15 C.F.R. § 930.70.
[288] *See* 650 RICR 20-05-11.9(A).
[289] Rhode Island, *Ocean Special Area Management Plan* at 6 (May 4, 2011), https://seagrant.gso.uri.edu/oceansamp/pdf/samp_crmc_revised/RI_Ocean_SAMP.pdf
[290] *See* 650 RICR 20-05-11.9(A).
[291] 650 RICR 20-05-11.9.1—11.9.7.

80

- "Offshore developments shall not have a significant adverse impact on the natural resources or existing human uses of the Rhode Island coastal zone, as described in the Ocean SAMP."[292] This evaluation must consider whether "there is an overall net benefit to the Rhode Island marine economic sector from the development of the project or if there is an overall net loss[;]"[293]

- "Large-scale offshore developments shall avoid areas designated as Areas of Particular Concern,"[294] which includes areas with "unique or fragile physical features, or important natural habitats," "areas of high natural productivity," "areas with features of historical significance or cultural value," "areas of substantial recreational value," "areas important for navigation, transportation, military and other human uses; and," "areas of high fishing activity[;]"[295]

- Offshore Development shall be prohibited if it "result[s] in significant long-term negative impacts to Rhode Island's commercial or recreational fisheries. Long-term impacts are defined as those that affect more than one or two seasons[;]"[296]

- "[P]otential adverse impacts of offshore developments and other uses on commercial or recreational fisheries [shall] be evaluated, considered, and mitigated. . . ."[297] "Mitigation shall be negotiated between the Council staff, the [Fisheries Advisory Board], the project developer, and approved by the Council[;]"[298]

---

[292] 650 RICR 20-05-11.10.1(C).
[293] *Id.*
[294] 650 RICR 20-05-11.10.1(B).
[295] 650 RICR 20-05-11.10.2(A)(1)-(6).
[296] 650 RICR 20-05-11.10.1(E).
[297] 650 RICR 20-05-11.10.1(F).
[298] 650 RICR 20-05-11.10.1(G).

- Projects that create significant adverse impacts to moraine edges must be modified or denied;[299] and

- Sensitive fish, shellfish, and crustacean habitats shall be protected.[300]

192.    The Revolution Wind Project and the South Fork Wind Project, as approved by BOEM, fail to comply with Rhode Island's Special Area Management Plan, and are inconsistent with the state's coastal management plan,  in numerous respects, including:

- The Projects do not provide a net benefit to the State of Rhode Island and will irreversibly damage the marine ecosystem.

- The Projects will disrupt the natural functions of fish and marine mammals and There will be mortality to eggs, larvae, fish, shellfish, and benthic species at each turbine foundation, adversely impacting the fishery resources in the lease area.

- The Projects will create a net loss to existing Rhode Island Marine businesses, Shoreside businesses, like fish markets, distribution, processing, recreational fishing licenses, bait and gear sales, boat repairs, hotels, restaurants, shoreside fish sales, fuel, and travel, that profit from fishery resources within the Project areas

- The Projects will create major, long-term adverse impacts on commercial and for-hire fishing and drastically limit access to the lease area and the fishery resources available for There will be mortality to eggs, larvae, fish, shellfish, and benthic species at each foundation, adversely impacting the fishery resources in the lease area,[301] commercial fishing and processing.[302]

---

[299] 650 RICR 20-05-11.10.1(F).
[300] 650 RICR 20-05-11.10.1(I).
[301] *See* Rhode Island, Staff Report (April 12, 2023) at 20.
[302] *Id.* at 32.

- The Projects' turbines, offshore substations, and export cables will degrade Cox Ledge, the glacial moraine, and benthic habitats in the lease area, regardless of the so-called mitigation measures required by the Coastal Resources Management Board.

- The Projects will diminish the ability of boaters and fishermen to safely travel through the lease area and productively fish.

- The Fisheries Advisory Board did not agree with and did not approve the mitigation measures for commercial and for-hire fishery impacts.

193.   Although Rhode Island's Coastal Resources Management Council issued a consistency determination for the Projects, that determination is not supported by the record and has been challenged in state court. In protest of the Council's determination, all nine members of Rhode Island's Fishery Advisory Board—who were supposed to be consulted with during consistency review and mitigation negotiations—resigned due to the Coastal Resources Management Council's failure to follow the Special Area Management Plan and protect fishing interests.

