IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREEN OCEANS, *et al.*,<br><br>     *Plaintiffs,*<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>     *Defendants,*<br><br>   and<br><br>SOUTH FORK WIND, LLC & REVOLUTION WIND, LLC,<br><br>     *Proposed Defendant-Intervenors* | Case No.: 1:24-cv-00141-RCL |

**DECLARATION OF KELLEN INGALLS IN SUPPORT OF REVOLUTION WIND, LLC'S INTERVENTION AS A DEFENDANT**

Pursuant to 28 U.S.C. § 1746(2), I, Kellen Ingalls, hereby declare:

     1.    I am employed by Orsted North America Inc. ("Ørsted") as the Project Development Director for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project"). I have been employed at Ørsted as the Project Development Director since October 2019. Collectively I have worked on the Project for approximately four years and I have over 15 years of professional experience in the renewable energy field. Ørsted and its affiliate companies develop, construct, and operate offshore and onshore wind farms, solar farms, energy storage facilities, and bioenergy plants, and provide energy products to their customers. I obtained my Bachelor of Arts in English from the State University of New York at Fredonia in 2004, and obtained my Master of Arts in English with a Concentration in Environmental Communications from the University of Vermont in 2008.

2.      The Project will contribute to the federal government's, Connecticut's, and Rhode Island's carbon reduction goals.

3.      The Project will supply renewable energy and jobs to Rhode Island and Connecticut. Overall, the Project will create more than 4,100 full-time equivalent jobs (direct, indirect, and induced effects of the Project) during Project construction, and an estimated 236 full-time equivalent jobs annually for the Project's operations and maintenance work.

4.      The Project is owned by Revolution Wind, LLC ("Revolution Wind"). Revolution Wind is a joint venture indirectly owned in equal part by Ørsted and Eversource Energy. Revolution Wind was formerly known as DWW Rev I, LLC. Revolution Wind and its affiliates worked to obtain the Bureau of Ocean Energy Management ("BOEM") lease at issue and to develop the Project for over seven years.

5.      The Project consists of up to 65 wind turbine generators ("WTGs") forming an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility that will be constructed on BOEM Renewable Energy Lease No. OCS-A 0486, which is located in the Atlantic Ocean approximately 15 miles east of Block Island, Rhode Island, and approximately 15.7 miles from Newport, Rhode Island, on the Outer Continental Shelf ("OCS") in federal waters.

6.      The Project has kept the public aware of construction activities, including through a website and listserv. In September 2023, the Project began onshore construction activities, which recently have included excavation to build the underground duct banks and work zone preparation for the new interconnection station and substation.[1] In January 2024, the Project began seabed-preparation activities in preparation for offshore construction. Revolution Wind has ordered equipment and contracted with vessels to prepare for offshore construction. Once operational, the

---

[1] Revolution Wind, Construction Updates, https://revolution-wind.com/resources-and-faqs/construction-updates ("Week of January 29" under the "January 2024" section).

Project will deliver approximately 704 MW of clean energy—approximately 304 MW to Connecticut and approximately 400 MW to Rhode Island, enough to power more than 350,000 homes, eliminating up to approximately 3 million tons of carbon emissions annually and over 100 million tons of carbon emissions over the Project's lifetime (estimated for this calculation as 35 years).

7. Revolution Wind has been awarded five power purchase agreements ("PPAs") under three separate procurements for a combined approximately 704 MW of generating capacity: (1) two October 2018 PPAs with Connecticut utilities for approximately 200 MW; (2) a February 2019 PPA with the Rhode Island utility for approximately 400 MW; and (3) two November 2019 PPAs with Connecticut utilities for another approximately 104 MW.

8. To date, Revolution Wind has incurred substantial financial obligations developing, permitting, engineering, procuring, fabricating, preparing for, and commencing construction of the Project. Revolution Wind has contractual commitments exceeding $1 billion to date in developing the Project.

9. As Project Development Director for the Project, I am and have been involved in and aware of negotiation and management of commercial and real estate agreements, local, state, and federal permitting, stakeholder and market affairs management, cable and interconnection facility siting, project layout and design, and site investigation activities for the Project. I am therefore personally familiar with Revolution Wind's environmental permitting and development history. I execute this Declaration in support of Revolution Wind's intervention in the case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.

10. Revolution Wind seeks to intervene in this action to protect its significant

protectable interests in the Project.

