# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GREEN OCEANS, et al., )
)
           *Plaintiffs*, )
)
      v. )     Case No. 1:24-cv-00141-RCL
)
UNITED STATES DEPARTMENT OF THE )     Hon. Royce C. Lamberth
INTERIOR, et al., )
)
           *Defendants*, )
)
     and )
)
REVOLUTION WIND, LLC, )
)
           *Defendant-Intervenor.* )
)

## Hearing Requested

## MEMORANDUM IN SUPPORT OF MOTION
## FOR STAY OF FINAL AGENCY ACTION

Roger J. Marzulla
Nancie G. Marzulla
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, D.C. 20036
(202) 822-6760
roger@marzulla.com
nancie@marzulla.com
Bar No. 394907
Bar No. 400985

Counsel for Plaintiffs

**Table of Contents**

Table of Authorities..................................................................................................... iii

Facts ............................................................................................................................ 2

Procedural History ...................................................................................................... 2

Statutory and Regulatory Framework ........................................................................ 3

    1.    Endangered Species Act ................................................................................ 3

    2.    Marine Mammal Protection Act.................................................................... 6

Argument .................................................................................................................... 7

    1.    Standard of Review ...................................................................................... 7

    2.    The Government's Admission That It Does Not Have a Valid Biological Opinion Proves Plaintiffs' Likelihood of Success................................................................ 8

    3.    Plaintiffs Will Suffer Irreparable Injury Without a Stay ............................ 10

        3.1    Endangered Whales Will Be Irreparably Harmed Without a Stay............................ 12

        3.2    Without a Stay, Endangered Sea Turtles Will Be Irreparably Harmed .................... 15

    4.    The Agencies and Defendant-Intervenor Revolution Wind Will Not Be Harmed By a Stay of Approvals in This Case ..................................................................... 17

    5.    The Paramount Public Interest Lies in Protecting the Endangered Species of Whales and Sea Turtles that Inhabit the Revolution Wind Site ................................... 19

Conclusion ................................................................................................................ 21

**Table of Authorities**

**Cases**

*Bennett v. Spear*, 520 U.S. 154 (1997)......................................................................... 10

*Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55 (D.C. Cir. 2022) ...................... 17

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012)...... 5, 9

*Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972 (D.C. Cir. 1985)...................................... 8

*Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) ................... 1, 5, 9

*Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231 (2020) ............................................ 18

*Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992) ............................... 1, 5, 9

*Strahan v. Roughead*, 910 F. Supp. 2d 358 (D. Mass. 2012)............................................... 5, 9

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978)................................................... 4, 19, 20

**Statutes**

16 U.S.C. § 1362(13)............................................................................................................ 7

16 U.S.C. § 1371.......................................................................................................... 2, 6, 7

16 U.S.C. § 1372(a)(l)-(2)..................................................................................................... 7

16 U.S.C. § 1375(a)(1).......................................................................................................... 7

16 U.S.C. § 1375(b)............................................................................................................... 7

16 U.S.C. § 1531(b)........................................................................................................... 3, 4

16 U.S.C. § 1531-1544........................................................................................................ 10

16 U.S.C. § 1536(a)(2)...................................................................................................... 5, 17

16 U.S.C. § 1536(a)............................................................................................................... 4

16 U.S.C. § 1536(d)........................................................................................................... 4, 5

16 U.S.C. § 1536................................................................................................................ 20

16 U.S.C. § 1540(a)(1)...................................................................................................... 6, 17

16 U.S.C. § 1540(b)(1)...................................................................................................... 6, 17

16 U.S.C. § 1540(g)(1)(A)...................................................................................................... 1

16 U.S.C. § 1540(g)(1)(B)...................................................................................................... 1

5 U.S.C. § 705...................................................................................................................... 8

5 U.S.C. § 701-706............................................................................................................... 7

**Other Authorities**

88 Fed. Reg. 41,171............................................................................................................. 2

**Rules**

Fed. R. Civ. P. 65(c)............................................................................................................. 8

**Regulations**

50 C.F.R. § 402.14............................................................................................................ 1, 4

50 C.F.R. § 402.16............................................................................................................... 5

**LIST OF EXHIBITS**

**EXHIBIT NO.**                    **DESCRIPTION**

Ex. 1      NMFS Letter re Reinitiation of Endangered Species Act Section 7
           Consultation for the Revolution Wind Project (March 12, 2024)

Ex. 2      Declaration of Lisa Linowes (April 18, 2024)

Ex. 3      NMFS Letter re Request for Reinitiation of Endangered Species Act
           Section 7 Consultation for the Revolution Wind Project (November 17,
           2023)

Ex. 4      Declaration of Apostolos Gerasoulis (April 16, 2024)

