# EXHIBIT 3



**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

MEMORANDUM FOR:   Jennifer Anderson, Assistant Regional Administrator
Protected Resources Division
NMFS, Greater Atlantic Regional Fisheries Office

FROM:   Jolie Harrison, Chief
Permits and Conservation Division
Office of Protected Resources

HARRISON.JULIA.MARIE.1365843380
Digitally signed by HARRISON.JULIA.MARIE.1365843380
Date: 2023.11.17 10:12:36 -05'00'

SUBJECT:   Request for Consultation under Section 7 of the Endangered Species Act (ESA) for the Proposed Issuance of an Incidental Take Regulation and Subsequent Letter of Authorization to Take Marine Mammals Incidental to the Revolution Wind Offshore Wind Project, offshore of Rhode Island.

On October 20, 2023, the Permits and Conservation Division (PR1) issued regulations (88 FR 72562) to Revolution Wind, LLC (Revolution Wind) pursuant to section 101(a)(5)(A) of the Marine Mammal Protection Act of 1972, as amended (16 U.S.C. 1361 *et seq.*). The regulations allow for the issuance of a Letter of Authorization (LOA), which would allow the take, by Level A harassment and Level B harassment, of marine mammals incidental to construction of the Revolution Wind Offshore Wind Energy Project offshore Rhode Island in BOEM Lease Area Outer Continental Shelf (OCS)-A-0486 over a 5-year period (2023-2028). In the final rule, NMFS describes that, after consideration of public comment of the proposed rule (87 FR 79092, December 23, 2022), authorization of take, by Level A harassment, incidental to foundation pile driving and unexploded ordinances/munitions and explosives of concern (UXO/MEC) detonation of fin whales and sei whales, both of which are listed as endangered under the Endangered Species Act (ESA), is warranted.

On July 21, 2023, GARFO concluded consultation on the effects of all Federal actions associated with BOEM's proposed approval of Revolution Wind's Construction and Operations Plan inclusive of PR1's proposal to issue regulations (*i.e.*, the proposed rule; 87 FR 79092) and associated LOA, by issuing a final Biological Opinion (Opinion; Construction, Operation, Maintenance, and Decommissioning of the Revolution Wind Offshore Energy Project (Lease OCS-A 0486) GARFO-2022-03532). The formal ESA Section 7 consultation, including analysis in the Opinion, was based on the number of takes proposed to be authorized, as described in the proposed rule. The Biological Opinion concluded that the proposed actions, inclusive of PR1's action, was likely to adversely affect but not likely to jeopardize the continued existence of any

ESA-listed whale species and would have no effect on any critical habitat designated for any ESA-listed whale species.

In the present circumstances, NMFS OPR (PR1) is the Federal action agency and NMFS GARFO PRD is the consulting agency for ESA Section 7 consultation purposes. Reinitiation of ESA section 7 consultation is required and shall be requested by the Federal action agency or the consulting agency, where discretionary Federal involvement or control over the action has been retained or is authorized by law, and:

1. If the amount or extent of taking specified in the incidental take statement is exceeded;
2. If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
3. If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or
4. If a new species is listed or critical habitat designated that may be affected by the identified action.

PR1 requests that GARFO re-initiate ESA consultation. As explained below, criteria 2 and 3 have been met as issuance of the LOA would authorize the incidental take of endangered fin and sei whales by MMPA Level A harassment (permanent threshold shift (PTS)): this manner of take for these species specifically was not included in the proposed rule and thus not analyzed in the final Opinion. While PR1 may issue the LOA as early as November 17, 2023, the activities that have the potential to result in PTS are seasonally restricted from December 1 through April 30 (*see* 50 C.F.R. § 217.274(c)(1), § 217.274(e)(3)) and are not scheduled to occur until May 2024. Therefore, we request re-initiation of formal consultation on the effects of the final ITR and associated LOA for the Revolution Wind project with expected completion by March 15, 2024.

