# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

GREEN OCEANS, et al.,

    *Plaintiffs,*

  v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, et al.,

    *Federal Defendants.*

Civ. No. 1:24-cv-00141-RCL

## FEDERAL DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR STAY OF FINAL AGENCY ACTION

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................1

II.   STATUTORY BACKGROUND ...........................................................3

III.  FACTUAL BACKGROUND.................................................................5

    A.  Revolution Project ...................................................................5

    B.  ESA Section 7 Consultation ....................................................5

    C.  Agency Permits and Approvals ...............................................6

    D.  Reinitiated Section 7 Consultation..........................................6

    E.  Construction Operations..........................................................7

    F.  Litigation .................................................................................8

IV.   STANDARD OF REVIEW....................................................................9

V.    ARGUMENT .......................................................................................11

    A.  Plaintiffs are not entitled to relief under APA Section 705...................................11

    B.  Plaintiffs have failed to establish irreparable harm................................................12

        1.  Plaintiffs have not demonstrated any irreparable harm to themselves or to ESA-listed species or critical habitat.................................................12

        2.  The protections afforded by the agencies consistent with ESA Section 7(d) ensure that there will be no irreparable harm during the reinitiated consultation process. ............................................................14

        3.  The terms and conditions of the challenged federal approvals prohibit operations that would cause irreparable harm during the consultation process...............................................................................18

        4.  To the extent that Plaintiffs' request for relief extends beyond the scope of reinitiated consultation, Plaintiffs' delay is fatal to its claim of irreparable harm. ..................................................................19

    C.  Plaintiffs have failed to establish a likelihood of success on the merits. ..............21

        1.  NMFS's 2023 Biological Opinion has not been withdrawn and is still valid. ..........................................................................................21

2.      Plaintiffs' ESA claim fails due to jurisdictional defects. ...........................23

D.      The balance of the equities and the public interest weigh against an injunction. ...........................................................................................................25

VI.    CONCLUSION ...........................................................................................................26

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| COP | Construction and Operations Plan |
| ESA | Endangered Species Act |
| ITR | Incidental Take Regulation |
| ITR/LOA | Incidental Take Regulation and Letter of Authorization |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NMFS GARFO | NMFS Greater Atlantic Regional Fisheries Office |
| NMFS OPR | NMFS Office of Protected Resources |
| ROD | Record of Decision |
| UXO/MEC | Unexploded Ordinances/Munitions and Explosives of Concern |

# TABLE OF AUTHORITIES

**Case**                                                                                          **Page**

*B&D Land and Livestock Co. v. Connor*,
   534 F. Supp. 2d 891 (N.D. Iowa 2008) ..................................................................................11

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ...............................................................................................................13

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018)..........................................................................................................20

*Clevinger v. Advoc. Holdings, Inc.*,
   No. 23-1159 (JMC), 2023 U.S. Dist. LEXIS 121860 (D.D.C. July 15, 2023) ........................10

*Ctr. for Biological Diversity v. Regan*,
   No. CV 21-119 (RDM), 2023 WL 5437496 (D.D.C. Aug. 23, 2023)....................................11

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
   698 F.3d 1101 (9th Cir. 2012) ..............................................................................................22

*Defs. of Wildlife v. BOEM*,
   684 F.3d 1242 (11th Cir. 2012) ............................................................................................22

*Defs. of Wildlife v. Everson*,
   984 F.3d 918 (10th Cir. 2020) ..............................................................................................24

*Friends of Animals v. Ashe*,
   808 F.3d 900 (D.C. Cir. 2015)..............................................................................................24

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) .............................................................................................................13

*Grand Canyon Tr. v. U.S. Bureau of Reclamation*,
   691 F.3d 1008 (9th Cir. 2012) ..............................................................................................23

*Gulf Oil Corp. v. Brock*,
   778 F.2d 834 (D.C. Cir. 1985)..............................................................................................21

*Hallstrom v. Tillamook Cnty.*,
   493 U.S. 20 (1989) ...............................................................................................................24

*In re Grand Jury Investigation*,
   916 F.3d 1047 (D.C. Cir. 2019).............................................................................................23

iv

*Mayo v. Jarvis*,
  No. CV 14-1751 (RC), 2016 WL 1254213 (D.D.C. Mar. 29, 2016) ................................. 16, 22

*Nat'l Wildlife Fed'n v. EPA*,
  286 F.3d 554 (D.C. Cir. 2002) .............................................................................................. 13

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................... 10, 25, 26

*Oceana v. BOEM*,
  37 F. Supp. 3d 147 (D.D.C. 2014) ................................................................................ 17, 22

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  990 F. Supp. 2d 9 (D.D.C. 2013) ........................................................................................ 12

*Singh v. Carter*,
  185 F. Supp. 3d 11 (D.D.C. 2016) ...................................................................................... 10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  239 F. Supp. 3d 77 (D.D.C. 2017) ...................................................................................... 21

*Strahan v. Roughead*,
  910 F. Supp. 2d 358 (D. Mass. 2012) ........................................................................... 22, 23

*Tennessee Valley Authority v. Hill*,
  437 U.S. 153 (1978) ............................................................................................................ 26

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011) .............................................................................................. 24

*W. Watersheds Project v. U.S. Bureau of Land Mgmt.*,
  774 F. Supp. 2d 1089 (D. Nev. 2011) ........................................................................... 25, 26

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ............................................................................................................ 25

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ...................................................................................................... 9, 10, 14

*Workman v. Bissessar*,
  275 F. Supp. 3d 263 (D.D.C. 2017) .................................................................................... 10

**Statutes**

5 U.S.C. § 705 .............................................................................................................................. 10, 11

16 U.S.C. § 1362(13) ...................................................................................................................... 5

16 U.S.C. § 1371(a) ................................................................................................5

16 U.S.C. § 1371(a)(5)(A)(i) ...................................................................................5

16 U.S.C. § 1372(a) ................................................................................................5

16 U.S.C. § 1532(15) ..............................................................................................3

16 U.S.C. § 1532(19) ..............................................................................................4

16 U.S.C. § 1536(a)(2) .........................................................................................3, 4

16 U.S.C. § 1536(b)(4) ............................................................................................4

16 U.S.C. § 1536(d) ........................................................................................passim

16 U.S.C. § 1540(g)(1)(A) .....................................................................................24

16 U.S.C. § 1540(g)(2)(A) .....................................................................................24

42 U.S.C. § 4370m-6(b) ........................................................................................10

43 U.S.C. § 1337(p)(1) ..........................................................................................25

**Rules**

Fed. R. Civ. P. 65(a) .............................................................................................11

