**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GREEN OCEANS, *et al.*,

      *Plaintiffs,*

  v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

      *Defendants,*

  and

REVOLUTION WIND, LLC,

      *Defendant-Intervenor*

Case No.: 1:24-cv-00141-RCL

**DEFENDANT-INTERVENOR REVOLUTION WIND, LLC'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR STAY OF FINAL AGENCY ACTION**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND ........................................................................................................4

     A.      The Revolution Wind Project Will Advance Important State and Federal
           Policy Objectives and Create Jobs........................................................................4
     B.      The Federal Agencies Conducted a Robust Environmental Review.......................5
     C.      Project Construction Is Underway and Any Delay From the Relief
           Plaintiffs' Seek Would Have Substantial Costs for Revolution Wind ...................8
     D.      NMFS and BOEM Requested Reinitiated ESA Consultation ..............................11

III.    LEGAL STANDARD................................................................................................12

IV.     ARGUMENT ............................................................................................................14

     A.      The Court Lacks Jurisdiction Because Plaintiffs Have Failed to Meet Their
           Burden to Show Standing for the Claims At Issue ...............................................14

           1.     Plaintiffs Fail to Show Injury In Fact ......................................................16
           2.     Plaintiffs Fail to Show Their Alleged Injuries Are Fairly Traceable
                  to Federal Defendants ...............................................................................19
           3.     Plaintiffs Fail to Show Their Alleged Injuries Are Redressable................20

     B.      Plaintiffs Failure to Provide Adequate 60-day Notice Under the
           Endangered Species Act Bars These Claims ........................................................21
     C.      Plaintiffs' Claims Fall Outside of Their Complaint..............................................23
     D.      The Court Lacks Jurisdiction Over Plaintiffs Claims Because They Are
           Not Ripe and There Is No Final Agency Action....................................................24
     E.      Plaintiffs Fail to Meet Their Burden of Establishing Any of the Four
           Factors Necessary to Obtain a Stay Under APA Section 705 ...............................26

           1.     Plaintiffs Have Not Proven Irreparable Harm ...........................................26
           2.     Plaintiffs Are Not Likely to Succeed on the Merits...................................32
           3.     The Balance of the Equities and the Public Interest Strongly Favor
                  Denial of the Motion.................................................................................35

V.      CONCLUSION.........................................................................................................37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Alexander v. FBI*,
    186 F.R.D. 185 (D.D.C. 1999) .........................................................................14

*Allco Renewable Energy Ltd. v. Haaland*,
    2022 WL 2373914 (D. Mass. June 30, 2022) ..........................................................23

*ASARCO Inc. v. Kadish*,
    490 U.S. 605 (1989)........................................................................................16

*B&D Land and Livestock Co. v. Connor*,
    534 F. Supp. 2d 891 (N.D. Iowa 2008)................................................................36

*Bennett v. Spear*,
    520 U.S. 154 (1997)........................................................................................25

*Burkhart v. Washington Metro. Area Transit Auth.*,
    112 F.3d 1207 (D.C. Cir. 1997)........................................................................14

*Common Sense Salmon Recovery v. Evans*,
    329 F. Supp. 2d 96 (D.D.C. 2004).....................................................................22

*\*Cuomo v. U.S. Nuclear Regul. Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985)...............................................................12, 13, 26

*Def. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
    684 F.3d 1242 (11th Cir. 2012) ........................................................................33

*Devia v. Nuclear Regul. Comm'n*,
    492 F.3d 421 (D.C. Cir. 2007).........................................................................26

*Dist. of Columbia v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................12

*Document Techs., LLC v. Hess*,
    2019 WL 6910137 (D.D.C. Dec. 19, 2019).........................................................27

*Duke Energy Field Servs. Assets, LLC v. Fed. Energy Regul. Comm'n*,
    150 F. Supp. 2d 150 (D.D.C. 2001)...................................................................21

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017)..........................................................................15

*Ellipso, Inc. v. Mann*,
　　460 F. Supp. 2d 99 (D.D.C. 2006) ........................................................................14

*Eng. v. Washington Metro. Area Transit Auth.*,
　　293 F. Supp. 3d 13 (D.D.C. 2017) ........................................................................15

*Env't Prot. Info. Ctr. v. Simpson Timber Co.*,
　　255 F.3d 1073 (9th Cir. 2001) ..............................................................................33

*Equal Rights Ctr. v. Post Properties, Inc.*,
　　246 F.R.D. 29 (D.D.C. 2007).................................................................................14

*Food & Water Watch, Inc. v. Vilsack*,
　　808 F.3d 905 (D.C. Cir. 2015) ..............................................................................18

*Friends of Animals v. Ashe*,
　　51 F. Supp. 3d 77 (D.D.C. 2014) ..........................................................................22

*Friends of Animals v. Salazar*,
　　670 F. Supp. 2d 7 (D.D.C. 2009) ..........................................................................23

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
　　232 F. Supp. 3d 53 (D.D.C. 2017) ........................................................................31

*Gwaltney of Smithfield v. Chesapeake Bay Found.*,
　　484 U.S. 49 (1987)................................................................................................21

*Hallstrom v. Tillamook Cnty.*,
　　493 U.S. 20 (1989)................................................................................................21

*Havens Realty Corp. v. Coleman*,
　　455 U.S. 363 (1982)..............................................................................................16

*HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc.*,
　　847 F.2d 908 (1st Cir. 1988).................................................................................36

*Hunt v. Wash. State Apple Advert. Comm'n*,
　　432 U.S. 333 (1977)..............................................................................................16

*Johnson v. Panetta*,
　　953 F. Supp. 2d 244 (D.D.C. 2013) ......................................................................33

*Kinsella v. Bureau of Ocean Energy Mgmt.*,
　　2023 WL 3571300 (E.D.N.Y. May 18, 2023) .......................................................27

*Linda R.S. v. Richard D.*,
　　410 U.S. 614 (1973)..............................................................................................20

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)....................................................................................15, 16, 17, 19

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990)..................................................................................................25

*Mahoney v. U.S. Dep't of the Interior,*
  2022 WL 1093199 (E.D.N.Y. Apr. 12, 2022) ........................................................27

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997)..................................................................................................13

*Morrison v. Sec'y of Def.,*
  802 F. Supp. 2d 6 (D.D.C. 2011)..............................................................................24

*Mt. Graham Red Squirrel v. Madigan,*
  954 F.2d 1441 (9th Cir. 1992) ..................................................................................33

*N. Slope Borough v. Andrus,*
  642 F.2d 589 (D.C. Cir. 1980) ..................................................................................35

*N.Y. State Elec. & Gas Corp. v. Fed. Energy Regul. Comm'n,*
  177 F.3d 1037 (D.C. Cir. 1999) ................................................................................26

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.,*
  Doc. #00118136384, No. 23-1501 (1st Cir. Apr. 24, 2024) ....................................31

*Nat'l Parks Conservation Ass'n v. Semonite,*
  282 F. Supp. 3d 284 (D.D.C. 2017)...............................................................26, 27, 31

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.,*
  2016 WL 420470 (D.D.C. Jan. 22, 2016) .................................................................31

*Nat'l Taxpayers Union, Inc. v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ..................................................................................18

*Nat'l Wilderness Inst. v. U.S. Army Corps of Engineers,*
  2005 WL 691775 (D.D.C. Mar. 23, 2005).................................................................34

*Navajo Nation v. Azar,*
  292 F. Supp. 3d 508 (D.D.C. 2018) ..........................................................................31

*Nken v. Holder,*
  556 U.S. 418 (2009)..............................................................................................12, 13

*NO Gas Pipeline v. Fed. Energy Regul. Comm'n,*
  756 F.3d 764 (D.C. Cir. 2014) ..................................................................................19

*Oceana v. Bureau of Ocean Energy Mgmt.*,
  37 F. Supp. 3d 147 (D.D.C. 2014) ....................................................................32

*Ohio v. EPA*,
  2024 WL 1515001 (D.C. Cir. Apr. 9, 2024) .......................................................15

*Olson v. Ako*,
  724 F. App'x 160 (3d Cir. 2018) ......................................................................24

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ........................................................................18

*Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*,
  845 F. Supp. 2d 1102 (S.D. Cal. 2012) .............................................................36

*Pub. Citizen v. Foreman*,
  471 F. Supp. 586 (D.D.C. 1979) .......................................................................20

*Quinn v. Dist. of Columbia*,
  740 F. Supp. 2d 112 (D.D.C. 2010) ..................................................................24

*Rsch. Air, Inc. v. Norton*,
  2006 WL 508341 (D.D.C. Mar. 1, 2006) ......................................................22, 23

*Russell v. Farley*,
  105 U.S. 433 (1881) .........................................................................................36

*Sabino Canyon Tours, Inc. v. U.S. Forest Serv.*,
  298 F. Supp. 3d 60 (D.D.C. 2018) ....................................................................17

*Safari Club Int'l v. Jewell*,
  960 F. Supp. 2d 17 (D.D.C. 2013) ....................................................................21

*Save Long Beach Island v. U.S. Dep't of Com.*,
  2024 WL 863428 (D.N.J. Feb. 29, 2024) ...................................................17, 19, 26

*Seafreeze Shoreside Inc. v. U.S. Dep't of the Interior*,
  2023 WL 3660689 (D. Mass. May 25, 2023) ......................................................36

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) .................................................................13, 35, 36

*Sierra Club v. Jackson*,
  833 F. Supp. 2d 11 (D.D.C. 2012) ....................................................................12

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) .........................................................................................17

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ..................................................................................16

*Strahan v. Roughead*,
  910 F. Supp. 2d 358 (D. Mass. 2012) ........................................................33

*Texas v. United States*,
  523 U.S. 296 (1998) ..................................................................................25

*Veloxis Pharms., Inc. v. U.S. Food & Drug Admin.*,
  109 F. Supp. 3d 104 (D.D.C. 2015) ...........................................................24

