**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREEN OCEANS, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>*Defendants,*<br><br>and<br><br>REVOLUTION WIND, LLC,<br><br>*Defendant-Intervenor* | Case No.: 1:24-cv-00141-RCL |

**DECLARATION OF KELLEN INGALLS IN SUPPORT OF DEFENDANT-INTERVENOR REVOLUTION WIND, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OF FINAL AGENCY ACTION**

Pursuant to 28 U.S.C. § 1746(2), I, Kellen Ingalls, hereby declare:

1.    I am employed by Orsted North America Inc. ("Ørsted") as the Project Development Director for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project"). The Project is owned by Revolution Wind, LLC ("Revolution Wind").[1]

2.    I have been employed at Ørsted as the Project Development Director since October 2019. Collectively I have worked on the Project for approximately four-and-a-half years and I have over 15 years of professional experience in the renewable energy field. I obtained my Bachelor of Arts in English from the State University of New York at Fredonia in 2004 and

---

[1] Revolution Wind is a joint venture indirectly owned in equal part by Ørsted and Eversource Energy.

obtained my Master of Arts in English with a Concentration in Environmental Communications from the University of Vermont in 2008.

3.     As the Project Development Director for the Project, I am and have been involved in and aware of numerous aspects of the Project, including: negotiation and management of commercial and real estate agreements; local, state, and federal permitting, including the Project's Endangered Species Act ("ESA") and Marine Mammal Protection Act ("MMPA") consultations; stakeholder and market affairs management; cable and interconnection facility siting; project layout and design; and site investigation activities.  I am therefore personally familiar with the Project's environmental permitting, its development history, and the impact that could result if its authorizations were stayed.  I execute this Declaration in support of Revolution Wind's Opposition to Plaintiffs' Motion for Stay of Final Agency Action (the "Motion") based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.

4.     This is my second declaration submitted in this matter.  Additional detail regarding the permitting and approval processes for the Project, as well as Revolution Wind's interests and investments in the Project, is provided in my Declaration of Kellen Ingalls in Support of Revolution Wind, LLC's Intervention as a Defendant, Dkt. 7-3 ("First Ingalls Declaration").

*Overview of the Project and Current Construction Status*

5.     The Project involves the construction and operation of an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility with up to 65 wind turbine generators ("WTGs"), two offshore substations, and associated inter-array cabling between the WTGs, as well as an export cable to bring electricity to the electric grid. The Project's WTGs will be located in federal waters on the U.S. Outer Continental Shelf ("OCS"), within the area covered by Bureau of Ocean Energy Management ("BOEM") Renewable Energy Lease No. OCS-A 0486,

in the Atlantic Ocean approximately 15 miles east of Block Island, Rhode Island, and approximately 15.7 miles from Newport, Rhode Island. A map depicting the Project area is provided below.[2] Revolution Wind will construct, operate and maintain the Revolution Wind Export Cable to deliver the generated electricity from the Revolution Wind Farm to the existing Davisville Substation in North Kingstown, Rhode Island that connects to the New England transmission system managed by ISO New England.[3]



**Figure 1.1-1. Project overview.**

<hr>

[2] This true and correct copy of the map is from the Project's Final Environmental Impact Statement ("FEIS") at 1-4, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2.pdf.
[3] Record of Decision ("ROD") Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan at 8, 34, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf.

6.      The Project is a "covered project" pursuant to Title 41 of the Fixing America's Surface Transportation Act, also known as "FAST-41".[4]

7.      Revolution Wind and its affiliates worked to obtain the BOEM lease at issue and subsequently worked to develop the Project for over eight years, including BOEM's August 2023 decision to approve the Revolution Wind Project Construction and Operations Plan ("COP"). BOEM issued a COP approval letter on November 17, 2023, providing final specific conditions on the Project's COP approval, which includes conditions to avoid and minimize potential impacts to marine mammals and sea turtles.  Further information on Revolution Wind's extensive, multi-year planning and development process and the federal approvals obtained for the Project is provided in the First Ingalls Declaration, paragraphs 11-38.

8.      The Project has kept the public aware of construction activities, including through websites and a listserv.  With respect to offshore construction specifically, Ørsted posts bi-weekly "Mariners' Briefings" describing planned activities and currently active vessels, and hosts weekly "Port Partners Briefing" Teams calls for interested maritime industry and industry-adjacent parties. Community outreach events for the Project have been held recently (and will continue to be held in the near future), including a presentation to the New England Fishery Management Council—the materials for which were cited in Plaintiffs' Memorandum in Support of their Motion, Dkt. 26-1 ("Motion Memorandum") at 11 n.52.  As described in the First Ingalls Declaration, paragraph 6, in September 2023 the Project began onshore construction activities; in January 2024 the Project began seabed-preparation activities for offshore construction.  Currently, with respect to onshore construction activities, the Project is continuing onshore excavation for conduits and backfilling

---

[4] 42 U.S.C. § 4370m *et seq.*  The FAST-41 permitting dashboard page for the Project is available at https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/revolution-wind-farm-project.

and restoring excavated areas as they progress; onshore piledriving activities are also ongoing for the new onshore interconnection station and substation off Camp Avenue.[5]  With respect to offshore construction activities, the Project is relocating boulders in the Revolution Wind Lease Area and installing scour protection at proposed turbine locations.[6]

9.     The Project has not yet begun any WTG or offshore substation foundation installation pile driving, and does not intend to do so until all required agency approvals have been obtained.  Additionally, due to military activity in the Atlantic Ocean (including during World War II), some portions of the Lease Area contain unexploded ordnance ("UXO").  Revolution Wind has successfully microsited Project facilities around all UXOs discovered to date, and would not need to detonate any UXO unless an emergent find for which detonation would be prudent were to be discovered during construction.  If this work were needed, it would only be conducted as authorized by the National Marine Fisheries Service ("NMFS") and BOEM under federal law.

