**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

GREEN OCEANS, *et al.*,

   *Plaintiffs,*

 v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

   *Defendants,*

 and

REVOLUTION WIND, LLC,

   *Defendant-Intervenor*

Case No.: 1:24-cv-00141-RCL

---

**EXPERT DECLARATION OF MARY JO BARKASZI IN SUPPORT OF
DEFENDANT-INTERVENOR REVOLUTION WIND'S OPPOSITION TO
PLAINTIFFS' MOTION FOR STAY**

Pursuant to 28 U.S.C. § 1746(2), I, Mary Jo Barkaszi, hereby declare:

1.  I am currently the Marine Mammals Program Manager at CSA Ocean Sciences ("CSA").  CSA serves as an environmental consultant for Defendant-Intervenor Revolution Wind LLC ("Revolution Wind")—a U.S.-based company and subsidiary of Orsted North America Inc. ("Ørsted") and Eversource Energy that is developing the Revolution Wind Project ("Project"), a commercial scale wind farm to be constructed offshore Rhode Island.

2.  In this lawsuit, a collection individual and organizational plaintiffs led by Green Oceans (collectively, "Plaintiffs") are challenging federal approvals of the Revolution Wind Project, including Bureau of Ocean Energy Management's ("BOEM") approval of a Construction and Operations Plan, a Final Environmental Impact Statement for the Project, and the National

Marine Fisheries Service's ("NMFS") issuance of an Incidental Take Regulation ("ITR"), which is a rulemaking specific to Revolution Wind, and a Letter of Authorization ("LOA") for specified Revolution Wind construction activities.

3.      On April 18, 2024, Plaintiffs filed a Motion for Stay of Final Agency Action ("Motion") seeking to stay the effectiveness of these approvals and enjoin Revolution Wind construction activities.  Plaintiffs' Motion relies upon allegations challenging Federal Defendants' compliance with the Endangered Species Act ("ESA") and Marine Mammal Protection Act ("MMPA").  In support of the Motion, Plaintiffs argue that if construction is allowed to proceed on Revolution Wind before additional consultation is complete and a new Biological Opinion under the ESA is issued, then these activities will result in irreparable harm to certain endangered whale and sea turtle species.

4.      Since 2017, in my role as Marine Mammals Program Manager at CSA, I have consulted on environmental impact, mitigation and permitting matters relating to marine protected species and the activities associated with multiple Ørsted projects including Revolution Wind.  For Revolution Wind, I prepared the "Assessment of Impacts to Marine Mammals, Sea Turtles, and Endangered Species Act-Listed Fish Species Revolution Wind Offshore Wind Farm" technical report for Revolution Wind's Construction and Operations Plan.  For other Ørsted projects, my role has included the application and review processes to obtain Incidental Take Authorizations ("ITAs"), and implementation of the ITAs' mitigation requirements.

5.      I have reviewed Plaintiffs' Complaint, filed January 16, 2024, as well as Plaintiffs' Motion and accompanying exhibits filed on April 18, 2024, including the Memorandum in Support of Plaintiffs' Motion and Declarations in support from Lisa Linowes, Apostolos Gerasoulis, and Robert Rand.

6.      I make this Declaration in support of Revolution Wind's Opposition to Plaintiffs' Motion for Stay of Final Agency Action in this case based upon both my personal knowledge of the matters referred to herein and my over 30 years of experience and expertise in evaluating risks to marine mammals in a wide variety of contexts, including offshore wind surveying, construction, and operation. I am willing and able to testify truthfully thereto, if called upon to do so.

## I.    OVERVIEW OF MY CONCLUSIONS

Based on my experience and expertise, I have reached the following conclusions:

7.      Plaintiffs' attempt to draw a causal connection where none exists between recent offshore wind development and large whale mortality, including the North Atlantic right whale, sei whale, and humpback whale (see Memorandum, pp. 12-14) is contrary to the scientific consensus. To support Plaintiffs' claims, the Memorandum relies on a Declaration from Lisa Linowes and a Declaration of Apostolos Gerasoulis, neither of whom presents scientific training or educational background regarding marine mammals, marine acoustics or regulatory impact assessment. Linowes claims that "[i]n 2017, which is when offshore wind developers started ramping up sonar monitoring and survey activities, there were 89 observed whale deaths-nearly three times the number of deaths found in 2015." Linowes Decl. ¶ 5. Gerasoulis asserts, without relevant scientific support, that "increase in offshore seismic survey activity correlates with whale death. . . such that whale deaths increase when seismic survey increases." Gerasoulis Decl. ¶ 6 Linowes', Gerasoulis' assertions, and by extension the Plaintiffs' Memorandum, do not comport with the **overwhelming scientific consensus that offshore wind activity is <u>not</u> a cause of these marine mammal mortalities.** Instead, the scientific community have determined the three declared Unusual Mortality Events ("UMEs") for whales in 2016 and 2017 that Plaintiffs rely upon are primarily caused by vessel strikes and fishing gear entanglements (and infectious disease for

3

the minke whales).  The National Oceanic and Atmospheric Administration ("NOAA"), the Marine Mammal Commission, academic institutions (e.g., Rutgers University; University of Rhode Island, Yale), environmental organizations (e.g., Sierra Club, Natural Resources Defense Council), BOEM and the U.S. Department of Energy, have all issued official statements that no marine mammal mortality has been attributed to offshore wind activities.  Plaintiffs' declarations fail to account for recent changes in maritime traffic or documented changes in marine mammal species distribution.  *See infra* Sections V and VIII.

8.    Plaintiffs' attempts to provide alternative data that are counter to NMFS's calculations and take authorization for Revolution Wind through using Robert Rand's summary of acoustic data allegedly collected at a different offshore wind construction project—Vineyard Wind—are not comparable to sound field data collected using scientifically standard methods. Rand used non-standard acoustic data collection methodology and reporting that do not uphold the scientific requirements of this type of highly complex field data collection.  Further, the vessels, mitigation measures and sound attenuation devices used in Vineyard Wind are not identical to those that will be used in Revolution wind and therefore, the data are not comparable to assess the potential impact of Revolution Wind construction.  A relevant comparison can be made to field data collected during the construction of the South Fork Wind Project, which used the same foundation installation vessels and noise mitigation technologies that Revolution Wind will use. The mitigation measures required as part of Revolution Wind and South Fork Wind ITAs under the MMPA and measures required as part of the Construction and Operations Plan consultations and approval conditions have been documented by real-world experience on the construction of the South Fork project to be effective.  Data from the reports submitted by the professional, 3rd-party scientists required on board vessels during project construction and the Sound Field

Verification (SFV) data collected using ISO-standard methods during South Fork Wind pile driving show that acoustic modeling was conservative and overestimated the number of marine mammals that could potentially be exposed to above-threshold sound levels by pile driving. Data from South Fork Wind monopile pile driving shows that Level B and Level A harassment ranges were substantially smaller than the ranges modeled for the challenged ITAs, including in some instances about half the size of modeled Level B ranges for impact pile driving of monopiles, meaning that the actual extent of the area for a potential take is smaller than modeled.

9.      Data from HRG surveys conducted during the pre-construction site assessment phase from all offshore wind site investigation surveys since 2017 and data from construction activities, show that substantially fewer marine mammals are exposed to sound levels above regulatory thresholds during actual activities than predicted through the protective estimation used in the permitting process. For example, from the published HRG survey reports from multiple offshore wind development projects within the U.S. Atlantic Ocean, professional protected species observers (PSOs) recorded 2,696 large whale detections, of these only 68 (2.5%) were detections that met Level B exposure criteria (animal distance and source operations), and were well below the authorized take numbers mentioned in Linowes' declaration. (Monitoring Reports [https://www.fisheries.noaa.gov/national/marine-mammal-protection/incidental-take-authorizations-other-energy-activities-renewable] ) (last accessed April 25, 2024).

10.      Thus, Linowes recitation in paragraph 10 of her declaration of the takes that are authorized in the ITR is not a reflection of actual takes of these species. As noted in Section VI(A), the number of authorized takes in an LOA is likely proportional to but not the actual number of takes that *will* occur during activities. Authorized takes mean that the project may not exceed the authorized number of takes within the given time period of the ITA. *See infra* Section VIII.

Linowes convolves the take numbers authorized for Revolution Wind by first listing 5 ESA-listed whale species, then providing the authorized take numbers of *all* marine mammals (all large whales, dolphins, seals, porpoises).  For the 5 ESA-listed whale species, NMFS has authorized Revolution Wind 152 Level B (behavioral disturbance) takes over the entire 5 years, and nine Level A (PTS) takes over the 5 years.  No Level A takes were authorized for the North Atlantic right whale.

## II.    PROFESSIONAL QUALIFICATIONS

11.    I am the Marine Mammals Program Manager at CSA Ocean Sciences, a marine environmental consulting firm specializing in investigating potential environmental impacts relating to marine and coastal projects around the world.  I am responsible for collecting data from the field and conducting scientific research to analyze and mitigate harm to marine mammals in the environment.

12.    I received a Bachelor of Science degree in Biology from Wittenberg University in 1986.  I received a Master's degree in Biological Oceanography from Florida Institute of Technology in 1990.

13.    Early in my career, I was employed as a marine biologist Mote Marine Laboratory in Sarasota, FL where some of my duties included aerial surveys for marine mammals and sea turtles and a member of the marine mammal stranding response team.  After my graduate studies, I was employed as a biologist in the life sciences support contract for John F. Kennedy Space center where some of my duties included aerial surveys for marine mammals and assistance in soft release programs for the Florida Manatee.

14.    I am a member of the American National Standards Institute ("ANSI") Passive Acoustic Monitoring ("PAM") Standards Working Group, the Acoustical Society of America

("ASA"), and the Society of Marine Mammalogy ("SMM").

15.    I and worked as a contracted scientist for in NMFS' long term aerial surveys as part of the Atlantic Marine Assessment Program for Protected Species ("AMAPPS") and the BOEM Wind Energy Area baseline surveys, conducting aerial visual and photogrammetric surveys for marine mammals and sea turtles.

16.    I have more than 30 years of experience in performing and overseeing marine wildlife baseline studies and mitigation programs for construction and offshore energy projects around the world--including acting as technical lead for offshore wind marine mammal ITA applications, COPs, mitigation and monitoring plans, and compliance assessment.

17.    My experience in acoustics includes studies on the potential impact of sound on marine animal species.  I have served as project manager for a marine soundscape biodiversity study for the National Park Service, Dry Tortugas National Park, to assess long-term marine habitat quality using autonomous acoustic recorders.  I have also managed projects to acoustically track sperm whales in the Northern Gulf of Mexico, and have tracked short-finned and long-finned pilot whales in the U.S. Mid-Atlantic Outer Continental Shelf ("OCS").  Prior to the acoustic assessments conducted for offshore wind ITAs beginning in 2017, I worked on the Delfin Liquefied Natural Gas ("LNG") offshore port facility in the Gulf of Mexico as the project manager for required acoustic modeling and impact analysis study for marine mammals, sea turtles, and fish.    Previously, I served as project manager for NOAA's IHA application for the decommissioning of the Neptune LNG deepwater port in Massachusetts Bay, Massachusetts.

18.    I have extensive experience managing protected species observer programs in federal waters associated with HRG surveys, deep water seismic surveys, pile driving, wind farm construction, explosive removals, and BOEM lease surveys throughout the United States and its

territories.  I was recently contracted by BOEM to assess mitigation compliance and effectiveness of vessel-based observer data in the Gulf of Mexico collected during deepwater geophysical surveys conducted between 2002 and 2015—the largest and most comprehensive assessment of seismic mitigation data in the United States which is now published in a peer-reviewed journal (Barkaszi and Kelly et al., 2024).

19.    I am co-lead on development of a vessel strike model designed to assess vessel strike risk in U.S OCS waters.

20.    I hold a NMFS unconditional permit for implementing protected species plans during underwater blasting, dredging, and marine construction.

21.    I have been an invited speaker to working groups and symposiums in the United States as well as to regulatory agencies internationally, including in Brazil (Brazilian Institute of Environment and Renewable Natural Resources), South Africa (Department of Environmental Affairs), and Suriname (National Institute for Environment and Development), to provide instruction on acoustic impact assessment and mitigation specific to each region.

22.    I am the author or co-author of more than a dozen peer-reviewed papers, conference proceedings, and technical reports on underwater acoustics and hearing in marine mammals and sea turtles.  I have overseen or supported the management of roughly 50 projects assessing the impacts of anthropogenic sound in underwater environments, and have recently managed approximately 20 projects assessing the acoustic impacts of offshore wind energy farms.  A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A**.

III.    **THE MARINE MAMMAL PROTECTION ACT, ENDANGERED SPECIES ACT, AND "TAKE"**

23.    Under the Marine Mammal Protection Act (MMPA), the term "take" is defined as

8

"to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal"[1]. This includes both intentional and unintentional actions that may harm marine mammals. The MMPA prohibits "take" with certain exceptions, allowing for incidental take authorizations under specific conditions. Incidental take refers to unintentional but not unexpected harm to marine mammals during activities like construction, scientific research, or military exercises.

24.    NMFS may only authorize the incidental take of small numbers of marine mammals. NMFS typically determines whether the total take of members of a particular species stock due to an activity will be small relative to the estimated population size of that species. Additionally, before it can authorize take from a planned activity, NMFS must also find that the activity will have a "negligible impact" on affected species or stocks of marine mammals, and will not have an "unmitigable adverse impact" on the availability of species or stock of marine mammals intended for subsistence uses.

25.    The MMPA requires projects to obtain ITAs prior to construction and operation if the project is likely to result in any incidental take of the marine mammals. ITAs authorize the incidental—but not intentional—"take" by harassment of small numbers of marine mammals by persons engaged in specified activities. This means that over the course of a permitted activity (e.g., seabed mapping), marine mammals could be exposed to noise that could cause a behavioral reaction, but those exposures are not the intended outcome of the activity.

26.    The MMPA regulates take based on two levels of harassment. Level A harassment means any act of pursuit, torment, or annoyance that has the *potential* to injure a marine mammal or marine mammal stock in the wild.[2] Level B harassment refers to acts that have the *potential* to

---

[1] NMFS 2021.

[2] 16 U.S.C. §§ 1362(18).

disturb (but not injure) a marine mammal or marine mammal stock in the wild by disrupting behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or/ sheltering.[3]

27.    As relevant here, for activities with the potential to result in injury harassment only but that are planned for multiple years, NMFS may issue an LOA.[4]  Before it can issue an LOA, NMFS must issue an ITR which is a rulemaking specific to a planned activity or project.  An ITR and LOA is valid for five years.

