**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREEN OCEANS, *et al.*,<br><br>   *Plaintiffs,*<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR, *et al.*,<br><br>   *Defendants,*<br><br>  and<br><br>REVOLUTION WIND, LLC,<br><br>   *Defendant-Intervenor* | Case No.: 1:24-cv-00141-RCL |

<u>**EXPERT DECLARATION OF DARREN IRELAND IN SUPPORT OF  DEFENDANT-**</u>
<u>**INTERVENOR REVOLUTION WIND'S OPPOSITION TO PLAINTIFFS' MOTION**</u>
<u>**FOR STAY**</u>

Pursuant to 28 U.S.C. § 1746(2), I, Darren Ireland, hereby declare:

1.  I am currently a Vice President and Senior Wildlife Biologist at LGL Ecological Research Associates, Inc. ("LGL"). LGL serves as an environmental consultant for Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind")—a U.S.-based company and indirect subsidiary of Orsted North America Inc. ("Ørsted") and Eversource Energy that is developing the Revolution Wind Project ("Project"), a commercial scale wind farm to be constructed offshore Rhode Island.

2.  In this lawsuit, a collection of individual and organizational plaintiffs led by Green Oceans (collectively, "Plaintiffs") are challenging federal approvals of the Revolution Wind Project, including Bureau of Ocean Energy Management's ("BOEM") approval of a Construction

and Operations Plan, a Final Environmental Impact Statement for the project, and the National Marine Fisheries Service's ("NMFS") issuance of an Incidental Take Regulation ("ITR"), which is a rulemaking specific to Revolution Wind and a Letter of Authorization ("LOA") for specified Revolution Wind construction activities.

3.      On April 18, 2024, Plaintiffs filed a Motion for Stay of Final Agency Action ("Motion") seeking to stay the effectiveness of these approvals and enjoin Revolution Wind construction activities. Plaintiffs' Motion relies upon allegations challenging Federal Defendants' compliance with the Endangered Species Act ("ESA") and Marine Mammal Protection Act ("MMPA"). In support of the Motion, Plaintiffs argue that if construction is allowed to proceed on Revolution Wind before additional consultation is complete and a new Biological Opinion under the ESA is issued, then these activities will result in irreparable harm to certain endangered whale and sea turtles species.

4.      In my role as Senior Wildlife Biologist and project manager at LGL, I have consulted on environmental matters relating to marine protected species and the activities associated with multiple Ørsted projects including Revolution Wind. For Revolution Wind, I assisted in preparing the application for Revolution Wind's ITR and LOA from NMFS as well as monitoring plans required by the LOA (and other agency approvals) designed to reduce potential impacts to protected species including the Pile Driving Monitoring Plan, Passive Acoustic Monitoring ("PAM") Plan, Sound Field Verification ("SFV") Plan, and Alternative Monitoring Plan for Nighttime Pile Driving. I also assisted with preparing Protected Species Mitigation and Monitoring Plans related to ESA listed sea turtle and fish species which informed the Biological Assessment prepared by BOEM and submitted to NMFS as part of the ESA Section 7 consultation.

5.      I have reviewed Plaintiffs' Complaint, filed January 16, 2024, as well as Plaintiffs'

Motion and accompanying exhibits filed on April 18, 2024, including the Memorandum in Support of Plaintiffs' Motion and Declarations in support from Lisa Linowes, Apostolos Gerasoulis, and Robert Rand. I have also reviewed the Declarations in support of Revolution Wind, LLC's Opposition to Plaintiffs' Motion for Stay of Final Agency Action from Mary Jo Barkaszi ("Barkaszi Decl.") and Kellen Ingalls ("Second Ingalls Decl.").

6.      I make this Declaration in support of Revolution Wind's Opposition to Plaintiffs' Motion for Stay of Final Agency Action in this case based upon both my personal knowledge of the matters referred to herein and my over 20 years of experience and expertise in evaluating risks to marine mammals, sea turtles and other aquatic life. I am willing and able to testify truthfully thereto, if called upon to do so.

## I.    OVERVIEW OF MY CONCLUSIONS

Based on my experience and expertise, I have reached the following conclusions:

7.      Plaintiffs incorrectly suggest that NMFS's reinitiation of consultation concedes the inadequacy of the Biological Opinion regarding construction impacts on endangered whales. Instead, the potential impact of construction activities on whales was fully considered in the initial take estimates provided by Revolution Wind, and NMFS's request for additional analysis was a precautionary measure following public comments and new information on whale sightings in a particular area, not an indication of any shortcomings in the Biological Opinion.

8.      Plaintiffs oversimplify the Biological Opinion's position on the presence of fin and sei whales in the vicinity of Revolution, disregarding the fact that the Biological Opinion includes a description of the presence of these species in the area during these months and both the draft ITR and Biological Opinion include potential Level B take of these species. Plaintiffs' claims are also undermined by the fact that despite fin and sei whale sightings during South Fork Wind

construction, there were no known Level A takes of any species during South Fork Wind construction, and minimal Level B takes.

9.    Plaintiffs describe allegedly higher underwater noise levels from pile driving at the Vineyard Wind Project that they claim was more than previously anticipated by BOEM and NMFS, as indicated by an "independent investigation" from Plaintiffs' declarant, Robert Rand. However, Rand's measurements suffer from flawed data collection methods not aligned with current BOEM guidelines and rely on outdated references, which lead to exaggerated results that do not reflect the best current scientific practices. Most notably, Rand inaccurately claims that NMFS underestimates actual sound levels received by marine mammals by using root-mean-square ("RMS") sound pressure levels, referencing an outdated study (Madsen 2005). However, NMFS has since adopted new metrics to determine "protective radii for marine mammal hearing," making Rand's claims inaccurate and irrelevant in multiple respects, including because his analysis of Vineyard Wind, a completely different project that used different installation vessels, is not relevant to Revolution Wind.

10.    Plaintiffs claim that a recent rise in whale deaths along the U.S. Atlantic coast is due to offshore wind development, but this is unsupported by scientific evidence and is refuted by the marine mammal scientific community, including NMFS.

11.    The Linowes Declaration mistakenly interprets NMFS's authorization of 56 Level B harassment takes of North Atlantic right whales as an expectation that these events will occur during Revolution Wind's construction, when in fact, the figure is an overestimate that accounts for cautionary assumptions and does not consider NMFS-required mitigation measures, including halting pile-driving if a North Atlantic right whale is observed at any distance. It is highly unlikely that the authorized number of Level B takes will actually occur, as evidenced by data from South

Fork Wind construction.

12.    Linowes's claim that NMFS mitigation measures are insufficient to protect fin and sei whales is refuted by the effective monitoring and mitigation demonstrated for South Fork Wind, which will be similarly applied in Revolution Wind with dedicated Protected Species Observers and Passive Acoustic Monitoring on multiple vessels.

13.    Plaintiffs incorrectly assert that the proposed 200 m exclusion zone for nighttime pile driving activities will cause irreparable harm to sea turtles, overlooking that the original 500 m zone was at least twice the distance to the permanent threshold shift ("PTS") for sea turtles. The reduction to a 200 m exclusion zone is protective and unlikely to result in harm, with the issuance of a very small number of predicted takes being a conservative measure to account for any potential impacts.

14.    Plaintiffs inaccurately describe the exclusion zone distances for sea turtles, and, therefore, Plaintiffs' comparison of these distances to the effective range of light enhancing devices for the detection of sea turtles is invalid.

15.    Plaintiffs acknowledge that recent Protected Species Observer technical reports indicate light-enhancing devices are effective in detecting marine mammals and sea turtles up to 200 meters away at night, which coincides with the revised exclusion zone distance proposed by BOEM and aligns with the largest expected distances to sea turtle PTS thresholds.

## II.    PROFESSIONAL QUALIFICATIONS

16.    I am a Vice President and Senior Wildlife Biologist at LGL, an environmental research and consulting firm that provides research, conservation, and project management services for projects in terrestrial, freshwater, and marine environments. In this role, I serve as a project manager for permitting and monitoring projects related to MMPA, National Environmental

Protection Act ("NEPA"), and ESA compliance during offshore activities in Alaska, Gulf of Mexico, and Atlantic regions.

17.    I received a Bachelor of Arts degree in Biology from Colby College in 2000.  I received a Master's degree in Fish and Wildlife Management from Montana State University in 2005.

