**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREEN OCEANS, et al., ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 1:24-cv-00141-RCL |
| ) | |
| UNITED STATES DEPARTMENT OF THE ) | Hon. Royce C. Lamberth |
| INTERIOR, et al., ) | |
| ) | |
| *Defendants,* ) | |
| ) | |
| and ) | |
| ) | |
| REVOLUTION WIND, LLC, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |
| ) | |

**Hearing Requested**

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR STAY OF FINAL AGENCY ACTION**

Roger J. Marzulla
Nancie G. Marzulla
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
(202) 822-6760
roger@marzulla.com
nancie@marzulla.com
Bar No. 394907
Bar No. 400985

May 14, 2024                                             Counsel for Plaintiffs

**Table of Contents**

Table of Authorities..........................................................................................................iii

Table of Abbreviations ...................................................................................................... v

Table of Exhibits ............................................................................................................... vi

Factual and Procedural Background ................................................................................... 2

1.  The Federal Government Launches an Aggressive Program to Push Through
Environmental Approvals for the Administration's New Offshore Wind Program ................... 2

2.  Federal Agencies Hastily Complete the Environmental Review and Approve Construction
Plans for the Revolution Wind Project ................................................................................. 4

3.  As Approved, the Revolution Wind Project Will Have Significant Impacts on Cox Ledge
and the Right Whale ........................................................................................................... 6

    3.1  Cox Ledge ......................................................................................................... 6

    3.2  The North Atlantic Right Whale ....................................................................... 7

4.  Construction Is Imminent ............................................................................................ 8

Procedural History ............................................................................................................. 8

Statutory Background ......................................................................................................... 9

1.  Endangered Species Act .............................................................................................. 9

2.  The Clean Water Act .................................................................................................11

Argument ......................................................................................................................... 12

1.  Standard of Review ................................................................................................... 12

    2.1  Cox Ledge is a Highly Productive Fishery, that Is a Special Aquatic Site Under the
    Clean Water Act ......................................................................................................... 15

    2.2  Although Corps Regulations Presume that Alternatives to This Special Aquatic Site
    Are Available, the Corps Failed to Consider Those Alternatives When It Authorized the
    Revolution Wind Project ............................................................................................ 17

3.  Green Oceans Is Likely to Succeed Because the Biological Opinion Violates the
Endangered Species Act and the Pollution Discharge Permit Violates the Clean Water Act.... 19

    3.1  The Government Has Failed to Protect the Highly Endangered North Atlantic Right
    Whale, in Violation of the Endangered Species Act ..................................................... 19

    3.2  NMFS's Biological Opinion Improperly Excluded Consideration of 22 Other
    Proposed and Planned Offshore Wind Projects ........................................................... 21

    3.3  The Government Had Available Scientific Information Demonstrating the
    Devastating Total Impacts of Offshore Wind Projects on the Whales, Which It Ignored ..... 24

3.4     NMFS Violated Its Own Regulations by Ignoring the Anticipated Effects of All Proposed Federal Projects That Have Already Undergone Formal or Early Section 7 Consultation ........................................................................................................... 27

3.5     North Atlantic Right Whales Occupy the Revolution Wind Area Year-Round, Including Months When Pile Driving Is Now Scheduled ...................................... 30

3.6     Revolution Wind, LLC Is Not Permitted to Use Two Pile-Driving Vessels ............. 31

4.     Plaintiffs Will Suffer Irreparable Injury Without a Stay ................................... 32

4.1     Plaintiff, Save Right Whale Coalition, Will Suffer Irreparable Harm If the Stay Is Not Granted ............................................................................................................ 32

4.2     Injury to the North Atlantic Right Whale is also injury to Green Oceans and Dr. Elizabeth Quattrocki Knight .................................................................................. 34

5.     The Agencies and Defendant-Intervenor Revolution Wind Will Not Be Harmed by a Stay in This Case ............................................................................................................ 36

6.     The Paramount Public Interest Lies in Conservation of the Ocean's Natural Resources . 38

Conclusion ...................................................................................................................... 39

## Table of Authorities

### Cases

*Am. Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230 (D.D.C. 2003) ............... 13, 14

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ...................... 13

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988). ............................................... 22, 23, 24

*Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55 (D.C. Cir. 2022) ...................... 37

*Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2024 WL 1602457 (D.D.C. Apr.
    12, 2024) ................................................................................................ 9, 10, 20, 21

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ................................... 13

*Defs. of Wildlife v. U.S. Env't Prot. Agency*, 420 F.3d 946 (9th Cir. 2005) ........................... 21, 23

*Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231 (2020) .................................... 37

*Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010) ................................... 13

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023) ... 21, 23

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996). ........................................ 14

*Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608 (D.C. Cir. 2013). ................................... 11

*N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ........................................ 22

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) ................................... 20

*National Wildlife Federation v. Burlington Northern R.R., Inc.*, 23 F.3d 1508 (9th Cir. 1994) ... 14

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002) .............................. 21

*Nken v. Holder*, 556 U.S. 418 (2009). .......................................................... 13

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011). .............................................. 13

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) ........................................... 9, 38, 39

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985). .......................................... 21, 23, 24

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010). ................................... 23, 24

### Statutes

16 U.S.C. § 1533. .................................................................................... 20

16 U.S.C. § 1536(a)(2). .......................................................................... 10, 37

16 U.S.C. § 1536(a). ............................................................................... 9

16 U.S.C. § 1536(d). ............................................................................... 10

16 U.S.C. § 1536. ................................................................................ 19, 39

16 U.S.C. § 1540(a)(1). .......................................................................... 37

16 U.S.C. § 1540(b)(1) ........................................................................... 37

33 U.S.C. § 1251. ................................................................................ 11

33 U.S.C. § 1251–1387. .......................................................................... 11

33 U.S.C. § 1311(a). ............................................................................ 11, 14

33 U.S.C. § 1319(c)(1). .......................................................................... 14

33 U.S.C. § 1344(a). ............................................................................ 11, 14

43 U.S.C. § 1337(p)(1)(C) ........................................................................ 2

5 U.S.C. § 702 ................................................................................... 12

5 U.S.C. § 703 ................................................................................... 12

5 U.S.C. § 704 ................................................................................... 12

5 U.S.C. § 705. ..................................................................................................... 12
5 U.S.C. § 706 ..................................................................................................... 12

## Regulations

30 C.F.R. § 285 ..................................................................................................... 3
33 C.F.R. § 203-385. ............................................................................................. 15
33 C.F.R. § 323.2(c). ............................................................................................. 14
33 C.F.R. § 323.2(e). ....................................................................................... 14, 15
33 C.F.R. § 326.6 ................................................................................................... 14
40 C.F.R. § 230.1(c). ............................................................................................. 12
40 C.F.R. § 230.10(a)(3). ...................................................................................... 17
40 C.F.R. § 230.3(m) ............................................................................................ 17
40 C.F.R. § 231.2(e). ............................................................................................. 12
50 C.F.R. § 216.3. .................................................................................................. 29
50 C.F.R. § 402.02. ..................................................................................... 10, 11, 27
50 C.F.R. § 402.14(a). ............................................................................................. 9
50 C.F.R. § 402.14(g). ........................................................................................... 10
50 C.F.R. § 402.14(g)(3). ....................................................................................... 11
50 C.F.R. § 402.14(g)(8) ....................................................................................... 10
50 C.F.R. § 402.16(a)(2)-(3) ................................................................................... 6
76 Fed. Reg. 28178 (May 16, 2011) ....................................................................... 3
76 Fed. Reg. 64432 (Oct. 18, 2011). ...................................................................... 2
86 Fed. Reg. 33810 (June 25, 2021) ........................................................... 2, 26, 30
86 Fed. Reg. 7619 (Jan. 27, 2021). ....................................................................... 19
87 Fed. Reg. 54248 (Sept. 2, 2022). ....................................................................... 4
87 Fed. Reg. 806 (Jan. 6, 2022) .................................................................. 2, 26, 30
88 Fed. Reg. 37606 (June 8, 2023) ............................................................. 2, 26, 30
88 Fed. Reg. 62898 (Sept. 13, 2023) ......................................................... 2, 26, 30
88 Fed. Reg. 65430 (Sept. 22, 2023) ......................................................... 2, 26, 30
88 Fed. Reg. 72562 (Oct. 10, 2023) ........................................................... 1, 26, 30
88 Fed. Reg. 8996 (Feb. 10, 2023) ............................................................. 2, 26, 30
89 Fed. Reg. 11342 (Feb. 14, 2024) ........................................................... 1, 26, 29
89 Fed. Reg. 31008 (Apr. 23, 2024). ..................................................... 2, 26, 28, 30
89 Fed. Reg. 4370 (Jan. 23, 2024) ............................................................. 1, 26, 29
89 Fed. Reg. 7633 (Feb. 5, 2024) .......................................................................... 16

**Table of Abbreviations**

| Abbreviation | Definition |
| --- | --- |
| BOEM | Bureau of Ocean Energy Management |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FWS | United States Fish and Wildlife Service |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| OCSLA | Outer Continental Shelf Lands Act |
| OSW | Offshore Wind |
| UXO/MEC | Unexploded Ordnance/ Munitions and Explosives of Concern |

**Table of Exhibits**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| Ex. 1 | NMFS Letter re Reinitiation of Endangered Species Act Section 7 Consultation for the Revolution Wind Project (March 12, 2024) |
| Ex. 2 | Declaration of Lisa Linowes (May 14, 2024) |
| Ex. 3 | Declaration of Elizabeth Quattrocki Knight (May 14, 2024) |
| Ex. 4 | Opinion from Dr. Sean Hayes to Brian Hooker, Lead Biologist at BOEM (May 13, 2022) |

Plaintiffs, Green Oceans et al. (collectively "Green Oceans") ask this Court for a preliminary injunction or an administrative stay enjoining or staying Defendants, the United States Department of Interior et al. (collectively, the "Government") and Defendant-Intervenor, Revolution Wind, LLC, from conducting any in-water work related to its offshore wind energy facility, the Revolution Wind Offshore Wind Project, until the merits of this lawsuit are resolved. Counsel for Green Oceans certifies that he has met and conferred in good faith with counsel for the Government and for Revolution Wind in compliance with Local Rule 7(m). Counsel for Green Oceans further states that Defendants have indicated that they intend to oppose this motion.

