**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GREEN OCEANS, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No.: 1:24-cv-00141-RCL |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | |
| *Defendants,* | |
| and | |
| REVOLUTION WIND, LLC, | |
| *Defendant-Intervenor* | |

**DEFENDANT-INTERVENOR REVOLUTION WIND, LLC'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR AN ADMINISTRATIVE STAY OR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................1

II.    BACKGROUND ...................................................................................................3

    A.    The Revolution Wind Project Will Advance Important State and Federal
           Policy Objectives and Create Jobs....................................................................3
    B.    The Federal Agencies Conducted a Robust Environmental Review.....................4
    C.    Project Construction Is Underway and Any Delay From the Relief
           Plaintiffs Seek Would Have Substantial Costs for Revolution Wind..................11

III.    LEGAL STANDARD...........................................................................................14

IV.    ARGUMENT .......................................................................................................16

    A.    The Court Lacks Jurisdiction Because Plaintiffs Have Failed to Meet Their
           Burden to Show Standing for the Claims at Issue ...............................................16

          1.    No Plaintiff Established Individual Standing ...........................................17

                    a.    Neither Individual Adequately Alleged An Injury In Fact ............18
                    b.    Neither Individual Established Causation......................................19
                    c.    Neither Individual Established Redressability...............................20
          2.    No Plaintiff Established Representational Standing ..................................21
          3.    No Plaintiff Established Organizational Standing ....................................21

    B.    Plaintiffs Fail to Meet Their Burden of Establishing Any of the Four
           Factors Necessary to Obtain Preliminary Injunctive Relief or an
           Administrative Stay ...........................................................................................23

          1.    Plaintiffs Have Not Proven Irreparable Harm ..........................................23

                    a.    Plaintiffs' Delay Shows Lack of Irreparable Harm .......................24
                    b.    Plaintiffs' Alleged Harms Are Speculative...................................24
          2.    Plaintiffs Are Not Likely to Succeed on the Merits..................................31

                    a.    Plaintiffs Are Not Likely to Succeed on Their Challenge to
                          the USACE Section 404 Permit.....................................................32
                    b.    Plaintiffs Are Not Likely to Succeed on Their Challenge to
                          NMFS' Biological Opinion...........................................................38
           3.    The Balance of the Equities and the Public Interest Strongly Favor
                Denial of the Motion...............................................................................43

V.    CONCLUSION....................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003) ..................................................................16

*Appalachian Power Co. v. EPA*,
251 F.3d 1026 (D.C. Cir. 2003) .......................................................................33

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
281 F. Supp. 3d 88 (D.D.C. 2017), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018) ...............31

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989) ......................................................................................18

*B&D Land & Livestock Co. v. Connor*,
534 F. Supp. 2d 891 (N.D. Iowa 2008) ..........................................................44

*Bennett v. Spear*,
520 U.S. 154 (1997) ......................................................................................32

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) .......................................................................32

*Communities for a Better Environment v. EPA*,
748 F.3d 333 (D.C. Cir. 2014) .......................................................................32

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .......................................................................41

*Ctr. for Biological Diversity v. Regan*,
No. 21-119, 2024 WL 1602457 (D.D.C. Apr. 12, 2024) ....................................32

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
772 F.2d 972 (D.C. Cir. 1985) ...................................................................15, 25

*Dallas Safari Club v. Bernhardt*,
453 F. Supp. 3d 391 (D.D.C. 2020) ...............................................................24

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ......................................................................................33

*Dist. of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................15

*Document Techs., LLC v. Hess*,
    No. 19-cv-3257, 2019 WL 6910137 (D.D.C. Dec. 19, 2019) ................................................25

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) ................................................................................................17

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ................................................................................................22

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
    232 F. Supp. 3d 53 (D.D.C. 2017) ..........................................................................................31

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975) ................................................................................................24

*Green Oceans v. U.S. Dep't of Interior*,
    No. 24-cv-00141, 2024 WL 1885543 (D.D.C. Apr. 30, 2024).................................................2

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)................................................................................................................22

*Healthy Gulf v. U.S. Army Corps of Engineers*,
    81 F.4th 510 (5th Cir. 2023) ...................................................................................................34

*HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc.*,
    847 F.2d 908 (1st Cir. 1988).................................................................................................44

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)................................................................................................................21

*Kinsella v. Bureau of Ocean Energy Mgmt.*,
    No. 22-2147, 2022 WL 16852674 (D.D.C. Nov. 10, 2022) ......................................................2

*Kinsella v. Bureau of Ocean Energy Mgmt.*,
    No. 23-cv-02915, 2023 WL 3571300 (E.D.N.Y. May 18, 2023)......................................3, 25

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973)................................................................................................................20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................................................17, 18, 19

*Mahoney v. U.S. Dep't of Interior*,
    No. 22-cv-01305, 2022 WL 1093199 (E.D.N.Y. Apr. 12, 2022)......................................2, 25

*Maine Lobstermen's Association v. National Marine Fisheries Service*,
    70 F.4th 582 (D.C. Cir. 2023)................................................................................................32

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ................................................................................14

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) ...........................................................24

*Nantucket Residents Against Turbines v. BOEM*,
  675 F. Supp. 3d 28 (D. Mass. 2023), *aff'd Nantucket Residents*, 100 F.4th 1 ................. 39-40

*Nantucket Residents Against Turbines v. BOEM*,
  100 F.4th 1 (1st Cir. 2024) ......................................................................31

*Nat'l Parks Conservation Ass'n v. Semonite*,
  282 F. Supp. 3d 284 (D.D.C. 2017) ...................................................25, 31

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*,
  No. 15-cv-01582, 2016 WL 420470 (D.D.C. Jan. 22, 2016).....................31

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) .................................................................22

*Nat'l Telephone Cooperative Ass'n v. FCC*,
  563 F.3d 536 (D.C. Cir. 2009) .................................................................32

*Navajo Nation v. Azar*,
  292 F. Supp. 3d 508 (D.D.C. 2018) .........................................................31

*Nevada v. DOE*,
  457 F.3d 78 (D.C. Cir. 2006) ...................................................................33

*Newdow v. Bush*,
  355 F. Supp. 2d 265 (D.D.C. 2005) .........................................................24

*Nken v. Holder*,
  556 U.S. 418 (2009)..................................................................................15

*NO Gas Pipeline v. Fed. Energy Regul. Comm'n*,
  756 F.3d 764 (D.C. Cir. 2014) .................................................................19

*North Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) .................................................................41

*Ohio v. EPA*,
  No. 22-1081, 2024 WL 1515001 (D.C. Cir. Apr. 9, 2024)........................17

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ...............................................................22

iv

*Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*,
  845 F. Supp. 2d 1102 (S.D. Cal. 2012), *aff'd*, 473 F. App'x 790 (9th Cir.
  2012) ..................................................................................................................45

*Pub. Citizen v. Foreman*,
  471 F. Supp. 586 (D.D.C. 1979) ......................................................................20

*Russell v. Farley*,
  105 U.S. 433 (1881).........................................................................................44

*Sabino Canyon Tours, Inc. v. U.S. Forest Serv.*,
  298 F. Supp. 3d 60 (D.D.C. 2018) ..................................................................18

*\*Save Long Beach Island v. U.S. Dep't of Commerce*,
  No. 23-1886, 2024 WL 863428 (D.N.J. Feb. 29, 2024) ...............................3, 18, 23

*Save Mattaponi v. U.S. Army Corps of Engineers*,
  515 F. Supp. 2d 1 (D.D.C. 2007) ....................................................................32

*\*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
  No. 22-cv-11091, 2023 WL 3660689 (D. Mass. May 25, 2023)...........................3, 24, 44, 45

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
  No. 22-cv-11091, 2023 WL 6691015 (D. Mass. Oct. 12, 2023) .......................36

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ....................................................................14, 43, 44

*Sierra Club v. Jackson*,
  833 F. Supp. 2d 11 (D.D.C. 2012) ..................................................................15

*Sierra Club v. Morton*,
  405 U.S. 727 (1972).....................................................................................18, 22

*Sierra Club v. U.S. Dep't of Interior*,
  990 F.3d 898 (5th Cir. 2021) ..........................................................................42

*Sims v. Apfel*,
  530 U.S. 103 (2000) ........................................................................................33

*Singh v. Carter*,
  185 F. Supp. 3d 11 (D.D.C. 2016) ..................................................................15

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..........................................................................................18

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)....................................................................................19, 20

*Thomas v. Peterson*,
  753 F.2d 754 (9th Cir. 1985) ...........................................................................41

*United States v. Bolton*,
  468 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................16

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978)...........................................................................................33

*W. Watersheds Project v. Bureau of Land Mgmt.*,
  774 F. Supp. 2d 1089 (D. Nev. 2011), *aff'd*, 443 F. App'x 278 (9th Cir. 2011)....................45

*Waterkeeper All., Inc. v. Regan*,
  41 F.4th 654 (D.C. Cir. 2022)...........................................................................21

*\*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..........................................................................14, 15, 25, 27, 43

*Wisconsin v. Illinois*,
  278 U.S. 367 (1929)...........................................................................................35

## STATUTES

5 U.S.C. § 705................................................................................................15, 44

16 U.S.C. § 1536(b)(4) .........................................................................................8

33 U.S.C.
  § 403.................................................................................................................34
  § 404...........................................................................2, 10, 32, 33, 34, 35, 37

33 U.S.C.
  § 1344(a)..........................................................................................................34
  § 1362(7)..........................................................................................................34
  § 1362(8)..........................................................................................................34

42 U.S.C.
  § 4370m(6).............................................................................................16, 43, 44
  § 4370m-6(b)...............................................................................................16, 44

43 U.S.C.
  § 1333(a)..........................................................................................................34
  § 1333(e)..........................................................................................................34

## RULES

Fed. R. Civ. P. 65(c) ........................................................................................44

Fed. R. Evid. 702(b)-(d)....................................................................................26

# REGULATIONS

33 C.F.R.

    § 322.3(b) ...................................................................................................35
    § 328.4(a) ...................................................................................................34
    § 328.4(a) ...................................................................................................34
    § 329.12(a) ...........................................................................................34, 35

40 C.F.R.

    § 230 ....................................................................................................35, 36
    § 230.3(m) ..................................................................................................36
    § 230.10(a)(3) ............................................................................................36
    § 230.40(a) .................................................................................................36
    § 230.41 ......................................................................................................36
    § 230.42 ......................................................................................................36
    § 230.43 ......................................................................................................36
    § 230.44 ......................................................................................................36
    § 230.45 ......................................................................................................36

50 C.F.R.

    § 402.02 ..........................................................................................38, 40, 42
    § 402.11(e) .................................................................................................42

# OTHER AUTHORITIES

89 Fed. Reg. 24,268 .....................................................................................38

89 Fed. Reg. 24,297 .....................................................................................38

89 Fed. Reg. 7633 ........................................................................................37

11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp.
    129-130 (2d ed.1995) .............................................................................14

## I.    INTRODUCTION

Plaintiffs' Motion for an Administrative Stay or Preliminary Injunction ("Motion") should be denied.  Just a month ago, Plaintiffs sought an emergency stay insisting that failure to halt the ongoing construction of the Revolution Wind Farm and Revolution Export Cable (collectively, the "Revolution Wind Project" or "Project") would irreparably harm them.  Dkt. #26-1 at 1.  The Court denied that motion on procedural grounds.  Abandoning the substantive arguments in that motion, Plaintiffs are now back for a second bite at the apple with a new suite of allegations regarding irreparable harm—this time due to purported impacts on Cox Ledge and to North Atlantic Right Whales ("right whales").  But this new Motion also fails on numerous grounds.

