**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GREEN OCEANS, *et al.*,<br><br>   *Plaintiffs,*<br><br> v.<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR, *et al.*,<br><br>   *Defendants,*<br><br> and<br><br>REVOLUTION WIND, LLC,<br><br>   *Defendant-Intervenor* | Case No.: 1:24-cv-00141-RCL |

<u>**DECLARATION OF KELLEN INGALLS IN SUPPORT OF
DEFENDANT-INTERVENOR REVOLUTION WIND, LLC'S
OPPOSITION TO PLAINTIFFS' MOTION FOR AN ADMINISTRATIVE STAY OR
PRELIMINARY INJUNCTION**</u>

Pursuant to 28 U.S.C. § 1746(2), I, Kellen Ingalls, hereby declare:

  1. I am employed by Orsted North America Inc. ("Ørsted") as the Project

Development Director for the commercial-scale Revolution Wind Farm and Revolution Wind

Export Cable (together, the "Project"). The Project is owned by Revolution Wind, LLC

("Revolution Wind").[1]

  2. I have been employed at Ørsted as the Project Development Director since October

2019. Collectively I have worked on the Project for approximately four-and-a-half years, and I

have over 15 years of professional experience in the renewable energy field. I obtained my

---

[1] Revolution Wind is a joint venture indirectly owned in equal part by Ørsted and Eversource
Energy.

Bachelor of Arts in English from the State University of New York at Fredonia in 2004 and obtained my Master of Arts in English with a Concentration in Environmental Communications from the University of Vermont in 2008.

3.     As the Project Development Director for the Project, I am and have been involved in and aware of numerous aspects of the Project, including: negotiation and management of commercial and real estate agreements; local, state, and federal permitting processes, including the Project's Clean Water Act ("CWA") Section 404 permitting and Endangered Species Act ("ESA") consultations; stakeholder and market affairs management; cable and interconnection facility siting; project layout and design; and site investigation activities.  I am therefore personally familiar with the Project's environmental permitting, its development history, and the impact that could result if its authorizations were stayed or enjoined.  I execute this Declaration in support of Revolution Wind's Opposition to Plaintiffs' May 14, 2024 Motion for an Administrative Stay or Preliminary Injunction (the "Motion") based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.

4.     This is my third declaration submitted in this matter.  Additional detail regarding the years-long permitting and approval processes for the Project, as well as Revolution Wind's interests and investments in the Project, is provided in my Declaration of Kellen Ingalls in Support of Revolution Wind, LLC's Intervention as a Defendant, Dkt. 7-3 (Feb. 6, 2024) ("First Ingalls Declaration").  Additional detail regarding the Project's August 2023 Record of Decision ("ROD") and October 2023 Incidental Take Regulation ("ITR"), and associated Letter of Authorization ("LOA") for the Project, as well as the National Marine Fisheries Service's ("NMFS") ESA Section 7 consultation process for the Project is provided in my Declaration of Kellen Ingalls in

Support of Defendant-Intervenor Revolution Wind, LLC's Opposition to Plaintiffs' April 18, 2024 Motion for Stay of Final Agency Action, Dkt. 29-1 (Apr. 25, 2024) ("Second Ingalls Declaration").

5.      The Project involves the construction and operation of an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility on the Outer Continental Shelf ("OCS") with up to 65 wind turbine generators ("WTGs"), two offshore substations, and associated inter-array cabling between the WTGs, as well as an export cable to bring electricity to the electric grid onshore.[2]  Construction of the Project both offshore and onshore is underway, as described further below.

6.      On May 14, 2024, Plaintiffs filed a Motion challenging the U.S. Army Corps of Engineers' ("USACE") compliance with CWA Act Section 404 and NMFS' compliance with the ESA for their respective Project approvals.  Plaintiffs' allegations of irreparable harm are based on their claims that the Project will harm Cox Ledge benthic habitat and the North Atlantic Right Whale ("NARW").  Memorandum in Support of Plaintiffs' Motion ("Memorandum") at 1-2, Dkt. 35-1.  Plaintiffs seek an Order (1) staying the effective dates of the approvals and authorizations in the Project's August 2023 ROD[3] and October 2023 ITR and (2) prohibiting Revolution Wind from beginning or performing any pile driving or other construction work or making any other irretrievable commitment of resources authorized by the ROD or the ITR until further Court Order. Motion at 1-2, Dkt. 35; Plaintiffs' Proposed Order, Dkt. 35-6.  Without the ROD and the ITR approved by NMFS, Revolution Wind cannot continue offshore construction for the Project.

---

[2] Further background on the Project's location is provided in the Second Ingalls Declaration, paragraph 5.

[3] On August 21, 2023, the Bureau of Ocean Energy Management ("BOEM"), USACE, and NMFS issue a joint ROD for their Project approvals, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf.

*Cox Ledge*

7.     When BOEM began the public process to establish the Rhode Island and Massachusetts Wind Energy Area ("WEA") where the Project's lease is now located, all of Cox's Ledge was originally included in the area for potential offshore wind leasing.[4]   In 2012, when BOEM announced the identification of the Rhode Island/Massachusetts WEA the agency explained that it excluded these "high value" fishing grounds from the WEA and thus from potential leasing, including portions of Cox Ledge.[5]

8.     Potential impacts from the Project on Cox Ledge and Essential Fish Habitat ("EFH") were also addressed through consultation under Section 305(b)(2) of the Magnuson-Stevens Fishery Conservation and Management Act, which requires consultation with NMFS for any action that may adversely affect EFH.   Based on that EFH consultation process, USACE and BOEM adopted conservation recommendations through conditions on their respective Project approvals to avoid and minimize EFH impacts from the Project.[6]

9.     The permit that USACE issued to the Project under CWA Section 404 and Rivers and Harbors Act ("RHA") Section 10 explains that Revolution Wind must comply with

---

[4] BOEM, Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement (July 2023) ("FEIS") at 3.9-15, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2.pdf; 75 Fed. Reg. 82,055 (Dec. 12, 2010); 76 Fed. Reg. 51,383 (Aug. 18, 2011).

[5] BOEM, Commercial Wind Energy Leasing on the Outer Continental Shelf Offshore Rhode Island and Massachusetts at 1 (Feb. 24, 2012), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Renewable_Energy_Program/State_Activities/AreaID_Announcement_022312.pdf; FEIS Appendix L at L-89, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/RWF_FEIS_App_L_0.pdf ("BOEM excluded 70 miles of Cox Ledge from offshore wind energy development because of the importance of the area to for-hire recreational fishing and commercial fisheries.").