194.   Because BOEM's approval of the Revolution Wind Project and the South Fork Wind Project are inconsistent with the requirements of Rhode Island's Special Area Management Plan, those approvals constitute final agency actions that are arbitrary, capricious, and otherwise not in accordance with the law. BOEM's approval should therefore be invalidated and set aside by this Court.

**Seventh Cause of Action**
**Violation of the National Historic Preservation Act**
**and Administrative Procedure Act**

195.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

196.    Plaintiffs Dee and Richard Gordon, Cornwall Lodge LLC, Howard G. Cushing III, 226 Ocean Avenue Moonwatch LLC, Kathryn K. and Jerome R. Kirby, Mary Cushing Coleman, Doug and Virginia Marzonie, Kristin and Andrew McKee, Ben and Leigh Carpenter, Charlotte DuHamel, Sandra Craig, Steven Gewirz and Katrina Hamilton Gewirz, Waves S, LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Paige Pieroni, Karen Blanchard, and Randy Panagakis own historic properties located within BOEM's identified Areas of Potential Effects. Many of these properties are located within federal or State recognized historic property districts in Newport, Middletown, and Little Compton, Rhode Island, are listed on the National Register as historic properties or landmarks, or are eligible for listing on the National Register.

197.    Newport, Rhode Island, is home to more than a dozen National Historic Landmarks, including the Bellevue Avenue Historic District, the Southern Thames Historic District, and the Ocean Avenue Historic District, as well as dozens of properties listed on the National Register. Numerous other properties in Newport are eligible to be placed on the National Register.

198.    The Ocean Avenue Historic District in Newport, otherwise known as "the Ocean Drive," is a roadway that bounds the city of Newport. Ocean Avenue is bordered on one side by beaches, ocean inlets, and cliffs and on the other side by ponds, swamps, fields, and sizeable

residences. Ocean Avenue is listed as a national landmark.[303] Plaintiffs Dee and Richard Gordon, Cornwall Lodge LLC, Howard G. Cushing III, 226 Ocean Avenue Moonwatch LLC, Kathryn K. and Jerome R. Kirby, and Mary Cushing Coleman and own properties in the Ocean Avenue Historic District and each is listed in Rhode Island's historic property register.

199.    The Bellevue Avenue Historic District is located along Bellevue Avenue in Newport, Rhode Island, and includes several historic gilded-age mansions. The District was declared a National Historic Landmark in 1976.[304] Plaintiffs, Waves S, LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Paige Pieroni, Karen Blanchard, and Randy Panagakis, own properties in the Bellevue Avenue Historic District.

200.    The town of Little Compton, Rhode Island, is home to seven properties on the National Register. The town is also home to several properties that are eligible to be placed on the National Register. Plaintiff Charlotte DuHamel owns the Mill at 581 West Main Road in Little Compton, which is eligible to be placed on the National Register.[305] Little Compton is also home to the Warren Point Historic District, which is recognized in the State of Rhode Island,[306] and eligible for listing on the National Register. Plaintiffs Doug and Virginia Marzonie, Kristin and Andrew McKee, and Ben and Leigh Carpenter own properties within the Warren Point Historic District.

---

[303] *Id.*

[304] *See* State of Rhode Island Historical Preservation & Heritage Commission, *National Historic Landmarks*, https://preservation.ri.gov/historic-places/national-historic-landmarks (last visited Jan. 11, 2024).

[305] State of Rhode Island Historic Property Search, *Search: 581 West Main Road*, https://www.ri.gov/preservation/search/view.php?idnumber=LTCO00042 (last visited Jan. 11, 2024).

[306] Rhode Island Historical Preservation Commission, *Historic and Architectural Resources of Little Compton, Rhode Island* (1990), https://preservation.ri.gov/sites/g/files/xkgbur406/files/pdfs_zips_downloads/survey_pdfs/little_compton.pdf.