***Revolution Wind's development process has spanned seven years.***

11.  Revolution Wind has invested significant resources in the extensive, multi-year planning and development process for the Project, including through the development of voluminous technical and scientific submissions to federal, state, and local agencies and participating in public consultation and review processes, and to construct the Project.

12.  On July 31, 2013, BOEM conducted a competitive lease sale for commercial leasing for wind power on the OCS offshore Rhode Island and Massachusetts after conducting a thorough environmental review and issuing an environmental assessment.  The lease areas offered in this competitive sale process were the result of an extended public planning process, including consultation under National Historic Preservation Act ("NHPA") Section 106 regarding the issuance of the commercial lease and approval of site assessment activities.  Deepwater Wind New England, LLC ("DWNE") won lease OCS-A 0486.   DWNE segregated 13,700 acres of the area covered by lease OCS-A 0486, resulting in lease OCS-A 0517.  The remaining portion of Lease OCS-A 0486 was assigned to DWW Rev I, LLC.  DWW Rev I, LLC subsequently changed its name to Revolution Wind, LLC.

13.  Revolution Wind submitted a Site Assessment Plan ("SAP") as required by BOEM regulations to conduct site assessment activities in the Project lease area and BOEM issued its final approval for the SAP on October 12, 2017.[2]

14.  Revolution Wind and its affiliates conducted extensive surveys of the Project area pursuant to the approved SAP to understand and characterize the environment and the Project site.

---

[2] https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/RI/SIGNED_BOEM-to-DWW_SAP-Approval-for-OCS-A-0486_101217-%281%29.pdf.

These included meteorological, bathymetric, geological, geotechnical, geophysical, biological, archaeological, hazard, and oceanographic surveys.

15.    In March 2020, Revolution Wind submitted a detailed Construction and Operations Plan ("COP") to BOEM, describing the planned facilities and construction and operation activities for the Project. Revolution Wind also updated the COP to include updated technical information. The final version of the COP is thousands of pages long, including appendices.[3]

16.    On April 30, 2021, BOEM issued a Notice of Intent ("Notice") to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA") for its review of the Project COP. That Notice began a more than two year period of environmental review by the federal government involving Revolution Wind, twelve federal agencies, three state cooperating agencies, and an extensive array of other stakeholders, ranging from the fishing industry, to local communities, to American Indian tribes and historic preservation organizations. The draft EIS ("DEIS") was published on August 29, 2022, and after accepting and responding to public comments, BOEM published the final EIS ("FEIS") on July 21, 2023.[4]

17.    Appendix A to the FEIS describes the extensive consultations and public involvement BOEM undertook in the process of its NEPA review, as well as the more than 20 federal, state, and local consultations and approvals required for the Project.

18.    BOEM's NEPA process included three public scoping meetings where interested parties were invited to offer feedback and identify issues and potential alternatives for BOEM to consider in the EIS. BOEM held an additional five public meetings on the DEIS. Revolution Wind attended all of the meetings. Revolution Wind also submitted comments in the NEPA

---

[3] https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.
[4] The DEIS and FEIS are available under the "Environmental Review" tab at https://www.boem.gov/renewable-energy/state-activities/revolution-wind.

5

process.

19. On August 21, 2023, BOEM issued a Record of Decision ("ROD") documenting the Department of the Interior's decision to approve the COP, with some modifications.[5] BOEM subsequently issued the COP approval for the Project on November 17, 2023.[6]

20. Extensive additional time, effort, and financial resources were also expended to secure other required permits and approvals for the Project.

21. BOEM and other cooperating agencies conducted Endangered Species Act ("ESA") Section 7 consultation. 16 U.S.C. § 1536. In April 2022, BOEM submitted a draft Biological Assessment to the National Marine Fisheries Service ("NMFS") and U.S. Fish and Wildlife Service, which BOEM subsequently updated during the course of the consultation.[7] On July 21, 2023, NMFS issued a Biological Opinion ("BiOp") that assessed the potential effects of construction, operation, maintenance, and decommissioning of the Project on ESA-listed whales, sea turtles, fish, corals, and designated critical habitat in the Project area.[8] The BiOp concluded the Revolution Wind Project is not likely to adversely affect certain ESA-listed species and is not likely to jeopardize the continued existence of the remaining ESA-listed species (including the North Atlantic right whale).[9] The BiOp also concluded the Project would have no effect on several other ESA-listed species and no effect on the critical habitat designated for the North Atlantic right whale and several other ESA-listed species.[10] The BiOp included an Incidental Take Statement