Ex. 5      Declaration of Robert Rand (April 16, 2024)

Ex. 6      BOEM Reinitiation Analysis for the Revolution Wind Project (January 12,
           2024)

The Government has just revealed that it has withdrawn the Biological Opinion on which the federal authorization of the Revolution Offshore Wind Project was based, and plans to reinitiate review and consultation regarding the harmful impacts of the Project on endangered species, including whales and turtles. Plaintiffs, Green Oceans et al. (collectively "Green Oceans"), understand that Revolution Wind, LLC intends to move forward with its construction plans—before the consultation is complete and without the requisite Government-required Biological Opinion. Federal law is unambiguous: "Reinitiation of consultation requires [the consulting agency] to issue a new Biological Opinion before the agency action may continue."[1] The Government has opined that consultation will be complete by May 1, 2024, the date on which construction has always been set to begin. This suggestion not only pre-judges the outcome of the consultation, but it fails to offer any guarantee that the endangered species will be adequately protected in accordance with the Endangered Species Act.

Letting construction begin without appropriate environmental review and protections adopted to protect these species that could be developed in the consultation process will cause irreparable harm. Four species of whales and four species of turtles are listed under the Endangered Species Act,[2] and the proposed construction, set to begin on May 1, 2024, will directly adversely harm and affect them.

The Government's authorizations and approvals of Revolution Wind construction require a valid Biological Opinion[3]—which the Revolution Wind project no longer has. The Court

---

[1] *See Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992).
[2] 16 U.S.C. § 1540(g)(1)(A)), (B).
[3] 50 C.F.R. § 402.14.

1

should stay the effect of those authorizations until the Government complies with the

Endangered Species Act and Marine Mammal Protection Act.[4]

**Facts**

On July 21, 2023, the National Marine Fisheries Service (NMFS) issued a Biological

Opinion for the Revolution Wind Project offshore Rhode Island,[5] and one month later, the

Bureau of Ocean Energy Management (BOEM), United States Army Corps of Engineers, and

National Marine Fisheries Service issued a Joint Record of Decision approving construction and

operation of the Revolution Wind Project.[6] The Revolution Wind Project lease covers 83,798

acres of sea floor, including designated critical habitat for five endangered whale species[7] and

four endangered sea turtle species.[8] The Project, as authorized, will include 65 giant wind

turbines, each standing twice the height of the Washington Monument and each anchored to the

ocean floor by a solid steel foundation, called a monopile, which is 12 meters in diameter, driven

at least 98 feet into the ocean floor by a huge, ship-mounted pile driver.[9]

**Procedural History**

On January 16, 2024, Plaintiffs, Green Oceans, filed a complaint challenging the failure

of Defendants, the United States Department of the Interior et al., to comply with several major

---

[4] 16 U.S.C. § 1371.

[5] 88 Fed. Reg. 41,171.

[6] Bureau of Ocean Energy Management, *Revolution Wind Record of Decision* (Aug. 21, 2023) https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf.

[7] National Marine Fisheries Service, *Revolution Wind Biological Opinion* (July 21, 2023) at 1, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf (North Atlantic Right Whale, Fin Whale, Sei Whale, Sperm Whale, and Blue Whale).

[8] *Id.* (Green Sea Turtle, Kemp's Ridley Sea Turtle, Loggerhead Sea Turtle, Leatherback Sea Turtle).

[9] Orsted, *Revolution Wind Construction and Operations Plan* (Mar. 2023) at 97, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution%20Wind%20COP%20Volume%201%20March%202023_v2_508c.pdf.

environmental, natural resource, and federal planning laws in issuing permits and approvals for the Revolution Wind Project.[10] Revolution Wind, LLC, has intervened as a Defendant-Intervenor,[11] but Defendants have not yet filed a responsive pleading.

Last week, the Government informed Green Oceans' counsel that NMFS has reinitiated consultation with BOEM concerning the Revolution Wind Project and expects to issue a new Biological Opinion to supersede the July 2023 Biological Opinion for Revolution Wind challenged in our initial complaint (Third Cause of Action).[12] NMFS's March 12, 2024 letter to BOEM states that the consultation required by Section 7 of the Endangered Species Act must be reopened

> to consider changes to the proposed actions that may affect listed species in a manner or to an extent not considered in our July 2023 Biological Opinion as well as the availability of new information that reveals effects of the action that may affect listed species in a manner or to an extent not previously considered.[13]

Under the Government's existing authorizations and permits, Revolution Wind, LLC may begin pile driving on May 1, 2024.[14]

**Statutory and Regulatory Framework**

**1.      Endangered Species Act**

The Endangered Species Act ("ESA") provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, . . . [and] a program for the conservation of such endangered species and threatened species."[15] The Act requires all

---

[10] Compl. (Jan. 16, 2024), ECF No. 1.
[11] Order Granting Mot. To Sever and Mot. To Intervene (Apr. 10, 2024), ECF No. 25.
[12] Our Amended Complaint will address this development.
[13] *See* Exhibit 1, NMFS Letter re Reinitiation of Endangered Species Act Section 7 Consultation for the Revolution Wind Project (Mar. 12, 2024) (citing 50 C.F.R. 402.16(a)(2)-(3)).
[14] *Id*. at 2.
[15] 16 U.S.C. § 1531(b).