Revolution Wind proposes to, among other things, install 81 wind turbine generator (WTG) and offshore substation (OSSs) foundations and detonate up to 13 UXO/MECs. The acoustic and exposure modeling used to support Revolution Wind's application for an MMPA ITA suggest that there is potential for permanent threshold shift (PTS) to occur to multiple species, including endangered fin and sei whales (Table 1), as a result of exposure to noise from pile driving and UXO/MEC detonation. PR1's proposed rule fully evaluated the impacts to marine mammals, in general, from PTS (see Potential Effects of the Specified Activities on Marine Mammals and their Habitat and the Negligible Impact Analysis and Determination section). However, Revolution Wind did not request authorization to take, by Level A harassment (PTS), any mysticete other than humpback whales because their analysis concluded that the efficacy of the mitigation and monitoring measures for impact pile driving and UXO/MEC detonations (*e.g.*, seasonal restrictions, use of Protected Species Observers (PSOs) on multiple platforms, clearance

and delay or shutdown procedures, pile driving soft start, use of noise abatement system, real-time PAM monitored by PAM operators ) and anticipated avoidance behavior was anticipated to minimize the risk of PTS to most species, including fin and sei whales, to such a low probability that the modeled exposure estimates are not likely to occur. In PR1's proposed rule, NMFS agreed with Revolution Wind's analysis in their application that mitigation and monitoring measures would minimize the risk of PTS to fin and sei whales to such a low probability that the modeled exposure was not expected to occur. GARFO concurred with this analysis in the July 21, 2023 Opinion and concluded that exposure of ESA-listed whales to noise above the Level A harassment threshold was extremely unlikely to occur. As such, the effects of ESA incidental take by harm or injury to fin and sei whales were not evaluated in the Opinion or exempted take in the form of PTS in its Incidental Take Statement (ITS).

During the 45-day public comment period on the proposed MMPA ITA, PR1 received public comments from the Conservation Law Foundation, a group of environmental non-governmental organizations (ENGO), and the Marine Mammal Commission suggesting that the potential for PTS, as identified in the calculated exposure estimates, should not be discounted fully due to the proposed mitigation and monitoring measures. Specifically, the Marine Mammal Commission recommended NMFS authorize an amount of PTS equal to the exposure estimates for foundation pile driving and UXO/MEC detonation (*i.e.*, not consider any mitigation other than 10-dB attenuation through the use of sound abatement devices) while others suggested additional mitigation and monitoring was necessary to avoid PTS. In light of the multiple comments received regarding the concern over the potential for PTS, PR1 re-evaluated the potential for PTS to fin and sei whales (and other non-ESA listed marine mammals). We considered:

- new sighting data of fin and sei whales during times when foundation installation and UXO/MEC detonation may occur;
- Exposure estimates results from animal modeling;
- habitat areas of biological significance (i.e., fin whale BIA (Mar - Oct) located within the project area and time of year of foundation installation and UXO detonation; and
- The risk of monitoring not fully eliminating potential to PTS and impracticality of implementing shutdown measures (*i.e.* pile instability / refusal) for safety reasons.

PR1 has determined, after review of public comments and consideration of the best available science, that authorization of a small number of Level A harassment (PTS) takes of fin and sei whales incidental to impact pile driving foundations and UXO/MEC detonations is warranted for reasons described below and ensures that the impacts of these takes by Level A harassment, should they occur, have been appropriately considered in the analysis supporting NMFS negligible impact determination.

New Sighting Data:  The South Fork lease area is immediately adjacent to the Revolution Wind lease area. Importantly, since publication of the proposed rule, NMFS has received new sighting data of fin and sei whales near the Revolution Wind project area, observed during construction of the South Fork Wind Project. Recent PSO reports (South Fork Wind 2023) indicate fin and sei whales were commonly seen in the project area in June, July, and August 2023, which are within the months that foundation pile driving and UXO/MEC detonation may occur for the Revolution Wind project. In select months, fin whales were the second-most (n = 49; June) and most (n = 34; July) commonly sighted mysticete during construction of the South Fork Wind Offshore Wind Project, and sei whales (which are considered rare in southern New England) were the third-most commonly sighted mysticete by South Fork Wind PSOs in June (n = 14), and were also sighted in July (n = 2) and August (n = 1). These data indicate that fin and sei whales are regularly using habitat in the project area and thereby have higher likelihood of being exposed to pile driving and UXO/MEC detonations, and potentially remaining within the area for extended periods of time. These data suggest that the number of whales observed constitute re-sighted individuals over several days (e.g., it is unlikely 14 individual sei whales were observed but that the sightings were of a fewer number of individuals observed on more than 1 day). These data support the assumption that these species may be more likely to be exposed to noise during times when activities may be in the area and remaining in the area which increases the potential for PTS.  While this new data is important in considering the likelihood of PTS for particular species, it does not constitute new significant data wherein new environmental concerns or impacts on the action are raised as the impacts of PTS on marine mammals, in general, from the project was fully discussed in the proposed rule and hence, considered in the Opinion.