**Regulations**

50 C.F.R. § 216.3 ....................................................................................................5

50 C.F.R. § 402.01(b) ..............................................................................................3

50 C.F.R. § 402.09 .....................................................................................14, 16, 22

50 C.F.R. § 402.14 (i)(1)(ii) ....................................................................................4

50 C.F.R. § 402.14 (i)(1)(iii) ...................................................................................4

50 C.F.R. § 402.14 (i)(1)(iv) ...................................................................................4

50 C.F.R. § 402.14(a) ..............................................................................................3

50 C.F.R. § 402.14(g)(2)-(4) ...................................................................................3

50 C.F.R. § 402.14(g)-(h) ..............................................................................................3

50 C.F.R. § 402.16(a)(2)-(3) .......................................................................................2, 15

**Federal Register**

88 Fed. Reg. 65,350 (Sept. 22, 2023).........................................................................11

88 Fed. Reg. 72,562 (Oct. 20, 2023)............................................................................6

## I.    INTRODUCTION

Plaintiffs have needlessly rushed to the Court seeking a prohibitory injunction of construction activities on the Revolution Wind Farm and Revolution Wind Export Cable Project ("Revolution Project") and a stay of the relevant federal approvals until further order of the Court. Plaintiffs' motion is based on the strawman premise that construction activities that may jeopardize species in a manner or to an extent not previously considered may be conducted prior to the completion of reinitiated consultation under Section 7 of the Endangered Species Act ("ESA"). But, as undersigned counsel attempted to explain, such activities are already prohibited by the challenged federal approvals.[1]

In November 2023 and January 2024, the National Marine Fisheries Service Office of Protected Resources ("NMFS OPR") and the Bureau of Ocean Energy Management ("BOEM"), respectively, requested to reinitiate ESA consultation on the Revolution Project due to recent modifications to the proposed action and the discovery of new information. The project modifications and new information had not (and could not have) been considered when the consulting agency—the National Marine Fisheries Service Greater Atlantic Regional Fisheries Office ("NMFS GARFO")—issued its July 2023 Biological Opinion for the project ("2023 Biological Opinion"). Pursuant to the ESA's regulations that address post-consultation developments such as these, BOEM and NMFS OPR (collectively, the "action agencies")

---

[1] On April 17, 2024, Federal Defendants' counsel confirmed for Plaintiffs' counsel that "pile-driving shall not commence until the reinitiated ESA consultation has been completed." Email Chain Between Counsel ("Ex. 1"), at 1. Plaintiffs did not express any further lingering concerns they may have had, nor did they advise that they intended to file a motion for emergency injunctive relief. Plaintiffs instead filed their motion for injunctive relief the following day without further communication, in violation of this Court's meet and confer requirement. *See* LCvR 7(m) ("Before filing any nondispositive motion in a civil action, counsel shall discuss the anticipated motion with opposing counsel in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement.").

reinitiated ESA consultation to ensure that the Revolution Project is not likely to jeopardize the continued existence of ESA-listed species in light of the proposed project modifications and new information. *See* 50 C.F.R. § 402.16(a)(2)-(3); NMFS GARFO Letter ("Ex. 2"). NMFS GARFO is "working to complete the consultation by April 30, 2024" and "anticipates that the result . . . will be a new Biological Opinion that will replace the July 21, 2023, Opinion." Ex. 2, at 2.

NMFS GARFO's letter reinitiating formal consultation (which Plaintiffs attach as an exhibit to their motion, ECF No. 26-3) confirms that, consistent with ESA Section 7(d), "[d]uring the consultation period . . . the action agencies and Revolution Wind must not make any irreversible or irretrievable commitment of resources that would foreclose the formulation or implementation of any reasonable and prudent alternatives to avoid jeopardizing [ESA-listed] species[.]" Ex. 2, at 2. And NMFS GARFO specifically conveyed its understanding that "no foundation installation activities for the Revolution Wind project will occur before this reinitiated consultation is completed with issuance of a new superseding final Biological Opinion." *Id.* Since no activity will occur that could potentially run afoul of the ESA during this period, Plaintiffs fail to establish that they will suffer irreparable harm absent an injunction.

Plaintiffs also fail to meet their burden on the other injunction factors. They are not likely to succeed on the merits of their ESA claim (the only claim Plaintiffs raise in their motion) because, by reinitiating consultation, the agencies did not, as Plaintiffs contend, conclude that the 2023 Biological Opinion was flawed or "withdraw" it. *See* Mem. in Support of Mot. for Stay of Final Agency Action ("Pls.' Br."), ECF No. 26-1 at 1. Instead, the agencies made appropriate use of a routine regulatory process that allows for adaptive consideration of changes to agency action or the discovery of new information that is relevant to the action. 50 C.F.R. § 402.16(a)(2)-(3). Indeed, the 2023 Biological Opinion remains valid and effective until superseded. Lastly, the

balance of the equities and the public interest weigh against granting a preliminary injunction because enjoining the Revolution Project and the relevant federal approvals would hinder the government's renewable energy goals.

For these reasons, as further demonstrated below, the Court should deny Plaintiffs' request for injunctive relief.

## II.   STATUTORY BACKGROUND

ESA Section 7 directs federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of" any ESA-listed species or destroy or adversely modify critical habitat that has been designated for such species. 16 U.S.C. § 1536(a)(2).[2] If an action agency's proposed action "may affect" an ESA-listed species or its critical habitat, it must consult with the relevant "consulting agency." 50 C.F.R. § 402.14(a).

At the conclusion of formal consultation, the consulting agency (here, NMFS GARFO) issues a Biological Opinion, which evaluates the effects of the proposed action on ESA-listed species and designated critical habitat. *Id*. § 402.14(g)(2)-(4). It also opines on whether the proposed action is "likely to jeopardize the continued existence" of any listed species or result in the destruction or adverse modification of critical habitat designated for such species and, if so, whether "reasonable and prudent alternatives" exist to avoid the likelihood of jeopardy. *Id*. § 402.14(g)-(h).

If the consulting agency finds that there will be "no jeopardy" and "no destruction or adverse modification" but anticipates that the proposed action may result in incidental "take" of

---

[2] Depending on the species in question, either the Secretary of Commerce or the Secretary of the Interior is responsible for implementing the ESA as the consulting agency. *Id*. § 1532(15). The Secretary of Commerce administers the ESA through NMFS and the Secretary of the Interior administers the ESA through the U.S. Fish and Wildlife Service. 50 C.F.R. § 402.01(b).

an ESA-listed species (defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct"), the consulting agency will provide an incidental take statement ("ITS") with its Biological Opinion that specifies "reasonable and prudent measures that [it] considers necessary or appropriate to minimize such impact," and terms and conditions to implement those measures. 16 U.S.C. § 1532(19); *id.* § 1536(b)(4); 50 C.F.R. § 402.14 (i)(1)(ii), (iv). "In the case of marine mammals, [the ITS must] specif[y] those measures that are necessary to comply with [S]ection 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking[.]" 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14 (i)(1)(iii).