*W. Watersheds Project v. Bureau of Land Mgmt.*,
  774 F. Supp. 2d 1089 (D. Nev. 2011) ........................................................37

*Waterkeeper All., Inc. v. Regan*,
  41 F.4th 654 (D.C. Cir. 2022) ...................................................................16

*\*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................13, 26, 27, 28, 35

*Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
  836 F.2d 173 (3d Cir. 1988) ......................................................................24

## STATUTES

5 U.S.C.
  § 704 ........................................................................................................25
  § 705 ....................................................................................12, 14, 26, 36
  § 706(2)(A) ...............................................................................................25

16 U.S.C.
  § 1362(18)(A)(i) ..........................................................................................7
  § 1362(18)(C) ..............................................................................................7
  § 1536(d) ...................................................................................................33
  § 1540(g)(2)(A)(1) .....................................................................................21
  § 1540(g)(2)(C) ..........................................................................................23

42 U.S.C.
  § 4370m(6) ..........................................................................................14, 37
  § 4370m-6(b) .............................................................................................14

Conn. Gen. Stat. § 22a-200a(3) .......................................................................4

R.I. Gen. Laws § 39-26-4(a)(14) .....................................................................4

## RULES

Fed. R. Evid. 702(b)-(d)............................................................................................28, 30

Local Rule 7(m)........................................................................................................14

## I.    INTRODUCTION

Plaintiffs' Motion for Stay of Final Agency Action ("Motion") should be denied.  The Revolution Wind Farm and Revolution Export Cable (collectively, the "Revolution Wind Project" or "Project") will provide clean, reliable power to Rhode Island and Connecticut and create thousands of well-paying jobs during construction and operation.   Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind") has worked to develop the Project for over eight years, has committed in excess of $3 billion dollars to date, and began onshore and portions of offshore construction months ago pursuant to extensive, existing federal and state approvals. Indeed, the Federal Defendants in this case—including the U.S. Department of the Interior, the Bureau of Ocean Energy Management ("BOEM"), the National Marine Fisheries Service ("NMFS"), and the U.S. Army Corps of Engineers ("USACE")—all participated in a thorough, years-long environmental review and permitting process.  That  process resulted in a well-designed Project that helps meet federal and state energy goals and protects the environment, including through required noise mitigation measures that were recently proven to be effective during construction of the South Fork offshore wind farm by an affiliate of Revolution Wind.

Recently, NMFS reinitiated consultation on one of the existing approvals for the Revolution Wind Project—the Endangered Species Act ("ESA") Section 7 Consultation Biological Opinion ("BiOp").  The agency reinitiated consultation to (1) evaluate modifying the pile driving clearance and shutdown zones for sea turtles to ensure the effectiveness of monitoring during nighttime pile driving and consider additional precautionary take; and (2) add a degree of conservatism—based upon new information that post-dated the current BiOp—by allowing additional small numbers of incidental, non-lethal take of sei and fin whales resulting from daytime pile driving.

In their Motion, Plaintiffs assert without support that the ongoing reinitiated consultation (which NMFS has stated it intends to conclude on or about April 30, 2024) somehow invalidates the existing BiOp—which, to be clear, requires that certain monitoring and mitigation plans be approved prior to the start of pile driving, anyway. *See* Mot. at 1. Plaintiffs attempt to manufacture an emergency to show alleged imminent harm by incorrectly assuming "that Revolution Wind, LLC intends to move forward with its construction plans" without requisite agency authorization and, on that basis, Plaintiffs argue that "[p]roject construction should be prohibited until Section 7 consultation is complete and there is a new, valid [BiOp]". *See id*. at 1, 21. None of these claims appears anywhere in Plaintiffs' Complaint or their multiple 60-day notices of ESA claims, and none is properly before the Court. In any event, and notwithstanding that the existing BiOp remains valid during reinitiation of consultation, Revolution Wind does not intend to start any pile driving until it has the requisite approvals in place from the federal agencies, including the aforementioned plan approvals (which have yet to be received). Plaintiffs' "understand[ing]" to the contrary, Mot. at 1, is uninformed, at best—had they complied with this Court's rules' requirement to meet and confer with Revolution Wind prior to filing their Motion, they would have realized as much.

Nonetheless, Plaintiffs seek the extraordinary relief of staying not only the improperly challenged BiOp, but also broadly staying all "approvals and authorizations" for the Project and enjoining Revolution Wind from "any pile driving **or other construction work**" for an indefinite time "until further Court Order." Proposed Order, Dkt. #26-2 (emphasis added); *see also* Mot. at 1-2. Any delay in offshore construction caused by the relief Plaintiffs seek would cause Revolution Wind to incur additional costs of more than **$1 million per day** beginning on May 1, 2024 and increasing to **$3 million per day** if the delay extended into and beyond late July 2024. Even a

delay in non-pile driving offshore "construction work" due to a stay would cost Revolution Wind more than $300,000 per day between now and May 1, 2024, and cause knock-on delays to subsequent construction activities.    Ultimately, Revolution Wind could lose a substantial proportion of the more than $3 billion it has committed as a result of cascading impacts under various construction timelines, seasonal prohibitions to protect species, and under contracts for the manufacture, transport, and installation of the remaining components of the Project and its existing power purchase agreements, including potential termination of those contracts.

None of Plaintiffs' arguments has any merit, let alone being sufficient to meet the high burden required for the extraordinary relief Plaintiffs seek.    BOEM and NMFS have made clear that the July 21, 2023 BiOp—which is based on a thorough review of the Project and its mitigation measures, and which imposes further reasonable and prudent measures on Project construction— remains in effect during the reinitiated consultation.    Revolution Wind has spent years designing a Project with substantial avoidance and minimization measures to protect the environment— including marine mammals and sea turtles.    Indeed, Revolution Wind will use the successful mitigation techniques employed by the recent, now-complete construction of the South Fork Wind project.    Documented experience from South Fork Wind shows that the irreparable harm Plaintiffs allege to endangered species is not likely.    Plaintiffs' arguments to the contrary are based on flawed scientific methodologies, applied to a different developer's offshore wind project.

Moreover, Revolution Wind will not  conduct pile driving until it has obtained all required approvals.    Far from showing any inadequacy in the existing BiOp, as Plaintiffs wrongly claim, the reinitiation of consultation demonstrates the agencies are following routine, required procedures to protect the environment, including marine mammals and sea turtles.    Further, the

Court lacks jurisdiction to hear these claims and Plaintiffs' Motion is riddled with errors.  The Motion for Stay should be denied.

## II.    BACKGROUND

### A.    The Revolution Wind Project Will Advance Important State and Federal Policy Objectives and Create Jobs

The Revolution Wind Project involves the construction and operation of an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility consisting of up to 65 wind turbine generators ("WTGs"), two offshore substations, and associated inter-array cabling between the WTGs, as well as an export cable to bring electricity to the electric grid.  Declaration of Kellen Ingalls in Support of Defendant-Intervenor Revolution Wind's Opposition to Plaintiffs' Motion for Stay of Final Agency Action ("Second Ingalls Decl."), ¶ 5.  The Revolution Wind Project will supply renewable energy and jobs to Rhode Island and Connecticut, and will also contribute to the federal government's, Rhode Island's, and Connecticut's carbon reduction goals.  Declaration of Kellen Ingalls in Support of Revolution Wind's Intervention as a Defendant, Dkt. #7-3 ("First Ingalls Decl."), ¶¶ 2-3.  Similar to the federal government's goal of 100% clean energy by 2035, Rhode Island has a goal of reaching 100% renewable energy by 2033, and Connecticut aims to reach 100% zero-carbon electricity supplied to customers by 2040.  *See* 39 R.I. Gen. Laws § 39-26-4(a)(14); Conn. Gen. Stat. § 22a-200a(3).  The federal government has set a goal of 30 gigawatts ("GW") of offshore wind by 2030.[1]  Second Ingalls Decl. ¶ 41.  Rhode Island's climate goals require the development of 9 to 11 GW of offshore wind power by 2030.  *Id.*  Additionally, Connecticut's climate goals require the development of 2 GW of offshore wind by 2030.  *Id.*

---

[1] *See* U.S. Dep't of Energy, Advancing Offshore Wind Energy in the United States 1, 9 (Mar. 2023), https://www.energy.gov/sites/default/files/2023-03/advancing-offshore-wind-energy-full-report.pdf ("[O]ffshore wind can be a key contributor in many U.S. energy markets to achieving a zero-carbon electricity grid by 2035 and a net-zero emissions economy by 2050.").