***Approvals Challenged in Plaintiffs' Motion for Stay of Final Agency Action***

10.     On April 18, 2024, Plaintiffs filed this Motion for stay challenging BOEM's, NMFS', and the U.S. Army Corps of Engineers' ("USACE") compliance with the ESA and the MMPA through their July 2023 ROD for the Project and through the Project's October 2023 Incidental Take Regulation ("ITR").  In support of the Motion, Plaintiffs argue that if construction is allowed to proceed on the Revolution Wind Project before additional consultation is complete and a new Biological Opinion ("BiOp") under the ESA is issued, then these activities will result in irreparable harm to certain endangered whale and sea turtle species.  Plaintiffs seek an Order

---

[5] Revolution Wind, Construction Updates, https://revolution-wind.com/resources-and-faqs/construction-updates ("Week of April 22" under the "April 2024" section).
[6] Ørsted, Mariners Briefing No. 7 Apr. 22, 2024, https://a2f3e3.emailsp.com/frontend/nl_preview_window.aspx?idNL=857 (last visited Apr. 24, 2024).

(1) staying the effective dates of the approvals and authorizations in the ROD and the ITR, and (2) prohibiting Revolution Wind from beginning or performing any pile driving or other construction work or making any irretrievable commitment of resources authorized by the ROD or the ITR until further Court Order.  Motion at 1-2.  Without the ROD and the ITR approved by NMFS, Revolution Wind cannot continue offshore construction for the Project.

11.     BOEM and other cooperating agencies conducted ESA Section 7 consultation for the Project before it was approved.[7]  In April 2022, BOEM submitted a draft Biological Assessment ("BA") to NMFS, which BOEM subsequently updated during the course of the consultation.[8]  ESA Section 7 consultation for marine species concluded with NMFS' issuance of a BiOp for the Project on July 21, 2023.[9]  The BiOp assessed the potential effects of construction, operation, maintenance, and decommissioning of the Project on ESA-listed whales and sea turtles in the Project area.  Contrary to Plaintiffs' allegations in their Motion Memorandum at 17, the BiOp concluded the Revolution Wind Project is not likely to  jeopardize the continued existence of any ESA-listed species, including each of the whale and sea turtle species that Plaintiffs cite in their Motion.[10]  *See* Motion Memorandum at 2 n.7-8.  The BiOp also concluded the Project was not likely to adversely affect, or would have no effect, on several other ESA-listed species, including the Northeast Atlantic Distinct Population Segment ("DPS") of loggerhead sea turtles,

---

[7] 16 U.S.C. § 1536.

[8] FEIS at Appendix A, A-6, A-9.

[9] NMFS' Biological Opinion for the Revolution Wind Project is available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf.

[10] *Id.* at 424 ("[I]t is our biological opinion that the proposed action is likely to adversely affect but is not likely to jeopardize the continued existence of blue, fin, sei, sperm, or North Atlantic right whales or the Northwest Atlantic DPS of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley or leatherback sea turtles[.]").

and no effect on the critical habitat designated for the North Atlantic right whale or the Northwest Atlantic DPS of loggerhead sea turtles, and several other ESA-listed species.[11]

12.      The BiOp includes an Incidental Take Statement pursuant to ESA Section 7(b)(4), which identifies the Project's permitted take incidental and reasonable and prudent measures and implementing terms and conditions to minimize impacts of incidental take to listed species.[12]  In addition to these reasonable and prudent measures and terms and conditions, the BiOp takes into account required measures to protect these species from BOEM's COP approval and NMFS' ITR issuance processes.  There are a number of measures related to pile driving activities to protect endangered species, including whales and sea turtles.  For example, among the environmental protection measures as part of the Project, for impact and vibratory pile driving activities the Project must: (a) implement a "ramp-up" or "soft start" at the beginning of each pile segment during pile driving to provide additional protection to mobile species in the vicinity by allowing them to vacate the area prior to the commencement of pile-driving activities; (b) establish pre-clearance and shutdown zones for marine mammals and sea turtles; (c) use noise attenuation systems such as bubble curtains, as appropriate; (d) use qualified, National Oceanic and Atmospheric Administration-approved Protected Special Observers ("PSO") to reliably detect marine mammals and sea turtles at the surface in clearance and shutdown zones; and (e) follow applicable shutdown procedures if a protected marine mammal or sea turtle is observed entering or found within the shutdown zones after impacted pile-driving has commenced.[13]

---

[11] *Id*.

[12] *Id.* (Section 11.0 – Incidental Take Statement).

[13] *Id*., Appendix A at A2-A4, A9-A10.  BiOp Appendix A presents measures included in BOEM's BA that are part of the proposed action for the ESA consultation.

13.     The BiOp considered the proposed Project as including up to 79 WTGs, two offshore substations, associated inter-array cabling as well as export cabling to bring electricity to land.[14]  The Project, as subsequently approved by BOEM in the ROD, reduced the number of WTGs to up to 65 WTGs.[15]

14.     On October 8, 2021, Revolution Wind submitted a request for the promulgation of regulations, known as an ITR, and issuance of a Letter of Authorization ("LOA") for the taking of marine mammals incidental to construction activities associated with the Project.  On March 21, 2022, NMFS published in the Federal Register a notice of receipt of Revolution Wind's application and held a 30-day public comment period.  NMFS published a proposed rule on December 23, 2022, and held a 45-day public comment period.  On October 20, 2023, NMFS published its final ITR.[16]  On November 20, 2023, NMFS issued its LOA for the Project.[17]

15.     NMFS' ITR and LOA allow for the non-lethal incidental take of marine mammals during construction-related activities within the Project area from November 20, 2023 through November 19, 2028 under the MMPA.  In particular, the ITR and the LOA allow incidental taking that consists of: (1) Level B harassment associated with the acoustic disturbance of marine

---

[14] BiOp at 1, 11.

[15] BOEM approved up to 79 possible positions for the installation of 65 WTGs.  ROD at 22.