28.    When reviewing an ITA application, NMFS estimates the number of marine mammal exposures to harassment (i.e., take) that potentially could occur incidentally during permitted activities—not those takes that will actually occur.  The estimates rely on the predicted monthly densities of marine mammals over a large regional scale (i.e., number of animals per 5 or 10 square km depending on the species).  Those broader regional densities would be higher than a localized, fine-scale distribution of animals around an activity.[5]

29.    There is a basic difference between estimating the potential take requested in the ITA and the actual take realized from the project activities.  Just as you pack extra clothes in your suitcase that you may never need, but bring along in case of unpredicted weather or travel delays, the ITA's "pack" enough takes to ensure compliance with the MMPA.  Therefore, in my experience, as a general matter NMFS typically authorizes higher numbers of takes than are realized upon completion of the project.

---

[3] *Ibid.*

[4] 16 U.S.C. § 1371(a)(5)(A).

[5] The fine scale data are confirmed in the mitigation and monitoring data collected during the NMFS-authorized surveys and required by the terms of issued ITAs to ensure compliance with the MMPA.

30.     All offshore wind projects apply for incidental take, which is defined as take that is not intentional but not unexpected.  The activity (e.g., pile driving) emits sound in the water, the production of this sound is not intentional, but rather, a byproduct of the activity.  However, science indicates that this activity may produce sound levels that meet or exceed accepted acoustic thresholds established by the NMFS acoustic guidance documents (https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-acoustic-technical-guidance) (last accessed April 25, 2024) and therefore, exposures to these thresholds can be reasonably expected.  Offshore wind projects apply for ITAs only for noise impacts associated with marine site characterization surveys (such as HRG surveys) and construction activities (such as monopile pile driving).

31.     For these impacts, offshore wind projects only request, and NMFS only authorizes, two specific types of marine mammal incidental harassment.  ITAs with Level A take only authorize permanent threshold shift ("PTS") which is a permanent hearing loss either within certain frequency bands or under certain amplitudes.  This means that an animal can potentially lose the ability to hear the lowest, or quietest, sounds that it could hear before exposure.  PTS is not general organ or bodily tissue damage; however, PTS is classified as Level A harassment because it is considered auditory injury.  The acoustic threshold levels that categorize Level A and Level B harassment are not statutory in the MMPA, rather, as described above, they are acoustic guidelines based on the current best available science, and applied within the regulatory framework of the MMPA.  All South Fork and Revolution Wind surveys, mitigation, and take assessments were conducted under this current regulatory framework and best available science.  The take presented in the ITAs represents the total number of animals that could be exposed to noise at or above the PTS acoustic thresholds based on site-specific and project-specific modeling. However,

the acoustic thresholds define the lowest sound level at which an animal may experience the onset of PTS effects; exposure to noise at or above this level does not equate to PTS taking effect in that animal. The assumption that all Level A takes in an issued ITA translate to realized PTS in that number of individuals is an incorrect inference. The true number of exposures that are experienced in the field during project activities are more accurately represented in the PSO reports which take into account the activity being conducted and an animal distance to that activity to determine if an exposure actually occurred.

32.    HRG survey ITAs and construction ITAs authorize Level B takes or behavioral disturbance that results when an animal changes its behavior due to being exposed to sound. Behavioral disturbance may or may not result in any long term or biologically important consequences, and is highly contextual. The potential disturbance resulting from HRG surveys and pile driving is not expected to have long term impacts on behavior or have population consequences for any marine mammal stocks.

33.    Section 7 of the ESA requires that federal agencies that propose to authorize, fund, or carry out activities that may affect threatened or endangered species must consult with the U.S. Fish and Wildlife Service or NMFS, depending on the species at issue, to ensure that the activity will not "jeopardize the continued existence of any endangered species or threatened species" or "result in the destruction or adverse modification" of critical habitat for those species.[6] If the agency determines that the action may affect a listed species or adversely modify critical habitat, it must initiate either an informal or formal consultation process with the U.S. Fish and Wildlife Service and/or NMFS.[7] The agencies must then prepare a biological opinion that assesses whether

---

[6] 16 USC §1536(a)(2); 50 CFR §402.14(a).

[7] 16 USC §1536(a)(4).

the project is likely to jeopardize the continued existence of the species or destroy or adversely modify the critical habitat.[8]  The opinion must also identify reasonable and prudent alternatives and measures for avoiding any adverse effects that are identified.  (16 USC §1536(b).)

34.    If a proposed activity results in a "take" of a listed species, defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct",[9] that is incidental to a lawful activity, then an "incidental take statement" may be included with the biological opinion which has the effect of authorizing what would otherwise be a prohibited take of listed species.[10]  An incidental take statement will include specific limits to the "take", measures to minimize the take, implementing terms and conditions, and reporting and monitoring requirements.[11]

## IV.    OCEAN ACOUSTICS AND MARINE MAMMALS

### A.    Basics of Marine Mammal Hearing

35.    A species hears sound within a spectrum defined by what frequencies it is sensitive to.  Sound frequency, sometimes referred to as pitch, is the number of times per second that a sound pressure wave repeats itself.  The faster a sound pressure wave repeats itself, the higher the frequency.  For example, a drumbeat has a lower frequency than a whistle.  Frequency is measured in units called hertz ("Hz"), or, if the frequency is fast enough, in kilohertz ("kHz").

36.    Frequency only tells us a species' range of hearing, not the "loudness" or "intensity"—often termed "amplitude"—of a sound it actually hears.  Amplitude is the metric used

---

[8] 50 C.F.R. §402.14(g).

[9] 16 U.S.C. § 1532(9).

[10] 50 CFR §402.14(i)(5).

[11] 50 CFR §402.14(i)(1), (3).

to determine whether a sound within an animal's hearing frequency is "loud" enough to be heard, or if it has the potential to elicit a behavioral reaction or has the potential to initiate a hearing threshold shift (e.g., PTS) in an animal. Amplitude is measured in decibels ("dB"). Decibels are a logarithmic measurement unit of sound pressure that must be referenced to the pressure medium within which the sound waves travel (e.g., air, water) meaning that 1 dB in air is different than 1 dB in water.

37.    The complexity of marine mammal hearing is important to consider when assessing potential impacts to sound sources because it is not a "one size fits all" scenario; each sound source must be evaluated within the context of each species' acoustic parameters. In humans, in-air sound frequencies above or below our hearing sensitivities are not well perceived by us, our hearing also changes with age and is different among individuals, and our hearing acuity will change in different background noise environments. There are established human acoustic criteria related to decibels and duration of noise exposure for hearing protection (e.g., OSHA standards), and how we perceive certain sounds depends on the context in which we hear them. For example, quiet footsteps in the dark may alert us and cause more of a stress response than the loud, routine takeoff and landing noise near an airport.

38.    Similarly for underwater noise, only those frequencies within a marine mammal's hearing range will be perceived by the animal, marine mammal hearing sensitivity will also change with age and is different among individuals, and marine mammal hearing acuity will depend on the background noise conditions. NMFS has established acoustic criteria for marine mammal hearing "protection" with the understanding that the behavioral reaction of a marine mammal to a sound will be highly contextual and not always directly associated with "loudness", as provided in the example above.

39.    Cetaceans (whales, dolphins, and porpoises) are generally separated into three generalized hearing groups. *Low frequency cetaceans* ("LFCs") include all baleen whales (including humpback whale, North Atlantic right whale, fin whale, sei whale, blue whale, and minke whale) have a general hearing sensitivity between 7Hz and 35kHz. *Mid frequency cetaceans* ("MFCs") include sperm whales and most dolphins, and have a general hearing sensitivity between 150Hz and 160kHz. *High frequency cetaceans* ("HFCs") primarily include porpoises, but also a few dolphin and small whale species, and have a general hearing sensitivity between 275Hz and 160kHz.

40.    Any assessment of noise impacts must consider the hearing groups *and* the frequencies associated with the noise being assessed. Frequencies outside of a group's hearing sensitivity are not likely to be perceived by an animal of that group and are not likely to initiate any auditory injury to, or behavioral response by, an animal of that group. Baleen whales (i.e., North Atlantic right, humpback, sei, blue, fin, and minke) are unlikely to perceive anything substantive above a frequency of 35kHz. And sperm whales are unlikely to hear anything above 160 kHz or below 150 Hz.

### B.    Underwater Acoustic Environment

41.    Underwater noise in the ocean environment originates from a variety of sources, including from non-biological sources, such as wind and waves, and from the movements or vocalizations of marine life (Hildebrand 2009). In addition, humans introduce sound into the marine environment through activities like construction, fish finder sonar, and vessel traffic.

42.    The acoustic environment or "soundscape" of a given ecosystem comprises all such sounds—biological (biophony), geophysical (geophony), and anthropogenic (anthrophony) (Pijanowski et al. 2011).

43.    Soundscapes are highly variable across the 3-dimensional space of the ocean and across time due to the properties of sound transmission and the types of sound sources present in each area.

44.    The basis of understanding potential impacts of man-made sound and how that introduced sound contributes to an animal's perceived soundscape depends on the ambient soundscape conditions, which are a combination of sound source types, frequencies, and amplitudes.

45.    Baseline acoustic studies were conducted in the southern New England and RI/MA Wind Energy Area (WEA) to evaluate ambient noise conditions, species presence, and species distribution (VanParjis et al., 2023)  This study included one acoustic recorder deployed within the Revolution Wind lease area between November 2020 and September 2022.  Median broadband sound pressure levels across all recorders (7) deployed across the WEA ranged from 105-112 dB re 1 µPa; the median increased at several individual sites between 2020 and 2022; however, no increase in median sound pressure levels was observed from the Revolution site data.  The data reported from the Revolution lease area yielded the most predictable cyclical acoustic patterns with higher SPLs in winter and lower SPLs in summer, and no increases between 2020 and 2022; these acoustic conditions may be more indicative of a system affected by environmental variables, such as wind, waves, and temperature, rather than anthropogenic (e.g., vessels) and biological (e.g., whale calls) signals (VanParjis et al., 2023).  Notably, there were HRG surveys conducted in or near the Revolution Wind Lease Area during June 2020 – February 2021and April – July 2022; these dates overlap with the data collection period and did not appear to affect the ambient conditions to any great extent, as evidenced by the cyclical pattern and stable sound pressure levels across years.

46.     Sound from offshore wind construction work will add only incrementally to the soundscape, if at all.  Animals will pick up sounds as the animals or the sources move, and the introduction of a new source will be relative to what is already being heard.  In human terms, this could equate to standing on a city street corner throughout the day.  Perhaps in early morning when traffic is low, individual vehicle noise is very discernable; a person can say "that sound is coming from that car".  However, as traffic increases, individual contributions of the same general noise are less discernable such that a person could not identify individual car noise unless they are very close to the car.  At a point of even moderate traffic volume, adding several cars to your street does not significantly change the sound levels or your perception of individual sources.  The same is true for an underwater animal receiver; the sound contribution of small numbers of individual vessels will only be perceived within the context of the existing soundscape.

## C.     Sound Sources from Offshore Wind Construction Activities

47.     Under the Revolution Wind ITA, Level A takes in the form of PTS and Level B takes are anticipated to occur from monopile foundation pile driving and potentially from unexploded ordnance (UXO) removal, although UXO detonations are unlikely to be necessary during the project.  As described in the MMPA section; however, takes have been requested and authorized on the outside chance that a high order detonation was necessary to remove a UXO.  Only Level B takes have the potential to occur during HRG surveys.  The purpose of HRG surveys is to support the site characterization, siting, and engineering design of offshore wind facilities, including wind turbine generators, offshore substations, and submarine cables within the respective lease areas and along export cable routes, which will transmit energy from the wind farms to onshore facilities.

48.     Some of the HRG survey equipment utilizes active acoustic sources that operate on

the same frequencies as marine mammals, such as whales and dolphins, and therefore some species are able to detect the sound projected by these devices.

49.     Recently, BOEM and the United States Geological Survey ("USGS") characterized underwater sounds produced by HRG sources and their potential to affect marine mammals (Ruppel et al., 2022).

50.     Ruppel et al., (2022) categorized marine acoustic survey systems into four tiers. Tier 1 surveys are high energy surveys that are likely to result in incidental take of marine mammals and warrant regulatory evaluation.  Tier 2 surveys are low to intermediate energy surveys, whereby incidental take could occur in some circumstances but are expected to have fewer effects (i.e., small impact ranges) than Tier 1 surveys.  Tier 3 surveys, such as impulsive HRG surveys (e.g., sparkers) may require Level B take authorization in some circumstances.  Tier 4 surveys are de minimis sources that are not likely to result in incidental take and comprise the majority of sources used on offshore wind HRG surveys.

51.     There are no Tier 1 or Tier 2 surveys conducted for offshore wind surveys.  Only a fraction of the HRG surveys for offshore wind could potentially fall into the Tier 3 category; the vast majority are de minimis Tier 4 sources.  Additionally, the use of mitigation measures during HRG surveys further reduces the potential for take, as discussed below.

## V.    MARINE TRAFFIC

52.     A primary threat to large whales that is not accounted for in any of the Plaintiffs' declarations is the overarching risk of vessel strike resulting from non-offshore wind maritime traffic.  Plaintiffs' discussion of an increase in whale mortality outside the context of commercial shipping in both the Linowes and Gerasoulis declarations is misleading because it does not represent the full contingent of vessel traffic in and around the region. Any discussion of offshore

wind vessel activity must be made within the context of existing marine traffic to be meaningful. Marine traffic has increased in the last several decades; key changes in maritime traffic since the early 2000's include:

53.    **Growth in Global Trade**: Global trade experienced significant growth, driven by globalization, economic development in emerging markets, and the expansion of international trade agreements. This increase in trade directly contributed to a higher volume of shipping traffic, as more goods were transported by sea.

54.    **Expansion of the Panama Canal**: The expansion of the Panama Canal, completed in 2016, allowed for the passage of larger "New Panamax" ships. This development directly impacted shipping routes and volumes, especially for routes connecting Asia with the U.S. East Coast, leading to an increase in vessel traffic in this region.

55.    **Port Infrastructure and Development**: Major ports along the U.S. East Coast, including the Port of NY and NJ, have undergone significant expansions and upgrades to accommodate larger vessels and increased cargo volumes. These improvements have made these ports more attractive for international shipping, contributing to the rise in vessel traffic.

56.    **Technological Advancements**: Advancements in shipping technology, such as improved vessel design for greater cargo capacity, better fuel efficiency, and advanced navigation systems, have made maritime transport more efficient and cost-effective, encouraging an increase in shipping activities.

57.    **Impact of COVID-19 Pandemic**: The COVID-19 pandemic had a significant impact on global shipping starting in 2020. Initial disruptions led to a decrease in traffic, followed by a surge in demand as economies began to recover, leading to increased shipping activities and congestion in major ports.

58.     **E-Commerce Growth**: The rise of e-commerce, especially accelerated by the pandemic, has led to increased demand for shipping services as consumers increasingly rely on online shopping for a wide range of products; and

59.     **Supply Chain Diversification**: In response to supply chain disruptions and geopolitical tensions, there has been a move towards diversifying supply chains, which has implications for shipping routes and volumes, including increased traffic in certain areas of the U.S. East Coast.