18.    I am a member of the Society for Marine Mammalogy.

19.    I have authored or co-authored more than 60 MMPA take authorization applications and supporting NEPA and ESA documents, including the calculation of marine mammal densities and the use of sound propagation and sound exposure modeling outputs for estimating potential take related to various activities such as high-resolution geophysical ("HRG") surveys, pile driving related to offshore wind foundations, 2D and 3D seismic surveys, geotechnical investigations, exploration drilling programs, as well as port development projects.

20.    I have developed and managed the implementation of multi-disciplinary monitoring plans to record and estimate potential impacts from industrial operations around permitted activities including the use of vessel-based observers, aerial surveys, unmanned aerial systems, static and towed passive acoustic recorders, and infrared camera systems.

21.    I have directed Protected Species Observer field operations including vessel and aerial survey programs involving over 60 observers, as well as acoustic monitoring activities.

22.    I am the author or co-author of more than a dozen peer-reviewed papers, conference proceedings, and technical reports on marine mammal monitoring and mitigation, whale behavior, and acoustic impacts to marine life.

23.    I have assisted clients who conduct activities in the Gulf of Mexico and off the U.S. Atlantic coast understand and comply with NMFS terms and conditions related to ESA-listed sea

turtles resulting from Section 7 consultations regarding HRG survey activities, offshore windfarm construction (pile driving, unexploded ordnance ("UXO") detonation, and cable landfall construction), deep-penetration geophysical (seismic) surveys, and offshore oil and gas operations. A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A**.

## III.    BACKGROUND

### A.    MMPA and ESA

24.    The MMPA (16 U.S.C. § 1361 et seq.), is designed to prevent unnecessary "take" of marine mammals, defined as "to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill any marine mammal."[1] Under the MMPA, NMFS may only authorize the take of small numbers of marine mammals incidental to an activity if the taking would have a negligible impact on the species or stock. As relevant here, NMFS issued an ITR and LOA to Revolution Wind because construction of the project could result in the incidental take of a small number of marine mammals that would have no more than a negligible impact on the impacted species or stocks.[2]

25.    Section 7 of the ESA requires that federal agencies that propose to authorize, fund, or carry out activities that may affect threatened or endangered species must consult with the U.S. Fish and Wildlife Service or NMFS, depending on the species at issue, to ensure that the activity will not "jeopardize the continued existence of any endangered species or threatened species" or "result in the destruction or adverse modification" of designated critical habitat for those species.[3]   The ESA also establishes a framework for protecting threatened or endangered species

---

[1] 16 U.S.C. § 1362(13); 50 C.F.R. § 216.3.

[2] 16 U.S.C. § 1371(a)(5)(D).

[3] 16 USC §1536(a)(2); 50 C.F.R. § 402.14(a).

and prohibits any person from "taking" any endangered species, defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct. "[4] When the "take" is incidental to a lawful activity, then an "incidental take statement" may be included with the project's biological opinion which has the effect of authorizing what would otherwise be a prohibited take of listed species.[5]

26.    The Declarations of Kellen Ingalls, ¶¶ 11-24, and Mary Jo Barkaszi, at ¶¶ 23-34, include additional detail regarding the MMPA and ESA in relation to Revolution Wind.

**B.    Extensive Data and Modeling In Support of Agency Approvals**

27.    In preparing the application for Revolution Wind's ITR and LOA and supporting the ESA consultation, I used the latest, NMFS-approved data and modeling to analyze the project's impacts on marine mammals and other aquatic life.

28.    The primary source of marine mammal data used in the analysis were the latest habitat-based density estimates produced by the Duke University Marine Geospatial Laboratory (Roberts et al. 2023) funded by the U.S. Navy. These marine mammal density and distribution data are provided in geographical information system ("GIS") files that provide a monthly (or in some case annual) estimate of the number of marine mammals of each species (or in some cases groups of similar species termed "guilds") present within 5x5 km grid cells within the entire U.S. Atlantic Exclusive Economic Zone. These density estimates were calculated by Roberts et al. (2022) by creating a statistical model that relates tens of thousands of kilometers of vessel-based and aerial line-transect survey effort from over 20 years of surveys in the region to underlying habitat characteristics, such as water depth, sea surface temperatures, currents, etc. The statistical

---

[4] 16 U.S.C. § 1532(9).

[5] 50 C.F.R. §402.14(i)(5).

relationships between the habitat characteristics of where each species was and was not observed was then used to predict species presence and numbers in all areas of the U.S. Atlantic Exclusive Economic Zone. This dataset reflects the best available peer-reviewed science describing the spatial and temporarily explicit density of marine mammals in this region.

29.    In addition to these data, we also incorporated Protected Species Observer sightings collected during HRG survey site-investigation on and near the area of the U.S. Outer Continental Shelf covered by BOEM Renewable Energy Lease No. OCS-A 0486 ("Revolution Wind Lease Area") to further refine our understanding of which species might be present at what time of year.

30.    To predict the number of sea turtles that may be present near the project, sea turtle densities were obtained from the US Navy Operating Area Density Estimate (NODE) database on the Strategic Environmental Research and Development Program Spatial Decision Support System (SERDP-SDSS) portal (DoN, 2012, 2017) and from the Northeast Large Pelagic Survey Collaborative Aerial and Acoustic Surveys for Large Whales and Sea Turtles (Kraus et al. 2016). These data are summarized seasonally (winter, spring, summer, and fall). Since the results from Kraus et al. (2016) use data that were collected more recently, those were used preferentially where possible.

31.    Modeling of underwater sounds likely to be produced during pile driving activities was performed by JASCO Applied Sciences who has been conducting underwater sound modeling and measurements in the marine environment for over 40 years and has conducted similar modeling for the majority of offshore wind developments in U.S. waters, including as relevant here for the South Fork Wind Project, which is located adjacent to the Revolution Wind Lease Area.

32.    The modeling started with technical information provided by Revolution Wind

about the size and type of piles and the pile driving hammer that will be used. These inputs were used to perform "source" modeling that predicts the sounds that will be produced at the source (the pile in the water).

33.     These sounds are then input into scientifically accepted sound propagation models (such as RAM and/or Bellhop) that take into account numerous environmental factors that could effect sound transmission (such as the water depth, the temperature and salinity profile throughout the water column, the bathymetry, and the soil conditions) to predict how the sounds will diminish at increasing distance from the pile in all directions around the pile.

34.     These 3-dimensional sound fields are then used in a computer simulation model where simulated animals (sometimes referred to as "animats") move in the marine environment using movement patterns defined specifically for each species.

35.     This approach is considered by the scientific community and regulatory agencies to be the best available science[6] and most advanced way to predict the number and level of potential takes from offshore activities such as windfarm construction.

36.     For other activities, including HRG surveys, UXO detonations,[7] and export cable landfall construction, the same best-available marine mammal densities and site specific Protected Species Observer sighting data were used to estimate the number and species of marine mammals and sea turtles likely to be present when and where these activities may occur. For all of these activities, the sounds likely to be produced at the source were estimated from prior measurements of similar sources or from mathematical models. Sound propagation modeling was then used to

---

[6] Biological Opinion, p. 185.
[7] Although this analysis modeled and accounted for potential UXO detonations, I understand that the Project was able to microsite around all UXOs discovered to date, and would not need to detonate any UXO unless an emergent find for which detonation would be prudent were to be discovered during construction. *See* Second Ingalls Decl. ¶ 9.

predict the sound fields that would be created around these sources and the total area where sounds could be above the relevant threshold levels was calculated. Finally, the total area that may be exposed above threshold levels was multiplied by the marine mammal and sea turtle densities to calculate the number of animals that might be exposed and potentially taken by Level A or Level B harassment.

37.    This approach is routinely accepted by NMFS for purposes of incidental take authorizations from these types of activities where potential impacts are expected to be lower than for large pile driving events as described above.

C.    **Endangered Whale Species**

38.    NMFS's Biological Opinion for Revolution Wind included an extensive analysis of the four whale species that Plaintiffs allege will be irreparably harmed by the project, specifically: (1) the North Atlantic right whale (*Eubalaena glacialis*); (2) the sei whale (*Balaenoptera borealis borealis*); (3) the fin whale (*Balaenoptera physalus*); and (4) the sperm whale (*Physeter macrocephalus*).[8] "After reviewing the current status of the ESA-listed species and critical habitat, the environmental baseline within the action area, the effects of the proposed action, and cumulative effects," NMFS found that "the proposed action is likely to adversely affect but is not likely to jeopardize the continued existence of blue, fin, sei, sperm, or North Atlantic right whales."[9]

39.    On November 17, 2023, NMFS Office of Protected Resources requested reinitiation of consultation under ESA Section 7 to take into account Level A harassment of two fin whales and three sei whales from monopile installation, including impact pile driving, and two

---

[8] Biological Opinion, pp. 396-419.