Green Oceans understands that Defendant-Intervenor, Revolution Wind, has already started pile driving. As Green Oceans has alleged, the Government has rushed through the approval and permitting for this major federal wind turbine project (with 65 massive turbines), shortcutting the requirements of the Endangered Species Act ("ESA") and the Clean Water Act. In violation of the ESA, the National Marine Fisheries Service ("NMFS") did not consider the cumulative impacts of twenty-two additional soon-to-be-constructed wind turbine projects on the highly endangered North Atlantic Right Whale, of which there are now fewer than 70 reproductively active females in existence.[1] The cumulative impacts of all approved or soon-to-be approved wind turbine projects along the Atlantic coastline will result in takes of 244 North Atlantic Right Whales.[2] Nor did the U.S. Army Corps of Engineers consider the impacts of the

---

[1] *See* BOEM and NOAA's Strategy on the North Atlantic Right Whale and Offshore Wind (Jan. 2024) at 7, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW _0.pdf (North Atlantic Right Whale Strategy).

[2] 89 Fed. Reg. 11342, 11392 (Feb. 14, 2024) (29 during Empire Wind construction); 89 Fed. Reg. 4370, 4424 (Jan. 23, 2024) (17 during Dominion Wind construction); 88 Fed. Reg. 72562 (Oct. 10, 2023) (56 during Revolution Wind construction); 88 Fed. Reg. 62898, 62953 (Sept. 13,

Project in its Clean Water Act analysis on the unique marine habitat, Cox Ledge, over which Revolution Wind intends to construct its wind turbines. The Corps ignored that Cox Ledge is the only remaining spawning ground for Atlantic Cod and a winter foraging area for five endangered whale species. The Rhode Island Coastal Management Council identified Cox Ledge as a marine habitat "having the highest ecological value . . . anywhere in [a] 1,467 square mile study area."[3]

Green Oceans asks this Court to grant its motion for an administrative stay or a preliminary injunction to preserve the status quo while the merits of this legal challenge are pending.

**Factual and Procedural Background**

**1.      The Federal Government Launches an Aggressive Program to Push Through Environmental Approvals for the Administration's New Offshore Wind Program**

In 2005, Congress amended the Outer Continental Shelf Lands Act ("OCSLA") to allow the Minerals Management Service, an agency within the Department of the Interior, to grant leases for offshore renewable energy projects, including such projects as the Revolution Wind Project here.[4] That amendment underscored that the Outer Continental Shelf is an important national, public resource and that development of the Outer Continental Shelf will have

---

2023) (14 during Ocean Wind 1 construction); 87 Fed. Reg. 806, 848 (Jan. 6, 2022) (13 during South Fork Wind construction); 86 Fed. Reg. 33810, 33836 (June 25, 2021) (20 during Vineyard Wind construction); 88 Fed. Reg. 37606 (June 8, 2023) (10 during New England Wind); 88 Fed. Reg. 8996, 9057 (Feb. 10, 2023) (47 during Sunrise Wind); 89 Fed. Reg. 504, 552 (Jan. 4, 2024) (10 during US Wind); 88 Fed. Reg. 65430, 65485 (Sept. 22, 2023) (21 during Atlantic Shores South); 89 Fed. Reg. 31008, 31042 (Apr. 23, 2024) (7 additional takes during the final phase of Vineyard Wind 1).

[3] Rhode Island Coastal Management Council, *Coastal Effects Analysis for South Fork Wind* at 4, http://www.crmc.ri.gov/meetings/2021_0525semipacket/2021_0525_CoastalEffectsAnalysis_SF W.pdf (last visited May 14, 2024).

[4] *See* 43 U.S.C. § 1337(p)(1)(C); 76 Fed. Reg. 64432, 64434, 64459 (Oct. 18, 2011).

"significant impacts on coastal and non-coastal areas of the coastal States," and that, all development within the reserve must be "subject to environmental safeguards."[5]

The Interior Department later revised its offshore wind energy leasing regulations to implement a "Smart from the Start" policy to "accelerate"[6] leasing on the Outer Continental Shelf and "speed offshore wind energy development off the Atlantic Coast."[7] In 2011, the Interior Department merged what had been four phases of project approval, (1) planning and analysis, (2) lease issuance, (3) site assessment plan approval, and (4) construction and operation plan approval, into one, leaving only one opportunity for public comment and removing any pre-bid opportunities for public comment on lease locations, on-site evaluations of environmental impacts, or reasonable uses before lease issuance.[8]

In January 2021, President Biden issued Executive Order 14008, launching a "government-wide approach to the climate crisis."[9] The development of wind energy was a big part of this new program.[10]

In March 2021, the administration urged "bold actions" to "catalyze offshore wind energy" development.[11] The White House stated its goal of deploying 30 gigawatts of offshore

---

[5] *Id.*

[6] U.S. Dept. of Interior, Press Release: *Salazar Launches 'Smart from the Start Initiative to Speed Offshore Wind Energy Development off the Atlantic Coast* (Nov. 23, 2020), https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.

[7] *Id.*

[8] *See* 76 Fed. Reg. 28178 (May 16, 2011) (amending 30 C.F.R. § 285).

[9] Biden Administration, *Executive Order on Tackling the Climate Crisis at Home and Abroad* (Jan. 27, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/#:~:text=The%20Secretary%20of%20the%20Interior,of%20doubling%20offshore%20wind%20by.

[10] *Id.*

[11] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-

wind energy by 2030 and announced that it was taking "coordinated steps to support rapid offshore wind deployment."[12] To meet the 2030 target, the administration announced that it planned to advance new lease sales and review "at least 16 Construction and Operations Plans (COPs) by 2025."[13]

Today, 30 offshore wind projects are in various stages of development,[14] which will be in, along, or near the endangered North Atlantic Right Whale's migration path and habitat and the Revolution Wind Project is to be constructed directly atop of Cox Ledge, a uniquely valuable marine habitat that supports the spawning of cod and other fish species.

**2.      Federal Agencies Hastily Complete the Environmental Review and Approve Construction Plans for the Revolution Wind Project**

In March 2020, Revolution Wind submitted its Construction and Operations Plan for the Project, which was most recently updated in 2023.[15] On August 29, 2022, the Bureau of Ocean Energy Management (BOEM) published its Draft Environmental Impact Statement.[16] On July 17, 2023, BOEM published a Final Environmental Impact Statement.[17]

---

releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[12] *Id.*

[13] *Id.*

[14] North Atlantic Right Whale Strategy *supra* note 1 at 5.

[15] Revolution Wind, *Construction & Operations Plan* (Mar. 1, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution%20Wind%20COP%20Volume%201%20March%202023_v2_508c.pdf.

[16] 87 Fed. Reg. 54248 (Sept. 2, 2022).

[17] Bureau of Ocean Energy Management, *Final Environmental Impact Statement* (July 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2.pdf (Revolution Wind Final Environmental Impact Statement).

On July 21, 2023, NMFS issued a Biological Opinion for the Revolution Wind Project offshore Rhode Island,[18] and one month later BOEM, United States Army Corps of Engineers, and NMFS issued a Joint Record of Decision approving construction and operation of the Revolution Wind Project.[19] The Revolution Wind Project lease covers 83,798 acres of sea floor, including designated critical habitat for five endangered whale species[20] and four endangered sea turtle species.[21] The Project, as authorized, includes 65 giant wind turbines, each standing twice the height of the Washington Monument and each anchored to the ocean floor by a solid steel foundation called a monopile, which is 12 meters in diameter, driven at least 98 feet into the ocean floor by a huge, ship-mounted pile driver.[22]

Revolution Wind then faced its first hiccup. On March 12, 2024, NMFS reinitiated consultation with BOEM concerning the Revolution Wind Project "to consider changes to the proposed actions" that may affect listed species "in a manner or to an extent not considered" in the July 2023 Biological Opinion and "new information" that reveals effects of the action that

---

[18] National Marine Fisheries Service, *July 21, 2023 Biological Opinion* (July 21, 2023), https://www.fisheries.noaa.gov/s3/2023-08/Rev-Wind-BiOp-Final-072123-508-Compliant.pdf.

[19] Bureau of Ocean Energy Management, *Revolution Wind Record of Decision* (Aug. 21, 2023) https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf.

[20] National Marine Fisheries Service, *Revolution Wind Biological Opinion* (July 21, 2023) at 1, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf (North Atlantic Right Whale, Fin Whale, Sei Whale, Sperm Whale, and Blue Whale).

[21] *Id.* (Green Sea Turtle, Kemp's Ridley Sea Turtle, Loggerhead Sea Turtle, Leatherback Sea Turtle).