As a threshold matter, Plaintiffs have failed to show they have standing to make the Clean Water Act ("CWA") and Endangered Species Act ("ESA") claims on which their Motion relies, and this Court therefore lacks jurisdiction to hear the Motion.  Plaintiffs identify no concrete and particularized harm sufficient to confer standing—only vague concerns about right whales and Cox Ledge—and nothing about causation or redressability.

While Plaintiffs seek extraordinary relief broadly against the Project to enjoin Revolution Wind from "any pile driving **or other construction work**" for an indefinite time "until further Court Order," Proposed Order, Dkt. #35-6 (emphasis added), Plaintiffs cannot show irreparable harm or likelihood of success on the merits.  Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind") worked with the U.S. Department of the Interior, the Bureau of Ocean Energy Management ("BOEM"), the National Marine Fisheries Service ("NMFS"), and the U.S. Army Corps of Engineers ("USACE") in a thorough, years-long environmental review and permitting process.  The Biological Opinion ("BiOp") and Incidental Take Regulations ("ITR") Plaintiffs challenge include extensive protections for right whales and prohibit lethal take.  Similarly, the Project has been sited to avoid and minimize potential impacts to Cox Ledge, and

BOEM's and USACE's approvals for the Project include extensive measures to protect that area.

Plaintiffs are not likely to succeed on the merits of the claims raised in the Motion because: (1) Plaintiffs failed entirely to comment on USACE's CWA Section 404 public notice, barring consideration of all CWA claims; (2) Cox Ledge is not a special aquatic site, or even within the statutory reach of CWA Section 404; and (3) in the BiOp, NMFS carefully applied regulations that have been on the books for nearly 40 years to analyze the environmental baseline, effects of the action (the Project), and cumulative effects, using the best available scientific information.

Additionally, the balance of the equities tips heavily against Plaintiffs' Motion. Revolution Wind has received all approvals to begin installing turbine foundations, and it began pile driving and foundation installation on May 10, 2024. Any delay in offshore construction caused by the relief Plaintiffs seek would cause Revolution Wind to incur additional costs of more than **$1 million per day,** increasing to **$3 million per day** if the delay extended into and beyond late July 2024. Ultimately, Revolution Wind could lose a substantial proportion of its more than $3 billion commitment as a result of cascading impacts under various construction timelines, seasonal prohibitions to protect species, contracts for the manufacture, transport, and installation of the remaining components of the Project, and its existing power purchase agreements, including potential termination of those contracts. The public interest, which supports important state and federal policy goals, also weighs against halting the Project.

Every court to consider a request for preliminary injunctive relief against an offshore wind project has denied the request. This Court should do likewise here. *See, e.g.*, *Green Oceans v. U.S. Dep't of Interior*, No. 24-cv-00141, 2024 WL 1885543, at *3-4 (D.D.C. Apr. 30, 2024); *Kinsella v. Bureau of Ocean Energy Mgmt.*, No. 22-2147, 2022 WL 16852674, at *2 (D.D.C. Nov. 10, 2022) (South Fork Wind project temporary restraining order denied); *Mahoney v. U.S. Dep't*

*of Interior*, No. 22-cv-01305, 2022 WL 1093199, at *3 (E.D.N.Y. Apr. 12, 2022) (South Fork Wind preliminary injunction denied); *Kinsella v. Bureau of Ocean Energy Mgmt.*, No. 23-cv-02915, 2023 WL 3571300, at *3 (E.D.N.Y. May 18, 2023) (South Fork Wind preliminary injunction denied); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, No. 22-cv-11091, 2023 WL 3660689, at *8 (D. Mass. May 25, 2023) (stay or preliminary injunction against Vineyard Wind 1 denied); *Save Long Beach Island v. U.S. Dep't of Commerce*, No. 23-1886, 2024 WL 863428, at *1 n.3 (D.N.J. Feb. 29, 2024) (denying as moot preliminary injunction against multiple offshore wind project approvals, including for Revolution Wind, because plaintiffs lacked standing).

## II.    BACKGROUND

### A.    The Revolution Wind Project Will Advance Important State and Federal Policy Objectives and Create Jobs

Construction of the Project is underway, and when it is complete, the Project will consist of an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility with 65 wind turbine generators ("WTGs"), two offshore substations, associated inter-array cabling between the WTGs, and an export cable to bring electricity to the electric grid.  Declaration of Kellen Ingalls in Support of Defendant-Intervenor Revolution Wind's Opposition to Plaintiffs' Motion for Stay of Final Agency Action, Dkt. #29-1 ("Second Ingalls Decl."), ¶ 5.  The Project will supply renewable energy and jobs to Rhode Island and Connecticut, and will also contribute to the federal government's, Rhode Island's, and Connecticut's carbon reduction goals. Declaration of Kellen Ingalls in Support of Revolution Wind's Intervention as a Defendant, Dkt. #7-3 ("First Ingalls Decl."), ¶¶ 2-3.  The federal government has established a policy goal of 100%

clean energy by 2035, with development of 30 gigawatts ("GW") of offshore wind by 2030,[1] Rhode Island's goal is 100% renewable energy by 2033, including development of 9 to 11 GW of offshore wind by 2030, and Connecticut's goal is 100% zero-carbon electricity by 2040, including development of 2 GW of offshore wind by 2030.  Second Ingalls Decl. ¶ 41.

**B.      The Federal Agencies Conducted a Robust Environmental Review**

Over a decade ago in the early stages of BOEM's offshore wind leasing, BOEM took steps to reduce potential impacts to Cox Ledge, an area of seafloor in Rhode Island Sound, among other resources.  Expert Declaration of Drew A. Carey in Support of Revolution Wind's Opposition to Plaintiffs' Motion for an Administrative Stay or Preliminary Injunction ("Carey Decl.") ¶ 29. While BOEM's original call for information for potential offshore wind commercial leasing included all of Cox Ledge, BOEM's announced Rhode Island/Massachusetts Wind Energy Area (where the Project is now located) excluded portions of Cox Ledge because of fishing interests. Declaration of Kellen Ingalls in Support of Revolution Wind's Opposition to Plaintiffs' Motion for an Administrative Stay or Preliminary Injunction ("Third Ingalls Decl.") ¶ 7; Carey Decl. ¶ 29.

After obtaining its lease, Revolution Wind submitted its Construction and Operations Plan ("COP") to BOEM in March 2020.  First Ingalls Decl. ¶ 15.  The final version of the Revolution Wind COP and appendices is thousands of pages long and underwent years of comprehensive environmental review and consultation.  *Id*. ¶¶ 15-16, 19.  BOEM conducted an extensive, more than two-year review of the Project under the National Environmental Policy Act ("NEPA").  *Id.* ¶ 16.  That environmental review process engaged twelve federal agencies, three state cooperating agencies, and an extensive array of other stakeholders, ranging from the fishing industry, to local

---

[1] *See* U.S. Dep't of Energy, Advancing Offshore Wind Energy in the United States 1, 9 (Mar. 2023), https://www.energy.gov/sites/default/files/2023-03/advancing-offshore-wind-energy-full-report.pdf.

communities, to American Indian tribes and historic preservation organizations. *Id.*

The location and distribution of "complex habitat" in the ocean near the Project was mapped in detail. Carey Decl. ¶ 23. BOEM developed, studied, and ultimately adopted Alternative G—a WTG layout on the lease that further minimized potential impacts to complex habitat and other Essential Fish Habitat ("EFH"), including on Cox Ledge. Third Ingalls Decl. ¶ 15. The Project as proposed initially by Revolution Wind would have included up to 100 WTGs; ultimately, BOEM eliminated 35 WTGs, reducing the Project to no more than 65 WTGs, including by removing WTGs that would have been sited in the southwestern portion of the lease area. *Id.* ¶¶ 15, 16. To avoid and minimize impacts even further, Revolution Wind is building Alternative G1, which in addition to removing turbines out of the southwestern area, also removes another 12 WTG locations from complex terrain or habitat in the southeastern area, and minimizes the WTGs within NMFS Priority Area 1. *Id.* ¶ 16. Therefore, the Project is not located "atop" Cox Ledge, as Plaintiffs argue. *See id.* ¶¶ 7, 15, 16; Carey Decl. ¶¶ 6, 22.

The Project's potential impacts on Cox Ledge and EFH were further addressed through consultation with NMFS under Section 305(b)(2) of the Magnuson-Stevens Fishery Conservation and Management Act. Third Ingalls Decl. ¶ 8. Based on that EFH consultation process, USACE and BOEM adopted conservation recommendations through conditions on their respective Project approvals to avoid and minimize EFH impacts from the Project. *Id.* In addition, the Rhode Island Coastal Resources Management Council's Coastal Zone Management Act federal consistency review included a condition on siting the Project to minimize impacts to Rhode Island coastal resources, including Cox Ledge.[2] *Id.* ¶ 17.

---

[2] State of Rhode Island Coastal Resources Management Council, Federal Consistency Review of the Revolution Wind Project at 5 (May 12, 2023), http://www.crmc.ri.gov/windenergy/revolution/RevWind_FedConDecision_20230512.pdf.

The Department of the Interior ultimately decided to approve the Project's COP through a Record of Decision ("ROD") on August 21, 2023.[3] *Id.* ¶ 6. On November 17, 2023, BOEM issued a COP approval letter with the final specific conditions of the Project's COP approval ("BOEM COP Conditions"), which includes many conditions that avoid and minimize potential impacts to marine mammals and Cox Ledge. *Id.* ¶¶ 14, 26 n.46.[4]

**ESA.** In April 2022, BOEM submitted a draft Biological Assessment to NMFS and the U.S. Fish and Wildlife Service, which BOEM subsequently updated during the course of the consultation.[5] First Ingalls Decl. ¶ 21. On July 21, 2023, NMFS issued a final BiOp. *Id.* NMFS and BOEM reinitiated consultation for reasons unrelated to Plaintiffs' Motion. Second Ingalls Decl. ¶¶ 20-24. On April 30, 2024, NMFS issued the operative BiOp. Third Ingalls Decl. ¶ 25.

The BiOp spans over 600 pages including appendices, and in it the agency assessed the potential effects of construction (including pile driving), operation, maintenance, and decommissioning of the Revolution Wind Project on ESA-listed whales, including the right whale, and designated critical habitat in the Project area—taking due account of the mitigation measures already included in the Project's construction processes. *Id.* NMFS comprehensively analyzed the effects of past projects, proposed projects that have already undergone Section 7 consultation,

---

[3] BOEM, Record of Decision Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan (Aug. 21, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf.

[4] BOEM, Conditions of Construction and Operations Plan Approval Lease Number OCS-A 0486 (Nov. 17, 2023, with a minor update on Apr. 25, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cond%20of%20COP%20Appr_REV%200486_April%202024.pdf.

[5] NMFS, Endangered Species Act Biological Opinion for Construction, Operation, Maintenance, and Decommissioning of the Revolution Wind Offshore Energy Project ("BiOp") at 9-10 (Apr. 30, 2024), https://www.fisheries.noaa.gov/s3/2024-05/2024-Rev-Wind-BiOp-508.pdf.

the project, and cumulative impacts on the right whale.  BiOp at 441-446.

In the BiOp, NMFS identified "the two major known human causes of mortality [to the right whale as] vessel strikes and entanglement in fishing gear."  *Id.* at 63.  Additionally, NMFS provided that "[c]limate change poses a significant threat to the recovery of North Atlantic right whales."  *Id.* at 65.  Climate change is already affecting the right whales, shifting their habitat further north.  *Id.*  Climate change is also expected to decrease right whales' prey and increase "harmful algal blooms of the toxic dinoflagellate[s]… increasing the risk of North Atlantic right whale exposure to neurotoxins."  *Id.* at 66-67.