[6] ROD at 21, 37, 60, B-13.

Environmental Protection Measures, including measures based on the EFH consultation,[7] and conservation recommendations from the EFH consultation process that USACE adopted through conditions on its permit (within the scope of its jurisdiction, either under CWA Section 404 or RHA Section 10, as discussed below).[8]  The Environmental Protection Measures require that the "[Revolution Wind Farm] and [Revolution Wind Export Cable] will be sited to avoid and minimize impacts to sensitive habitats (e.g., hard bottom habitats) to the extent practicable," and to the extent feasible, require the Project's inter-array and export cables to be buried using equipment intended to limit "impacts to soft bottom EFH and EFH species by minimizing the extent and duration of direct habitat impacts and reducing suspended sediment effects on EFH species."[9]  These measures also require a plan to be developed "prior to construction and installation to identify no-anchorage areas to avoid documented sensitive resources" and that "HRG surveys and other site characterization methods would be used to identify, avoid, and minimize impacts to complex bottom habitats from [Revolution Wind Farm] and [Revolution Wind Export Cable] construction to the extent practicable."[10]  These measures also note that "[t]iming restrictions to avoid noise impacts on North Atlantic right whale would also be protective for the majority of the cod spawning season."[11]

10.     The Project's USACE permit under RHA Section 10 includes several conditions related to work on the OCS that are designed to minimize impacts to EFH, cod spawning, and complex habitat.  For example, Revolution Wind must "prepare and implement Anchoring

---

[7] USACE Permit for Revolution Wind (2023) at 5, https://www.nae.usace.army.mil/Missions/Regulatory/Permits-Issued/Orsted-Revolution-Wind-LLC-Oct-2023/ (providing USACE Permit and enclosures).
[8] ROD at 60.
[9] USACE Permit, Enclosure 3 at 206.
[10] USACE Permit, Enclosure 3 at 206-07.
[11] USACE Permit, Enclosure 3 at 207.

Plans/Plats for all areas where anchoring or buoy placement occurs during construction, operations/maintenance, or decommissioning and include avoidances of complex habitats,"[12] use jack-up barge locations on the OCS to "avoid or minimize deployment in complex habitats,"[13] and submit "as-placed" anchor plats for work on the OCS "to demonstrate that seabed-disturbing activities complied with avoidance requirements for seabed features and hazards, complex habitat, . . . ."[14]

11.    This USACE permit also requires that Revolution Wind prepare and implement a "Micrositing Plan" that describes how turbine locations, inter-array cables, and export cable routes will be microsited to avoid or minimize impacts to complex habitat.[15] For turbines and cables that cannot be microsited to avoid impacts to complex habitat, the plan must identify technically and economically practical or feasible impact minimization measures and use a prioritized list of complex habitat sub-types to avoid during micrositing.[16] Revolution Wind is also required to prepare a micrositing report that includes describing "how impacts to complex habitats and benthic features were avoided and/or minimized within the lease area and export cable corridors."[17]

12.    The USACE permit also requires Revolution Wind to "prepare and implement a Sequencing Plan that describes how construction activities will be sequenced to avoid or minimize impacts to Atlantic cod spawning" and describe "how the construction schedule is designed to the extent technically feasible to avoid any pile driving in the lease area between November 1 and December 31 each year (in addition to the January 1 to April 30 restriction on pile driving for

---

[12] USACE Permit at 11 (Condition 34).
[13] USACE Permit at 11 (Condition 35).
[14] USACE Permit at 12 (Condition 37).
[15] USACE Permit at 12 (Condition 38).
[16] USACE Permit at 12 (Condition 38).
[17] USACE Permit at 12 (Condition 40).

NARW)."[18]  Prior to construction-related bottom disturbing activities, Revolution Wind is also required to "prepare and implement a Cod Spawning Monitoring Plan to monitor for Atlantic cod aggregations in the lease area between November 1 and March 31 of each year during which construction activities are planned" and submit annual reports documenting "any cod detections and contain information on all survey activities that took place during the season, including location of equipment and location, time, and date of detections."[19]

13.     Although Revolution Wind may only construct up to 65 WTGs, there is flexibility under the agency adopted layout Alternative G to locate those WTGs within 14 other identified "spare locations" on the lease that could be utilized "if unforeseen siting issues made any of the 65 turbine positions infeasible."[20]  The USACE permit requires that if Revolution Wind determines that if any of the 14 "spare" turbine positions authorized for the project under Alternative G are utilized, then Revolution must "prioritize the use of spare locations that would have the least impacts on complex habitats and areas of cod spawning to the extent it is technically and/or economically practical or feasible."[21]

14.     Like the USACE permit, the conditions in BOEM's Construction and Operations Plan ("COP") approval[22] also include several measures that are designed to avoid complex habitat and minimize impacts to EFH, including Cox Ledge.  For example, Revolution Wind must: (1) implement Anchoring Plans/Plats that include avoidances of complex habitats,[23] (2) prepare a Cod

[18] USACE Permit at 16-17 (Condition 55).
[19] USACE Permit at 17 (Condition 56).
[20] ROD at 36.
[21] USACE Permit at 17 (Condition 57).
[22] On November 17, 2023, BOEM issued a COP approval letter with the final specific conditions of the Project's COP approval ("BOEM COP Conditions").  BOEM COP Conditions (with a minor update on Apr. 25, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Cond%20of%20COP%20Appr_REV%200486_April%202024.pdf.
[23] BOEM COP Conditions, Condition 5.5.2.

Spawning Monitoring Plan and submit annual reports to document "any cod detections" and describe "survey activities . . . regardless of whether cod were detected,"[24] (3) conduct micrositing "to avoid or minimize impacts to complex habitat,"[25] (4) submit a micrositing report describing "how impacts to complex habitats and benthic features were avoided and/or minimized within the lease area and export cable corridors,"[26] (5) prepare and implement a Sequencing Plan that "describes how construction activities will be sequenced to avoid or minimize impacts to Atlantic cod spawning," including how construction activities (e.g., inter-array cable installation and burial, scour protection installation, boulder relocation, foundation site preparation, and pile driving) "will occur such that construction activities in the center portion of the lease area are avoided between November 1 to March 31,"[27] (6) "prioritize the use of spare locations that would have the least impacts on complex habitats and areas of cod spawning" to the extent practical or feasible,[28] and (7) avoid jack-up barge locations in complex habitats, and where full avoidance is not feasible, must avoid locations for the jack-up barge in a specified order of priority.[29]

15.     Ultimately, the reduction in size of the Project through the environmental review process from up to 100 WTGs as initially proposed to 65 WTGs as finally approved resulted in no WTGs being sited in the southwestern portion of the Lease area.  Ultimately Alternative G was selected by BOEM as the most environmentally preferable alternative for a number of reasons

---

[24] BOEM COP Conditions, Condition 5.5.4.
[25] BOEM COP Conditions, Condition 5.5.3.
[26] BOEM COP Conditions, Condition 5.6.1.
[27] BOEM COP Conditions, Condition 5.5.5.
[28] BOEM COP Conditions, Condition 5.5.9.
[29] BOEM COP Conditions, Condition 5.5.11.

including to minimize harm to reduce impacts to complex habitat and other EFH, including on Cox Ledge.[30]



Figure 2.1-23. Project location and components under Alternative G1.