201.     Middletown, Rhode Island, is home to the Indian Avenue Historic District, which has been given a determination of eligibility for the National Register.[307] Plaintiffs, Steven Gewirz and Katrina Hamilton Gewirz, own property within the Indian Avenue Historic District. The town is also home to the Stoneybrook Estate Historic District, which comprises 501 Indian Avenue to 521 Indian Avenue. The Stoneybrook Estate was placed on the National Register in 2009. Plaintiff Sandra Craig owns property within the Stoneybrook Estate Historic District.

**Violation of Section 106 of the National Historic Preservation Act**

202.     Section 106 of the National Historic Preservation Act[308] requires federal agencies to consider and take into account the effect of federal undertakings, permits, and projects on any historic property prior to approval of the undertaking.[309] Section 106 prevents federal agencies from approving any undertaking unless the agency takes into account the effects on historic properties and resolves the adverse effects on those properties.[310]

203.     As part of this consideration, the acting federal agency—in this case, BOEM—must give interested parties and the public a chance to weigh in on how the federal projects—Revolution Wind and South Fork Wind—will impact historic properties.

204.     The Section 106 consultation involves a four-step process: (1) initiation, where the agency determines whether the action is an undertaking subject to review; (2) identification of historic properties in the Area of Potential Effects; (3) assessment of whether the action would

---

[307] State of Rhode Island Historic Property Search, *Search: Indian Avenue Historic District*, https://www.ri.gov/preservation/search/view.php?idnumber=MIDL00008 (last visited Jan. 11, 2024).
[308] 54 U.S.C. §§ 100101 to 307101.
[309] 54 U.S.C. § 306108.
[310] *Id.*

cause adverse effects to historic properties; and (4) resolution between the parties on steps to address adverse effects.

205.    Once an agency determines that the action is an undertaking that triggers a Section 106 Consultation, the agency identifies an Area of Potential Effects, which sets the scope of review. Once this area is set, the agency identifies historic properties within the Area of Potential Effects. These include properties that are listed on the National Register and those that could be eligible for the National Register.

206.    The agency must also identify parties to consult with, which include local governments, tribal nations, or other parties with a demonstrated interest in the undertaking,[311] and make a "[r]easonable and good faith effort" to identify historic properties.[312] That effort may include "background research, consultation, oral history interviews, sample field investigation, and field survey. . . . The agency official should also consider other applicable professional, State, tribal, and local laws, standards, and guidelines."[313]

207.    The Revolution Wind Project and the South Fork Wind Project are undertakings that are subject to Section 106 of the National Historic Preservation Act.

208.    During its historic property review, BOEM identified three Areas of Potential Effects: (1) Marine Area of Potential Effects consisting of "all offshore areas where seafloor disturbing activities from [turbines and offshore substation] foundation construction IAC trenching and installation, boulder relocation, and vessel anchoring could occur[;]"[314] (2) Terrestrial Area of Potential Effects consisting of a 20-acre landfall work area; and (3) a visual

---

[311] 36 C.F.R. § 800.2(c).
[312] 36 C.F.R. § 800.4(b)(1); *see also United Keetoowah Band of Cherokee Indians in Oklahoma v. Federal Communications Commission*, 933 F.3d 728 (D.C. Cir. 2019).
[313] 36 C.F.R. § 800.4(b)(1).
[314] Revolution Wind Final Environmental Impact Statement at Appendix J-12.

Area of Potential Effects which consists of Connecticut, New York, Rhode Island and Massachusetts coastal areas and includes a radius of 40 miles for offshore components and a radius of three miles for onshore components.[315]

209.    BOEM failed to identify all of the historic properties that the Revolution Wind Project and the South Fork Wind Project will adversely affect and failed to identify all of the historic properties within the Areas of Potential Effects. Failing to identify these properties was neither reasonable nor done in good faith, and it impermissibly narrowed the scope of BOEM's review of historic properties.

210.    In approving these projects without taking into account the impacts on historic properties and without conducting a proper Section 106 consultation, BOEM failed to comply with the National Historic Preservation Act in the following ways:

- BOEM failed to assess and resolve the projects' adverse direct, indirect, and cumulative effects and adverse economic effects on the Plaintiffs' historic properties.

- BOEM failed to adequately consult, or to consult at all, with interested parties with historic properties in the Areas of Potential Effects, including Plaintiffs.