---

[5] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf.
[6] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/COP%20Appv%20Ltr_REV%20OCS-A%200486.pdf.
[7] FEIS at Appendix A, A-9.
[8] NMFS's Biological Opinion is available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf.
[9] *Id*. at 424.
[10] *Id*.

pursuant to ESA Section 7(b)(4), 16 U.S.C. § 1536(b)(4), and identified the permitted take incidental to the Revolution Wind Project and enforceable mitigation measures and requirements to minimize impacts to listed species.[11]

22. On October 8, 2021, Revolution Wind submitted a request for the promulgation of regulations, known as Incidental Take Regulations ("ITR"), and issuance of a letter of authorization ("LOA") for the taking of marine mammals incidental to construction activities associated with the Project. On March 21, 2022, NMFS published in the Federal Register a notice of receipt of Revolution Wind's application, and held a 30-day public comment period.[12] NMFS published a proposed rule on December 23, 2022, and held a 45-day public comment period.[13] On October 20, 2023, NMFS published its final Incidental Take Regulations. On November 20, 2023, NMFS issued its LOA for the Project.[14]

23. NMFS's ITR and LOA allow for the incidental take of marine mammals during construction-related activities within the Project area from November 20, 2023 through November 19, 2028. NMFS's LOA includes over 30 pages of mitigation requirements and monitoring and reporting requirements.[15] The ITR and LOA authorize incidental take of marine mammals by harassment, but does not authorize take of marine mammals by mortality or serious injury.[16]

24. In June 2021, Revolution Wind submitted consistency certifications to the Rhode

---

[11] *Id*. (Section 11.0 – Incidental Take Statement).
[12] NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode Island, 88 Fed. Reg. 72,562 (Oct. 20 2023), https://www.federalregister.gov/documents/2023/10/20/2023-22056/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.
[13] 88 Fed. Reg. at 72,563.
[14] NMFS LOA for the Project, https://www.fisheries.noaa.gov/s3/2023-11/BL52-Revolution-Wind-LOA-OPR1-Final-signed-OPR1.pdf.
[15] LOA at 3 – 34.
[16] 88 Fed. Reg. at 72,562; LOA at 2.

7

Island Coastal Resources Management Council ("RI CRMC") and the Massachusetts Office of Coastal Zone Management ("MA CZM") for review for consistency, to the maximum extent practicable, with each state's approved coastal management program pursuant to the Coastal Zone Management Act, 16 U.S.C. § 1451.[17] In May 2023 (following approximately 20 months of review, two publicly-noticed meetings before the RI CRMC, and dozens of meetings with RI CRMC staff, many of which also included the Rhode Island Fisherman's Advisory Board), the RI CRMC issued a federal consistency determination of concurrence for the Project, finding it is consistent and complies with the enforceable policies of Rhode Island's approved coastal management program, subject to certain mutually agreed conditions.[18] The MA CZM also issued a federal consistency determination of concurrence for the Project in May 2023.[19]

25. Revolution Wind retained cultural resource specialists to conduct required assessments. SEARCH, Inc. was retained to conduct an extensive archaeological assessment and produce a Marine Archaeological Resource Assessment Report for the Project, and The Public Archaeology Laboratory, Inc. was retained to prepare a Terrestrial Archaeological Resources Assessment. Revolution Wind also hired Environmental Design & Research, Landscape Architecture, Engineering & Environmental Services, D.P.C., an experienced historic preservation consulting firm, to perform additional surveys and analyses, including reports titled:

        a. "Visual Impact Assessment and Historic Resources Visual Effects Analysis Revolution Wind Onshore Facilities" (2021);

        b. "Visual Impact Assessment Revolution Wind Farm" (2021);

        c. "Revolution Wind Farm National Historic Landmarks" (2022);

---

[17] *See* Revolution Wind FEIS, Appendix A, A-8-A-9.
[18] http://www.crmc.ri.gov/windenergy/revolution/RevWind_FedConDecision_20230512.pdf.
[19] Revolution Wind FEIS, Appendix A, A-8-A-9.

    d. "Cultural Resources Avoidance, Minimization, and Mitigation Measures" (2022); and

    e. "Historic Resources Visual Effects Analysis Revolution Wind Farm" ("HRVEA") (2022) (updated 2023).