Federal departments and agencies to "conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes."[16] Congress's intent in enacting the Endangered Species Act "was to halt and reverse the trend toward species extinction, whatever the cost"[17]—even when doing so is inconvenient or counter to Government-created goals.

Section 7 of the ESA requires that a government agency (BOEM) consult with the Secretary (authority delegated to NMFS) before taking any action that may jeopardize endangered species (such as whales or sea turtles):

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species. . . .[18]

The regulations promulgated to implement ESA Section 7 require that an action agency—in this case, BOEM and the Corps—first must determine whether the action "may affect" an endangered or threatened species.[19] If so, the action agency must consult with the National Marine Fisheries Service, which has responsibility for marine species under the ESA.[20] The Section 7 consultation concludes when the National Marine Fisheries Service issues a Biological Opinion determining whether the proposed action jeopardizes the species: "[T]he Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."[21] And the consulting agency

---

[16] 16 U.S.C. § 1531(b).
[17] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).
[18] 16 U.S.C. § 1536(a).
[19] 50 C.F.R. § 402.14(a).
[20] *Id.*
[21] 16 U.S.C. § 1536(d).

(NMFS) must use "the best scientific and commercial data available" to it when preparing a biological opinion.[22]

Federal agencies must reinitiate their Section 7 consultation whenever "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."[23] Reinitiation is also required when an "identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion."[24]

Once reinitiation occurs, the original Biological Opinion is superseded: "'When reinitiation of consultation is required, the original biological opinion loses its validity,'"[25] and "[r]einitiation of consultation requires [the appropriate consulting agency] to issue a new Biological Opinion before the agency action may continue."[26]

During the Section 7 consultation, the parties are prohibited from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures."[27]

The take of an endangered species without a permit is punishable by both civil and criminal penalties: "Any person who knowingly violates . . . any provision of this chapter, or any provision of any permit . . . may be assessed a civil penalty by the Secretary of not more than

---

[22] 16 U.S.C. § 1536(a)(2).
[23] 50 C.F.R. § 402.16.
[24] Ex. 1 at 2.
[25] *Strahan v. Roughead*, 910 F. Supp. 2d 358, 375 (D. Mass. 2012) (quoting *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1108 (9th Cir. 2012)).
[26] *See Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992).
[27] 16 U.S.C. § 1536(d).

$25,000 for each violation. . ."[28] and "[a]ny person who knowingly violates any provision of this chapter, of any permit or certificate issued hereunder . . . shall, upon conviction, be fined not more than $50,000 or imprisoned for not more than one year, or both."[29]

**2.      Marine Mammal Protection Act**

The Marine Mammal Protection Act ("MMPA") directs that the primary objective of marine mammal management should be to maintain the health and stability of the marine ecosystem and, when consistent with that primary objective, to obtain and maintain optimum sustainable populations of marine mammals. In 2018, Congress amended the MMPA to require a general moratorium on the take of marine mammals without a permit:

> There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases. . . .[30]

The permit exception to the MMPA moratorium states that

> upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population stock . . . [provided that the Secretary] finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock. . . .[31]

The Marine Mammal Protection Act also prohibits persons or vessels subject to the jurisdiction of the United States from taking any marine mammal in waters or on lands under the

---

[28] 16 U.S.C. § 1540(a)(1).
[29] 16 U.S.C. § 1540(b)(1).
[30] 16 U.S.C. § 1371(a)(1).
[31] 16 U.S.C. § 1371(5)(a).

jurisdiction of the United States or on the high seas.[32] The baseline under the MMPA is that "no permit may be issued for the taking of any marine mammal."[33] That said, the Service may allow the incidental take of only "small numbers of marine mammals of a species or population stock."[34] Under the MMPA, "take" means to "harass, hunt, capture, kill, or attempt to harass, hunt, capture, or kill any marine mammal."[35]

The take of a marine mammal without a permit is punishable by both civil and criminal penalties: "Any person who violates any provision of [the MMPA] or of any permit or regulation issued thereunder . . . may be assessed a civil penalty by the Secretary of not more than $10,000 for each such violation[,]"[36] and "[a]ny person who knowingly violates any provision of [the MMPA] or any permit or regulation issued . . . shall, upon conviction, be fined not more than $20,000 for each such violation, or imprisoned for not more than one year, or both."[37]