Habitat Areas of Biological Significance: In the proposed rule, we identified that the Revolution Wind lease area partially overlaps (11%) a fin whale foraging BIA from March to October when foundation installation and UXO/MEC detonation may occur (in part, noting impact pile driving of foundations is prohibited January 1 through April 30 and UXO/MEC detonation is prohibited November 1 through April 30). This remains the case; however, coupled with the recent sighting data described above, the potential for fin whales to remain in the area to forage warranted reconsideration of the amount of PTS proposed to be authorized from pile driving. Specifically, the fact that animals could be remaining in a given area for longer periods of time means that they could be exposed to the noise from pile driving for a longer duration - the likelihood of incurring PTS is influenced by a combination of received level and exposure duration and, all else being equal, increasing exposure duration increases the likelihood of PTS resulting from a given exposure.

Exposure Estimates: Exposure modeling resulted in the Level A harassment (PTS) exposure estimates for each species and activity, shown in column 2 of Table 1. As mentioned previously, these exposure estimates do not account for any mitigation or monitoring, other than 10-dB noise attenuation and the seasonal restriction on pile driving and UXO/MEC detonation. For impact

pile driving, we determined that it would be overly conservative to assume that the entire number of fin whale Level A harassment (PTS) exposures (6.4 exposures, rounded to 7 individuals) would occur (*i.e.*, that 7 fin whales would enter the Level A harassment (PTS) zone undetected), given the suite of required mitigation and monitoring measures for this activity. Therefore, we authorized the amount of Level A harassment (PTS) take equal to 20 percent of the fin whale exposure estimate, increased to group size (n = 2; Table 1) to account for the fact that individuals often occur with a typical number of conspecifics rather than in isolation. NMFS has determined 20% of the modeled exposure estimates is a reasonable amount of take to authorize considering the likelihood of aversion in the closer vicinity of the impact pile driving location and the likely effectiveness of the mitigation measures. This adjustment is consistent with the adjustment used in the Gulf of Mexico incidental take regulations (86 FR 5354, January 19, 2021), which was informed by the associated relative risk assessment framework developed by an expert working group in which animal movement models were used to evaluate predicted PTS, assuming aversion and, separately, no aversion. Modeled scenarios with no aversion probability overestimated PTS by about five times. Accordingly, total modeled PTS exposures calculated without accounting for aversion were multiplied by 0.2, and we have determined that this adjustment is conservative but similarly appropriate for this analysis. The impact pile driving Level A harassment (PTS) exposure estimate for sei whales (n = 2.5) is small and nearly equivalent to the average group size for the species, thus we authorized Level A harassment (PTS) take equivalent to the full exposure estimate, increased to the nearest whole number (n = 3). UXO/MEC Level A harassment (PTS) exposure estimates for both species are also very small (fin whale = 1.2; sei whale = 0.5) and, consequently, we authorized Level A harassment (PTS) take of each species equal to the species-specific average group size (fin whale = 2; sei whale = 2).

Monitoring/Mitigation: The combination of visual and acoustic monitoring is designed to reliably detect marine mammals such that the mitigation measures described in the proposed and final rule can be implemented for all project activities (*e.g.,* impact pile driving, UXO/MEC detonations). Further, we recognize the ER95% ranges for impact pile driving (Table 2) which reflect the closest point of approach during the various pile driving scenarios per day considering animal movement modeling, as described in the proposed rule, are small. Overall, the monitoring requirements in the final rule are anticipated to detect whales effectively. However, the addition of Level A harassment take of fin and sei whales in response to public comments and consideration of new PSO data remains justified under the MMPA.

As described above, recent sighting data suggests fin and sei whales are remaining within the project area for extended durations. Unlike North Atlantic right whales, we are not requiring Revolution Wind to conduct enhanced mitigation measures (*e.g*., delaying and shutting down pile driving if a whale is observed or acoustically detected at any distance) and there are no fin or sei whale sighting networks available to monitor that are analogous to the extensive reporting

contained within the North Atlantic right whale Sighting Advisory Network. We also acknowledge that Revolution Wind may begin pile driving when fin and sei whales are outside the clearance zone but may have difficulty in shutting down immediately (although Revolution Wind has indicated they believe the number of times they could not shut down would be minimal, if any). Further, because the seasonal restrictions of these activities are driven by North Atlantic right whale presence, conducting these activities outside of periods when North Atlantic right whales use the project area (versus summer when, for example, the fin whale BIA is identified) greatly minimize potential for exposures in general, including noise levels that may generate PTS. In summary, due to the seasonal restrictions and enhanced North Atlantic right whale monitoring and mitigation measures (*e.g.,* delaying the start of pile driving/UXO/MEC detonation or shutting down if a right whale is observed by PSOs at any distance or acoustically detected within 10kms; monitoring of North Atlantic right whale Sighting Network for increased awareness), PR1 retains that the potential for PTS of North Atlantic right whales from pile driving and UXO/MEC detonation is extremely unlikely, as described in the July 2023 Opinion.