When an action agency retains discretionary control over an action, it is required to request reinitiation of consultation if, as is relevant here: "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered"; and/or "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence[.]" 50 C.F.R. § 402.16(a)(2)-(3).

ESA Section 7(d) addresses those activities that may and may not proceed during consultation:

> After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) [i.e., 16 U.S.C. § 1536(a)(2)] of this section.

16 U.S.C. § 1536(d).

### III.    FACTUAL BACKGROUND

#### A.  Revolution Project

The Revolution Project is an offshore wind development project, located off the coast of Rhode Island, that will have the capacity to generate 704 megawatts of clean energy and power for nearly 250,000 homes.[3] Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind") submitted a proposed Construction and Operations Plan ("COP") for the project, for which BOEM issued its final approval on November 17, 2023.[4]

#### B.  ESA Section 7 Consultation

BOEM initiated ESA Section 7 consultation with NMFS GARFO in April 2022 as the lead action agency on behalf of the Bureau of Safety and Environmental Enforcement, the U.S. Army Corps of Engineers ("Corps"), the Environmental Protection Agency, and the U.S. Coast Guard. In November 2022, NMFS OPR also initiated Section 7 consultation with NMFS GARFO for its proposed Incidental Take Regulation ("ITR") under the Marine Mammal Protection Act ("MMPA").[5] On July 21, 2023, the agencies completed consultation under ESA Section 7 and NMFS GARFO issued the final 2023 Biological Opinion, in which it determined that the

---

[3] BOEM, Revolution Wind Project, https://www.boem.gov/renewable-energy/state-activities/revolution-wind (last visited Apr. 25, 2024).

[4] BOEM, COP Approval Letter for Revolution Project, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/COP%20Appv%20Ltr_REV%20OCS-A%200486.pdf (last visited Apr. 25, 2024).

[5] The MMPA generally prohibits "take" of marine mammals (which is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill"). 16 U.S.C. §§ 1371(a), 1372(a), 1362(13); 50 C.F.R. § 216.3. Under an exception to this general prohibition, NMFS may, upon request by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region, issue an ITR, which together with a Letter of Authorization (collectively, "ITR/LOA"), authorizes "the incidental, but not intentional, taking . . . of small numbers of marine mammals of a species or population stock if [NMFS] . . . finds that the total of such taking . . . will have a negligible impact on such species or stock," for a period of up to five years. 16 U.S.C. § 1371(a)(5)(A)(i). Take by "harassment" is classified in two levels: Level A and Level B.

Revolution Project is "not likely to jeopardize the continued existence of" any ESA-listed species affected by the proposed action or have any effect on designated critical habitat.[6] The 2023 Biological Opinion also included an ITS with detailed measures to minimize the impacts of incidental take on ESA-listed whales, turtles, and sturgeon.[7] Consistent with the terms and conditions of the 2023 Biological Opinion's ITS, Revolution Wind subsequently submitted a night-time pile driving plan to BOEM and NMFS OPR for review and approval.[8]

### C. Agency Permits and Approvals

On August 21, 2023, BOEM, NMFS OPR, and the Corps issued a Joint Record of Decision ("ROD") for the Revolution Project and announced NMFS OPR's determination to issue an ITR/LOA to Revolution Wind pursuant to its authorities under the MMPA.[9] On November 17, 2023, BOEM approved Revolution Wind's COP.[10] And on October 20, 2023, NMFS OPR issued its ITR/LOA.[11]

### D. Reinitiated Section 7 Consultation

On November 17, 2023, and January 12, 2024, NMFS OPR and BOEM, respectively, sent letters to NMFS GARFO requesting to reinitiate ESA consultation on the Revolution Project due

---

[6] NMFS GARFO, 2023 Biological Opinion, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf, at 424 (last visited Apr. 25, 2024).

[7] *Id.* at 427-445.

[8] *Id.* at 442-443.

[9] BOEM, ROD for Revolution Project, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf (last visited Apr. 25, 2024).

[10] BOEM, COP Approval Letter for Revolution Project, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/COP%20Appv%20Ltr_REV%20OCS-A%200486.pdf (last visited Apr. 25, 2024).

[11] 88 Fed. Reg. 72,562 (Oct. 20, 2023); NMFS OPR, ITR Letter of Authorization, https://www.fisheries.noaa.gov/s3/2023-11/BL52-Revolution-Wind-LOA-OPR1-Final-signed-OPR1.pdf (last visited Apr. 25, 2024).

to limited modifications to the proposed action and the discovery of new information after the 2023 Biological Opinion was issued. NMFS OPR Letter ("Ex. 3"); BOEM Letter ("Ex. 4"). The bases for reinitiating consultation were:

(1) BOEM proposed a modification to the size of the monitoring zone within which Protected Species Observers are required to monitor for sea turtle presence and order pile driving shutdowns if sea turtles are detected. Specifically, BOEM proposed that the clearance and shutdown zone be reduced from 500 meters to 200-300 meters based on new information it received in Revolution Wind's draft Nighttime Monitoring Plan regarding the effectiveness of monitoring for sea turtles after dark provided. *See* Ex. 4.

(2) In its final ITR/LOA, NMFS OPR authorized the harassment of an additional small number of individual fin and sei whales as result of pile driving and UXO/MEC detonations, based on new information that NMFS OPR received during the public comment period on its proposed ITR. *See* Ex. 3.

### E. Construction Operations

As reflected in Revolution Wind's construction schedule, which was posted on BOEM's website in March 2023, offshore construction operations began in January 2024.[12] Ongoing construction activities include boulder clearance (relocating boulders on the seafloor along cable corridors and at the proposed turbine locations) and scour protection installation.[13] Per BOEM's Conditions of Approval for the COP, "[n]o foundation impact pile driving activities are allowed to occur . . . until BOEM has notified [Revolution Wind] that all necessary ESA Section 7 consultations addressing foundation impact pile driving have concluded."[14]

---

[12] BOEM, Revolution Project COP and Appendices (updated March 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution%20Wind%20COP%20Volume%201%20March%202023_v2_508c.pdf, at 62 (Figure 3.2-1, Revolution Wind Indicative Construction Schedule) (last visited Apr. 25, 2024).
[13] Orsted, Mariners Briefing for Revolution Wind and Sunrise Wind Projects, https://a2f3e3.emailsp.com/frontend/nl_preview_window.aspx?idNL=857 (last visited Apr. 25, 2024).
[14] BOEM, Revolution Project Conditions of COP Approval, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cond%20of%20COP%20Appr_REV%20OCS-A%200486_0.pdf , at 65 (Section 5.10.2) (last visited Apr. 25, 2024).