**B.**    **The Federal Agencies Conducted a Robust Environmental Review**

Revolution Wind submitted the Construction and Operations Plan ("COP") for the Revolution Wind Project to BOEM in March 2020. First Ingalls Decl. ¶ 15. The final version of the Revolution Wind COP is thousands of pages long, including appendices, and underwent years of comprehensive environmental review and consultation. *Id*. ¶¶ 15-16, 19. BOEM conducted an extensive, more than two-year review of the Project under the National Environmental Policy Act ("NEPA"). *Id.* ¶ 16. The review process engaged twelve federal agencies, three state cooperating agencies, and an extensive array of other stakeholders, ranging from the fishing industry, to local communities, to American Indian tribes and historic preservation organizations. *Id.* The Federal Defendants also reviewed the Project under other statutes, including the Coastal Zone Management Act, *id.* ¶ 24, the National Historic Preservation Act ("NHPA"), *id.* ¶¶ 27-37, and the Clean Water Act ("CWA"), *id.* ¶ 38. Most relevant for the Plaintiff's Motion, the environmental review and permitting process included extensive analysis of potential Project impacts to species, including marine mammals and sea turtles. The Department of Interior decided to approve the Revolution Wind Project's COP through a Record of Decision on August 21, 2023. *Id.* ¶ 19; Second Ingalls Decl. ¶ 7. On November 17, 2023, BOEM issued a COP approval letter with the final specific conditions of the Project's COP approval ("BOEM COP Conditions"), which includes conditions to avoid and minimize potential impacts to marine mammals and sea turtles. First Ingalls Decl. ¶ 19; Second Ingalls Decl. ¶ 7.[2]

**Endangered Species Act ("ESA").** In April 2022, BOEM submitted a draft Biological Assessment to NMFS and the U.S. Fish and Wildlife Service, which BOEM subsequently updated

---

[2] BOEM, Conditions of Construction and Operations Plan Approval Lease Number OCS-A 0486 (Nov. 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cond%20of%20COP%20Appr_REV%20OCS-A%200486_0.pdf.

during the course of the consultation. First Ingalls Decl. ¶ 21. On July 21, 2023, NMFS issued a final BiOp that assessed the potential effects of construction (including pile driving), operation, maintenance, and decommissioning of the Revolution Wind Project on ESA-listed whales, sea turtles, fish, corals, and designated critical habitat in the Project area—taking due account of the mitigation measures already included in the Project's construction processes. *Id.* While Plaintiffs incorrectly claim otherwise, the BiOp concluded the Revolution Wind Project is not likely to jeopardize the continued existence of any ESA-listed species, including each of the whale and sea turtle species that Plaintiffs discuss in their Motion. Second Ingalls Decl. ¶ 11; *see* BiOp at 424.[3] The BiOp also concluded the Revolution Wind Project was not likely to adversely affect, or would have no effect, on several other ESA-listed species, and no effect on the critical habitat designated for the North Atlantic right whale and several other ESA-listed species. BiOp at 424. The BiOp included an Incidental Take Statement pursuant to ESA Section 7(b)(4), 16 U.S.C. § 1536(b)(4), and identified permitted non-lethal take incidental to development of the Revolution Wind Project and legally-enforceable mitigation measures and requirements to avoid and minimize impacts to listed species, including specifically from pile driving. BiOp, Section 11.0.

**Marine Mammal Protection Act ("MMPA").** On October 8, 2021, Revolution Wind submitted a request for the promulgation of Incidental Take Regulations ("ITR"), and issuance of an Letter of Authorization ("LOA") for the taking of marine mammals incidental to construction of the Revolution Wind Project. First Ingalls Decl. ¶ 22. On March 21, 2022, NMFS published in the Federal Register a notice of receipt of Revolution Wind's application, and held a 30-day

---

[3] NMFS, Endangered Species Act Biological Opinion for Construction, Operation, Maintenance, and Decommissioning of the Revolution Wind Offshore Energy Project (July 21, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf.

public comment period. *Id.* NMFS published a proposed rule on December 23, 2022, and held a 45-day public comment period. *Id.* On October 20, 2023, NMFS published its final ITR[4] and on November 20, 2023, NMFS issued its LOA for the Revolution Wind Project.[5] *Id.* NMFS's ITR and LOA allow for the non-lethal incidental take of marine mammals during construction-related activities within the Revolution Wind Project area from November 20, 2023 through November 19, 2028.[6] Second Ingalls Decl. ¶ 15. Consistent with the newly promulgated regulations, NMFS's LOA includes over 30 pages of mitigation, monitoring, and reporting requirements. *Id.* ¶ 16. The ITR and LOA authorize incidental take of marine mammals by harassment, **but do not authorize any take of marine mammals by mortality or serious injury**. *Id.* ¶ 15.

Before any pile driving may begin, the BOEM COP Conditions, the BiOp, the ITR, and the LOA all require that NMFS review and approve three plans. *Id*. ¶ 18. These are the Sound Field Verification Plan, the Foundation Installation Pile Driving Marine Mammal Monitoring Plan, and the Pile Driving Passive Acoustic Monitoring Plan. *Id.* These plans have been submitted to NMFS and are currently under review by the agency. *Id.* None of these plans has been approved yet by NMFS, and Revolution Wind will not conduct pile driving until each of the plans has been approved. *Id.*

---

[4] NMFS' final ITR for the Revolution Wind Project is available at 50 C.F.R. Part 217, Subpart BB. *See also* 88 Fed. Reg. 72,562 (Oct. 20, 2023), https://www.federalregister.gov/documents/2023/10/20/2023-22056/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.

[5] NMFS Letter of Authorization (Nov. 20, 2023), https://www.fisheries.noaa.gov/s3/2023-11/BL52-Revolution-Wind-LOA-OPR1-Final-signed-OPR1.pdf.

[6] Under the MMPA, incidental take has different levels. Level A harassment is "any act of pursuit, torment, or annoyance" that has the "potential to injure a marine mammal or marine mammal stock in the wild." 16 U.S.C. § 1362(18)(A)(i), (18)(C). Level B harassment is less serious, and encompasses "any act of pursuit, torment, or annoyance" that has the "potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns[.]" *Id*. § 1362(18)(A)(ii), (18)(D).

**C.      Project Construction Is Underway and Any Delay From the Relief Plaintiffs'
Seek Would Have Substantial Costs for Revolution Wind**

The Project has mobilized a large team of specialized workers who are currently working
on the Project.  In September 2023, the Revolution Wind Project began onshore construction
activities.  *Id*. ¶ 8.  Currently, the Project is continuing onshore excavation for conduits and
backfilling and restoring excavated areas as they progress; onshore pile driving activities are also
ongoing for the new onshore interconnection station and substation off Camp Avenue.  *Id.*

Offshore, in January 2024, the Project began seabed-preparation activities in preparation
for offshore construction, and that work is ongoing.  *Id*. ¶¶ 8, 32.  The Project is relocating boulders
in the Revolution Wind Lease Area and installing scour protection at proposed WTG locations.
*Id*. ¶ 32.  The Project has not yet begun any WTG or offshore substation foundation installation
pile driving, and will not do so until all required agency approvals have been obtained.  *Id*. ¶ 9.

Revolution Wind and its affiliates have committed in excess of $3 billion to date to plan,
permit, develop, and construct the Project.  *Id.* ¶ 26.  Revolution Wind has ordered equipment and
contracted with specialized vessels to prepare for offshore construction.  *Id.*; First Ingalls Decl. ¶
6.  Revolution Wind has been awarded five power purchase agreements ("PPAs") under three
separate procurements for a combined approximately 704 MW of generating capacity.  Second
Ingalls Decl. ¶ 27.  Each of the PPAs contain commercial milestones the Project must meet by
certain dates; delays result in increased contract security requirements (which Revolution Wind
would forfeit upon termination), daily liquidated damages charges ($70,400 per day in total across
the five PPAs), and ultimately termination rights for the buyers.  *Id.* ¶¶ 27, 28.

Staying the approvals now, as Plaintiffs seek in this Motion, would cause the Revolution
Wind Project to face serious delay, jeopardizing the significant investment of many years of efforts
in the approval processes, commitments exceeding $3 billion in planning, engineering,

environmental field work, technical analyses, permitting, contracting, and construction by Revolution Wind and its affiliates. *Id.* ¶ 26, 34-37, 40. Revolution Wind has contracted with four primary vessels (and additional support vessels) for seabed preparation work, and would incur standby and fuel costs of more than $300,000 per day between now and May 1, 2024, if this work had to stop. *Id.* ¶ 32. Additionally, Revolution Wind has contracted with several vessels to perform the foundation-installation work. *Id.* ¶ 34. If the Court were to stay the federal approvals required for this work or otherwise order this work to stop, Revolution Wind would incur additional delay standby and fuel costs in excess of $1 million per day. *Id.* If WTG installation and cable-laying could not begin on schedule in July and August, Revolution Wind could incur a further $2 million per day in standby and fuel costs. *Id.* ¶ 35. Ultimately, depending upon the length of the delay, standby and fuel costs could be in excess of $3 million per day if delay continues into and beyond late July 2024 alone. *Id.* ¶ 36. Assuming a hypothetical six-month delay, these costs could amount to approximately $230 million. *Id.*

A delay in one aspect of the Project's offshore construction can have cascading effects because of the sequential nature of the construction activities and limited availability of specialized vessels. *Id.* ¶¶ 37, 39. For example, if a particular vessel's work were to be delayed beyond its contractual latest vessel availability date, Revolution Wind would then need to work with the contractor (or another contractor) to remobilize another vessel, leading to additional costs, and possibly also to further delays, assuming alternate vessels were available at all. *Id.* ¶ 37. The Project's construction schedule is also subject to seasonal environmental mitigation measures for species protection that restrict the windows in which various construction activities are allowed, essentially foundations can only be installed during half of the year. *Id.* ¶ 38. Again, even a brief delay in the Project's construction can have magnified effects because a delay of just a few days

could result in many months of delay if there is not enough time to complete a construction activity in that year's window. *Id.* ¶ 38. Additionally, halting or delaying the Project would have significant cascading impacts to Revolution Wind's substantial financial obligations under various contracts for the manufacture, transport, installation, and construction of the remaining components of the Revolution Wind Project. *Id.* ¶ 26.

Staying the approvals for the Revolution Wind Project would also harm the economy and workers. The Revolution Wind Project will create more than 4,100 full-time equivalent jobs (direct, indirect, and induced effects of the Project) during construction and an estimated 236 full-time equivalent jobs annually for the Project's operations and maintenance work. First Ingalls Decl. ¶ 3. Further, on April 22, 2022, Ørsted, the North America's Building Trades Unions, and the United Brotherhood of Carpenters entered into a "National Offshore Wind Agreement", a first-of-its kind U.S. project labor agreement that creates expansive job opportunities for workers in the building trade unions on offshore construction associated with Ørsted's projects, including the Revolution Wind Project. Second Ingalls Decl. ¶ 44. Construction on the Project is also being performed pursuant to project labor agreements with the Norwich-New London Building Trades Council (offshore wind turbine pre-assembly at the New London State Pier) and the Rhode Island Building and Construction Trades Council (advance foundation component construction, as well as work on the onshore cable route and onshore substation). *Id.* Consistent with these agreements, many of the jobs associated with the Project are union jobs. *Id.* Ørsted and Eversource are also investing significantly in domestic manufacturing and port infrastructure, and Revolution Wind is making financial commitments to communities and institutions in Connecticut and Rhode Island. *Id.* ¶¶ 44-46. Granting the relief requested in Plaintiffs' Motion and halting construction would imperil these critical economic benefits.