[16] NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode Island, 88 Fed. Reg. 72,562 (Oct. 20, 2023), https://www.federalregister.gov/documents/2023/10/20/2023-22056/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the;  NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode Island; Correction, 88 Fed. Reg. 78,674 (Nov. 16, 2023) (providing corrections to the Oct. 20, 2023 ITR's vessel strike avoidance measures provision), https://www.federalregister.gov/documents/2023/11/16/2023-25366/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.

[17] NMFS' LOA for the Project is available at https://www.fisheries.noaa.gov/s3/2023-11/BL52-Revolution-Wind-LOA-OPR1-Final-signed-OPR1.pdf.

mammals by impact pile driving (WTG and OSS foundation installation), vibratory pile driving (cofferdam and goal post installation and removal), pneumatic hammering (casing pipe installation and removal), unexploded ordnances/munitions and explosives of concern ("UXO/MEC") detonations, and HRG site characterization surveys; and (2) Level A harassment associated with the acoustic disturbance of marine mammals by impact pile driving of WTG and OSS foundations, pneumatic hammering of casing pipes, and UXO/MEC detonations.[18]  The LOA and the ITR authorize incidental take of marine mammals by harassment, but *do not* authorize take of marine mammals by death or serious injury.[19]

16.    NMFS' ITR and LOA include detailed mitigation requirements and monitoring and reporting requirements—spanning over 30 pages in the LOA, including requirements that protect the whale species at issue in Plaintiffs' Motion.[20]  These required measures include: vessel strike avoidance and separation measures, including speed limits and dedicated visual observer requirements; seasonal and time of year construction restrictions, including with respect to impact pile driving activities and UXO/MEC detonations; HRG survey requirements, including ramp-up procedures; and PSO and passive acoustic monitoring ("PAM") operator requirements and reporting procedures.[21]  Notably, the mitigation requirements for the Project are stricter in certain respects than those that were successfully implemented for the South Fork Wind Project by an affiliate of Revolution Wind.  For example, vessels associated with Revolution Wind pile driving are required to have three protected species observers on board, whereas the required number was

---

[18] LOA at 2; 88 Fed. Reg. at 72,562, 72,660; 50 C.F.R. § 217.272(a), (b) and (d).

[19] 88 Fed. Reg. at 72,610 ("Revolution Wind did *not request and we are not authorizing* take by mortality or non-auditory injury.") (emphasis added); LOA at 2 ("Take by mortality or serious injury of *any* marine species is *not* authorized.") (emphasis added).  *See also* 50 C.F.R. § 217.272(c).

[20] LOA at 3 – 34; 88 Fed. Reg. at 72,660-73; 50 C.F.R. §§ 217.274, 217.275.

[21] *See id.*

two for the South Fork Wind Project.  And in the event a large whale is sighted or detected

acoustically at any distance during pile driving for Revolution Wind, but cannot be identified, it

must be treated as if it were a North Atlantic Right Whale for purposes of mitigation, whereas for

the South Fork Wind Project that requirement was only applicable for unidentified, large whales

detected within 2000 meters or less of the pile.

17.    Similarly, Revolution Wind's COP approval from BOEM limits foundation pile

driving as follows:

> 5.10.2. <u>Seasonal and Daily Restrictions</u> (Construction). No
> foundation impact pile driving activities are allowed to occur
> January 1 through April 30 or until BOEM has notified the Lessee
> that all necessary ESA Section 7 consultations addressing
> foundation impact pile driving have concluded. No more than two
> foundation monopiles are allowed to be installed per day. The
> Lessee must not conduct pile driving operations at any time when
> lighting or weather conditions (e.g., darkness, rain, fog, sea state)
> prevent visual monitoring of the full extent of the clearance and
> shutdown zones. The lead PSO must determine when sufficient
> light exists to allow effective visual monitoring in all cardinal
> directions. If light is insufficient, the lead PSO must call for a
> delay until the visual clearance zone is visible in all directions or
> must implement the Reduced Visibility Monitoring Plan/Nighttime
> Pile Driving Monitoring Plan (as required by the terms of the July
> 21, 2023 BiOp; see Section 5.4.8(a)). The Lessee is not allowed to
> conduct night-time pile driving (i.e., initiation of pile driving more
> than 1 hour prior to civil sunrise or 1.5 hours before civil sunset),
> unless the Lessee has received concurrence from BOEM and
> BSEE on the Reduced Visibility Monitoring Plan/Nighttime Pile
> Driving Monitoring Plan (see Section 5.5.1).

18.    Importantly, before beginning pile driving, the BiOp, the ITR and LOA, and

BOEM's Conditions for its COP approval all require that NMFS review and approve three plans

before daytime pile driving can begin.  These are the Sound Field Verification ("SFV") Plan, the

Foundation Installation Pile Driving Monitoring Plan for Marine Mammals and Sea Turtles, and

the Pile Driving Passive Acoustic Monitoring Plan.[22]  These plans have been submitted to NMFS and are currently under review by the agency.  None of these plans has been approved yet by NMFS, and Revolution Wind does not intend to conduct daytime pile driving until each of the plans has been approved.