60.     Based on the U.S. Department of Transportation statistics, maritime imports and exports of containerized goods (i.e., container ships) has increased between 2019 and 2022.[12] Statistics for 2023 showed a substantial increase in maritime containerized goods volume (measured in 20-foot equivalent units [TEUs]) handled by ports on the U.S. East Coast.  A substantial portion of the East Coast volume was handled by the port of NJ/NY.[13]  To better understand the risk of vessel strikes, the movements of a tagged North Atlantic right whale were displayed alongside the movements of vessels operating an automatic identification system ("AIS"), which are dominated by large, commercial vessels. This visualization can be viewed at https://www.fisheries.noaa.gov/s3/2023-05/Update-NARW-2021-NJ-NY-Visualization.gif   (last accessed April 25, 2024).

## VI.    REVOLUTION WIND ITR

61.     In October 2023, NMFS issued the ITR and subsequent LOA in November 2023 for Revolution Wind, concluding that, based on the agency's expert analysis of the likely effects of the proposed activities on marine mammals and their habitat, and taking into consideration the

---

[12] Bureau of Transportation Statistics [https://www.bts.gov/ports] (last accessed April 25, 2024).

[13] Bureau of Transportation Statistics [https://www.bts.gov/ports] (last accessed April 25, 2024).

implementation of monitoring and mitigation measures, "the authorized incidental take of marine mammals from all of Revolution Wind's specified activities combined" (1) "will have a negligible impact on all affected marine mammal species or stocks"; and, (2) only "small numbers of marine mammals would be taken relative to the population size of the affected species or stocks".[14]

### A.    "Take" Estimate Methodology

62.    Estimated takes from acoustic impacts resulting from any activity requiring MMPA authorization consider the following in the calculations:

a.    Regulatory acoustic thresholds above which marine mammals could exhibit a behavioral reaction or incur some degree of permanent hearing impairment;

b.    The area or volume of water that will be ensonified (i.e., reached by sound) above these levels over a discrete assessment period (e.g., a day, a week, a single pile installation);

c.    Location of activities;

d.    The density or occurrence (and in some cases swim and dive behaviors) of marine mammals within ensonified areas; and

e.    The number of days within each month or season that activities will take place.

### B.    Acoustic Thresholds

63.    NMFS utilizes the best available science to determine acoustic thresholds for marine mammals and relies on widely accepted methodology to estimate the level and specified geographic extent of potential impacts associated with the survey and construction activities authorized under the ITR.   South Fork and Revolution Wind utilized the regulatory acoustic guidance, as required, to assess acoustic impacts.   While other thresholds may be available,

---

[14] 88 Fed. Reg. 72562, 72658 (Oct. 20, 2023).

standard practice primarily applies only the regulatory thresholds for calculating take for ITAs. Acoustic thresholds identify the levels of underwater sound above which exposed marine mammals would be reasonably expected to elicit a behavioral reaction (i.e., a Level B take under the MMPA), or to incur PTS (i.e., a Level A take under the MMPA).

64.    For Level B take, the current regulatory threshold for all marine mammals is a root-mean-square sound pressure level ("SPL") of 120 dB (re 1 μPa) for non-impulsive, continuous noise sources (e.g., vibratory pile driving), and 160 dB (re 1 μPa) for non-explosive impulsive (e.g., impact pile driving) or non-impulsive, intermittent noise sources (e.g., HRG sonar sources). When a marine mammal is exposed to noise above these levels, a behavioral response may occur. As noted earlier, behavior is highly contextual, so exposure to these sound levels does not mean a reaction will always occur, only that they may occur and thus provides a metric that can inform the development of mitigation measures to minimize impacts.

65.    For Level A take, NMFS identifies dual criteria to assess auditory injury to different groups of marine mammals.  For mid-frequency cetaceans (sperm whales, dolphins) and low-frequency cetaceans, (North Atlantic right whales, humpback whales, fin whales, blue whales, and sei whales), exposure to impulsive peak sound pressure levels of 219 dB and 230 dB, respectively, impulsive weighted cumulative sound exposure levels over 24 hours of 183 dB and 185 dB, respectively, and non-impulsive sound exposure levels of 199 dB and 198 dB, respectively, are identified as the sound levels that can initiate the onset of PTS for specific hearing groups.

66.    Regulatory PTS thresholds are important to understand in the context assessing Level A take because exposure thresholds are based on a 24-hour exposure period and the possibility of a marine mammal having this 24-hour exposure during offshore wind activities is very, very low.

### C.    Density of Marine Mammals

67.    The Duke University Marine Geospatial Ecology Laboratory (the "Laboratory") has produced habitat-based density models that are recognized as the best available information regarding marine mammal densities in each projects' areas for which Ørsted has required IHAs. (Roberts *et al*., 2016, and associated updates, 2022, 2023).  Marine mammal density estimates in the each of Ørsted's IHAs were obtained using these modelling results.

### D.    Final Take Calculation

68.    Final take calculations were estimated for each activity, HRG surveys, pile driving and UXO/MEC detonation.  For HRG surveys, Level B exposures were estimated by multiplying the average annual density of each species in a project's areas by the largest Level B ensonified area (i.e., radius = 141 m) to estimate the maximum number of potential Level B exposures for one day.  This was then multiplied by the maximum number of survey days in each project's area, and rounded to the nearest whole number to calculate the maximum instances of potential take for the entire HRG survey period.  This method tends to over-estimate the number of potential takes, counter to what the Plaintiffs state, but ensures compliance with the MMPA should these maximum estimates be realized.

69.    The NMFS' LOA issued for Revolution Wind, following promulgation of the Revolution Wind regulations, authorizes Level B harassment associated with the acoustic disturbance of specific identified marine mammal species by impact pile driving for foundation installation, vibratory pile driving for cofferdam and goal post installation and removal, pneumatic hammering for casing pipe installation and removal, unexploded ordnance detonations, and HRG site characterization surveys.  NMFS' LOA for Revolution Wind also authorizes Level A harassment associated with the acoustic disturbance of specific identified marine mammal species

by impact pile driving of foundations, pneumatic hammering of casing pipes, and unexploded ordnance detonations.

70.    The LOA NMFS issued to Revolution Wind does **not** authorize any take by mortality or serious injury of any marine mammal species.

## VII.    MITIGATION AND MONITORING MEASURES

71.    The ITR and LOA for Revolution Wind include extensive mitigation measures that are designed to minimize project impacts.  For example, Revolution Wind LLC must adhere to strict vessel strike avoidance measures to protect marine mammals, including mandatory training for project personnel on species identification, observation methods, and mitigation requirements, as well as maintaining a lookout for marine mammals and slowing down or altering course to avoid collisions.  Dedicated Trained Lookouts or professional PSOs must be on watch during all vessel transits, and are equipped with monitoring technology for low visibility conditions.  Vessels must monitor for whales via various channels and systems and adhere to speed restrictions in designated areas and during certain times of the year.[15]

72.    Offshore wind project construction is another source of potential sound.  While the Revolution Wind ITR and LOA authorize harassment from construction activities, mainly impact pile driving, they also require extensive mitigation measures described below.  Construction noise from these projects is dampened through the use of double big bubble (DBB) curtains, which consist of a two rings of large hoses with small holes that are placed on the seabed at specified distances around the monopile.  Compressors pump air into the hose and a concentric, uninterrupted bubble "screen" is produced.  The air trapped in each bubble serves to absorb and

---

[15] 50 C.F.R. § 217.274(b).

dampen sound that travels through the water.

73.    Another mitigation tool used in South Fork Wind construction that will also be used in Revolution Wind construction is an AdBm, which is a curtain of air-filled "cups" that act as acoustic resonators (i.e., mufflers).  The resonators are designed to respond to these specific frequencies, causing them to vibrate or oscillate. This oscillation helps to absorb some of the energy from the noise, reducing the overall noise level (Peng et al., 2018). The curtain of resonators is lowered over the monopile and hangs down to the seabed during piling.

74.    These measures have been shown effective in field observation for South Fork Wind construction, as explained below.  Importantly, Revolution Wind will be using these same noise abatement measures that South Fork Wind used during pile driving and will also use the same foundation installation and bubble curtain vessels.

75.    In addition, impact pile driving for the installation of wind turbine generators and offshore substation foundations is subject to specific time of year restrictions to mitigate harm to marine life.  Pile driving is prohibited from January 1 through April 30, with limited exceptions. Monopiles must not exceed 15 meters in diameter for offshore substation foundations or 12 meters in diameter for WTG foundations, and a maximum of three may be installed per day.  Pile driving requires a soft-start protocol and the establishment of clearance zones to delay activities if marine mammals are detected nearby.  Two noise abatement systems are mandated to reduce noise levels, and PAM systems must be used to detect North Atlantic right whales.  Pile driving may begin only if no North Atlantic right whale visual detections at any distance or acoustic detections within the PAM monitoring zone have occurred during the 60-minute clearance zone monitoring period.  At least three Protected Species Observers ("PSOs") must be on the pile driving platform, with additional PSOs on dedicated vessels. Shutdown zones are defined to halt pile driving if marine

mammals enter the area, with specific protocols for North Atlantic right whales.[16]

76.    During pile driving, Revolution Wind is required to use two fully functional, uncompromised noise abatement systems, such as bubble curtains, and must maintain specified quality control measures.[17]

77.    The ITR and LOA also include mitigation measures for HRG surveys operating sub-bottom profilers (i.e., boomers, sparkers, and Compressed High Intensity Radiated Pulse). Acoustic sources must be deactivated when not in use, used at the lowest necessary level, and ramped up prior to full power, ensuring marine mammals are not present in clearance zones.  If marine mammals are detected within clearance zones, ramp-up must be delayed until the area is clear.  Shutdown zones must be respected, with immediate cessation of acoustic sources if marine mammals enter, except for certain small delphinids.  If a source is shut down due to marine mammal presence, it cannot resume until the animal has left the area or a set time has passed without sightings.  If a shutdown lasts over 30 minutes, clearance and ramp-up procedures must be reinitiated, unless PSOs have maintained constant observation and no marine mammals were detected during the downtime.[18]

78.    The ITR and LOA for Revolution Wind also include extensive monitoring and reporting requirements to ensure its mitigation measures are faithfully implemented.  For example, Revolution Wind must employ independent, NMFS-approved PSOs and PAM operators who are tasked solely with monitoring for protected species and managing mitigation requirements.  PSOs must have good visual acuity, data collection skills, and the ability to communicate with crew

---

[16] 50 C.F.R. § 217.274(c).

[17] LOA at 9-10.

[18] 50 C.F.R. § 217.274(f).

about marine mammal sightings and mitigation measures. Both PSOs and PAM operators must complete a relevant training course within the last five years and be approved by NMFS, either conditionally without field experience or unconditionally with adequate experience. PSOs and PAM operators must be designated for each activity, with resumes and qualifications submitted to NMFS for approval well in advance of project commencement.[19] Approved PSOs must have training and/or experience in northwestern Atlantic Ocean marine mammal identification and behaviors (LOA Condition 4.a.4).

79.    The ITR and LOA ensure that PSOs and PAM operators adhere to specific monitoring requirements during various marine construction activities, including pile driving and HRG surveys. PSOs must use binoculars and naked-eye observations to search continuously for marine mammals, while PAM operators must use approved systems and software. During low visibility, PFOs must use alternative technologies like infrared or thermal cameras. PSOs and PAM operators must not exceed 4 consecutive hours of duty, must have at least a 2-hour break between shifts, and cannot work more than 12 hours in a 24-hour period to ensure alertness and effectiveness.[20]

80.    The ITR LOA include several reporting requirements to keep the NMFS Office of Protected Resources informed of project activities. Before starting any on-water project activities, they must demonstrate that all personnel, including vessel crews, captains, PSOs, and PAM operators, have completed the required training. Weekly and monthly reports are required during foundation installation, documenting daily activities, marine mammal detections, and mitigation actions. Draft and final annual reports must be submitted detailing marine mammal detections,

---

[19] 50 C.F.R. § 217.275(a).

[20] 50 C.F.R. § 217.275(b).

mitigation measures, and project operations. Any significant issues with measured acoustic isopleths must be reported to NMFS within one business day. PAM detections of North Atlantic right whales must be reported within 24 hours, and full detection data from all real-time hydrophones must be submitted within 90 days after the conclusion of activities requiring PAM. Situational reports are required for various incidents, including North Atlantic right whale sightings, marine mammal strandings or injuries, vessel strikes, and lost gear.[21]

81.    On November 17, 2023, NMFS Office of Protected Resources requested reinitiation of consultation under ESA Section 7 to take into account Level A harassment of two fin whales and three sei whales from monopile installation, including impact pile driving, that NMFS authorized in the Revolution Wind LTR/LOA under the MMPA. Such reinitiation of consultation is a routine undertaking to harmonize MMPA and ESA documents. On March 12, 2024, NMFS confirmed that it would reinitiate consultation under the ESA to consider the changes to the proposed action and new information on effects of the action with respect to the take of fin and sei whales authorized under the MMPA. NMFS explains that it will update the Biological Opinion analysis as necessary.

## VIII.    PLAINTIFFS' ALLEGATIONS

### A.    No Increase in Whale Deaths Cotemporaneous with Offshore Wind Activity

82.    Plaintiffs allege that there has been a significant increase in whale mortalities along the Eastern Seaboard that can be attributed to the growth of offshore wind in this area and that there is correlation between the "increase in offshore seismic survey activity" and "whale death" in areas along the Eastern seaboard. (Memorandum, p. 12 [citing Linowes Decl. at ¶ 5; Gerasoulis

---

[21] 50 C.F.R. § 217.275(g).

Decl. at ¶ 6].)  According to Linowes, following the increase in offshore wind activities "[t]he increase in deaths has been so significant that the National Oceanic and Atmospheric Administration (NOAA) has declared three Unusual Mortality Events [("UME")] involving endangered whale species: (1) Humpback Whales in 2017, (2) North Atlantic right whales in 2017, and (3) Minke Whales in 2018."  (*Ibid.*). It is well understood in science that while correlation and causation can occur together, correlation does not indicate causation and cannot be used to attribute a response to an action.

83.    Plaintiffs' allegations are factually incorrect and without scientific basis.  Plaintiffs fundamentally misconstrue what an "unusual mortality event" is and the context of pre-existing "unusual mortality events" relating to marine mammal along the East Coast of the United States.  Under the MMPA, an Unusual Mortality Event (previously defined as "UME") is defined as "a stranding that is unexpected; involved a significant die-off of any marine mammal population; and demands immediate response."[22]  UMEs are designated by the National Marine Fisheries Service Office of Protected Resources ("OPR").