[9] Biological Opinion, p. 424.

fin whales and two sei whales from UXO detonation[10] that NMFS authorized in the Revolution Wind LTR/LOA under the MMPA. As described in paragraph 44 below, NMFS included this Level A harassment in the ITR/LOA based on comments received on a draft version of the ITR/LOA. On March 12, 2024, NMFS confirmed that it would reinitiate consultation under the ESA to consider the changes to the proposed action and new information on effects of the action with respect to the take of fin and sei whales authorized under the MMPA. NMFS explained that it would update the Biological Opinion analysis as necessary.

### D. Endangered Sea Turtles

40.    NMFS's Biological Opinion for Revolution Wind also included an extensive analysis of the four sea turtle species that Plaintiffs allege will be irreparably harmed by the project, specifically: (1) Loggerhead sea turtles (*Caretta caretta*); (2) Kemp's Ridley sea turtles (*Lepidochelys kempii*); (3) Green Sea turtles (*Chelonia mydas*); and (4) Leatherback sea turtles (*Deromchelys coriacea*).[11] "After reviewing the current status of the ESA-listed species and critical habitat, the environmental baseline within the action area, the effects of the proposed action, and cumulative effects," NMFS found that "the proposed action is likely to adversely affect but is not likely to jeopardize the continued existence of . . . the Northwest Atlantic [distinct population segment ("DPS")] of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley or leatherback sea turtles."[12] The Biological Opinion also determined that "the project will have no effect on any species of . . . the Northeast Atlantic DPS of loggerhead sea

---

[10] As noted above, I understand that the Project was able to microsite around all UXOs discovered to date and would not need to detonate any UXO unless there was an emergent find. Second Ingalls Decl. ¶ 9.

[11] Biological Opinion, pp. 376-396.

[12] Biological Opinion, p. 424.

turtles . . .  or the Northwest Atlantic DPS of loggerhead sea turtles."[13]

41.    The Biological Opinion also describes threats to Kemp's Ridley sea turtles, Loggerhead turtles, Green Turtles and Leatherback Turtles, including bycatch in fishing gear, loss and degradation of shoreline nesting habitat, vessel strikes, harvest of turtles and eggs, ocean pollution and debris, and climate change.[14]

42.    NMFS's March 12, 2024 notice of reinitiation of ESA consultation also confirmed that NMFS will consider modifications to the Revolution Wind pile driving clearance and shutdown zones for sea turtles based on new information on the effectiveness of monitoring for sea turtles after dark that was incorporated into Revolution Wind's draft Nighttime Monitoring Plan. As noted above, NMFS confirmed it would consider the changes to the proposed action reflected in the plan and new information on effects of the action with respect to the Nighttime Monitoring Plan and NMFS explained that it would update the Biological Opinion analysis as necessary.

## IV.    CONSTRUCTION FOR REVOLUTION WIND WILL NOT CAUSE IRREPARABLE HARM TO ENDANGERED WHALES

43.    Plaintiffs' Memorandum of Law alleges that the increased number of dead whales observed off the U.S. Atlantic coast since 2017, especially North Atlantic right whales, humpback whales, and fin whales, are somehow linked to or have otherwise been caused by offshore wind development activities are without merit and lack scientific support. The consensus in the marine mammal scientific community, including by NMFS is that the primary activity conducted so far by offshore wind developers in this region, HRG surveys, involves sound sources that have not

---

[13] *Ibid*.

[14] Biological Opinion, pp. 80, 83, 90, 97.

been shown to cause effects to the hearing abilities of large whales, much less cause mortality. "At this point, there is no scientific evidence that noise resulting from offshore wind site characterization surveys could potentially cause whale deaths. There are no known links between large whale deaths and ongoing offshore wind activities."[15] Plaintiffs rely on the Declaration of Robert Rand and attached report (Exhibit 5, Dkt. 26-7) ("Rand Declaration") that implies HRG survey activities have similar potential impacts as much stronger sound sources like deep penetration seismic airgun surveys conducted for oil and gas exploration or low-frequency active sonar used by the U.S. Navy. This shows a lack of understanding about the nature of these different sound sources, how the sounds propagate through the water, and what types of impacts they may have on marine mammals. The Barkaszi Declaration at ¶¶ 83-101, thoroughly describes what is known about the timing and likely causes of whale deaths in this region and how there is no scientific evidence to support the implication that offshore wind development activities are the cause of these deaths.

44.    Plaintiffs' Motion alleges that endangered whales will be irreparably harmed because Plaintiffs imply (at 10, 12-13) that NMFS's reinitiation of consultation somehow concedes that the Biological Opinion is inadequate and does not consider construction impacts. That is incorrect. The full extent of potential take from construction activities was included in the sound exposure modeling take estimates included in the ITR/LoA application submitted by Revolution Wind. As described in the November 17, 2023 Letter from NMFS Office of Protected Resource ("OPR") to NMFS Greater Atlantic Regional Field Office ("GARFO") requesting reinitiation of consultation, the request to incorporate additional analysis of potential Level A take of fin and sei

---

[15] NOAA Fisheries, Frequent Questions—Offshore Wind and Whales, https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales (last accessed on April 25, 2024).

whales in the Biological Opinion stemmed from new information received by NMFS OPR during the public comment process on the ITR regarding potential fin and sei whale abundance in the Project area,[16] NMFS OPR therefore decided it was appropriate to authorize small numbers of potential Level A take for the two species. However, this was a precautionary approach, and not as Plaintiffs wrongly allege, any inadequacy in the Biological Opinion.

45.    NMFS OPR stated "[w]hile this new data is important in considering the likelihood of PTS for particular species, it does not constitute new significant data wherein new environmental concerns or impacts on the action are raised as the impacts of PTS on marine mammals, in general, from the project was fully discussed in the proposed rule and hence, considered in the [Biological] Opinion." *Id.*

46.    Moreover, NMFS OPR determined that the full modeled Level A take for fin and sei whales was unlikely to occur, again due to the cautionary assumptions of the take estimate modeling and required monitoring and mitigation, and therefore only authorized a portion of it (20%) for fin whales during pile driving in the final ITRs (e.g., two takes), in addition to three Level A takes for sei whales . *Id.*

47.    Therefore, the reinitiation of Section 7 consultation reflects successful coordination in the face of new information.  Indeed, NMFS explained "we do not anticipate that [inclusion of small amount of Level A harassment take for fin and sei whales] will result in a change to determinations in the July Opinion." *Id.*

---

[16] NMFS-OPR, Memorandum for NMFS-GARFO re: Request for Consultation under Section 7 of the Endangered Species Act (ESA) for the Proposed Issuance of an Incidental Take Regulation and Subsequent Letter of Authorization to Take Marine Mammals Incidental to the Revolution Wind Offshore Wind Project, offshore of Rhode Island ("NMFS Reinitiation Request") (Nov. 17, 2023), which is attached to Plaintiffs' Motion as Exhibit 3, Dkt. 26-5.

48.     Plaintiffs' Motion alleges that the Biological Opinion claims fin and sei whales "are not usually present in the Revolution wind area in the summer months (and so not affected by pile driving)."  This is an oversimplification as the Biological Opinion includes a description of the presence of these species in the area during these months and both the ITR and Biological Opinion include assessment of potential Level B take of these species. As NMFSOPR worked through the ITR rulemaking process, they sought to incorporate public comment and new information into their final decision regarding the authorization of marine mammal takes. This included results from Protected Species Observer monitoring during pile driving activities conducted at the neighboring South Fork lease area during construction of South Fork Wind in 2023.  The sightings of fin and sei whales by Protected Species Observers during the South Fork Wind pile driving were not entirely unexpected as evidenced by the fact that the Draft ITR, which was assessed in the Biological Opinion, included authorization of Level B takes for these species. It was appropriate for NMFS OPR to then consult with NMFS GARFO to reinitiate consultation to include the new information in the Biological Opinion analysis. Of note, despite the fin and sei whale sightings during South Fork Wind construction, there were no known Level A takes of any species during South Fork Wind construction, and minimal Level B takes.[17]

49.     Related to Plaintiffs' expressed concerns regarding fin and sei whale Level A take, Plaintiffs' Motion states that an "…independent investigation of the nearby Vineyard Wind Project area found that the pile driving activities create higher underwater decibel levels than considered and anticipated by BOEM and NMFS" and references the Rand Declaration as support. The Rand Declaration summarizes results of purported sound field verification measurements. Based on my

---

[17] South Fork Wind Marine Mammal and Sea Turtle Monitoring During Windfarm Construction September 2022 -- August 2023. BOEM Lease OCS-A 0517. Submitted to BOEM, BSEE, and NMFS. February 9, 2024.

review of the declaration and attached report of Robert Rand, my opinion is that these measurements were made using flawed data collection methods that are inconsistent with the most recent recommendations for collecting these types of measurements.[18] Moreover, the declaration and report rely on an outdated source (Madsen 2005) to support use of analysis methods and metrics to artificially inflate the results in contrast to the best available current scientific recommendations.