[22] Orsted, *Revolution Wind Construction and Operations Plan* (Mar. 2023) at 97, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution%20Wind%20COP%20Volume%201%20March%202023_v2_508c.pdf.

may affect listed species "in a manner or to an extent not previously considered."[23] By April 30,

2024, NMFS published its new Biological Opinion.[24]

### 3. As Approved, the Revolution Wind Project Will Have Significant Impacts on Cox Ledge and the Right Whale

#### 3.1 Cox Ledge

The coastal waters of Rhode Island are home to critical marine habitats. One such habitat,

Cox Ledge, is off the coast of Rhode Island where the Revolution Wind Project is sited. Cox

Ledge is an area with extensive "complex benthic habitat that supports several commercially and

recreationally important species."[25] Cox Ledge is primarily known for the "spawning activity for

Atlantic cod, [which is] a species of biological, ecological, economic, and cultural significance to

this region."[26] This spawning cod stock is reproductively isolated from the rest of New

England's cod stock. Other than cod, Cox Ledge is home to finfish, shellfish, crustaceans,

marine mammals, sea turtles, and birds.[27] Recognizing its importance, the Rhode Island Coastal

Management Council identified Cox Ledge as "having the highest ecological value of anywhere

in [a] 1,467 square mile study area."[28]

---

[23] *See* Exhibit 1, NMFS Letter re Reinitiation of Endangered Species Act Section 7 Consultation for the Revolution Wind Project (Mar. 12, 2024) (citing 50 C.F.R. § 402.16(a)(2)-(3)).

[24] National Marine Fisheries Service, *Revolution Wind April 30, 2024 Biological Opinion* (Apr. 30, 2024) (Revolution Wind April 30, 2024 Biological Opinion).

[25] Revolution Wind Final Environmental Impact Statement *supra* note 17 at 3.13-75; *see also id.* at 3.13-61 ("Cox Ledge, is known to support cod spawning aggregations.").

[26] *Id.* at Appendix L-164, Comment BOEM-2022-0045-0100 (National Marine Fisheries Service Comment).

[27] *See generally* Rhode Island Coastal Resources Management Council, *Coastal Effects for South Fork Wind* (May 25, 2021), http://www.crmc.ri.gov/meetings/2021_0525semipacket/2021_0525_CoastalEffectsAnalysis_SFW.pdf.

[28] *Id.* at 4.

### 3.2    The North Atlantic Right Whale

Few species are as imperiled as the North Atlantic Right Whale. The species is close to extinction, easily susceptible to stress and chronic injuries from construction, vessel strikes, or entanglements, and has low reproductive rates.[29] Defendants have acknowledged how imperiled this species is:

> Due to the declining status of [North Atlantic Right Whales], the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction . . . [and] the loss of even one individual a year may reduce the likelihood of recovery and of the species' achieving optimum sustainable population.[30]

Since 2011, roughly 237 individual North Atlantic Right Whales have died, and the construction of the Revolution Wind Project, combined with all the other wind turbine projects approved up and down the Atlantic coast, threatens the existence of this species.

The North Atlantic Right Whale breeds in the waters offshore New England and then migrates yearly along the Atlantic coast to southern waters to give birth, traversing many of the other areas where Defendants have approved or planned to approve offshore wind projects.[31] While generally a migratory species, some individuals become residents of preferred locations and do not migrate. Pregnant females give birth in shallow waters only a few miles offshore.[32] In the springtime, the females who have given birth to a calf migrate back up the Atlantic coast and return to high latitude foraging grounds.[33]

The Government's wind energy corridor and the Revolution Wind Project, which is soon to be constructed, will be situated directly in the migration path of the North Atlantic Right

---

[29] Revolution Wind April 30, 2024 Biological Opinion *supra* note 24 at 59.
[30] *See* North Atlantic Right Whale Strategy *supra* note 1 at 10.
[31] *See id.* at 9.
[32] Revolution Wind April 30, 2024 Biological Opinion *supra* note 24 at 59.
[33] *Id.*

Whale. This means that each migrating North Atlantic Right Whale must navigate through all 30 offshore wind projects—and traverse through thousands of massive wind turbines—to maintain reproductive integrity and survive as a species.

### 4.    Construction Is Imminent

Revolution Wind intended to begin construction on May 1, 2024, but had to wait until NMFS approved several mitigation plans. These plans were approved on May 9, 2024, and Revolution Wind has started pile driving.

**Procedural History**

On January 16, 2024, Plaintiffs, Green Oceans, filed a complaint challenging the Government's failure to comply with several major environmental, natural resource, and federal planning laws in issuing permits and approvals for the Revolution Wind Project.[34] On April 10, 2024, the Court granted Revolution Wind, LLC's motion to intervene as a Defendant.[35]

On May 9, 2024, counsel for Green Oceans and counsel for the Government and Revolution Wind met and conferred telephonically to discuss Green Ocean's planned motion, as required by Local Rule 7(m), to discuss Defendants' position on the motion, and to determine if any of the issues could be resolved amicably or whether any issues could be narrowed. Counsel for Defendants informed Green Oceans' counsel that they would oppose the motion and that there was no way of narrowing the issues.

---

[34] Compl. (Jan. 16, 2024), ECF No. 1.
[35] Order Granting Mot. To Sever and Mot. To Intervene (Apr. 10, 2024), ECF No. 25.

**Statutory Background**

**1.      Endangered Species Act**

The ESA requires all federal agencies to "conserve endangered species and threatened species" and to "utilize their authorities in furtherance of the purposes."[36] Congress's intent in enacting the ESA "was to halt and reverse the trend toward species extinction, whatever the cost"[37]—even when doing so is inconvenient to agency officials.

This Court has recognized that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."[38] Congress made a "conscious decision . . . to give endangered species priority over the 'primary missions' of federal agencies."[39]

Section 7 of the ESA requires that a government agency (here, BOEM) consult with the Secretary (authority delegated to NMFS) before taking any action that may jeopardize an endangered species.[40] The regulations promulgated to implement ESA Section 7 require that before acting, the action agency—here, BOEM and the U.S. Army Corps of Engineers—first must determine whether the action "may affect" an endangered or threatened species.[41] If so, the action agency must consult with NMFS, which has primary responsibility for marine species under the ESA.[42] Section 7 consultation requires NMFS to issue a Biological Opinion determining whether the proposed action jeopardizes endangered species: "[T]he Secretary shall

---

[36] 16 U.S.C. § 1531(b).
[37] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).
[38] *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2024 WL 1602457 (D.D.C. Apr. 12, 2024) (internal citations omitted).
[39] *Id.*
[40] 16 U.S.C. § 1536(a).
[41] 50 C.F.R. § 402.14(a).
[42] *Id.*

provide to the Federal agency and the applicant, if any, a written statement setting forth the

Secretary's opinion, and a summary of the information on which the opinion is based, detailing

how the agency action affects the species or its critical habitat."[43]

When preparing a Biological Opinion, the consulting wildlife agency must "use the best

scientific and commercial data available."[44] In addition, the consulting agency—NMFS—must:

(1)     Review all relevant information provided by the [action] agency or
        otherwise available. Such review may include an on-site inspection of the
        action area with representatives of the [action] agency and the applicant.

(2)     Evaluate the current status and environmental baseline of the listed species
        or critical habitat.

(3)     Evaluate the effects of the action and cumulative effects on the listed species
        or critical habitat

(4)     Add the effects of the action and cumulative effects to the environmental
        baseline and in light of the status of the species and critical habitat,
        formulate the Service's opinion as to whether the action is likely to
        jeopardize the continued existence of listed species or result in the
        destruction or adverse modification of critical habitat.[45]

As explained in *Center for Biological Diversity v. Regan*,[46] "[e]stablishing the

'environmental baseline of the listed species or critical habitat' is a substantial undertaking."[47]

The "environmental baseline" is the condition of the listed species without taking into account

the impacts to that species caused by the proposed action or project.[48] The "baseline" includes

the following:

(a)     The past and present impacts of all Federal, State, or private actions and other
        human activities in the action area;

---

[43] 16 U.S.C. § 1536(d).
[44] 50 C.F.R. § 402.14(g)(8); see also 16 U.S.C. § 1536(a)(2).
[45] *Ctr. for Biological Diversity*, 2024 WL 1602457, at *6 (citing 50 C.F.R. § 402.14(g)).
[46] *Id.*
[47] *Id.*
[48] 50 C.F.R. § 402.02.

(b)    The anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation;

(c)    The impact of State or private actions which are contemporaneous with the consultation in process.[49]

After establishing the environmental baseline, the consulting wildlife agency must "[e]valuate the effects of the action and cumulative effects on the listed species."[50] The "effects of the action" include "all consequences to the listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action."[51] "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."[52]

## 2.    The Clean Water Act

In 1972, Congress enacted the Clean Water Act, also known as the Federal Water Pollution Control Act,[53] "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[54] The Clean Water Act provides that "the discharge of any pollutant by any person shall be unlawful,"[55] except when in compliance with specifically enumerated Clean Water Act provisions, including Section 404.[56]

Section 404(a) of the Clean Water Act authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged or fill material into navigable waters "after notice and opportunity for public hearings."[57] Applicable Clean Water Act

---

[49] *Id.*
[50] 50 C.F.R. § 402.14(g)(3).
[51] 50 C.F.R. § 402.02.
[52] *Id.*
[53] 33 U.S.C. § 1251–1387.
[54] 33 U.S.C. § 1251.
[55] 33 U.S.C. § 1311(a).
[56] *Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608, 609 (D.C. Cir. 2013).
[57] 33 U.S.C. § 1344(a).

regulations provide that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern,"[58] and that significant adverse impacts to fisheries or marine mammals constitute unacceptable adverse impacts that preclude the issuance of a Section 404 permit:

> Unacceptable adverse effect means impact on an aquatic or wetland ecosystem which is likely to result in . . . significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas. In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines.[59]

Under Section 231.2(e) and Section 404 of the Clean Water Act, the Corps was required to confirm that any dredge and fill activities authorized by the October 2023 Section 404 permit for the Revolution Wind Project would not have unacceptable, adverse impacts on fisheries, marine mammals, and the aquatic ecosystem.[60]

## Argument

## 1.    Standard of Review

Green Oceans seeks either a preliminary injunction or, in the alternative, an administrative stay under 5 U.S.C. § 705. The Administrative Procedure Act[61] gives the Court broad power to stay the effective date of an agency action to preserve the status quo or avoid irreparable injury.[62]

---

[58] 40 C.F.R. § 230.1(c).
[59] 40 C.F.R. § 231.2(e).
[60] *Id.*
[61] 5 U.S.C. § 701-706.
[62] 5 U.S.C. § 705 (The reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.").