NMFS concluded, based on an extensive record, best available science, and the agency's expertise, that the Revolution Wind Project is not likely to jeopardize the continued existence of any ESA-listed species under NMFS' jurisdiction, including right whales, and will have no effect on the critical habitat designated for the right whale or several other ESA-listed species.  BiOp at 468-470, 473-474.  The agency determined that the Project would not cause any permanent effects to right whales.  Rather, based on NMFS' conservative assumptions in the BiOp, the Project could cause a temporary threshold shift ("TTS")—which is a temporary loss of hearing sensitivity— and/or behavioral disturbance to a maximum of 22 right whales during pile driving and to a maximum of 12 right whales during the detonation of unexploded ordnance ("UXO").  BiOp at 223-231, 240, 473-74.  Revolution Wind has successfully microsited Project facilities around all UXOs discovered to date and would not need to detonate any UXO unless there is an emergent find.  Third Ingalls Decl. ¶ 40.  TTS is considered "take" under the ESA and the MMPA.  *See* BiOp at 469-471.  But NMFS determined the Project will not permanently injure or kill right whales.  *Id.* at 231 ("Thus, as no injury or mortality will actually occur, the response of right whales to pile driving noise does not meet the definition of 'harm'" under the ESA).  Rather, NMFS

concluded:

> [A]ll of these impacts, including TTS, are expected to be
> temporary with normal behaviors resuming quickly after the noise
> ends . . . Any TTS will resolve within a week of exposure (that is,
> hearing sensitivity will return to normal within one week of
> exposure) and is not expected to affect the health of any whale or
> its ability to migrate, forage, breed, or calve.

*Id.* at 442.[6]

In reaching this conclusion, NMFS used the best available science, and employed conservative assumptions that would tend to overstate the impacts to right whales, including: (1) considering effects of up to 79 WTGs, even though BOEM's and USACE's approvals are each limited to 65 WTGs, BiOp at 13; (2) basing take estimates on the JASMINE model that did "not incorporate any animal movements or avoidance behaviors that would be expected to result from exposure to underwater noise," *id.* at 202; (3) basing its noise impacts analysis on "the three WTG monopile foundation per day scenario," even though "it is unlikely that this installation rate would be consistently possible throughout construction," *id.* at 204; (4) estimating takes assuming a construction schedule in which "79 WTG monopiles and 2 OSS monopiles" were installed "during the highest density month of each species . . . at a rate of 3 WTG monopiles per day," *id.* at 206; and (5) NMFS requiring that "any large whale sighted . . . or acoustically detected . . . that cannot be identified as a species other than a North Atlantic right whale must be treated as if it were a North Atlantic right whale," *id.* at 214.

The BiOp included an Incidental Take Statement pursuant to ESA Section 7(b)(4), 16 U.S.C. § 1536(b)(4), permitted non-lethal take incidental to development of the Project, and required mitigation measures to avoid and minimize impacts to listed species such as the right

---

[6] NMFS also found that "we do not expect avoidance of pile driving noise to result in an increased risk of vessel strike or entanglement in fishing gear."  BiOp at 229.

whale, including from pile driving.  BiOp, Section 11.0.  Those measures include: (1) to avoid the time of year with the highest densities of right whales, pile driving is only authorized from May 1 through December 31 (and December pile driving requires prior approval from NMFS), BiOp at 201, 217; (2) at least three protected species observers ("PSOs") will be present on the pile driving platform to visually monitor the clearance zone during pile driving and two PSO vessels with at least three additional PSOs on each vessel will monitor clearance and shutdown zones prior to and during pile driving, *id*. at 42-43, 45, 214; (3) a  real-time passive acoustic monitoring ("PAM") system will be used before and during pile driving to monitor the presence of marine mammals in the clearance and shutdown zones, *id.* at 211-212; (4) before beginning soft-start procedures, PSOs must confirm that no right whale has been seen at any distance, including any additional distance that they can see beyond the clearance zones, for at least the 30 minutes immediately prior to a soft-start of pile driving, and the PAM operator must confirm no right whale vocalizations have been detected in the 10 kilometer PAM clearance zone for the preceding 60 minutes, *id.* at 213; (5) soft-start procedures must be used in pile driving—beginning with 4-6 strikes per minute at 10-20 percent of maximum hammer energy—to create an opportunity for any whale to move away before more intense sound is emitted, *id.* at 219-220; and (6) all pile driving must be mitigated by noise attenuation systems, such as a double big bubble curtain, *id*. at 45, 182-83.

NMFS also evaluated Cox Ledge in the BiOp.  The BiOp concludes that for a variety of reasons, "effects will be so small that they cannot be meaningfully measured, evaluated, or detected and are, therefore, insignificant."  *Id.* at 383.

**MMPA.**  NMFS separately evaluated and authorized the incidental harassment of right whales pursuant to the MMPA.  On October 20, 2023, NMFS published its final ITR and on November 20, 2023, NMFS issued its Letter of Authorization ("LOA") for the Revolution Wind

Project.  First Ingalls Decl. ¶ 22.  On April 29, 2024, NMFS issued a modified LOA.[7]  Third Ingalls Decl.  ¶ 28.  NMFS' LOA includes over 30 pages of mitigation, monitoring, and reporting requirements.  *Id.* ¶¶ 29-31.  The ITR and LOA authorize non-lethal incidental take of marine mammals by harassment, **but do not authorize any take of right whales (or any marine mammals) by mortality or serious injury**.  *Id.* ¶ 28; Second Ingalls Decl.  ¶ 15.  The BiOp considers and includes all of the incidental take authorized in the ITR and the LOA—so references to the take allowed by the BiOp are comprehensive.  BiOp at 8-9.

**CWA Section 404 and Rivers and Harbors Act ("RHA") Section 10.**  On June 3, 2022, Revolution Wind applied for a CWA Section 404 permit and a RHA Section 10 permit.  First Ingalls Decl. ¶ 38.  After an extensive process, including opportunity for public comment, and following USACE's August 21, 2023 approval of the ROD, the USACE issued the permit to Revolution Wind on October 2, 2023.  Third Ingalls Decl. ¶ 19.  This permit includes environmental protection measures, reporting, coastal surveying, and other special conditions on Revolution Wind's activities, including to avoid and minimize impacts to EFH and complex habitat.  *Id*. ¶¶ 9-13, 19, 22-23.  Cox Ledge is not located within the three nautical mile limit of the territorial seas—the limit of USACE's CWA Section 404 permitting authority—and is instead located much farther offshore.  *Id*. ¶ ¶¶ 7, 22, 24.  However, the Project's RHA Section 10 authorization includes several conditions related to work on the U.S. Outer Continental Shelf ("OCS")—beyond the territorial seas—that are designed to minimize impacts to EFH, cod spawning, and complex habitat.  *Id*. ¶ 10.  The three nautical mile limit delineation of the Project's CWA Section 404 permit is depicted in this figure.  *Id*. ¶ 24.

---

[7] NMFS Letter of Authorization (Apr. 29, 2024), https://www.fisheries.noaa.gov/s3/2023-11/BL52-Revolution-Wind-LOA-OPR1-Final-signed-OPR1.pdf.



### C. Project Construction Is Underway and Any Delay From the Relief Plaintiffs Seek Would Have Substantial Costs for Revolution Wind

The Project has mobilized a large team of specialized workers who are currently constructing the Project. In September 2023, the Revolution Wind Project began onshore construction activities. *Id.* ¶ 39. Currently, the Project is continuing onshore construction for the export cable and the new onshore interconnection station and substation off Camp Avenue. *Id.*

Offshore, in January 2024, the Project began seabed-preparation activities, and that work is ongoing. *Id.* The Project has completed pre-lay scour protection installation at proposed turbine locations and in the Revolution Wind Lease Area is: relocating boulders, deploying bubble curtains, PAM buoys, and Sound Field Verification equipment; and holding and transferring monopiles. *Id.* The Project has received all approvals to commence turbine foundation installation and began pile driving for foundation installation on May 10, 2024. *Id.* ¶ 40.

Revolution Wind and its affiliates have committed in excess of $3 billion to date to plan, permit, develop, and construct the Project. *Id.* ¶ 43. Revolution Wind has ordered equipment and contracted with specialized vessels to prepare for offshore construction. *Id.* ¶ 43, 47-48; First Ingalls Decl. ¶ 6. Revolution Wind has been awarded five power purchase agreements ("PPAs") under three separate procurements for a combined approximately 704 MW of generating capacity. Third Ingalls Decl. ¶ 44. Each of the PPAs contain commercial milestones the Project must meet by certain dates; delays result in increased contract security requirements (which Revolution Wind would forfeit upon termination), daily liquidated damages charges ($70,400 per day in total across the five PPAs), and ultimately termination rights for the buyers. *Id.* ¶¶ 45-46.

Staying or enjoining the approvals now, as Plaintiffs seek in this Motion, would cause the Project to face serious delay, jeopardizing the significant investment of nearly a decade of efforts in the approval processes, commitments exceeding $3 billion in planning, engineering, environmental field work, technical analyses, permitting, contracting, and construction by Revolution Wind and its affiliates. *Id.* ¶¶ 43, 51-54, 57. Revolution Wind has contracted with three primary vessels (and additional support vessels) to perform ongoing seabed preparation work. *Id.* ¶ 49. Revolution Wind has contracted with several vessels to perform the foundation-installation and support work, including one vessel for foundation pile-driving, one vessel for non-pile driving secondary installation work and other vessels that are deploying acoustic mitigation measures, deploying acoustic monitoring systems, and hosting PSOs. *Id.* ¶¶ 41, 51. If the Court were to stay the federal approvals required for this work or otherwise order this work to stop, Revolution Wind would incur additional delay standby and fuel costs in excess of $1 million per day. *Id.* ¶ 51. If WTG installation and cable-laying could not begin on schedule in July and August, respectively, Revolution Wind could incur a further $2 million per day in standby and fuel

costs. *Id.* ¶ 52. Ultimately, depending upon the length of the delay, standby and fuel costs could be in excess of $3 million per day if delay continues into and beyond late July 2024 alone. *Id.* ¶ 53. Assuming a hypothetical six-month delay, these costs could amount to approximately $230 million. *Id.*

A delay in one aspect of the Project's offshore construction can have cascading effects because of the sequential nature of the construction activities and limited availability of specialized vessels. *Id.* ¶¶ 47, 50-56. For example, if a particular vessel's work were to be delayed beyond its contractual latest vessel availability date, Revolution Wind would then need to work with the contractor (or another contractor) to remobilize another vessel, leading to additional costs, and possibly also to further delays, assuming alternate vessels were available at all. *Id.* ¶ 54.

The Project's construction schedule is also subject to seasonal environmental mitigation measures for species protection that restrict the windows in which various construction activities are allowed—essentially only a half-year window to install turbine foundations and the offshore substation foundations, including periods with challenging weather late in the season. *Id.* ¶ 55. Again, even a brief delay in the Project's construction can have magnified effects because a delay of just a few days could result in many months of delay if there is not enough time to complete a construction activity in that year's window. *Id.* ¶ 56. Additionally, halting or delaying the Project would have significant cascading impacts to Revolution Wind's substantial financial obligations under various contracts for the manufacture, transport, installation, and construction of the remaining components of the Revolution Wind Project. *Id.* ¶ 43.