16.    Among the sub-alternatives within Alternative G that were authorized, Revolution Wind is building Alternative G1, which includes "relocating two WTG locations from a NMFS Priority 1 area to reduce fishery and EFH impacts."[31]  As shown above in Figure 2.1-23 from the FEIS, Alternative G1 does not include WTGs in the southwestern area and it removes another 12 WTG locations from complex terrain or habitat in the southeastern area and minimizes the WTGs within NMFS Priority Area 1.

---

[30] ROD at 20, 36; FEIS at 3.13-23 ("Alternative G would result in less extensive impacts to large-grained complex and complex habitats on Cox Ledge than the Proposed Action and Alternatives D, E, and F."); *id.* at 2-68 – 2-69, 3.6-79.
[31] FEIS at 2-5.

17.     In addition, as part of the state of Rhode Island Coastal Resources Management Council ("CRMC") Coastal Zone Management Act federal consistency review of the Revolution Wind Project, the CRMC included the following condition relating to Cox Ledge as part of the CRMC's concurrence for the Project:

> "Where practicable, turbine and offshore substation foundations and the associated export cables, <u>with the exception of inter-array cables,</u> will be sited outside of Cox Ledge and will be micro-sited to minimize the reasonably foreseeable effects to Rhode Island coastal resources and uses, including effects to those resources and uses with the same characteristics, values, and resources as found in Rhode Island State Waters, <u>unless such siting outside of Cox Ledge precludes Revolution Wind from meeting its power purchase agreement obligations.</u>"[32]

***Approvals Challenged in Plaintiffs' Motion for an Administrative Stay or Preliminary Injunction***

<u>USACE's CWA Section 404 Permit</u>

18.     On June 3, 2022, Revolution Wind filed an application with USACE for a CWA Section 404 and RHA Section 10 individual permit for the Project.  On September 2, 2022, the USACE issued a 45-day public notice and request for public comment on Revolution Wind's permit application and this comment period was extended.[33]  The public notice was posted on USACE-New England District's website and sent electronically and/or mailed to interested parties and stakeholders.[34]

---

[32] State of Rhode Island Coastal Resources Management Council, Federal Consistency Review of the Revolution Wind Project at 5 (May 12, 2023), http://www.crmc.ri.gov/windenergy/revolution/RevWind_FedConDecision_20230512.pdf. (emphasis in original); *see also id.* at 38 (inter-array cable "will be routed in a manner so to avoid moraine and boulder fields to the extent practicable" and "micro-siting efforts will greatly minimize adverse impacts").
[33] https://www.nae.usace.army.mil/Portals/74/docs/regulatory/PublicNotices/2022/NAE-2020-00707-20220901-Public-Notice.pdf; ROD at 32.
[34] ROD at 32.

19.    Following USACE's August 21, 2023 approval of the ROD, USACE issued the CWA Section 404 and RHA Section 10 permit to Revolution Wind on October 2, 2023.[35]  The permit includes environmental protection measures, annual compliance reporting, coastal surveying, and other special conditions applicable to Revolution Wind's activities.

20.    The following non-upland activities authorized by USACE's CWA Section 404 permit within the three nautical mile limit of the territorial seas are: (1) placement of secondary cable protection over approximately 5% of the export cables as well as in seven locations with existing cables or pipelines; and (2) refilling of the two horizontal directional drilling ("HDD") exit pits to be excavated for the work associated with the shore to landfall transition.[36]

21.    The following activities are authorized by USACE's RHA Section 10 authorization for structures and work in navigable waters (within the 3 nautical mile limit of the territorial seas): boulder relocation, cable lay and burial trials, the pre-lay grapnel run, the installation of the two cables and cable joints, and the placement of secondary cable protection as needed.[37]  The following activities are authorized by USACE's RHA Section 10 authorization for structures on the OCS: WTG and OSS foundations and scour protection; approximately 155 miles of inter-array cables and 9 miles of OSS link cables regarding impacts associated with secondary cable protection; and approximately 38 miles of export cables regarding impacts associated with secondary cable protection.[38]

22.    As explained by the USACE, "the limit of [CWA] section 404 jurisdiction is measured from the baseline of the territorial seas in a seaward direction, a distance of 3 nautical

---

[35] USACE Permit, https://www.nae.usace.army.mil/Missions/Regulatory/Permits-Issued/Orsted-Revolution-Wind-LLC-Oct-2023/.
[36] ROD at 30; USACE Permit at 1.
[37] ROD at 31; USACE Permit at 1.
[38] ROD at 31-32; USACE Permit at 1.

miles."[39]  Therefore, the scope of Project activities authorized under CWA Section 404 portion of the permit, and the associated conditions on those activities specified in the permit, are within the three nautical mile limit of the territorial seas.[40]  In their Complaint and in this Motion, Plaintiffs have challenged USACE's Section 404 permit but have not challenged USACE's permit under RHA Section 10.  As described above, Cox Ledge is not within that three nautical mile limit of the territorial seas, and is instead located much farther offshore.

23.    While these measures do not directly apply to Cox Ledge given the geographic location, USACE's CWA Section 404 permit includes conditions "related to work within the three (3) nautical mile limit of the territorial seas" that are designed to minimize impacts to EFH and complex habitat, such as plan requirements for boulder relocation, cable siting, and fisheries monitoring.[41]

24.    The following map shows the Project layout with respect to the three nautical mile limit.

---

[39] ROD at 7.
[40] ROD at 30.
[41] USACE Permit at 7-11.