- BOEM failed to consult with property owners, including Plaintiffs, regarding mitigation measures, resulting in drastically inadequate proposals that do not provide mitigation for all the historic properties that will be affected by the projects.

---

[315] *Id.* at J-14.

211.    Authorizing the Revolution Wind Project and the South Fork Wind Project without a proper Section 106 consultation and without Section 106 compliance was arbitrary, capricious, and contrary to law.

**BOEM also Violated Section 110(f) of the National Historic Preservation Act**

212.    Section 110(f) of the National Historic Preservation Act requires BOEM to minimize harm to National Historic Landmarks.[316] Section 110(f) contemplates a higher level of scrutiny requiring that "[p]rior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark."[317]

213.    BOEM failed to comply with Section 110(f)'s heightened standard of review by failing to engage in all possible planning to minimize harm to National Historic Landmarks, which include the Bellevue Avenue Historic District, the Ocean Avenue Historic District, the Newport Historic District, Southern Thames Historic District, town of Little Compton, and the Indian Avenue Historic District, among others.[318]

214.    BOEM failed to conduct adequate visual simulations, assess adverse effects, and resolve the adverse effects to the National Historic Landmarks.

215.    BOEM also failed to properly consult with the National Park Service and the Advisory Council to identify adequate ways to minimize harm to the National Historic Landmarks. Instead, BOEM relied on mitigation measures it identified and developed during its

---

[316] 54 U.S.C. § 306107.
[317] *Id.*
[318] *See* State of Rhode Island Historical Preservation & Heritage Commission, *National Historic Landmarks*, https://preservation.ri.gov/historic-places/national-historic-landmarks (last visited Jan. 11, 2024).

NEPA review and Section 106 consultation, which fail to meet the stringent standards in Section 110(f).

216.     Authorizing the Revolution Wind and South Fork Wind projects without using all possible planning to minimize harm to the National Historic Landmarks at issue in this case violates Section 110(f) and was arbitrary, capricious, and contrary to law.

**Prayer for Relief**

Plaintiffs, Green Oceans, Responsible Offshore Development Alliance, Save the Right Whales Coalition, New England Fishermen's Stewardship Association, Bat World Sanctuary, Chris Brown, Ralph Craft, Murray Danforth, Rich Hittinger, Lauren Knight, Lisa Quattrocki Knight, M.D., Ph.D., Gary Mataronas, Eric Philippi, Benjamin Riggs, Alan Shinn, Cornwall Lodge, Ledges 66 LLC (Howard G. Cushing III), 226 Ocean Avenue Moonwatch LLC, Mary Cushing Coleman, Richard and Dee Gordon, Charlotte DuHamel, Doug and Virginia Marzonie, Kristin and Andrew McKee, Ben and Leigh Carpenter, Veter et Nova Trust (Sandra Craig), Steven Gewirz and Katrina Hamilton Gewirz, Kathryn K. and Jerome R. Kirby, Waves S, LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Pieroni Family Revocable Trust (Michael and Paige Pieroni), Karen Blanchard, and Panagakis Family Trust (Randy Panagakis) ask the Court for the following relief:

1.     An order holding unlawful, vacating, and setting aside Defendants' November 17, 2023, decision approving the Construction and Operations Plan for the Revolution Wind Project, Incidental Harassment Authorization, and Clean Water Act permits as arbitrary, capricious, and otherwise not in accordance with law;

2.     An order holding unlawful, vacating, and setting aside Defendants' January 18, 2022, decision approving the Construction and Operations Plan for the South Fork Wind Project,

90

Incidental Harassment Authorization, and Clean Water Act permits as arbitrary, capricious, and otherwise not in accordance with law;

3.      Reasonable attorneys' fees and costs for bringing this suit; and

4.      Such other and further relief as the Court deems appropriate.


Dated: January 16, 2024                    Respectfully submitted,

                                           Roger J Marzulla
                                           Nancie G. Marzulla
                                           Marzulla Law, LLC
                                           1150 Connecticut Ave., NW
                                           Suite 1050
                                           Washington, D.C. 20036
                                           (202) 822-6760
                                           roger@marzulla.com
                                           nancie@marzulla.com


                                           Counsel for Plaintiffs