26. In addition, BOEM retained SWCA Environmental Consultants to prepare a "Cumulative Historic Resources Visual Effects Analysis – Revolution Wind Farm and Revolution Wind Export Cable Project" (2022), which was updated on March 22, 2023.[20]

27. BOEM's NHPA Section 106 consultation process began in the Spring of 2021. Between April 2 and 30, 2021, BOEM extended invitations to consult under NHPA Section 106 to 127 potential consulting parties. Additional consulting parties were invited through the consultation process, as they were identified.

28. BOEM convened five consulting party meetings on December 21, 2021; April 8, 2022; September 27, 2022; April 7, 2023; and June 7, 2023. Revolution Wind participated in every consultation meeting. Revolution Wind also engaged in additional outreach directly to consulting parties to discuss potential mitigation measures. Revolution Wind met with Newport stakeholders, including Preservation Society of Newport County and its counsel as well as the Rhode Island State Historic Preservation Officer ("SHPO") and the National Park Service ("NPS") in January 2022. Revolution Wind met with the Southeast Lighthouse Foundation and its counsel as well as the Rhode Island SHPO, NPS, and the federal Advisory Council on Historic Preservation ("Advisory Council") in February 2022.

29. BOEM circulated documents and analyses to consulting parties and consulted on the Area of Potential Effect ("APE") for the Project and identification of historic properties in

---

[20] https://www.boem.gov/sites/default/files/documents/renewable-energy/RWF_CHRVEA_redacted_508_updated.pdf.

9

2022 and 2023.

30.     BOEM circulated a draft Finding of Adverse Effect ("FoAE") in August 2022 and draft Memorandum of Agreement ("MOA"), both of which were refined over time with additional consulting party comments and consultation meetings.

31.     BOEM circulated a final FoAE in June 2023.[21]  The FoAE discussed the process that was used to identify historic properties in the Project's APE, including properties in the "viewshed" from which renewable energy structures might potentially be visible, whether located onshore or offshore (the "Viewshed APE").

32.     BOEM determined that the Project would have adverse visual effects on 101 historic properties in Massachusetts and Rhode Island.  Of these properties, 37 are listed on the National Register of Historic Places.  Five of the properties are National Historic Landmarks ("NHLs"): Southeast Lighthouse NHL; Ocean Drive Historic District NHL; Bellevue Avenue Historic District NHL; The Breakers NHL; and Marble House NHL.  BOEM determined that the other remaining 350 historic properties in Rhode Island and Massachusetts within the Project's Viewshed APE, including seven NHLs, would not be adversely affected (or would not be affected at all).  Additionally, the FoAE described BOEM's compliance with NHPA Section 110(f) for the five NHLs that BOEM determined would be adversely affected by the Project.  In the FoAE, BOEM confirmed that it gave "a higher level of consideration to minimizing harm" to the five NHLs, and that it invited NPS (as delegated by the Secretary of the Interior) and the federal Advisory Council to be consulting parties and notified them of its determination of adverse effect to the NHLs.

33.     The FoAE determined that the magnitude of the Project's visual effects on the five

---

[21] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/RWF_FEIS_App_J_FOE-MOA_508_compressed.pdf.

NHLs would be minimized by the distance between proposed Project WTGs, as well as other factors (such as obscuring factors including fog, haze, sea spray, wave height, and normal viewer acuity) limiting views between the Project WTGs and the five NHLs.  The FoAE further concluded that while the Project would affect the historic setting of the five NHLs, it would not affect other character-defining features or aspects of the NHLs' historic integrity.  Nonetheless, the FoAE stated that, in addition to existing measures such as turbine spacing and lighting and marking requirements in compliance with BOEM guidance, BOEM would identify and finalize mitigation measures specific to each NHL with consulting parties through development of the Project MOA.

34. Each of the four relevant SHPOs—including Rhode Island's—concurred with or did not object to BOEM's FoAE.

35. BOEM consulted with the consulting parties on drafts of the MOA, and made the draft MOA available for public review and comment.  In August 2023, the final MOA was agreed to and executed by BOEM, the Connecticut SHPO, the Rhode Island SHPO, the New York SHPO, the Massachusetts SHPO, the Advisory Council, the U.S. Army Corps of Engineers, the Town of Aquinnah, Massachusetts, and Revolution Wind by August 17, 2023.[22]

36. The final MOA memorialized agreements by the signatories to adopt specific avoidance, minimization, and mitigation measures, including relating to the five affected NHLs, "in order to take into account the effects of the undertaking on historic properties."[23]  Specifically, to minimize adverse impacts to historic properties, including the NHLs, the MOA required that BOEM include mitigation measures as conditions of approval for the Project COP, including: (1) uniform WTG design, speed, height, and rotor diameter to reduce visual contrast and clutter; (2)

---

[22] https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/RevolutionWindFarm_MOA.pdf.