**Argument**

**1.    Standard of Review**

The Administrative Procedure Act[38] gives the Court broad power to postpone the effective date of an agency action to preserve the status quo or avoid irreparable injury: "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," courts reviewing agency action "may issue all necessary and appropriate process to postpone

---

[32] 16 U.S.C. § 1372(a)(l)-(2).
[33] 16 U.S.C. § 1371.
[34] *Id.*
[35] 16 U.S.C. § 1362(13).
[36] 16 U.S.C. § 1375(a)(1).
[37] 16 U.S.C. § 1375(b).
[38] 5 U.S.C. § 701-706.

the effective date of an agency action or to preserve status or rights pending conclusion of the

review proceedings."[39]

The Court considers four factors to determine whether a stay is justified:

The factors to be considered in determining whether a stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.[40]

A stay may be granted if the plaintiff shows either a high likelihood of success or substantial

irreparable injury:

To justify the granting of a stay, a movant need not always establish a high probability of success on the merits. Probability of success is inversely proportional to the degree of irreparable injury evidenced. A stay may be granted with either a high probability of success and some injury, or *vice versa.*[41]

However, unlike a preliminary injunction, which requires a movant to post a bond, a stay

under 5 U.S.C. § 705 has no such requirement.[42]

## 2.    The Government's Admission That It Does Not Have a Valid Biological Opinion Proves Plaintiffs' Likelihood of Success

The Government itself has recently determined that the Biological Opinion that NMFS

issued last year, allowing the take of endangered whales and turtles resulting from the

construction of the Revolution Wind Project, is inadequate. In a recent letter to BOEM, NMFS

---

[39] 5 U.S.C. § 705 (The reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.").

[40] *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

[41] *Id.*

[42] *Compare* 5 U.S.C. § 705 ("the reviewing court . . . may issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings") *with* Fed. R. Civ. P. 65(c) (requiring that the "court may issue a preliminary injunction . . . only if the movant gives a security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

announced that it has reopened the statutorily required analysis of jeopardy to these species

because of information and activities that were not considered last year:

> BOEM and NMFS OPR have separately determined that reinitiation of consultation
> is necessary to consider changes to the proposed actions that may affect listed
> species in a manner or to an extent not considered in our July 2023 Biological
> Opinion as well as the availability of new information that reveals effects of the
> action that may affect listed species in a manner or to an extent not previously
> considered (50 CFR 402.16 (a)(2)-(3)).[43]

To remedy these flaws in its Biological Opinion, NMFS has reinitiated the statutorily

required consultation with BOEM under Section 7 of the Endangered Species Act and anticipates

issuing a new Biological Opinion:

> We anticipate that the result of reinitiation of this consultation will be a new
> Biological Opinion that will replace the July 21, 2023, Opinion. In this new
> Opinion, we will consider the changes to the proposed action and new information
> on effects (i.e., modifications to the clearance and shutdown zones for sea turtles
> during pile driving and changes to the amount and type of take of sei and fin whales
> authorized under the MMPA), review any other new information on listed species
> and effects of the federal actions, and will update the analysis as necessary. As such,
> the new Biological Opinion may include a revised Incidental Take Statement.[44]

Until NMFS issues a new Biological Opinion, BOEM has no authorization to take any

endangered whale, turtle (or other endangered species) caused by Revolution Wind Project

construction: "'When reinitiation of consultation is required, the original biological opinion loses

its validity,'"[45] and "[r]einitiation of consultation requires [the appropriate consulting agency] to

issue a new Biological Opinion before the agency action may continue."[46]

---

[43] Ex. 1.
[44] Ex. 1.
[45] *Strahan v. Roughead*, 910 F. Supp. 2d 358, 375 (D. Mass. 2012) (quoting *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1108 (9th Cir. 2012)).
[46] *See Env't Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992).

The take of an endangered species without NMFS authorization would be punishable by severe fines and possible imprisonment.[47] This prohibition applies to federal agencies and private parties.[48]

Plaintiffs' Third Cause of Action challenges the existing Biological Opinion as arbitrary, capricious, and contrary to law, and asks that it be invalidated and set aside. By admitting that the Biological Opinion is inadequate, the Government proves the validity of Plaintiffs' claim—establishing the likelihood that Plaintiffs will succeed on the merits and satisfying the first factor for granting a stay.