PR1 included updated monitoring measures in the final rule (*e.g.,* increased number of PSOs on the pile driving vessel to 3 and determined that additional monitoring and mitigation measures to further minimize the potential for PTS (*e.g*., delaying or shutting down when a fin or sei whale is detected at any distance, similar to North Atlantic right whales) was unnecessary as the potential is already extremely low. Further, additional measures could also lead to unintended adverse consequences by delaying the project to times when large whales, particularly North Atlantic right whales, are present in higher densities. Overall, the combination of visual and acoustic monitoring is designed to reliably detect marine mammals such that effective mitigation can be implemented; however, PR1 acknowledges PTS may not be entirely avoidable in every case for certain (but remains very unlikely). Therefore, NMFS has conservatively included a small amount of take of these species in the final rule. Importantly, PR1 has determined that the issuance of the LOA to Revolution Wind, inclusive of authorizing a small amount of take by Level A harassment of fin and sei whales, will have a negligible impact on the affected species and stocks, that our mitigation measures effect the least practicable adverse impact on marine mammals and further, we do not anticipate that it will result in a change to determinations in the July Opinion concluding the proposed action is likely to adversely affect but not likely to jeopardize the continued existence of any ESA-listed whale species and would have no effect on any critical habitat designated for any ESA-listed whale species.

As noted above, PR1 has determined that two triggers for reinitiation of consultation have been met. The PTS modeled exposure estimates presented in PR1's proposed rule (and thus considered in the July 2023 Opinion) remains unchanged. However, public comments and new information, in the form of recent PSO data, led to PR1's conclusion to rely on the exposure estimates to authorize take for fin and sei whales in lieu of full discounting. Because PR1 did not specifically propose authorizing PTS of fin and sei whales in its proposed rule, doing so in the

final rule is considered to result in effects of the action on these listed species in a manner or to an extent not previously considered in GARFO's July 2023 Opinion (although we note that the proposed rule contains an analysis of the effects of PTS on marine mammals, including baleen whales, and remains unchanged). Overall, PR1's action of issuing the requested ITA to Revolution Wind remains unchanged; however, PR1 has since included fin and sei whales as species for which Level A harassment (in the form of PTS) would be authorized. For this reason, PR1 is requesting reinitiation of this ESA consultation.

Table 1. Level A harassment (PTS) exposure estimates and amount of take considered in PR1's final rule for impact pile driving and UXO/MEC detonations.

| Species | Exposure Estimates[1] | Amount of Take by Level A harassment (PTS) in PR1's Final Rule |
|---|---|---|
|  | Level A ($SPL_{cum}$) |  |
| Monopile installation (impact pile driving) | | |
| Fin | 6.4 | 2[2] |
| Sei | 2.5 | 3 |
| UXO/MEC detonations | | |
| Fin | 1.2 | 2[3] |
| Sei | 0.5 | 2[3] |

1 - The values here represent JASCO's density-based modeled exposure estimates that were included in PR1's proposed and final rules.

2 - Amount of take, by Level A harassment, incidental to foundation impact pile driving represents 20% of the modeled exposure estimates for foundation impact pile driving, increased to group size.

3 - Amount of take, by Level A harassment, incidental to UXO/MEC detonation represents the modeled exposure estimates rounded to group size.

Table 2. Impact Pile Driving Level A Harassment Exposure Ranges (ER95%) and UXO/MEC PTS-Onset Acoustic Ranges (R95%) for Fin and Sei Whales included in PR1's Proposed and Final Rules.

| Species | Level A Harassment (PTS) 95% Exposure Range (km) | SEL-based PTS-Onset R95% Acoustic Ranges (km) |
|---|---|---|
|  | Impact pile driving[1] | UXO/MEC detonation[2] |

| | | |
|---|---|---|
| Fin whale | 1.57-4.38 | 0.552 - 3.79 |
| Sei whale | 1.42 - 3.67 | 0.552 - 3.78 |

1 - A range of ER95% values is presented because modeled distances vary by the number of piles/day assumed (1 vs 3) and the sound speed profile used (summer or winter) for modeling. See Table 14 in proposed rule or Table 10 in final rule for more details.

2 - Acoustic ranges (R95%) for Low Frequency Cetacean (LFC) hearing group. See Tables 18 and 19 in proposed rule and Table 13 in final rule for more details.