**F.  Litigation**

On January 5, 2024, Plaintiffs sent BOEM, NMFS, and the Corps a "Sixty-Day Notice of Intent to Sue Under the Outer Continental Shelf Lands Act, Clean Water Act, and Endangered Species Act." Pls.' Notice of Intent to Sue ("Ex. 5"). Eleven days later, on January 16, 2024, Plaintiffs filed this lawsuit, asserting challenges to federal approvals associated with the Revolution Project and the South Fork Wind Farm and South Fork Export Cable Project ("South Fork Project"). ECF No. 1. Plaintiffs asserted claims under the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), ESA, National Historic Preservation Act, MMPA, Migratory Bird Treaty Act, and Coastal Zone Management Act. *Id.* On February 16, 2024, Plaintiffs sent a "supplement" to their previous Notice of Intent to Sue letter, indicating they planned to file an amended complaint. Pls.' Supp. Notice of Intent to Sue ("Ex. 6").

On March 5, 2024, Federal Defendants moved to sever and reassign Plaintiffs' claims relating to the South Fork Project, ECF No. 20, which the Court granted on April 10, 2024, ECF No. 25. On April 11, 2024, Federal Defendants informed Plaintiffs that NMFS GARFO had accepted requests from BOEM and NMFS OPR to reinitiate ESA Section 7 consultation on the Revolution Project. Ex. 1, at 3. Federal Defendants advised Plaintiffs that NMFS GARFO expected to issue a new Biological Opinion, which would supersede the July 2023 Biological Opinion, so that Plaintiffs could choose whether and when to amend their ESA claim. *Id.* Federal Defendants provided Plaintiffs with a copy of NMFS GARFO's letter reinitiating consultation with BOEM and NMFS OPR, which included a description of the two narrow grounds on which the agencies reinitiated consultation, stemming from proposed modifications to the Revolution Project and the need to consider information that was not previously available. Exs. 1, 2. In response, Plaintiffs' counsel asked for copies of BOEM's and NMFS OPR's requests to reinitiate consultation and

asked "whether pile-driving is authorized to commence prior to July 30, 2024[.]" Ex. 1, at 2. On April 17, 2024, Federal Defendants informed Plaintiffs' counsel that "pile-driving shall not commence until the reinitiated ESA consultation has been completed" and provided copies of Plaintiffs' requested documents. *Id.* at 1. The following day, on April 18, 2024, Plaintiffs filed the instant motion, seeking to: "(1) stay[] the effective dates of the approvals and authorizations in the [ROD] for the Revolution [Project] . . . . and the [ITR] approved by [NMFS] . . . . until further Court order, and (2) prohibiting Defendant-Intervenor Revolution Wind[] from beginning or performing any pile driving or other construction work or making any other irretrievable commitment of resources purportedly authorized by the [ROD] or [ITR] until further Court Order." ECF No. 26. Plaintiffs' counsel did not confer with Federal Defendants to "discuss the anticipated motion . . . in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is, to narrow the areas of disagreement." LCvR 7(m).

As detailed in NMFS GARFO's letter provided to Plaintiffs, *see* Ex. 2, and in Federal Defendants' emails to Plaintiffs' counsel, *see* Ex. 1, NMFS GARFO expects to complete its reinitiated ESA consultation next week, by April 30, 2024.

## IV.    STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (citation omitted). Such injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citation omitted). A plaintiff seeking a preliminary injunction must demonstrate four elements: (1) a likelihood of irreparable harm absent injunctive relief; (2) a likelihood of success on the merits; (3) a balance of hardships that tips in their favor; and (4) that the public interest weighs in favor of granting the injunction. *Id.* at 20 (citations omitted). The party seeking the preliminary injunction

bears the burden of establishing that these four factors weigh in its favor, which includes a "burden of producing credible evidence sufficient to demonstrate her entitlement to injunctive relief[.]" *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017) (citation omitted).[15]

The APA permits a court reviewing agency action to "issue all necessary and appropriate process[es] to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" if it is "necessary to prevent irreparable injury[.]" 5 U.S.C. § 705. The standard for seeking such a stay is the same as the standard for seeking a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 433 (2009).

In considering a request to stay agency action under the APA, the reviewing court should bear in mind that the public is "generally entitled to the prompt execution" of an agency action "that the legislature has made final[,]" so a stay "is not a matter of right, even if irreparable injury might otherwise result to the [plaintiff.]" *Id.* at 427 (citation omitted).

Additionally, because the Revolution Project is a "covered project" under the FAST-41 Act, in weighing the equities, the Court must "(1) consider the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction; and (2) not presume that the harms described in paragraph (1) are reparable." 42 U.S.C. § 4370m-6(b). The FAST-41 Act was "enacted to improve the timeliness,

---

[15] Plaintiffs argue that it is sufficient to "show[ ] either a high likelihood of success or substantial irreparable injury," Pls.' Br. 8 (citation omitted), but the viability of this "sliding scale approach is highly questionable . . . in light of the Supreme Court's holding in *Winter* . . ., that a court may not issue 'a preliminary injunction based only on a possibility of irreparable harm [since] injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (quoting *Winter*, 555 U.S. at 22). Indeed, following "*Winter*, the D.C. Circuit has suggested, but not decided, that the sliding scale approach does not survive *Winter*'s holding." *Clevinger v. Advoc. Holdings, Inc.*, No. 23-1159 (JMC), 2023 U.S. Dist. LEXIS 121860, at *11 n.2 (D.D.C. July 15, 2023) (citation omitted).

predictability, transparency, and accountability of the Federal environmental review and authorization processes" for important infrastructure projects. 88 Fed. Reg. 65,350 (Sept. 22, 2023).

## V.     ARGUMENT

### A.  Plaintiffs are not entitled to relief under APA Section 705.

As a threshold matter, Plaintiffs' request for injunctive relief under APA Section 705 instead of Federal Rule of Civil Procedure 65(a) should be denied. *See* Pls.' Br. 7-8, n.42. APA Section 705 is intended to "*postpone* the effective date of an agency action" or "*preserve* status[.]" 5 U.S.C. § 705 (emphasis added). Here, BOEM, NMFS OPR, and the Corps issued a Joint ROD for the Revolution Project on August 21, 2023, BOEM approved Revolution Wind's COP on November 17, 2023, and NMFS OPR issued its ITR/LOA on October 20, 2023. Indeed, offshore construction has been underway for over three months now.[16] Plaintiffs should therefore not be entitled to relief under APA Section 705, because they are not seeking to preserve the status quo by staying the effective date of an agency rule or action. *See, e.g., Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2023 WL 5437496, at *5 (D.D.C. Aug. 23, 2023) (finding that the ability to "'postpone the effective date' of a rule ends when the rule takes legal effect").