### D.    NMFS and BOEM Requested Reinitiated ESA Consultation

Contrary to Plaintiffs' allegations, reinitiation of consultation, as may be needed, is a routine and common part of the Section 7 process, as provided under ESA implementing regulations. *See* 50 C.F.R. § 402.16 (reinitiation of consultation). NMFS and BOEM requested reinitiation of the ESA Section 7 consultation process for the Project on two narrow bases. Second Ingalls Decl. ¶ 20. First, on November 17, 2023, NMFS' Office of Protected Resources ("OPR" or "NMFS-OPR") requested reinitiation to consider the potential for Level A harassment (a permanent shift in sensitivity of hearing referred to as a "permanent threshold shift" or "PTS") to fin whales and sei whales as a result of exposure to noise from pile driving (take by harassment of two fin whales and three sei whales) and potential unexploded ordnance ("UXO")/munitions and explosives of concern ("MEC") detonation (take by harassment of two fin whales and two sei whales). *Id.*; NMFS Reinitiation Request, Dkt. #26-5, at 8. This request resulted from the fact that the final ITR included these takes based on comments from the Marine Mammal Commission on the draft ITR. Specifically, species sighting data from the summer of 2023 indicated an increased presence of fin and sei whales, so NMFS decided to evaluate and authorize potential Level A harassment of these species as a precautionary measure. *See* Dkt. #26-5 at 4-5. In seeking reinitiation of consultation on this basis, NMFS stated that this new data "does not constitute new significant data wherein new environmental concerns or impacts on the action are raised" and clarified "the impacts of PTS on marine mammals, in general, from the project was fully discussed in the proposed rule and hence, considered in the [BiOp]." *Id* at 4.

Second, on January 12, 2024, BOEM requested reinitiation to consider its proposal to modify the nighttime pile driving clearance and shutdown zones for sea turtles, to ensure the effectiveness of monitoring for sea turtles after dark that was incorporated into Revolution Wind's proposed draft Nighttime Pile Driving Monitoring Plan. Second Ingalls Decl. ¶ 21. Therefore,

BOEM proposed that NMFS evaluate issuance of a very small number of potential takes—BOEM proposed less than two individuals per turtle species—as a conservative measure. *See* Dkt. #26-8 at (4-6). Both of these requests were made out of an abundance of caution and to ensure that conservative take authorization is in place for these types of construction activity. Second Ingalls Decl. ¶ 20. In response to these requests from NMFS-OPR and BOEM, on March 12, 2024, NMFS-Greater Atlantic Regional Fisheries Office ("NMFS-GARFO") reinitiated ESA Section 7 consultation for the Project. *Id.* ¶ 24.

Revolution Wind has been able to micro-site the Project to avoid known UXO/MEC sites and avoid associated detonations (and potential takes). Revolution Wind does not intend to begin the pile driving being analyzed in the reinitiated consultation until all required agency approvals have been obtained. *Id.* ¶ 9.

## III.    LEGAL STANDARD

Under Section 705 of the APA, a court may issue a stay of an agency action:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. The test for a stay under Section 705 is the same as the test for a preliminary injunction. *See, e.g., Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012) ("The Court concludes that the standard for a stay at the agency level is the same as the standard for a stay at the judicial level: each is governed by the four-part preliminary injunction test applied in this Circuit."); *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) ("The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay.") (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009).

Under this standard, a stay is an "extraordinary" remedy that can only be granted upon a "clear showing" of entitlement to such relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008) (preliminary injunction); *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (preliminary injunction); *Cuomo*, 772 F.2d at 974 (a stay is an "extraordinary remedy" and the movant bears the "burden of showing that exercise of the court's extraordinary injunctive powers is warranted").

Applying the preliminary injunction standard, a plaintiff seeking a stay must show: (1) likelihood of success on the merits; (2) that there will be irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tips in its favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20; *see also Cuomo*, 772 F.2d at 974. The party seeking the relief bears the burden of persuasion. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–30 (2d ed. 1995))).

The first two factors are the most important. *See Nken*, 556 U.S. at 434. And the Supreme Court has made clear that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is **likely** in the absence of an injunction" and not simply possible. *Winter,* 555 U.S. at 22 (emphasis in original).

In addition to the above factors, "in any action seeking a temporary restraining order or a preliminary injunction against an agency or project sponsor in connection with review or authorization of a covered project" under the federal FAST-41 statute, "the court shall: (1) consider the potential effects on public health, safety, and the environment, and the potential for significant

13

negative effects on jobs resulting from an order or injunction; and (2) not presume that the harms

described in paragraph (1) are reparable." 42 U.S.C. § 4370m-6(b). The Project is a "covered

project" under the FAST-41 statute, *see id.* § 4370m(6); *see also* Revolution Wind Project FEIS

at A-5, L-33.[7] Although Plaintiffs style their Motion as a motion for stay under APA Section 705,

by seeking an order directing Revolution Wind to "not begin or perform any pile driving or other

construction work", Plaintiffs are in fact seeking preliminary injunctive relief. *See* Proposed

Order, Dkt. #26-2. Because of the relief sought in Plaintiffs' Motion, and because, as discussed

above, the same four-part test for a preliminary injunction applies here, Plaintiffs' Motion is

subject to FAST-41's heightened standard.

## IV.    ARGUMENT

### A.    The Court Lacks Jurisdiction Because Plaintiffs Have Failed to Meet Their Burden to Show Standing for the Claims At Issue[8]

Plaintiffs cannot demonstrate Article III standing to support their claims of irreparable

injury from potential harm to whale and sea turtle species because (1) they have not suffered any

---

[7] BOEM, Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement ("FEIS") (July 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2.pdf.

[8] Plaintiffs' Motion should also be denied on the grounds that Plaintiffs failed to comply with Local Rule 7(m), which requires a moving party to meet-and-confer in good faith before filing a non-dispositive motion and to include a certification in the brief that the requirement has been met. Plaintiffs' preliminary Motion for Stay is non-dispositive and Rule 7(m) applies. *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1215 (D.C. Cir. 1997). Here, Plaintiffs made no attempt to contact Revolution Wind prior to filing their Motion and Plaintiffs have provided no credible excuse for failing to comply with Rule 7(m). Had Plaintiffs made any effort to meet and confer, they would have learned that their purported basis for seeking extraordinary relief from the Court is incorrect. Second Ingalls Decl. ¶¶ 9, 18, 19 . Accordingly, this Court should deny the Motion. *See Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 102 (D.D.C. 2006), "[i]f a party files a nondispositive motion without certifying its compliance with Rule 7(m), the motion will be denied." *See also Alexander v. FBI*, 186 F.R.D. 185, 187 (D.D.C. 1999) (Lamberth, J.) (interpreting then-rule 108(m) (now 7(m)); *Equal Rights Ctr. v. Post Properties, Inc.*, 246 F.R.D.

concrete, particularized, actual, or certainly impending injuries, (2) their unproven alleged injuries are not fairly traceable to the alleged misconduct of the Federal Defendants, and (3) granting Plaintiffs the relief they seek would not redress their supposed injuries.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs fall short of their burden to establish standing to support their alleged injuries from potential harm to whale and sea turtle species—they fail to adequately plead standing in the Complaint or adequately allege standing in the declaration of Lisa Linowes (who is not a Plaintiff in this case) on behalf of one of the Plaintiffs, the Save Right Whales Coalition.  *See* Declaration of Lisa Linowes ("Linowes Decl."), Dkt. #26-4.  "[A]bsent 'good cause shown,' a petitioner whose standing is not readily apparent must show that it has standing in 'its opening brief.'"  *Ohio v. EPA*, No. 22-1081, 2024 WL 1515001, at *7 (D.C. Cir. Apr. 9, 2024).  When assessing standing at the preliminary injunction stage, the district court applies "the heightened standard for evaluating a motion for summary judgment[,]" meaning "the plaintiff cannot rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing."  *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 400 (D.C. Cir. 2017) (internal citations and quotations omitted).  Additionally, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish."  *Lujan*, 502 U.S. at 562 (citation omitted).

As an organization, Save Right Whales Coalition must demonstrate standing either as a representative of its members ("representational standing") or in its own capacity ("organizational

---

29, 31 (D.D.C. 2007); *Eng. v. Washington Metro. Area Transit Auth.*, 293 F. Supp. 3d 13, 16 (D.D.C. 2017)).

standing"). To establish representational standing, an organization must show: (1) at least one of its members has standing; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires participation of the organization's individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Alternatively, to establish organizational standing, Save Right Whales Coalition must demonstrate that it meets the standing requirements itself. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). Save Right Whales Coalition fails to show it has either representational standing or organizational standing.

### 1.    Plaintiffs Fail to Show Injury In Fact

To establish injury in fact, Plaintiffs must prove "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Save Right Whales fails to show that either the organization itself or any of its members have suffered an injury in fact.

Save Right Whales Coalition fails to establish injury in fact to its members. On the first prong of representational standing, Plaintiffs must show that at least one of its members has standing. *Hunt*, 432 U.S. at 343; *Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022) (dismissing claim for lack of representational standing where no individual members of plaintiff organization had shown standing). The only member of Save Right Whales Coalition who submitted a declaration in this action is Lisa Linowes. Linowes Decl. ¶ 1.