19.    Revolution Wind submitted a draft of the Nighttime Pile Driving Monitoring Plan[23] to the federal agencies on August 4, 2023 and submitted an updated version on January 19, 2024 after receiving and responding to agency comments.  The BiOp and BOEM's Conditions for its COP approval require that Revolution Wind submit a Nighttime Pile Driving Monitoring Plan to BOEM, the Bureau of Safety and Environmental Enforcement ("BSEE"), and NMFS, and obtain BOEM's and BSEE's concurrence with this Nighttime Pile Driving Monitoring Plan prior to the start of nighttime pile driving.[24]  Without approval of this Nighttime Pile Driving Monitoring Plan, no pile driving may be initiated later than 1.5 hours prior to civil sunset or earlier than 1 hour

---

[22] BiOp at 441 (Terms and Conditions 10.a – Passive Acoustic Monitoring Plan for Pile Driving), 442 (Terms and Conditions 10.c – Marine Mammal and Sea Turtle Monitoring Plan – Pile Driving and UXO/MEC Detonation), 443-45 (Terms and Conditions 10.e – Sound Field Verification Plan - Monopile Installation and UXO/MEC Detonation).
ITR, 88 Fed. Reg. at 72,664 (Mitigation Requirements – WTG and OSS foundation installation – (c)(14)(x) – SFV Plan, (c)(15) – Foundation Installation Pile Driving Marine Mammal Monitoring Plan, and (c)(16) – Passive Acoustic Monitoring Plan); *see also* 50 C.F.R. §§ 217.274(c)(14), (15), (16).
LOA at 13 (Mitigation Requirements – WTG and OSS foundation installation – (c)(14)(x) – SFV Plan, (c)(15) – Foundation Installation Pile Driving Marine Mammal Monitoring Plan, and (c)(16) – Passive Acoustic Monitoring Plan (PAM Plan)).
BOEM COP Approval Conditions 5.4.4 (Pile Driving PAM Plan), 5.4.5 (Sound Field Verification Plan), 5.4.8 (Marine Mammal and Sea Turtle Monitoring Plan for Pile Driving and UXO Detonation), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cond%20of%20COP%20Appr_REV%20OCS-A%200486_0.pdf.
[23] Contrary to Plaintiffs' assertion (Motion Memorandum at 15), Project may conduct nighttime pile driving after it receives concurrence from BOEM on its Nighttime Pile Driving Monitoring Plan.  *See e.g.*, Conditions of COP Approval Condition 5.10.2.
[24] BiOp at 442-43 (Terms and Conditions 10.d – Reduced Visibility Monitoring Plan/Nighttime Pile Driving Monitoring Plan); BOEM COP Approval Conditions 5.4.9 (Reduced Visibility Monitoring Plan/Nighttime Pile Driving Monitoring Plan).

before civil sunrise.  Similarly, NMFS' ITR and LOA allow Revolution Wind to initiate impact pile driving later than 1.5 hours prior to civil sunset through 1 hour after civil sunrise from June 1 to October 31 only in accordance with a NMFS-approved Alternative Monitoring Plan for Nighttime Pile Driving.[25]  This Plan has not yet been approved by the relevant federal agencies, and Revolution Wind does not intend to conduct nighttime pile driving until this Plan is approved.

***Reinitiation of ESA Section 7 Consultation Process***

20.    As further detailed below, NMFS' Office of Protected Resources ("NMFS-OPR") and BOEM requested reinitiation of the ESA Section 7 consultation process for the Project on November 17, 2023 and January 12, 2024 on two narrow bases.[26]  Both of these requests were made out of an abundance of caution, so that conservative take authorization is in place prior to the beginning of these types of construction activity.  Contrary to Plaintiffs' allegations (at Motion Memorandum at 1), NMFS-Greater Atlantic Regional Fisheries Office ("NMFS-GARFO") did not withdraw the July 2023 BiOp as a result of the reinitiation of consultation under the ESA; that BiOp remains valid and provides take coverage for ongoing construction activities, as needed. NMFS-GARFO expressly stated that it "expect[s] that the action agencies and Revolution Wind will adhere to all of the Terms and Conditions and Reasonable and Prudent Measures included with the July 2023 [BiOp] *until such time as it is replaced by the new [BiOp] that results from this reinitiation*."[27]  First, on November 17, 2023, NMFS-OPR requested reinitiation to consider the potential for Level A harassment (permanent threshold shift or "PTS") to fin whales and sei

---

[25] 50 C.F.R. § 217.274(c)(3); 88 Fed. Reg. at 72,662; LOA at 8.
[26] *See* NMFS-GARFO, Letter re: Reinitiation of Endangered Species Action Section 7 Consultation for the Revolution Wind Project ("NMFS' Reinitiation Letter") at 1 (Mar. 12, 2024), which is attached to Plaintiffs' Motion as Exhibit 1, Dkt. 26-3.
[27] *Id*. at 2 (emphasis added).

whales, as a result of exposure to noise from pile driving and UXO/MEC detonation.[28]  This was due primarily to new information obtained during the construction of the South Fork Wind Project regarding the prevalence of fin and sei whales in the Project area during the construction window and because the final ITR included these takes based on comments from the Marine Mammal Commission on the draft ITR referencing the new information.  NMFS-OPR's request did not involve other species of whales or any species of sea turtle.

21.    Second, on January 12, 2024, BOEM separately requested reinitiation to consider its proposal to modify the pile driving clearance and shutdown zones for sea turtles based on new information on the effectiveness of monitoring for sea turtles after dark that was incorporated into Revolution Wind's draft Nighttime Pile Driving Monitoring Plan.[29]  BOEM's Reinitiation Request did not involve any species of whale.[30]  In BOEM's Reinitiation Request, BOEM stated that it "understands that the existing [BiOp] and associated Incidental Take Statement will remain valid and effective until consultation is completed."[31]

22.    As further background, on December 29, 2023, Revolution Wind asked BOEM to confirm that reinitiation of the ESA Section 7 consultation process "would only impact the ability to conduct nighttime piling activities, and would not prevent the project from continuing with daytime piling activities."  On January 2, 2024, BOEM confirmed in communications to

---

[28] NMFS-OPR, Memorandum for NMFS-GARFO re: Request for Consultation under Section 7 of the Endangered Species Act (ESA) for the Proposed Issuance of an Incidental Take Regulation and Subsequent Letter of Authorization to Take Marine Mammals Incidental to the Revolution Wind Offshore Wind Project, offshore of Rhode Island ("NMFS Reinitiation Request") at 2, 7-8 (Nov. 17, 2023), which is attached to Plaintiffs' Motion as Exhibit 3, Dkt. 26-5.