84.    NMFS established the Working Group on Marine Mammal Unusual Mortality Events (the "UME Working Group") in 1991.  The UME Working Group is tasked with understanding, investigating, and responding to marine mammal UMEs.  The working group is comprised of experts from scientific and academic institutions, conservation organizations, and state and federal agencies who work closely with stranding networks and have a wide variety of experience in biology, toxicology, pathology, ecology, and epidemiology.[23]

---

[22] 16 U.S.C. § 1421h(6).

[23] NMFS, NOAA Fisheries Partners in the Spotlight:  The Working Group on Marine Mammal Unusual Mortality Events (*including a list of current voting members*), https://www.fisheries.noaa.gov/national/marine-life-distress/noaa-fisheries-partners-spotlight-working-group-marine-mammal-unusual-mortality-events (last accessed April 25, 2024).

85.     The dates and causation of the referenced data that triggered the UMEs provided by Linowes are misleading as is Linowes's presentation of data regarding annual whale strandings because they ignore trend data upon which UMEs are based.  Declaration of a UME occurs when elevated mortalities are recognized in the population for a period of time prior to that declaration, therefore, a UME declared in a specific year is triggered by trending data, sometimes over one year or less but sometimes several years' worth, prior to the year of UME declaration.  Therefore, isolating the correlation of the beginning of the UME with the beginning of the offshore wind surveys does not statistically explore other potential variables, including a general increase in overall shipping, change in whale distribution, and other biological and non-biological factors that may contribute to either strike risk or mortality.

86.     According to the NMFS, the branch of NOAA responsible for managing U.S. marine mammal stocks and administering the MMPA, the Atlantic humpback whale UME was declared in 2017 based on data beginning in January 2016 from Maine through Florida; the Atlantic minke whale UME was declared in 2018 based on data beginning in January 2017 from Maine to South Carolina; and the North Atlantic right whale UME was declared in 2017 based on data beginning in January 2017 along the entire U.S. *and* Canadian coast from Newfoundland through Florida. The stranding numbers associated with UMEs and the number of permitted "sonar surveys" referenced by Linowes is provided in Figure 1, **showing no direct correlation**, or clear pattern, in the number of surveys and the number of strandings, and in fact, numbers of strandings for some species were lower in years with higher numbers of permitted surveys.

**Figure 1.**



87.    UMEs are species and region-specific.  As of April 23, 2024, there are four active UMEs for United States waters: an Atlantic Florida Manatee UME, an Atlantic Minke Whale UME, a North Atlantic Right Whale UME, and an Atlantic Humpback Whale UME.[24]

88.    Plaintiffs analysis focused only on offshore wind survey vessel traffic, but ignore the likely underlying causes of the observed whale deaths on the East coast.  Plaintiffs make no mention of species distribution, activity changes outside of the survey areas, or the mortality evidenced in peer-reviewed scientific publications since the beginning of the North Atlantic right whale or Atlantic humpback whale UMEs (Meyer-Gutbrod et al. 2022) (Knowlton et al. 2022)

---

[24]    NMFS,    Active    and    Closed    Unusual    Mortality    Events, https://www.fisheries.noaa.gov/national/marine-life-distress/active-and-closed-unusual-mortality-events (last accessed April 25, 2024).

(Davies et al. 2019) (Leiter et al. 2017) (Quintana-Rizzo et al. 2021).[25]

89.    The UME Working Group identified the cause of the Atlantic humpback whale UME as vessel strikes, and the North Atlantic right whale UME as vessel strikes and entanglements.[26]

90.    A vessel strike is a collision between any type of boat and a marine animal in the ocean.  Strikes typically occur when a vessel or an animal fail to make evasive maneuvers when on an intersecting path or when both the vessel and animal avert in the same direction.  All sizes and types of vessels have the potential to collide with nearly any marine species.  Hundreds of vessels transit the coastal waters offshore Rhode Island and Massachusetts on a daily basis.

91.    A recent study published by the Wildlife Conservation Society ("WCS") and Columbia University describes numerous observations during the study of humpback and fin whales with evidence of a previous vessel strike, such as healing or healed boat propeller wounds, missing dorsal fin, or missing part of fluke (tail) (King et al., 2021).  Faster vessel speeds, particularly speeds greater than 10 knots, increase the occurrence and lethality of vessel strikes in large whales (Laist et al., 2001, Vanderlaan et al., 2007).

92.    One of the primary protection measures for North Atlantic right whales is the implementation of vessel speed rules. The foundational speed rule, established in 2008, is the

---

[25]    NMFS,    North    Atlantic    Right    Whale    Stock    Assessment    Reports,    2022, https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-stock-assessments  (last accessed April 25, 2024); Moore, M.J., 2023. Policy enabling North Atlantic right whale reproductive health could save the species. ICES Journal of Marine Science, 80(2), pp. 237-242.

[26] NMFS, 2016-2023 Humpback Whale Unusual Mortality Event Along the Atlantic Coast, https://www.fisheries.noaa.gov/national/marine-life-distress/2016-2023-humpback-whale-unusual-mortality-event-along-atlantic-coast (last accessed April 25, 2024); NMFS, 2017-2023 North Atlantic Right Whale Unusual Mortality Event, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2023-north-atlantic-right-whale-unusual-mortality-event (last accessed April 25, 2024).

seasonal management area ("SMA") designation which requires a mandatory 10-knot speed restriction for most vessels 65 feet and longer operating in specific geographic areas (mainly around larger ports) during peak right whale seasons in those areas. SMA speed rules are voluntary for vessels under 65 feet in length.  However, **all offshore wind vessels, regardless of length, are required to adhere to the 10-knot speed rule through their Lease stipulations**.  Voluntary speed rules are also initiated by NMFS through right whale slow zones and dynamic management area ("DMA") designations.  The slow zones and DMAs are designated through a combination of real-time aerial, vessel, and/or acoustic detections of right whales along the entire east coast of the United States.  When a slow zone or DMA is designated, a notice to mariners is released, along with associated maps, that identifies the location of right whale detection(s) and the zone in which vessels are recommended to operate at 10-knots or less.  As is the case with SMAs, although these slow zones and DMAs are voluntary, **all offshore wind vessels are required through their Lease stipulations to comply with the slow speed restrictions in these zones; and all offshore wind vessels, regardless of size, must transmit AIS data at all times of operation**.

93.    Data from all commercial vessel AIS analyses are publicly available on the NOAA Fisheries North Atlantic Right Whale Active Seasonal Speed Zone Vessel Traffic Dashboard (SMA Dashboard) at https://experience.arcgis.com/experience/315a0a2c4e084cf6ae8babd8c81b07b3/ (last accessed April 25, 2024).  These data provide vessel transit and vessel speed compliance statistics within the geographic bounds of active SMAs.  The most applicable SMAs for the region described in the Plaintiff's declarations include the Block Island Sound, Ports of New York/New Jersey, Entrance to Delaware Bay, and Entrance to Chesapeake Bay SMAs.  The data on the SMA Dashboard showed an average 83% compliance rate for vessels 65 feet or longer (Table).   The

compliance analysis indicates that over 344,000 nautical miles (nm) of transit by vessels 65 feet or longer through the highest density right whale areas, were at speeds above the 10-knot speed limit and thus, were out of regulatory compliance (Table 1). The voluntary compliance for vessels under 65 feet decreases further to an average of 53% for all years between 2018 and 2023, equating to roughly 171,000 nm of transit over 10 knots through the SMAs. **Thus, a substantial proportion of the non-offshore wind maritime vessel traffic is not abiding by the species protections that all offshore wind vessels observe.** This illustrates the importance of considering all variables in a situation when attempting to assign causation, as the correlation of offshore wind vessels in these areas is not the only factor affecting marine mammals, and these factors cannot be considered in isolation.

**Table 1. Percent compliance, transit distances, and transit speeds within four North Atlantic right whale Seasonal Management Areas (SMAs) between 2018 and 2023.**

| Annual Seasonal Management Areas (Block Island Sound, Ports of New York/New Jersey, Entrance to Delaware Bay, Entrance to Chesapeake Bay) | Vessels 65 feet or greater (mandatory) | | | | Vessel under 65 feet (voluntary) | | | |
|---|---|---|---|---|---|---|---|---|
| | Percent compliance by transit distance | Number of transits through SMAs | Total transit distance (nm) within SMAs | Distance (nm) transited at >10knots | Percent compliance by transit distance | Number of transits through SMAs | Total transit distance (nm) within SMAs | Distance (nm) transited at >10knots |
| November 2018–April 2019 | 82% | 26,873 | 108,121 | 19,808 | 51% | 6,446 | 65,917 | 32,273 |
| November 2019–April 2020 | 84% | 27,030 | 500,544 | 81,739 | 54% | 7,147 | 72,981 | 33,520 |
| November 2020–April 2021 | 83% | 28,028 | 490,453 | 82,445 | 52% | 6,643 | 76,658 | 37,041 |
| November 2021–April 2022 | 81% | 26,176 | 456,438 | 85,445 | 56% | 6,126 | 66,337 | 29,168 |
| November 2022–April 2023 | 85% | 29,707 | 498,781 | 74,119 | 54% | 8,029 | 84,902 | 39,191 |

94.    UMEs are also attributed to entanglements, which occur when fishing gear (ropes, buoys, nets) or other marine debris become wrapped around parts of the marine animal inhibiting movement and critical activities, and often causing physical injury as the gear constricts from the weight of towing through the water by the animal.

95.     Specifically, for the Atlantic humpback whale UME, the increased numbers of whale mortalities correlate to climate-related shifts in spatial distribution and abundance of Atlantic humpback whales (Meynecke, J.O 2021) in those waters due to shifts in foraging.  A recent study published by the Wildlife Conservation Society ("WCS") and Columbia University shows that several large whale species (humpback, fin, minke) are using the waters off NY and NJ—particularly in between Montauk Point, NY and Cape May, NJ—as a supplemental feeding area. (King et al., 2021).  The WCS study describes this phenomenon as an "unprecedented climate-driven shift" in whale distribution caused by changing prey availability and/or oceanographic conditions.

96.     Likewise, similar shifts in North Atlantic right whale distribution has been documented    (NOAA,    North    Atlantic    Right    Whale,    available    at https://www.fisheries.noaa.gov/species/north-atlantic-right-whale) (last accessed April 25, 2024; however, unlike Atlantic humpback whales, the North Atlantic right whale population is more susceptible to the long-standing threats of entanglements and vessels strikes both in the U.S. and Canada given its declining status.

97.     Full or partial necropsy examinations were conducted on more than 60% of the stranded minke whales and preliminary findings have shown evidence of human interactions (fishing and vessel) or infectious diseases; however, the data are still being analyzed and no final conclusions are available to date.

98.     No UMEs declared have been attributed to offshore wind surveying or construction associated with offshore wind, nor has surveying or construction been implicated as a contributing cause of any of the UMEs. No UMEs established since 2017 have been declared for other large whales including the ESA-listed fin, sei and sperm whales.  Fin whales are the second most

commonly reported whale in survey mitigation reports which compile 100% of all marine mammal sightings made at any distance from the survey vessels; but no UME has been declared for this species, further evidence of a lack of influence that offshore wind surveys have on UME declarations and whale strandings.

99.    UMEs for large whales are not a new or unique occurrence. The first reported UME for North Atlantic right whales was designated in 1996 due to human interactions in Georgia and Florida. In 2003, a UME was declared for humpback, minke, and fin whales in the Gulf of Maine from Canada to Massachusetts; in 2005, an Atlantic Large Whale UME was declared for minke, fin, sei, and sperm whales for Canada through Maryland; and during 2005-2006 a UME was declared for humpback whales between Maine and Virginia.  The Gulf of Maine humpback whale stock (which is expected to occur in the REV project area) is estimated to be *increasing* in abundance by about 2.8% per year (Hayes et al., 2020),[27] and the North Atlantic right whale stock has shown an estimated *decrease* in abundance of 29.3% from 2011 through 2021 (NMFS, 2024) No trend analysis is available in the most recent stock assessment report for either the minke whale or fin whale stocks present in this region (NMFS, 2024)[28], and only the fin whale is listed as Endangered under the ESA. However, the most recent stock assessment reports do have estimates of annual human-caused mortality and serious injury for all these species which show that the main anthropogenic causes of mortality and serious injury are incidental entanglements in fisheries equipment and vessel strikes, but the estimated rate of mortality or injury attributed to entanglements outnumbers the rate attributed to vessel strikes for all species (Hayes et al., 2020; NMFS, 2024).

---

[27] Hayes, S.A., 2020. U.S. Atlantic and Gulf of Mexico marine mammal stock assessments 2020.

[28] 2023 Marine Mammal Stock Assessment Report Public Comment Draft (noaa.gov).

100.    The overwhelming consensus among agency scientific experts confirms that no marine mammal mortalities have occurred as the result of offshore wind activities:

        a.    NOAA has stated that "[t]here are no known links between large whale mortalities and ongoing offshore wind surveys."[29]

        b.    The Marine Mammal Commission, an independent federal agency tasked with marine mammal conservation, has stated that "[d]espite several reports in the media, there is no evidence to link these strandings to offshore wind energy development."[30]

        c.    The U.S. Department of Energy has stated, "[a]s of now, there is no evidence to support speculation that noise resulting from wind development-related site characterization surveys could potentially cause mortality of whales, and no specific links between recent large whale mortalities and currently ongoing surveys."[31]

101.    These conclusions are consistent with those of the wider scientific community including Rutgers Offshore Wind Energy Collaborative[32] and University of Rhode Island School

---

[29] NOAA Fisheries, Frequent Questions—Offshore Wind and Whales, https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales (last accessed April 25, 2024).

[30] Marine Mammal Commission, "Update on Strandings of Large Whales along the East Coast" (Feb. 21, 2023), https://www.mmc.gov/wp-content/uploads/Update-on-Strandings-of-Large-Whales-along-the-East-Coast-2.21.2023.pdf (last accessed April 25, 2024).

[31] U.S. Department of Energy (Apr. 28, 2023), https://www.energy.gov/articles/addressing-misinformation-offshore-wind-farms-and-recent-whale-mortalities (last accessed April 25, 2024).

[32] Rutgers Offshore Wind Energy Collaborative, "Q&A on Recent Whale Strandings and Offshore Wind Energy Development", https://osw.rutgers.edu/home/recent-whale-strandings/ (last accessed April 25, 2024) ("there are no data or evidence linking whale mortalities to any one specific factor, including offshore wind development").

of Oceanography[33] and environmental non-governmental organizations including the Sierra Club[34] and Natural Resources Defense Council.[35]

102.    To better understand the risk of vessel strikes, the movements of a tagged North Atlantic right whale were displayed alongside the movements of vessels that operate AIS – a near-real time position reporting system required for large vessels under the International Convention for the Safety of Life at Sea ("SOLAS").    This visualization can be viewed at https://www.fisheries.noaa.gov/s3/2023-05/Update-NARW-2021-NJ-NY-Visualization.gif (last accessed April 25, 2024).