50.     The BOEM sound field verification measurement guidelines state that "for sound field verification, stationary platforms–either bottom mounted or buoy moored systems–can be employed. Mobile platforms, either vessel autonomous vehicle, or drifting, may be used to supplement the fixed recorders." The use of a "dipped" hydrophone from a mobile platform (fishing vessel) utilized in the study in the Rand Declaration is not recommended because that method results in the introduction of "self-noise" to the recordings, where sounds from the measurement vessel and/or from the recording system (hydrophone and cable itself moving through the water column) get included in the measurement data. Although the report attached to the Rand declaration claimed precautions were taken to avoid this type of noise contamination, ultimately it is not possible to eliminate this type of contamination of the recorded data and hence this method is not recommended for this type of measurement.

51.     Referencing an outdated publication (Madsen 2005), the Rand Declaration suggests that the NMFS recommended method of calculating root-mean-square (RMS) sound pressure levels experienced by marine mammals results in an underestimate of the actual sound levels

---

[18] See BOEM Recommendations for Offshore Wind Project Pile Driving Sound Exposure Modeling and Sound Field Measurement (October 2023), available at: https://www.boem.gov/sites/default/files/documents/renewable-energy/BOEMOffshoreWindPileDrivingSoundModelingGuidance.pdf.

received by as much as 6 dB. However, the Rand Declaration incorrectly interprets these RMS sound pressure levels as being used by NMFS to establish "protective radii for marine mammal hearing". That is not the case. Based in part on concerns consistent with those raised by Madsen (2005) regarding the use of RMS sound levels to set "protective radii", NMFS convened an expert working group of acousticians that recommended alternative metrics be used and provided new threshold levels for determining "protective radii for marine mammal hearing" (Southall et al. 2007). These new metrics do not rely on RMS sound pressure levels. Instead, the new thresholds use peak sound pressure level (SPLpk) and cumulative sound exposure levels (cSEL) to set thresholds based on when permanent threshold shift (PTS) may occur in marine mammals. These new metrics were introduced in draft form in 2013 and as final guidance in 2016.[19] They were most recently updated in 2018.[20]

52.     Thus, the statement in the Rand Declaration that "90-percent RMS should not be considered a conservative metric for establishing protective radii for marine mammalian hearing" is in fact true, and indeed NMFS no longer uses that metric for that purpose. Additionally, by using an RMS calculation method that utilizes only the "loudest" (highest amplitude) 200 milliseconds of a recorded impulsive sound, the associated results are biased higher. Madsen (2005) intentionally made the recommendation to use this method so that results would be biased high

---

[19] NMFS, Technical Guidance for Assessing the Effects of Anthropogenic Sound on Marine Mammal Hearing: Underwater Acoustic Thresholds for Onset of Permanent and Temporary Threshold Shifts (2016). U.S. Dept. of Commerce, NOAA. NOAA Technical Memorandum NMFS-OPR-55, 178 p., https://repository.library.noaa.gov/view/noaa/15850; 81 Fed. Reg. 51693.

[20] NMFS, 2018 Revisions to: Technical Guidance for Assessing the Effects of Anthropogenic Sound on Marine Mammal Hearing (Version 2.0): Underwater Thresholds for Onset of Permanent and Temporary Threshold Shifts, U.S. Dept. of Commer., NOAA. NOAA Technical Memorandum NMFS-OPR-59, 167 p. https://www.fisheries.noaa.gov/s3/2023-05/TECHMEMOGuidance508.pdf; 83 Fed. Reg. 28824.

and therefore produce cautionary estimates of potential impacts. This inherent bias is especially true at longer distances from the sound source where the overall length of the sound increases due to propagation effects. The RMS sound pressure levels calculated using 90-percent of the pulse energy are used for determining when behavioral disturbance might occur, not when permanent hearing threshold shift might occur.

53.    The Linowes Declaration (Plaintiff's' Exhibit 2, Dkt. 26-4) alleges that "NMFS anticipates that 56 North Atlantic right whales will experience, at the very least, behavioral effects from Revolution Wind's construction-related activities." This statement misconstrues the authorization by NMFS of 56 North Atlantic right whale Level B takes with the idea that NMFS believes those takes will happen.[21] The calculation of potential takes described above includes a number of cautionary assumptions at multiple steps, often leading to an overestimation of the amount of take that is likely to actually occur. Importantly, the take estimates do not include the implementation of mitigation measures required by NMFS. This includes a requirement to delay the start of pile driving or stop pile driving if a North Atlantic right whale is observed by a Protected

---

[21] The notice for the Final ITR even explains the conservative nature of these authorizations. See NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode Island (2023), 88 Fed.Reg. 72562 ("The number of takes that NMFS authorized is considered conservative for several reasons, including, but not limited to, the following: authorized take numbers are based on the highest number resulting from among three take estimate methodologies . . . ; authorized take numbers assume all foundation piles (n=81) will be installed and all UXO/MECs detonations would occur in the month with the highest monthly average density for each marine mammal species; . . . authorized take numbers assume sparkers and/or boomers, which result in the largest acoustic footprint, would be the dominant source for all HRG surveys days, although this may not be the case; authorized take numbers for Level A harassment (PTS) do not fully account for the likelihood that marine mammals will avoid a stimulus when possible before the individual accumulates enough acoustic energy to potentially cause auditory injury, nor do the take numbers fully account for the effectiveness of the required mitigation and monitoring measures (exception for foundation installation and UXO/MEC detonations, which incorporate 10-dB of sound attenuation).")

Species Observer **at any distance** from the pile, even if it is well outside of the Level B harassment zone. Therefore, even though NMFS has authorized 56 Level B takes of North Atlantic right whales, that number of individuals is very unlikely to experience Level B harassment as a result of the Revolution Wind construction activities. This is evidenced by comparing the observed amount of take during the South Fork Wind project to the amount of authorized take. For example, the IHA authorized Level B take of 11 fin whales, 2 sei whales, 32 Minke whales, 19 humpback whales, and 13 North Atlantic right whales for a total of 77 mysticete (baleen) whales. While monitoring during pile driving activities, Protected Species Observers observed the following number of whales with the maximum Level B distance: 0 fin whales, 1 sei whale, 0 Minke whales, 2 humpback whales, 0 North Atlantic right whales, and 12 "non-North Atlantic right whale unidentified whales" for a total of 15 mysticete whales. A "non-North Atlantic right whale unidentified whale" is recorded when a Protected Species Observer observes a mysticete whale, but is unable to observe characteristics definitive of a single species, while still being able to rule out that it was possibly a North Atlantic right whale (usually due to the presence of a dorsal fin, which North Atlantic right whales do not have). Notably, all of the whales seen during pile driving were at distances near the outer edge of the Level B zone (calculated based on the maximum hammer energy) while the pile driver was using relatively low hammer energies (<50 % of maximum power). Thus, it is likely that very few to none of the whales observed by Protected Species Observers within the Level B zone were actually exposed to pile driving sounds above the 160 dB behavioral harassment threshold.[22]

54.    The Linowes Declaration goes on to state "NMFS's so-called mitigation measures

---

[22] South Fork Wind Marine Mammal and Sea Turtle Monitoring During Windfarm Construction September 2022 -- August 2023. BOEM Lease OCS-A 0517. Submitted to BOEM, BSEE, and NMFS. February 9, 2024.

will not be enough to protect this endangered whale…". This is contradicted by the successful monitoring and mitigation conducted during installation of the neighboring South Fork Wind project. The results of that monitoring contributed the new information about fin and sei whale presence that was used, in part, by NMFS to determine that Level A takes for these species should be authorized. This shows that the monitoring was effective at detecting ESA-listed large whale species which would have allowed for mitigation measures to be implemented, should one of these species have entered a mitigation zone during pile driving (which they did not). The same overall monitoring conducted during the South Fork Wind project—as well as the same noise mitigation— will be used by Revolution Wind.  The monitoring includes the use of dedicated Protected Species Observers. These Protected Species Observers will be watching for marine mammals and sea turtles aboard 5 vessels (the pile driving vessel and 4 vessels dedicated to supporting Protected Species Observer visual observations or conducting Passive Acoustic Monitoring (PAM) efforts) intended to detect whales in the area and collect sound field verification measurements consistent with the BOEM guidelines.  The map below depicts the visual and PAM monitoring that will occur during each pile installation on the Revolution Wind project.