Whether granting an injunction or staying challenged action, plaintiffs bear "the burden of persuasion and must demonstrate, 'by a clear and convincing showing,' that the requested relief is warranted."[63] In reaching its determination, the court looks at four factors: (1) a substantial likelihood of success on the merits; (2) that the plaintiff would suffer irreparable injury if the injunction is not granted; (3) that any injunction would not substantially injure other interested parties; and (4) the public interest would be served by the injunction.[64]

Further, in this Circuit, courts perform a "sliding scale" assessment, to determine where a strong showing on one factor will compensate for a weaker showing on another.[65]

> If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. For example, if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success. Alternatively, if substantial harm to the nonmovant is very high and the showing of irreparable harm to the movant very low, the movant must demonstrate a much greater likelihood of success. It is in this sense that all four factors must be balanced against each other.[66]

Finally, some courts have moved to a two-prong test when the plaintiff alleges violations of the Endangered Species Act.[67] The two-factor analysis is entirely consistent with the Supreme Court conclusion that "the language, history, and structure of the [Endangered Species Act] . . . indicate[] beyond doubt that Congress intended endangered species to be afforded the highest of priorities."[68] This Court has concluded that when determining whether to grant a preliminary

---

[63] *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see Nken v. Holder*, 556 U.S. 418, 433–434 (2009) ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.").
[64] *Am. Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230, 248–249 (D.D.C. 2003).
[65] *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011).
[66] *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009).
[67] *American Rivers*, 271 F. Supp. 2d at 249.
[68] *Id.* at 174.

injunction, "the balance of interests 'weighs heavily in favor of protected species.'"[69] Because "Congress has determined that under the ESA, the balance of hardships always sharply favors the endangered or threatened species,"[70] the preliminary injunction standard for ESA cases is much more liberal than the traditional standard.[71]

## 2. The Government Failed to Consider the Adverse Effects of Constructing Revolution Wind Atop Cox Ledge, a Designated Special Aquatic Site, in Violation of the Clean Water Act

The Clean Water Act prohibits the "discharge of any pollutant by any person"[72] into navigable waters without a permit, and violations are punishable by substantial civil and criminal fines or imprisonment.[73] While the authority to issue permits for the discharge of most pollutants is vested in the EPA,[74] Section 404 of the Clean Water Act authorizes the U.S. Army Corps of Engineers to issue permits for "the discharge of dredged or fill material into the navigable waters."[75] The Clean Water Act defines "dredged material" as "material that is excavated or dredged from the waters of the United States,"[76] and "fill material" as "material placed in the waters of the United States where the material has the effect of: replacing any portion of waters of the United States with dry land; or changing the bottom elevation."[77] Fill material includes

---

[69] *Id.* at 261 (quoting *National Wildlife Federation v. Burlington Northern R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994)).
[70] *Id.*; *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996).
[71] *See National Wildlife Federation*, 23 F.3d at 1511.
[72] 33 U.S.C. § 1311(a).
[73] 33 U.S.C. § 1319(c)(1); 33 C.F.R. § 326.6.
[74] 33 U.S.C. § 1344(a).
[75] *Id.*
[76] 33 C.F.R. § 323.2(c).
[77] 33 C.F.R. § 323.2(e).

rock, sand, clay, plastics, and construction debris but does not include trash or garbage.[78] The

Corps has adopted regulations for the issuance of these Section 404 permits.[79]

Because construction of the Revolution Wind Project will discharge tons of sand and rock

into navigable waters, these discharges of pollutants into the marine ecosystem require a Section

404 permit from the Corps. The installation of turbines, inter-array cables, export cables, scour

protection, and cable protection will permanently damage thousands of acres of the seafloor,

destroying and disturbing habitats, fish, and protected species. Constructing this offshore power

plant's components involves significant excavation of the seafloor over many miles and, in some

instances, requires the use of explosive devices. The laying of scour and cable protection, in the

form of concrete mattresses (8 feet by 20 feet), rock bags, etc., along the export and inter-array

cables further disrupts the seafloor and crushes the organisms on the seafloor.

### 2.1    Cox Ledge is a Highly Productive Fishery, that Is a Special Aquatic Site Under the Clean Water Act

Located directly beneath the Revolution Wind construction site is Cox Ledge, an area

with extensive "complex benthic habitat that supports several commercially and recreationally

important species."[80] Cox Ledge is one of the few sites for "spawning activity for Atlantic cod,

[which is] a species of biological, ecological, economic, and cultural significance to this

region."[81] This population of cod stock is reproductively isolated from the rest of New England's

cod stock. Cox Ledge has been recognized as essential for all life stages of Atlantic cod, herring,

---

[78] *Id.*
[79] *See* 33 C.F.R. § 203-385.
[80] Revolution Wind Final Environmental Impact Statement *supra* note 17 at 3.13-75; *see also id.* at 3.13-61 ("Cox Ledge, is known to support cod spawning aggregations.").
[81] *Id.* at Appendix L-164, Comment BOEM-2022-0045-0100 (National Marine Fisheries Service Comment).

scallops, monkfish, skates, winter flounder, and red hake.[82] Cox Ledge is also an important

habitat for finfish, shellfish, crustaceans, marine mammals, sea turtles, and birds, as recognized

by the Rhode Island Coastal Resources Management Council, the National Oceanic and

Atmospheric Administration, and the National Marine Fisheries Service.[83]

      The National Marine Fisheries Service has designated Cox Ledge as a "Habitat Area of

Particular Concern," because it is an area that is "particularly vulnerable to human impact,"[84]

serves an important ecological function, is sensitive to human-induced environmental

degradation, and will undergo stress from development activities.[85] In designating Cox Ledge as

a Habitat Area of Particular Concern, NMFS identified "important cod spawning grounds and

areas of complex [benthic] habitat that are known to serve important habitat functions to

federally managed species within and adjacent to offshore wind development areas."[86] And

NMFS instructed that Cox Ledge's new status "should lead to special attention regarding

potential adverse effects on habitats within areas of particular concern from various activities."[87]

---

[82] Rhode Island Department of Environmental Management Division of Marine Fisheries, *Rhode Island Annual Fisheries Report 2022* (June 30, 2023) at 5, https://dem.ecms.ri.gov/sites/g/files/xkgbur861/files/2023-07/AnnualRpt_2022.pdf; *see also* Revolution Wind Final Environmental Impact Statement *supra* note 17 at Appendix L, Comments BOEM-2022-0045-0110 (National Wildlife Federation, Natural Resources Defense Council, Conservation Law Foundation, and National Audubon Society Comments).
[83] Rhode Island Coastal Resources Management Council, *Coastal Effects for South Fork Wind* (May 2021) at 4, http://www.crmc.ri.gov/meetings/2021_0525semipacket/2021_0525_CoastalEffectsAnalysis_SFW.pdf.
[84] *Fisheries of the Northeastern United States; Framework Adjustments to Northeast Multispecies, Atlantic Sea Scallop, Monkfish, Northeast Skate Complex, and Atlantic Herring Fisheries; Southern New England Habitat Area of Particular Concern Designation*, 89 Fed. Reg. 7633 (Feb. 5, 2024).
[85] *Id.*
[86] *Id.*
[87] *Id.*

Other federal agencies have also recognized the importance of Cox Ledge's benthic habitats and fish habitats for years. In June 2021, the New England Fishery Management Council voted to establish a new Habitat Area of Particular Concern.[88] The Habitat Area overlaps with the nine offshore energy lease sites in southern New England and includes the Revolution Wind lease area.[89]

### 2.2    Although Corps Regulations Presume that Alternatives to This Special Aquatic Site Are Available, the Corps Failed to Consider Those Alternatives When It Authorized the Revolution Wind Project

Corps' regulations require that, where a dredge-and-fill permit is sought for an activity that includes a special aquatic site like Cox Ledge, the Corps must presume that practicable alternatives are available,[90] and all "practicable alternatives to the proposed discharge which do not involve a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."[91] Corps' regulations define "special aquatic site" as "geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region."[92]

---

[88] New England Fishery Management Council, *Press Release: Council Approves HAPC For Southern New England; Previews Northeast Regional Habitat Assessment Explorer* (July 18, 2022), https://s3.us-east-1.amazonaws.com/nefmc.org/NEFMC-Approves-HAPC-for-Southern-New-England-Previews-Northeast-Regional-Habitat-Assessment-Data-Explorer.pdf.
[89] *Id.*
[90] 40 C.F.R. § 230.10(a)(3).
[91] Bureau of Ocean Energy Management, *Revolution Wind Record of Decision* (Aug. 21, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf.
[92] 40 C.F.R. § 230.3(m).

But, in violation of 40 C.F.R. § 230.40 to 230.45 and 40 C.F.R. § 230.3(m), the Corps granted dredge-and-fill permits for the Revolution Wind Project without considering or analyzing whether practicable alternatives to building atop the Cox Ledge special aquatic site exist. The Corps never analyzed whether the Project could be built elsewhere on the 83,798-acre Revolution Wind lease area—let alone whether the same electric energy could be produced somewhere else—preserving Cox Ledge's highly productive fishery.