Staying or otherwise enjoining the Project approvals would also harm the economy and workers. The Project will create more than 4,100 full-time equivalent jobs (direct, indirect, and induced effects of the Project) during construction and an estimated 236 full-time equivalent jobs

annually for the Project's operations and maintenance work. *Id.* ¶ 60. On April 22, 2022, Ørsted, the North America's Building Trades Unions, and the United Brotherhood of Carpenters entered into a "National Offshore Wind Agreement", a first-of-its kind U.S. project labor agreement that creates expansive job opportunities for workers in the building trade unions on offshore construction associated with Ørsted's projects, including the Revolution Wind Project. *Id.* ¶ 61. Construction on the Project is also being performed pursuant to project labor agreements with the Norwich-New London Building Trades Council (offshore wind turbine pre-assembly at the New London State Pier) and the Rhode Island Building and Construction Trades Council (advance foundation component construction, as well as work on the onshore cable route and onshore substation). *Id.* Consistent with these agreements, many of the jobs associated with the Project are union jobs. *Id.* Ørsted and Eversource are also investing significantly in domestic manufacturing and port infrastructure, and Revolution Wind is making financial commitments to communities and institutions in Connecticut and Rhode Island. *Id.* ¶¶ 62-63. Granting Plaintiffs' Motion and halting construction would imperil these critical economic benefits.

## III.    LEGAL STANDARD

A preliminary injunction is an "extraordinary" remedy that can only be granted upon a "clear showing" of entitlement to such relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008); *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011). A plaintiff seeking a preliminary injunction must show: (1) likelihood of success on the merits; (2) that there will be irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tips in its favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20. The plaintiff bears the burden of persuasion. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (quoting 11A C. Wright,

A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129–130 (2d ed.1995))).

The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009). And the Supreme Court has made clear that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is **likely** in the absence of an injunction" and not simply possible. *Winter,* 555 U.S. at 22 (emphasis in original). The moving party must make a "a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 434.

Plaintiffs seek "either a preliminary injunction or, in the alternative, an administrative stay under 5 U.S.C. § 705." Plaintiffs' Motion ("Mot."), Dkt. #35-1 at 12. Section 705 of the Administrative Procedure Act ("APA") is intended to "postpone the effective date of an agency action." 5 U.S.C. § 705. Where, as here, all of the challenged agency actions have become effective and Revolution Wind is proceeding under the operative approvals, Section 705 does not apply. In any event, the same stringent test applies for a stay under Section 705 of the APA as for a preliminary injunction. *See, e.g., Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30 (D.D.C. 2012) ("[T]he standard for a stay at the agency level is the same as the standard for a stay at the judicial level: each is governed by the four-part preliminary injunction test applied in this Circuit."); *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) ("The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay.") (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Nken*, 556 U.S. at 434.

Plaintiffs advocate for a "sliding scale" to reduce their burden. Mot. at 13. But this Court has held that the "'sliding scale approach is highly questionable . . . in light of the Supreme Court's holding in *Winter*.'" *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (quoting *Winter*, 555 U.S. at 22). Indeed, this Court continues to require movants to establish all four preliminary

injunction factors.[8]  *See, e.g., United States v. Bolton*, 468 F. Supp. 3d 1, 5 (D.D.C. 2020) (Lamberth, J.).  Further, this Court has not adopted the two-prong test Plaintiffs assert "some courts have moved to" when ESA violations are alleged.  Mot. at 13 (citing *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 249 (D.D.C. 2003) (finding the D.C. Circuit "has not definitively ruled on the issue" and applying the normal four-part test).

In addition, "in any action seeking a temporary restraining order or a preliminary injunction against an agency or project sponsor in connection with review or authorization of a covered project" under the federal FAST-41 statute, "the court shall: (1) consider the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction; and (2) not presume that the harms described in paragraph (1) are reparable." 42 U.S.C. § 4370m-6(b).  The Project is a "covered project" under the FAST-41 statute, *see id.* § 4370m(6); *see also* Revolution Wind Project FEIS at A-5, L-33,[9] and Plaintiffs' Motion is subject to FAST-41's heightened standard.

## IV.    ARGUMENT

### A.    The Court Lacks Jurisdiction Because Plaintiffs Have Failed to Meet Their Burden to Show Standing for the Claims at Issue

Plaintiffs cannot demonstrate Article III standing to support their claims of irreparable injury from potential harm to marine mammals or benthic habitat because (1) Plaintiffs have not suffered any concrete, particularized, actual, or certainly impending injuries, (2) their unproven

---

[8] Even if the Court were to apply a less stringent "sliding scale," Plaintiffs would still fall short of their burden because Plaintiffs have not established that any of the factors weigh in favor of granting preliminary injunctive relief.  *See infra* Section IV.B.

[9] BOEM, Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement ("FEIS") (July 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2.pdf.

alleged injuries are not fairly traceable to the alleged conduct of the Federal Defendants, and (3) granting Plaintiffs the relief they seek would not redress their supposed injuries. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs offer just two declarations in their attempt to support standing as to just one individual (Elizabeth Quattrocki Knight) and two organizations (Green Oceans and Save Right Whales Coalition ("SRWC")). *See* Declaration of Elizabeth Quattrocki Knight ("Quattrocki Knight Decl.") (on behalf of herself and Green Oceans), Dkt. # 35-4; Declaration of Lisa Linowes ("Linowes Decl.") (on behalf of SRWC), Dkt. #35-3. Yet neither declaration adequately supports individual, representative, or organizational standing as to any Plaintiff. "[A]bsent 'good cause shown,' a petitioner whose standing is not readily apparent must show that it has standing in 'its opening brief.'" *Ohio v. EPA*, No. 22-1081, 2024 WL 1515001, at *7 (D.C. Cir. Apr. 9, 2024). When assessing standing at the preliminary injunction stage, the district court applies "the heightened standard for evaluating a motion for summary judgment[,]" meaning "the plaintiff cannot rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (internal citations and quotations omitted). Additionally, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (citation omitted). No Plaintiff has established standing here.

### 1.    No Plaintiff Established Individual Standing

To establish individual standing, a plaintiff must adequately allege an injury in fact, causation, and traceability. *See Lujan*, 504 U.S. at 560-61. Neither Dr. Quattrocki Knight (the only individual plaintiff to provide a declaration purportedly in support of standing) nor Ms.

Linowes (as a member of SRWC), have alleged facts sufficient to satisfy any of the three elements.

        a.      <u>Neither Individual Adequately Alleged An Injury In Fact</u>

To establish injury in fact, a plaintiff must prove "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Plaintiffs claim "[i]njury to the North Atlantic Right Whale is also injury to . . . Dr. Elizabeth Quattrocki Knight." Mot. at 34. Yet Dr. Quattrocki Knight—a psychiatrist with training in neuroscience who does not even claim to participate in whale watching or fishing—does not offer any basis to conclude that purported harm to right whales or benthic habitat within the Revolution Wind lease area would constitute *any* injury to her personally, much less a particularized one. *See* Quattrocki Knight Decl. ¶ 2. That Dr. Quattrocki Knight is "deeply troubled by the impact offshore wind . . . will have on marine mammals . . . and fishermen", *id.* ¶ 5, reflects only "generalized grievances" by a concerned citizen that "are not cognizable in the federal courts." *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 616 (1989); *see also Sabino Canyon Tours, Inc. v. U.S. Forest Serv.*, 298 F. Supp. 3d 60, 74 (D.D.C. 2018) ("a general concern for the environment is simply not sufficient" to allege a "concrete particularized injury").

Similarly, Ms. Linowes fails to show that she has been, or imminently will be, "'directly affected apart from [her] 'special interest' in the subject."[10] *Lujan*, 504 U.S. at 563 (citing *Sierra Club v. Morton*, 405 U.S. 727, 735, 739 (1972)). Indeed, the Quattrocki Knight Declaration and Linowes Declaration make no allegation that either declarant has visited or intends to visit the Project area, let alone that they have the sort of specific, concrete plans that may support standing. *See Lujan*, 504 U.S. at 564; *see also Save Long Beach Island*, 2024 WL 863428, at *9. The

---

[10] Ms. Linowes' declaration fails to address benthic habitat, fishing or Cox Ledge.

Supreme Court has expressly rejected the "'animal nexus' approach, whereby anyone who has an interest in studying or seeing [an] endangered animal[] anywhere on the globe has standing" to challenge a federal action that may affect that species. *Lujan*, 504 U.S. at 566-67.

Moreover, Plaintiffs purport to have standing based purely on a procedural harm. *See* First Amended Complaint ("Am. Compl."), Dkt. #33 ¶ 35 ("Plaintiffs have standing because they are injured in fact by the federal Defendants' actions or omissions"). However, mere disagreement with Federal Defendants' analyses (here, regarding right whales and benthic habitat) does not constitute Article III injury-in-fact because Plaintiffs do not allege a concrete interest affected by the alleged deprivation of a procedural right. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). Accordingly, neither Dr. Quattrocki Knight nor Ms. Linowes can establish the injury in fact necessary to show standing at this stage.

b.    Neither Individual Established Causation

Dr. Quattrocki Knight and Ms. Linowes fail to establish that their alleged injuries are fairly traceable to the actions of Federal Defendants, as opposed to the "independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation omitted); *see also NO Gas Pipeline v. Fed. Energy Regul. Comm'n*, 756 F.3d 764, 768 (D.C. Cir. 2014). "Plaintiffs' attempt . . . to draw a causal connection where none exists between recent offshore wind development and large whale mortality, including the North Atlantic right whale is contrary to the scientific consensus." Expert Declaration of Mary Jo Barkaszi in Support of Defendant-Intervenor Revolution Wind's Opposition to Plaintiffs' Motion for Administrative Stay or Preliminary Injunction ("Second Barkaszi Decl.") ¶ 8. And Plaintiffs ignore the overwhelming scientific consensus that offshore wind projects are not the cause of increased mortalities of whales, but rather that vessel strikes and

fishing gear entanglements are the primary causes of those increased mortalities. *Id.* (summarizing findings of the National Oceanic and Atmospheric Administration ("NOAA"), the Marine Mammal Commission, BOEM, the U.S. Department of Energy, Rutgers University, Yale University, University of Rhode Island, the Sierra Club, and the Natural Resources Defense Council).[11]  To the extent Plaintiffs *disagree* with Federal Defendants' findings, this is insufficient to confer standing.  *See Summers*, 555 U.S. at 496.  Finally, Plaintiffs do not attribute the alleged harms to the right whale only to the Project; rather—and unsurprisingly, given that their Motion's ESA claims are focused on supposed cumulative impacts, *see infra* Section IV.B.2.b—Plaintiffs blame all potential offshore wind farms on the eastern seaboard.  *See, e.g.*, Linowes Decl. ¶ 12 ("In total, NMFS has either proposed or approved the take of more than 240 North Atlantic Right Whales in eleven projects. . . .  For NMFS to disregard the impacts of the offshore wind program as a whole, and to only look at one project at a time—as they did with Revolution Wind—threatens the North Atlantic Right Whale.").  Plaintiffs have failed to demonstrate that the challenged agency actions are the legally relevant cause of their purported harms.

c.    Neither Individual Established Redressability

Redressability exists only where the requested relief would remedy a plaintiff's alleged injury directly.  *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973); *Pub. Citizen v. Foreman*, 471 F. Supp. 586, 590 (D.D.C. 1979) ("[A] plaintiff must show 'an injury to himself that is likely to be redressed by a favorable decision.'") (citation omitted).  Here, Plaintiffs show no cognizable injury.  *See supra* Section IV.A.1.a.  But even if they did, Plaintiffs fail to show the injury would

---

[11] *See also* BOEM and NOAA Fisheries, North Atlantic Right Whale and Offshore Wind Strategy ("North Atlantic Right Whale Strategy") at 2-3 (Jan. 2024)(The NARW population is currently in decline, mainly due to vessel strikes and entanglement in fishing gear) (citing Pettis et al. 2023), https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf.

be redressable by the relief they seek from this Court. Harms to whales are not caused by offshore wind activities but primarily from vessel strikes and fishing gear entanglements. *See supra* Section IV.A.1.b; *see also infra* Section IV.B.1.b; Second Barkaszi Decl. ¶¶ 8, 41-49. Indeed, the Motion concedes the right whale population has been "rapidly declining" and highlights right whale deaths over recent years—all in the absence of, and unimpacted by, the Project construction Plaintiffs seek to halt. *See* Mot. at 28-29. Plaintiffs do not allege this population decline will stop, much less reverse, if the Court orders the relief sought by Plaintiffs. Thus, an Order staying or enjoining Project approvals would not redress Plaintiffs' purported harms. Plaintiffs fail to establish any, much less every, element of individual standing.