<u>NMFS' ESA Consultation and Biological Opinion</u>

25.    BOEM and NMFS conducted ESA Section 7 consultation for the Project before it was approved and issued a Biological Opinion in July 2023.[42]  In response to requests from NMFS' Office of Protected Resources ("NMFS-OPR") and BOEM, on March 12, 2024, NMFS-Greater Atlantic Regional Fisheries Office ("NMFS-GARFO") reinitiated ESA Section 7 consultation for the Project; the reinitiated consultation process concluded with NMFS-GARFO's issuance of a superseding Biological Opinion on April 30, 2024 ("2024 BiOp").[43]  Further information on Revolution Wind's multi-year ESA Section 7 consultation process and re-initiation of ESA Section 7 consultation for the Project is provided in the Second Ingalls Declaration at paragraphs 11, 20-

---

[42] 16 U.S.C. § 1536.
[43] NMFS ESA Section 7 Consultation Biological Opinion for Revolution Wind Project (Apr. 30, 2024), https://www.fisheries.noaa.gov/s3/2024-05/2024-Rev-Wind-BiOp-508.pdf.

24. The 2024 BiOp spans over 600 pages including appendices and assessed the potential effects of construction (including pile driving), operation, maintenance, and decommissioning of the Project on ESA-listed whales in the Project area, including the NARW, and designated critical habitat in the Project area. The 2024 BiOp concluded the Revolution Wind Project is not likely to jeopardize the continued existence of any ESA-listed species, including the NARW.[44] The 2024 BiOp also concluded the Project was not likely to adversely affect, or would have no effect, on several other ESA-listed species and would have no effect on the critical habitat designated for the NARW or several other ESA-listed species.[45]

26. The 2024 BiOp includes an Incidental Take Statement pursuant to ESA Section 7(b)(4), which identifies the Project's permitted take incidental and reasonable and prudent measures and implementing terms and conditions to minimize impacts of incidental take to listed species.[46] In addition to these reasonable and prudent measures and terms and conditions, the 2024 BiOp takes into account required measures to protect these species contained in BOEM's COP Conditions[47] and NMFS' ITR issuance processes. There are a number of measures related to pile driving activities to protect endangered species, including the NARW. For example, among the environmental protection measures as part of the Project, for impact and vibratory pile driving activities the Project must: (a) implement a "ramp-up" or "soft start" at the beginning of each pile segment during pile driving to provide additional protection to mobile species in the vicinity by allowing them to vacate the area prior to the commencement of pile-driving activities; (b) establish pre-clearance and shutdown zones for marine mammals and sea turtles; (c) use noise attenuation

---

[44] *Id.* at 469; *see also id.* at 474.
[45] *Id*. at 469.
[46] *Id.* (Sec. 11.0 – Incidental Take Statement).
[47] The BOEM COP Conditions include conditions to avoid and minimize potential impacts to marine mammals including the NARW.

systems such as double big bubble curtains, as appropriate; (d) use qualified, National Oceanic

and Atmospheric Administration-approved Protected Special Observers ("PSO") to reliably detect

marine mammals and sea turtles at the surface in clearance and shutdown zones; and (e) follow

applicable shutdown procedures if a protected marine mammal or sea turtle is observed entering

or found within the shutdown zones after impacted pile-driving has commenced.[48]

27.    The 2024 BiOp conservatively evaluated a proposed Project including up to 79

WTGs, two offshore substations, associated inter-array cabling as well as export cabling to bring

electricity to land.[49]  As discussed above in paragraph 15, the Project, as approved by BOEM in

the ROD, reduced the number of WTGs to up to 65 WTGs.[50]

28.    NMFS published its ITR for the Project on October 20, 2023, and issued its LOA

on November 20, 2023 (and most recently issued a modified LOA[51] for the Project on April 29,

2024).  The Project's ITR and LOA authorize incidental take of marine mammals by harassment,

but do not authorize take of marine mammals by death or serious injury.[52]  Additional detail

---

[48] 2024 BiOp, Appendix A at A2-A4, A9-A10.  2024 BiOp Appendix A presents measures
included in BOEM's Biological Assessment that are part of the proposed action for the ESA
consultation.

[49] *Id*. at 5, 13, 46.

[50] BOEM approved up to 79 possible locations for the installation of 65 WTGs.  ROD at 22; *see
also* 2024 BiOp at 13, 46.

[51] The modified LOA includes a minor revision to one provision of the LOA to clarify that at
least one PAM operator must be actively monitoring during the specified times, rather than a
separate PAM operator for each acoustic data stream.  NMFS' April 29, 2024 LOA for the
Project supersedes its November 2023 LOA,  https://www.fisheries.noaa.gov/s3/2024-
05/RevolutionWind-ModifiedLOA-LOA-OPR1.pdf.  References to the LOA throughout this
declaration refer to the issued modified LOA; *see also* NOAA, Takes of Marine Mammals
Incidental to Specified Activities; Taking Marine Mammals Incidental to the Revolution Wind
Offshore Wind Farm Project Offshore Rhode Island, 89 Fed. Reg. 41,391 (May 13, 2024).

[52] NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine
Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode
Island, 88 Fed. Reg. 72,562, 72,610 (Oct. 20, 2023) ("Revolution Wind did *not request and we
are not authorizing* take by mortality or non-auditory injury.") (emphasis added); LOA at 2

regarding the Project's ITR, and associated LOA for the Project, is provided in the Second Ingalls Declaration at paragraphs 14-15.

29.     NMFS' ITR and LOA include detailed mitigation requirements and monitoring and reporting requirements—spanning over 30 pages in the LOA, including requirements that protect the NARW at issue in Plaintiffs' Motion.[53]   These required measures include: vessel strike avoidance and separation measures, including speed limits and dedicated visual observer requirements; seasonal and time of year construction restrictions, including with respect to impact pile driving activities and unexploded ordnance ("UXO")/Munitions and Explosives of Concern ("MEC") detonations; HRG survey requirements, including ramp-up procedures; PSO and passive acoustic monitoring ("PAM") operator requirements and reporting procedures; requirement for a PAM system that can detect a NARW vocalization up to 10 kilometers; and requirement that Revolution Wind must delay or shutdown pile driving if a NARW is acoustically detected within the PAM monitoring zone or visually detected at any distance.[54]

30.     Additionally, the clearance zone may only be declared clear if no NARW visual detections at any distance or acoustic detections within the PAM Monitoring Zone have occurred during the 60-minute clearance zone monitoring period and in this period 30 consecutive minutes must be determined to be clear of marine mammals prior to commencing pile driving activities; in the event of shutdown, pile driving may not restart until the NARW has neither been visually or acoustically detected for 30 minutes.[55]   If a NARW is acoustically detected at any time by a

---

("Take by mortality or serious injury of any marine species is *not* authorized.") (emphasis added); *see also* 50 C.F.R. § 217.272(c).