[23] MOA at 5.

11

uniform WTG spacing to decrease visual clutter; (3) an option to reduce the number of constructed WTGs from a maximum proposed number of 100 to as few as, or fewer than, 65 WTGs; (4) requirements that Revolution Wind color the WTGs pure white/light gray before operation to reduce daytime visibility on the horizon; and (5) the use of an aircraft detection lighting system to limit the time during which WTG lights are on and visual from affected properties, which Revolution Wind estimates will only be active for approximately three hours and 39 minutes over the course of a year.

37. Further, included as attachments to the MOA are Historic Property Treatment Plans ("HPTPs") that Revolution Wind is required to implement to mitigate visual adverse effects to historic properties. The proposed mitigation measures in the HPTPs serve to support other means of conveying the significance of the historic properties and to minimize the harm to NHLs, including documentation, interpretation, and dissemination of information and property preservation planning and activities (including repair and stabilization). Under the terms of the MOA, Revolution Wind is required to provide up to $11.6 million to support avoidance, minimization, and mitigation of all adverse effects to historic properties from the Project. In executing the MOA, the full suite of mitigation measures was agreed to by BOEM, all four SHPOs and the Advisory Council as sufficient to resolve adverse effects.

38. On June 3, 2022, Revolution Wind filed an application with the U.S. Army Corps of Engineers ("USACE") for a Clean Water Act Section 404 and Rivers and Harbors Act of 1899 Section 10 individual permit for the Revolution Wind Project. On September 2, 2022, the USACE issued a public notice and request for public comment on Revolution Wind's permit application.[24]

---

[24] https://www.nae.usace.army.mil/Portals/74/docs/regulatory/PublicNotices/2022/NAE-2020-00707-20220901-Public-Notice.pdf.

Following USACE's August 21, 2023 approval of the ROD,[25] USACE issued the CWA Section 404 and RHA Section 10 permit to Revolution Wind.[26] This permit includes environmental protection measures, annual compliance reporting, coastal surveying, and other special conditions on Revolution Wind's activities.

*Potential impairment of Revolution Wind's significant interests in the Project approvals.*

39. Revolution Wind has committed over $1 billion to date to plan, permit, develop, and construct this Project.

40. Revolution Wind has entered into contracts for the manufacture and transport of project components and for the leasing of vessels, and has taken other steps in reliance on the approvals challenged here. As discussed, Revolution Wind has also been awarded five PPAs under three separate procurements for a total combined approximately 704 MW of generating capacity. Revolution Wind's substantial financial and schedule obligations under these contracts and PPAs would be adversely impacted if the Project timeline were delayed by any of the relief sought in this lawsuit. For example, if Revolution Wind does not achieve commercial operations within the timeframe established under the PPAs, Revolution Wind may face liquidated damages, increased contract security requirements, and termination of its PPAs. If the Revolution Wind PPAs were to be terminated, the value of the Project would be substantially reduced, as Revolution Wind would likely lose the great majority of its investments and expected future profits.

41. As the Project developer, OCS lessee, holder of many state and federal permits, and owner of real estate rights from governmental and private entities, Revolution Wind seeks to

---

[25] USACE, BOEM, and NMFS issued a joint ROD for the Revolution Wind Project, available at https://www.nae.usace.army.mil/Portals/74/docs/regulatory/2023%20Permits/20230821_ROD_Signed_by_USACE.pdf?ver=QctSVRsZvrhaA1YFTltKsA%3d%3d.

[26] USACE's ROD and Permit for Revolution Wind are available at https://www.nae.usace.army.mil/Missions/Regulatory/Permits-Issued/Orsted-Revolution-Wind-LLC-Oct-2023/.

13

protect its significant financial investments in the Project as well as its significant investment of time in the administrative processes supporting the challenged approvals. Revolution Wind and its affiliates could lose billions of dollars if Plaintiffs succeed in blocking the Project.

42. As a result of its substantial investments in the Project and the related governmental approvals, Revolution Wind has a significant legally protectable interest in preserving and defending the numerous approvals that Plaintiffs have challenged in this case, which would be impaired if it were not permitted to intervene.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 5, 2024.

Kellen Ingalls