**3.     Plaintiffs Will Suffer Irreparable Injury Without a Stay**

Plaintiffs not only show a high likelihood of success on their Endangered Species Act claim, but they also show irreparable harm if the ongoing seabed construction and the intended May 1, 2024 start of pile driving are not stayed. For example, Lisa Linowes, President of Save the Right Whales, states that Revolution Wind's ongoing construction—even while Section 7 consultation is happening—threatens marine mammals and endangered whales in Revolution Wind's lease area. Construction must be halted until NMFS is able to review and analyze the impacts to the endangered whales and other marine mammals and NMFS should require more stringent mitigation measures to protect these animals that are dying at rapid rates.[49]

NOAA Fisheries (now NMFS) itself made this same point in a 2021 report titled *Right Whale Use of Southern New England Wind Energy Areas Increasing*:

> Construction and operation of hundreds of wind turbines is likely to introduce increased ocean noise, vessel traffic and possibly habitat alteration. All of these factors have the potential to affect right whales.

---

[47] 16 U.S.C. § 1531-1544.
[48] *Bennett v. Spear*, 520 U.S. 154, 173 (1997).
[49] *See* Exhibit 2, Declaration of Lisa Linowes (Apr. 18, 2024).

Increased vessel traffic in the region will bring with it a greater risk of vessel strikes, one of the leading causes of serious injury and death of right whales.

Increased noise from wind turbine construction and operations and vessels could also directly impact important whale behaviors and interfere with the detection of critical acoustic cues. These types of impacts may also be associated with physiological stress and could affect the whales' use of the region.

The presence of wind turbine foundations may impact oceanographic and atmospheric conditions including potential changes in ocean stratification. This might alter the formation of plankton aggregations and thus foraging opportunities for right whales.[50]

Additional studies also demonstrate an "increase in whale and large marine mammal deaths [observed] in recent years, which strongly correlates with the start of the offshore wind—program including surveying, sonar, site assessment mapping, and construction."[51]

Although reinitiation of consultation is supposed to halt a Project, NMFS, BOEM, and the Defendant-Intervenor are determined to keep up with the Project's schedule and to not delay—even though there is no longer a valid Biological Opinion and the required mitigation measures to comply with the ESA could be unclear. In fact, Defendant-Intervenor is working to construct the Revolution Wind while consultation is ongoing. Revolution Wind, LLC is clearing boulders in the lease area and installing scour protection throughout the lease area.[52]

When this construction activity started, the irreparable harm to the environment and to plaintiffs began. Once pile driving activities start, as planned, in May, even more damage will be done. The harm caused by the removal of boulders, the laying of cable and scour protection, and

---

[50] NOAA Fisheries, *Right Whale Use of Southern New England Wind Energy Areas Increasing* (July 29, 2021), https://www.fisheries.noaa.gov/feature-story/right-whale-use-southern-new-england-wind-energy-areas-increasing.
[51] Ex. 2 at ¶ 4.
[52] Orsted, *Revolution Wind Construction Update* (Apr. 17, 2024), https://d23h0vhsm26o6d.cloudfront.net/1e.-Orsted-Revolution-Wind-update-to-NEFMC.pdf.

the pile driving to install monopiles and cables cannot easily be reversed and may never be able
to be undone.

### 3.1     Endangered Whales Will Be Irreparably Harmed Without a Stay

Four endangered whale species—North Atlantic right whale, sei whale, fin whale, and
sperm whale—will be irreparably harmed by the construction that is already ongoing in the lease
area, and further irreparably harmed if pile driving activities commence on May 1, 2024 as
planned. We cannot know the full extent of the harm because, as NMFS admits, the full adverse
impact of the Project "was not considered in the biological opinion."[53]

We do know that "[i]n 2017, which is when offshore wind developers started ramping up
sonar monitoring and survey activities, there were 89 observed whale deaths—nearly three times
the number of deaths found in 2015" before offshore wind activities began.[54] And, as the now-
invalidated Biological Opinion states, 56 North Atlantic right whales will experience adverse
behavioral effects from Revolution Wind's construction-related activities.[55] An ongoing
independent investigation has also found a correlation between the "increase in offshore seismic
survey activity" and  "whale death" in areas along the Eastern seaboard.[56]

---

[53] Exhibit 3, NMFS Letter re Request for Reinitiation of ESA Section 7 Consultation for the
Revolution Wind Project (Nov. 17, 2023), at 2.
[54] Ex. 2 at ¶ 5.
[55] National Marine Fisheries Service, *Revolution Wind Biological Opinion* (July 21, 2023) at 40,
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-
Wind-BiOp.pdf.
[56] Exhibit 4, Declaration of Apostolos Gerasoulis (Apr. 16, 2024) at ¶ 6.