But if the Court nevertheless considers Plaintiffs' request for injunctive relief, Plaintiffs should not be permitted to use Section 705 as a shield to avoid posting a bond. *See, e.g., B&D Land and Livestock Co. v. Connor*, 534 F. Supp. 2d 891, 911-12 (N.D. Iowa 2008) (issuing injunction and a stay under Section 705 and imposing bond).

---

[16] BOEM, Revolution Project COP and Appendices (updated March 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution%20Wind%20COP%20Volume%201%20March%202023_v2_508c.pdf, at 62 (Figure 3.2-1, Revolution Wind Indicative Construction Schedule) (last visited Apr. 25, 2024).

**B. Plaintiffs have failed to establish irreparable harm.**

Plaintiffs' claim that they will suffer irreparable harm to their alleged interest in endangered whales and other marine mammals absent a stay of "ongoing seabed construction" and the "intended May 1, 2024 start of pile driving[,]" Pls.' Br. 10, fails for several reasons. First, Plaintiffs fail to meet their burden of proving irreparable harm because they have not alleged any harm that *they* will suffer. They allege only that certain marine species will suffer harm and, even then, the alleged harm is purely speculative and belied by the thorough analysis conducted by the federal agencies in approving the Revolution Project. Moreover, Plaintiffs' expansive request to halt all construction activities should be denied because it is almost entirely untethered to the agencies' reinitiated ESA consultation, which is purportedly what triggered Plaintiffs to seek injunctive relief. And even the narrow portion of Plaintiffs' request that pertains to pile driving (the only part of their request that is arguably tethered to the reinitiated consultation) fails because the challenged agency approvals already mandate that such activities will not occur until reinitiated ESA consultation is completed. With respect to any ongoing construction activities that Plaintiffs seek to halt, Plaintiffs' delay in seeking injunctive relief (over three months after offshore construction began) is fatal to their claim of irreparable harm. Accordingly, Plaintiffs' motion should be denied. *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) ("[A] court may refuse to issue an injunction without considering any other factors when irreparable harm is not demonstrated.") (quotation marks and citation omitted).

> **1. Plaintiffs have not demonstrated any irreparable harm to themselves or to ESA-listed species or critical habitat.**

Plaintiffs fail to establish that they will suffer any harm, let alone irreparable harm absent an injunction. Indeed, Plaintiffs' motion is devoid of any allegations establishing how the organizations and individuals named as Plaintiffs in this lawsuit will be irreparably harmed absent

an injunction. Instead, Plaintiffs make broad conclusory statements, alleging a correlation between whale deaths and "the start of the offshore wind[] program including surveying, sonar, site assessment mapping, and construction," which rely on self-serving declarations (none of which appear to be authored by a biologist). *See* Pls.' Br. 11 (citing Decl. of Lisa Linowes, Ex. 2, ECF No. 26-4 ¶ 4). Thus, Plaintiffs plainly fail to meet their burden of establishing irreparable harm—for which the relevant showing "is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Further, Plaintiffs' cursory assertions regarding alleged harm to marine animals are untethered to the specific project challenged in this case or to the voluminous environmental analysis undertaken by the federal agencies. These allegations in no way undermine NMFS GARFO's scientific findings in its 2023 Biological Opinion, which are entitled to substantial deference.[17] *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 560 (D.C. Cir. 2002) ("[P]articular deference is given by the court to an agency with regard to scientific matters in its area of technical expertise.") (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

---

[17] *See, e.g.,* NMFS GARFO, 2023 Biological Opinion, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf, at 220 (last visited Apr. 25, 2024) (analyzing the impacts of High-Resolution Geophysical Surveys on ESA-listed whales) ("[T]he potential for substantial disruption to activities such as feeding (including nursing), resting, and migrating is extremely unlikely given the very brief exposure to any noise (given that the source is traveling and the area ensonified at any given moment is so small). Any brief interruptions of these behaviors are not anticipated to have any lasting effects. Additionally, given the extremely short duration of any behavioral disruption and the very small distance any animal would have to swim to avoid the noise it is extremely unlikely that the behavioral response would increase the risk of exposure to other threats including vessel strike or entanglement in fisheries gear. Because the effects of these temporary behavioral changes are so minor as to be insignificant, it is extremely unlikely that, under the NMFS' interim ESA definition of harassment, they are equivalent to an act that would 'create the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering.' For similar reasons it is extremely unlikely that any individual would experience ESA take by harm.")

Similar to their allegations regarding whales, with respect to ESA-listed sea turtles, Plaintiffs broadly predict that, "[i]f pile driving is allowed to begin on May 1," the four ESA-listed turtles at issue in BOEM's request to reinitiate consultation "will experience irreparable harm that cannot be undone or mitigated." Pls.' Br. 15. Plaintiffs' unsupported allegations amount to pure speculation. They speculate about the impacts of pile driving. And they also speculate that pile driving will begin before ESA consultation is complete (which, as discussed *supra*, it will not) or that the reinitiated ESA consultation will not afford sufficient protections. But, to establish irreparable harm, Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (citations omitted). "[T]he possibility of some remote future injury" is not enough. *Id.* (quotation marks and citation omitted).

Thus, Plaintiffs have wholly failed to meet their burden of proving that they are likely to suffer irreparable harm absent the requested injunction.

### 2. The protections afforded by the agencies consistent with ESA Section 7(d) ensure that there will be no irreparable harm during the reinitiated consultation process.

Plaintiffs' alleged need for injunctive relief is based entirely on the mistaken premise that "Revolution Wind[] intends to move forward with its construction plans—before the [reinitiated] consultation is complete and without the requisite Government-required Biological Opinion." Pls.' Br. 1. As an initial matter, Plaintiffs' argument is based on allegations concerning Revolution Wind's expected conduct, not that of the federal agencies. But, regardless, any government response that Plaintiffs could conceivably expect during the consultation period has already been provided by the agencies consistent with ESA Section 7(d). ESA Section 7(d) prescribes what is required of federal agencies and applicants when consultation is reinitiated and, notably, it does not require a stay of the effective date of federal project approvals, as Plaintiffs request. 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09.

14

ESA consultation was reinitiated on two narrow issues stemming from modifications to the proposed project after the 2023 Biological Opinion was issued and new information that was not previously available, including: (1) BOEM proposed a modification to the size of the monitoring zone within which Protected Species Observers are required to monitor for sea turtle presence and order pile driving shutdowns if sea turtles are detected (BOEM proposed that the size of the clearance and shutdown zone be reduced from 500 meters to 200-300 meters based on new information regarding the effectiveness of monitoring for sea turtles after dark provided in Revolution Wind's draft Nighttime Monitoring Plan), *see* Ex. 4; and (2) NMFS OPR authorized the harassment of an additional small number of individual fin and sei whales in its final ITR/LOA as a result of pile driving and UXO/MEC detonations, based on new information it received during the public comment period on the proposed ITR, *see* Ex. 3.