Ms. Linowes has not shown injury in fact to herself and thus has not demonstrated representational standing. Ms. Linowes expresses an interest in studying and advocating for right whales and sea turtles. However, such "generalized grievances" brought by a concerned citizen "are not cognizable in the federal courts." *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 616 (1989);

*see also Sabino Canyon Tours, Inc. v. U.S. Forest Serv.*, 298 F. Supp. 3d 60, 74 (D.D.C. 2018) ("a general concern for the environment is simply not sufficient" to allege a "concrete particularized injury"). Further, Ms. Linowes provides no facts showing that she has been, or imminently will be, "'directly' affected apart from [her] 'special interest' in the subject." *Lujan*, 504 U.S. at 563 (citing *Sierra Club*, 405 U.S. at 735, 739). Indeed, the declaration makes no allegation that Ms. Linowes has visited or intends to visit the area where the Project is located—let alone that she has the sort of specific, concrete plans that may support standing. *Lujan*, 504 U.S. at 564 ("'some day' intentions" to observe species "do not support a finding of the 'actual or imminent' injury that our cases require"); *see also Save Long Beach Island v. U.S. Dep't of Com.*, No. 23-1886 (RK) (JBD), 2024 WL 863428, at *9 (D.N.J. Feb. 29, 2024). The Supreme Court has expressly rejected the "'animal nexus' approach, whereby anyone who has an interest in studying or seeing [an] endangered animal[] anywhere on the globe has standing" to challenge a federal action that may adversely affect that species. *Lujan*, 504 U.S. at 566-67 ("It goes beyond the limit . . . and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a [] project affecting some portion of that species with which he has no more specific connection."). Ms. Linowes has not established the injury in fact necessary to show standing at this stage.

Save Right Whales Coalition fails to establish injury in fact to itself. "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved'." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). To show injury in fact to an organization, the plaintiff "must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not

impart standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). To determine whether the organization suffered "concrete and demonstrable injury" to its activities, the court will "ask, first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015) (internal quotation marks omitted).

Here, Save Right Whales Coalition fails to show an injury in fact sufficient to establish organizational standing. The Complaint broadly alleges that Save Right Whales Coalition "engages with local stakeholders to advocate for preserving and conserving the North Atlantic right whale" and "to protect the North Atlantic right whale and other marine life from the industrialization of the ocean habitat through large-scale offshore wind energy development." Compl., Dkt. #1, ¶ 3. And the Linowes Declaration states that Save Right Whales Coalition "advocates against offshore wind projects that could be harmful to wildlife and is committed to educating the public and political leaders on the harms of offshore wind on ocean life and for those who live, work, and visit our coastal communities." Linowes Decl. ¶ 1. But Save Right Whales Coalition's "expend[iture of] resources to educate its members and others regarding" government action "does not present an injury in fact." *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). There is nothing in the Linowes Declaration that suggests Save Right Whales Coalition's activities have been "impeded" in any way by the Project or the challenged Project authorizations.

Instead, Linowes merely states that in furtherance of its asserted mission, Save Right Whales Coalition "actively engages with . . . federal agencies . . . to provide comments on how to protect marine life and on the impacts offshore development will have on marine life." Linowes

Decl. ¶ 2. And the extensive public process held by BOEM, NMFS, and the other Federal Defendants during the Project's permitting and environmental review process provided a forum in which Save Right Whales Coalition could engage in its public educational mission and attempt to shape the Project. *See supra* Section II.B. This process resulted in a Project that is legally required to comply with extensive avoidance, mitigation, monitoring, and reporting requirements related to the endangered whale and sea turtle species. *Id.* None of the challenged approvals prevents Save Right Whales Coalition's advocacy or educational mission and the organization has failed to demonstrate a direct injury from those approvals. *See Save Long Beach Island,* 2024 WL 863428, at *9 (dismissing challenge by plaintiffs against NMFS approvals, finding "a dearth of allegations in the Complaint that demonstrate a direct injury to [p]laintiffs apart from their alleged 'special interest' in marine mammals").

### 2. Plaintiffs Fail to Show Their Alleged Injuries Are Fairly Traceable to Federal Defendants

Plaintiffs also fail to establish that their alleged injuries are fairly traceable to the actions of Federal Defendants, as opposed to the "independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation omitted); *see also NO Gas Pipeline v. Fed. Energy Regul. Comm'n*, 756 F.3d 764, 768 (D.C. Cir. 2014). Plaintiffs "attempt to draw a causal connection where none exists between recent offshore wind development and large whale mortality, including the North Atlantic right whale, sei whale, and humpback whale." Expert Declaration of Mary Jo Barkaszi ("Barkaszi Decl.") ¶ 7. And Plaintiffs ignore the overwhelming scientific consensus that offshore wind projects are not the cause of increased mortalities of whales, but rather that vessel strikes and fishing gear entanglements are the primary causes of those increased mortalities. *Id.* (summarizing findings of the National Oceanic and Atmospheric Administration ("NOAA"), the Marine Mammal Commission, BOEM, the U.S. Department of Energy, Rutgers University,

University of Rhode Island, the Sierra Club, and the Natural Resources Defense Council). As to sea turtles, NOAA has recognized that sea turtle mortality and harm is caused by vessel strikes, bycatch of turtles in fishing gear, loss and degradation of shoreline and beach nesting habitat, ocean pollution, and climate change. Expert Declaration of Darren Ireland ("Ireland Decl.") ¶ 41. Without credible support, Plaintiffs (at 15-16) and Linowes allege that the Revolution Wind Project will result in irreparable harm to endangered sea turtle species. *See* Linowes Decl. ¶¶ 23, 24. But this allegation is based on Plaintiffs' false assertion that the existing BiOp is no longer valid and what appears to be a premature challenge to the conclusion of the reinitiated Section 7 consultation between NMFS and BOEM that has not yet even occurred. As a result, Plaintiffs have failed to demonstrate that the challenged agency actions are the legally relevant cause of their purported harms.

### 3.    Plaintiffs Fail to Show Their Alleged Injuries Are Redressable

Redressability exists only where the requested relief would remedy a plaintiff's alleged injury directly. *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973); *Pub. Citizen v. Foreman*, 471 F. Supp. 586, 590 (D.D.C. 1979) ("[A] plaintiff must show 'an injury to himself that is likely to be redressed by a favorable decision.'") (citation omitted).

Here, Plaintiffs show no cognizable injury. *See supra* Section IV.A.1. But even if they did, Plaintiffs fail to show the injury would be redressable by the relief they seek from this Court. Harms to sea turtles and whales are not caused by offshore wind activities but primarily from vessel strikes and fishing gear entanglements. *See supra* at 19-20; *see also infra* Section IV.E.1 . Moreover, as to whales, Plaintiffs claim harm will occur "[w]ithout a stay to allow adequate analysis of the effects on these four endangered whale species . . ." Mot. at 15. But Plaintiffs have made no showing that the stay they seek would make any difference because NMFS is *already* studying the impacts on whales. Similarly, as to sea turtles Plaintiffs claim that "harm will hit the

sea turtles if Revolution Wind, LLC is allowed to ignore these Government-disapproved construction methods starting May 1." *Id.* at 17. Again, Plaintiffs make no showing that a stay would redress the alleged harm because NMFS is already evaluating nighttime pile driving and the observation area in the reinitiated consultation. *See supra* at 11. Thus, a court order staying the Revolution Wind approvals would not redress Plaintiffs' purported harms.

Because Plaintiffs have failed to demonstrate standing, the Motion should be denied.

**B.  Plaintiffs Failure to Provide Adequate 60-day Notice Under the Endangered Species Act Bars These Claims**

Because Plaintiffs failed to provide an adequate 60-day notice under the ESA, none of their ESA claims are properly before the Court—including the narrow claims they make now in the Motion. The ESA requires that, before filing any lawsuit, a private plaintiff must first send a 60-day notice to the defendant describing its claims. 16 U.S.C. § 1540(g)(2)(A)(1). Notice "is a mandatory, not optional, condition precedent for suit." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26 (1989) (interpreting similar notice provision in the Resource Conservation and Recovery Act); *Duke Energy Field Servs. Assets, LLC v. Fed. Energy Regul. Comm'n*, 150 F. Supp. 2d 150, 154-55 (D.D.C. 2001) (Lamberth, J.) (applying *Hallstrom* to support dismissing Outer Continental Shelf Lands Act ("OCSLA") claim under substantially similar 60-day notice requirement); *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 78 (D.D.C. 2013) (the ESA's "sixty-day notice requirement is mandatory and jurisdictional.") (internal quotations and citations omitted). Plaintiffs failed to provide the required 60-day notice, and therefore their ESA claims are not properly before the Court.

"[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987) (discussing 60-day

notice under the CWA); *Common Sense Salmon Recovery v. Evans*, 329 F. Supp. 2d 96, 104 (D.D.C. 2004) (applying *Hallstrom* to conclude that dismissal of ESA claim is required where plaintiffs failed to comply with the ESA's 60-day notice requirement for a particular claim because their 60-day notice letter made no mention of that claim).

Here Plaintiffs sent Federal Defendants 60-day notices of intent to sue ("60-Day Notice Letters") dated January 5, 2024 and February 16, 2024, alleging violations of the ESA, OCSLA, and CWA.[9]  Nowhere in these notices did Plaintiffs raise the precise claims they seek to litigate in their Motion.  *See Friends of Animals v. Ashe*, 51 F. Supp. 3d 77, 86 (D.D.C. 2014) (dismissing suit for failure to provide adequate 60-day notice of intent to sue under the ESA); *Rsch. Air, Inc. v. Norton*, No. CIV.A. 05-623 (RMC), 2006 WL 508341, at *10 (D.D.C. Mar. 1, 2006) (adequate notice "it must, at a minimum, provide sufficient information of a violation so that the Secretary or [agency] [can] identify and attempt to abate the violation.") (citation and internal quotations omitted).