[29] BOEM Letter to NMFS-GARFO (Jan. 12, 2024) ("BOEM's Reinitiation Request"), which is attached to this declaration as **Exhibit A**.

[30] *Id.*; *see also* NMFS' Reinitiation Letter at 1.

[31] BOEM's Reinitiation Request at 2.

Revolution Wind that this was correct.  BOEM stated: "confirming you are correct, daytime piling is already approved with conditions, as long as those existing conditions are followed."[32]

23.    On February 2, 2024, I understand that BOEM submitted an analysis of potential effects to sea turtles to support its request for reinitiation of ESA Section 7 consultation.[33]  BOEM noted that "[t]he conclusions of the biological opinion for all other listed species, critical habitats, and activities are not affected and remain the same."[34]  In this analysis, BOEM considered acoustic modeling analyses of PTS exposure ranges for sea turtles based on WTG and OSS pile driving noise.[35]  BOEM also considered information in Revolution Wind's draft Nighttime Pile Driving Monitoring Plan indicating that an effective nighttime monitoring range of 200 to 300 meters is more realistic than the 500 meters considered under the existing BiOp.[36]  BOEM found that "[a]lthough effective monitoring to these distances would be sufficient to cover the sea turtle PTS zone determined by the acoustic modeling (210 m during WTG monopile installation and 250 m during OSS monopile installation), there is less certainty of avoiding sea turtle injury by not monitoring the full 500 m exclusion zone."[37]  Accordingly, to mitigate potential PTS exposure of sea turtles, BOEM proposed that Revolution Wind use PSOs to establish a clearance zone of 200 meters[38] around pile driving equipment for 60 minutes prior to the start of pile driving activities;

---

[32] This email correspondence that I received from BOEM is attached to this declaration as **Exhibit B**.
[33] BOEM, Reinitiation Analysis for the Construction, Operation, Maintenance, and Decommissioning of the Revolution Wind Offshore Energy Project (Lease OCS-A 0486) ("BOEM's Reinitiation Analysis") at 1 (Feb. 2, 2024), which is attached to Plaintiffs' Motion as Exhibit 6, Dkt. 26-8.
[34] *Id*. at 1.
[35] *Id*. at 3-4.
[36] *Id*. at 5.
[37] *Id*.
[38] Contrary to Plaintiffs' assertion (at Motion Memorandum at 16) that "the light-enhancing devices that will be used by [Revolution Wind] to detect sea turtles in darkness are generally limited to 100 meters," if required, Revolution Wind expects to achieve lighting conditions on

if a sea turtle is observed approaching or entering the clearance zone during that time, pile driving will be delayed until the sea turtle has voluntarily left and been visually confirmed beyond the clearance zone, or there has been 30 minutes without re-detection of the animal.[39]  Additionally, BOEM proposed that if a sea turtle is observed within the clearance zone after piling has begun, the PSO will request a temporary cessation of pile driving.[40]  As a result of its analysis, BOEM asked NMFS to authorize potential injury take of sea turtles and concluded that BOEM "believes that the analysis in the Biological Assessment and the Biological Opinion remain valid and that the request is only to consider a smaller monitoring and exclusion zone for sea turtles that may result in the injurious take of a small number (less than 2 individuals) of all ESA-listed sea turtles that may occur in the action area."[41]

24.    In response to these requests from NMFS-OPR and BOEM, on March 12, 2024, NMFS-GARFO reinitiated ESA Section 7 consultation for the Project.[42]  NMFS-GARFO is working to complete consultation by April 30, 2024 before the seasonal window for pile driving opens on May 1, 2024.  In its Reinitiation Letter, NMFS-GARFO explained that "[c]onsidering the time of year restriction, no foundation installation activities for the Revolution Wind project will occur before this reinitiated consultation is completed with issuance of a new superseding final Biological Opinion."[43]

***Harm to Revolution Wind From Relief Plaintiffs Seek In Their Motion***

---

the installation vessel that would make sea turtles visible out to 350 m with a handheld night vision device.

[39] BOEM's Reinitiation Analysis at 4.

[40] *Id*.

[41] *Id*. at 5.

[42] NMFS' Reinitiation Letter.

[43] *Id*. at 2.

25.     On April 18, 2024, Plaintiffs filed their Motion seeking an Order from the Court to stay the effectiveness of the approvals and authorizations in the Project's ROD and ITR.  Plaintiffs also ask this Court to directly prohibit certain construction activities that Revolution Wind plans to undertake once all required agency approvals have been obtained and the relevant seasonal restrictions in the Project's approvals allow for these activities.  Plaintiffs' broadly requested relief, if granted, would halt all currently ongoing and planned construction activity for the Project on the OCS and in state waters.

26.     Revolution Wind, as the Project developer, OCS lessee, and holder of many federal, state, and local permits issued for the Project, has made significant financial investments in the Project as well as significant investments of time in the administrative processes supporting the approvals that Plaintiffs challenge.  Revolution Wind has committed in excess of $3 billion to the planning, permitting, developing, and construction of the Project, including by entering into contracts for the manufacture and transport of Project components, as well as for the use of specialized construction vessels, and has taken other steps in reliance on the approvals challenged here.  If the Project's ROD or ITR were stayed, Revolution Wind could lose a substantial proportion of its investment as a result of cascading impacts under various construction timelines as well as under contracts for the manufacture, transport, installation, and construction of the remaining components of the Project.

27.     For example, Revolution Wind has been awarded five power purchase agreements ("PPAs") under three separate procurements for a combined approximately 704 MW of generating capacity: (1) two October 2018 PPAs with Connecticut utilities for approximately 200 MW; (2) a December 2018 PPA with the Rhode Island utility for approximately 400 MW; and (3) two November 2019 PPAs with Connecticut utilities for another approximately 104 MW.  Some or all

of these PPAs would be adversely impacted if the Project timeline were delayed through the stay Plaintiffs now seek or its approvals vacated by any of the relief sought in this lawsuit.