## IX.    THE ALLEGED SOUND INVESTIGATIONS PERFORMED BY RAND ARE NOT APPLICABLE TO THE REVOLUTION WIND PROJECT

103.    Plaintiffs rely upon an "independent investigation" by Rand to allege that pile driving noise at a completely different offshore wind project—the Vineyard Wind Project—had higher decibel levels than anticipated by NMFS and BOEM, but this is irrelevant to Plaintiffs'

---

[33] University of Rhode Island, School of Oceanography, "Offshore wind turbines not cause of whale strandings, deaths, says URI ocean engineering professor" (Mar. 24, 2023), https://web.uri.edu/gso/news/offshore-wind-turbines-not-cause-of-whale-strandings-deaths-says-uri-ocean-engineering-professor/#:~:text=News%20%26%20Events-,Offshore%20wind%20turbines%20not%20cause%20of%20whale%20strandings%2C%20deaths,says%20URI%20ocean%20engineering%20professor&text=URI%20expert%20James%20Miller%20says,to%20no%20impact%20on%20whales (last accessed April 25, 2024).

[34] Sierra Club, "Unfounded and Premature: Correlating Wind Turbine Construction with Whale Mortalities" (Jan. 13, 2023), https://www.sierraclub.org/new-jersey/blog/2023/01/unfounded-and-premature-correlating-wind-turbine-construction-whale (last accessed April 25, 2024).

[35] Natural Resources Defense Council, "Whale Strandings Emphasize a Need for Practical Solutions," https://www.nrdc.org/bio/francine-kershaw/whale-strandings-emphasize-need-practical-solutions (last accessed April 25, 2024) ("the sounds produced by offshore wind's pre-construction surveys are much lower in energy than more powerful industrial sources, and tend to be highly directional, making it very unlikely that they drove the whales off New York and New Jersey to strand.").

allegations regarding Revolution Wind. Rand's speculation (¶4) that Revolution Wind "may" use the Orion—the same pile driving vessel that was used in Vineyard Wind—is wrong. Revolution Wind is using the Bokalift 2 pile driving and foundation installation vessel and is using its own noise mitigation measures and support vessels.

104.    A more apt comparison to understand the effectiveness of noise mitigation for Revolution Wind is the field data collected during South Fork Wind construction. Like, Revolution Wind, South Fork Wind used the Bokalift 2 for pile driving and foundation installation. Like, Revolution Wind, South Fork Wind used double big bubble curtains as one means of noise mitigation and an AdBm resonator as a near-pile noise mitigation. Rand says Vineyard Wind's outer bubble curtain radius is "roughly 150 to 200 meters," whereas according to SCOCO for Revolution Wind the inner radius is 57 meters and the outer radius is 103 meters. The precise location and the precise reporting of that location is critical to know (and report) for accurate sound field measurements because the sound levels attenuated by a bubble curtain at 50 meters is entirely different than the sound levels attenuated by a curtain at 150m due to transmission loss. Therefore, the fact that the Rand report states "roughly" indicates a potential source of inaccuracy in both the measurements and reporting.

105.    Rand also reports that a hydrodamper was used during the piling that was measured. In contrast, South Fork Wind used and Revolution Wind will use an AdBm resonator. While both of these serve the same purpose to reduce the amount of noise propagated from the pile strike, they operate in different manners and thus produce different levels of noise attenuation in both amplitude and frequency.

106.    An important point to understand about the sound field verification ("SFV") data collected during pile driving and foundation installation at South Fork Wind is that, in contrast to

the Rand Declaration and his technical report, the methods and equipment used meet rigorous scientific standards for underwater acoustic measurements of high intensity noise sources. Such measurements and associated analysis are complex and must account for ambient noise conditions; hydrophone sensitivity and dynamic range; high pass and/or low pass filters (or lack thereof) built into the hydrophones; slant range (i.e., distance to the sound source in relation to the depth of the hydrophone); and the local conductivity/temperature/depth sound transmission profiles from surface to seabed. Multiple measurements must be taken, simultaneously, at varying distances from the pile to accurately assess the propagated sound field. These methods contrast the methods used by Rand, who took measurements by dipping a single hydrophone from a boat. Limited information is provided about the instrumentation deployment setup used by Rand other than "a hydrophone dipped by hand to a 20 m depth", suggesting the measurements were not conducted according to the standard ISO[36]: 18406:2017. Therefore, the recordings are most likely contaminated by different types of deployment noise such as flow noise, surface heave or mechanical noise (as specified in ISO18406:2017). The depth of the measurement may not be accurately determined using the dipping method described by Rand due to the drift of the unweighted hydrophone and minimally sized cable; there was no indication of what other activities might be present during the recording. Southfork Wind measurements had to comply with the requirements set in ISO:18406:2017, therefore, the findings in the Rand report cannot be readily compared to the measured levels presented in other ISO-compliant SFV reports.

---

[36] ISO stands for the International Organization for Standardization, and is an independent, international standards development organization composed of experts in whatever field the ISO standard is being developed for. The ISO defines a standard as a "document, established by consensus and approved by a recognized body, that provides – for common and repeated use – rules, guidelines or characteristics for activities or for their results, aimed at the achievement of the optimum degree of order in a given context."

107.    On page 5 of the Rand report, it states that RMS levels over 160 dB were measured at over 3.3 kilometers.  These distances are calculated in the Rand report using an alternative definition of the SPLrms metric not identical to the definition in the ISO:18405:2017 standard (as also mentioned in the Rand report), and which is inconsistent the regulatory guidance for acoustic thresholds defined by NMFS under the MMPA (NMFS, 2024).  The Rand report also presents the distance to the 160 dB RMS threshold when the ISO:18405 definition is used in which case the distance is 2 km which is below the permitted IHA distance of 2,739 meters. Additionally, measurement data from this report show SPLrms levels following the ISO:18405 definition and NMFS MMPA acoustic guidelines were an average of 160 dB at 1.59 km, and below 160 dB at 2.48 km – which are lower than the permitted IHA distances for SFW noted above.

108.    The Rand report indicated that (9) "pile driving impulsive peak noise levels measured up to 180 dB over 1 km away".  The acoustic threshold for peak sound pressure level for Level A effects from NMFS (2024) acoustic guidance is 219 dB which defines the minimum peak sound pressure level at which low-frequency cetaceans (i.e., baleen whales) may experience the onset of PTS. This threshold is not discussed in Rand's Technical Report and there is no explanation why this number would be used because it is not associated with any of the current acoustic criteria.  The measurement data tables provided in Appendix D of this report indicate that the 219 dB threshold for PTS in LFC is not met or exceeded, even at the measurement location nearest to the pile.

109.    Rand notes in (12) that vessel noise exceeded the 120 dB behavioral disturbance threshold for non-impulsive, continuous sources during their measurements and that the project did not assess construction-related noise using the 120 dB threshold.  However, per NMFS publication in the Federal Register for issuance of the Revolution Wind LOA, "NMFS

acknowledges the aggregate impacts of Revolution Wind's vessel operations on the acoustic habitat of marine mammals and has considered it in the analysis" (88 FR 72562). Additionally, effects of non-impulsive vessel noise were assessed in the Revolution Wind COP in Section 4.3.4.3 and Appendix Z1, as well as Section 1.3 of the project's ITA which NMFS used as the basis for preparing and publishing their issued LOA.

110.    The Rand (14) discussion of noise levels above a frequency weighted 140 dB behavioral response threshold from their measurements is in reference to the Biological Assessment for the Vineyard Wind Project not the Revolution Wind Project.  The Biological Assessment for the Revolution Wind Project published in 2023 does not use the Wood et al., (2012) probabilistic step function thresholds because it follows the 2023 guidance from NMFS for MMPA and ESA acoustic thresholds (NMFS 2023), which do not include the 140 dB threshold for behavioral disturbances and is therefore not applicable to Revolution Wind.

111.    Construction sound mitigation data gathered during South Fork Wind project has been compiled and analyzed. While the reports are still under review by the Federal government agencies, I am able to verify that they confirm the conservative nature of modelling and efficacy of the noise attenuation system (i.e., double big bubble curtains and AdBm) because the range to acoustic thresholds resulting from pile driving were consistently smaller than predictive modeled ranges.  Effectiveness of noise mitigation depends on how well it is implemented, for example adjusting the distance between the inner and outer bubble curtains, and ensuring sufficient airflow is critical to its efficacy.  Data on position, air flow, and ultimately the sound measurements provided confirmation that the double big bubble curtain was optimized and monitored.  The data also confirm that the mitigation teams were able to detect marine mammals within the required clearance and shutdown zones; and that mitigation measures were successfully implemented.

Given the comparable mitigation planned for Revolution Wind, these confirmations should hold true for its construction activities. Data from South Fork Wind monopile pile driving showed that Level B and Level A harassment ranges were smaller than the ranges modeled by NMFS for the challenged ITAs, including in some instances in which the measured ranges were about half the size of modeled Level B ranges for impact pile driving of monopiles. Similarly, the Level A pile driving ranges also show dramatic differences, with data indicating an up to 80% decrease between modeled and measured ranges in certain circumstances. These reductions in actual ranges from those that were modeled are due both to the conservative nature of NMFS' analysis and to the noise abatement systems that were deployed for the South Fork Wind project and that will also be deployed for Revolution Wind, including a double big bubble curtain and an AdBm resonator.

112.    Marine mammal take calculations in support of the ITAs are designed to provide an estimate of potential exposures to noise levels that meet a minimum, regulatory threshold for acoustic harassment so that project activities remain compliant with the MMPA. NMFS correctly calculated the maximum number of marine mammals that could potentially be harassed by the underwater sound associated with Revolution Wind construction based on the best scientific data and evidence available. This estimate of potential take is not a calculation of the number of marine mammals that will actually be exposed to noise levels above harassment thresholds.

113.    Field data from the recently constructed South Fork Wind Project, which utilized the same foundation installation vessel that Revolution Wind will use and successful  mitigation techniques that will also be employed by Revolution Wind during pile driving, showed that the South Fork **Wind project did not reach or exceed the permissible take limits for any species**. Specifically, professional PSOs stationed on support vessels and the pile driving vessel during construction of SFW reported 348 mysticete whale detections (comprising 552 individual animals)

using visual and acoustic monitoring methods.  Of these total detections, only 29 detections (51 individuals) were made during active pile driving; and of these detections, only 12 (15 individuals) were within the Level B acoustic ranges modeled and field-verified by the SFV and thus would qualify as Level B *Take* under the MMPA.  There were no marine mammals within the Level A ranges during any of the pile driving.  By contrast, a total of 77 mysticete whales were authorized under the MMPA for Level B take during foundation pile driving activities; actual takes represent less than 20% of authorized takes.

114.    For South Fork Wind and Revolution Wind construction, clearance zones have to be monitored visually and acoustically for a minimum of 60 minutes and be clear of all marine mammals for a full 30 minutes before any piling could begin; all piling began with a "soft start" that represented the minimal practical hammer energy to safely stabilize the pile; shutdowns were required for marine mammals entering their respective shutdown zones (which were defined separately for North Atlantic right whales and other large whale species to account for differences in population vulnerability), and post-piling monitoring was required.  Plaintiffs do not consider the level of monitoring and mitigation specifically for protection of marine mammals involved in construction activities for South Fork Wind and Revolution Wind.  The team of monitoring personnel and equipment for South Fork Wind consisted of everything described in Table 2.  This mitigation contingent is in addition to sound mitigation technologies that include double big bubble curtains and an AdBm resonator described later in this declaration.  The Revolution Wind mitigation measures and monitoring team requirements, personnel, and equipment meet or exceed those that were used for South Fork.  The scope of personnel and equipment deployed for each project is developed based on the acoustic and exposure modeling to ensure sufficient coverage and protection for marine mammal species.

**Table 2. Summary of the monitoring and mitigation personnel and equipment on each vessel during SFW construction (from SFW PSO/PAM monitoring report; February 9, 2024)**

| Vessel Name | | Bokalift 2 | Rana Miller | Go Freedom | Berto Miller | Josephine Miller |
|---|---|---|---|---|---|---|
| Vessel Role | | Piling | PSO | PSO | PSO + PAM deployment | PSO + SFV deployment |
| Personnel | | | | | | |
| Visual PSOs | | 4 | 4 | 4 | 4 | 4 |
| PAM Operators | | 2 | 0 | 0 | 0 | 0 |
| Acoustic Reporting Scientist | | 0 | 0 | 0 | 0 | 1 |
| Number PSOs on active watch | | 2 | 2 | 2 | 2 | 2 |
| Number of PAM Operators on duty | | 1 | 0 | 0 | 0 | 0 |
| Deployment / Acoustic support personnel on duty | | 0 | 0 | 0 | 2 | 2 |
| Equipment | Model | | | | | |
| Vessel-mounted Thermal Cameras | Current Corp Cooled – NN 3050 Uncooled - NN 3025 | 2 (1 cooled, 1 uncooled) | 1 uncooled | 1 uncooled | 1 uncooled | 1 uncooled |
| 25 x Binoculars | Fujinon 25 x 150 MT-SX | 2 | 2 | 2 | 2 | 2 |
| PAM Buoys | RSA-ORCA 750-a1 | 0 | 0 | 0 | 4 | 0 |
| Binoculars (reticle) | Varied | 2 | 2 | 2 | 2 | 2 |
| Marine Binoculars | Varied | 2 | 2 | 2 | 2 | 2 |
| Digital cameras | Varied | 2 | 2 | 2 | 2 | 2 |
| PAM Hydrophone Moorings | TR-FLOAT | 0 | 0 | 0 | 4 | 0 |
| Mysticetus System | Mysticetus Advanced | 1 | 1 | 1 | 1 | 1 |

115.    Measured distances to the thresholds from the South Fork Wind Construction Underwater SFV report, compared to the expected ranges based on the acoustic modeling conducted by Denes et al. (2020), are provided in the table below, and show that all ranges were below what was modeled.

**Table 3. Summary of Modeled vs. Measured Distances to the Marine Mammal Acoustic Thresholds during SFW Construction (from SFW SFV report 5 April 2024)**

| Hearing Group | SEL$_{24h}$ Measured Distance[1] | Expected Range from Modeling Report | SPL Measured Distance[1] | Expected Range from Modeling Report |
|---|---|---|---|---|
| LFC | 1,480 m | 8,692 | 2,444 m | 4,684 m |
| MFC | 45 m | 60 | 2,444 m | 4,684 m |
| HFC | 742 m | 3,627 | 2,444 m | 4,684 m |
| PPW | 144 m | 1,143 | 2,444 m | 4,684 m |

[1]Represents the average of all pile installation measurement data for which effective mitigation was in place.