## V.   CONSTRUCTION FOR REVOLUTION WIND WILL NOT CAUSE IRREPARABLE HARM TO ENDANGERED SEA TURTLES

55.   Plaintiffs' Motion points to the reinitiation of consultation to conclude broadly that "If pile driving is allowed to begin on May 1… the four endangered sea turtle species… will experience irreparable harm that cannot be undone or mitigated." In fact, however, BOEM's request to reinitiate consultation was driven by a narrowly focused request to revise the very cautionary 500 m exclusion zone for sea turtles required in the Biological Opinion down to 200 m. The 200 m distance is in line with the exposure modeling predicted distances to the largest sea turtle PTS thresholds. Therefore, potential harm from pile driving sounds will be adequately mitigated.

56.   Plaintiffs' Motion states "The clearance zone that BOEM is asking NMFS to consider and approve for nighttime pile driving activities—the approval of which appears to be a foregone conclusion based on NMFS's response to reinitiation—is inadequate and will place sea turtles in imminent danger and cause irreparable harm to sea turtles."  This is incorrect. The exposure modeling for sea turtles resulted in a distance of, at most, 250 m to the PTS threshold (for 15 m maximum diameter OSS monopiles) and 210 m for the smaller (12 m maximum diameter) and more numerous WTG monopiles.  The 500 m exclusion zone distance required by the Biological Opinion is therefore twice as far as the longest distance to a sea turtle PTS threshold. Additionally, the modeled distances to sea turtle PTS threshold will be conservative because the actual pile sizes will be smaller (the 2 OSS monopiles will have a maximum diameter of 10 m and the WTG monopiles will have a diameter of either 9.5 m or 10 m, depending on the location). The smaller piles sizes means that less hammer energy will likely be necessary to install them which will result in shorter ranges to PTS thresholds than the conservative modeling predicted. Therefore,

implementation of the 200 m exclusion zone would be protective of sea turtles and likely avoid all potential instances of PTS because the actual distances to PTS thresholds will likely be less than the 200 m exclusion zone and sea turtles would need to remain within that distance for an extended period of time before incurring PTS, during which they would be detected by Protected Species Observers who would implement the appropriate mitigation measures. Issuance of the very small number of exposure modeling predicted takes (less than 1 Kemp's ridley sea turtle, 1 leatherback sea turtle, 1 loggerhead sea turtle, and approximately 1 green sea turtle) is an appropriate conservative measure to avoid underestimating potential take. This requested change again reflects the agencies properly accounting for new information and does not significantly change the amount or extent of anticipated impacts.

57.     The Linowes Declaration states that "In the Biological Opinion, NMFS lays out the minimum visibility zones required for detecting ESA listed marine mammals and sea turtles. From May to November, these species must be detectable from the wind turbines from at least 2,300 meters, and 4,400 meters in December.  However, the light-enhancing devices that will be used by the developer to detect sea turtles in darkness are generally limited to distances of less than 100 meters, making it less likely that sea turtles will be detected."  This statement mistakenly includes sea turtles within the scope of the referenced minimum visibility distances. These distances only apply to marine mammals and not sea turtles. Thus, the comparison of these distances to the effective range of light enhancing devices for the detection of sea turtles is invalid.

58.     Plaintiff's Motion states "the 2020 and 2021 Protected Species Observer Technical Reports following high-resolution geophysical surveys at the Revolution Wind, Sunrise Wind, South Fork Wind, and Baystate Wind lease areas also show that under nighttime conditions while using all available technologies, the ability for observers to detect marine mammals, and by

extension sea turtles, decreased dramatically at distances of more than 200 meters from an observing vessel." This statement shows Plaintiffs' agreement that the evidence they referenced (Protected Species Observer technical reports) support effectiveness of light enhancing devices to detect marine mammals and sea turtles out to 200 m. Notably, the 200 m effective distance is the same as the revised exclusion zone distance described by BOEM, which is also approximately the same as the distances to the largest sea turtle PTS thresholds. This means that if nighttime pile driving is approved, Protected Species Observers will be able to monitor the sea turtle exclusion zone using light-enhancing devices.

## VI.    CONCLUSION

The Plaintiff's Memorandum of Law and supporting Declarations inaccurately claim that the re-initiation of Section 7 consultation reflects the potential for significantly more harm to marine mammals and sea turtles. However, Plaintiffs' arguments are based on errors in either understanding or describing the potential impacts being assessed by the agencies and Plaintiffs exaggerate the potential for harm to whales and sea turtles. Instead, the re-initiation of Section 7 consultation reflects appropriate procedure and precautionary approaches.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 25, 2024.


Darren Ireland

## <u>Scientific Literature and Reports Cited</u>

Department of the Navy (US). 2012. Commander Task Force 20, 4th, and 6th Fleet Navy marine species density database. Technical report for Naval Facilities Engineering Command Atlantic, Norfolk, VA.

Department of the Navy (US). 2017. U.S. Navy marine species density database phase III for the Atlantic Fleet training and testing study area. NAVFAC Atlantic Final Technical Report. Naval Facilities Engineering Command Atlantic, Norfolk, VA.

Kraus, S. D., S. Leiter, K. Stone, B. Wikgren, C. Mayo, P. Hughes, R. D. Kenney, C. W. Clark, A. N. Rice, B. Estabrook, and J. Tielens. 2016. Northeast large pelagic survey collaborative aerial and acoustic surveys for large whales and sea turtles. OCS Study BOEM 2016-054, Sterling, VA.

Madsen, P.T. 2005.  Marine mammals and noise: Problems with root mean square sound pressure levels for transients. The Journal of the Acoustical Society of America (JASA), 117(6), 3952 3957.

Roberts J.J., Yack T.M., Halpin P.N. 2023.  Marine mammal density models for the U.S. Navy Atlantic Fleet Training and Testing (AFTT) study area for the Phase IV Navy Marine Species Density Database (NMSDD). Document version 1.3. Report prepared for Naval Facilities Engineering Systems Command, Atlantic by the Duke University Marine Geospatial Ecology Lab, Durham,  North Carolina.

Southall, B. L., Bowles, A. E., Ellison, W. T., Finneran J. J., Gentry, R. L., Greene, C. R., Jr., Tyack P. L. 2007. Marine mammal noise exposure criteria. Aquatic Mammals, 33(4).

**<u>Exhibit A</u>**

Curriculum Vitae of Darren Ireland



# DARREN IRELAND, M.S.

*Senior Wildlife Biologist, Vice President*

## EDUCATION

| | |
|---|---|
| 2004 | Master of Science (***Fish and Wildlife Management***), Montana State University, Bozeman, MT |
| 2000 | Bachelor of Arts (***Biology***), Colby College, Waterville, ME |

## PROFESSIONAL EXPERIENCE

### Senior Wildlife Biologist, VP – LGL                                              2005 – Present

Project manager for permitting and monitoring projects related to Marine Mammal Protection Act (MMPA), National Environmental Protection Act (NEPA), and Endangered Species Act (ESA) compliance during offshore activities in Alaska, Gulf of Mexico, and Atlantic regions.

- Authored or co-authored more than 60 MMPA take authorization applications and supporting NEPA and ESA documents, including the calculation of marine mammal densities and the use of sound propagation and sound exposure modeling outputs for estimating potential take related to various activities such as high-resolution geophysical surveys, pile driving related to offshore wind foundations, 2D and 3D seismic surveys, geotechnical investigations, exploration drilling programs, as well as development projects.

- Developed and managed the implementation of multi-disciplinary monitoring plans to record and estimate potential impacts from industrial operations around permitted activities including the use of vessel-based observers, aerial surveys, unmanned aerial systems, static and towed passive acoustic recorders, and infrared camera systems.

- Worked closely with client management and planning teams to develop operational plans and monitoring programs to reduce and document potential impacts to marine mammals, subsistence users and other stakeholders.

- Directed Protected Species Observer (PSO) field operations including vessel and aerial survey programs involving over 60 observers simultaneous deployed across 20 vessels and aircraft as well as acoustic monitoring activities.