The Corps simply ignored that many practicable alternatives to offshore wind energy production do exist, and they do not require discharges of dredge or fill material into navigable waters at this special aquatic site. These alternatives include traditional fossil fuel plants such as natural gas and, perhaps more important, other forms of renewable energy such as traditional nuclear plants, modular nuclear small-scale generators, onshore wind turbines, and solar panels, and efforts to improve energy efficiency and conservation. But, as evidenced by the Record of Decision, the Corps analyzed no alternatives that did not involve offshore wind turbine construction within the Revolution Wind lease area.

Because the Corps failed to consider practicable alternatives to the discharge of tons of crushed rock, boulders, and sand that will smother the Cox Ledge special aquatic site—not to mention ditching and trenching to lay high-tension cables and pile-driving massive steel foundations into the seabed to support these giant wind turbines—the Court should stay the effective date of the Corps' Clean Water Act permit for the Project until alternatives to destroying Cox Ledge have been properly analyzed in accordance with law.

**3.    Green Oceans Is Likely to Succeed Because the Biological Opinion Violates the Endangered Species Act and the Pollution Discharge Permit Violates the Clean Water Act**

In its rush to construct enormous offshore wind power plant facilities that the Government has permitted (or is in the process of authorizing) to fulfill Executive Order 14008[93] and the plan to produce 30 gigawatts of wind energy by 2030,[94] these Government agencies have ignored numerous statutes and regulations intended to protect our nation's natural resources. Covering millions of acres of ocean floor,[95] each of the thousands of turbines will stand nearly 1,000 feet tall above the ocean surface, require more than 25,000 square feet of concrete and boulders paving the ocean floor at each turbine foundation, and require additional materials for cable protection, electric substations, and more.

**3.1    The Government Has Failed to Protect the Highly Endangered North Atlantic Right Whale, in Violation of the Endangered Species Act**

The ESA flatly prohibits federal agency actions that are likely to jeopardize the existence of a listed endangered species: "Each federal agency shall . . . insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species."[96] This provision, Section 7 of the ESA, "prescribes the steps that federal agencies must take to ensure

---

[93] *See* Biden Administration, *Tackling the Climate Crisis at Home and Abroad*, Exec. Order 14008, 86 Fed. Reg. 7619, 7624 (Jan. 27, 2021).

[94] *See* Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs (Mar. 29, 2021), available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[95] *Tackling the Climate Crisis at Home and Abroad*, Exec. Order 14008, 86 Fed. Reg. 7619, 7624 (Jan. 27, 2021).

[96] 16 U.S.C. § 1536.

that their actions do not jeopardize endangered wildlife and flora."[97] Central to this statutory

process is the Biological Opinion that NMFS was required to issue in this case, analyzing

whether the Revolution Wind Project was likely to jeopardize the existence of the critically

endangered North Atlantic Right Whale, using the "best scientific and commercial data

available."[98]

But instead of analyzing all of the best information available, NMFS intentionally chose

to exclude from its analysis the effects that 22 other offshore wind projects along the Right

Whale's annual migration path will have on the remaining 338 members of this nearly extinct

whale species, invalidating its Biological Opinion and BOEM's authorization of the Project

based on NMFS's incomplete Biological Opinion.[99] Because the Biological Opinion explicitly

states that it ignores and does not consider all of the effects of the agency's action on this

severely endangered species, it is invalid as a matter of law:

> We reviewed the list of cumulative impacts identified by BOEM in the DEIS and
> determined that most (other offshore wind energy development activities . . . ) do
> not meet the ESA definition of cumulative effects because we expect that if any of
> these activities were proposed in the action area, or proposed elsewhere yet were
> to have future effects inside the action area, they would require at least one Federal
> authorization or permit and would therefore require their own ESA section 7
> consultation.[100]

In short, this is not a case where the Court must defer to agency expertise. Here, where

the issue is the proper interpretation of the ESA rather than the facts supporting the agency

action, Courts—not marine biologists—must determine the validity of the Biological Opinion by

---

[97] *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007); *see Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2024 WL 1602457 (D.D.C. Apr. 12, 2024).

[98] 16 U.S.C. § 1533.

[99] *Ctr. for Biological Diversity*, 2024 WL 1602457.

[100] *See* Revolution Wind April 30, 2024 Biological Opinion *supra* note 24 at 355.

first ascertaining the proper meaning of the statutory language.[101] Where the Biological

Opinion's flaws "are legal in nature," discerning the flaw "'requires no technical or scientific

expertise.'"[102]

### 3.2    NMFS's Biological Opinion Improperly Excluded Consideration of 22 Other Proposed and Planned Offshore Wind Projects

The Revolution Wind Biological Opinion admits that NMFS ignored and did not analyze

how 22 other offshore wind projects along the North Atlantic Right Whale's annual migration

route will affect the species, taking the position that "other future offshore wind energy

development activities," including construction of thousands of giant turbines on millions of

acres of ocean bed, could be ignored because "they would require at least one Federal

authorization or permit and would therefore require their own ESA section 7 consultation

requirements."[103]

Rejecting the parallel cumulative impacts analysis required for Environmental Impact

Statements,[104] the Revolution Wind Biological Opinion states:

> It is important to note that, while there may be some overlap, the ESA definition of
> cumulative effects is not equivalent to the definition of "cumulative impacts" as
> described in the Revolution Wind DEIS. Under NEPA, "cumulative effects . . . are
> the impact on the environment resulting from the incremental impact of the action
> when added to other past, present, and reasonably foreseeable future actions. While
> the effects of past and ongoing Federal projects within the action area for which
> consultation has been completed are evaluated in both the NEPA and ESA processes
> (Section 6.0 *Environmental Baseline*), reasonably foreseeable future actions by

---

[101] *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023).

[102] *Ctr. for Biological Diversity*, 2024 WL 1602457 (quoting *Defs. of Wildlife v. U.S. Env't Prot. Agency*, 420 F.3d 946, 976 (9th Cir. 2005)).

[103] Revolution Wind April 30, 2024 Biological Opinion *supra* note 24 at 355.

[104] *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002) ("Although federal agencies are given considerable discretion to define the scope of NEPA review, connected, cumulative, and similar actions must be considered together to prevent an agency from 'dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'") (quoting *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir. 1985)).

federal agencies must be considered (see 40 CFR 1508.7) in the NEPA process but not the ESA Section 7 process.[105]

NMFS offers no rationale (other than a citation to its regulations) for why it should ignore this known, critical scientific information about the effects of these 22 offshore power plants as the North Atlantic Right Whale traverses them in its annual migration. Nothing in the ESA authorizes federal agencies to ignore known threats to endangered species just because the activity will require its own biological opinion in the future.[106]

Directly on point is *Conner v. Burford*,[107] in which the Ninth Circuit rejected this same argument, invalidating a biological opinion for a federal oil and gas lease even though each well location would later be subject to a post-lease Section 7 consultation and its own biological opinion: "Although we recognize that the precise location and extent of future oil and gas activities were unknown at the time, extensive information about the behavior and habitat of the species in the areas covered by the leases was available."[108] In that case, the court agreed with the appellees that asserting

> incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available. 16 U.S.C. § 1536(a)(2). With the post-leasing and biological information that was available, the FWS could have determined whether post-leasing activities in particular areas were fundamentally incompatible with the continued existence of the species.[109]

The *Conner* court flatly rejected the Government's rationale—resurrected in this Biological Opinion—that cumulative effects of future projects could be ignored:

---

[105] Revolution Wind April 30, 2024 Biological Opinion *supra* note 24 at 390–391.
[106] *See N. Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980) ("action" must be construed broadly).
[107] *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988).
[108] *Id.* at 1454.
[109] *Id.*

With the information available, the FWS could also have identified potential conflicts between the protected species and post-leasing activities due to the cumulative impact of oil and gas activities. For example, species like the grizzly and the gray wolf require large home ranges making it critical that ESA review occur early in the process to avoid piecemeal chipping away of habitat.[110]

Failure to consider available scientific information is a facial violation of ESA. The Court of Appeals for the District of Columbia recently held that, in cases which involve the proper interpretation of the Endangered Species Act, it is the Courts—not NMFS and its marine biologists—who must determine the proper meaning of the statute.[111] And in *Wild Fish Conservancy v. Salazar*,[112] the Ninth Circuit affirmed the principle enunciated in the recent *Lobstermen's*[113] case—that legal or procedural violations of ESA do not require subject-matter expertise: "Where the opinion's flaws are 'legal in nature,' however, '[d]iscerning them requires no technical or scientific expertise[.]'"[114]

"Given a substantial procedural violation of the ESA in connection with a federal project, the remedy must be an injunction of the project pending compliance with the ESA."[115] That is because

[t]he ESA's procedural requirements call for a systematic determination of the effects of a federal project on endangered species. If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible.[116]

---

[110] *Id.*
[111] *See generally Maine Lobstermen's Association*, 70 F.4th 582.
[112] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010).
[113] *Maine Lobstermen's Association*, 70 F.4th 582.
[114] *Wild Fish Conservancy*, 628 F.3d at 532 (quoting *Defenders of Wildlife*, 420 F.3d at 976).
[115] *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985).
[116] *Id.*

In *Thomas v. Peterson*,[117] the court held that not requiring a comprehensive, cumulative review of related actions "would permit dividing a project into multiple 'actions' each of which individually has an insignificant environmental impact but which collectively have a substantial impact."[118] Such an approach "might result, for example, in the 'piecemeal chipping away of habitat' for endangered species."[119] So, contrary to NMFS's announced position in the Biological Opinion, the case law is clear that Section 7 mandates an analysis that does not allow the agency to carve related actions into separate pieces and ignore the cumulative effects on the species, as NMFS has done here. This erroneous approach to evaluating environmental harm is unlawful under NEPA, just as it is under the ESA.