### 2.    No Plaintiff Established Representational Standing

To establish representational standing, an organization must show: (1) at least one of its members has standing; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires participation of the organization's individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

On the first prong of representational standing, Green Oceans and SRWC must show that at least one of their members has individual standing. *Hunt*, 432 U.S. at 343; *Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022) (dismissing claim for lack of representational standing where no individual members of plaintiff organization showed standing). The only members of Green Oceans and SRWC who submitted declarations in this action are Dr. Quattrocki Knight and Ms. Linowes, respectively. As above, neither of them has established individual standing. *See supra* Section IV.A.1. On this basis alone, then, neither Green Oceans nor SRWC can establish representational standing; the Court need not inquire any further.

### 3.    No Plaintiff Established Organizational Standing

To establish organizational standing, an organization must demonstrate that it meets the

standing requirements itself. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved'[.]" *Sierra Club*, 405 U.S. at 739. To show injury in fact to an organization, a plaintiff "must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). To determine whether the organization suffered "concrete and demonstrable injury" to its activities, the court will evaluate "whether the agency's action or omission to act injured the [organization's] interest . . . ." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (internal quotation marks omitted).

Here, Green Oceans and SRWC fail to show an injury in fact sufficient to establish organizational standing. The Amended Complaint broadly alleges that Green Oceans "believes that 'protecting the ocean and biodiversity ensures our own survival'" and that it "dedicates time to educating the public about risks to the ocean . . . ." Am. Compl. ¶ 1; Linowes Decl. ¶ 4. Similarly, SRWC alleges that it "engages with local stakeholders to advocate for preserving and conserving the North Atlantic right whale" "to protect the North Atlantic right whale and other marine life from the industrialization of the ocean habitat through large-scale offshore wind energy development[,]" Am. Compl. ¶ 3, and "advocates against offshore wind projects that could be harmful to wildlife . . . ." Linowes Decl. ¶ 1. But an organization's "expend[iture of] resources to educate its members and others regarding" government action "does not present an injury in fact." *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). Nothing in the Quattrocki Knight or Linowes Declarations suggests Green Oceans' or SRWC's

activities have been "impeded" in any way by the Project or the challenged Project authorizations.

Instead, both Green Oceans and SRWC participated in the extensive public processes held by Federal Defendants during the Project's permitting and environmental review process, which provided a forum in which both groups could engage in their public educational mission and attempt to shape the Project. *See supra* Section II.B.  This process resulted in a Project that is legally required to comply with extensive avoidance, mitigation, monitoring, and reporting requirements related to right whales and benthic habitat. *Id.*; *see also* Expert Declaration of Mary Jo Barkaszi in Support of Defendant-Intervenor Revolution Wind's Opposition to Plaintiffs' Motion for Stay or Preliminary Injunction, Dkt. #29-2 ("First Barkaszi Decl.") ¶ 71-81.  None of the challenged approvals prevents Green Ocean's or SRWC's advocacy or educational missions, and the organizations have failed to demonstrate a direct injury from those approvals.[12] *Save Long Beach Island,* 2024 WL 863428, at *9 (dismissing challenge by plaintiffs against NMFS approvals, finding "a dearth of allegations in the Complaint that demonstrate a direct injury to [p]laintiffs apart from their alleged 'special interest' in marine mammals").

Additionally, because neither Green Oceans nor SRWC has shown any cognizable injury, they cannot trace an injury to the challenged approvals or establish that their requested relief would redress any purported injury.  In short, because Plaintiffs have failed to demonstrate any type of standing for any Plaintiff, the Motion should be denied.

**B.**     **Plaintiffs Fail to Meet Their Burden of Establishing Any of the Four Factors Necessary to Obtain Preliminary Injunctive Relief or an Administrative Stay**

**1.**     **Plaintiffs Have Not Proven Irreparable Harm**

---

[12] To the extent either organization might claim an injury directly from purported harm to right whales or benthic habitats, causation and redressability would fail for the reasons discussed for Dr. Quattrocki Knight and Ms. Linowes above. *See supra* Sections IV.A.1.b, c.

a.    Plaintiffs' Delay Shows Lack of Irreparable Harm

"An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).   A delay in seeking a preliminary injunction is particularly "inexcusable" where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm. *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020) (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).

Plaintiffs have known of and actively opposed the Project since before it was approved on August 21, 2023.  *See* FEIS, Appendix L at 26 (summarizing comments from Plaintiff Responsible Offshore Development Alliance).   Plaintiffs concede that the challenged approvals constitute "authorization to begin construction."  Am. Compl. at 2.  Yet, Plaintiffs waited nearly five months after the agency approved the Project to even file suit.  Plaintiffs then waited an additional four months after that to file their Motion.  Plaintiffs fail to explain this delay, which "militates against a finding of irreparable harm" with respect to all of Plaintiffs' alleged irreparable harms.  *See Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (denying preliminary injunction after plaintiff's two-month delay in filing suit).

This case is analogous to *Seafreeze Shoreside* where the U.S. District Court for the District of Massachusetts found that plaintiffs could not show irreparable harm because they waited until after pile driving had started to file their motion for stay "despite knowing for months that installation of the monopiles would commence."  2023 WL 3660689, at *5.  The court found that plaintiffs had "not demonstrated reasonable diligence" and could therefore not show irreparable harm.  *Id.*  Plaintiffs' delay in this case should yield the same result.

b.    Plaintiffs' Alleged Harms Are Speculative

Even setting aside their delay, Plaintiffs' alleged harms are speculative and do not meet the

high bar of demonstrating that "irreparable injury is **likely** in the absence of an injunction." *See Winter,* 555 U.S. at 22 (emphasis in original); *see also Cuomo,* 772 F.2d at 976.  Based on lack of irreparable harm alone, the Court should deny Plaintiffs' Motion.  *See Nat'l Parks Conservation Ass'n v. Semonite,* 282 F. Supp. 3d 284, 288 (D.D.C. 2017) (Lamberth, J.); *Document Techs., LLC v. Hess,* No. 19-cv-3257, 2019 WL 6910137, at *5 (D.D.C. Dec. 19, 2019) (Lamberth, J.).

The alleged harm must be "both certain and great; [the injury] must be actual and not theoretical." *Nat'l Parks Conservation Ass'n,* 282 F. Supp. 3d at 287.  Further, to warrant a stay, Plaintiffs must demonstrate that the alleged harm will exist **even after** the mitigation measures are implemented.  *See Kinsella,* 2023 WL 3571300, at *3 (denying preliminary injunction for lack of irreparable harm where agency "ha[d] already found that the [offshore wind project] as proposed will not exacerbate existing PFAS, in part because of mitigation measures included in the Project's plan"); *see also Mahoney,* 2022 WL 1093199, at *2 (denying preliminary injunction for lack of irreparable harm where plaintiff failed to "address the effect of the mitigation measures provided for in [South Fork Wind's] plan").  But Plaintiffs fail to allege a single non-speculative harm or even acknowledge the relevant mitigation measures required for the Project.

At the outset, Plaintiffs rely, in part, on an erroneous claim that there will be two vessels simultaneously pile driving.  Mot. at 31, 32.  That is false.  Third Ingalls Decl. ¶ 41.  Only one of the vessels that Plaintiffs invoke for this erroneous assertion has the capability and equipment to perform pile driving operations.  *Id.*  The other vessel is restricted to installation of secondary steel components on the foundations once installed—work that is solely above the waterline.  *Id.*

Plaintiffs further speculate that the Project's construction will irreparably harm right whales and Cox Ledge.  Mot. at 12-17.  As an initial matter, these allegations now exclusively rely on the Linowes Declaration and the Quattrocki Knight Declaration.  But as described in Revolution

25

Wind's Objections, filed concurrently with this opposition, neither of these individuals are qualified to express any opinions regarding underwater acoustics or marine mammals or vessel traffic and have not explained the "sufficient facts or data" necessary to support their opinions, nor identified any "reliable principles and methods" they may have utilized. *See* Fed. R. Evid. 702(b)-(d). Nor do they show irreparable harm to any of the Plaintiffs themselves. *See supra* Section IV.B.1.

Ms. Linowes relies on her own January 18, 2024 paper to support her allegations of harm, Linowes Decl. fn. 1, but her purported "investigation" of large whale mortality is not a peer-reviewed scientific publication; her conclusions do not comport with scientific publications regarding vessel strike risk for large whales, and her paper incorrectly uses pre-construction stranding data to draw inaccurate conclusions from later construction activities. *See* Second Barkaszi Decl. ¶¶ 11, 62. In contrast, field data from the recently constructed South Fork Wind project, which utilized the same foundation installation vessel and successful mitigation techniques that are also being employed by Revolution Wind during pile driving, showed that the South Fork Wind project did not reach or exceed the permissible take limits for any species, including large whales. *Id.* ¶ 59. Plaintiffs also rely on a NOAA website and agency letter by Sean Hayes, Mot. at 34, 36, but neither offer an opinion on Revolution Wind or Plaintiffs' claims. The letter from Sean Hayes identified additional areas of scientific inquiry and BOEM subsequently funded a National Academies of Sciences study that provided additional assessment. Second Barkaszi Decl. ¶¶ 13, 64. For these reasons alone, Plaintiffs have not demonstrated irreparable harm.

Moreover, the allegations fall short of the high standard needed for the extraordinary relief of a preliminary injunction. Indeed, although Plaintiffs generally discuss the threats to the right whales and other marine mammals and the importance of Cox Ledge as fish habitat (issues the

expert agencies analyzed with great care), they barely discuss why they believe Revolution Wind will cause irreparable harm, and then only in vague and hyperbolic terms.  *See, e.g.,* Mot. at 33.

And Plaintiffs completely ignore the Project's avoidance, minimization, and mitigation measures that directly undercut Plaintiffs' claims.  Plaintiffs cannot show irreparable harm because the BiOp merely authorizes temporary noise disturbances, prohibits pile-driving activities when right whales are more likely present, and mandates robust mitigation measures to avoid impacts. *See supra* Section 0; *see also* Third Ingalls Decl. ¶¶ 26-31, 34, 55 (describing the extensive mitigation requirements and monitoring and reporting requirements provided in NMFS' BiOp, ITR, and LOA); *see also* First Barkaszi Decl. ¶¶ 71-80.  Similarly, the agencies carefully considered and mitigated impacts to Cox Ledge.  *See supra* Section 0; *see also* Third Ingalls Decl. ¶¶ 8-17.

The evidence clearly shows that the required measures protect right whales and Cox Ledge:

**Right whales and other marine mammals**.  The overwhelming scientific and expert agency consensus attributes these mortality increases to vessel strikes and fishing gear entanglements and not to offshore wind development.  Second Barkaszi Decl. ¶¶ 8, 41, 52, 53 (summarizing findings of the NOAA, the Marine Mammal Commission, BOEM, the U.S. Department of Energy, Rutgers University, Yale University, University of Rhode Island, the Sierra Club, and the Natural Resources Defense Council).  In fact, these groups have all issued official statements that no marine mammal mortality has been attributed to offshore wind activities.  *Id*. ¶¶ 52-53.  Plaintiffs offer no proof whatsoever that the Project is likely to harm right whales or other marine mammals.  *Winter*, 555 U.S. at 22.