[53] LOA at 3 – 34; 88 Fed. Reg. at 72,660-73; 50 C.F.R. §§ 217.274, 217.275.

[54] LOA at 3 – 34; 88 Fed. Reg. at 72,660-73; 50 C.F.R. §§ 217.274, 217.275; *see also* 2024 BiOp at 218.

[55] LOA at 9-10 (Mitigation Requirements – WTG and OSS foundation installation – (c)(7), (c)(12)).

Project-related PAM system, Revolution Wind must report the detection to NMFS as soon as possible, but no later than 24-hours after the detection; similarly if a NARW is observed at any time by PSOs or project personnel, Revolution Wind must report the sighting to NMFS and the Right Whale Sightings Advisory and submit a report to NMFS-GARFO, NMFS-OPR, and NMFS Northeast Fisheries Science Center within 24 hours.[56]

31.     Notably, the mitigation requirements for the Project are stricter in certain respects than those that were successfully implemented for the South Fork Wind Project by an affiliate of Revolution Wind.  For example, vessels associated with Revolution Wind pile driving are required to have three PSOs on board, whereas the required number was two for the South Fork Wind Project.[57]  And in the event a large whale is sighted or detected acoustically at any distance during pile driving for Revolution Wind, but cannot be identified, it must be treated as if it were a NARW for purposes of mitigation, whereas for the South Fork Wind Project that requirement was only applicable for unidentified, large whales detected within 2,000 meters or less of the pile.[58]

32.     Similarly, Revolution Wind's COP approval from BOEM provides additional mitigation for species protection by limiting foundation pile driving both seasonally as well as during time of day as follows:

> 5.10.2. <u>Seasonal and Daily Restrictions</u> (Construction). No foundation impact pile driving activities are allowed to occur January 1 through April 30 or until BOEM has notified the Lessee that all necessary ESA Section 7 consultations addressing foundation impact pile driving have concluded.  No more than three foundation monopiles are allowed to be installed per day. The Lessee must not conduct pile driving operations at any time

---

[56] *Id.* at 31, 32 (Monitoring and Reporting Requirements – Reporting – (g)(11), (g)(13)(i)-(ii)).
[57] *See id.* at 10 (Mitigation Requirements – WTG and OSS foundation installation – (c)(10)), 28 (Monitoring and Reporting Requirements – PSO and PAM operator requirements during WTG and OSS foundation installation and UXO/MEC detonations – (c)(2)); *see also* 2024 BiOp at 45.
[58] *See* LOA at 4 (Mitigation Requirements – General Conditions – (a)(6)); *see also* 2024 BiOp at 215.

when lighting or weather conditions (e.g., darkness, rain, fog, sea state) prevent visual monitoring of the full extent of the clearance and shutdown zones. The lead PSO must determine when sufficient light exists to allow effective visual monitoring in all cardinal directions. If light is insufficient, the lead PSO must call for a delay until the visual clearance zone is visible in all directions or must implement the Reduced Visibility Monitoring Plan/Nighttime Pile Driving Monitoring Plan (as required by the terms of the July 21, 2023 BiOp; see Section 5.4.8(a)). The Lessee is not allowed to conduct night-time pile driving (i.e., initiation of pile driving more than 1 hour prior to civil sunrise or 1.5 hours before civil sunset), unless the Lessee has received concurrence from BOEM and BSEE on the Reduced Visibility Monitoring Plan/Nighttime Pile Driving Monitoring Plan (see Section 5.5.1).

33.     The 2024 BiOp concludes that NMFS expects that the various required mitigation measures in combination with the requirements for monitoring NARW sighting reports, which increases awareness of potential NARWs in the Wind Development Area ("WDA"), and the low density of right whales in the WDA when pile driving could occur "*make it extremely unlikely that pile driving would begin with a right whale in the clearance zone*."[59]

34.     Importantly, before daytime pile driving could begin, the 2024 BiOp, the ITR and LOA, and BOEM's Conditions for its COP approval all require that NMFS review and approve three plans: the Sound Field Verification ("SFV") Plan, the Foundation Installation Pile Driving Monitoring Plan for Marine Mammals and Sea Turtles, and the Pile Driving PAM Plan.[60] These

---

[59] 2024 BiOp at 218 (emphasis added).

[60] 2024 BiOp at 491-92 (Terms and Conditions 12.a – Passive Acoustic Monitoring Plan for Pile Driving), 492 (Terms and Conditions 12.b – Marine Mammal and Sea Turtle Monitoring Plan – Pile Driving and UXO/MEC Detonation), 493-95 (Terms and Conditions 12.d – Sound Field Verification Plan – Monopile Installation and UXO/MEC Detonation).
ITR, 88 Fed. Reg. at 72,664 (Mitigation Requirements – WTG and OSS foundation installation – (c)(14)(x) – SFV Plan, (c)(15) – Foundation Installation Pile Driving Marine Mammal Monitoring Plan, and (c)(16) – Passive Acoustic Monitoring Plan); *see also* 50 C.F.R. §§ 217.274(c)(14), (15), (16).
LOA at 13 (Mitigation Requirements – WTG and OSS foundation installation – (c)(14)(x) – SFV Plan, (c)(15) – Foundation Installation Pile Driving Marine Mammal Monitoring Plan, and (c)(16) – Passive Acoustic Monitoring Plan (PAM Plan).

plans have been approved by the relevant agencies and the Project commenced daytime pile driving on May 10, 2024.

35.     Each of these daytime pile driving plans include measures to protect endangered species, including the NARW, during pile driving activities.  For example, the Pile Driving PAM Plan is designed for real time acoustic monitoring by the PAM operator(s) of clearance and shutdown zones for marine mammal call detection and mitigation during offshore foundation installation; PAM is intended to compliment visual monitoring, extend the detection range for mysticete whales (including NARWs), and increase situational awareness for visual PSOs.[61] Pursuant to the Pile Driving PAM Plan, the Project will use two types of PAM systems (RSA ORCA and the ThayerMahan SeaPicket systems) to detect a vocalization of NARWs up to 10 kilometers.[62]  The SeaPicket system is being used as an additional precautionary measure and a redundancy for near-real time coverage of the 10 kilometer PAM clearance/shutdown zone for NARW.[63]  To conduct acoustic monitoring, the PAM systems will be deployed at least 60 minutes prior to pile driving, continued throughout monopile installation, and extended at least 30 minutes post-piling, at which point the systems will be recovered for relocation to the next pile, as necessary.[64]  As the SeaPicket systems will not typically be moved between pile driving events, these systems will provide continuous PAM data for the 24-hour period prior to pile driving that will be used to meet the requirement of the LOA to review acoustic detections from the prior 24