"The North Atlantic right whale is distinguished by its stocky body and lack of a dorsal fin. The species was listed as endangered on December 2, 1970."[57] As the Biological Opinion states, the species is in steep decline:

> The North Atlantic right whale population continues to decline. As noted above, between 1990 to 2011, right whale abundance increased by approximately 2.8% per year; however, since 2011 the population has been in decline (Pace et al. 2017). The draft 2023 SAR reports an overall abundance decline between 2011 and 2020 of 29.7% (Hayes et al.).[58]

Sei and fin whales are both listed as endangered due to past commercial whaling that caused a steep decline in populations, and both species are listed as depleted under the MMPA.[59] Like other endangered whales, these species are threatened by vessel strikes, reduced prey availability, an anthropogenic sound, and human-caused mortality[60]—making offshore wind activity a serious threat. Although the Government's Biological Opinion claims these whales are not usually present in the Revolution Wind area in the summer months (and so not affected by pile driving), during the summer months of 2023 fin and sei whales were regularly observed in and around Revolution Wind's lease area.[61] According to NMFS, these sightings indicate "that these species may be more likely to be exposed to noise during times when activities may be in

---

[57] National Marine Fisheries Service, *Revolution Wind Biological Opinion* (July 21, 2023) at 53, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf.

[58] *Id*. at 58.

[59] *Sei Whale*, NOAA Fisheries (last updated Oct. 30, 2023), https://www.fisheries.noaa.gov/species/sei-whale/overview; *Fin Whale (Balaenoptera physalus): Western North Atlantic Stock*, NOAA Fisheries (May 2022), https://media.fisheries.noaa.gov/2022-08/Fin%20Whale-West%20N%20Atl%20Stock_SAR%202021.pdf.

[60] *See* National Marine Fisheries Service, *Revolution Wind Biological Opinion* (July 21, 2023) at 68, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf.

[61] *See* Exhibit 6, BOEM Reinitiation Analysis for the Revolution Wind Project (Jan. 12, 2024) at 4.

the area and remaining in the area which increases the potential for" permanent damage.[62] And a recent independent investigation of the nearby Vineyard Wind Project area found that the pile driving activities create higher underwater decibel levels than considered and anticipated by BOEM and NMFS.[63]

"Sperm whales are the largest of the toothed whales and have one of the widest global distributions of any marine mammal species."[64] As with sei and fin whales, NMFS has erroneously dismissed the threat to this species on the grounds that they are not present in the Project area in the summer months. However, a recent study, authored by several biologists from NMFS, that documented the presence of whales in and near the Revolution Wind lease area and Cox Ledge using passive acoustic records found that sperm whales were present in the area year-round, with a majority of the acoustic occurrences of sperm whales occurring between May and August.[65] The study also found that sightings occurred in Cox Ledge and the Revolution Wind lease area.[66]

In addition,

[o]ther, non-endangered whales are also dying at increasing rates. For example, since the five turbine Block Island pilot offshore wind project construction started in 2016, there have been five humpback whale deaths near Block Island's turbines. NOAA's data indicates that before 2016 there were no humpback whale deaths near this area. Every year since 2016, vessel traffic related to offshore wind construction in the area has increased.[67]

---

[62] *Id.*
[63] Exhibit 5, Declaration of Robert W. Rand (Apr. 16, 2024) at ¶ 9.
[64] *Sperm Whale*, NOAA Fisheries (last updated Jan. 20, 2023),
https://www.fisheries.noaa.gov/species/sperm-whale.
[65] Westell, et al., *Acoustic Presence and Demographics of Sperm Whales (Physeter macrocephalus) off Southern New England and Near a US Offshore Wind Energy Area*, ICES CIEM (Jan. 26, 2024).
[66] *Id.* at 5.
[67] Ex. 2 at ¶ 13.

Without a stay to allow adequate analysis of the effects on these four endangered whale species—originally but erroneously thought to be absent from the Project area in the summer—these magnificent creatures will be pushed closer and closer to the brink of extinction from the noise, vessel traffic, and environmental degradation that Revolution Wind construction requires. Immediate commencement of pile driving "poses a great risk to marine mammals and will cause displacement, disturbance, avoidance behavior, injury, and even death."[68]

### 3.2    Without a Stay, Endangered Sea Turtles Will Be Irreparably Harmed

NMFS reinitiated consultation because BOEM proposed to modify the pile driving clearance and shutdown zones for sea turtles based on information from Revolution Wind's draft Nighttime Monitoring Plan, which is not publicly available for review.

If pile driving is allowed to begin on May 1, as contemplated by the Developer, BOEM, and NMFS, the four endangered sea turtle species—Loggerhead turtles, Kemp's Ridley Sea Turtles, Green Sea turtles, and Leatherback turtles—will experience irreparable harm that cannot be undone or mitigated.