Contrary to Plaintiffs' suggestions, Pls.' Br. 9, NMFS GARFO's acceptance of BOEM's and NMFS OPR's requests to reinitiate consultation does not reflect "flaws" in the 2023 Biological Opinion. It reflects the proper use of a routine regulatory process that allows for adaptive consideration of changes to agency action or the discovery of new, relevant information. 50 C.F.R. § 402.16(a)(2)-(3) (requiring that consultation be reinitiated if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or if the action is "modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion").[18] Also, contrary to Plaintiffs' suggestions, as discussed *infra* Section V.C.1., the reinitiation of consultation does not "invalidate"

---

[18] Indeed, a "Reinitiation Notice" citing the ESA implementing regulations and "reinitiation triggers" was included in the 2023 Biological Opinion, as is standard practice. *See* NMFS GARFO, 2023 Biological Opinion, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf, at 451 (last visited Apr. 25, 2024).

the existing Biological Opinion. Pls.' Br. 12. The existing Biological Opinion remains valid unless and until a superseding Biological Opinion is issued (depending on the results of the reinitiated consultation, the issuance of a new Biological Opinion may or may not be warranted). *See Mayo v. Jarvis*, No. CV 14-1751 (RC), 2016 WL 1254213, at *29 (D.D.C. Mar. 29, 2016), *amended by* 2016 WL 4083308 (D.D.C. Aug. 1, 2016) (finding "no authority for [the] proposition that, whenever the [agency] reinitiates formal consultation, the consultation must result in the production of a new, full-blown [biological opinion]").

Though the existing biological opinion remains valid and effective during reinitiated consultation, ESA Section 7(d) acts as a protective mechanism for ESA-listed species and critical habitat that may be impacted by the proposed action during that period. ESA Section 7(d) requires that, upon initiation or reinitiation of consultation, the action agency "and the permit or license applicant [here, Revolution Wind] shall not make any irreversible or irretrievable commitment of resources . . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" that might be necessary to avoid jeopardizing ESA-listed species or their critical habitat. 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09. In other words, during the consultation period, BOEM, NMFS OPR, and Revolution Wind are prohibited from conducting activities that would preclude NMFS GARFO from developing an alternate means of implementing the proposed action under consultation in a manner that would avoid jeopardizing species.[19] Here, this means that, at a minimum, the action agencies and Revolution Wind are prohibited from pile driving or using UXO/MEC detonations during the pendency of the reinitiated

---

[19] In its letter accepting the action agencies' requests to reinitiate consultation, NMFS GARFO advised them that, "[d]uring the consultation period, pursuant to section 7(d) of the ESA, the action agencies and Revolution Wind must not make any irreversible or irretrievable commitment of resources that would foreclose the formulation or implementation of any reasonable and prudent alternative . . . ." Ex. 2, at 2.

consultation, to the extent such actions would constitute an irreversible commitment of resources that may foreclose NMFS GARFO from implementing reasonable and prudent alternative measures to avoid jeopardizing ESA-listed species.

The agencies have fully complied and continue to fully comply with the requirements of ESA Section 7(d). The only construction activities that remain ongoing during the consultation period include activities like boulder clearance (relocating boulders on the seafloor along cable corridors and at the proposed turbine locations) and installation of scour protection.[20] These operations—which are  not at issue in the agencies' reinitiated consultation—have been fully analyzed under NMFS GARFO's 2023 Biological Opinion, in which NMFS GARFO reasonably concluded that such operations are not likely to adversely affect any ESA-listed species.[21] The ongoing operations thus do not constitute an irreversible or irretrievable commitment of resources that could foreclose the implementation of reasonable and prudent alternative measures to avoid jeopardy. 16 U.S.C. § 1536(d); *Oceana v. BOEM*, 37 F. Supp. 3d 147, 176 (D.D.C. 2014) ("[U]nder § 7(d), an agency is not forbidden from taking *all* action while consultation is underway, but is simply barred from irreversibly or irretrievably committing resources during that interval. The purpose of § 7(d) is to ensure that the status quo is maintained during consultation, so as to avoid a circumstance in which a large-scale commitment of resources is made during the consultation process, which resources cannot be diverted or redirected to other productive uses if the outcome

---

[20]   *See* Orsted, Mariners Briefing for Revolution Wind and Sunrise Wind Projects, https://a2f3e3.emailsp.com/frontend/nl_preview_window.aspx?idNL=857 (last visited Apr. 25, 2024).

[21]   *See, e.g.,* NMFS GARFO, 2023 Biological Opinion, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf, at 288-93 (last visited Apr. 25, 2024).

of consultation is that the project would violate the 'no jeopardy' requirement of § 7(a).")
(quotation marks and citation omitted).

Plaintiffs have failed to demonstrate that any of these ongoing operations have, or will,
cause them irreparable harm absent an injunction. Plaintiffs' sole allegation regarding the ongoing
construction activities is the following cursory statement: "The harm caused by the removal of
boulders, the laying of cable and scour protection . . . cannot easily be reversed and may never be
able to be undone." Pls.' Br. 11-12. But Plaintiffs do not even identify what this alleged "harm"
would consist of. These unsupported allegations fail to undermine NMFS GARFO's reasoned
conclusions in the 2023 Biological Opinion that such activities are not likely to adversely affect
any ESA-listed species.[22]

In sum, Plaintiffs have not and cannot establish irreparable harm because ESA Section 7(d)
serves as a protective mechanism that prevents such harm during the period of reinitiated
consultation and the agencies have acted consistently with Section 7(d)'s requirements. There is
no need for this court to issue an injunction granting relief Plaintiffs already have.

### 3. The terms and conditions of the challenged federal approvals prohibit operations that would cause irreparable harm during the consultation process.

In addition to the protections afforded by ESA Section 7(d), BOEM's Conditions of
Approval for the Revolution Project COP also prohibit Revolution Wind from conducting
operations that may cause irreparable harm before NMFS completes its reinitiated ESA
consultation. BOEM's Conditions of Approval provide that, "[n]o foundation impact pile driving
activities are allowed to occur January 1 through April 30 or until BOEM has notified [Revolution
Wind] that all necessary ESA Section 7 consultations addressing foundation impact pile driving

---

[22] *See, e.g.,* NMFS GARFO, 2023 Biological Opinion,
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-
Wind-BiOp.pdf, at 288-93 (last visited Apr. 25, 2024).

have concluded."[23] In other words, Revolution Wind must wait for the results of the reinitiated consultation process before it can commit resources to pile driving consistent with the new Biological Opinion.