Critically, rather than waiting for the 60-day requirement to pass, Plaintiffs filed their Complaint including other ESA claims on January 16, 2024—only 11 days after the January 5 Notice Letter, and remarkably a full month before they sent the February 16 Notice Letter.  As a result, none of those 60-Day Notice Letters were sent to Federal Defendants **60 days before** Plaintiffs filed this action and therefore all of Plaintiffs' ESA claims are defective.  In *Basel Action Network v. Maritime Administration*, the court rejected exactly the same maneuver that Plaintiffs attempt here.  *See* 370 F. Supp. 2d 57, 75 (D.D.C. 2005).  In that case, the plaintiffs provided their notice of intent to sue under the Toxic Substances Control Act (which has a similar 60-day notice

---

[9] A subset of the Plaintiffs sent the January 5 60-Day Notice Letter ("January 5 Notice Letter"). *See* Dkt. #22-1.  Then Plaintiffs sent a supplemental 60-Day Notice Letter dated February 16, 2024 ( "February 16 Notice Letter").  *See* Dkt. #22-2.

requirement as the ESA) on September 8, 2003, then filed their complaint just 18 days later, then waited for the 60-days after the notice and amended their complaint. *Id.* The court found that this procedure was inadequate, and granted a motion for summary judgment on the basis of an improper notice, finding "[p]laintiffs' defective notice cannot be cured by the filing of an amended complaint after the required notice period." *Id.* at 76; *see also Friends of Animals v. Salazar*, 670 F. Supp. 2d 7, 13-14 (D.D.C. 2009) (denying leave to amend complaint and dismissing claim where plaintiffs provided 60-day notice of ESA claim after filing complaint); *Allco Renewable Energy Ltd. v. Haaland*, No. 1:21-CV-11171-IT, 2022 WL 2373914, at *2 (D. Mass. June 30, 2022) (dismissing plaintiff's ESA and OCSLA claims against an offshore wind project for failure to provide the requisite 60-day notice "prior to commencing the action" and holding that "dismissal of suits where the complaint is filed less than sixty days after actual notice to the agency and the alleged violators is necessary") (citations omitted).[10]

### C.    Plaintiffs' Claims Fall Outside of Their Complaint

Plaintiffs argue in their Motion: (1) that "[w]hen reinitiation of consultation is required, the original biological opinion loses its validity", Mot. at 5, 9; and (2) in reinitiating consultation, NMFS and BOEM have "pre-judge[d] the outcome of the consultation . . . [and] fail[ed] to offer any guarantee that the endangered species will be adequately protected in accordance with the Endangered Species Act", *id.* at 1.

---

[10] There is no "emergency" authority under the ESA citizen suit provision that Plaintiffs could attempt to invoke here to get around the statutory 60-day notice requirement. *See* 16 U.S.C. § 1540(g)(2)(C) (allowing suits before 60 days for emergencies relating to ESA species listing decisions). But even if Plaintiffs could invoke such emergency authority (and they cannot), pre-suit notice was still required—and Plaintiffs gave none. *See Allco Renewable Energy Ltd.*, 2022 WL 2373914, at *1 n.4 (analogous provision under OCSLA "waives only the sixty-day waiting period, requiring pre-suit notice prior to commencement of any action regardless").

Not only are these claims not included in Plaintiffs' 60-day Notice Letters, *see supra* Section IV.B, neither of these claims is in Plaintiffs' Complaint, and the Motion fails for that independent reason. *See, e.g., Morrison v. Sec'y of Def.,* 802 F. Supp. 2d 6, 11 n.3 (D.D.C. 2011) (claim not raised in complaint in challenge to agency action under APA waived); *Quinn v. District of Columbia*, 740 F. Supp. 2d 112, 130 (D.D.C. 2010) ("It is well established that plaintiffs may not, through summary judgment briefs, raise new claims where such claims were not raised in the complaint") (internal quotation marks and alterations omitted); *Veloxis Pharms., Inc. v. U.S. Food & Drug Admin.*, 109 F. Supp. 3d 104, 123 (D.D.C. 2015) (claim not raised in complaint waived).

Plaintiffs acknowledge that their Complaint does not address the reinitiated consultation between BOEM and NMFS. *See* Mot. at 3 n.12 ("Our Amended Complaint will address this development."). But Plaintiffs' attempt to raise new arguments in their Motion is not a substitute for amending their complaint. *See Morrison,* 802 F. Supp. at 11 n.3 (refusing to consider procedural argument made in brief but not addressed in complaint); *see also Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018) ("[I]t is 'axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'") (*quoting Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)).

## D.    The Court Lacks Jurisdiction Over Plaintiffs Claims Because They Are Not Ripe and There Is No Final Agency Action

Though Plaintiffs concede that the reinitiated ESA Section 7 consultation between NMFS and BOEM is still ongoing, Plaintiffs nonetheless challenge the results of the not-yet-completed reinitiation of consultation by premising their request for immediate injunctive relief on alleged harms that are under evaluation in that ongoing consultation. Plaintiffs also incorrectly assume that Revolution Wind "intends to move forward with its construction plans—before the

24

consultation is complete and without the requisite Government-required Biological Opinion." Mot. at 1.

Plaintiffs' apparent challenge to the still-ongoing consultation is not ripe and the Court lacks jurisdiction over that challenge. While the existing BiOp remains effective during reinitiation of consultation, *see infra* Section IV.**Error! Reference source not found.**, because Federal Defendants have not taken final action on the reinitiated Section 7 consultation, Plaintiffs' claims related to the subject of that ongoing reinitiation are essentially challenging the outcome of that ongoing reinitiated consultation (*i.e.*, a not-yet-issued new BiOp) and are not ripe. A case is not "'ripe' for judicial review under the APA until . . . some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Without a final determination on reinitiated Section 7 consultation between BOEM and NMFS, there can be no legal or practical effects on any party. Plaintiffs seek to involve the Court in speculation and ask for judicial intervention before the issuance of final agency decisions on a revised BiOp, erroneously asserting that NMFS and BOEM have "pre-judge[d] the outcome of the consultation" and "fail[ed] to offer any guarantee that the endangered species will be adequately protected in accordance with the Endangered Species Act." Mot. at 1. But Plaintiffs' claims are premised "upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). Moreover, because NMFS has not yet issued a revised BiOp, there is currently is no "agency action, findings, and conclusions" that the Court **could** review under the APA. 5 U.S.C. § 706(2)(A).[11]

---

[11] The APA limits judicial review to "final agency action." 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (an action is only "final," and thus reviewable, if two conditions are met: (1) "the action must mark the consummation of the agency's decisionmaking process"; and (2)

Finally, Plaintiffs' assumption that Revolution Wind intends to move forward with the relevant construction activity without complying with the ESA is both unsupported and unripe. Revolution Wind "has not yet begun any WTG or offshore substation foundation installation pile driving, and does not intend to do so until all required agency approvals have been obtained." Second Ingalls Decl. ¶ 9.  And NMFS's reinitiation letter demonstrates NMFS's intention to complete consultation by April 30, 2024.  Dkt. #26-3 (NMFS's Reinitiation Letter).  This is before any pile driving is possible, given the time-of-year restrictions in place.  *See id.*  Plaintiffs' mere speculation that the Project would, in the future, undertake pile driving without required approvals is unripe for this Court's review.  *See, e.g.*, *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421 (D.C. Cir. 2007) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (citations and internal quotations omitted); *N.Y. State Elec. & Gas Corp. v. Fed. Energy Regul. Comm'n*, 177 F.3d 1037, 1040 (D.C. Cir. 1999).

### E.    Plaintiffs Fail to Meet Their Burden of Establishing Any of the Four Factors Necessary to Obtain a Stay Under APA Section 705

#### 1.    Plaintiffs Have Not Proven Irreparable Harm

Plaintiffs' alleged harms are speculative at best and do not meet the high bar of demonstrating that "irreparable injury is **likely** in the absence of an injunction."  *See Winter,* 555 U.S. at 22 (emphasis in original); *see also Cuomo*, 772 F.2d at 976.  Based on lack of irreparable harm alone, the Court should deny Plaintiffs' Motion.  *See Nat'l Parks Conservation Ass'n v.*

---

"the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."); *see also Save Long Beach Island*, 2024 WL 863428, at *12 (challenge to future MMPA incidental take authorizations ("ITA") not ripe where NMFS may "otherwise modify" the ITA.  Because there is no final agency action regarding the reinitiated Section 7 consultation, the Court lacks jurisdiction over Plaintiffs' claim under the APA.

*Semonite*, 282 F. Supp. 3d 284, 288 (D.D.C. 2017); *see also Document Techs., LLC v. Hess*, No. 1:19-cv-3257, 2019 WL 6910137, at *5 (D.D.C. Dec. 19, 2019) (Lamberth, J.).

First and foremost, Revolution Wind does not intend to conduct pile driving until all necessary agency approvals are obtained. Second Ingalls Decl. ¶¶ 9, 18, 19. As a result, Plaintiffs cannot claim irreparable harm from alleged failure to obtain required approvals for pile driving that has not yet occurred.

Second, Plaintiffs' alleged harms are highly speculative and do not meet the high standard for a stay. A "possibility" of irreparable harm is insufficient; "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). The alleged harm must be "both certain and great; [the injury] must be actual and not theoretical." *Nat'l Parks Conservation Ass'n*, 282 F. Supp. 3d at 287. Further, to warrant a stay, Plaintiffs must demonstrate that the alleged harm will exist **even after** the mitigation measures are implemented. *See Kinsella v. Bureau of Ocean Energy Mgmt.*, No. 23-CV-02915-FB-ST, 2023 WL 3571300, at *3 (E.D.N.Y. May 18, 2023) (denying preliminary junction for lack of irreparable harm where agency "ha[d] already found that the [offshore wind project] as proposed will not exacerbate existing PFAS, in part because of mitigation measures included in the Project's plan"); *see also Mahoney v. U.S. Dep't of the Interior*, No. 22-CV-01305-FB-ST, 2022 WL 1093199, at *2 (E.D.N.Y. Apr. 12, 2022) (denying preliminary injunction for lack of irreparable harm where plaintiff failed "to address the effect of the mitigation measures provided for in SFW's plan"). But Plaintiffs fail to allege a single non-speculative harm or even acknowledge the relevant mitigation measures required for the Project.