28.    Delays to the Project's commercial operations date can have a significant effect on its PPA revenues. All five of the Project's PPAs contain commercial milestones—most importantly the Project's achieving commercial operations by certain dates. If Revolution Wind does not achieve commercial operations within the timeframe established under the PPAs, Revolution Wind will face increased contract security requirements (which Revolution Wind would forfeit in the event of termination), daily liquidated delay damages, and termination rights for buyers. Delays to the Project's commercial operations date past certain dates trigger liquidated damages of $100 per MW-hour of contracted capacity per day ($70,400 per day in total across the five PPAs) for up to a total of 365 days. In all of the PPAs, the buyer would eventually also have the right to terminate the agreement based on delays.

29.    For example, if Revolution Wind does not achieve commercial operation within the timeframe established under the approximately 400-MW Rhode Island PPA, Revolution Wind would be required to pay liquidated damages of $40,000 per day for each day of delay up to 365 days. The amount of delay damages under this one PPA alone could be as much as approximately $14.6 million. And, if Revolution Wind were still not achieve to commercial operation under the PPA within that 365-day period of paying liquidated damages, the buyer would be entitled to terminate the PPA (in which case Revolution Wind would also forfeit $16 million in contract security). In the four Connecticut PPAs, the buyer's termination accrues earlier—at the same time as the obligation to pay liquidated damages (in the absence of termination) is triggered. If the Revolution Wind PPAs were to be terminated, the value of the Project would be substantially

reduced, as Revolution Wind would likely lose the great majority of its investments and expected future profits.

30.    Revolution Wind has sequenced its construction schedules to ensure efficient usage of scarce resources, such as specialized ships, for the Project. Construction of large-scale offshore wind projects requires the use of specialized vessels and these vessels are in limited supply and are thus tightly scheduled, with limited schedule availability to work beyond the contracted reservation dates. Critically, Ørsted's contracts for vessels for project construction typically include latest vessel availability date provisions; under these provisions, if Project work is not complete by the specified vessel availability date, the contracted vessels are able to depart to begin work on non-Ørsted projects. As a result, in a worst-case scenario of schedule delays, the vessels may be required to depart the Project site for other contractually-scheduled commitments without completing work.

31.    There are specialized vessels currently at and in transit to the Revolution Wind Project Lease Area offshore to conduct work in accordance with the Project schedule, once all required agency approvals have been obtained and the relevant seasonal restrictions in the Project's approvals allow for these activities.[44]

32.    Seabed-preparation activities, including boulder relocation, are currently underway at the site of the array cable and WTG locations, and are currently scheduled to be completed in July. There are a substantial number of boulders at the Project site, rendering the work more time-consuming. Four primary vessels (in addition to support vessels) have been contracted to perform seabed-preparation work. If the Court were to stay the federal approvals required for this work or

---

[44] Revolution Wind: Current Project Vessels, https://a2f3e3.emailsp.com/frontend/nl_preview_window.aspx?idNL=804 (listing vessels currently active in Revolution Wind Project) (last visited April 24, 2024).

otherwise order this work to stop, Revolution Wind would incur standby and fuel costs of more than $300,000 per day between now and May 1, 2024.

33.    Because seabed-preparation activities are a prerequisite to subsequent construction activities, if they are halted prematurely, it would be impossible for subsequent offshore construction activities to begin until vessels had been re-mobilized to complete the seabed preparation. Depending on the extent of the delay, it is uncertain when vessels would be available to re-mobilize to complete the seabed-preparation work or to perform the subsequent offshore construction work.

34.    Installation of the 65 monopile foundations for the Project's WTGs and two foundations for the offshore substations is currently scheduled to begin on May 1, 2024, if all required approvals from NMFS, BOEM, and BSEE are received before then. Two principal installation vessels, as well as vessels for noise mitigation and monitoring, protected species, and other support functions, have been contracted to perform the foundation-installation work. (Noise mitigation will begin the preceding week.) If the Court were to stay the federal approvals required for this work or otherwise order this work to stop, Revolution Wind would incur additional delay standby and fuel costs in excess of $1 million per day. Furthermore, as with delays to seabed-preparation activities, delays to foundation installation would lead to knock-on delays to installation of the WTGs, currently scheduled to begin in mid-August.

35.    If WTG installation and cable-laying could not begin on schedule in July and August, respectively, Revolution Wind could incur a further $2 million per day in standby and fuel costs.

36.    Ultimately, depending upon the length of the delay, standby and fuel costs could be in excess of $3 million per day if delays continue into and beyond late July 2024 alone.  Assuming a hypothetical six-month delay, these costs could amount to approximately $230 million.

37.    And it is important to note that the cost impacts of delays can consist of more than simply standby rates.  For example, if a particular vessel's work were to be delayed beyond its contractual latest vessel availability date, Revolution Wind would then need to work with the contractor (or another contractor) to remobilize another vessel to the site to complete the work. This would lead to additional costs, and possibly also to further delays—assuming alternate vessels were available at all.  In fact, significant delays in vessel availability (and resulting costs) have led Ørsted to cease development of projects in the past.

38.    The Project's construction schedule is also subject to seasonal environmental mitigation measures that restrict the windows in which various construction activities are allowed. NMFS' ITR/LOA[45] and the conditions of BOEM's COP approval (Condition 10.5.2) for the Project prohibit pile-driving from January 1 through April 30 to protect the North Atlantic right whale.[46]  NMFS' ITR/LOA[47] and the conditions of BOEM's COP approval (Condition 5.12.2) prohibit UXO detonation from December 1 to April 30 to reduce impacts to North Atlantic right whales during peak migratory periods.[48]  NMFS' LOA prohibits nighttime pile driving between November 1 and May 31.[49]  The conditions of BOEM's COP approval (Condition 5.5.5) requires sequencing of the Project's construction activities to avoid certain areas between November 1 and

---

[45] 88 Fed. Reg. at 72,662; LOA at 8.
[46] Impact pile driving may occur in December with prior approval by NMFS.  88 Fed. Reg. at 72,651.
[47] 88 Fed. Reg. at 72,665; LOA at 14.
[48] 88 Fed. Reg. at 72,613.
[49] LOA at 8.