## X.    CORRELATION BETWEEN OFFSHORE WIND VESSEL TRAFFIC AND REPORTED WHALE STRANDINGS PUT FORTH BY GERASOULIS

116.    The analysis from Gerasoulis indicates a correlation between offshore wind survey vessel presence and whale strandings.  The correlation is simply that offshore wind survey vessels are present in the same general regions as some of the marine mammal stranding events; however, this correlation could be made for any selected vessel type over the same time period and in the same geographic location.  Similar maps could be produced for fishing vessels, tanker ships, or container ships.   Understanding the difference between correlation and causation is one of the foundational attributes of the scientific process.  Correlation means there is a relationship between two different variables but does not indicate the nature of this relationship.  Causation means that one variable is influencing another (Chen, 2021).  In order to prove causation, rigorous statistical analysis must be performed that explores all potential variables and influences, not just geographic overlap.  Geographic overlap in an important indicator of strike risk when analyzed in context of whale presence, density and activity and correlated to vessel sizes, speeds, routes, and mitigation.

117.    The conclusions presented by Gerasoulis that increased vessel traffic increases whale deaths are not sufficient to assign causation as they do not account for 1) all sources of vessel traffic in the region; and 2) all sources of whale mortalities.  As discussed previously, marine

traffic in the region has generally increased due increases in global trade, port developments, and technology developments, so the offshore wind survey vessels are not the only change in maritime traffic observed in the region during the period from 2015-2023 assessed by Gerasoulis. The analysis did not include reference to the potential effects of non-offshore wind survey vessel traffic (or any other factors) on the large whale mortality trends to sufficiently rule them out as a contributing variable.

118.    Offshore wind survey vessels not only adhere to all required speed restrictions, they also typically survey at speeds of less than 7 knots and are required to conduct continuous monitoring and marine species reporting. Therefore, even with the small increase in vessel activity in the region, the risk of vessel strike from a survey vessel is low and the risk of severe injury if a strike were to occur is even lower. Again, geographic overlap of the activity is not enough to fully evaluate the risk of vessel strike by any group of vessels.

119.    NMFS (2023) also describes habitat issues, climate change, prey availability, and expansion of the aquaculture industry as other notable contributors to potential mortalities and the overall status of this stock; all factors not addressed in Gerasoulis' declaration. Therefore, it is insufficient to only consider one variable when assessing the reported whale strandings as a potential cause, and all potential sources of impact must be assessed together.

## XI.    CONCLUSION

120.    Experts and professionals in the field of underwater acoustics and marine mammal biology and behavior overwhelmingly support the fact that offshore wind activities are not, as Plaintiffs claim, the cause nor a contributing factor either directly or indirectly for whale strandings from the last 5 years.

121.    The expert Working Group charged with investigating possible UME situations and

recommending appropriate responses determined the primary cause of these UMEs is direct impacts from entanglement, vessel strikes, and in some cases with contributing morbidity from diseases and toxins.  There are increasing volumes of high-speed large vessel traffic combined with shifting distribution in large whales; therefore, there is more than just a geographic overlap that has been documented as causal over last decade (Redfern et al., 2020; Laist et al 2001; Winkler et al., 2020).

122.    NMFS' take calculations are conservative estimates of the maximum number of marine mammals that could potentially be harassed by the offshore wind construction, and are based on the best available science and widely accepted modelling principals.  Plaintiffs' attempts to undermine these calculations with unsupported assertions that are not based in the best scientific evidence available are not credible.

123.    Lack of ISO-compliant methods and the lack published, scientifically acceptable methods used for sound field verification in the Rand report render those results inapplicable for comparison to any past or future sound field measurements from South Fork or Revolution Wind.

124.    Plaintiffs are ignoring a number of widely-accepted issues around whale strandings and UMEs that have been in place for nearly a decade and are drawing comparisons and conclusions with no scientific basis.  This misplaced effort confuses the public, conflates scientific fact with non-factual, pseudo-science, and ultimately does a significant disservice to the whales.

125.    Mitigation measures and sound field measurements conducted during South Fork Wind construction showed high efficacy of the noise mitigation system be producing Level A and Level B acoustic ranges that were smaller (in many cases by 50%) than the ranges produced by predictive modeling.  Therefore, the risk of acoustic exposure is lower than predicted.

126.    Marine species monitoring by PSOs on South Fork construction was successful

with both large and small marine mammals documented. The PSOs were therefore able to successfully identify marine mammals near or in the clearance and shutdown zones and were thus able to implement successful mitigation measures further reducing the risk of acoustic exposures.

127.    Given that the mitigation measures, equipment, personnel, and requirements set forth in the ITA for Revolution Wind meet or exceed those that were used for South Fork wind construction, it can be reasonably assumed that these measures will be successful when implemented at Revolution Wind given the similarity of location, species, and operations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 25, 2024.

_____
Mary Jo Barkaszi

## Scientific Literature and Reports Cited

Bureau of Ocean Energy Management. (BOEM) (2021), Baker K, Howson U. 2021, Data collection and site survey activities for renewable energy on the Atlantic Outer Continental Shelf. Biological assessment. Sterling (VA): U.S. Dep't of the Interior.

Bureau of Ocean Energy Management. (BOEM) (2021) Final Environmental Assessment - Commercial and Research Wind Lease and Grant Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf of the New York Bight, https://www.boem.gov/sites/default/files/documents//NYBightFinalEA_BOEM_2021-073.pdf (last accessed April 25, 2024).

Bureau of Ocean Energy Management. (BOEM) (2023) Revolution Wind Farm and Revolution Wind Export Cable – Development and Operation Biological Assessment, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/RevWind_NMFS%20BA.pdf (last accessed April 25, 2024).

Clark, C.W., and Gagnon, G.C. 2002. Low-frequency vocal behaviors of baleen whales in the North Atlantic: Insights from IUSS detections, locations and tracking from 1992 to 1996. J. Underwater Acoust. (USN), 52 (3):609–640.

Davies, K. T. A., Brown, M. W., Hamilton, P. K., Knowlton, A. R., Taggart, C. T., & Vanderlaan, A. S. M. (2019). Variation in North Atlantic right whale *Eubalaena glacialis* occurrence in the Bay of Fundy, Canada, over three decades. *Endangered Species Research*, https://doi.org/10.3354/esr00951 (last accessed April 25, 2024).

Estabrook, B. J., Hodge, K. B., Salisbury, D. P., Ponirakis, D., Harris, D. V., Zeh, J. M., Parks, S. E., & Rice, A. N. (2020). *Year-2 Annual Survey Report for New York Bight Whale Monitoring Passive Acoustic Surveys October 2018- October 2019*.

Estabrook, B. J., Hodge, K. B., Salisbury, D. P., Rahaman, A., Ponirakis, D., Harris, D. V., Zeh, J. M., Parks, S. E., & Rice, A. N. (2021). *Final Report for New York Bight Whale Monitoring Passive Acoustic Surveys October 2017- October 2020*.

Finneran, J. J. (2012). Auditory effects of underwater noise in odontocetes. *The Effects of Noise on Aquatic Life*, 197-202.

Frankel, Adam. "A comparison of visual and acoustic marine mammal monitoring methods." *The Journal of the Acoustical Society of America* 112.5_Supplement (2002): 2399-2399.

Gardline (2016). Survey report for Lease 500: Field verification and vessel signature report. Gardline, Norfolk, England. 62 pages.

Gardline (2017). Technical memo in support of Lease 500 field verification report. Gardline, Norfolk, England. 3 pages.

Gardline (2017a) Technical Memo to Orsted (then DONG Energy) for sparker field measurements. 3 pages.

Hayes, S. A., Josephson, E., Maze-Foley, K., Rosel, P. E., & Turek, J. (2021). *US Atlantic and Gulf of Mexico Marine Mammal Stock Assessments 2020*. (NOAA Technical Memorandum NMFS-NE-271).

Hildebrand, J. A. (2009). Anthropogenic and natural sources of ambient noise in the ocean. *Marine Ecology Progress Series*, *395*, 5-20, https://doi.org/10.3354/meps08353.

Johnson H, Morrison D, Taggart C (2021). WhaleMap: a tool to collate and display whale survey results in near real-time. Journal of Open Source Software, 6(62), 3094, https://joss.theoj.org/papers/10.21105/joss.03094 (last accessed April 25, 2024).

King, K., Joblon, M., McNally, K., Clayton, L., Pettis, H., Corkeron, P., & Nutter, F. (2021). Assessing North Atlantic Right Whale (*Eubalaena glacialis*) Welfare. *Journal of Zoological and Botanical Gardens*, *2*(4), 728-739, https://doi.org/10.3390/jzbg2040052 (last accessed April 25, 2024).

Knowlton, A., Pettis, H., Kraus, S., & Aquarium, N. E. (2018). Right whale entanglement and scarring data: 2010-2018. *How can these data help inform management efforts*.

Kraus, S. D., Leiter, S., Stone, K., Wikgren, B., Mayo, C., Hughes, P., Kenney, R. D., Clark, C. W., Rice, A. N., Estabrook, B., & Tielens, J. (2016). *Northeast Large Pelagic Survey Collaborative Aerial and Acoustic Surveys for Large Whales and Sea Turtles.* (OCS Study BOEM 2016-054). Sterling, Virginia.

Laist, D.W., Knowlton, A.R., Mead, J.G., Collet, A.S. and Podesta, M., 2001. Collisions between ships and whales. Marine Mammal Science, 17(1), pp.35-75.

Leiter, S., Stone, K., Thompson, J., Accardo, C., Wikgren, B., Zani, M., Cole, T., Kenney, R., Mayo, C., & Kraus, S. (2017). North Atlantic right whale Eubalaena glacialis occurrence in offshore wind energy areas near Massachusetts and Rhode Island, USA. *Endangered Species Research*, *34*, 45-59, https://doi.org/10.3354/esr00827 (last accessed April 25, 2024).

MAI. (2018). Final report for Oceaneering International, Inc. Sound source verification: Supporting Deepwater Wind's Skipjack Wind Farm Project off Maryland and Delaware. MAI 1046, TN 18-026, Arlington, Virginia. 21 pages.

Marine Mammal Commission (Feb. 21, 2023) Update on Strandings of Large Whales along the East Coast, https://www.mmc.gov/wp-content/uploads/Update-on-Strandings-of-Large-Whales-along-the-East-Coast-2.21.2023.pdf (last accessed April 25, 2024).

Marine Mammal Stranding Coalition, https://mmsc.org/stranding-statistics (last accessed April 25, 2024).

Meyer-Gutbrod, Erin L., Kimberley TA Davies, Catherine L. Johnson, Stephane Plourde, Kevin A. Sorochan, Robert D. Kenney, Christian Ramp, Jean-Francois Gosselin, Jack W. Lawson, and Charles H. Greene. "Redefining North Atlantic right whale habitat-use patterns under climate change." *Limnology and Oceanography* (2022).

Meynecke, J.O., De Bie, J., Barraqueta, J.L.M., Seyboth, E., Dey, S.P., Lee, S.B., Samanta, S., Vichi, M., Findlay, K., Roychoudhury, A. and Mackey, B., 2021. The role of environmental drivers in humpback whale distribution, movement and behavior: A review. Frontiers in Marine Science, 8.

Moore, M.J. (2023) Policy enabling North Atlantic right whale reproductive health could save the species. ICES Journal of Marine Science, 80(2), pp.237-242.

Murray, A., Rekdahl, M. L., Baumgartner, M. F., & Rosenbaum, H. C. (2022). Acoustic presence and vocal activity of North Atlantic right whales in the New York Bight: Implications for protecting a critically endangered species in a human-dominated environment. *Conservation Science and Practice*, *4*(11), e12798.

National Marine Fisheries Service. (NMFS) (2013).  Endangered Species Act Section 7 Consultation Biological Opinion Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf in Massachusetts, Rhode Island, New York and New Jersey Wind Energy Areas NER-2012-9211 GARFO-2012-00011.

National Marine Fisheries Service. (NMFS) (2016-2023) Humpback Whale Unusual Mortality Event Along the Atlantic Coast, U.S. Dept. of Commer., NOAA, https://www.fisheries.noaa.gov/national/marine-life-distress/2016-2023-humpback-whale-unusual-mortality-event-along-atlantic-coast (last accessed April 25, 2024).

National Marine Fisheries Service. (NMFS) (2017-2023) North Atlantic Right Whale Unusual Mortality Event, U.S. Dept. of Commer., NOAA, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2023-north-atlantic-right-whale-unusual-mortality-event (last accessed April 25, 2024).

National Marine Fisheries Service. (NMFS) (2018). 2018 Revisions to: Technical Guidance for Assessing the Effects of Anthropogenic Sound on Marine Mammal Hearing (Version 2.0): Underwater Thresholds for Onset of Permanent and Temporary Threshold Shifts. U.S. Dept. of Commer., NOAA. NOAA Technical Memorandum NMFS-OPR-59, 167.

National Marine Fisheries Service. (NMFS) (2022) North Atlantic Right Whale Draft Stock Assessment Reports, U.S. Dept. of Commer., NOAA, https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-stock-assessments (last accessed April 25, 2024).

National Marine Fisheries Service. (NMFS) (2022) Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Construction of the South Fork Offshore Wind Project, 87 Fed. Reg. 806, U.S. Dept. of Commer., NOAA.

National Marine Fisheries Service. (NMFS) (2022) Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Marine Site Characterization Surveys in the Area of Commercial Lease of Submerged Lands for Renewable Energy Development on the Outer Continental Shelf (OCS) Lease Areas OCS-A 0486, 0487, and 0500, 87 Fed. Reg. 61575, U.S. Dept. of Commer., NOAA.

National Marine Fisheries Service. (NMFS) Active and Closed Unusual Mortality Events, U.S. Dept. of Commer., NOAA, https://www.fisheries.noaa.gov/national/marine-life-distress/active-and-closed-unusual-mortality-events (last accessed April 25, 2024).

National Marine Fisheries Service. (NMFS) Frequent Questions—Offshore Wind and Whales, Dep't of Commer., NOAA, https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales (last accessed April 25, 2024).

National Marine Fisheries Service. (NMFS) Summary of Atlantic Marine Mammal Stock Assessment Reports for Stocks of Marine Mammal Under NMFS Authority that occupy Waters Under USA Jurisdiction, https://www.fisheries.noaa.gov/s3/2024-01/Draft-2023-MMSARs-Public-Comment.pdf (last accessed April 25, 2024).

Kelley, D.E., Vlasic, J.P. and Brillant, S.W., 2021. Assessing the lethality of ship strikes on whales using simple biophysical models. Marine Mammal Science, 37(1).

Kershaw, F, Chase, A (Jan. 23, 2023) Whale Strandings Emphasize a Need for Practical Solutions, Natural Resources Defense Council, https://www.nrdc.org/bio/francine-kershaw/whale-strandings-emphasize-need-practical-solutions (last accessed April 25, 2024).