- Supervised and conducted daily reporting from monitoring programs to clients and regulatory agencies to meet multiple levels of reporting requirements with different notification timelines.

- Directed and conducted end-of-season data analysis and report writing to meet client's MMPA authorization requirements (90-day, annual, and comprehensive reports).

- Presented significant results at numerous scientific conferences.

Team lead for various technology development efforts associated with projects including the evaluation of fixed-wing unmanned aircraft for marine mammal surveys, automated software for the detection of marine mammals in aerial digital imagery, evaluation of infrared camera systems for the detection of marine mammals, and the development of observer data entry software to streamline collection, QA/QC and reporting procedures.

### Graduate Research Assistant                                                       2002 – 2004

Developed methods for estimating the mass of adult female and pup Weddell seals in Antarctica from digital photographs. Tagged adult and pup Weddell seals as part of an ongoing population study. Assisted in the collection of blood and blubber samples and the application of time-depth recorders. Wrote annual progress reports and coordinated efforts in the field with other research teams studying Weddell seals.

*\* Department of Ecology, Montana State University, Bozeman, Montana*

## Graduate Teaching Assistant                                                    Fall 2004

Taught three laboratory sections of Introductory Biology to undergraduate students. Prepared brief lectures and introductory materials for weekly lab assignments and assisted students with the development of critical thinking skills integral to the scientific method, as well as experimental design, data collection and analysis, presentation, and report writing skills.

*** Department of Ecology, Montana State University, Bozeman, Montana**

## Biological Science Technician                                                1999 – 2002

Assisted with and supervised data collection including hair samples for DNA analysis using barbed wire hair snares, identification and measurement of bear tracks, aerial and ground radio telemetry of radio-collared animals, scat collection, and annual surveys of food abundance.

Assisted and supervised the locating, trapping, and handling of grizzly and black bears in and around Yellowstone N.P. Conducted roadside crowd control and removed carcasses along roadsides. Analyzed data and created maps for the Fish and Wildlife Service during ESA consultations concerning effects of road building on grizzly bear habitat. Wrote a grant proposal and procured funding for a study of fire effects on grizzly bear vegetal foods. Designed, conducted, and wrote a biological assessment on the presence of Canada lynx along roads scheduled for re-construction.

*** Bear Management Office, Yellowstone National Park, Wyoming**

## Field Technician                                                            2000 – 2001

Located mountain lions and wolves using radio telemetry from the ground as well as in small aircraft across the northern range of Yellowstone. Tracked mountain lions to study behavior and locate kills as well as interactions with wolves and elk. Investigated, performed necropsies, and collected samples from wolf and cougar kills which included elk, mule deer, and bighorn sheep. Conducted track surveys looking for other forest predators. Assisted with the capture and handling of kitten and adult mountain lions. Supervised and instructed co-workers on use of radio-telemetry equipment, winter backcountry survival and first aid.

*** Hornocker Wildlife Institute/Wildlife Conservation Society, Gardiner, Montana**

# PUBLICATIONS

Rickard, M.E., K.S. Lomac-MacNair, **D.S. Ireland**, S.M. Leiter, M.D. Poster, A.M. Zoidis. 2022. Evidence of Large Whale Socio-Sexual Behavior in the New York Bight. Aquatic Mammals: 48(5) pg 401-417. DOI 10.1578/AM.48.5.2022.401.

Lomac-MacNair, K.S., A.M. Zoidis, **D.S. Ireland**, M.E. Rickard, K.A. McKown. 2021. New York Bight; a foraging area for humpback, fin, and minke whales. *Aquatic Mammals*: 48(5) pg 142-158. DOI 10.1578/AM.48.2.2022.142.

Zoidis, A.M., K.S. Lomac-MacNair, **D.S. Ireland**. K.A. McKown, M.E. Rickard, M.D. Schlesinger. 2021. Distribution and density of six large whale species in the New York Bight from monthly aerial surveys 2017 to 2020. *Continental Shelf Research*. 230. 18 pp. DOI 10.1016/j.csr.2021.104572.

Matthews, M.-N. R., **D.S. Ireland**, D.G. Zeddies, R.H. Brune, C.D. Pyć. 2021. A modeling comparison of the potential effects on marine mammals from sounds produced by marine vibroseis and air gun seismic sources. *J. Mar. Sci. Eng.* 9:12 https://dx.doi.org/10.3390/jmse9010012.

**Ireland, D.S.**, W.R. Koski, T.A. Thomas, J. Beland, C.M. Reiser, D.W. Funk, and A.M. Macrander. 2009. Updated distribution and relative abundance of cetaceans in the eastern Chukchi Sea in 2006-8. Paper SC/61/BRG4 presented to the International Whaling Commission Scientific Committee, 2009. 14 pp.

Koski, W.R., D.W. Funk, **D.S. Ireland**, C. Lyons, K. Christie, A.M. Macrander, S.B. Blackwell. 2009. An update on feeding by bowhead whales near an offshore seismic survey in the central Beaufort Sea. Paper SC/61/BRG3 presented to the International Whaling Commission Scientific Committee, 2009. 24 pp.

Koski, W.R., T. Allen, **D. Ireland**, G. Buck, P. R. Smith, A. M. Macrander, M. A. Halick, C. Rushing, D. J. Sliwa, T. L. McDonald. 2009. Evaluation of an Unmanned Airborne System for Monitoring Marine Mammals. *Aquatic Mammal*s 35(3): 347-357.

**Ireland, D.** W.R. Koski, T.A. Thomas, M. Jankowski, D.W. Funk, A.M. Macrander and C. Rea. 2008. Distribution and Relative abundance of cetaceans in the eastern Chukchi Sea in 2006 and 2007. Paper SC/60/BRG27 presented to the International Whaling Commission Scientific Committee, 2008. 11 pp.

Koksi, W.R., D.W. Funk, **D.S. Ireland**, C. Lyons, A.M. Macrander, and I. Voparil. 2008. Feeding by bowhead whales near an offshore seismic survey in the Beaufort Sea. Paper SC/60/E14 presented to the International Whaling Commission Scientific Committee, 2008. 14 pp.

Buck, G.B., **D. Ireland**, W.R. Koski, D.J. Sliwa, T. Allen, and C. Rushing. 2007. Strategies to improve UAS performance for marine mammal detection. Paper SC/59/E2 presented to the International Whaling Commission Scientific Committee, Anchorage, AK, May 2007. 15 pp.

**Ireland, D.**, R. A. Garrott, J. Rotella, J. Banfield. 2006. Development and application of a mass-estimation method for Weddell seals. *Marine Mammal Science*. 22(2): 361-378.

**Ireland, D.** 2004. Mass estimation of Weddell seals through photogrammetry. M.S. Thesis. Montana State University. Bozeman, MT.

## CONFERENCE PRESENTATIONS & POSTERS

Zoidis, A.M., K. Lomac-MacNair, **D. Ireland**, M. Rickard. 2020. Large whale distribution and density in the New York Bight from monthly aerial surveys (2017-2020). (Poster) Society for Marine Mammalogy Biennial Conference. December 2021, Palm Beach, Florida.

Zoidis, A.M., K. Lomac-MacNair, **D. Ireland**, M. Rickard. 2020. North Atlantic Right Whales in the New York Bight update: Comprehensive findings from monthly aerial surveys over three years. (Poster) North Atlantic Right Whale Consortium 2020 Annual Meeting. October 2020, Virtual.

**Ireland, D.**, M.-N.R. Matthews, D.G. Zeddies, R. Brune, C. Pyć. 2019. Comparison of potential acoustic impacts from marine vibrator technology and air guns. (Poster) Fifth International Conference on the Effects of Noise on Aquatic Life, June 2019. The Hague, Netherlands.

**Ireland, D.S.**, K. Leonard, G. Schaefer, G. Mercer, R. Jannarone, W.R. Koski, K. Broker. Automated detection of large whales and walrus in digital imagery from aerial surveys. (Presentation) Society for Marine Mammalogy Biennial Conference, Oct. 2017. Halifax, Nova Scotia, Canada.

Leonard, K.E., **D.S. Ireland**, G. Schaefer, G. Mercer, R. Jannarone, C. Tombach Wright, K. Chellappan, M. Marcoux, L. Montsion, W.R. Koski. 2017. Automated detection of narwhal in aerial digital imagery: Application of existing software to novel targets. (Poster) Society for Marine Mammalogy Biennial Conference, Oct. 2017. Halifax, Nova Scotia, Canada.