### 3.3    The Government Had Available Scientific Information Demonstrating the Devastating Total Impacts of Offshore Wind Projects on the Whales, Which It Ignored

When NMFS issued its 2024 Biological Opinion, the Government had available scientific information available to identify conflicts between offshore wind development and the North Atlantic Right Whale. In October 2022, BOEM and NMFS authored and sent for comment a draft *North Atlantic Right Whale and Offshore Wind Strategy*, in which they recognize this development (from siting to decommissioning) must be undertaken responsibly, including managing and mitigating the impacts on endangered species like the North Atlantic Right Whale and that the agencies must take precautions to ensure that Offshore Wind development is "carried out in a way that avoids or minimizes the potential for introducing adverse effects to the species

---

[117] *Thomas,* 753 F.2d 754.
[118] *Id.* at 758.
[119] *Wild Fish Conservancy*, 628 F.3d at 522 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)).

and ecosystems on which it depends. . . ."[120] BOEM and NMFS published the final Right Whale Strategy in January 2024.[121]

The Strategy identifies "30 renewable energy lease areas in the Atlantic Outer Continental Shelf"[122] and that the North Atlantic Right Whale, "whose range overlaps with the area proposed for [Offshore Wind] development, is one of the most endangered large whales in the world."[123] The agencies state that "[t]he activities associated with [Offshore Wind] development would introduce or further contribute to existing stressors in the environment that affect [North Atlantic Right Whales]."[124] These stressors include "exposure to noise and/or pressure (particularly from construction activities),"[125] resulting "in hearing impairment, masking of [North Atlantic Right Whale] vocal communication, physiological impacts (e.g., stress), and/or behavioral disturbance, as well as mortality and injury."[126] The Strategy urges caution in authorizing offshore wind projects is necessary because

> [d]ue to the declining status of [North Atlantic Right Whales], the resilience of this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction, and the population size is small enough that the death of even some individuals can have a measurable effect on its population status, trend, and population dynamics. Further, the loss of even one individual a year may reduce the likelihood of recovery and of the species' achieving optimum sustainable population.[127]

Most of the offshore wind projects now authorized or in the process of being approved are all located along the migration path of the North Atlantic Right Whale, as recognized by

---

[120] *See* North Atlantic Right Whale Strategy *supra* note 1 at 3.
[121] *Id.* at 5.
[122] *Id.*
[123] *Id.* at 5.
[124] *Id.* at 12.
[125] *Id.*
[126] *Id.*
[127] *Id.* at 8.

BOEM and NOAA in their Joint Strategy to protect the Right Whales: North Atlantic Right Whales "migrating along the U.S. Atlantic Coast have the potential to travel near or through many currently proposed OSW developments along the Atlantic Coast."[128] Offshore wind projects, many of which were not even considered by NMFS in its Section 7 Consultation, "occur in areas that are important for [North Atlantic Right Whale] vital functions."[129] Without considering the cumulative effects of all of the currently planned offshore wind projects, NMFS failed to use the best available information on whether Revolution Wind, together with the other components of the offshore wind program, will jeopardize this magnificent species as it stands on the brink of extinction.

To date, in eleven of the planned 30 offshore wind projects (including Revolution Wind), NMFS has already authorized the take of 149 North Atlantic Right Whales[130] and proposed the take of an additional 95 North Atlantic Right Whales,[131] for a total take of 244 Right Whales. And, given the similarity of the projects, they will likely cause hundreds more takes of the species before the Atlantic Coast offshore wind program is completed.

---

[128] *Id.* at 14.

[129] *Id.*

[130] 89 Fed. Reg. 11342, 11392 (Feb. 14, 2024) (29 during Empire Wind construction); 89 Fed. Reg. 4370, 4424 (Jan. 23, 2024) (17 during Dominion Wind construction); 88 Fed. Reg. 72562 (Oct. 10, 2023) (56 during Revolution Wind construction); 88 Fed. Reg. 62898, 62953 (Sept. 13, 2023) (14 during Ocean Wind 1 construction); 87 Fed. Reg. 806, 848 (Jan. 6, 2022) (13 during South Fork Wind construction); 86 Fed. Reg. 33810, 33836 (June 25, 2021) (20 during Vineyard Wind construction).

[131] 88 Fed. Reg. 37606 (June 8, 2023) (10 during New England Wind); 88 Fed. Reg. 8996, 9057 (Feb. 10, 2023) (47 during Sunrise Wind); 89 Fed. Reg. 504, 552 (Jan. 4, 2024) (10 during US Wind); 88 Fed. Reg. 65430, 65485 (Sept. 22, 2023) (21 during Atlantic Shores South); 89 Fed. Reg. 31008, 31042 (Apr. 23, 2024) (7 additional takes during the final phase of Vineyard Wind 1).

**3.4    NMFS Violated Its Own Regulations by Ignoring the Anticipated Effects of All Proposed Federal Projects That Have Already Undergone Formal or Early Section 7 Consultation**

Although they fall short of the ESA's requirements, NMFS's own regulations require it to at least consider "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."[132] Yet, in issuing the 2024 Biological Opinion, NMFS violated its own regulation by excluding from consideration four projects that have already undergone formal consultation or are in early section 7 consultation within the action area. The term action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.[133]

The 2024 Biological Opinion omits consideration of these four projects:

- **Maryland Offshore Wind Project**, to be constructed on 79,707 acres, with the western edge located approximately 18.5 km (11.5 miles) off the coast of Maryland. The parties started Section 7 Consultation on March 5, 2024, and it is now in progress.[134]

- **Beacon Wind**, to be constructed 20 miles south of Nantucket and 60 miles east of Montauk and consisting of up to 155 turbines.[135] The parties planned to start Section 7 consultation on February 23, 2024, and are likely in the early stages of consultation.

- **SouthCoast Wind Energy LLC**, to be constructed off Massachusetts and consisting of up to 147 turbines and up to five offshore substation platforms.[136] Consultation with Fish and Wildlife Service is complete, and consultation with NMFS is planned for the near future.

---

[132] 50 C.F.R. § 402.02.

[133] *Id.*

[134] Permitting Dashboard, *Maryland Offshore Wind Project*, https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/maryland-offshore-wind-project (last visited May 9, 2024).

[135] BOEM, *Beacon Wind*, https://www.boem.gov/renewable-energy/state-activities/beacon-wind (last visited May 9, 2024).

[136] BOEM, *SouthCoast Wind Energy LLC*, https://www.boem.gov/renewable-energy/state-activities/southcoast-wind-formerly-mayflower-wind (last visited May 9, 2024); BOEM, *SouthCoast Wind Project Overview*, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SouthCoast_Wind_Project_Project_Overview.pdf (last visited May 14, 2024).

SouthCoast's developer requested the take of at least 216 North Atlantic Right Whales in its application for a Letter of Authorization.[137]

- **Vineyard Wind 1 (Phase 2)**, to be constructed off Massachusetts to complete Vineyard Wind 1's construction. Vineyard Wind did not complete its construction of the project within its one-year Incidental Harassment Authorization. Vineyard Wind applied for an additional Incidental Harassment Authorization for the take of marine mammals incidental to the installation of the last 15 turbines of the project. NMFS reinitiated Section 7 consultation before April 23, 2024.[138]

What we do know is that over the last three years, there has been a tragic and unexplained increase in injuries and deaths of North Atlantic Right Whales. In 2022, 10 North Atlantic Right Whales suffered serious injury or illness.[139] In 2023, 22 North Atlantic Right Whales were killed, seriously injured, or in declining health.[140] The two deaths included a newborn calf found dead in Morehead City, North Carolina,[141] and a 20-year-old male found dead in the surf on Virginia Beach in February 2023.[142] The year 2024 has already seen four deaths of North Atlantic Right Whales and two other severe injuries.[143] In January of this year, a deceased female North Atlantic Right Whale, born in the 2021 calving season, was found near a beach in Martha's Vineyard,

---

[137] SouthCoast, *Petition for Incidental Take Regulations for the Construction and Operations of the Mayflower Wind Project* (Sept. 2022) at 100, https://media.fisheries.noaa.gov/2022-10/MayflowerWindNewEng_2022ITA_App_OPR1.pdf.

[138] *See* Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Phase 2 Construction of the Vineyard Wind 1 Offshore Wind Project Off Massachusetts, 89 Fed. Reg. 31008, 31064 (Apr. 23, 2024).

[139] BOEM, *North Atlantic Right Whale Updates*, https://www.fisheries.noaa.gov/national/endangered-species-conservation/north-atlantic-right-whale-updates#new-dead-right-whale-calf-documented-under-pier-in-north-carolina (last visited May 13, 2024).

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] NMFS, *2017–2024 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event#counts-of-north-atlantic-right-whale-ume-mortality,-serious-injury,-and-morbidity-(sublethal-injury-or-illness)-cases (last visited May 7, 2024).

Massachusetts.[144] In February, another juvenile female was found dead off Savannah, Georgia.[145] In March, authorities found a dead calf off Cumberland Island in Georgia.[146] And in April 2024, a company conducting whale surveys for the navy notified NMFS of a dead North Atlantic Right Whale female offshore Virginia Beach/Norfolk, Virginia.[147] Unfortunately, this female had just given birth to her sixth calf this winter and the calf was not seen in the vicinity of the carcass.[148] It is unlikely the calf will survive without its mother for much longer.[149]

Although the North Atlantic Right Whale has been rapidly declining—by increased death, serious injuries, and other morbidities—NMFS has continued to approve, or considered approving, the Level B take[150] of almost two-thirds of the entire North Atlantic Right Whale population through its ESA and MMPA approvals for offshore wind. NMFS has approved the take of 149 North Atlantic Right Whales in its final approvals to construct six offshore wind projects: 29 during Empire Wind construction,[151] 17 during Dominion Wind construction,[152] 56

---

[144] BOEM, *North Atlantic Right Whale Update,* https://www.fisheries.noaa.gov/national/endangered-species-conservation/north-atlantic-right-whale-updates#new-dead-right-whale-calf-documented-under-pier-in-north-carolina (last visited May 13, 2024).