Plaintiffs' attempt to simply add up authorized right whale takes in various NMFS authorizations (Mot. at 26, 29, and 30, Linowes Decl. ¶ 10) to speculate population level effects

and potential jeopardy of the right whale and other species—not to mention improperly seeking to have the Revolution Wind Project enjoined on the basis of alleged irreparable harm that Plaintiffs also attribute to **other** offshore wind projects—misconstrues the nature of those authorizations. Second Barkaszi Decl. ¶¶ 9, 55-58.  Although Plaintiffs assume all authorized takes will be realized, this is not correct. Only a small portion of authorized takes under a particular authorization are ever realized from the intersection of a marine mammal with the estimated ensonified area; and only a portion of those exposures are likely to manifest in PTS or a behavioral disturbance.  *Id.* ¶ 56; First Barkaszi Decl. ¶ 31. In contrast to Plaintiffs' mere speculation and flawed analysis, the **actual** field data collected during the construction of the South Fork Wind Project, which closely resembles the Revolution Wind Project in terms of construction methods and marine mammal mitigation, demonstrates that actual take was far lower than authorized take and that Revolution Wind will not result in irreparable harm to marine mammals.  Second Barkaszi Decl. ¶ 59-61.  Like Revolution Wind, South Fork Wind used the Bokalift 2 for pile driving and foundation installation.  *Id.* ¶ 61, Table 2; First Barkaszi Decl. ¶ 104.  Like Revolution Wind, South Fork Wind used double big bubble curtains as one means of noise mitigation.  Second Barkaszi Decl. ¶ 61, Table 2.  And like Revolution Wind, South Fork Wind construction used another sound mitigation device called a resonator.  *Id.*

Indeed, the Revolution Wind Project will be required to implement stricter mitigation measures than the South Fork Wind Project was in certain respects—for example, requiring three PSOs on each vessel associated with pile driving, rather than two; and treating all detected-but-unidentified large whales as right whales for purposes of pile driving mitigation, rather than only those detected within 2,000 meters of the pile.  Third Ingalls Decl. ¶ 31.  Data from South Fork Wind Project monopile pile driving showed that, when its noise mitigation measures were

optimized, Level B and Level A harassment ranges were significantly smaller than the ranges modeled. First Barkaszi Decl. ¶ 111. During South Fork Wind construction, there were **no known Level A takes** of any species and actual Level B takes of mysticetes (including right whale) for South Fork Wind foundation pile driving activities represented less than 20% of authorized takes. Second Barkaszi Decl. ¶ 59.

**Cox Ledge.** The Project is not actually located "atop" Cox Ledge, as Plaintiffs incorrectly claim. *See* Mot. at 4, 14, 18, 39; Carey Decl. ¶ 22. Although there is no agreed upon boundary for Cox Ledge, the great majority of the Project's approved footprint and lease area is not on the general area of Cox Ledge. Carey Decl. ¶ 22. This is the outcome of more than a decade of efforts to site the Project to avoid and minimize impacts to benthic habitats. BOEM excluded portions of Cox Ledge from its leasing process because of fishing interests. Third Ingalls Decl. ¶ 7; Carey Decl. ¶ 29. And within the Project's lease area, BOEM further avoided and minimized impacts to Cox Ledge by reducing the overall number of WTGs approved (from up to 100 to 65 WTGs). Third Ingalls Decl. ¶ 15; Carey Decl. ¶ 30. And even within the approved footprint, the Project's WTGs and cables will be "microsited" to further avoid these habitats, based on detailed mapping efforts conducted as part of the environmental review and regulatory approval processes. Third Ingalls Decl. ¶¶ 11, 14, 17; Carey Decl. ¶ 31.

Furthermore, there are numerous conditions on the Project's construction that further minimize impacts to high-value "complex habitat" for Atlantic cod spawning and other EFH. Third Ingalls Decl. ¶¶ 10-14; Carey Decl. ¶¶ 32-34. For example, Revolution Wind is required to implement a "Sequencing Plan" for its construction schedule to avoid or minimize impacts to Atlantic cod spawning. Third Ingalls Decl. ¶ 12; Carey Decl. ¶ 32. Other protective measures include planning anchoring and jack-up barge locations to try to avoid complex habitats. Third

29

Ingalls Decl. ¶¶ 10, 14.  There are numerous measures in place to prevent the alleged harms to Cox Ledge that Plaintiffs claim.

Plaintiffs are incorrect in arguing (Mot. at 18) that "crushed rock, boulders, and sand" from the Project will "smother" Cox Ledge, not only because much of the Project is not located on Cox Ledge but also because the placement of these materials in limited areas would not cause irreparable harm.  Carey Decl. ¶ 35.  The "complex habitat" (defined by NMFS as essential to Atlantic cod) includes boulders, cobbles, and gravel, and the Project involves preferentially relocating boulders such that the net effect would be to increase complex habitat, not decrease or destroy it.  *Id*.  And to the extent the Project results in limited impacts to habitat, research and prior offshore wind development demonstrate that the type of habitat found on Cox Ledge is highly resilient.  *Id.* ¶ 37.[13]  The results of benthic and fish monitoring of other nearby offshore wind projects shows that the benthic habitats around turbines and along cable routes are resilient and returning to baseline or increased habitat conditions.  *Id.* ¶ 38.  As a result, construction and operation of the Project will not result in "destroying Cox Ledge" as valuable habitat or substantively change the Atlantic cod spawning activities, as Plaintiffs claim.  *See* Mot. at 6, 15-16, 18, 35-36; Carey Decl. ¶ 39.  Nor will the Project's pile driving and laying of scour protection "devastate the ocean floor," as Dr. Quattrocki Knight claims.  *See* Quattrocki Knight Decl. ¶ 6; Carey Decl. ¶¶ 25-29.  Plaintiffs have not met their high burden to show irreparable harm.

Many of Plaintiffs' apparent harm allegations are procedural.  *E.g.,* Mot. at 35 (discussing extensive participation in NOAA proceedings).  A "procedural harm" consisting of a violation of an environmental statute "is insufficient, *standing alone*, to constitute irreparable harm" to justify

---

[13] "Research in Rhode Island Sound from 1974 to the present on the effects of placement of fill, installation of cables, and cable protection has demonstrated that benthic habitat quality returns within six to nine months . . . ."  Carey Decl. ¶ 37.

granting preliminary injunctive relief. *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, No. 15-cv-01582, 2016 WL 420470, at *11 (D.D.C. Jan. 22, 2016) (emphasis in original); *see also Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 67 (D.D.C. 2017) (same); *see also Nat'l Parks Conservation Ass'n*, 282 F. Supp. 3d at 290 (providing "that irreparable harm [must] be likely, not merely speculative"); *cf. Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 19 (1st Cir. 2024) ("NMFS was not required to account for entirely speculative environmental effects that were neither suggested nor supported by the scientific evidence.").

Plaintiffs' alleged harms are therefore both scientifically incorrect and too speculative to be irreparable. Because Plaintiffs have failed to demonstrate irreparable harm, the Court need not address the remaining factors. *See Nat'l Parks Conservation Ass'n*, 282 F. Supp. 3d at 288 ("[F]ailure to show any irreparable harm is [ ] grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.") (internal citation and quotation omitted); *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018) ("[I]t is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat [a] motion [for preliminary injunction].").

### 2.    Plaintiffs Are Not Likely to Succeed on the Merits

This Court should deny Plaintiffs' Motion because they cannot establish a likelihood of success on the merits. "It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits, because absent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of administration and judicial review." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017) (internal quotation marks and citation omitted), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018).

The Court will review Plaintiffs' challenges to the USACE Section 404 Permit and to the BiOp under the "arbitrary and capricious" standard of the APA. *Bennett v. Spear,* 520 U.S. 154, 174-79 (1997) (BiOp); *Save Mattaponi v. U.S. Army Corps of Engineers*, 515 F. Supp. 2d 1, 7 (D.D.C. 2007) (Section 404 permit). "The arbitrary and capricious standard is deferential; it requires that agency action simply be 'reasonable and reasonably explained.'" *Communities for a Better Environment v. EPA,* 748 F.3d 333, 335 (D.C. Cir. 2014) (quoting *Nat'l Telephone Cooperative Ass'n v. FCC,* 563 F.3d 536, 540 (D.C. Cir. 2009)). Under this standard, a reviewing court "give[s] an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." *Id.* at 336 (quoting *City of Waukesha v. EPA,* 320 F.3d 228, 247 (D.C. Cir. 2003)) (internal quotation marks omitted).[14]

    a.    <u>Plaintiffs Are Not Likely to Succeed on Their Challenge to the USACE Section 404 Permit</u>

Plaintiffs' argument that the USACE violated its own regulations regarding "special aquatic sites" in analyzing Cox Ledge and project alternatives is unlikely to succeed on the merits for three independent reasons. **First**, Plaintiffs have waived this argument as none of the Plaintiffs commented on USACE's public notice for Revolution Wind's CWA Section 404 permit. **Second**, Cox Ledge is located on the OCS, beyond the statutory scope of authority of the USACE under CWA Section 404, and the regulations regarding special aquatic sites simply do not apply. **Third**,

---

[14] Plaintiffs' arguments that the BiOp is entitled no deference are incorrect and not supported by Plaintiffs' citations. In *Maine Lobstermen's Association v. National Marine Fisheries Service*, 70 F.4th 582 (D.C. Cir. 2023), the court determined that NMFS was not owed deference in applying a "precautionary principle" that was contrary to the text of the ESA. *Id.* at 598, 599; *see also Ctr. for Biological Diversity v. Regan*, No. 21-119, 2024 WL 1602457, at *38 (D.D.C. Apr. 12, 2024) (deference not required when "major swaths of what the ESA and its governing regulations require a consulting agency to consider in a BiOp are simply absent."). Plaintiffs cite no analogous legal error here—indeed, Plaintiffs ignore longstanding regulatory text and controlling caselaw.

even assuming CWA Section 404 were applicable, Cox Ledge would not be a "special aquatic site" under the relevant regulations (which Plaintiffs selectively quote).

(1)    CWA Arguments are Waived Because Plaintiffs Failed to Participate in USACE's CWA Administrative Process

As an initial matter, Plaintiffs have waived this argument as they failed to raise this concern during USACE's public comment period as required by *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004). In general, parties challenging an agency's compliance with its legal duties must "'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Id.* at 764 (alterations in original) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). Thus, "in most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court." *Sims v. Apfel*, 530 U.S. 103, 1112 (2000) (O'Connor, J., concurring in part and concurring in the judgment) ("On this underlying principle of administrative law, the Court is unanimous."). Here, USACE only received four comments in response to its public notice—one from Cultural Heritage Partners, a law firm representing a variety of parties (none of whom are Plaintiffs in this case), and comment letters from the United States Coast Guard, NMFS, and EPA. ROD at 32-34. By failing to provide any comments to USACE as part of that agency's administrative process, Plaintiffs have "waived the argument by failing to raise it at the administrative level." *See Nevada v. DOE*, 457 F.3d 78, 88 (D.C. Cir. 2006) (declining to "reach the merits" of Petitioner's argument because it was not raised before the agency at the administrative level); *see also Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2003) ("It is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.") (internal citations and quotations omitted); *see also*

*Healthy Gulf v. U.S. Army Corps of Engineers*, 81 F.4th 510, 521 (5th Cir. 2023) (claims denied for failure to timely respond to USACE public notice because "[u]nder ordinary principles of administrative law a reviewing court will not consider arguments that [parties] failed to raise in timely fashion before an administrative agency.") (citations and quotations omitted).