---

BOEM COP Approval Conditions 5.4.4 (Pile Driving PAM Plan), 5.4.5 (Sound Field Verification Plan), 5.4.8 (Marine Mammal and Sea Turtle Monitoring Plan for Pile Driving and UXO Detonation).
[61] Revolution Wind, LLC, Pile Driving Passive Acoustic Monitoring Plan ("Pile Driving PAM Plan") at 1 (May 2024).
[62] Id. at 3.
[63] Id. at 3, 6.
[64] Id. at 3.

hours to provide situational awareness for vessel operators, PSO(s), and PAM operator(s) on NARW presence in or near the Project Area.[65]

36.     Similarly, the Pile Driving Monitoring Plan provides protocols and guidelines for mitigation and monitoring activities to minimize potential impacts on marine mammals such as the NARW.[66]  During daylight conditions, a number of monitoring and mitigation protocols will be implemented including the following: (1) a minimum of three PSOs on each PSO vessel will simultaneously monitor the relevant clearance/shutdown zones using standard handheld binoculars (7x), high magnification (25x) binoculars, and the unaided eye to search continuously for protected species; (2) PSOs stationed on dedicated PSO vessels will ensure the outer portion of the clearance/shutdown zones are visually monitored; (3) PSOs on all vessels will immediately communicate sighting within or near the clearance zones to PSOs aboard the installation vessel so appropriate mitigation measures can be implemented; and (4) pile driving will not be initiated any time when the minimum visibility zone is not fully visible and if daylight is insufficient, the Lead PSO will call for a delay in pile driving until the relevant minimum visibility distance can be monitored in all directions.[67]

37.     Revolution Wind submitted a draft of the Nighttime Pile Driving Monitoring Plan to the federal agencies on August 4, 2023, and submitted an updated version on January 19, 2024, after receiving and responding to agency comments.  This plan is still under review by the relevant

---

[65] *Id*. at 22; *see also* LOA at 26 (Monitoring and Reporting Requirements – PSO and PAM operator requirements during WTG and OSS foundation installation and UXO/MEC detonations –(c)(3)).
[66] Revolution Wind, LLC, Revolution Wind Pile Driving Monitoring Plan (Foundations) ("Pile Driving Monitoring Plan") at 1 (May 2024).
[67] *Id*. at 30, 33.

federal agencies, has not yet been approved, and Revolution Wind does not intend to conduct nighttime pile driving until this Plan is approved.

***Current Construction Status of the Project***

38.    The Project has kept the public aware of construction activities, including through websites and a listserv.  With respect to offshore construction specifically, Ørsted posts frequent, publicly available, "Mariners Briefings" describing planned activities and currently active vessels, and hosts weekly "Port Partners Briefing" Teams calls for interested maritime industry and industry-adjacent parties.

39.    As described in the First and Second Ingalls Declarations, in September 2023 the Project began onshore construction activities; in January 2024 the Project began seabed-preparation activities for offshore construction.  Currently, with respect to onshore construction activities, the Project is continuing onshore excavation for conduits and backfilling and restoring excavated areas as they progress; onshore piledriving activities are also ongoing for the new onshore interconnection station and substation off Camp Avenue.[68]  With respect to offshore construction activities, the Project has completed pre-lay scour protection installation at proposed turbine locations.  Additionally, in the Revolution Wind Lease Area, the Project is:  installing foundations; installing secondary steel; relocating boulders; deploying bubble curtains, PAM buoys, and SFV; and holding and transferring monopiles.[69]

40.    The Project has received all approvals to commence turbine foundation installation and began pile driving for foundation installation on May 10, 2024.  Additionally, due to military

---

[68] Revolution Wind, Construction Updates, https://revolution-wind.com/resources-and-faqs/construction-updates ("Week of May 20" under the "May 2024" section).
[69] Ørsted, Mariners Briefing No. 15, May 20, 2024, https://a2f3e3.emailsp.com/frontend/nl_preview_window.aspx?idNL=857 (last visited May 21, 2024).

activity in the Atlantic Ocean (including during World War II), some portions of the Lease Area contain UXO. Revolution Wind has successfully microsited Project facilities around all UXOs discovered to date and would not need to detonate any UXO unless an emergent find for which detonation would be prudent were to be discovered during construction. If this work were needed, it would only be conducted as authorized by NMFS and BOEM under federal law.

41.    Contrary to Plaintiffs allegations in their Memorandum (at 31-32), Revolution Wind is not conducting simultaneous pile driving by two different pile-driving vessels and has no intention of doing so on this Project. The Bokalift 1 and Bokalift 2 heavy lift vessels are both contracted to execute work for Revolution Wind, however only the Bokalift 2 has the capability (in terms of lifting capacity) and the specialist piling equipment onboard to perform piling driving operations. The Bokalift 1 is restricted to the installation of advanced foundation components on the piles once installed.[70] The work by the Bokalift 1 is solely above the waterline and consequently does not produce underwater noise beyond the standard operating noise of the vessel.

***Harm to Revolution Wind From Relief Plaintiffs Seek In Their Motion***

42.    On May 14, 2024, Plaintiffs filed their Motion seeking an Order from the Court to stay the effectiveness of the approvals and authorizations in the Project's ROD and ITR. Plaintiffs also ask this Court to stay or enjoin Revolution Wind's ongoing construction activities. Plaintiffs' broadly requested relief, if granted, would halt all currently ongoing and planned construction activity for the Project on the OCS and in state waters.

---

[70] Ørsted, Mariners Briefing No. 15, May 20, 2024, https://a2f3e3.emailsp.com/frontend/nl_preview_window.aspx?idNL=857 (last visited May 21, 2024) ("**Revolution Wind:** BOKALIFT 2 is installing foundations at AE07 and AJ02. BOKALIFT 1 is installing secondary steel at installed foundation locations.").

43.     Revolution Wind, as the Project developer, OCS lessee, and holder of many federal, state, and local permits issued for the Project, has made significant financial investments in the Project as well as significant investments of time in the administrative processes supporting the approvals that Plaintiffs challenge.  Revolution Wind has committed in excess of $3 billion to the planning, permitting, developing, and construction of the Project, including by entering into contracts for the manufacture and transport of Project components, as well as for the use of specialized construction vessels, and has taken other steps in reliance on the approvals challenged here.  If the Project's ROD or ITR were stayed or enjoined, Revolution Wind could lose a substantial proportion of its investment as a result of cascading impacts under various construction timelines as well as under contracts for the manufacture, transport, installation, and construction of the remaining components of the Project.