The approved Construction and Operations Plan did not allow Revolution Wind to pile drive at night when these endangered sea turtles could not be seen.[69] But now the developer has asked the Government to drop this limitation and allow them to pile drive at night (for strictly economic reasons, apparently).[70] NMFS is ostensibly ready to rubber-stamp this request, stating

---

[68] Ex. 2 at ¶ 9 (citing Bureau of Ocean Energy Management, *Final Environmental Impact Statement* at 3.15-37, 42, 43, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2.pdf).

[69] Ex. 2 at ¶ 22-23.

[70] *See* Ex. 6.

"we are working to complete the consultation by April 30, 2024, so that it is available before the seasonal window for pile driving opens on May 1."[71]

The Plan and Biological Opinion also required that if a sea turtle is spotted within 500 meters of a monopile being installed, operations must temporarily cease.[72] But now Revolution Wind has asked the Government to drop this requirement to 200 meters—a method never analyzed in the Biological Opinion.[73]

The clearance zone that BOEM is asking NMFS to consider and approve for nighttime pile driving activities—the approval of which appears to be a foregone conclusion based on NMFS's response to reinitiation—is inadequate and will place sea turtles in imminent danger and cause irreparable harm to sea turtles. As outlined in the Declaration of Lisa Linowes, the light-enhancing devices that will be used by the developer to detect sea turtles in darkness are generally limited to less than 100 meters, making it less likely that sea turtles will be detected at 200 meters—let alone the 500 meters that NMFS has prescribed as necessary to protect the turtles. The 2020 and 2021 Protected Species Observer Technical Reports following high-resolution geophysical surveys at the Revolution Wind, Sunrise Wind, South Fork Wind, and Baystate Wind lease areas also show that under nighttime conditions while using all available technologies, the ability for observers to detect marine mammals, and by extension sea turtles, decreased dramatically at distances of more than 200 meters from an observing vessel.[74]

---

[71] *See* Ex. 1.
[72] National Marine Fisheries Service, *Revolution Wind Biological Opinion* (July 21, 2023) at 169, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf.
[73] Ex. 6.
[74] Ex. 2 at ¶ 23 (citing National Marine Fisheries Service, *Incidental Take Authorization: Orsted Wind Power North America, LLC Site Characterization Survey off of New York to Massachusetts* (Mar. 3, 2022), https://www.fisheries.noaa.gov/action/incidental-take-authorization-orsted-wind-power-north-america-llc-site-characterization).

Because NMFS's existing opinion is that nighttime pile driving jeopardizes these four species of sea turtle, and that even in daylight the observation area must be 500 meters, harm will hit the sea turtles if Revolution Wind, LLC is allowed to ignore these Government-disapproved construction methods starting May 1.

**4.    The Agencies and Defendant-Intervenor Revolution Wind Will Not Be Harmed By a Stay of Approvals in This Case**

The interests of the Government agencies and Intervenor will not be harmed by a stay. But a stay would benefit both the Government and Defendant-Intervenor because starting construction without a valid Biological Opinion violates the Endangered Species Act.

The ESA requires federal agencies to ensure "'that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat.'"[75] Under the ESA, it is unlawful to take a protected species without a valid biological opinion and corresponding incidental take statement.[76]

In the March 12, 2024 letter regarding reinitiation of consultation, NMFS stated that both NMFS and BOEM had

> separately determined that reinitiation of consultation is necessary to consider changes to the proposed actions that may affect listed species in a manner or to an extent not considered in our July 2023 Biological Opinion as well as the availability of new information that reveals effects of the action that may affect listed species in a manner or to an extent not previously considered."[77]

---

[75] *Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55, 62 (D.C. Cir. 2022) (quoting 16 U.S.C. § 1536(a)(2)).

[76] *See* 16 U.S.C. § 1540(a)(1) ("Any person who knowingly violates . . .  any provision of this chapter, or any provision of any permit . . . may be assessed a civil penalty by the Secretary of not more than $25,000 for each violation. . ."); *see also* 16 U.S.C. § 1540(b)(1) ("[a]ny person who knowingly violates any provision of this chapter, of any permit or certificate issued hereunder . . . shall, upon conviction, be fined not more than $50,000 or imprisoned for not more than one year, or both.").

[77] *See* Ex. 1.

17

In this statement, the Government admits that the July 2023 Biological Opinion did not consider all of the impacts of Revolution Wind. Issuing a stay to prohibit construction in Revolution Wind's lease area until after consultation is complete and a new Biological Opinion and Incidental Take Statement are issued is in the best interests of the agencies and the Intervenor because the take of an endangered species when there is an invalid Biological Opinion would be a violation of the ESA and, potentially, the MMPA.