Moreover, the COP Conditions of Approval provide that, upon issuance of a new Biological Opinion resulting from reinitiated consultation, any conditions or mitigation measures that may be imposed by NMFS's new Biological Opinion automatically apply to any operations authorized by BOEM's COP approval.[24]

This means that the operations that are subject to further analysis in the reinitiated ESA consultation will not go forward until consultation is completed and, even then, will be subject to any conditions imposed as a result of that consultation. Thus, Plaintiffs' argument that there will be irreparable harm "[o]nce pile driving activities start, as planned, in May" lacks support. Pls.' Br. 11.

### 4. To the extent that Plaintiffs' request for relief extends beyond the scope of reinitiated consultation, Plaintiffs' delay is fatal to its claim of irreparable harm.

Plaintiffs' argument that they are entitled to injunctive relief is based entirely on the false premise that ESA-listed species will not be protected during the ESA reinitiated consultation process. *See* Pls' Br. 1 ("Letting construction begin without appropriate environmental review and protections adopted to protect these species that could be developed in the consultation process will cause irreparable harm."). It is unclear whether Plaintiffs seek to enjoin construction of operations beyond the scope of the reinitiated ESA consultation (i.e., whether they seek to enjoin

---

[23] BOEM, Revolution Project Conditions of COP Approval, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cond%20of%20COP%20Appr_REV%20OCS-A%200486_0.pdf , at 65 (Section 5.10.2) (last visited Apr. 25, 2024).

[24] *See id.* at 3, Section 1.4 ("Activities authorized by COP approval will be subject to any terms and conditions and reasonable and prudent measures resulting from any BOEM-reinitiated consultation for the Project's NMFS [Biological Opinion.]").

operations other than pile driving and UXO/MEC detonations, which are part of the narrow issues that consultation was reinitiated on). It is also unclear whether they are seeking an injunction that would last beyond the conclusion of the reinitiated consultation. *See* [Proposed] Order Granting Mot. to Stay Final Agency Action, ECF No. 26-2 (asking the Court to order that "Revolution Wind[] shall not begin or perform any pile driving *or other construction work*, nor make any irretrievable commitment of resources . . . *until further Court Order*") (emphasis added).

To the extent that Plaintiffs are seeking relief beyond the scope of the reinitiated consultation, their delay in bringing this motion is fatal to their claim of irreparable harm. A plaintiff's delay in seeking emergency relief weighs against a finding of irreparable harm. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must generally show reasonable diligence" in seeking emergency relief.); *see also* Charles Alan Wright & Arthur R. Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d ed. 2023) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). Here, Revolution Wind's construction schedule has been publicly available on BOEM's website since March 2023, which reflects that offshore construction would begin in Q1 2024.[25] Indeed, pre-survey activities and boulder clearing began in January 2024 and, according to Plaintiffs, their alleged irreparable harm "began" when Revolution Wind started "clearing boulders in the lease area and installing scour protection[.]" Pls.' Br. 11. But, despite the schedule being publicly available for over a year, Plaintiffs waited three months *after* construction began before seeking injunctive relief.

---

[25] Revolution Wind COP and Appendices (updated March 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution%20Wind%20COP%20Volume%201%20March%202023_v2_508c.pdf, at 62 (Figure 3.2-1, Revolution Wind Indicative Construction Schedule) (last visited Apr. 25, 2024).

Thus, Plaintiffs have not shown reasonable diligence in seeking injunctive relief with respect to construction operations outside the scope of reinitiated consultation (i.e., any operations other than pile driving and UXO/MEC detonations). Their delay belies the irreparability of any alleged harm. On this basis alone, the Court should reject Plaintiffs' allegations of irreparable harm with respect to the currently ongoing construction operations, which are all outside the scope of the reinitiated ESA consultation. *See Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985) ("[A]n injunction must be narrowly tailored to remedy the harm shown.") (footnote omitted).

**C. Plaintiffs have failed to establish a likelihood of success on the merits.**

While Plaintiffs' Complaint raises claims under a number of statutes, *see* ECF No. 1, their ESA claim is the only claim that they argue they are likely to succeed on as a basis for their motion for injunctive relief. Pls.' Br. 8-10. But Plaintiffs' ESA arguments fail, and they are unlikely to succeed on the merits.

**1. NMFS's 2023 Biological Opinion has not been withdrawn and is still valid.**

Plaintiffs stake their entire merits argument on their mistaken assertion that the existing Biological Opinion was invalidated by the reinitiation of consultation. *See* Pls.' Br. 8 ("The Government's Admission That It Does Not Have a Valid Biological Opinion Proves Plaintiffs' Likelihood of Success"). But Plaintiffs' argument fails, and their motion should be denied because the 2023 Biological Opinion remains valid. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 83 (D.D.C. 2017) ("[C]ourts in [the D.C.] Circuit have held that a failure to show a likelihood of success on the merits alone is sufficient to defeat [a] motion" for a preliminary injunction.) (citations omitted).

In reinitiating consultation, the agencies did not, as Plaintiffs contend, conclude that the 2023 Biological Opinion was flawed or withdraw it. Nor did the mere act of reinitiating

consultation automatically invalidate the 2023 Biological Opinion, as Plaintiffs allege. Pls.' Br. 9. To the contrary, several courts, including this one, have held that the mere reinitiation of consultation does not automatically render the existing biological opinion invalid or otherwise preclude any further action at all. *See, e.g., Defs. of Wildlife v. BOEM,* 684 F.3d 1242, 1252 (11th Cir. 2012) (rejecting argument that "BOEM's choice to reinitiate consultation with NMFS and [the U.S. Fish and Wildlife Service] automatically renders the former biological opinions invalid"); *Mayo*, 2016 WL 1254213, at *29 (agencies need not produce a new biological opinion after reinitiating consultation); *Oceana*, 37 F. Supp. 3d at 175 (reinitiation of consultation does not necessarily require an agency to complete consultation on a new biological opinion before moving forward with any action). Indeed, if the reinitiation of consultation automatically rendered the operative biological opinion invalid, it would create tremendous impracticalities, as federal projects could be forced to halt every time a project is modified in a way that impacts ESA-listed species in a way that was not previously considered.

This conclusion is also confirmed by the ESA and its regulations, which state only that, upon initiation or reinitiation of consultation, the action agency "shall make no irreversible or irretrievable commitment of resources" that would have "the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives" that might be necessary to avoid jeopardy. 50 C.F.R. § 402.09; 16 U.S.C. § 1536(d); *see also Oceana*, 37 F. Supp. 3d at 175. As discussed above, the agencies are fully complying with that statutory requirement.