Plaintiffs speculate that the Project's construction will irreparably harm four endangered whale species and four sea turtle species. Mot. at 12-17. As an initial matter, these allegations

rely on the Linowes Declaration and Declarations of Apostolos Gerasoulis and Robert Rand. *Id.* at 12-16. But as described in Revolution Wind's Objections, filed concurrently with this opposition, none of these individuals are qualified to express any opinions regarding underwater acoustics or marine mammals and have not explained the "sufficient facts or data" necessary to support their opinions, nor identified any "reliable principles and methods" they may have utilized. *See* Fed. R. Evid. 702(b)-(d). For these reasons alone, Plaintiffs have not shown irreparable harm. Moreover, the allegations are demonstrably false.

**Marine Mammals**. Plaintiffs speculate, without adequate scientific support, about a causal connection between offshore wind development generally and whale mortality. Mot. at 12-15. However, the overwhelming scientific and expert agency consensus attributes these mortality increases to vessel strikes and fishing gear entanglements, and not to offshore wind development. Barkaszi Decl. ¶ 7 (summarizing findings of the NOAA, the Marine Mammal Commission, BOEM, the U.S. Department of Energy, Rutgers University, University of Rhode Island, the Sierra Club, and the Natural Resources Defense Council). In fact, these groups have all issued official statements that no marine mammal mortality has been attributed to offshore wind activities. *Id.* ¶¶ 7, 100-01. Plaintiffs offer no proof whatsoever that the Project is likely to harm marine mammals. *Winter*, 555 U.S. at 22.

Plaintiffs also fail to show irreparable harm based on the "recent independent investigation of the nearby Vineyard Wind Project" conducted by Robert Rand, which allegedly "found that the pile driving activities create higher underwater decibel levels than considered and anticipated by BOEM and NMFS." Mot. at 14 (citing Exhibit 5, Declaration of Robert W. Rand, Dkt. #26-7 (Apr. 16, 2024) at ¶ 9). The summary information allegedly collected from the Vineyard Wind project (which, contrary to Rand's assertions, used different installation vessels from those that are

contracted for the Revolution Wind Project) is not credible, used flawed methodology, and is irrelevant to the potential impact of the Revolution Wind Project's construction. Barkaszi Decl. ¶¶ 8, 103; Ireland Decl. ¶¶ 9, 43, 49-52. For example, Rand used an outdated publication to suggest that NMFS's recommended method of calculating root-mean-square sound pressure levels experienced by marine mammals results in an underestimate of the actual sound levels received, but Rand was seemingly unaware that NMFS has recommended that alternative metrics be used and provided new threshold levels for determining "protective radii for marine mammal hearing". Ireland Decl. ¶ 51.

In contrast to Plaintiffs' mere speculation and flawed analysis, the **actual** data from the South Fork Wind Project, which closely resembles the Revolution Wind Project in terms of construction methods and mitigation, demonstrates that Revolution Wind will not result in irreparable harm to marine mammals. There is now reliable field data collected during the construction of the South Fork Wind Project. Barkaszi Decl. ¶ 8, 104. Like Revolution Wind, South Fork Wind used the Bokalift 2 for pile driving and foundation installation. *Id*. ¶ 104. Like, Revolution Wind, South Fork Wind used double big bubble curtains as one means of noise mitigation. *Id*. And like Revolution Wind, South Fork Wind construction used another sound mitigation device called a resonator. *Id*. ¶ 104-05. Indeed, the Revolution Wind Project will be required to implement stricter mitigation measures than the South Fork Wind Project was in certain respects—for example, requiring three protected species observers on each vessel associated with pile driving, rather than two; and treating all detected-but-unidentified large whales as North Atlantic Right Whales for purposes of pile driving mitigation, rather than only those detected within 2000 meters of the pile. Second Ingalls Decl. ¶ 16. Data from South Fork Wind Project monopile pile driving showed that, when its noise mitigation measures were optimized, Level B

and Level A harassment ranges were significantly smaller than the ranges modeled.  Barkaszi Decl. ¶ 111.  In some instances, ranges were about half the size of modeled Level B ranges for impact pile driving of monopiles, and data indicates an up to 80% decrease between modeled and measured Level A ranges in certain circumstances.  *Id*.  During South Fork Wind construction, there were no known Level A takes of any species and minimal Level B takes.  Ireland Decl. ¶ 8.

**Sea Turtles**.  Similarly, Plaintiffs fail to show any irreparable harm to sea turtles.  Plaintiffs' similarly rely on the Linowes Declaration provide in support of their allegations of irreparable harm to sea turtles.  Motion at 15-16.  But, as noted, Linowes is unqualified to express any opinions regarding underwater acoustics or marine life and has not explained the "sufficient facts or data" necessary to support her opinions, nor identified any "reliable principles and methods" she may have utilized.  *See* Fed. R. Evid. 702(b)-(d).  And the allegations are false.  Plaintiffs incorrectly assert that the proposed exclusion zone for nighttime pile driving activities that is under consideration in reinitiated consultation will cause irreparable harm to sea turtles, overlooking that the original zone was at least twice the distance to the PTS for sea turtles.

The reduction NMFS is evaluating is protective and unlikely to result in harm and NMFS's consideration of authorizing a very small number of takes (less than two individuals for each turtle species) is a conservative measure.  Ireland Decl. ¶ 56.  Plaintiffs also inaccurately describe the safe visibility distances for sea turtles, and, therefore, Plaintiffs' comparison of these distances to the effective range of light enhancing devices for the detection of sea turtles is invalid.  *Id*. ¶¶ 14, 57-58.  Finally, Plaintiffs disregard the fact that Revolution Wind's COP Conditions prohibits foundation pile driving "at any time when lighting or weather conditions (e.g., darkness, rain, fog, sea state) prevent visual monitoring of the full extent of the clearance and shutdown zones" and provide that "[i]f light is insufficient, the lead [Protected Species Observer] must call for a delay

30

until the visual clearance zone is visible in all directions or must implement the Reduced Visibility

Monitoring Plan/Nighttime Pile Driving Monitoring Plan."  Second Ingalls Decl. ¶ 17 (citing

BOEM COP Condition 5.10.2).

**Reinitiation of Consultation.**  Plaintiffs also try to frame their argument that "reinitiation

of consultation is supposed to halt a Project" as an irreparable harm.  Mot. at 11.  But Plaintiffs are

incorrect—reinitiation of consultation does not invalidate the existing BiOp or otherwise put its

effectiveness on pause.  *See infra* Section IV.E.**Error! Reference source not found.**.  Moreover,

a "procedural harm" consisting of a violation of an environmental statute "is insufficient, standing

alone, to constitute irreparable harm" to justify granting preliminary injunctive relief.  *Nat'l Parks*

*Conservation Ass'n v. U.S. Forest Serv.*, No. 15-cv-01582, 2016 WL 420470, at *11 (D.D.C. Jan.

22, 2016) (emphasis in original); *see also Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232

F. Supp. 3d 53, 67 (D.D.C. 2017) (same); *see also Nat'l Parks Conservation Ass'n*, 282 F. Supp.

3d at 290 (providing "that irreparable harm [must] be likely, not merely speculative."); *cf.*

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, Doc.

#00118136384, No. 23-1501, at 32 (1st Cir. Apr. 24, 2024) ("NMFS was not required to account

for entirely speculative environmental effects that were neither suggested nor supported by the

scientific evidence.").

Plaintiffs' alleged harms are therefore both scientifically incorrect and too speculative to

be irreparable.  Because Plaintiffs have failed to demonstrate irreparable harm, the Court need not

address the remaining factors.  *See Nat'l Parks Conservation Ass'n*, 282 F. Supp. 3d at 288

("[F]ailure to show any irreparable harm is [ ] grounds for refusing to issue a preliminary

injunction, even if the other three factors entering the calculus merit such relief.") (internal citation

and quotation omitted); *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018) ("[I]t is

clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat [a] motion [for preliminary injunction].").

### 2.    Plaintiffs Are Not Likely to Succeed on the Merits

Plaintiffs are not likely to succeed on the merits of the claims raised in the Motion because, in addition to the lack of justiciability described above, Plaintiffs' assertion that the reinitiation of consultation renders the existing BiOp invalid, *see* Mot. at 9, is contrary to the consultation documents between NMFS and BOEM and has been squarely rejected by this Court. In requesting reinitiation of consultation, BOEM stressed that it understands that the existing BiOp and associated ITR "will remain valid and effective until consultation is completed." Second Ingalls Decl. ¶ 21; *id.*, Ex. A (letter from BOEM to NMFS-GARFO requesting reinitiation of consultation).[12] Contrary to Plaintiffs' claims, NMFS did not withdraw the July 2023 BiOp as a result of the reinitiation of consultation under the ESA. Rather, NMFS expressly stated that it "expect[s] that the action agencies and Revolution Wind will adhere to all of the Terms and Conditions and Reasonable and Prudent Measures included with the July 2023 [BiOp] **until such time as it is replaced by the new [BiOp] that results from this reinitiation**." Dkt. #26-3 (NMFS's Reinitiation Letter) (emphasis added).