March 31 to avoid or minimize impacts to Atlantic cod spawning.  These restrictions on offshore construction leave only a limited time period within which to complete foundation installation— essentially only a half year window to install 65 WTG foundations and the offshore substation foundations, including periods with challenging weather late in the season.

39.    As a result, even a brief delay can have magnified effects, such that a delay of just a few days could result in many months of delay if there is not enough time left to complete a construction activity in that year's window.  A brief delay can also have cascading effects for subsequent construction activities on the Project, which may require the completion of the preceding stage before moving to the next, incurring costs and risks as described above.

40.    In short, if Plaintiffs succeed in delaying or blocking offshore construction of the Project, Revolution Wind and its affiliates could lose billions of dollars in planning, engineering, environmental field work, technical analyses, permitting, contracting, and construction.

***The Project Serves the Public Interest***

41.    The Project is a key component of the federal government's laws and policies to fight climate change and to meet carbon reduction goals, as well as similar initiatives by the States of Rhode Island and Connecticut.  The federal government has set a goal of 30 gigawatts ("GW") of offshore wind by 2030[50] and this goal will help the federal government meet its target to achieve 100% clean electricity by 2035.[51]  Rhode Island has a goal of reaching 100% renewable energy by

---

[50] *See* The White House, "FACT SHEET: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs" (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/ statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[51] *See* U.S. Dep't of Energy, Advancing Offshore Wind Energy in the United States 1, 9 (Mar. 2023), https://www.energy.gov/sites/default/files/2023-03/advancing-offshore-wind-energy-full-report.pdf ("[O]ffshore wind can be a key contributor in many U.S. energy markets to achieving a zero-carbon electricity grid by 2035 and a net-zero emissions economy by 2050.").

2033[52] and its climate goals require the development of approximately 9 to 11 GW of offshore wind power by 2030.[53]  Rhode Island issued a Request for Proposals to solicit approximately 1200 MW of new offshore wind to help power the state's clean energy needs.[54]  Finally, Connecticut aims to reach 100% zero-carbon electricity supplied to customers by 2040 and its climate goals require the development of 2 GW of offshore wind by 2030.[55]

42.    Staying the Project's offshore construction would prevent the important public benefits of the Project from being realized.  Once completed, the Project will provide enough clean energy to power more than 350,000 homes in Rhode Island and Connecticut, while eliminating up to approximately 3 million tons of carbon emissions per year and over 100 million tons of carbon emissions over the Project's lifetime (estimated for this calculation as 35 years).

43.    As explained in the FEIS, the Project will create, overall, more than 4,100 full-time equivalent jobs (direct, indirect, and induced effects of the Project) during Project construction, and an estimated 236 full-time equivalent jobs annually for the Project's operations and maintenance work.[56]

44.    On April 22, 2022, Ørsted, the North America's Building Trades Unions, and the United Brotherhood of Carpenters entered into a "National Offshore Wind Agreement," a first-of-its kind U.S. project labor agreement that creates expansive job opportunities for workers in the

---

[52] *See* 39 R.I. Gen. Laws § 39-26-4(a)(14).
[53] https://energy.ri.gov/renewable-energy/100-percent-renewable-electricity-2030; https://energy.ri.gov/sites/g/files/xkgbur741/files/documents/renewable/The-Road-to-100-Percent-Renewable-Electricity---Brattle-04Feb2021.pdf.
[54] "Governor McKee Announces New Opportunity to Bring Approximately 1200 Megawatts of New Offshore Wind to Rhode Island" (Sept. 28, 2023), https://governor.ri.gov/press-releases/governor-mckee-announces-new-opportunity-bring-approximately-1200-megawatts-new.
[55] Conn. Gen. Stat. § 22a-200a(3); ROD at 9.
[56] FEIS at 3.11-45 – 3.11-46

building trade unions on offshore construction associated with Ørsted's offshore wind projects, including the Project.[57]  Construction on the Project is also being performed pursuant to project labor agreements with the Norwich-New London Building Trades Council (offshore wind turbine pre-assembly at the New London State Pier) and the Rhode Island Building and Construction Trades Council (advance foundation component construction, as well as work on the onshore cable route and onshore substation).  Consistent with these agreements, many of the jobs associated with the Project are union jobs.

45.    Revolution Wind has also made commitments totaling more than $10 million to communities and institutions in Connecticut and Rhode Island, with more than $5 million of that scheduled to be paid in the future.  For example, Revolution Wind contributed  $500,000 to establish Rhode Island's first Global Wind Organization training center at the Community College of Rhode Island, and $500,000 to the Rhode Island Department of Labor and Building Futures Rhode Island to enable new entrants to union construction careers through pre-apprenticeship and for offshore wind career training for Rhode islanders involved in the construction of offshore wind projects.[58]  To date, this funding has enabled more than 100 Rhode Islanders to obtain credentials required for Revolution Wind's offshore construction.

46.    Ørsted and Revolution Wind are also investing significantly in port infrastructure and domestic manufacturing.  In Rhode Island, Ørsted and Eversource are investing more than $100 million in an offshore wind construction hub at the Port of Providence, creating more than 125 local union jobs, partnering with local shipyards, investing $1 million in a local training

---

[57] Ørsted, "North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor" (May 5, 2022) https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement.
[58] FEIS at F-17.

partnership, and collaborating with local fishermen.[59]    Ørsted and Eversource have also contributed more than $100 million of funding to support the Connecticut Port Authority and the State of Connecticut's re-development of the State Pier Terminal in the Port of New London.