National Marine Fisheries Service, Summary of Marine Mammal Protection Act Acoustic Thresholds (Feb. 2023), https://www.fisheries.noaa.gov/s3/2023-02/MMAcousticThresholds_secureFEB2023_OPR1.pdf (last accessed April 25, 2024).

National Marine Fisheries Service, Summary of Endangered Species Act Acoustic Thresholds (Marine Mammals, Fishes, and Sea Turtles), https://www.fisheries.noaa.gov/s3/2023-02/ESA%20all%20species%20threshold%20summary_508_OPR1.pdf (last accessed April 25, 2024).

National Marine Fisheries Service, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode Island, 88 Fed. Reg. 72562 (Oct. 20, 2023), https://www.federalregister.gov/documents/2023/10/20/2023-22056/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the#h-31 (last accessed April 25, 2024).

New Jersey Department of Environmental Protection (March 15, 2023) NJDEP Statement on East Coast Whale Mortalities, https://www.nj.gov/dep/newsrel/2023/23_0021.htm (last accessed April 25, 2024).

Noise Control Engineering (NCE) (2018). Sound field verification report provided to Orsted.

Nowacek, Douglas P., Mark P. Johnson, and Peter L. Tyack. "North Atlantic right whales (Eubalaena glacialis) ignore ships but respond to alerting stimuli." *Proceedings of the Royal Society of London. Series B: Biological Sciences* 271.1536 (2004): 227-231.

Pijanowski, B. C., Villanueva-Rivera, L. I., Dumyahn, S. L., Farina, A., Krause, B. L., Napoletano, B. M., Gage, S. H., & Pieretti, N. (2011). Soundscape ecology: the science of sound in the landscape. *BioScience*, *61*(3), 203-216.

Quintana-Rizzo, E., Leiter, S., Cole, T., Hagbloom, M., Knowlton, A., Nagelkirk, P., Brien, O., Khan, C., Henry, A., & Duley, P. (2021). Residency, demographics, and movement patterns of North Atlantic right whales Eubalaena glacialis in an offshore wind energy development area in southern New England, USA. *Endangered Species Research*, *45*, 251-268.

Peng, Y., Tsouvalas, A., Metrikine, A. and Belderbos, E., 2018, January. Modelling and development of a resonator-based noise mitigation system for offshore pile driving. In Proceedings of the 25th International Congress on Sound and Vibration.

Redfern, J.V., Becker, E.A. and Moore, T.J., 2020. Effects of variability in ship traffic and whale distributions on the risk of ships striking whales. Frontiers in Marine Science, 6, p.793.

Richardson, W. J., Miller, G. W., & Greene Jr, C. R. (1999). Displacement of migrating bowhead whales by sounds from seismic surveys in shallow waters of the Beaufort Sea. *The Journal of the Acoustical Society of America*, *106*(4), 2281-2281.

Roberts, J. J., Best, B. D., Mannocci, L., Fujioka, E., Halpin, P. N., Palka, D. L., Garrison, L. P., Mullin, K. D., Cole, T. V. N., Khan, C. B., McLellan, W. M., Pabst, D. A., & Lockhart, G. G. (2016). Habitat-based cetacean density models for the U.S. Atlantic and Gulf of Mexico. *Scientific Reports*, *6*, 22615.

Roberts, J. J., Yack, T., & Halpin, P. N. (2022). *Habitat-based Marine Mammal Density Models for the U.S. Atlantic: Latest Versions (last updated 20 June 2022), provided by Duke University Marine Geospatial Ecology Laboratory, v.12*. Retrieved 11 April 2023 from https://seamap.env.duke.edu/models/Duke/EC/ (last accessed April 25, 2024).

Rosenbaum, H. C., Rekdahl, M., & Del Greco, L. (2021). *Assessing Cetacean Presence in the New York Harbor Using Passive Acoustic Monitoring*. (January 2021).

Ruppel, C. D., Weber, T. C., Staaterman, E. R., Labak, S. J., & Hart, P. E. (2022). Categorizing Active Marine Acoustic Sources Based on Their Potential to Affect Marine Animals. *Journal of Marine Science and Engineering*, *10*(9), 1-46. https://doi.org/10.3390/jmse10091278 (last accessed April 25, 2024).

Rutgers Offshore Wind Energy Collaborative, Q&A on Recent Whale Strandings and Offshore Wind Energy Development, Rutgers Univ., https://osw.rutgers.edu/home/recent-whale-strandings/ (last accessed April 25, 2024).

Sierra Club (Jan. 13, 2023) Unfounded and Premature: Correlating Wind Turbine Construction with Whale Mortalities, https://www.sierraclub.org/new-jersey/blog/2023/01/unfounded-and-premature-correlating-wind-turbine-construction-whale (last accessed April 25, 2024).

Smith, S.E., Brown, D.M., Oliveras, J.R., Sieswerda, P.L., Ahearn, S. and Reiss, D., 2022. A preliminary study on humpback whales lunge feeding in the New York Bight, United States. Frontiers in Marine Science, 9.

State of New Jersey *et al.* (Sept. 2020) New Jersey Offshore Wind Strategic Plan, https://www.nj.gov/bpu/pdf/Final_NJ_OWSP_9-9-20.pdf (last accessed April 25, 2024).

University of Rhode Island, School of Oceanography (Mar. 24, 2023) Offshore wind turbines not cause of whale strandings, deaths, says URI ocean engineering professor, https://web.uri.edu/gso/news/offshore-wind-turbines-not-cause-of-whale-strandings-deaths-says-uri-ocean-engineering-professor/#:~:text=News%20%26%20Events-,Offshore%20wind%20turbines%20not%20cause%20of%20whale%20strandings%2C%20deaths,says%20URI%20ocean%20engineering%20professor&text=URI%20expert%20James%20Miller%20says,to%20no%20impact%20on%20whales (last accessed April 25, 2024).

U.S. Department of Energy (Apr. 28, 2023) Addressing Misinformation on Offshore Wind Farms and Recent Whale Mortalities, https://www.energy.gov/articles/addressing-misinformation-offshore-wind-farms-and-recent-whale-mortalities (last accessed April 25, 2024).

Yale Environment 360, The East Coast Whale Die-Offs: Unraveling the Causes (Mar. 8, 2023), https://e360.yale.edu/features/humpback-whale-strandings-u.s.-east-coast (last accessed April 25, 2024).

Vanderlaan, A.S. and Taggart, C.T., 2007. Vessel collisions with whales: the probability of lethal injury based on vessel speed. Marine mammal science, 23(1), pp.144-156.

Van Parijs, S.M., A I DeAngelis, T Aldrich, R Gordon, A Holdman, J A McCordic, X Mouy, T J Rowell, S Tennant, A Westell, G E Davis (2023). Establishing baselines for predicting change in ambient sound metrics, marine mammal, and vessel occurrence within a US offshore wind energy area, ICES Journal of Marine Science.

Winkler, C., Panigada, S., Murphy, S. and Ritter, F., 2020. Global numbers of ship strikes: an assessment of collisions between vessels and cetaceans using available data in the IWC ship strike database. IWC B, 68.

Wood, J., Southall, B. L., & Tollit, D. J. (2012). *PG&E offshore 3-D Seismic Survey Project EIR – Marine Mammal Technical Draft Report*. (SMRUL-NA0611ERM).

## **Exhibit A**

Curriculum Vitae of Mary Jo Barkaszi



**MARY JO BARKASZI**

**Director, Offshore Wind and Renewable Ocean Energy**
**Marine Mammals Programs Manager**

**Education**

*Master of Science in Biological Oceanography, Florida Institute of Technology, 1990*

*Bachelor of Science in Biology, Wittenberg University, 1986*

Ms. Barkaszi's 30-year career has been integral with the evaluation and mitigation of impacts on marine mammals, sea turtles, and other vulnerable species with implementation of the Marine Mammal Protection Act, Endangered Species Act, and other regulatory guidelines throughout the world. Presently, as a senior scientist with CSA Ocean Sciences, she is the Director of Offshore Wind and Renewable Ocean Energy where she provides clients with science-based solutions for marine species assessment to achieve successful project implementation. Under her guidance, CSA stays at the forefront of marine species issues as they relate to the ever increasing and evolving ocean energy initiatives.

In the past several years, she was the lead for over a dozen Incidental Take Authorizations (ITA) applications for offshore wind development, LNG facilities, seismic surveys, and nearshore construction projects. She is subject matter expert (SME) and contributing author for several Construction and Operation Plans, mitigation plans, and marine species research programs involving the use of novel technology to assist in marine mammal detection and protection.

Ms. Barkaszi has been a member of multiple National Oceanic and Atmospheric Administration (NOAA) science teams for aerial, shipboard, and acoustic marine mammal surveys for which she implemented transect-based population surveys for scientific data collection and species stock assessments. As a member of the Acoustical Society of America (ASA) *American National Standards Institute* (ANSI) Passive Acoustic Monitoring (PAM) Standards Working Group, she has been instrumental in developing the technical standards for PAM implementation for mitigation and monitoring.

Ms. Barkaszi's experience in acoustics includes: the study design, deployment and analysis of long term acoustic recorder data deployed for environmental baseline surveys and mitigation zone verification for project around the world; modeling studies for pile driving in coastal waters and LNG deep water port facilities; project manager for a marine soundscape biodiversity studies for the National Park Service; and acoustic tracking sperm whales as part of the Deepwater Horizon oil spill assessment.

Ms. Barkaszi completed a BOEM contract to assess mitigation compliance and effectiveness of vessel-based observer data in the Gulf of Mexico collected during deepwater geophysical surveys conducted between 2002 and 2015. This is the largest and most comprehensive assessment of seismic mitigation data in the United States.

In addition to U.S.-focused work Ms. Barkaszi has been an invited speaker to international regulatory agencies including Brazil (Brazilian Institute of Environment and Renewable Natural Resources [IBAMA]), South Africa (Department of Environmental Affairs [DEA]), and Suriname (National Institute for Environment & Development [NIMOS]), to provide instruction on acoustic impact assessment and mitigation specific to each region.

**CSA**

**MARY JO BARKASZI**

## KEY PROJECT EXPERIENCE

**2012 to Present: CSA Ocean Sciences Inc.**

- Technical lead for vessel strike risk model development for large whales and sea turtles in the Atlantic OCS
- Technical lead for thermal camera technology applications for vessel strike avoidance on global vessel fleets
- Technical lead for BOEM-contracted passive acoustic monitoring algorithm development to determine localization effectiveness of towed acoustic systems for low frequency whales
- Technical lead for Joint Industry Programme-funded acoustic analysis development for determining the effective range of species call detections from hydrophones within a PAMguard software module
- Lead the completion of white papers assessing the acoustic impacts from parametric subbottom profilers and UXO removals associated with offshore wind farm activities
- Subject matter expert for marine mammals, sea turtles, and ESA-listed fish species for BOEM/NMFS/USFWS NEPA consultation documents.
- Technical Lead for incidental take applications for offshore wind development and assist with authoring the marine mammal sections of the client's Construction and Operation Plan (COP) for BOEM.
- Project manager and technical lead for acoustic modeling and impact analysis for the construction and operation of the Delfin LNG and LNG-21 offshore port facilities, Gulf of Mexico.
- Project manager and technical lead for data analysis for 12 years of visual and acoustic mitigation monitoring for protected species during seismic surveys in the Gulf of Mexico under a BOEM-funded contract.
- Project manager and technical lead for NOAA IHA application for decommissioning of the Neptune LNG deepwater port, Massachusetts Bay.
- Project Manager for marine soundscape biodiversity study for the National Park Service, Dry Tortugas National Park, for long-term assessment marine habitat quality using autonomous acoustic recorders.
- Project Manager for an observer data quality assurance program, agency comment procurement, and administrative record delivery during the 2015 Shell Alaska Venture in the Chukchi Sea.
- Project Manager for the BOEM Pressure Wave and Acoustic Study which collected and analyzed underwater measurements of pressure produced by explosive decommissioning of oil platforms.
- Member of American Acoustical Society standards task force researching passive acoustic monitoring systems used for mitigation and monitoring.
- Project Manager for acoustic tracking of sperm whales in the Northern Gulf of Mexico. This program was completed under contract to Oregon State University.



**MARY JO BARKASZI**

- Primary Author for a publication of mitigation standards assessment for Africa, Europe, and the Middle East under contract to the International Association of Geophysical Contractors (IAGC).

**2010 to 2012: ECOES Consulting, Inc. – Protected Species Specialist**

- Technical lead for program to acoustically track short-finned and long-finned pilot whales in the U.S. Mid-Atlantic outer continental shelf

- Aerial Marine Mammal Observer for NOAA Atlantic Marine Assessment Program for Protected Species (AMAPPS) program in the Northeast region.

- Marine species consultant for shuttle launch pad multi-user environmental assessment. Innovative Health Applications, Kennedy Space Center, Florida.

- Co-Investigator/marine mammal and turtle specialist for Normandeau Associates/BOEM pilot study of aerial high-definition surveys for seabirds, marine mammals, and sea turtles on the Atlantic outer continental shelf.

- Marine Mammal Protection Act / Endangered Species Act compliance and mitigation monitoring for Neptune LNG deepwater port construction and maintenance, Massachusetts Bay.

- Subject matter expert (subcontractor) for BOEM-funded study comparing digital aerial surveys, vessel surveys, and manned aerial surveys for conduction marine mammal and sea turtle assessment in wind energy areas.

**2008 to 2010: RPS Energy – Vice President of Protected Species Compliance and Global MMO Coordinator**

- Developed web-based conservation and compliance modules for an interactive database to formulate best practices methodologies for oil and gas exploration in developing countries and under-represented oceans.

- Responsible for visual and acoustic protected species observer programs throughout the U.S. and global regions covered by RPS Energy. Coordinated closely with other RPS observer offices to develop global pool (200+) of trained protected species observers.

**2002 to 2008: GEOCet, LLC – Founder, Co-Owner and Protected Species Manager**

- Grew the offshore oil and gas division of ECOES and established a separate corporation, GeoCet LLC, designed strictly to meet the needs of oil and gas exploration federal compliance requirements.

- Responsible for protected species observer programs in federal U.S. waters working on seismic vessels, pile driving, wind farm construction, explosive removals and MMS lease surveys throughout U.S. and its territories. Responsible for approximately 100 personnel.

- Conducted offshore migratory bird censuses for oil and gas structures and developed PAM techniques for marine mammals throughout the Gulf of Mexico.

- Developed PAM techniques for Gulf of Mexico marine mammals.

**2001 to 2008: ECOES Consulting, Inc. – Founder, Owner, Ecologist**

- Project Manager, Protected Species Program. Northeast Gateway LNG deepwater port construction and early-alert auto acoustic buoy test program

- Marine mammal/turtle specialist for biological characterization of borrow sites offshore East Florida and West Florida Coasts for the Mineral Management Service.