Patterson, H.M., L.N. Bisson, **D.S. Ireland**. 2017. Changes in ice seal and Pacific walrus sighting rates from vessel supporting petroleum exploration activities in the Alaskan Arctic. (Poster) Alaska Marine Science Symposium, Jan. 2017. Anchorage, Alaska.

Leonard, K., **D.S. Ireland**, G. Schaefer, G. Mercer, R. Jannarone, C. Sparks, H. Patterson, W.R. Koski, A.M. Macrander, K. Broker. 2017. Automated detection of wildlife and aerial digital imagery: A case study of Arctic marine mammals. (Poster) Alaska Marine Science Symposium, Jan. 2017. Anchorage, Alaska.

Bisson, L., H. Patterson, **D.S. Ireland**. 2017. Assessing changes in ice seal presence and estimating residency time near offshore drilling units in the Alaskan Beaufort and Chukchi seas. (Poster) Alaska Marine Science Symposium, Jan. 2017. Anchorage, Alaska.

**Ireland, D.S.**, K. Leonard, G. Schaefer, C. Sparks, R.J. Jannarone, W.R. Koski, D.W. Funk, A.M. Macrander, K. Broker. 2015. Automated detection of large cetaceans in aerial digital imagery. (Presentation) Society for Marine Mammalogy Biennial Conference, Dec. 2015. San Francisco, California.

Reiser, C.M., J. Delarue, D.W. Funk, **D.S. Ireland**, D.M.S. Dickson. 2012. Recent visual and acoustic detections of fin and humpback whales in the Alaskan Chukchi Sea. (Poster) Alaska Marine Science Symposium, Jan. 2012. Anchorage, Alaska.

Koski, W.R., J.R. Brandon, **D.S. Ireland**, D.W. Funk, C. Reiser, A.M. Macrander. 2012. Do bowhead whales avoid sound pressure levels of 120 dB re 1 μPa (rms) from seismic surveys during fall migration? (Poster) Alaska Marine Science Symposium, Jan. 2012. Anchorage, Alaska.

Brandon, J.R., T. Thomas, S. Blackwell, W.R. Koski, **D.S. Ireland**, C. Reiser, M. Bourdon, D.W. Funk, A.M. Macrander. 2012. Ice, seismic activity and the 2010 fall migration of bowheads through Harrison Bay in the central Beaufort Sea. (Poster) Alaska Marine Science Symposium, Jan. 2012. Anchorage, Alaska.

Reiser, C.M., S.W. Raborn, **D.S. Ireland**, DW. Funk, J. Beland, D.M.S. Dickson. 2011. Factors affecting sighting rates of ice seals during vessel-based surveys in the Alaskan Chukchi and Beaufort seas. (Poster) Society for Marine Mammalogy Biennial Conference, Nov. 2011. Tampa, Florida.

Weissenberger, J., K. Hartin, M. Blees, J. Christensen, **D. Ireland**. 2011. Monitoring for marine mammals in Alaska using a 360° infrared camera system. (Poster) Society for Marine Mammalogy Biennial Conference, Nov. 2011. Tampa, Florida.

Dickson, D.M.S., C.M. Reiser, D.W. Funk, **D.S. Ireland**, T. Thomas, J.R. Brandon, W.R. Koski, and D. Hannay. Extralimital sightings of marine mammals in the Alaskan Chukchi and Beaufort seas. (Poster) Society for Marine Mammalogy Biennial Conference, Nov. 2011. Tampa, Florida.

Koski, W.R., J.R. Brandon, **D.S. Ireland**, D.W. Funk, A.M. Macrander, and S.B. Blackwell. Aerial sighting distributions of bowhead whales in the central Beaufort Sea relative to seismic activity during 2007, 2008, and 2010. (Poster) Society for Marine Mammalogy Biennial Conference, Nov. 2011. Tampa, Florida.

Koski, W.R., **D.S. Ireland** and J.M. Kendrick. 2010. Industry Sponsored Studies of UAS for Monitoring Marine Mammals. (Presentation) Unmanned Systems Canada Conference, 2-5 November 2010, Montreal, Quebec.

Koski, W.R., **D.S. Ireland** and J.M. Kendrick. 2010. A Summary of Findings from Industry-sponsored Studies of UAS for Monitoring Marine Mammals. (Presentation) Unmanned Systems Canada Conference, 2-5 November 2010, Montreal, Quebec.

Christie, K., C. Lyons, W.R. Koski, **D.S. Ireland**, and D.W. Funk. Patterns of bowhead whale occurrence and distribution during marine seismic operations in the Alaskan Beaufort Seas. (Poster) Society for Marine Mammalogy Biennial Conference, Oct. 2009. Quebec City, Canada.

Savarese, D.M., B. Haley, J. Beland, C.M. Reiser, **D.S. Ireland**, R. Rodrigues, and D.W. Funk. Localized avoidance of marine seismic operations by cetaceans in the Chukchi and Beaufort seas. (Presentation; given by **D.S. Ireland**) Society for Marine Mammalogy Biennial Conference, Oct. 2009. Quebec City, Canada.

Thomas, T.A., W.R. Koski, **D.S. Ireland**, D.W. Funk, M. Laurinolli, A.M. Macrander. 2009 Pacific walrus movements and use of terrestrial haul-out sites along the Alaskan Chukchi Sea coast in 2007. (Poster) Society for Marine Mammalogy Biennial Conference, Oct. 2009. Quebec City, Canada.

Reiser, C.M., B. Haley, J. Beland, D.M. Savarese, **D.S. Ireland**, D.W. Funk. 2009. Evidence for short-range movements by phocid species in reaction to marine seismic surveys in the Alaskan Chukchi and Beaufort seas. (Poster) Society for Marine Mammalogy Biennial Conference, Oct. 2009. Quebec City, Canada.

Beland, J., B. Haley, B., C.M. Reiser, D.M. Savarese, **D.S. Ireland**, and D.W. Funk. Effects of the presence of other vessels on marine mammal sightings during multi-vessel operations in the Alaskan Chukchi Sea. (Poster) Society for Marine Mammalogy Biennial Conference, Oct. 2009. Quebec City, Canada.

**Ireland, D.S.**, G. B. Buck, W. R. Koski, D. Sliwa, T. Allen, C. Rushing. 2007. Strategies to improve UAS performance for marine mammal detection. (Poster) Society for Marine Mammalogy Biennial Conference, Dec 2007. Cape Town, South Africa.

## SELECTED TECHNICAL REPORTS

Matthews, M.-N. R., **D. Ireland**, R. Brune, D.G. Zeddies, J. Christian, G. Warner, T.J. Deveau, H. Frouin-Mouy, S. Denes, C. Pyć, V.D. Moulton, and D.E. Hannay. 2018. Determining the Environmental Impact of Marine Vibrator Technology: Final Report. Document number 01542, Version 1.0. Technical report by JASCO Applied Sciences, LGL Ecological Research Associates Inc., and Robert Brune LLC for the IOGP Marine Sound and Life Joint Industry Programme.

**Ireland, D.S.**, L. Bisson, S.B. Blackwell, M. Austin, D.E. Hannay, K. Bröker, A.M. Macrander (eds.). 2016. Comprehensive Report of Marine Mammal Monitoring and Mitigation in the Chukchi and Beaufort Seas, 2006–2015. LGL Alaska Report P1363-E. Report from LGL Alaska Research Associates, Inc., Greeneridge Sciences, Inc., and JASCO Applied Sciences Ltd., for Shell Gulf of Mexico, Inc. and National Marine Fisheries Service, U.S. Fish and Wildlife Service. 558 p. plus Appendices.

**Ireland, D.S.** and L.N. Bisson. (eds.) 2016. Marine mammal monitoring and mitigation during exploratory drilling by Shell in the Alaskan Chukchi Sea, July–October 2015: 90-Day Report. LGL Rep. P1363D. Rep. from LGL Alaska Research Associates Inc., Anchorage, AK, USA, and JASCO Applied Sciences, Victoria, BC, Canada, for Shell Gulf of Mexico Inc, Houston, TX, USA, Nat. Mar. Fish. Serv., Silver Spring, MD, USA, and U.S. Fish and Wild. Serv., Anchorage, AK, USA. 188 pp, plus appendices.

Beland, J.A., **D.S. Ireland**, L.N. Bisson, and D. Hannay. (eds.) 2013. Marine mammal monitoring and mitigation during a marine seismic survey by ION Geophysical in the Arctic Ocean, October-November 2012: 90-day report. LGL Rep. P1236. Rep. from LGL Alaska Research Associates Inc., LGL Ltd., and JASCO Research Ltd. for ION Geophysical, Nat. Mar. Fish. Serv., and U.S. Fish and Wild. Serv. 156 pp, plus appendices.