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] *Id.*

[149] New England Aquarium, *North Atlantic Right Whale that Recently Gave Birth Found Dead Off Coast of Virginia*, https://www.neaq.org/about-us/press-room/press-releases/north-atlantic-right-whale-that-recently-gave-birth-found-dead-off/ (last visited May 7, 2024) ("Calf not likely to survive without its mother.").

[150] Level B Harassment "means any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering but which does not have the potential to injure a marine mammal or marine mammal stock in the wild." 50 C.F.R. § 216.3.

[151] 89 Fed. Reg. 11342, 11392 (Feb. 14, 2024).

[152] 89 Fed. Reg. 4370, 4424 (Jan. 23, 2024).

during Revolution Wind construction,[153] 14 during Ocean Wind 1 construction,[154] 13 during

South Fork construction,[155] and 20 during Vineyard Wind construction.[156] NMFS has also

proposed the take of an additional 95 North Atlantic Right Whales for five projects still awaiting

final approval: 10 during New England Wind,[157] 47 during Sunrise Wind,[158] 10 during US Wind,

[159] 21 during Atlantic Shores South,[160] and 7 additional takes during the final phase of Vineyard

Wind.[161]

### 3.5 North Atlantic Right Whales Occupy the Revolution Wind Area Year-Round, Including Months When Pile Driving Is Now Scheduled

Although the Biological Opinion authorizes pile driving from May 1 to October 31, this

does not mean that North Atlantic Right Whales are absent from the Revolution Wind site during

that construction period. The Biological Opinion itself reports that "Right whales have been

observed nearly year round in the area south of Martha's Vineyard and Nantucket, with highest

sighting rates between December and May."[162] In fact, NMFS recommends "avoiding impact

pile driving in May and December"[163]—a conservation recommendation that Revolution Wind,

LLC seems determined to ignore.

The Biological Opinion also reports that "North Atlantic right whales may occur year

round in the area where trap surveys will take place."[164] Lest there be any question, the Final

---

[153] 88 Fed. Reg. 72562 (Oct. 10, 2023).

[154] 88 Fed. Reg. 62898, 62953 (Sept. 13, 2023).

[155] 87 Fed. Reg. 806, 848 (Jan. 6, 2022).

[156] 86 Fed. Reg. 33810, 33836 (June 25, 2021).

[157] 88 Fed. Reg. 37606 (June 8, 2023).

[158] 88 Fed. Reg. 8996, 9057 (Feb. 10, 2023).

[159] 89 Fed. Reg. 504, 552 (Jan. 4, 2024).

[160] 88 Fed. Reg. 65430, 65485 (Sept. 22, 2023).

[161] 89 Fed. Reg. 31008 (Apr. 23, 2024).

[162] Revolution Wind April 30, 2024 Biological Opinion *supra* note 24 at 58.

[163] *Id.* 498.

[164] *Id.* at 372.

Environmental Impact Statement for the Revolution Wind Project also reports that, although they migrate, North Atlantic Right Whale occurrences are common and that they are present year-round.[165] For that reason, the Biological Opinion recommends that, to minimize or avoid adverse effects of Revolution Wind construction, BOEM and the Corps "[w]ork with the lessee to develop a construction schedule that further reduces potential exposure of North Atlantic right whales to noise from pile driving and UXO/MEC [unexploded ordnance/ munitions and explosives of concern] detonations including expanding the time of year restriction on UXO/MEC detonations to include May and avoiding impact pile driving in May and December."[166] BOEM and Revolution Wind, LLC, have chosen to ignore this recommendation to date.

### 3.6    Revolution Wind, LLC Is Not Permitted to Use Two Pile-Driving Vessels

Because of the disastrous effects of underwater sound waves on North Atlantic Right Whales' sensitive hearing, communications, and navigation abilities, the Biological Opinion and BOEM's Record of Decision strictly limit the allowable decibel level from pile-driving in the presence of North Atlantic Right Whales. Yet, without explanation, Revolution Wind, LLC has stationed two pile-driving vessels, the Bokalift 1 and the Bokalift 2, at the Project site, poised to work. Because each vessel's pile-driving will generate damaging sound for the Whales, the two vessels should never operate at the same time. Simultaneous pile-driving by two vessels would threaten an unauthorized take of North Atlantic Right Whales, in violation of the Endangered Species Act.

---

[165] Final Environmental Impact Statement *supra* note 17 at 3.15-24,
[166] Revolution Wind April 30, 2024 Biological Opinion *supra* note 24 at 498.



### 4.    Plaintiffs Will Suffer Irreparable Injury Without a Stay

#### 4.1    Plaintiff, Save Right Whale Coalition, Will Suffer Irreparable Harm If the Stay Is Not Granted

Plaintiff, Save Right Whales Coalition, is a nonprofit organization actively involved in the fight to protect marine life, including whales, dolphins, sea turtles, seals, and other species—as well as the marine environment on which they depend.[168] Save Right Whales Coalition actively engages with regulators, federal agencies, and state/local stakeholders to provide comments on how to protect marine life and on the impacts offshore development will have on marine life. Save Right Whales Coalition has submitted comments in response to Federal Register notices regarding issuance of Incidental Harassment Authorizations for offshore wind projects and the draft NOAA/BOEM North Atlantic Right Whale Offshore Wind Strategy.[169]

---

[167] Image depicting location of Bokalift 2 (designated pile driving ship) and Bokalift 1 (ship designed for pile-driving) in the Revolution Wind Lease area as of 12:00 PM on May 13, 2024. *See* Marine Traffic, *Live Map*, https://www.marinetraffic.com/en/ais/home/centerx:-71.0/centery:41.2/zoom:11 (last visited May 13, 2024).
[168] Exhibit 2, Decl. of L. Linowes (May 14, 2024) ¶ 1–2.
[169] *Id.* ¶ 13.

Additionally, Save Right Whales Coalition has filed comments and sent numerous letters to NOAA regarding the increase in whale deaths on the eastern seaboard.[170] These comments and letters highlight the organization's concerns that the protective mitigation measures adopted by NOAA and BOEM to reduce whale injury and mortality, particularly when it comes to offshore wind construction and pre-construction activities are inadequate.

Ms. Linowes has been involved in the research and analysis of wind energy, both onshore and offshore, for nearly two decades.[171] In addition to her work with Save Right Whales, she is the Executive Director for the WindAction Group, which is a national advocacy group focused on the impacts and policy issues associated with industrial wind energy development.[172] She has testified before Congress on environmental issues relating to wind energy production.[173]

Her work with Save Right Whales has included research regarding the increase in whale and large marine mammal deaths in recent years, which strongly correlates with the start of the offshore wind—program including surveying, sonar, site assessment mapping, and construction.

As outlined in the Declaration of Lisa Linowes, President of Plaintiff Save Right Whales Coalition, Revolution Wind's ongoing and planned construction threatens marine mammals and endangered whales in Revolution Wind's lease area.[174]

NOAA Fisheries (now NMFS) itself made this same point in a 2021 report titled *Right Whale Use of Southern New England Wind Energy Areas Increasing*:

> Construction and operation of hundreds of wind turbines is likely to introduce increased ocean noise, vessel traffic and possibly habitat alteration. All of these factors have the potential to affect right whales.

---

[170] *Id.*
[171] *Id.* ¶ 3.
[172] *Id.*
[173] *Id.*
[174] *See id.* ¶ 5–12.

Increased vessel traffic in the region will bring with it a greater risk of vessel strikes, one of the leading causes of serious injury and death of right whales.

Increased noise from wind turbine construction and operations and vessels could also directly impact important whale behaviors and interfere with the detection of critical acoustic cues. These types of impacts may also be associated with physiological stress and could affect the whales' use of the region.

The presence of wind turbine foundations may impact oceanographic and atmospheric conditions including potential changes in ocean stratification. This might alter the formation of plankton aggregations and thus foraging opportunities for right whales.[175]

### 4.2    Injury to the North Atlantic Right Whale is also injury to Green Oceans and Dr. Elizabeth Quattrocki Knight

Dr. Elizabeth Quattrocki Knight is an individual Plaintiff and President of Plaintiff, Green Oceans. As her declaration states,

- "Green Oceans is a federally recognized 501(c)(3) corporation comprised of citizens combating climate change without sacrificing the ocean's biodiversity and health. Green Oceans includes artists, scientists, doctors, educators, local business leaders, ex-military personnel, and homeowners who feel a deep personal connection to the ocean."[176]

- "Green Oceans aims to prevent irreversible damage to the marine ecosystem and coastal communities and dedicates time to educating the public about the risks of offshore development to the Ocean. Green Oceans also advocates for more transparency from the Government and developers about the unknown risks of offshore development."[177]

- "Green Oceans and I are deeply troubled by the impact offshore wind, particularly the Revolution Wind Project, will have on marine mammals, the marine environment, the ecologically vital Coxes Ledge area, and fishermen who fish in the Revolution Wind area."[178]

---

[175] NOAA Fisheries, *Right Whale Use of Southern New England Wind Energy Areas Increasing* (July 29, 2021), https://www.fisheries.noaa.gov/feature-story/right-whale-use-southern-new-england-wind-energy-areas-increasing.
[176] Exhibit 3, Decl. of E. Knight (May 14, 2024) ¶ 3.
[177] *Id.* ¶ 4.
[178] *Id.* ¶ 5.