(2)    Cox Ledge Lies Outside of the "Waters of the United States" Subject to a CWA Section 404 Permit

USACE issued its permit for the Project under two, distinct authorities—CWA Section 404 and RHA Section 10.  The statutory provision in CWA Section 404 limits USACE permitting authority to the portion of Project involving fill being placed in "navigable waters." 33 U.S.C. § 1344(a).  The statute defines "navigable waters," for purposes of CWA Section 404, as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7); *see also* 33 C.F.R. §328.4(a); USACE Section 404 Permit at 1.  The "territorial seas," are the waters generally extending seaward three nautical miles from the coast in direct contact with the open sea, but they may also extend elsewhere, such as bays, inlets, or three miles from islands.  33 U.S.C. § 1362(8) ("The term 'territorial seas' means the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea . . . extending seaward a distance of three miles"); 33 C.F.R. §§ 328.4(a), 329.12(a).  The Revolution Wind lease area lies on the OCS approximately 13 nautical miles (15 miles) east of Block Island, Rhode Island, well beyond the territorial sea (*i.e.*, three miles from shore).  Third Ingalls Decl. ¶ 24 (map); FEIS at 1-1.  USACE's authority under CWA Section 404 extends only three miles from shore—and not to the Revolution Wind lease area or Cox Ledge as Plaintiffs assert.

In contrast, USACE's permitting authority under Section 10 of the RHA includes any obstruction or structure in navigable waters **or on the OCS**.  33 U.S.C. § 403 (RHA Section 10 permit requirement for "waters of the United States"); 43 U.S.C. § 1333(a), (e) (Outer Continental

34

Shelf Lands Act provisions extending RHA Section 10 permit authority to "installations and other devices permanently or temporarily attached to the seabed" on the OCS); ROD at 7; *see also* 33 C.F.R. §§ 322.3(b), 329.12(a).  RHA Section 10 is not designed to address impacts to aquatic resources but instead is applied to prohibit "unreasonable obstructions to navigation and navigable capacity." *Wisconsin v. Illinois*, 278 U.S. 367, 413 (1929).  Thus, contrary to Plaintiffs' assertions (Mot. at 17-18), USACE's CWA Section 404 permitting authority—including its implementing regulations governing special aquatic sites—does not extend to Cox Ledge.[15]

Consistent with this statutory backdrop, the ROD states that as Revolution Wind's "proposed activities in the Lease Area would occur on the OCS," these activities are "outside of the waters of the United States regulated by USACE under section 404 of the CWA."  ROD at 48. Additionally, although Revolution Wind's proposed activities on the OCS are "regulated by USACE under section 10 of the RHA," these activities "in the Lease Area do not involve any discharge of dredged or fill material into waters of the United States and are not subject to the requirements of the 404(b)(1) Guidelines," which include the regulations regarding special aquatic sites at 40 C.F.R. Part 230.  ROD at 48.  Plaintiffs' arguments are contrary to the statute and unlikely to succeed.

### (3)    Cox Ledge Is Not a Special Aquatic Site

Selectively quoting and omitting a key portion of the regulation that defines special aquatic sites, Plaintiffs claim that Cox Ledge is a special aquatic site.  Mot. at 15-17.  Even if Plaintiffs had not waived the argument (which they did) and the Section 404(b)(1) regulations were to apply to the OCS (which they do not), Plaintiffs' claim would still fail because Cox Ledge is not a special

---

[15] Plaintiffs have not challenged the USACE's determination under RHA Section 10 either in the Motion or in their First Amended Complaint.  Dkt. #35-1; Dkt. #33.

aquatic site.  Under the regulatory definition, "[S]pecial aquatic site means those sites identified in subpart E." 40 C.F.R. § 230.3(m).  Subpart E, in turn, includes only an enumerated list of fairly narrow features.  *See* 40 C.F.R. §§ 230.40(a) ("Sanctuaries and refuges . . . designated under State and Federal laws or local ordinances to be managed principally for the preservation and use of fish and wildlife resources."), 230.41 (wetlands), 230.42 (mud flats), 230.43 (vegetated shallows), 230.44 (coral reefs), 230.45 (riffle and pool complexes).  Cox Ledge is none of these, so the regulations regarding special aquatic sites are inapplicable.

USACE specifically found that "the applicant's proposed activity does not involve a discharge into a special aquatic site."  ROD at 38; *see also* ROD at 47 ("the proposed discharges of dredged and fill material within the 3 nautical mile limit of jurisdiction would have no direct effect on sanctuaries and refuges, wetlands, mud flats, vegetated shallows, coral reefs or riffle and pool complexes as the proposed discharges would not occur within any of these special aquatic sites.").  Since Cox Ledge is not a special aquatic site, the alternatives analysis provided for in 40 C.F.R. § 230.10(a)(3) for such sites does not apply.[16]  *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, No. 22-cv-11091, 2023 WL 6691015, at *17 (D. Mass. Oct. 12, 2023).

Unsurprisingly, Plaintiffs do not even attempt to fit Cox Ledge within any of the enumerated regulatory categories of a special aquatic site.  And contrary to Plaintiffs' insinuations otherwise, *see* Mot. at 15–17, NMFS' subsequent designation of Cox Ledge as a Habitat Area of Particular Concern ("HAPC") in Southern New England—effective this March, more than six months **after** USACE issued the ROD—did not create a special aquatic site.  Even had it taken effect before the ROD, that designation does not fall within the definition set forth in 40 C.F.R.

---

[16] In any event, USACE reviewed numerous alternatives during its review of the Project.  *See* ROD at 34-44; *see also* FEIS at K-32 – K-45.

Part 230, Subpart E; instead, it is "a non-regulatory designation" that is designed only to "provide for increased attention when habitat protection measures are considered" during EFH consultations, with a focus on cod spawning habitats and complex benthic habitats where those habitats may exist within the boundary of the HAPC.  89 Fed. Reg. 7633, 7634 (Feb. 5, 2024).

Nevertheless, although Cox Ledge is not located within the geographic limits of USACE's Section 404 permit authority, USACE consulted with NMFS and adopted conservation measures regarding Cox Ledge as part of the EFH consultation under USACE's RHA Section 10 authority. Third Ingalls Decl. ¶¶ 8-9.  The Project's USACE permit under RHA Section 10 includes several conditions related to work on the OCS that are designed to minimize impacts to EFH, cod spawning, and complex habitat.  *Id*. ¶ 10; Carey Decl. ¶¶ 26-28 (the EFH consultation process for the Project considered the minimization and mitigation measures recommended by the draft New England Fishery Management Council Southern New England HAPC Framework, which was subsequently finalized in September 2023, and was the basis for the NMFS HAPC determination). Plaintiffs' other cited sources stand for the proposition that Cox Ledge is fish habitat—which is a point the USACE studied in depth.  Mot. at 15 n.81 (response to a NMFS comment letter, which notes that the FEIS was specifically revised to incorporate more information about Cox Ledge in response to the New England Fishery Management Council's June 2022 approval to establish an HAPC); *id.* at 82 (citing the FEIS' responses to comments generally).  And Plaintiffs' motion also relies on citations that appear in error.  Mot. at 16 n.82 (citing Rhode Island Department of Environmental Management Division of Marine Fisheries, Rhode Island Annual Fisheries Report 2022 at 5 (June 30, 2023) (which says nothing about Cox Ledge)).

       b.       <u>Plaintiffs Are Not Likely to Succeed on Their Challenge to NMFS'</u>
                <u>Biological Opinion</u>

          (1)      Plaintiffs Cannot Meet Their Burden Because NMFS
                 Properly Analyzed Cumulative Effects

Plaintiffs erroneously argue (at Mot. at 1, 19-26, 36) that NMFS failed to consider the cumulative effects of the Project with other offshore wind projects under the ESA. But the Record shows that NMFS properly assessed the effects of other offshore wind projects consistent with the ESA and the relevant implementing regulations. As required, NMFS included the effects on right whales (and other listed species) of other offshore wind projects in the action area that have already undergone section 7 consultation as part of the environmental baseline. Environmental baseline is defined as "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."[17] 50 C.F.R. § 402.02. NMFS devoted nearly 50 pages of the BiOp to describing the environmental baseline, which includes the effects of fishing activities, vessel operations, port traffic, scientific surveys, and other activities. BiOp at 129-176. The baseline specifically includes a detailed analysis of the offshore wind projects for which NMFS has completed an ESA consultation before Revolution Wind's 2024 BiOp—Ocean Wind 1 (2023), South Fork Wind (2021), Vineyard Wind 1 (2021), Coastal Virginia Offshore Wind ("CVOW") (2016 and 2023), Block Island (2014), Empire Wind

---

[17] The 2019 version of the ESA regulations apply to the BiOp. BiOp at 11. All citations to the ESA regulations herein refer to the 2019 version of the regulations. The ESA regulations were recently updated effective May 6, 2024, 89 Fed. Reg. 24,268 (Apr. 5, 2024). The updated regulations continue to include "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation" in the definition of "environmental baseline." *See* 89 Fed. Reg. at 24,297.

(2023), Revolution Wind (2023), Sunrise Wind (2023), Atlantic Shores South (2023), and New England Wind (2023).  BiOp at 165-66.  Thus, Plaintiffs' claim that NMFS "ignored" other offshore wind projects is belied by the record.[18]  Mot. at 21.

NMFS added "the *Effects of the Action* (Section 7) to the *Environmental Baseline* (Section 6) and the *Cumulative Effects* (Section 8), while also considering effects in context of climate change and the status of the species (Section 5), to formulate the agency's biological opinion as to whether the proposed action 'reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of an ESA-listed species in the wild by reducing its numbers, reproduction, or distribution[.]'"  BiOp at 395 (emphasis in original).  Considering all of this information, NMFS explained that it "do[es] not expect any harm, injury (auditory or otherwise), serious injury, or mortality of any right whale to result from the proposed action" nor does it expect the proposed action "to affect the health of any right whale."  *Id*. at 446.  Moreover, NMFS found that "the effects of the proposed action are not likely to appreciably reduce the likelihood of both the survival and recovery of North Atlantic right whales in the wild."  *Id.* at 447.  NMFS further concluded the proposed action is "not likely to jeopardize the continued existence of any ESA listed species" under its jurisdiction.  *Id*. at 474.

Plaintiffs do not even attempt to meet their burden under the APA of explaining why NMFS' careful approach was arbitrary and capricious.[19]  Instead, Plaintiffs assert that NMFS

---

[18] For example, the BiOp states: "based on available information, we expect that foundation installation for Revolution Wind, scheduled for 2024, would occur during the same period as CVOW", which is located offshore Virginia.  BiOp at 166.  NMFS concluded that "given the large geographic separation between the project [sic], no additive effects are anticipated (i.e., the sound fields would not overlap in space or time)."  *Id*. at 166-67.

[19] Plaintiffs also ignore the BiOp's extensive mitigation measures, which were a key part of NMFS' decision.  *See* Third Ingalls. Decl. ¶ 26.  Courts have upheld a BiOp for the Vineyard Wind 1 project against a challenge similar to the one Plaintiffs bring here, emphasizing the extensive mitigation.  *Nantucket Residents Against Turbines v. BOEM*, 675 F. Supp. 3d 28, 43

should have included *future* wind projects[20] requiring federal approvals in its cumulative effects analysis.  Mot. at 21, 22.  But under regulations that have been in effect for nearly 40 years, "[c]umulative effects are those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02 (emphasis added); Interagency Cooperation -- Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19,926, 19,958 (June 3, 1986).  Indeed, the regulatory preamble for the original rule explains why the definition of cumulative effects excludes future projects subject to federal approval: because under the ESA, those future projects **cannot be approved** if they jeopardize the continued existence of any species:

> If the jeopardy standard is exceeded, the proposed Federal action cannot proceed without an exemption. This is a substantive prohibition that applies to the Federal action involved in the consultation. In contrast, NEPA is procedural in nature, rather than substantive, which would warrant a more expanded review of cumulative effects. Otherwise, in a particular situation, the jeopardy prohibition could operate to block "nonjeopardy" actions because future, speculative effects occurring after the Federal action is over might, on a cumulative basis, jeopardize a listed species. Congress did not intend that Federal actions be precluded by such speculative actions.