44.     For example, Revolution Wind has been awarded five power purchase agreements ("PPAs") under three separate procurements for a combined approximately 704 MW of generating capacity: (1) two October 2018 PPAs with Connecticut utilities for approximately 200 MW; (2) a December 2018 PPA with the Rhode Island utility for approximately 400 MW; and (3) two November 2019 PPAs with Connecticut utilities for another approximately 104 MW.  Some or all of these PPAs would be adversely impacted if the Project timeline were delayed through the stay or injunction Plaintiffs now seek or its approvals vacated by any of the relief sought in this lawsuit.

45.     Delays to the Project's commercial operations date can have a significant effect on its PPA revenues.  All five of the Project's PPAs contain commercial milestones—most importantly the Project's achieving commercial operations by certain dates.  If Revolution Wind does not achieve commercial operations within the timeframe established under the PPAs, Revolution Wind will face increased contract security requirements (which Revolution Wind

would forfeit in the event of termination), daily liquidated delay damages, and termination rights for buyers. Delays to the Project's commercial operations date past certain dates trigger liquidated damages of $100 per MW-hour of contracted capacity per day ($70,400 per day in total across the five PPAs) for up to a total of 365 days. In all of the PPAs, the buyer would eventually also have the right to terminate the agreement based on delays.

46.     For example, if Revolution Wind does not achieve commercial operation within the timeframe established under the approximately 400 MW Rhode Island PPA, Revolution Wind would be required to pay liquidated damages of $40,000 per day for each day of delay up to 365 days. The amount of delay damages under this one PPA alone could be as much as approximately $14.6 million. And, if Revolution Wind were still not to achieve commercial operation under the PPA within that 365-day period of paying liquidated damages, the buyer would be entitled to terminate the PPA (in which case Revolution Wind would also forfeit $16 million in contract security). In the four Connecticut PPAs, the buyer's termination accrues earlier—at the same time as the obligation to pay liquidated damages (in the absence of termination) is triggered. If the Revolution Wind PPAs were to be terminated, the value of the Project would be substantially reduced, as Revolution Wind would likely lose the great majority of its investments and expected future profits.

47.     Revolution Wind has sequenced its construction schedules to ensure efficient usage of scarce resources, such as specialized ships, for the Project. Construction of large-scale offshore wind projects requires the use of specialized vessels, and these vessels are in limited supply and are thus tightly scheduled, with limited schedule availability to work beyond the contracted reservation dates. Critically, contracts for vessels for project construction typically include latest vessel availability date provisions; under these provisions, if Project work is not complete by the

specified vessel availability date, the contracted vessels are able to depart to begin work on non-Ørsted projects. As a result, in a worst-case scenario of schedule delays, the vessels may be required to depart the Project site for other contractually-scheduled commitments without completing work.

48. All required agency approvals have been obtained for the Project's ongoing offshore construction and there are specialized vessels currently in the Revolution Wind Project Lease Area offshore conducting work in accordance with the Project schedule.[71]

49. Seabed-preparation activities, including boulder relocation, are currently underway at the site of the array cable and WTG locations, and are currently scheduled to be completed in July. There are a substantial number of boulders at the Project site, rendering the work more time consuming. Three primary vessels (in addition to support vessels) have been contracted to perform ongoing seabed-preparation work.[72] If the Court were to stay or enjoin the federal approvals required for this work or otherwise order this work to stop, Revolution Wind would incur standby and fuel costs of approximately $300,000 per day for this work alone.

50. Because seabed-preparation activities are a prerequisite to subsequent construction activities, if they are halted prematurely, it would be impossible for subsequent offshore construction activities to begin until vessels had been re-mobilized to complete the seabed preparation. Depending on the extent of the delay, it is uncertain when vessels would be available to re-mobilize to complete the seabed-preparation work or to perform the subsequent offshore construction work.

---

[71] Revolution Wind: Current Project Vessels, https://a2f3e3.emailsp.com/frontend/nl_preview_window.aspx?idNL=804 (listing vessels currently active in Revolution Wind Project) (last visited May 21, 2024).
[72] The fourth primary vessel discussed in Second Ingalls Declaration paragraph 32 was contracted to do scour protection and has completed its work.

51.    As noted above, all required approvals from NMFS, BOEM, and BSEE were received and the sequential installation of the 65 monopile foundations for the Project's WTGs and two foundations for the offshore substations began on May 10, 2024.  Two principal installation vessels, as well as vessels for noise mitigation and monitoring, protected species, and other support functions, have been contracted to perform the foundation-installation work, which is currently underway.  If the Court were to stay or enjoin the federal approvals required for this work or otherwise order this work to stop, Revolution Wind would incur additional delay standby and fuel costs in excess of $1 million per day.  Furthermore, as with delays to seabed-preparation activities, delays to foundation installation would lead to knock-on delays to installation of the WTGs, currently scheduled to begin in mid-August.

52.    If WTG installation and cable-laying could not begin on schedule in July and August, respectively, Revolution Wind could incur a further $2 million per day in standby and fuel costs.

53.    Ultimately, depending upon the length of the delay, standby and fuel costs could be in excess of $3 million per day if delays continue into and beyond late July 2024 alone.  Assuming a hypothetical six-month delay, these costs could amount to approximately $230 million.

54.    And it is important to note that the cost impacts of delays can consist of more than simply standby rates.  For example, if a particular vessel's work were to be delayed beyond its contractual latest vessel availability date, Revolution Wind would then need to work with the contractor (or another contractor) to remobilize another vessel to the site to complete the work. This would lead to additional costs, and possibly also to further delays—assuming alternate vessels were available at all.  In fact, significant delays in vessel availability (and resulting costs) have led Ørsted to cease development of projects in the past.

55.     The Project's construction schedule is also subject to seasonal environmental mitigation measures that restrict the windows in which various construction activities are allowed. NMFS' ITR/LOA[73] and the conditions of BOEM's COP approval (Condition 5.10.2) for the Project prohibit pile-driving from January 1 through April 30 to protect the NARW.[74] NMFS' ITR/LOA[75] and the conditions of BOEM's COP approval (Condition 5.12.2) prohibit UXO detonation from December 1 to April 30 to reduce impacts to NARWs during peak migratory periods.[76] NMFS' LOA prohibits nighttime pile driving between November 1 and May 31.[77] The conditions of BOEM's COP approval (Condition 5.5.5) requires sequencing of the Project's construction activities to avoid certain areas between November 1 and March 31 to avoid or minimize impacts to Atlantic cod spawning.  These restrictions on offshore construction leave only a limited time period within which to complete foundation installation—essentially only a half year window to install WTG foundations and the offshore substation foundations, including periods with challenging weather late in the season.