The Government cannot credibly argue that it will be harmed by having to comply with environmental laws. Requiring an agency to do its statutorily required duty "is not a hardship, but an obligation."[78]

Likewise, Defendant-Intervenor has an interest in making sure environmental laws are complied with before conducting a federally approved activity that may result in the unlawful take/harassment of an endangered species without a valid Biological Opinion or Incidental Take Statement. In its motion to intervene, Revolution Wind sought "intervention to defend the validity of a government approval it ha[d] been granted," and that "a decision in [Revolution Wind's] absence would impair its ability to protect that interest."[79] Intervenor cannot argue that it will be harmed by the stay asked for here because Intervenor, like the Government, has an interest in protecting the project approvals by complying with environmental laws before conducting activity that will probably result in the unlawful take of an endangered species.

---

[78] *See Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 246 (2020) (bid protest case granting injunction where the harm in "requiring the government to continue purchasing the services from the incumbent for the interim does not outweigh the irreparable harm to an offeror arising from an agency's own failure to comply with the law in awarding the contract.").
[79] Mem. In Supp. of Mot. to Intervene, ECF No. 7-1 at 25.

While the Defendant-Intervenor may assert that it might suffer financial or economic harm from granting the stay, that financial harm would be de minimis compared to the potential harm caused by forging ahead without a valid Biological Opinion or Incidental Take Statement. That is particularly true here, while consultation is ongoing to "consider changes to the proposed actions that may affect listed species in a manner or to an extent not considered in our July 2023 Biological Opinion as well as the availability of new information that reveals effects of the action that may affect listed species in a manner or to an extent not previously considered."[80]

Despite the harm asserted that may be asserted by the Government or Defendant-Intervenor opposing this motion, the irreparable harm to the marine environment and to Plaintiffs of letting Revolution Wind's construction continue and letting pile driving commence on May 1—without a valid biological opinion and incidental take statemen, and before ESA consultation has concluded—requires a stay of the project approvals.

5.    **The Paramount Public Interest Lies in Protecting the Endangered Species of Whales and Sea Turtles that Inhabit the Revolution Wind Site**

The public interest, as expressed by Congress in the Endangered Species Act, gives first priority to the protection of endangered species: Section 7 "reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species."[81] In the landmark case of *Tennessee Valley Authority v. Hill*,[82] the Supreme Court rejected the argument that the interest in completing a nearly finished $100 million publicly financed dam overrode the public interest in protecting an endangered, minnow-like species that the dam would exterminate:

---

[80] *See* Ex. 1.
[81] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).
[82] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978).

The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute. All persons, including federal agencies, are specifically instructed not to "take" endangered species . . . . Agencies in particular are directed by §§ 2(c) and 3(2) of the Act to "use . . . *all methods* and procedures which are necessary" to preserve endangered species.[83]

So, while the public may have a legitimate interest in advancing the governmental offshore wind program,[84] that interest takes a backseat to the protection of species identified as endangered or threatened by governmental actions. And Revolution Wind, LLC's interests in time and money invested, and its profits to be made from this project, while important economic considerations, do not outweigh the significant public interest considerations in species preservation. There are, for example, only 338 remaining right whales in existence.

In a contest between a public policy project and endangered species protection, the species wins: "[I]t is clear Congress foresaw that § 7 would, on occasion, require agencies to alter ongoing projects in order to fulfill the goals of the Act."[85] So, the ESA commands that agencies assure that their actions do not jeopardize an endangered species:

One would be hard-pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies to ensure "that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of habitat of such species . . . ." This language admits of no exception.[86]

---

[83] *Id.* at 184–185.
[84] BOEM, however, admits that the Revolution Wind Project "would have no measurable influence on climate change." *See* Bureau of Ocean Energy Management, *Final Environmental Impact Statement* at 3.8-12, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2.pdf.
[85] *Tennessee Valley Auth.*, 437 U.S. at 186.
[86] *Id.* at 173 (quoting 16 U.S.C. § 1536).

**Conclusion**

Project construction should be prohibited until Section 7 consultation is complete and there is a new, valid Biological Opinion. Because plaintiffs have shown that there is a likelihood they will prevail on the merits, that the balance of harms weighs in Plaintiffs' favor, and that there is a substantial public interest in protecting these endangered species, this Court should grant Plaintiffs' Motion to Stay Revolution Wind's construction.


Dated: April 18, 2024                                           Respectfully submitted,

                                                                s/ Roger J. Marzulla
                                                                Roger J. Marzulla
                                                                Nancie G. Marzulla
                                                                Marzulla Law, LLC
                                                                1150 Connecticut Ave., NW
                                                                Suite 1050
                                                                Washington, D.C. 20036
                                                                (202) 822-6760
                                                                roger@marzulla.com
                                                                nancie@marzulla.com
                                                                Bar No. 394907
                                                                Bar No. 400985

                                                                Counsel for Plaintiffs