Plaintiffs' only retort is to cite a Massachusetts district court case for the proposition that "when reinitiation of consultation is required, the original biological opinion loses its validity[.]" Pls.' Br. 9 (citing *Strahan v. Roughead*, 910 F. Supp. 2d 358, 375 (D. Mass. 2012) (quoting *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1108 (9th Cir. 2012)). But

neither *Strahan* nor the Ninth Circuit case it quotes actually addresses the question of whether a preexisting biological opinion remains valid when consultation is reinitiated, meaning that the statement is dicta in both cases. *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019). And, further, the context of the discussion regarding reinitiation of consultation in *Strahan* relates to consultation that must be reinitiated because "the amount or extent of incidental take permitted in the [Biological Opinion's] ITS is exceeded" or the "ITS set[s] forth a trigger that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision"—which is very different from the situation here, where consultation was reinitiated on limited grounds to consider certain proposed modifications to the project and new information. *Strahan*, 910 F. Supp. 2d at 375 (quotation marks and citations omitted).

In sum, Plaintiffs' argument that they are likely to succeed on the merits of their ESA claim because the 2023 Biological Opinion is invalid fails.

### 2. Plaintiffs' ESA claim fails due to jurisdictional defects.

Plaintiffs also are not likely to succeed on their ESA claim due to (at a minimum) two jurisdictional flaws with their claim. As an initial matter, as it is currently asserted (i.e., a challenge to the 2023 Biological Opinion), Plaintiffs' ESA claim will be rendered moot by a superseding consultation opinion. As set forth in NMFS GARFO's letter accepting BOEM's and NMFS OPR's requests to reinitiate consultation, NMFS "anticipate[s] that the result of reinitiation of this consultation will be a new Biological Opinion that will replace the July 21, 2023, Opinion[,]" and is "working to complete the consultation by April 30, 2024[.]" Ex. 2, at 2. Should NMFS issue a new Biological Opinion, which it anticipates doing within the next week, Plaintiffs' ESA claim will be moot. *See, e.g., Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1017 (9th Cir. 2012), *as amended* Sept. 17, 2012 (the issuance of a superseding Biological Opinion renders

a challenge to the preceding Biological Opinion moot); *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) (the issuance of a superseding ROD renders a challenge to the preceding ROD moot); *Defs. of Wildlife v. Everson*, 984 F.3d 918, 945-47 (10th Cir. 2020) (plaintiff lacked Article III standing to challenge a discrete agency action "that had expired and ceased to have any effect" before the lawsuit commenced).

Plaintiffs' ESA claim fails for the additional reason that they failed to provide the requisite 60-days' notice before filing their claim. The ESA's citizen-suit provision permits civil lawsuits against an action agency when the agency is "alleged to be in violation of any provision of [the ESA.]" 16 U.S.C. § 1540(g)(1)(A). But the provision requires that "[n]o action may be commenced . . . prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation[.]" *Id.* § 1540(g)(2)(A). Here, Plaintiffs provided notice of their intent to sue Federal Defendants under the ESA on January 5, 2024, then filed suit less than two weeks later, on January 16. *See* Ex. 5; ECF No. 1. Because Plaintiffs failed to satisfy this mandatory prerequisite for suit, the Court must dismiss their ESA claim against the action agencies. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989) (interpreting an analogous 60-days' notice requirement under a federal statute as a "mandatory condition[] precedent to commencing suit"); *Friends of Animals v. Ashe*, 808 F.3d 900, 903-04 (D.C. Cir. 2015) (applying *Hallstrom* to the 60-days' notice provision in the ESA citizen-suit provision and dismissing an ESA suit for insufficient notice).

Because Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their ESA claim, their motion for injunctive relief should be denied on that basis alone.

**D.  The balance of the equities and the public interest weigh against an injunction.**

The third and fourth factors of the preliminary injunction test—balancing the equities and the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted). Here, these considerations tilt decisively in Federal Defendants' favor.

The Court should deny Plaintiffs' motion because allowing the Revolution Project to proceed is in the public interest. In Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad," the government recognized that "[t]he United States and the world face a profound climate crisis." Exec. Order 14008, 86 Fed. Reg. 7619 (Feb. 1, 2021). As one part of the government's response, Executive Order 14008 announced an objective to increase renewable energy production on the outer continental shelf. *Id.* § 207. Congress, too, has taken steps to encourage renewable energy development, including by enacting the Energy Policy Act of 2005, which expressly authorized the Secretary of the Interior to approve renewable energy projects on the outer continental shelf. 43 U.S.C. § 1337(p)(1). In doing so, "Congress has articulated the public policy that our nation should incorporate clean energy as a necessary part of America's future and it is essential to securing our nation's energy independence and decreasing greenhouse emissions." *W. Watersheds Project v. U.S. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103 (D. Nev. 2011), *aff'd,* 443 F. App'x 278 (9th Cir. 2011) (citing the Energy Policy Act of 2005).

The Revolution Project furthers these important public interests, including environmental interests under the FAST-41 Act. With the capacity to generate 704 megawatts of clean energy, the

project has the potential to power nearly 250,000 homes.[26] By the same token, enjoining the Revolution Project would undermine the public interest and "harm federal renewable energy goals." *Id.* (holding that the balance of equities disfavored enjoining an agency's authorizations of wind energy facility).

Plaintiffs' reliance on *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), for their argument that the balance of the equities tips in their favor is misplaced. In *Tennessee Valley*, the Supreme Court found that a federal dam project should be enjoined because, after engaging in ESA Section 7 consultation, the consulting agency "determined that operation of the dam would eradicate an endangered species[.]" *Id.* at 156. By contrast, here, Section 7 consultation led NMFS GARFO to determine that the Revolution Project will have "no effect" on certain ESA-listed species, "is not likely to adversely affect" certain other ESA-listed species, and is "likely to adversely affect but is not likely to jeopardize the continued existence of" certain other ESA-listed species.[27]

In sum, enjoining the Revolution Project or staying Federal Defendants' approvals of the project would threaten more harm to the combined interests of the government and public, *see Nken*, 556 U.S. at 435, than Plaintiffs have shown that they will suffer absent an injunction. Plaintiffs have not carried their burden to show that the balance of equities favor an injunction.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' request for injunctive relief.

---

[26] *See* BOEM, Revolution Wind Project, https://www.boem.gov/renewable-energy/state-activities/revolution-wind (last visited Apr. 25, 2024).
[27] NMFS GARFO, 2023 Biological Opinion, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf, at 424 (last visited Apr. 25, 2024).

Respectfully submitted this 25th day of April, 2024.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Michelle M. Spatz*
MICHELLE M. SPATZ
Trial Attorney
Wildlife and Marine Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Tel: 202-598-9741
michelle.spatz@usdoj.gov

AMANDA K. RUDAT
Trial Attorney
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Tel: 202-532-3201
amanda.rudat@usdoj.gov