Plaintiffs cite three out-of-circuit cases for the proposition that the July 2023 BiOp became invalid as a result of the reinitiation of consultation, *see* Mot. at 5—despite NMFS's and BOEM's clear statements otherwise, *see* Second Ingalls Decl. ¶¶ 20-22. But this Court has expressly rejected that line of cases. In *Oceana v. Bureau of Ocean Energy Management*, 37 F. Supp. 3d

---

[12] Additionally, when Revolution Wind asked BOEM whether reinitiation of the ESA Section 7 consultation for sea turtles would affect activities authorized under the existing BiOp, BOEM confirmed in email communications to Revolution Wind that this was correct, so long as the conditions of approval were followed. Ingalls Decl. ¶ 22, Ex. B.

147, 175-76 (D.D.C. 2014), the court rejected the plaintiffs' argument that reinitiation of consultation requires the issuance of a new BiOp before a project may go forward and provided that "neither the ESA nor the case law interpreting the ESA require completion of a [Biological Opinion] before action in all instances." "Section 7(d) of the ESA allows agencies to take action during the reinitiated consultation, so long as that action does not constitute an 'irreversible or irretrievable commitment of resources.'" *Id.* at 176. The *Oceana* court specifically rejected the out-of-circuit line of cases cited by Plaintiffs here, finding *Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001) and *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992) unpersuasive, because the statement that reinitiation of consultation invalidates an existing BiOp "appear in dicta and the relevant quotes are dropped in the legal standard sections with no explanation or citation whatsoever." *Id.* at 175 n.26; *see also Def. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1152 n.4 (11th Cir. 2012) ("ESA has no such requirement" to require a new BiOp "before the agency action may continue" after reinitiation of consultation). The other case cited by Plaintiffs also contains this proposition in dicta and is not applicable to the facts here. *See Strahan v. Roughead*, 910 F. Supp. 2d 358, 376 (D. Mass. 2012).

Plaintiffs note in passing that during the Section 7 consultation, the parties are prohibited from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." Mot. at 5 (quoting 16 U.S.C. § 1536(d)). But by failing to actually brief this argument, Plaintiffs have waived it. *E.g., Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived."). Similarly, Plaintiffs have waived any

MMPA arguments by referencing the MMPA in their Motion but not developing any actual arguments. *See* Mot. at 6-7. And neither the 60-Day Notice Letters nor the Complaint include any argument that construction during the reinitiated consultation constitutes a "irreversible or irretrievable commitment of resources" in violation of ESA Section 7(d).

Regardless, the construction activities being conducted during the reinitiated consultation does not constitute any "irreversible or irretrievable commitment of resources" with respect to the agency action, and it certainly does not "foreclose the formulation or implementation of any reasonable and prudent alternative measures" that would violate Section 7(a)(2) (e.g., jeopardize the continued existence of threatened or endangered species). The purpose of the prohibition of ESA Section 7(d) "is to ensure that the status quo is maintained throughout the consultation process[.]" *See Nat'l Wilderness Inst. v. U.S. Army Corps of Engineers*, 2005 WL 691775, at \*16 (D.D.C. Mar. 23, 2005) (internal citation omitted). Additionally, Section 7(d) was intended to "preclude the investments of large sums of money in any endeavor if (1) at the time of the investment there was a reasonable likelihood that the project, at any stage of development, would [be likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of habitat of such species] and (2) that investment was not salvageable (i.e. it could not be applied to either an alternative approach to the original endeavor or to another project)." *Id*. (internal citation and quotation omitted). Here, Revolution Wind's proposed activities during the reinitiation of consultation do not fit into either of these criteria and thus do not fit into the definition of an "irreversible or irretrievable commitment of resources." *See id.* These activities (e.g., scour protection, boulder removal) are being conducted under a valid BiOp during the reinitiation of consultation. Indeed, in reinitiating consultation for two narrow issues, NMFS specifically required that the "the action agencies and Revolution Wind must not

make any irreversible or irretrievable commitment of resources that would foreclose the formulation or implementation of any reasonable and prudent alternatives to avoid jeopardizing endangered or threatened species or destroying or adversely modifying any critical habitat." Dkt. #26-3 (NMFS's Re-Initiation Letter).

The NMFS Re-Initiation Letter acknowledges that the status quo will be maintained during the reinitiated consultation, noting the time-of-year restrictions that prohibit pile driving until May 1, 2024 and NMFS's intention to conclude reinitiation by April 30, 2024. On that basis, NMFS concluded "no foundation installation activities for the Revolution Wind project will occur before this reinitiated consultation is completed with issuance of a new superseding final Biological Opinion" while at the same time keeping the "Terms and Conditions and Reasonable and Prudent Measures included with the July 2023 Opinion until such time as it is replaced by the new Opinion that results from [the] reinitiation." *Id.*; *see also N. Slope Borough v. Andrus,* 642 F.2d 589, 610 (D.C. Cir. 1980) (no reversible or irretrievable commitment of resources from oil exploration activities pursuant to lease sale). That is happening here.

> **3.    The Balance of the Equities and the Public Interest Strongly Favor Denial of the Motion**

When "the competing claims of injury" and the "effect[s] on each party of the granting or withholding of the requested relief" are analyzed, including economic harm, the balance of the equities strongly weighs in favor of denying Plaintiffs' Motion. *See Winter*, 555 U.S. at 24; *Sherley*, 644 F.3d at 398-99.[13] While Plaintiffs will not suffer any irreparable harm if the Motion is denied, *see supra* Section IV.E.1., Revolution Wind will face "certain and substantial" harm if

---

[13] Citing *Cuomo*, Plaintiffs frame the third prong slightly differently, as "the prospect that others will be harmed if the court grants the stay." Mot. at 8. Under either formulation, Plaintiffs fail to meet their burden to show the Court should grant their request for extraordinary relief.

Plaintiffs obtain the relief they ask for in their Motion.  *See Sherley*, 644 F.3d at 398–99 (reversing grant of preliminary injunction where injunction would disrupt researchers who had already begun projects in reliance upon agency funding such that "their investments in project planning would be a loss, their expenditures for equipment a waste, and their staffs out of a job").

These harms are real and tangible—and include extensive financial losses to Revolution, risks to thousands of jobs, impacts to local manufacturing and power production, and delays to the federal government's and states' efforts to fight climate change and to meet carbon reduction goals. Second Ingalls Decl. ¶¶ 26, 34-39, 41-44.  Ultimately, costs to Revolution could be in excess of $3 million per day if delays continue into and beyond late July 2024 and a hypothetical six-month delay could amount to approximately $230 million, putting into jeopardy's the more than $3 billion that Revolution Wind has already committed to developing the Project.  *Id.* ¶¶ 26-37, 40; *see supra* Section II.C.  In contrast, other than speculation, Plaintiffs offer no specific harm or injury to themselves.[14]

Further, in evaluating the public interest, the Court may consider the public's interest in the local economy, job security, securing reliable energy, achieving clean energy goals, and reducing greenhouse gas emissions.  *See Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*, 845 F. Supp. 2d 1102, 1116–17 (S.D. Cal. 2012) (public interest in reliable energy), *aff'd*, 473 F. App'x

---

[14] Plaintiffs claim no bond is required if the Court issues a stay.  Mot. at 8.  But nothing in Section 705 prohibits the Court from using its inherent equitable authority to require a bond.  *See, e.g., Russell v. Farley*, 105 U.S. 433, 438-40 (1881) (discussing inherent equitable authority); *HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 915 (1st Cir. 1988); *B&D Land and Livestock Co. v. Connor*, 534 F. Supp. 2d 891, 911-12 (N.D. Iowa 2008) (issuing injunction and a stay under Section 705 and imposing bond); *Seafreeze Shoreside Inc. v. U.S. Dep't of the Interior*, No. 1:22-cv-11091-IT, 2023 WL 3660689, at *8 (D. Mass. May 25, 2023) (discussing importance of bond in case seeking stay or preliminary injunction, but ultimately denying emergency relief).  Given that even a short stay would cause enormous harm to the Project and Revolution Wind, a bond should be required if the Court issues a stay.

790 (9th Cir. 2012); *W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103–04 (D. Nev. 2011) (public interest in increasing energy independence, decreasing greenhouse gas emissions, and advancing clean energy policies), *aff'd*, 443 F. App'x 278 (9th Cir. 2011).

In this case, denying Plaintiffs' requested stay is in the public interest. Delaying the Revolution Wind Project (possibly resulting in terminating the Project) as a result of Plaintiffs' requested relief would result in increased greenhouse gas emissions from non-renewable energy sources, directly undermining important long-term federal and state policies to reduce emissions, deploy offshore wind energy generation, and increase clean energy growth. *See* Second Ingalls Decl. ¶ 41; *supra* Section IV.A. The Project is a key component of both the federal government's and multiple states' laws and policies to fight climate change, which include policy and statutory goals to adopt offshore wind. *Id.* Plaintiffs' requested injunctive relief would delay—or potentially prevent—the realization of these goals to benefit the environment.

Because the Revolution Wind Project is a "covered project" under the FAST-41 statute, *see* 42 U.S.C. § 4370m(6), in the context of a request for preliminary injunctive relief, as here, this Court must "consider the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction," *id.* § 4370m-6(b)(1). The FAST-41 statute directs that these harms shall not be presumed reparable. *Id.* § 4370m-6(b)(2).

Therefore, the balance of the equities and the harm to the public interest from enjoining the Projects' approvals weigh strongly against granting Plaintiffs' Motion.

## V.    CONCLUSION

For the foregoing reasons, Revolution Wind respectfully request that the Court deny Plaintiffs' Motion.

Dated:  April 25, 2024

Respectfully submitted,

By */s/  Janice M. Schneider*

Janice M. Schneider (D.C. Bar No. 472037)
Stacey L. VanBelleghem (D.C. Bar No. 988144)
Devin M. O'Connor (D.C. Bar No. 1015632)
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, D.C. 20004
Tel:  (202) 637-2200
Fax:  (202) 637-2201
Email: janice.schneider@lw.com
         stacey.vanbelleghem@lw.com
         devin.o'connor@lw.com

*Counsel for Defendant-Intervenor*
*Revolution Wind, LLC*