47.    Halting the Project's ongoing offshore construction by granting Plaintiffs' Motion would impair these critical components of federal and state emissions reduction goals and prevent the Project's important public benefits from being realized.


I declare under penalty of perjury that the foregoing is true and correct. Executed on April 25, 2024.

_____
Kellen Ingalls

---

[59] Revolution Wind, "Governor McKee, Congressional Delegation, Mayor Smiley Mark New Phase of Offshore Wind Construction Hub at ProvPort" (May 1, 2023), https://revolution-wind.com/news/2023/05/new-phase-of-offshore-wind-construction-hub-at-provport.

## Exhibit A

# United States Department of the Interior

## BUREAU OF OCEAN ENERGY MANAGEMENT
### WASHINGTON, DC  20240-0001

Mr. Michael Pentony
Regional Administrator
Greater Atlantic Regional Fisheries Office
National Marine Fisheries Service
55 Great Republic Drive
Gloucester, Massachusetts  01930

Dear Mr. Pentony:

The purpose of this letter is to formally request the reinitiation of consultation with the National Marine Fisheries Service (NMFS) regarding the potential impacts of activities connected with the Revolution Wind Project on endangered species populations in Southern New England waters. The Bureau of Offshore Energy Management (BOEM) has reviewed the alternative monitoring plan for nighttime pile driving for the Project and would like to revise the proposed action regarding the distance to which sea turtles will be monitored during pile driving activities. The Biological Opinion does not currently allow for any injurious take of sea turtles during pile driving as it assumes the acoustic injury threshold for pile driving can be effectively monitored and noise reduction measures implemented to preclude such take from occurring. BOEM is requesting that NMFS to reconsider the potential injury take of sea turtles resulting from exposure to impact pile driving sounds during foundation installation. The enclosure includes an assessment explaining and supporting this request.

*Regulatory Authority*
In April 2009, DOI announced the final regulations for the Outer Continental Shelf (OCS) Renewable Energy Program, which was authorized by the Energy Policy Act of 2005 (EPAct). The Outer Continental Shelf Lands Act (OCSLA), as amended, mandates the Secretary of the Interior (Secretary), through BOEM, to manage the siting and development of OCS renewable energy facilities.  The EPAct of 2005, Public Law 109-58, added Section 8(p)(1)(C) to the OCSLA, which grants the Secretary the authority to issue leases, easements, or rights-of-way for the purpose of renewable energy development (43 U.S.C. § 1337(p)(1)(C)).  The Bureau of Safety and Environmental Enforcement, U.S. Army Corps of Engineers, U.S. Environmental Protection Agency, and National Oceanic and Atmospheric Administration (NOAA) are co-action agencies pursuant to their authorities described in the BA.  BOEM is delegated the responsibility for overseeing offshore renewable energy development in Federal waters (30 CFR 585) and has accepted designation as the lead Federal agency (50 C.F.R. 402.07) for the purposes of fulfilling interagency consultation under Section 7 of the ESA.

2

*Project and Consultation History*

On March 23, 2023, consultation for the project was initiated resulting in a Biological Opinion issued by NMFS on July 21, 2023. The NMFS Office of Protected Resources reinitiated consultation on November 17, 2023, due to new information regarding the potential take of fin and sei whales. It is anticipated that the enclosed information will be included in a single re-issued Biological Opinion inclusive of both requests.

BOEM understands that the existing Opinion and associated Incidental Take Statement will remain valid and effective until consultation is completed. Thank you for your continued coordination on the Revolution Wind Project. Please contact Kyle Baker (kyle.baler@boem.gov) with any questions or additional information that may be required.

Sincerely,

David Diamond
Deputy Chief for Operations,
Atlantic Outer Continental Shelf
Office of Renewable Energy Programs

Enclosures

**Exhibit B**

**From:** Wolfson, Laura Lee W <Lauralee.Wolfson@boem.gov>
**Sent:** Tuesday, January 2, 2024 2:10 PM
**To:** Whitney Marsh; Hauer, Whitney B
**Cc:** Melanie Gearon; Kirsten Holland Nantz; Amanda Zuniga; Rande Patterson; Kellen Ingalls
**Subject:** RE: [EXTERNAL] ESA Consultation Inquiry
**Attachments:** Fw: [EXTERNAL] REV ESA and sea turtles


Sorry catching up on emails from holiday, but confirming you are correct, daytime piling is already approved with conditions, as long as those existing conditions are followed.
Thanks,

Laura Lee Wolfson
Environmental Protection Specialist
Environment Branch for Renewable Energy
Office of Renewable Energy Programs
Bureau of Ocean Energy Management
Office: (703) 787-1433
Cell: (571) 363-7972

**From:** Whitney Marsh <WHIMA@orsted.com>
**Sent:** Friday, December 29, 2023 12:56 PM
**To:** Hauer, Whitney B <whitney.hauer@boem.gov>; Wolfson, Laura Lee W <Lauralee.Wolfson@boem.gov>
**Cc:** Melanie Gearon <MELGE@orsted.com>; Kirsten Holland Nantz <KIRHO@orsted.com>; Amanda Zuniga <AZUNI@orsted.com>; Rande Patterson <RAPAT@orsted.com>; Kellen Ingalls <KELIN@orsted.com>
**Subject:** [EXTERNAL] ESA Consultation Inquiry


**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**


Hi Whitney and Laura Lee,

As discussed during a bi-weekly meeting, our understanding is that if Revolution Wind were to request reopening of ESA Consultation for additional sea turtle take pertaining to proposed nighttime pile driving activities, this reopening would not impact daytime pile driving activities. The proposed reopening would only impact the ability to conduct nighttime piling activities, and would not prevent the project from continuing with daytime piling activities. We would like to receive confirmation that BOEM is of the same opinion as it pertains to COP Approval Condition 5.10.2.

Thank you!

Best regards,
**Whitney Marsh**
Permit Manager, Revolution Wind
Northeast Permitting
Region Americas