- Project Manager, Protected Species Program. Various explosive severance projects in deep water Gulf of Mexico. Included aerial, platform and acoustic monitoring

- Project Manager, Protected Species Program. U.S. Army Corps of Engineers Miami Harbor Deepening (Phase II) Project.

- Project Manager, Protected Species Program, Massachusetts Hubline Construction Project.

- Founded ecology-based consulting firm focusing on listed and imperiled species assessment and protection. Grew company as a woman-owned small business working closely with agencies and clients to reconcile practical needs with rigorous environmental protection. Specific projects include:

  o Development, implementation and coordination of aerial and boat observers for the protected marine species watch plan for the film industry using regulated waters in the Miami area.

  o Development, implementation and coordination of all observer activities for protected marine species during sub aqueous blasting in Boston Harbor HubLine per specifications under the Northeast Region of the National Marine Fisheries Service (NMFS).

  o Project manager and primary (aerial) observer for listed species protection program and provided all observers for the protected marine species watch plan (marine mammals, turtles and anadromous fish) for 2-year U.S. Army Corps of Engineers (USACE) expansion project in the Cape Fear River Estuary, Wilmington, North Carolina.

  o Development, implementation, and coordination of all observer activities for protected marine species during bridge demolition using explosives: USACE Palm Valley Bridge Project, Florida Department of Transportation (DOT) Fuller-Warren Bridge, and Georgia DOT Sydney-Lanier Bridge Projects.

  o Migratory bird nesting surveys for USACE Jacksonville District construction and dredging operations.

  o Drafted and produced education plan and educational materials for USACE to be used during construction and dredging activities that could potentially impact gopher tortoises and Eastern indigo snakes. The education plan and materials have become part of the Corp's specifications on selected projects.

  o Project manager for St. Johns River Water Management District public education contract for a five-county, four-basin area project concerning watershed issues.

  o Lead ecologist for Florida Communities Trust faunal surveys for sites in Cocoa Beach, Cape Canaveral, and Thousand Islands.

  o Project manager and primary observer for listed species protection program. Provided all observers for the protected marine species watch plan (marine mammals, turtles and anadromous fish) in the Cape Fear River Estuary, Wilmington, North Carolina.

  o Project manager for Florida Fish and Wildlife Conservation Commission's Florida Advisory Council on Environmental Education Grant involving public education about non-point source pollution, seagrass, and the manatee in Brevard County, Florida.

- o Environmental services including Phase 1 assessment, protected species surveys, land management plans, cultural resource surveys, hydrological analysis and technical writing for the City of Cocoa, Mud Lake Restoration Project.
- o NMFS-approved protected species protection program coordinator and observer coordinator for blasting and dredging operations in San Juan Harbor, San Juan, Puerto Rico.
- o Department of Environmental Protection (DEP) Endangered Species watch coordinator and primary (aerial) protected species observer for Volusia County Mosquito Control District impoundment restoration.
- o DEP Endangered Species watch coordinator and primary (aerial) protected species observer for blasting activities at Atlantic Dry Dock, Jacksonville, Florida.
- o Ecologist for Port Canaveral Environmental Services.

**1990 to 1995: NASA Life Sciences Contract – Conservation Biologist**

- ■ Conservation biologist for the NASA life sciences support contract on John F. Kennedy Space Center (KSC). Responsibilities include collection, monitoring, and interpretation of wildlife data for utilization in environmental assessments, long term monitoring, and management activities. Operated GIS (ArcInfo) software to implement conservation planning and to monitor threatened and endangered species habitat. Produced educational programs for all class levels as well as for teachers. Conducted extensive field work and data analysis concerning State- and Federally-listed species.

**1987 to 1990: Florida Institute of Technology – Graduate Research Assistant**

- ■ Performed research and teaching duties in the Oceanography/Ocean Engineering/Environmental Sciences Department.

- ■ Master's Thesis: Comparisons in macrofaunal habitat use between the seagrass, *Halodule wrightii,* and the macroalga, *Caulerpa prolifera*.

- ■ Chief Scientist (1989) for research and teaching duties for baseline oceanographic data collection throughout continental shelf, Gulf Stream and Bahaman Bank ecosystems for ocean-going research cruises.

- ■ Coordinator for the marine mammal stranding network, east-central Florida region.

- ■ Provided extensive assistance to studies involving the use of oil ash blocks as artificial reefs and manatee scar pattern recognition studies at winter refugia.

**1986 to 1987: Mote Marine Laboratory – Biological Technician**

- ■ Field collection and data analysis for the following projects: zooplankton and ichthyoplankton entrainment studies for fine mesh screen instrumentation at the Tampa Electric Company; submerged aquatic vegetation mapping at Crystal River power plant and Myakka River estuary; marine mammal aerial surveys and stranding response; benthic fauna sorting and identification; and Snook/Redfish capture and captive breeding stock maintenance.



**MARY JO BARKASZI**

## PUBLICATIONS

Barkaszi, M. J., M. Fonseca, T. Foster, A. Malhotra, and K. Olsen. "Risk Assessment to Model Encounter Rates Between Large Whales and Vessel Traffic from Offshore Wind Energy on the Atlantic OCS." *Sterling (VA): US Department of the Interior, Bureau of Ocean Energy Management. OCS Study BOEM* 34 (2021): 54.

Thode A, Abadie S, Barkaszi MJ. 2021. Optimization of towed passive acoustic monitoring (PAM) array design and performance study (passive acoustic monitoring study). Sterling (VA): U.S. Department of the Interior, Bureau of Ocean Energy Management. 32 p. Report No.: OCS Study BOEM 2021-086.

Barkaszi, M.J. and C.J. Kelly. 2018. Seismic survey mitigation measures and protected species observer reports: synthesis report. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. Contract No.: M17PD00004. OCS Study BOEM 2019-012.220 pp.

Barkaszi, M.J., A. Frankle, J. Martin, and W. Poe. 2016. Pressure wave and acoustic properties generated by the explosive removal of offshore structures in the Gulf of Mexico. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2016-019. 69 pp.

Barkaszi, M.J., M. Butler, R. Compton, A. Unietis, and B. Bennet. 2012. Seismic survey mitigation measures and marine mammal observer reports. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2012-015. 28 pp + apps.

Barkaszi, M.J. and D. Epperson. 2009. Six-year compilation of cetacean sighting data collected during commercial seismic survey mitigation observations throughout the Gulf of Mexico, USA. Poster presentation to Society for Marine Mammalogy annual conference. Quebec, Canada.

Barkaszi, M.J. and M. Smith. 2009. BHP Billiton Multi-Vessel Survey: A case study for the commercial application of Passive Acoustic Monitoring (PAM) for regulatory compliance in the Gulf of Mexico, USA. In: Workshop on the Status and Applications of Acoustic Mitigation and Monitoring Systems for Marine Mammals. (http://www.acousticmonitoring.org/materials/index.html).

Barkaszi, M.J. 2008. Northeast Gateway Construction Marine Mammal Sightings and Take Summary Report. In: Request for the Taking of Marine Mammals Incidental to the Operation of Northeast Gateway Deepwater Port and Algonquin Pipeline Lateral. Petition to NMFS for Incidental Harassment Authorization (IHA) pursuant to Section 101(a)(5) of the Marine Mammal Protection Act.

Zarillo, G., J. Reidenauer, K. Zarillo, T. Shinskey, E. Reyier, M. Barkaszi, J. Shenker, M. Verdugo, and N. Hodges. 2008. Biological characterization/numerical wave model analysis within borrow sites offshore West Florida Coast. MMS 2008-005 (BP).

Zarillo, G., J. Reidenauer, K. Zarillo, T. Shinskey, E. Reyier, M. Barkaszi, J. Shenker, M. Verdugo, and N. Hodges. 2008. Biological characterization/numerical wave model analysis within borrow sites offshore West Florida Coast: Volume II Appendices A-C. MMS 2008-005. (BP).

Barkaszi, M.J. 2004. Marine Mammal Mitigation. In: Hutchinson, D.R. and P.E Hart. 2004. Cruise Report for G1-03-GM USGS Gas Hydrates Cruise, R/V *Gyre*, 1-14 May 2003, Northern Gulf of Mexico. U.S. Geological Survey Open-File Report OF 03-474. 103 pp.

Barkaszi, M.J. 2004. A whale of a tale: results from the first year of mitigation with the marine mammal observer program during seismic acquisition in the Gulf of Mexico. SEG Expanded Abstracts 23, 61 (2004): doi: 10.1190/1.1842415.

Barkaszi, M.J., S. Tyson, and E. Bouthiller. 1999. Final Report for the Endangered Species Watch Program for Blasting Activities at Atlantic Dry Dock, Duval County, Jacksonville, Florida. FDEP Division of Protected Species, Tallahassee, FL.

Breininger, D.R., M.J. Barkaszi, R.B. Smith, D.M. Oddy, and J.A. Provancha. 1997. Prioritizing wildlife taxa for biological diversity conservation at the local scale. Environmental Management.

Breininger, D.R., V.L. Larson, R.B. Smith, D.M. Oddy, and M.J. Barkaszi. 1997. Florida scrub jay demography in periodically burned scrub on Merritt Island. Auk.

Smith, R.B., M.J. Barkaszi, D.R. Breininger, and T.M.Burke. 1994.  Florida scrub jay study at Playalinda Beach access road crossing: final report. Submitted to Nation Park Service Headquarters, Boulder, CO.

Hinkle, C.R., B. Engle, M.J. Barkaszi, C.R. Hall, W.M. Knott III, and B.R. Summerfield. 1994. Mapping analysis and planning system for John F. Kennedy Space Center, FL. Technology 2004.

Breininger, D.R., M.J. Barkaszi, R.B. Smith, D.M. Oddy, and J.A. Provancha. 1994. Endangered and potentially endangered wildlife on John F. Kennedy Space Center and faunal integrity as a goal for maintaining biological diversity. NASA Technical Memorandum 109204.

Breininger, D.R., R.B. Smith, and M.J. Barkaszi. 1993. Florida scrub jay study at Playalinda Beach access road crossing: recommendations for habitat management. Submitted to National Park Service Headquarters, Boulder, Colorado.

**PUBLICATIONS (NASA Technical)**

Barkaszi, M.J., R.B. Smith, J.A. Provancha, C.R. Hall, D.M. Oddy, R. Schaub, V.L. Larson, and R.A Reddick. 1993. Biological assessment for the Banana River dredging spoil sites on John F. Kennedy Space Center.

Barkaszi, M.J. and R.A. Reddick. 1993. Biological assessment for the components refurbishment facility on John F. Kennedy Space Center.

Barkaszi, M.J. 1992. Biological assessment for the non-hazardous waste storage facility on John F. Kennedy Space Center.

Barkaszi, M.J. and R. Schaub. 1992. Biological assessment for the proposed landfill at Schwartz Rd. John F. Kennedy Space Center.

Kehl, M.J. and R.B. Smith. 1991. Biological assessment for a payload spin test facility on John F. Kennedy Space Center.

Breininger, D.R., M.J. Kehl, and D.M. Oddy. 1990.  Florida scrub jay study at Titan launch complexes 40 and 41 on Cape Canaveral Air Force Station.



**MARY JO BARKASZI**

## PUBLICATIONS (Presentations)

Barkaszi, M.J., V.L. Larson, R.A. Reddick, and B.A. Engel. 1995. Beyond launching rockets: merging environmental management and conservation priorities on John F. Kennedy Space Center. Abstract and presentation to Society for Conservation Biology, Ft. Collins, CO.

Barkaszi, M.J., R.B. Smith, and D.R. Breininger. 1995. Home range characteristics of the eastern indigo snake (*Drymarchon corais couperi*) on John F. Kennedy Space Center, FL. Abstract and presentation to the Society for the Study of Amphibians and Reptiles. Boone, NC.

Barkaszi, M.J., V.L Larson, and R.A. Reddick. 1994. Mapping analysis and planning system: a conservation strategy regarding space. Abstract and presentation to the Natural Areas Association Conference, Palm Beach, FL.

Barkaszi, M.J. 1993. Wildlife Research on John F, Kennedy Space Center, FL. Abstract and presentation to the American Association for Laboratory Animal Science, Florida Branch. Melbourne, FL.

Breininger, D.R., M.J. Barkaszi, R.B. Smith, D.M. Oddy, J.A. Provancha, and V.L. Larson. 1992. Identification of species considerations for the maintenance of biological diversity along the Atlantic coast of Florida. Abstract and Presentation to the Ecological Society of America, Honolulu, Hawaii.

Breininger, D.R., P.A. Schmalzer, V.L. Larson, R.B. Smith, M.J. Barkaszi, and D.M. Oddy. 1992. The spatial distribution of habitat and species of conservation concern in scrub dominated landscapes on Kennedy Space Center and its surroundings. Abstract and paper presented at Archbold Biological Station Florida Scrub Workshop.

Kehl, M.J., R.B. Smith, and D.R. Breininger. 1991. Using Geographic Information Systems (GIS) as a research tool in the conservation of the eastern indigo snake, (*Drymarchon corais couperi*) on John F. Kennedy Space Center, Florida. Abstract and poster presentation for the Society for Conservation Biology, Madison, WI.

Kehl, M.J., R.B. Smith, and D.R. Breininger. 1991. Radiotelemetry studies of eastern indigo snakes (*Drymarchon corais couperi*). Abstract and presentation to the American Society of Ichthyology and Herpetology, New York, NY.

Breininger, D.R., R.B. Smith, and M.J. Kehl. 1991. Methods used for monitoring and environmental impact assessment involving the Florida scrub jay on John F. Kennedy Space Center. Abstract and presentation to the Society for Conservation Biology, Gainesville, FL.

Kehl, M.J. 1989. Comparisons in macrofaunal habitat use between the seagrass *Halodule wrightii* and the macroalga *Caulerpa prolifera* in the Banana River, Florida. Abstract and presentation to the Florida Academy of Sciences, St. Petersburg, FL.

Kehl, M.J. 1987. Patterns in bottlenose dolphin (*Tursiops truncatus*) abundance during aerial surveys of Tampa Bay and Sarasota Bay, Florida, 1984-1987. Abstract and presentation to the Florida Academy of Sciences, Tampa, FL.



**MARY JO BARKASZI**

## PROFESSIONAL CERTIFICATIONS

Trainer for MMS/BOEM/BSEE NTL 2007-G07 through NTL 2012-G02 observer candidates
FWC Level 4/aerial observer and trainer
NMFS unconditional permit for implementing protected species plans during underwater blasting, dredging, and construction
NMFS letter of authorization for marine mammal stranding response
USFWS Florida Scrub Jay banding permit (expired research permit)
FWC gopher tortoise relocation permit (expired research permit)
USFWS indigo snake handling permit (expired research permit)
Passive Acoustic Monitoring – course completion and co-trainer
Capture, tagging and DNA sampling for shortnose sturgeon
Handling and DNA sampling of marine turtles for preemptive trawling and relocation