Hartin K.G., L.N. Bisson, S.A. Case, **D.S. Ireland**, and D. Hannay. (eds.) 2011. Marine mammal monitoring and mitigation during site clearance and geotechnical surveys by Statoil USA E&P Inc. in the Chukchi Sea, August–October 2011: 90-day report. LGL Rep. P1193. Rep. from LGL Alaska Research Associates Inc., LGL Ltd., and JASCO Research Ltd. for Statoil USA E&P Inc., Nat. Mar. Fish. Serv., and U.S. Fish and Wild. Serv. 202 pp, plus appendices.

Funk, D.W. C.M. Reiser, **D.S. Ireland**, R. Rodrigues, and W.R. Koski (eds.). 2011. Joint Monitoring Program in the Chukchi and Beaufort seas, 2006–2010. LGL Alaska Draft Report P1213-1, Report from LGL Alaska Research Associates, Inc., LGL Ltd., Greeneridge Sciences, Inc., and JASCO Research, Ltd., for Shell Offshore, Inc. and Other Industry Contributors, and National Marine Fisheries Service, U.S. Fish and Wildlife Service. 529 p. plus Appendices.

Funk, D.W., **D.S. Ireland**, R. Rodrigues, and W.R. Koski (eds.). 2011. Joint Monitoring Program in the Chukchi and Beaufort seas, open-water seasons, 2006–2009. LGL Alaska Draft Report P1050-2, Report from LGL Alaska Research Associates, Inc., LGL Ltd., Greeneridge Sciences, Inc., and JASCO Applied Sciences, for Shell Offshore, Inc. and Other Industry Contributors, and National Marine Fisheries Service, U.S. Fish and Wildlife Service. 462 p. plus Appendices.

Blees, M.K., K.G. Hartin, **D.S. Ireland**, and D. Hannay. (eds.) 2010. Marine mammal monitoring and mitigation during open water seismic exploration by Statoil USA E&P Inc. in the Chukchi Sea, August–October 2010: 90-day report. LGL Rep. P1119. Rep. from LGL Alaska Research Associates Inc., LGL Ltd., and JASCO Research Ltd. for by Statoil USA E&P Inc., Nat. Mar. Fish. Serv., and U.S. Fish and Wild. Serv. 102 pp, plus appendices.

**Ireland, D. S.**, R. Rodrigues, D. Funk, W. Koski, D. Hannay. (eds.) 2009. Marine mammal monitoring and mitigation during open water seismic exploration by Shell Offshore Inc. in the Chukchi and Beaufort Seas, July–October 2008: 90-day report. LGL Rep. P1049-1. Rep. from LGL Alaska Research Associates Inc., LGL Ltd., and JASCO Research Ltd. for Shell Offshore Inc, Nat. Mar. Fish. Serv., and U.S. Fish and Wild. Serv. 277 pp, plus appendices.

**Ireland, D. S.**, D. W. Funk. R. Rodrigues, and W.R. Koski (eds.). 2009. Joint Monitoring Program in the Chukchi and Beaufort seas, open water seasons, 2006–2007. LGL Alaska Report P971–2, Report from

LGL Alaska Research Associates, Inc., Anchorage, AK, LGL Ltd., environmental research associates, King City, Ont., JASCO Research, Ltd., Victoria, BC, and Greeneridge Sciences, Inc., Santa Barbara, CA, for Shell Offshore, Inc., Anchorage, AK, ConocoPhillips Alaska, Inc., Anchorage, AK, and the National Marine Fisheries Service, Silver Springs, MD, and the U.S. Fish and Wildlife Service, Anchorage, AK. 485 p. plus Appendices.

Funk, D. W., D. Hannay, **D. Ireland**, R. Rodrigues, and W. R. Koski (eds.). 2008. Marine mammal monitoring and mitigation during open water seismic exploration by Shell Offshore Inc. in the Chukchi and Beaufort Seas, July- November 2007: 90-day report. LGL Rep. P969-1. Rep. from LGL Alaska Research Associates Inc., Anchorage, AK, LGL Ltd., and JASCO Research Ltd. for Shell Offshore Inc, Houston, TX, and Nat. Mar. Fish. Serv., Silver Spring, MD. 218 pp plus appendices.

Funk, D. W., R. Rodrigues, **D. Ireland**, and W. R. Koski (eds.). 2007. Joint Monitoring Program in the Chukchi and Beaufort Seas, July-November 2006. LGL Rep. P891-2. Report from LGL Alaska Research Associates Inc., Anchorage, AK, LGL Ltd., King City, Ont., Greeneridge Sciences Inc., Santa Barbara, CA, Bioacoustics Research Program, Cornell University, and Biowaves Inc., for Shell Offshore Inc., Houston, TX, ConocoPhillips Alaska, Inc., GXT Corporation, and Nat. Mar. Fish. Serv., Silver Spring, MD. 316 p. plus appendices.

**Ireland, D.**, D. Hannay, R. Rodrigues, H. Patterson, B. Haley, A. Hunter, M. Jankowski, and D. W. Funk. 2007. Marine mammal monitoring and mitigation during open water seismic exploration by GX Technology in the Chukchi Sea, October—November 2006: 90-day report. LGL Draft Rep. P891-1. Rep. from LGL Alaska Research Associates Inc., Anchorage, AK, LGL Ltd., King City, Ont., and JASCO Research, Ltd., Victoria, B.S., Can. for GX Technology, Houston, TX, and Nat. Mar. Fish. Serv., Silver Spring, MD. 118 p.

**Ireland, D.**, R. Rodrigues, D. Hannay, M. Jankowski, A. Hunter, H. Patterson, B. Haley, and D. W. Funk. 2007. Marine mammal monitoring and mitigation during open water seismic exploration by ConocoPhillips Alaska Inc. in the Chukchi Sea, July–October 2006: 90-day report. LGL Draft Rep. P903-1. Rep. from LGL Alaska Research Associates Inc., Anchorage, AK, LGL Ltd., King City, Ont., and JASCO Research Ltd., Victoria, BC, for ConocoPhillips Alaska, Inc., Anchorage, AK, and Nat. Mar. Fish. Serv., Silver Spring, MD. 116 p.

**Ireland, D.**, M. Holst, and W.R. Koski. 2005. Marine mammal monitoring during Lamont-Doherty Earth Observatory's seismic program off the Aleutian Islands, Alaska, July–August 2005. LGL Rep. TA4089-3. Rep. from LGL Ltd., King City, Ont., for Lamont-Doherty Earth Observatory of Columbia Univ., Palisades, NY, and Nat. Mar. Fish. Serv., Silver Spring, MD. 67 p.

Haley, B. and **D. Ireland**. 2005. Marine mammal monitoring during University of Alaska Fairbanks' marine geophysical survey across the Arctic Ocean, August–September 2005. LGL Rep. TA4122-3. Rep. from LGL Ltd., King City, Ont., for University of Alaska Fairbanks, Fairbanks, AK, and Nat. Mar. Fish. Serv., Silver Spring, MD. 96 p.

**Ireland, D.**, T.M. Markowitz, D.W. Funk, C. Kaplan. 2005. Beluga whale distribution and behavior in Eagle Bay and the Sixmile Area of upper Cook Inlet, Alaska, in September and October 2005. Rep. from LGL Alaska Research Associates, Inc., Anchorage, AK in association with HDR Alaska, Inc., Anchorage, AK, for the Knik Arm Bridge and Toll Authority, Anchorage, AK, Department of Public Facilities, Anchorage, AK and the Federal Highways Administration, Juneau, AK.

**Ireland, D.**, S. McKendrick, D. W. Funk, T. M. Markowitz, A. P. Ramos, M. R. Link, and M. W. Demarchi. 2005. Spatial analysis of beluga whale distribution in Knik Arm. Chapter 7 *In:* Funk, D.W., T.M. Markowitz and R. Rodrigues (eds.) 2005. Baseline studies of beluga whale habitat use in Knik Arm, Upper Cook Inlet, Alaska, July 2004–July 2005. Rep. from LGL Alaska Research Associates, Inc., Anchorage, AK, in association with HDR Alaska, Inc., Anchorage, AK, for the Knik Arm Bridge and Toll Authority, Anchorage, AK, Department of Transportation and Public Facilities, Anchorage, AK, and the Federal Highway Administration, Juneau, AK.