- "The construction of Revolution Wind, including the pile driving activities, will cause irreversible damage to the ocean and to Green Oceans and their members. Their members will have issues fishing, boating, and enjoying the unindustrialized ocean."[179]

- "The construction of Revolution Wind will threaten the continued existence of the North Atlantic Right Whale, which will injure Green Oceans interests in protecting the marine environment and the endangered species within it for future generations."[180]

Green Oceans has also been vocal about the impact offshore development will have on commercial fishing and Cox Ledge. Cox Ledge is an area with extensive "complex benthic habitat that supports several commercially and recreationally important species."[181] Cox Ledge is known for the "spawning activity for Atlantic cod, [which is] a species of biological, ecological, economic, and cultural significance to this region."[182] Cox Ledge is also essential for all life stages of Atlantic cod, herring, scallops, monkfish, skates, winter flounder, and red hake.[183] Cox Ledge is also crucial for sperm whales and other endangered marine mammals.[184]

Green Oceans submitted more than 1,500 signatures in support of NOAA designating Cox Ledge as a Habitat Area of Particular Concern, which became final in February 2024.[185] The pile driving and laying of scour protection in this area will completely decimate the ocean floor and the crucial benthic habitats that are present in the area—habitats that fish and other marine

---

[179] *Id.* ¶ 10.

[180] *Id.* ¶ 11.

[181] Revolution Wind Final Environmental Impact Statement *supra* note 17 at 3.13-75; *see also id.* at 3.13-61 ("Cox Ledge, is known to support cod spawning aggregations.").

[182] *Id.* at Appendix L-164, Comment BOEM-2022-0045-0100 (National Marine Fisheries Service Comment).

[183] *Id.* at Appendix L, Comments BOEM-2022-0045-0110 (National Wildlife Federation, Natural Resources Defense Council, Conservation Law Foundation, and National Audubon Society Comments).

[184] *See* Westell, et al., *Acoustic Presence and Demographics of Sperm Whales (Physeter macrocephalus) off Southern New England and Near a US Offshore Wind Energy Area*, ICES CIEM (Jan. 26, 2024).

[185] Ex. 3 ¶ 7.

life rely on for spawning and prey. Once pile-driving activities start, the harm caused by the relocation of boulders and concrete, trenching for the laying of cables, and the pile-driving to install monopiles and cables cannot easily be reversed and may never be undone. The harm to the species and Green Oceans will be irreversible and irreparable.

## 5.    The Agencies and Defendant-Intervenor Revolution Wind Will Not Be Harmed by a Stay in This Case

Because starting construction without a valid Biological Opinion violates the Endangered Species Act, a stay or preliminary injunction would do no more than require that Defendants conform their conduct to the law. On the other hand, construction will hasten the decline of the North Atlantic Right Whale and impose immeasurable harm on the whales, Cox Ledge, the marine environment, and Green Oceans. By ignoring the cumulative effects of offshore wind projects now awaiting final approval, NMFS puts the species at risk. As NMFS biologist, Dr. Sean Hayes, wrote in an opinion letter to BOEM:

- "Right whales are one of the most endangered marine mammals with fewer than 350 animals remaining in the population (Pettis et al. 2022), down from a high of 478 in 2011 and over 400 as recently as 2017 (Hayes et al. 2021)."[186]

- "Additional noise vessel traffic, and habitat modifications due to offshore wind development will likely cause added stress that could result in additional population consequences to a species that is already experiencing rapid decline (30% in the last 10 years)."[187]

- "The presence of structures such as wind turbines are likely to result in both local and broader oceanographic effects, and may disrupt the dense aggregations and distribution of zooplankton prey through altering the strength of tidal currents and associated fronts, changes in stratification, primary production, the degree of mixing, and stratification in the water column (Chen et al. 2021, Johnson et al 2021, Christiansen et al 2022, Dorrell et al 2022)."[188]

---

[186] Exhibit 4, Opinion from Dr. Sean A. Hayes to Brian R. Hooker, Lead Biologist at the Bureau of Ocean Energy Management (May 13, 2022).
[187] *Id.* at 1
[188] *Id.* at 2.

- "Maintenance and operational impacts would be for a duration of thirty or more years."[189]

- "As offshore wind energy projects in southern New England progress in development, in particular around Nantucket Shoals, it is critical to assess the range of impacts/threats and stressors to protected species and the degree to which they can be mitigated. This needs to include taking into consideration the chronic state of right whales and the importance of productive foraging habitats to these species. These impacts should be thoroughly analyzed in any EIS or other environmental reviews associated with offshore wind development."[190]

The ESA requires federal agencies to ensure "'that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat.'"[191] Under the ESA, it is unlawful to take a protected species without a valid biological opinion and corresponding incidental take statement.[192]

The Government cannot credibly argue that it will be harmed by having to comply with environmental laws. Requiring an agency to do its statutorily required duty "is not a hardship, but an obligation."[193]

Likewise, Revolution Wind has an interest in making sure environmental laws are complied with before conducting a federally approved activity that may result in the unlawful

---

[189] *Id.*

[190] *Id.*

[191] *Ctr. for Biological Diversity v. Env't Prot. Agency*, 56 F.4th 55, 62 (D.C. Cir. 2022) (quoting 16 U.S.C. § 1536(a)(2)).

[192] *See* 16 U.S.C. § 1540(a)(1) ("Any person who knowingly violates . . . any provision of this chapter, or any provision of any permit . . . may be assessed a civil penalty by the Secretary of not more than $25,000 for each violation. . . ."); *see also* 16 U.S.C. § 1540(b)(1) ("[a]ny person who knowingly violates any provision of this chapter, of any permit or certificate issued hereunder . . . shall, upon conviction, be fined not more than $50,000 or imprisoned for not more than one year, or both.").

[193] *See Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 246 (2020) (bid protest case granting injunction where the harm in "requiring the government to continue purchasing the services from the incumbent for the interim does not outweigh the irreparable harm to an offeror arising from an agency's own failure to comply with the law in awarding the contract.").

take/harassment of an endangered species without a valid Biological Opinion. Mere financial

loss can be remedied; the extinction of a species cannot.

### 6.    The Paramount Public Interest Lies in Conservation of the Ocean's Natural Resources

Whatever weight may be given to the Government's offshore wind program, a short delay

in starting construction of the Revolution Wind Project will not cause any significant injury to

the public interest. As the Government's Final Environmental Impact Statement concludes,

"future offshore wind activities are anticipated to reduce the impacts of climate change trends to

an unknown degree, but offshore wind development alone is anticipated to result in negligible

contributions to impacts from climate change trends."[194]

On the other hand, the public interest, as expressed by Congress in the Endangered

Species Act, gives first priority to the protection of endangered species: Section 7 "reveals an

explicit congressional decision to require agencies to afford first priority to the declared national

policy of saving endangered species."[195] In the landmark case of *Tennessee Valley Authority v.*

*Hill*,[196] the Supreme Court rejected the argument that the interest in completing a nearly finished

$100 million publicly financed dam overrode the public interest in protecting an endangered,

minnow-like species that the dam would exterminate:

> The plain intent of Congress in enacting this statute was to halt and reverse the trend
> toward species extinction, whatever the cost. This is reflected not only in the stated
> policies of the Act, but in literally every section of the statute. All persons, including
> federal agencies, are specifically instructed not to "take" endangered species . . . .
> Agencies in particular are directed by §§ 2(c) and 3(2) of the Act to "use . . . *all*
> *methods* and procedures which are necessary" to preserve endangered species.[197]

---

[194] Revolution Wind Final Environmental Impact Statement *supra* note 17 at 3.10-25.
[195] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).
[196] *Tennessee Valley Auth.*, 437 U.S. 153.
[197] *Id.* at 184–185.

So, while the public may have a legitimate interest in advancing the governmental offshore wind program,[198] that interest takes a backseat to the protection of species identified as endangered or threatened by governmental actions. And Revolution Wind, LLC's interests in time and money invested and its profits to be made from this project, while important economic considerations, do not outweigh the significant public interest considerations in species preservation. There are, for example, only 338 remaining right whales in existence.

In a contest between a public policy project and endangered species protection, the species wins: "[I]t is clear Congress foresaw that § 7 would, on occasion, require agencies to alter ongoing projects in order to fulfill the goals of the Act."[199] So, the ESA commands that agencies ensure that their actions do not jeopardize an endangered species:

> One would be hard-pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies to ensure "that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of habitat of such species . . . ." This language admits of no exception.[200]

**Conclusion**

Revolution Wind's construction should be stayed or enjoined until the Corps has properly analyzed alternatives to constructing the Revolution Wind Project atop Cox Ledge and there is a new, valid Biological Opinion that includes analysis of the cumulative effects of other offshore wind projects on the highly endangered North Atlantic Right Whale. Because Plaintiffs have shown that there is a likelihood they will prevail on the merits, that the balance of harms weighs

---

[198] BOEM, however, admits that the Revolution Wind Project "would have no measurable influence on climate change." *See* Revolution Wind Final Environmental Impact Statement *supra* note 17 at 3.8-12.

[199] *Tennessee Valley Auth.*, 437 U.S. at 186.

[200] *Id.* at 173 (quoting 16 U.S.C. § 1536).

in Plaintiffs' favor, and that there is a substantial public interest in protecting these endangered species, this Court should grant Plaintiffs' Motion to Stay Revolution Wind's construction.


Dated: May 14, 2024                              Respectfully submitted,

                                                 s/ Roger J. Marzulla
                                                 Roger J. Marzulla
                                                 Nancie G. Marzulla
                                                 Marzulla Law, LLC
                                                 1150 Connecticut Ave., NW
                                                 Suite 1050
                                                 Washington, DC 20036
                                                 (202) 822-6760
                                                 roger@marzulla.com
                                                 nancie@marzulla.com
                                                 Bar No. 394907
                                                 Bar No. 400985

                                                 Counsel for Plaintiffs