*Id.* at 19,993.  As the BiOp explains, "in each successive consultation, the effects on listed species of other offshore wind projects under construction or completed would be considered to the extent they influence the status of the species and/or environmental baseline according to the best

---

(D. Mass. 2023) ("[N]umerous mitigation measures are designed not only to protect right whales from harassment, but also to protect other species."), *aff'd Nantucket Residents*, 100 F.4th at 20 ("[T]he Residents have not demonstrated that the agency's proposed mitigation measures are inadequate, or that reliance on those measures was arbitrary and capricious.").

[20] Plaintiffs argue that the BiOp "excluded" 22 other proposed and planned offshore wind farms. It is not clear how Plaintiffs arrive at that number. Mot. at 21.  The page of the BiOp they cite says nothing about other wind projects.  BiOp at 355.  In any event, wind farms in the area are either one of the 11 projects the BiOp considered as part of the baseline, or they are future projects that will require their own BiOp.  Nothing was "excluded."

available scientific information." BiOp at 394. The effects of a future offshore wind project is a question that NMFS will evaluate during consultation on that project.

None of the cases Plaintiffs cite helps their arguments. In *Conner v. Burford*, 848 F.2d 1441, 1453-58 (9th Cir. 1988), the court invalidated BiOps that did not analyze the entirety of the agency action approved. The BiOps challenged in that case addressed only the "incremental-step" of leasing and not the subsequent phases of oil and gas production, even though the lessees could undertake oil and gas development under the operative leases without further environmental review. *Id.* at 1444, 1453. The 2024 BiOp at issue here evaluated the entire Revolution Wind Project. *Conner* offers no support for Plaintiffs' argument here that NMFS was required to analyze other, future projects that will be subject to their own ESA Section 7 consultations.[21] Likewise, *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985) stands for the unremarkable proposition that "[o]nce an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment . . . ." BOEM prepared a biological assessment here, and Plaintiffs have not claimed otherwise or challenged it. BiOp at 9. The Ninth Circuit statements Plaintiffs cite about "cumulative impacts" were related to NEPA claims (not ESA claims) and offer no support for Plaintiffs' ESA argument here. *See Thomas*, 753 F.2d at 757-61.

Plaintiffs point to four specific projects they argue NMFS should have included in the BiOp, alleging those projects have started or are planning to start consultation. Mot. at 27-28 (alleging (1) Maryland Offshore Wind Project "started Section 7 Consultation on March 5, 2024,"

---

[21] OCSLA, which governs the Project, has built-in safeguards to prevent the kind of prohibited "incremental-step" review that the court rejected in *Conner*. *See, e.g., North Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980) (upholding BiOp for lease sale because OCSLA includes "[m]andatory stage-by-stage review" that "makes ESA requirements more likely to be satisfied both in an ultimate and a proximate sense.").

(2) Beacon Wind "planned to start Section 7 consultation on February 23, 2024," (3) SouthCoast Wind Energy LLC "consultation with NMFS is planned for the near future," and (4) Vineyard Wind 1 (Phase 2) "reinitiated Section 7 consultation before April 23, 2024").  But Plaintiffs' argument is premised on a fundamental misunderstanding of the term "early Section 7 consultation" in the context of the regulatory definition of environmental baseline.  *See* 50 C.F.R. § 402.02.  "Early section 7 consultation" does not mean that NMFS has started formal consultation; it is a distinct regulatory process that concludes in a "preliminary biological opinion."  *Id*. § 402.11(e).

The BiOp did not include those four projects cited by Plaintiffs for the simple reason that their (formal or early) section 7 consultation was not complete.  Mot. at 27. ("Section 7 consultation . . . is now in progress."); BiOp at 130 ("This section of the Opinion has been updated to incorporate relevant new information available since the issuance of the 2023 Opinion, including *the completion of section 7 consultations* for additional offshore wind projects.") (emphasis added); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021) ("Service was effectively required to exclude the Annova project because Section 7 consultation regarding the Annova project had not yet concluded, and the environmental baseline instead must include only those projects that have already undergone such consultation.") (citation omitted).

(2)    Plaintiffs Have Not Shown the BiOp is Arbitrary and<br>Capricious on Any Grounds

Plaintiffs state that right whales are present year-round but do not explain how that renders NFMS' BiOp arbitrary and capricious.  Mot. at 30-31.  Indeed, the BiOp acknowledges and takes into account year-round presence of the right whale.  BiOp at 136 ("[W]e anticipate individual right whales to occur year round in the action area in both coastal, shallower waters as well as offshore, deeper waters.").

Plaintiffs also argue that NMFS failed to consider BOEM and NOAA's Strategy on the North Atlantic Right Whale and Offshore Wind ("Strategy"), a recent guidance document. *See* Mot at 24-25; Strategy at 7. But that document is a non-binding guidance document that says nothing about the Revolution Wind Project. *See* Strategy at 1 ("Nothing in this document is intended to modify or amend any Federal statutes, regulations, permits, or leases, nor create any rights or cause of action . . . ."). And NMFS' authorizations issued for Revolution Wind are consistent with the Strategy's goals of developing mitigation and decision support tools; research and monitoring; and collaboration, communication, and outreach. *See* Second Barkaszi Decl. ¶¶ 12, 63. Regardless, what Plaintiffs attempt to cast as new information from the Strategy was in fact considered in the BiOp. Compare Mot. at 25-26, with BiOp at 134 (considering Project area as "stopover site for whales migrating"), 166-172 (analyzing impacts of offshore wind projects), 173 (specifically analyzing noise impacts from offshore wind projects). Plaintiffs point to no information or recommendation in the Strategy that is contrary to the careful analysis NMFS included in the BiOp.

In sum, Plaintiffs fail to show likelihood of success on the merits on any of their claims.

### 3.    The Balance of the Equities and the Public Interest Strongly Favor Denial of the Motion

When "the competing claims of injury" and the "effect[s] on each party of the granting or withholding of the requested relief" are analyzed, including economic harm, the balance of the equities strongly weighs in favor of denying Plaintiffs' Motion. *See Winter*, 555 U.S. at 24; *Sherley*, 644 F.3d at 398-99. Plaintiffs fail to grapple with the fact that because the Revolution Wind Project is a "covered project" under the FAST-41 statute, *see* 42 U.S.C. § 4370m(6), in the context of a request for preliminary injunctive relief, as here, this Court must "consider the potential effects on public health, safety, and the environment, and the potential for significant

negative effects on jobs resulting from an order or injunction," *id.* § 4370m-6(b)(1).  The FAST-41 statute directs that these harms shall not be presumed reparable.  *Id.* § 4370m-6(b)(2).  While Plaintiffs will not suffer any irreparable harm if the Motion is denied, *see supra* Section IV.B.1., Revolution Wind will face "certain and substantial" harm if Plaintiffs obtain the relief they ask for in their Motion.  *See Sherley*, 644 F.3d at 398–99 (reversing grant of preliminary injunction where injunction would disrupt researchers who had already begun projects in reliance upon agency funding such that "their investments in project planning would be a loss, their expenditures for equipment a waste, and their staffs out of a job").

These harms are real and tangible—including extensive financial losses to Revolution Wind, risks to thousands of jobs, impacts to local manufacturing and power production, and delays to the federal government's and states' efforts to fight climate change and meet carbon reduction goals.  Third Ingalls Decl. ¶¶ 42-57.  Ultimately, costs to Revolution Wind could be in excess of $3 million per day if delays continue into and beyond late July 2024 and a six-month delay could amount to approximately $230 million, jeopardizing the more than $3 billion that Revolution Wind has already committed to developing the Project.  *Id.* ¶¶ 43, 51-53, 57; *see supra* Section II.C.  In contrast, other than speculation, Plaintiffs offer no specific harm or injury to themselves.[22]

---

[22] Under Federal Rule of Civil Procedure 65(c), "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Nothing in this Rule or Section 705 of the APA prohibits the Court from using its inherent equitable authority to require a bond where, as here, Plaintiffs seek to restrain private action.  *See, e.g., Russell v. Farley*, 105 U.S. 433, 438-40 (1881) (discussing inherent equitable authority); *HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 915 (1st Cir. 1988); *B&D Land & Livestock Co. v. Connor*, 534 F. Supp. 2d 891, 911-12 (N.D. Iowa 2008) (issuing injunction and a stay under Section 705 and imposing bond); *Seafreeze Shoreside*, 2023 WL 3660689, at *8 (discussing importance of bond in case seeking stay or preliminary injunction, but ultimately denying emergency relief).  Given that even a short stay would result in economic damages to Revolution Wind, a substantial bond should be required if the Court issues a preliminary injunction or stay.

In evaluating the public interest, the Court may consider the interest in the local economy, job security, securing reliable energy, achieving clean energy goals, and reducing greenhouse gas emissions. *See Seafreeze Shoreside,* 2023 WL 3660689, at \*8 (finding public interest prong did not support injunction against offshore wind project because "Congress has articulated the public policy that our nation should incorporate clean energy as a necessary part of America's future and it is essential to securing our nation's energy independence and decreasing greenhouse emissions.") (quotation omitted); *Protect Our Cmtys. Found. v. U.S. Dep't of Agric.*, 845 F. Supp. 2d 1102, 1116-17 (S.D. Cal. 2012) (public interest in reliable energy), *aff'd*, 473 F. App'x 790 (9th Cir. 2012); *W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103-04 (D. Nev. 2011) (public interest in increasing energy independence, decreasing greenhouse gas emissions, and advancing clean energy policies), *aff'd*, 443 F. App'x 278 (9th Cir. 2011).

In this case, denying Plaintiffs' requested injunctive relief is in the public interest. Delaying the Project (possibly resulting in terminating the Project) as a result of Plaintiffs' requested relief would result in increased greenhouse gas emissions from non-renewable energy sources, directly undermining important long-term federal and state policies to reduce emissions, deploy offshore wind energy generation, and increase clean energy growth. *See* Third Ingalls Decl. ¶ 58; *supra* Section IV.A. Plaintiffs' requested injunctive relief would delay—or potentially prevent—the realization of these goals to benefit the environment.

Therefore, the balance of the equities and the harm to the public interest from enjoining the Projects' approvals weigh strongly against granting Plaintiffs' Motion.

## V.    CONCLUSION

For the foregoing reasons, Revolution Wind respectfully requests that the Court deny Plaintiffs' Motion.

45

Dated:  May 21, 2024                    Respectfully submitted,

By /s/  Janice M. Schneider

       Janice M. Schneider (D.C. Bar No. 472037)
       Stacey L. VanBelleghem (D.C. Bar No. 988144)
       Devin M. O'Connor (D.C. Bar No. 1015632)
       LATHAM & WATKINS LLP
       555 11th Street NW, Suite 1000
       Washington, D.C. 20004
       Tel:  (202) 637-2200
       Fax:  (202) 637-2201
       Email: janice.schneider@lw.com
              stacey.vanbelleghem@lw.com
              devin.o'connor@lw.com

       *Counsel for Defendant-Intervenor*
       *Revolution Wind, LLC*