56.     As a result, even a brief delay can have magnified effects, such that a delay of just a few days could result in many months of delay if there is not enough time left to complete a construction activity in that year's window.  A brief delay can also have cascading effects for subsequent construction activities on the Project, which may require the completion of the preceding stage before moving to the next, incurring costs and risks as described above.

---

[73] 88 Fed. Reg. at 72,562-63, 72,662; LOA at 8.

[74] Impact pile driving may occur in December with prior approval by NMFS.  88 Fed. Reg. at 72,651, 72,574; 2024 BiOp at 201, 210.

[75] 88 Fed. Reg. at 72,665; LOA at 14.

[76] 88 Fed. Reg. at 72,613.

[77] LOA at 8.

57.    In short, if Plaintiffs succeed in delaying or blocking offshore construction of the Project, Revolution Wind and its affiliates could lose billions of dollars in planning, engineering, environmental field work, technical analyses, permitting, contracting, and construction.

**The Project Serves the Public Interest**

58.    The Project is a key component of the federal government's laws and policies to fight climate change and to meet carbon reduction goals, as well as similar initiatives by the States of Rhode Island and Connecticut.  The federal government has set a goal of 30 gigawatts ("GW") of offshore wind by 2030,[78] and this goal will help the federal government meet its target to achieve 100% clean electricity by 2035.[79]  Rhode Island has a goal of reaching 100% renewable energy by 2033,[80] and its climate goals require the development of approximately 9 to 11 GW of offshore wind power by 2030.[81]  Rhode Island issued a Request for Proposals to solicit approximately 1200 MW of new offshore wind to help power the state's clean energy needs.[82]  Finally, Connecticut

---

[78] The White House, "FACT SHEET: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs" (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/ statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[79] U.S. Dep't of Energy, Advancing Offshore Wind Energy in the United States 1, 9 (Mar. 2023), https://www.energy.gov/sites/default/files/2023-03/advancing-offshore-wind-energy-full-report.pdf ("[O]ffshore wind can be a key contributor in many U.S. energy markets to achieving a zero-carbon electricity grid by 2035 and a net-zero emissions economy by 2050.").

[80] 39 R.I. Gen. Laws § 39-26-4(a)(14).

[81] State of Rhode Island Office of Energy Resources, "100 Percent Renewable Electricity by 2030," (July 27, 2022), https://energy.ri.gov/renewable-energy/100-percent-renewable-electricity-2030; State of Rhode Island Office of Energy Resources & The Brattle Group, *The Road to 100% Renewable Electricity by 2030 in Rhode Island* (Dec. 2020) at iv, 18, https://energy.ri.gov/sites/g/files/xkgbur741/files/documents/renewable/The-Road-to-100-Percent-Renewable-Electricity---Brattle-04Feb2021.pdf.

[82] "Governor McKee Announces New Opportunity to Bring Approximately 1200 Megawatts of New Offshore Wind to Rhode Island" (Sept. 28, 2023), https://governor.ri.gov/press-releases/governor-mckee-announces-new-opportunity-bring-approximately-1200-megawatts-new.

aims to reach 100% zero-carbon electricity supplied to customers by 2040, and its climate goals require the development of 2 GW of offshore wind by 2030.[83]

59.     Staying or enjoining the Project's offshore construction would prevent the important public benefits of the Project from being realized.  Once completed, the Project will provide enough clean energy to power more than 350,000 homes in Rhode Island and Connecticut, while eliminating up to approximately 3 million tons of carbon emissions per year and over 100 million tons of carbon emissions over the Project's lifetime (estimated for this calculation as 35 years).

60.     As explained in the FEIS, the Project will create, overall, more than 4,100 full-time equivalent jobs (direct, indirect, and induced effects of the Project) during Project construction, and an estimated 236 full-time equivalent jobs annually for the Project's operations and maintenance work.[84]

61.     On April 22, 2022, Ørsted, the North America's Building Trades Unions, and the United Brotherhood of Carpenters entered into a "National Offshore Wind Agreement," a first-of-its kind U.S. project labor agreement that creates expansive job opportunities for workers in the building trade unions on offshore construction associated with Ørsted's offshore wind projects, including the Project.[85]  Construction on the Project is also being performed pursuant to project labor agreements with the Norwich-New London Building Trades Council (offshore wind turbine pre-assembly at the New London State Pier) and the Rhode Island Building and Construction Trades Council (advance foundation component construction, as well as work on the onshore cable

---

[83] Conn. Gen. Stat. § 22a-200a(3); ROD at 9.
[84] FEIS at 3.11-45 – 3.11-46
[85] Ørsted, "North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor" (May 5, 2022), https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement.

route and onshore substation).  Consistent with these agreements, many of the jobs associated with the Project are union jobs.

62.    Revolution Wind has also made commitments totaling more than $10 million to communities and institutions in Connecticut and Rhode Island, with more than $5 million of that scheduled to be paid in the future.  For example, Revolution Wind contributed $500,000 to establish Rhode Island's first Global Wind Organization training center at the Community College of Rhode Island, and $500,000 to the Rhode Island Department of Labor and Building Futures Rhode Island to enable new entrants to union construction careers through pre-apprenticeship and for offshore wind career training for Rhode islanders involved in the construction of offshore wind projects.[86]  To date, this funding has enabled more than 100 Rhode Islanders to obtain credentials required for Revolution Wind's offshore construction.

63.    Ørsted and Revolution Wind are also investing significantly in port infrastructure and domestic manufacturing.  In Rhode Island, Ørsted and Eversource are investing more than $100 million in an offshore wind construction hub at the Port of Providence, creating more than 125 local union jobs, partnering with local shipyards, investing $1 million in a local training partnership, and collaborating with local fishermen.[87]  Ørsted and Eversource have also contributed more than $100 million of funding to support the Connecticut Port Authority and the State of Connecticut's re-development of the State Pier Terminal in the Port of New London.

---

[86] FEIS at F-17.
[87] Revolution Wind, "Governor McKee, Congressional Delegation, Mayor Smiley Mark New Phase of Offshore Wind Construction Hub at ProvPort" (May 1, 2023), https://revolution-wind.com/news/2023/05/new-phase-of-offshore-wind-construction-hub-at-provport.

64.     Halting the Project's ongoing offshore construction by granting Plaintiffs' Motion would impair these critical components of federal and state emissions reduction goals and prevent the Project's important public benefits from being realized.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 21, 2024.

_____
Kellen Ingalls