## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREEN OCEANS, *et al.*,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,

*Defendants,*

and

REVOLUTION WIND, LLC,

*Defendant-Intervenor*

Case No.: 1:24-cv-00141-RCL

## EXPERT DECLARATION OF MARY JO BARKASZI IN SUPPORT OF DEFENDANT-INTERVENOR REVOLUTION WIND'S OPPOSITION TO PLAINTIFFS' MOTION FOR ADMINISTRATIVE STAY OR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746(2), I, Mary Jo Barkaszi, hereby declare:

1.     I am currently the Marine Mammals Program Manager at CSA Ocean Sciences ("CSA").  CSA serves as an environmental consultant for Defendant-Intervenor Revolution Wind LLC ("Revolution Wind")—a U.S.-based company and subsidiary of Orsted North America Inc. ("Ørsted") and Eversource Energy that is developing the Revolution Wind Project ("Project"), a commercial scale wind farm that is currently under construction offshore Rhode Island.

2.     In this lawsuit, a collection of individual and organizational plaintiffs led by Green Oceans (collectively, "Plaintiffs") are challenging federal approvals of the Revolution Wind Project, including Bureau of Ocean Energy Management's ("BOEM") approval of a Construction

and Operations Plan, a Final Environmental Impact Statement for the Project, the National Marine

Fisheries Service's ("NMFS") issuance of a Biological Opinion ("BiOp") and an Incidental Take

Regulation ("ITR"), which is a rulemaking specific to Revolution Wind, and a Letter of

Authorization ("LOA") for specified Revolution Wind construction activities.

      3.      On May 14, 2024, Plaintiffs filed a Motion for Administrative Stay or Preliminary

Injunction ("Motion") seeking to stay the effectiveness of these approvals and enjoin Revolution

Wind construction activities until further order of the Court.  Among other things, Plaintiffs'

Motion relies upon allegations challenging Federal Defendants' Biological Opinion issued under

the Endangered Species Act ("ESA").  In support of the Motion, Plaintiffs argue that if

construction is allowed to proceed on Revolution Wind, these activities will result in irreparable

harm to certain endangered whale species.

      4.      This is Plaintiffs' second motion in this litigation seeking to stay the effectiveness

of these approvals and enjoin Revolution Wind construction activities.  *See* Plaintiffs' Motion for

Stay of Final Agency Action, Dkt. #35.  On April 25, 2024, I filed an expert declaration in support

of Defendant-Intervenor Revolution Wind's Opposition to Plaintiffs' first Motion for Stay.  *See*

Expert Declaration of Mary Jo Barkaszi in Support of Defendant-Intervenor Revolution Wind's

Opposition to Plaintiffs' Motion for Stay, Dkt #29-2 ("First Barkaszi Decl.").  In the First Barkaszi

Declaration, I provide background on the Marine Mammal Protection Act ("MMPA"), the ESA,

the basics of marine mammal hearing and the underwater acoustic environment (which is not

generally free of man-made noise), the types of equipment used during marine surveys, and the

extensive mitigation and monitoring measures employed to protect marine mammals, which is

incorporated by reference and is not repeated here.

      5.      Since 2017, in my role as Marine Mammals Program Manager at CSA, I have

consulted on environmental impact, mitigation and permitting matters relating to marine protected species and the activities associated with multiple Ørsted projects including Revolution Wind.  For Revolution Wind, I prepared the "Assessment of Impacts to Marine Mammals, Sea Turtles, and Endangered Species Act-Listed Fish Species Revolution Wind Offshore Wind Farm" technical report for Revolution Wind's Construction and Operations Plan.  For other Ørsted projects, my role has included the application and review processes to obtain Incidental Take Authorizations ("ITAs"), and implementation of the ITAs' mitigation requirements.

6.    I have reviewed Plaintiffs' Amended Complaint, filed May 13, 2024 and Plaintiffs' Motion and accompanying exhibits filed on May 14, 2024, including the Memorandum in Support of Plaintiffs' Motion ("Memorandum") and Declarations from Lisa Linowes and Elizabeth Quattrocki Knight as well as Plaintiffs' Exhibit 4, a May 13, 2022 letter from Sean Hayes at National Oceanic and Atmospheric Administration ("NOAA") to Brian Hooker at BOEM.

7.    I make this Declaration in support of Revolution Wind's Opposition to Plaintiffs' Motion for Administrative Stay or Preliminary Injunction in this case based upon both my personal knowledge of the matters referred to herein and my over 30 years of experience and expertise in evaluating risks to marine mammals in a wide variety of contexts, including offshore wind surveying, construction, and operation.  I am willing and able to testify truthfully thereto, if called upon to do so.

## I.    OVERVIEW OF MY CONCLUSIONS

Based on my experience and expertise, I have reached the following conclusions:

8.    Plaintiffs' attempt (Memorandum, pp. 28-30) to draw a causal connection where none exists between recent offshore wind development and large whale mortality, including the North Atlantic right whale, is contrary to the scientific consensus.  To support Plaintiffs' claims,

the Memorandum relies on a Declaration from Lisa Linowes, who does not present scientific training or educational background regarding marine mammals, marine acoustics or regulatory impact assessment. (Second Linowes Decl. ¶¶ 1, 3-5). Linowes claims that she has identified "a distinct pattern of whale deaths in the Atlantic that positively correlated with the increase in preconstruction offshore wind activities in the lease areas." (Second Linowes Decl. ¶ 6). Linowes' assertions and by extension the Plaintiffs' Memorandum, do not comport with the **overwhelming scientific consensus that offshore wind activity is <u>not</u> a cause of these marine mammal mortalities.** Instead, the scientific community have determined that the three declared Unusual Mortality Events ("UMEs") for whales in 2016 and 2017 are primarily caused by vessel strikes and fishing gear entanglements (and infectious disease for the minke whales). And NOAA, the Marine Mammal Commission, academic institutions (e.g., Rutgers University; University of Rhode Island, Yale University), environmental organizations (e.g., Sierra Club, Natural Resources Defense Council), BOEM and the U.S. Department of Energy, have all issued official statements that no marine mammal mortality has been attributed to offshore wind activities.

9.      Plaintiffs' attempts to add up authorized take issued under various NMFS' offshore wind project authorizations to imply population-level impacts is not the correct methodology stipulated by the take authorization process required under the MMPA and ESA and misrepresents the nature of the agency assessments and authorizations. (Memorandum at 26, 29-30). Plaintiffs also assume all authorized takes will be realized; this is not correct. Only a small portion of authorized takes under a particular authorization are ever realized from the intersection of a marine mammal with the estimated ensonified area; and only a portion of those exposures are likely to manifest to a behavioral disturbance.

10.     The mitigation measures required for the Revolution Wind and South Fork Wind

projects, including the ITAs under the MMPA and mitigation measures required by the BiOp and mitigations and monitoring required by conditions of approval for the Construction and Operations Plan have been documented by real-world experience on the construction of the South Fork Wind project to be effective. Data from the reports submitted by the professional, 3rd-party scientists required onboard vessels during South Fork Wind project construction and the Sound Field Verification ("SFV") data collected using ISO-standard methods during South Fork Wind pile driving show that acoustic modeling was conservative and tended to overestimate the range at which marine mammals could be exposed to sound levels above disturbance thresholds and thus, the number of marine mammals that could potentially be exposed to above-threshold sound levels by pile driving. Data from South Fork Wind monopile pile driving shows that Level B and Level A harassment ranges were substantially smaller than the modeled ranges, including in some instances about half the size of modeled Level B ranges for impact pile driving of monopiles, meaning that the actual extent of the area for a potential take is smaller than modeled.

11.    The Linowes document referenced in footnote 1 of the Linowes Declaration that Linowes presents as an investigation of large whale mortality is not a peer-reviewed scientific publication; the conclusions drawn in the document do not comport with scientific publications regarding vessel strike risk for large whales (e.g. Redfern et al, 2020; Rockwood et al., 2021; Kelley et al., 2021); it incorrectly associates locations of whale strandings with temporal and spatial offshore wind activities; and it uses pre-construction stranding data to purport to assess impacts from construction activities, despite the fact that these distinct activities are not equal in timing or scope.

12.    Contrary to Plaintiffs' suggestion that "the Government" "ignored" the North Atlantic Right Whale and Offshore Wind Strategy (2024), (Memorandum (May 14, 2024), pp. 24-

25), NMFS's MMPA authorizations issued for Revolution Wind are consistent with the Strategy's goals of developing mitigation and decision support tools; research and monitoring; and collaboration, communication, and outreach.  In particular, the mitigation and monitoring data that are already published, combined with mitigation and monitoring efforts required under Revolution Wind's approvals during pre, during, and post construction, represent a large body of scientific data that directly feed many of the goals established in the Strategy.

13.     The interagency correspondence from NOAA Chief of Endangered Species, Sean Hayes, to the BOEM lead biologist, Brian Hooker (termed the Hayes memo) that Plaintiffs cite (Memorandum at 36-37), was a transfer of scientific information and a call for additional assessment of a novel North Atlantic right whale feeding area off Nantucket Shoals.  Subsequent to the Hayes memo, BOEM funded a study by the National Academies of Sciences[1] regarding the copepod resources around Nantucket Shoals and the potential effects of offshore wind build-out to the south and west of the Shoals.  The study conclusions do not recommend a halt to offshore wind development. Rather, the study identifies the complexity of hydrographic influences in this region, including climate change effects.

## II.    PROFESSIONAL QUALIFICATIONS

14.     I am the Marine Mammals Program Manager at CSA Ocean Sciences, a marine environmental consulting firm specializing in investigating potential environmental impacts relating to marine and coastal projects around the world.  I am responsible for collecting data from the field and conducting scientific research to analyze and mitigate harm to marine mammals in

---

[1] National Academies of Sciences, Engineering, and Medicine. 2024. *Potential Hydrodynamic Impacts of Offshore Wind Energy on Nantucket Shoals Regional Ecology: An Evaluation from Wind to Whales.* Washington, DC: The National Academies Press, https://doi.org/10.17226/27154 (last accessed May 21, 2024).

the environment.

15.    I received a Bachelor of Science degree in Biology from Wittenberg University in 1986. I received a Master's degree in Biological Oceanography from Florida Institute of Technology in 1990.

16.    Early in my career, I was employed as a marine biologist at Mote Marine Laboratory in Sarasota, FL where some of my duties included aerial surveys for marine mammals and sea turtles and a scientific member of the marine mammal stranding response team. After my graduate studies, I was employed as a biologist in the life sciences support contract for John F. Kennedy Space center where some of my duties included aerial surveys and impact assessment for marine mammals and assistance in soft release programs for the Florida Manatee.

17.    I am a member of the American National Standards Institute ("ANSI") Passive Acoustic Monitoring ("PAM") Standards Working Group, the Acoustical Society of America ("ASA"), and the Society of Marine Mammalogy ("SMM").

18.    I worked as a contracted scientist for NMFS' long term aerial surveys as part of the Atlantic Marine Assessment Program for Protected Species ("AMAPPS") and the BOEM Wind Energy Area baseline surveys, conducting aerial visual and photogrammetric surveys for marine mammals and sea turtles.

19.    I have more than 30 years of experience in performing and overseeing marine wildlife baseline studies and mitigation programs for construction and offshore energy projects around the world--including acting as technical lead for offshore wind marine mammal ITA applications, COPs, third-party Environmental Impact Statements (EIS), ESA consultation documents, mitigation and monitoring plans, and compliance assessment.

20.    I have experience in acoustic studies on the potential impact of sound on marine

animal species.  I have served as project manager for a marine soundscape biodiversity study for the National Park Service, Dry Tortugas National Park, to assess long-term marine habitat quality using autonomous acoustic recorders.  I have also managed projects to acoustically track sperm whales in the Northern Gulf of Mexico, and have tracked short-finned and long-finned pilot whales in the U.S. Mid-Atlantic Outer Continental Shelf ("OCS").  Prior to the acoustic assessments conducted for offshore wind ITAs beginning in 2017, I worked on several offshore energy construction ITAs including the Delfin Liquefied Natural Gas ("LNG") offshore port facility in the Gulf of Mexico and served as project manager for NOAA's LOA application for the decommissioning of the Neptune LNG deepwater port in Massachusetts Bay, Massachusetts.

21.    I have extensive experience managing protected species observer programs in federal waters associated with HRG surveys, deep water seismic surveys, pile driving, wind farm construction, explosive removals, and BOEM lease surveys throughout the United States and its territories.  I was recently contracted by BOEM to assess mitigation compliance and effectiveness of vessel-based observer data in the Gulf of Mexico collected during deepwater geophysical surveys conducted between 2002 and 2015—the largest and most comprehensive assessment of seismic mitigation data in the United States which is now published in a peer-reviewed journal (Barkaszi and Kelly et al., 2024).

22.    I am co-lead on development of a vessel strike model designed to assess vessel strike risk in U.S. OCS waters, and co-lead on a funded study reviewing the risk of vessel strike on the endangered Rice's whale in the Gulf of Mexico.

23.    I hold a NMFS unconditional permit for implementing protected species plans during underwater blasting, dredging, and marine construction.

24.    I have been an invited speaker to working groups and symposiums in the United

States as well as to regulatory agencies internationally, including in Brazil (Brazilian Institute of Environment and Renewable Natural Resources), South Africa (Department of Environmental Affairs), and Suriname (National Institute for Environment and Development), to provide instruction on acoustic impact assessment and mitigation specific to each region.

25.     I am the author or co-author of more than a dozen peer-reviewed papers, conference proceedings, and technical reports on underwater acoustics and hearing in marine mammals and sea turtles.  I have overseen or supported the management of roughly 50 projects assessing the impacts of anthropogenic sound in underwater environments and have recently managed approximately 20 projects assessing the acoustic impacts of offshore wind energy farms.  A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A**.

III.    **MARINE TRAFFIC**

26.     A primary threat to large whales that Plaintiffs do not account for is the overarching risk of vessel strike resulting from non-offshore wind maritime traffic.  Plaintiffs' discussion of an increase in whale mortality outside the context of commercial shipping in the Linowes declaration is misleading because it does not represent the full contingent of vessel traffic in and around the region. Any discussion of offshore wind vessel activity must be made within the context of existing marine traffic to be meaningful.  Marine traffic has increased in the last several decades; key changes in maritime traffic since the early 2000's include:

27.     **Growth in Global Trade**: Global trade experienced significant growth, driven by globalization, economic development in emerging markets, and the expansion of international trade agreements. This increase in trade directly contributed to a higher volume of shipping traffic, as more goods were transported by sea.

28.     **Expansion of the Panama Canal**: The expansion of the Panama Canal, completed

in 2016, allowed for the passage of larger "New Panamax" ships. This development directly impacted shipping routes and volumes, especially for routes connecting Asia with the U.S. East Coast, leading to an increase in vessel traffic in this region.

29.     **Port Infrastructure and Development**: Major ports along the U.S. East Coast, including the Port of NY and NJ, have undergone significant expansions and upgrades to accommodate larger vessels and increased cargo volumes. These improvements have made these ports more attractive for international shipping, contributing to the rise in vessel traffic.

30.     **Technological Advancements**: Advancements in shipping technology, such as improved vessel design for greater cargo capacity, better fuel efficiency, and advanced navigation systems, have made maritime transport more efficient and cost-effective, encouraging an increase in shipping activities.

31.     **Impact of COVID-19 Pandemic**: The COVID-19 pandemic had a significant impact on global shipping starting in 2020. Initial disruptions led to a decrease in traffic, followed by a surge in demand as economies began to recover, leading to increased shipping activities and congestion in major ports.

32.     **E-Commerce Growth**: The rise of e-commerce, especially accelerated by the pandemic, has led to increased demand for shipping services as consumers increasingly rely on online shopping for a wide range of products; and

33.     **Supply Chain Diversification**: In response to supply chain disruptions and geopolitical tensions, there has been a move towards diversifying supply chains, which has implications for shipping routes and volumes, including increased traffic in certain areas of the U.S. East Coast.

34.     Based on the U.S. Department of Transportation statistics, maritime imports and

exports of containerized goods (i.e., container ships) has increased between 2019 and 2022.[2] Statistics for 2023 showed a substantial increase in maritime containerized goods volume handled by ports on the U.S. East Coast.  A substantial portion of the East Coast volume was handled by the port of NJ/NY.[3]  To better understand the risk of vessel strikes, the movements of a tagged North Atlantic right whale were displayed alongside the movements of vessels operating an automatic identification system ("AIS"), which are dominated by large, commercial vessels. This visualization can be viewed at https://www.fisheries.noaa.gov/s3/2023-05/Update-NARW-2021-NJ-NY-Visualization.gif  (last accessed May 21, 2024).

## IV.    PLAINTIFFS' ALLEGATIONS

### A.    There Is No Increase In Whale Deaths Cotemporaneous with Offshore Wind Activity

35.    Plaintiffs allege that there has been a significant increase in whale mortalities along the Eastern Seaboard that can be attributed to the growth of offshore wind in this region. (Memorandum (May 14, 2024), p. 28).  According to Linowes, "[SRWC's] work found a distinct pattern of whale deaths in the Atlantic that positively correlated with the increase in preconstruction offshore wind activities in the lease areas" (Second Linowes Decl. ¶ 6), and "[w]hile it is still an open question as to why offshore wind activity might be killing whales, something acute occurred within whale habitat along the eastern seaboard where offshore wind leases were actively undergoing sonar surveys.  It is evident that marine mammals are being displaced from biologically important habitats" (¶ 9).  It is well understood in science that while correlation and causation can occur together, correlation does not indicate causation and cannot be

---

[2] Bureau of Transportation Statistics, https://www.bts.gov/ports (last accessed May 21, 2024).

[3] Bureau of Transportation Statistics, https://www.bts.gov/ports (last accessed May 21, 2024).

used to attribute a response to an action.

36.     Plaintiffs' allegations are factually incorrect and without scientific basis.  Plaintiffs omit the context of pre-existing "unusual mortality events" relating to marine mammals along the East Coast of the United States.  Under the MMPA, an Unusual Mortality Event (previously defined as "UME") is defined as "a stranding event that is unexpected; involved a significant die-off of any marine mammal population; and demands immediate response."[4]   UMEs are designated by the National Marine Fisheries Service Office of Protected Resources ("OPR").

37.     NMFS established the Working Group on Marine Mammal Unusual Mortality Events (the "UME Working Group") in 1991.  The UME Working Group is tasked with understanding, investigating, and responding to marine mammal UMEs.  The working group is comprised of experts from scientific and academic institutions, conservation organizations, and state and federal agencies who work closely with stranding networks and have a wide variety of experience

38.     According to the NMFS, the branch of NOAA responsible for managing U.S. marine mammal stocks and administering the MMPA, the Atlantic humpback whale UME was declared in 2017 based on data beginning in January 2016 from Maine through Florida; the Atlantic minke whale UME was declared in 2018 based on data beginning in January 2017 from Maine to South Carolina; and the North Atlantic right whale UME was declared in 2017 based on data beginning in January 2017 along the entire U.S. *and* Canadian coast from Newfoundland through Florida.

---

[4] 16 U.S.C. § 1421h(6).

**Figure 1.**



39.    UMEs are species and region-specific.  As of May 21, 2024, there are four active UMEs for United States waters: an Atlantic Florida Manatee UME, an Atlantic Minke Whale UME, a North Atlantic Right Whale UME, and an Atlantic Humpback Whale UME.[5]

40.    Plaintiffs' analysis focused only on offshore wind activity, but ignore the likely underlying causes of the observed whale deaths on the East coast.  Plaintiffs make no mention of species distribution, activity changes outside of the survey areas, or the mortality evidenced in peer-reviewed scientific publications since the beginning of the North Atlantic right whale or Atlantic humpback whale UMEs (Meyer-Gutbrod et al. 2022) (Knowlton et al. 2022) (Davies et

---

[5] NMFS, Active and Closed Unusual Mortality Events,
https://www.fisheries.noaa.gov/national/marine-life-distress/active-and-closed-unusual-mortality-events (last accessed May 21, 2024).

al. 2019) (Leiter et al. 2017) (Quintana-Rizzo et al. 2021).[6]

41.    The UME Working Group identified the primary cause of the Atlantic humpback whale UME as vessel strikes; the North Atlantic right whale UME as vessel strikes and entanglements; and the minke whale UME as a combination of factors including vessel strike, gear entanglement, and infectious disease; however, some of the causes of the UME-associated mortality remain undetermined for this species.[7]

42.    A vessel strike is a collision between any type of boat and a marine animal in the ocean.  Strikes typically occur when a vessel or an animal fail to make evasive maneuvers when on an intersecting path or when both the vessel and animal avert in the same direction.  All sizes and types of vessels have the potential to collide with nearly any marine species.  Hundreds of vessels transit the coastal waters offshore Rhode Island and Massachusetts on a daily basis.

43.    A recent study published by the Wildlife Conservation Society and Columbia University describes numerous observations during the study of humpback and fin whales with evidence of a previous vessel strike, such as healing or healed boat propeller wounds, missing dorsal fin, or missing part of fluke (tail) (King et al., 2021).  Faster vessel speeds, particularly speeds greater than 10 knots, increase the occurrence and lethality of vessel strikes in large whales (Laist et al., 2001, Vanderlaan et al., 2007).

---

[6] NMFS, North Atlantic Right Whale Stock Assessment Reports, 2022, https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-stock-assessments (last accessed May 21, 2024); Moore, M.J., 2023. *Policy enabling North Atlantic right whale reproductive health could save the species.* ICES Journal of Marine Science, 80(2), pp. 237-242.

[7] NMFS, 2016-2024 Humpback Whale Unusual Mortality Event Along the Atlantic Coast, https://www.fisheries.noaa.gov/national/marine-life-distress/2016-2024-humpback-whale-unusual-mortality-event-along-atlantic-coast (last accessed May 21, 2024); NMFS, 2017-2024 North Atlantic Right Whale Unusual Mortality Event, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event (last accessed May 21, 2024).

44.     One of the primary protection measures for North Atlantic right whales is the implementation of vessel speed rules. The foundational speed rule, established in 2008, is the seasonal management area ("SMA") designation which requires a mandatory 10-knot speed restriction for most vessels 65 feet and longer operating in specific geographic areas (mainly around larger ports) during peak right whale seasons in those areas.  SMA speed rules are voluntary for vessels under 65 feet in length.  However, **all offshore wind vessels, regardless of length, are required to adhere to the seasonal 10-knot speed rule as stipulated in the LOA**.[8]  Voluntary speed rules are also initiated by NMFS through right whale slow zones and dynamic management area ("DMA") designations.  The slow zones and DMAs are designated through a combination of real-time aerial, vessel, and/or acoustic detections of right whales along the entire east coast of the United States.  When a slow zone or DMA is designated, a notice to mariners is released, along with associated maps, that identifies the location of right whale detection(s) and the zone in which vessels are recommended to operate at 10-knots or less.  As is the case with SMAs, although these slow zones and DMAs are voluntary, **all offshore wind vessels are required through enforceable stipulations to comply with the slow speed restrictions in these zones; and all offshore wind vessels, regardless of size, must transmit AIS data at all times of operation**.

45.     Data from all commercial vessel AIS analyses are publicly available on the NOAA Fisheries North Atlantic Right Whale Active Seasonal Speed Zone Vessel Traffic Dashboard (SMA Dashboard).[9]   These data provide vessel transit and vessel speed compliance statistics

---

[8] NMFS Letter of Authorization, Mitigation Requirement 3(b) (April 29, 2024), https://www.fisheries.noaa.gov/s3/2023-11/BL52-Revolution-Wind-LOA-OPR1-Final-signed-OPR1.pdf (last accessed May 21, 2024).

[9] SMA Dashboard, https://experience.arcgis.com/experience/315a0a2c4e084cf6ae8babd8c81b07b3/ (last accessed May 21, 2024).

within the geographic bounds of active SMAs. The most applicable SMAs for the region described in the Plaintiff's declarations include the Block Island Sound, Ports of New York/New Jersey, Entrance to Delaware Bay, and Entrance to Chesapeake Bay SMAs. The data on the SMA Dashboard showed an average 83% compliance rate for vessels 65 feet or longer (Table 1). The compliance analysis indicates that over 344,000 nautical miles (nm) of transit by vessels 65 feet or longer through the highest density right whale areas, were at speeds above the 10-knot speed limit and thus, were out of regulatory compliance (Table 1). The voluntary compliance for vessels under 65 feet decreases further to an average of 53% for all years between 2018 and 2023, equating to roughly 171,000 nm of transit over 10 knots through the SMAs. **Thus, a substantial proportion of the non-offshore wind maritime vessel traffic is not abiding by the species protections that all offshore wind vessels observe.** This illustrates the importance of considering all variables in a situation when attempting to assign causation, as the correlation of offshore wind vessels in these areas is not the only factor affecting marine mammals, and these factors cannot be considered in isolation.

**Table 1. Percent compliance, transit distances, and transit speeds within four North Atlantic right whale Seasonal Management Areas (SMAs) between 2018 and 2023.**

| Annual Seasonal Management Areas (Block Island Sound, Ports of New York/New Jersey, Entrance to Delaware Bay, Entrance to Chesapeake Bay) | Vessels 65 feet or greater (mandatory) | | | | Vessel under 65 feet (voluntary) | | | |
|---|---|---|---|---|---|---|---|---|
| | Percent compliance by transit distance | Number of transits through SMAs | Total transit distance (nm) within SMAs | Distance (nm) transited at >10knots | Percent compliance by transit distance | Number of transits through SMAs | Total transit distance (nm) within SMAs | Distance (nm) transited at >10knots |
| November 2018–April 2019 | 82% | 26,873 | 108,121 | 19,808 | 51% | 6,446 | 65,917 | 32,273 |
| November 2019–April 2020 | 84% | 27,030 | 500,544 | 81,739 | 54% | 7,147 | 72,981 | 33,520 |
| November 2020–April 2021 | 83% | 28,028 | 490,453 | 82,445 | 52% | 6,643 | 76,658 | 37,041 |
| November 2021–April 2022 | 81% | 26,176 | 456,438 | 85,445 | 56% | 6,126 | 66,337 | 29,168 |
| November 2022–April 2023 | 85% | 29,707 | 498,781 | 74,119 | 54% | 8,029 | 84,902 | 39,191 |

46.     UMEs are also attributed to entanglements, which occur when fishing gear (ropes, buoys, nets) or other marine debris become wrapped around parts of the marine animal inhibiting

movement and critical activities, and often causing physical injury as the gear constricts from the weight of towing through the water by the animal.

47.    Specifically, for the Atlantic humpback whale UME, the increased numbers of whale mortalities correlate to climate-related shifts in spatial distribution and abundance of Atlantic humpback whales (Meynecke, J.O. 2021) in those waters due to shifts in foraging.  The recent study published by the Wildlife Conservation Society and Columbia University shows that several large whale species (humpback, fin, minke) are using the waters off NY and NJ—particularly in between Montauk Point, NY and Cape May, NJ—as a supplemental feeding area. (King et al., 2021).  That study describes this phenomenon as an "unprecedented climate-driven shift" in whale distribution caused by changing prey availability and/or oceanographic conditions.

48.    Likewise, NOAA has documented similar shifts in North Atlantic right whale distribution[10]; however, unlike Atlantic humpback whales, the North Atlantic right whale population is more susceptible to the long-standing threats of entanglements and vessels strikes both in the U.S. and Canada given its declining status.

49.    Full or partial necropsy examinations were conducted on more than 60% of the stranded minke whales and preliminary findings have shown evidence of human interactions (fishing and vessel) or infectious diseases; however, the data are still being analyzed and no final conclusions are available to date.

50.    No UMEs declared have been attributed to offshore wind surveying or construction associated with offshore wind, nor has surveying or construction been implicated as a contributing cause of any of the UMEs. No UMEs established since 2017 have been declared for other large

---

[10] NOAA, North Atlantic Right Whale, https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last accessed May 21, 2024).

whales including the ESA-listed fin, sei and sperm whales.  Fin whales are the second most commonly reported whale in survey mitigation reports which compile 100% of all marine mammal sightings made at any distance from the survey vessels; but no UME has been declared for this species, further evidence of a lack of influence that offshore wind surveys have on UME declarations and whale strandings.

51.    UMEs for large whales are not a new or unique occurrence.  The first reported UME for North Atlantic right whales was designated in 1996 due to human interactions (i.e., vessel strikes) in Georgia and Florida.  In 2003, a UME was declared for humpback, minke, and fin whales in the Gulf of Maine from Canada to Massachusetts; in 2005, an Atlantic Large Whale UME was declared for minke, fin, sei, and sperm whales for Canada through Maryland; and during 2005-2006 a UME was declared for humpback whales between Maine and Virginia.  The Gulf of Maine humpback whale stock (which is the relevant stock here) is estimated to be *increasing* in abundance by about 2.8% per year (Hayes et al., 2023), and the North Atlantic right whale stock has shown an estimated *decrease* in abundance of 29.3% from 2011 through 2021 (NMFS, 2024) No trend analysis is available in the most recent stock assessment report for either the minke whale or fin whale stocks present in this region (NMFS, 2024)[11], and only the fin whale is listed as Endangered under the ESA.  However, the most recent stock assessment reports do have estimates of annual human-caused mortality and serious injury for all these species which show that the main anthropogenic causes of mortality and serious injury are incidental entanglements in fisheries equipment and vessel strikes, but the estimated rate of mortality or injury attributed to entanglements outnumbers the rate attributed to vessel strikes for all species (Hayes et al., 2023;

---

[11] 2023 Marine Mammal Stock Assessment Report Public Comment Draft (noaa.gov) (last accessed May 21, 2024).

NMFS, 2024).

52.    The overwhelming consensus among agency scientific experts confirms that no marine mammal mortalities have occurred as the result of offshore wind activities:

a.    NOAA has stated that "[t]here are no known links between large whale mortalities and ongoing offshore wind surveys."[12]

b.    The Marine Mammal Commission, an independent federal agency tasked with marine mammal conservation, has stated that "[d]espite several reports in the media, there is no evidence to link these strandings to offshore wind energy development."[13]

c.    The U.S. Department of Energy has stated, "[a]s of now, there is no evidence to support speculation that noise resulting from wind development-related site characterization surveys could potentially cause mortality of whales, and no specific links between recent large whale mortalities and currently ongoing surveys."[14]

53.    These conclusions are consistent with those of the wider scientific community

---

[12] NOAA Fisheries, Frequent Questions—Offshore Wind and Whales, https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales (last accessed May 21, 2024).

[13] Marine Mammal Commission, "Update on Strandings of Large Whales along the East Coast" (Feb. 21, 2023), https://www.mmc.gov/wp-content/uploads/Update-on-Strandings-of-Large-Whales-along-the-East-Coast-2.21.2023.pdf (last accessed May 21, 2024).

[14] U.S. Department of Energy (Apr. 28, 2023), https://www.energy.gov/articles/addressing-misinformation-offshore-wind-farms-and-recent-whale-mortalities (last accessed May 21, 2024).

including Rutgers Offshore Wind Energy Collaborative,[15] Yale University,[16] and University of Rhode Island School of Oceanography[17] and environmental non-governmental organizations including the Sierra Club[18] and Natural Resources Defense Council.[19]

54.    To better understand the risk of vessel strikes, the movements of a tagged North Atlantic right whale were displayed alongside the movements of vessels that operate AIS – a near-real time position reporting system required for large vessels under the International Convention for the Safety of Life at Sea.    This visualization can be viewed at https://www.fisheries.noaa.gov/s3/2023-05/Update-NARW-2021-NJ-NY-Visualization.gif (last accessed May 21, 2024).

---

[15] Rutgers Offshore Wind Energy Collaborative, "Q&A on Recent Whale Strandings and Offshore Wind Energy Development", https://osw.rutgers.edu/home/recent-whale-strandings/ (last accessed May 21, 2024) ("there are no data or evidence linking whale mortalities to any one specific factor, including offshore wind development").

[16] Yale Environment 360, The East Coast Whale Die-Offs: Unraveling the Causes (Mar. 8, 2023), https://e360.yale.edu/features/humpback-whale-strandings-u.s.-east-coast (last accessed May 21, 2024).

[17] University of Rhode Island, School of Oceanography, "Offshore wind turbines not cause of whale strandings, deaths, says URI ocean engineering professor" (Mar. 24, 2023), https://web.uri.edu/gso/news/offshore-wind-turbines-not-cause-of-whale-strandings-deaths-says-uri-ocean-engineering-professor/#:~:text=News%20%26%20Events-,Offshore%20wind%20turbines%20not%20cause%20of%20whale%20strandings%2C%20deaths,says%20URI%20ocean%20engineering%20professor&text=URI%20expert%20James%20Miller%20says,to%20no%20impact%20on%20whales (last accessed May 21, 2024).

[18] Sierra Club, "Unfounded and Premature: Correlating Wind Turbine Construction with Whale Mortalities" (Jan. 13, 2023), https://www.sierraclub.org/new-jersey/blog/2023/01/unfounded-and-premature-correlating-wind-turbine-construction-whale (last accessed May 21, 2024).

[19] Natural Resources Defense Council, "Whale Strandings Emphasize a Need for Practical Solutions," https://www.nrdc.org/bio/francine-kershaw/whale-strandings-emphasize-need-practical-solutions (last accessed May 21, 2024) ("the sounds produced by offshore wind's pre-construction surveys are much lower in energy than more powerful industrial sources, and tend to be highly directional, making it very unlikely that they drove the whales off New York and New Jersey to strand").

**B.**    **Plaintiffs' Attempt To Use Simplistic Addition Of Authorized Take Numbers As An Assessment Of Population Impacts Misconstrues The Purpose And Methodology Used In NMFS Analysis And Authorizations**

55.    Plaintiffs allege population impacts to whale species, based on addition of all of the authorized take for multiple offshore wind projects in a way that ignores the intent and methodology of take assessment under the MMPA.  Plaintiffs present a relatively simplistic and scientifically unsupported approach of mathematically adding authorized take without a full understanding of how take is assessed before during and after the authorized project.  The approach also lacks the detail regarding how the take analysis of an authorized project is related to the small numbers determination required under the MMPA.  My previous declaration filed in this case (Dkt. # 29-2) contains a detailed description of NMFS's take analysis under both the MMPA and ESA, and mitigation and monitoring requirements for Revolution Wind at paragraphs 61-80.

56.    Plaintiffs' approach results in a misrepresentation of both individual level and population-level impacts.  Although Plaintiffs assume all authorized takes will be realized; this is not correct.  Only a small portion of authorized takes under a particular authorization are typically realized from the intersection of a marine mammal with the estimated ensonified area, in part because mitigation, while considered in the assessment to minimize or avoid take, is not considered as part of the direct take number estimate.  The complexities of predicting specific animal densities in the dynamic time and place of any operation further requires a protective approach to take estimation and must consider typical and unusual events.  Therefore, only a portion of those exposures allowed in the take authorization are likely to manifest in permanent threshold shift (for hearing) or behavioral disturbance.  It is important to clarify that the authorized take numbers only estimate the number of animals *potentially exposed to sound levels above a specific threshold*; take numbers do not estimate the actual numbers of animals that will experience permanent threshold shift or behavioral disturbance, which are highly contextual and impossible to quantify.

57.     Marine mammal take calculations in support of the ITAs are designed to provide an estimate of potential exposures to noise levels that meet a minimum, regulatory threshold for acoustic harassment so that project activities remain compliant with the MMPA.  NMFS calculated the maximum number of marine mammals that could potentially be harassed by the underwater sound associated with Revolution Wind construction based on the best scientific data and evidence available.  This estimate of potential take is not a calculation of the number of marine mammals that will actually be exposed to noise levels above harassment thresholds.  There is a basic difference between estimating the potential take requested in the ITA and the actual take realized from the project activities.  Just as you pack extra clothes in your suitcase that you may never need, but bring along in case of unpredicted weather or travel delays, the ITA's "pack" enough takes to ensure compliance with the MMPA.  Therefore, in my experience, as a general matter NMFS typically authorizes higher numbers of takes than are realized upon completion of the project.

58.     Similarly, Linowes' recitation in paragraph 10 of her declaration is incorrect because the takes that are authorized in the ITAs are not a pre-determined number of actual takes of these species.  Moreover, Linowes convolves the take numbers authorized for Revolution Wind by first listing 5 ESA-listed whale species, then providing the authorized take numbers of all marine mammals (all large whales, dolphins, seals, porpoises).  For the 5 ESA-listed whale species, NMFS has authorized Revolution Wind 152 Level B (behavioral disturbance) takes over the entire 5 years, and nine Level A (PTS) takes over the 5 years.  No Level A takes were authorized for the North Atlantic right whale, Sperm Whale or Blue Whale.

59.     Field data from the recently constructed South Fork Wind Project, which utilized the same foundation installation vessel that Revolution Wind will use and successful mitigation

techniques that will also be employed by Revolution Wind during pile driving, showed that the **South Fork Wind project did not reach or exceed the permissible take limits for any species**. Specifically, professional Protected Species Observers ("PSOs") stationed on support vessels and the pile driving vessel during construction of SFW reported 348 mysticete whale detections (comprising 552 individual animals) using visual and acoustic monitoring methods. Of these total detections, only 29 detections (51 individuals) were made during active pile driving; and of these detections, only 12 (15 individuals) were within the Level B acoustic ranges modeled and field-verified by the SFV and thus would qualify as Level B take under the MMPA. There were no marine mammals within the Level A ranges during any of the pile driving. By contrast, a total of 77 mysticete whales were authorized under the MMPA for Level B take during foundation pile driving activities; actual takes represent less than 20% of authorized takes.

60. These findings from South Fork Wind construction are consistent with results of ITA-required compliance monitoring and take assessment from other offshore wind activities. Data from HRG surveys conducted during the pre-construction site assessment phase from publicly available data for offshore wind site investigation surveys since 2017 and data from construction activities, show that substantially fewer marine mammals are potentially exposed to sound levels above regulatory thresholds during actual activities than predicted through the protective estimation used in the permitting process. For example, from the published HRG survey reports from multiple offshore wind development projects within the U.S. Atlantic Ocean, professional PSOs recorded 2,696 large whale detections, of these only 68 (2.5%) were detections that met Level B exposure criteria (animal distance and source operations) and were well below

the authorized take numbers.[20]

61.    Plaintiffs do not consider the level of monitoring and mitigation specifically for protection of marine mammals involved in construction activities for South Fork Wind and Revolution Wind.  The team of monitoring personnel and equipment for South Fork Wind consisted of everything described in Table 2.  This mitigation contingent is in addition to sound mitigation technologies that include double big bubble curtains and an AdBm resonator described later in this declaration.  The Revolution Wind mitigation measures and monitoring team requirements, personnel, and equipment meet or exceed those that were used for South Fork.  The scope of personnel and equipment deployed for each project is developed based on the acoustic and exposure modeling to ensure sufficient coverage and protection for marine mammal species.

---

[20] Monitoring Reports, https://www.fisheries.noaa.gov/national/marine-mammal-protection/incidental-take-authorizations-other-energy-activities-renewable (last accessed May 21, 2024).

**Table 2. Summary of the monitoring and mitigation personnel and equipment on each vessel during SFW construction (from SFW PSO/PAM monitoring report; February 9, 2024)**

| Vessel Name | | Bokalift 2 | Rana Miller | Go Freedom | Berto Miller | Josephine Miller |
|---|---|---|---|---|---|---|
| Vessel Role | | Piling | PSO | PSO | PSO + PAM deployment | PSO + SFV deployment |
| Personnel | | | | | | |
| Visual PSOs | | 4 | 4 | 4 | 4 | 4 |
| PAM Operators | | 2 | 0 | 0 | 0 | 0 |
| Acoustic Reporting Scientist | | 0 | 0 | 0 | 0 | 1 |
| Number PSOs on active watch | | 2 | 2 | 2 | 2 | 2 |
| Number of PAM Operators on duty | | 1 | 0 | 0 | 0 | 0 |
| Deployment / Acoustic support personnel on duty | | 0 | 0 | 0 | 2 | 2 |
| Equipment | Model | | | | | |
| Vessel-mounted Thermal Cameras | Current Corp Cooled – NN 3050 Uncooled - NN 3025 | 2 (1 cooled, 1 uncooled) | 1 uncooled | 1 uncooled | 1 uncooled | 1 uncooled |
| 25 x Binoculars | Fujinon 25 x 150 MT-SX | 2 | 2 | 2 | 2 | 2 |
| PAM Buoys | RSA-ORCA 750-a1 | 0 | 0 | 0 | 4 | 0 |
| Binoculars (reticle) | Varied | 2 | 2 | 2 | 2 | 2 |
| Marine Binoculars | Varied | 2 | 2 | 2 | 2 | 2 |
| Digital cameras | Varied | 2 | 2 | 2 | 2 | 2 |
| PAM Hydrophone Moorings | TR-FLOAT | 0 | 0 | 0 | 4 | 0 |
| Mysticetus System | Mysticetus Advanced | 1 | 1 | 1 | 1 | 1 |

**C.    Linowes' Stated 2024 Investigation of Large Whale Mortality Does Not Use Scientifically Accepted Methods Of Analysis Or Results Reporting And Therefore Presents Cause And Effects Relationships That Are Not Able To Be Validated Or Reproduced**

62.    Linowes' report cited in footnote 1 of her Declaration is not peer reviewed or published in any science-based context such as a scientific journal, an expert scientific committee

report, a scientific conference presentation, or an agency report. Therefore, analysis and review of Linowes' document is challenging because no accepted scientific tenets are followed to form the conclusions. Nevertheless, I address a number of items presented in the Linowes' document within the context of their relation to the Revolution Wind Project to describe why her conclusions are not accurate:

    a.   Linowes does not assess any other impact producing factors (IPFs) such as fishing gear entanglement and non-offshore wind vessel strike in developing her purported causal conclusion relating offshore wind survey activity and an increase in whale mortality. These IPFs not considered in the Linowes documents are the IPFs specifically recognized by the wider scientific community to be the primary causes of large whale mortality along the East coast, as I described in paragraphs 41 to 49 above.

    b.   Linowes relies only on vessel transit density (data which are of unknown vessel content and temporal scales), but ignores the considerations of vessel speed, vessel type, and mitigation measures which also influence not only the risk of strike but largely, the severity of potential strikes (i.e., strikes that would likely result in mortality).

    c.   Linowes' vessel data does not isolate offshore wind specific vessel activity, it includes all commercial vessels, fishing vessels, and any personal recreation vessels equipped with an automatic identification system (AIS). She also conducts no analysis on vessel speeds nor any comparisons in commercial vessels that operate without any mitigation measures with offshore wind vessels that operate with substantial speed restrictions, situational awareness requirements, dedicated ship board protected species observers, and marine mammal detection reporting requirements. Faster vessel speeds, particularly speeds greater than 10 knots, increase the occurrence and lethality of vessel

strikes in large whales (Laist et al., 2001, Vanderlaan et al., 2007).

d.  Linowes does not account for the fact that stranding locations are often correlated with currents and do not directly represent the specific location where a whale may have been struck or entangled; therefore, while regional assumptions can be made for stranding locations, the specific location of a stranding cannot be correlated with activities at that stranding location unless there is evidence of that correlation. Carcasses in a state of moderate to advanced decomposition, like those on Block Island and Martha's Vineyard described in Linowes' document, have likely been adrift in currents for a period of days to weeks such that the location of the actual death of the animal is largely undeterminable.

e.  Linowes mixes stranding data from non-UME time periods with UME time periods to conclude causation.  Establishment of a UME specifically indicates an increase in mortality, therefore, presenting data before and after a UME supports only the fact that there are higher mortalities, not why those mortalities occurred.  The official UME data results from examination of the stranded animals do not implicate any offshore wind activities with whale deaths, as described in paragraphs 46-54 above.

**D.    Revolution Wind Authorizations Are Consistent With The North Atlantic Right Whale And Offshore Wind Strategy**

63.    The North Atlantic Right Whale and Offshore Wind Strategy ("Strategy") lays out a long-term, data-driven, adaptable vision, formulated collaboratively by agencies and the wider scientific, fisheries, wind, and non-governmental organization communities, to facilitate continued development of renewable energy projects that combat one of the major threats to the North Atlantic right whale, climate change, in a manner that does not put the species population at risk due to that development.  The Strategy states "OSW development must be carried out in a way

that avoids or minimizes the potential for introducing adverse effects to the species and the ecosystems on which it depends by integrating science-based avoidance and minimization approaches throughout the OSW siting, leasing, construction, operations, and decommissioning process to protect and conserve the species and its habitat." The permitting, construction and monitoring programs associated with Revolution Wind meet the Strategy's three goals in the following ways:

a. **Goal 1: Mitigation and Decision Support Tools.**

- Revolution Wind has submitted mitigation and monitoring plans, vessel operations plans, communication and decision plans, passive acoustic monitoring plans, and sound field verification plans in support of offshore construction activities. These plans have gone through a rigorous review and revision process by subject matter experts and at least four federal agencies (BOEM, BSEE, NMFS [OPR and GARFO], USACE) before approval of any activities.

- Revolution Wind committed to a minimum decibel noise reduction level for foundation pile driving which drives the noise attenuation mitigation technology for efficacy rather than employing a fixed-case mitigation measure and accepting whatever sound attenuation levels are achieved by that measure.

- Revolution Wind is employing state of the art acoustic monitoring systems that will be compared for efficacy upon project completion to provide future procedural and technological recommendations.

- Revolution Wind is employing emerging visual enhancement technologies for construction protected species visual monitoring.

b. **Goal 2: Research and Monitoring**

• In addition to the extensive project-specific visual and acoustic monitoring, Revolution Wind has deployed or supported deployment of long term regional acoustic monitoring systems that will provide data beyond the construction of the project and beyond the local boundaries of the project.

c. **Goal 3: Collaboration, Communication, Outreach**

• Revolution Wind is committed to collaborative science with the commercial and recreational fishing industries pre-, during, and post-construction. This science contributes to the understanding of the right whale ecosystem.

• Ørsted (a parent company of Revolution Wind) is an active participant in the Regional Wildlife Science Collaborative for Offshore Wind.

E.    **2022 Hayes Letter Led To The NAS Study, Which Does Not Recommend Cessation Of Offshore Wind Activities Or Construction**

64.    The interagency correspondence from NOAA Chief of Endangered Species, Sean Hayes, to the BOEM lead biologist, Brian Hooker (termed the Hayes memo) that Plaintiffs reference was a transfer of scientific information and a call for additional assessment of a novel right whale feeding area off Nantucket Shoals. Subsequent to the Hayes memo, BOEM funded a study by the National Academies of Sciences[21] ("Academies") regarding the copepod resources around Nantucket Shoals and the potential effects of offshore wind build-out to the south and west of the Shoals.

65.    The preface to the Academies report acknowledges that "Offshore wind energy is

---

[21] National Academies of Sciences, Engineering, and Medicine. 2024. *Potential Hydrodynamic Impacts of Offshore Wind Energy on Nantucket Shoals Regional Ecology: An Evaluation from Wind to Whales.* Washington, DC: The National Academies Press, https://doi.org/10.17226/27154 (last accessed May 21, 2024).

integral to the future of renewable energy sources." The Academies report does not recommend stopping offshore wind development; rather, it emphasizes the need for further data collection and studies for a regional understanding of the wider hydrographic conditions pre- and post-construction.

## V.    CONCLUSION

66.    Experts and professionals in the field of underwater acoustics and marine mammal biology and behavior overwhelmingly support the fact that offshore wind activities are not, as Plaintiffs claim, the cause nor a contributing factor either directly or indirectly for whale strandings from the last 5 years.

67.    The expert Working Group charged with investigating possible UME situations and recommending appropriate responses determined the primary cause of these UMEs is direct impacts from entanglement, vessel strikes, and in some cases with contributing morbidity from diseases and toxins. There are increasing volumes of high-speed large vessel traffic combined with shifting distribution in large whales; therefore, there is more than just a geographic overlap that has been documented as causal over last decade (Redfern et al., 2020; Laist et al 2001; Winkler et al., 2020).

68.    Mitigation measures and sound field measurements conducted during South Fork Wind construction showed high efficacy of the noise mitigation system by producing Level A and Level B acoustic ranges that were generally smaller (in many cases by 50%) than the ranges produced by predictive modeling. Therefore, the risk of acoustic exposure is lower than predicted.

69.    Marine species monitoring by PSOs on South Fork construction was successful with both large and small marine mammals documented. The PSOs were therefore able to successfully identify marine mammals near or in the clearance and shutdown zones and were thus

able to implement successful mitigation measures further reducing the risk of acoustic exposures.

70.     Given that the mitigation measures, equipment, personnel, and requirements set forth in the ITA for Revolution Wind meet or exceed those that were used for South Fork Wind construction, it can be reasonably assumed that these measures will be successful when implemented at Revolution Wind given the similarity of location, species, and operations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 21, 2024.

_____
Mary Jo Barkaszi

## Scientific Literature and Reports Cited

Barkaszi, M.J. and Kelly, C.J., (2024). Analysis of protected species observer data: Strengths, weaknesses, and application in the assessment of marine mammal responses to seismic surveys in the northern Gulf of Mexico 2002–2015. *Plos one*, *19*(3), p.e0300658.

Davies, K. T. A., Brown, M. W., Hamilton, P. K., Knowlton, A. R., Taggart, C. T., & Vanderlaan, A. S. M. (2019). Variation in North Atlantic right whale *Eubalaena glacialis* occurrence in the Bay of Fundy, Canada, over three decades. *Endangered Species Research*, https://doi.org/10.3354/esr00951 (last accessed May 21, 2024).

Hayes, S. A., Josephson, E., Maze-Foley, K., Rosel, P. E., & Turek, J. McCordic & Wallace (eds) (2023). US Atlantic and Gulf of Mexico Marine Mammal Stock Assessments 20202022. (NOAA Technical Memorandum NMFS-NE-271304).

Kelley, D.E., Vlasic, J.P. and Brillant, S.W., 2021. Assessing the lethality of ship strikes on whales using simple biophysical models. *Marine Mammal Science*, *37*(1), pp.251-267.

King, K., Joblon, M., McNally, K., Clayton, L., Pettis, H., Corkeron, P., & Nutter, F. (2021). Assessing North Atlantic Right Whale (*Eubalaena glacialis*) Welfare. *Journal of Zoological and Botanical Gardens*, *2*(4), 728-739, https://doi.org/10.3390/jzbg2040052 (last accessed May 21, 2024).

Knowlton, A. R., Clark, J. S., Hamilton, P. K., Kraus, S. D., Pettis, H. M., Rolland, R. M., & Schick, R. S. (2022). Fishing gear entanglement threatens recovery of critically endangered North Atlantic right whales. *Conservation Science and Practice*, *4*(8), e12736.

Laist, D.W., Knowlton, A.R., Mead, J.G., Collet, A.S. and Podesta, M., 2001. Collisions between ships and whales. Marine Mammal Science, 17(1), pp.35-75.

Leiter, S., Stone, K., Thompson, J., Accardo, C., Wikgren, B., Zani, M., Cole, T., Kenney, R., Mayo, C., & Kraus, S. (2017). North Atlantic right whale Eubalaena glacialis occurrence in offshore wind energy areas near Massachusetts and Rhode Island, USA. *Endangered Species Research*, *34*, 45-59, https://doi.org/10.3354/esr00827 (last accessed May 21, 2024).

Marine Mammal Commission (Feb. 21, 2023) Update on Strandings of Large Whales along the East Coast, https://www.mmc.gov/wp-content/uploads/Update-on-Strandings-of-Large-Whales-along-the-East-Coast-2.21.2023.pdf (last accessed May 21, 2024).

Meyer-Gutbrod, Erin L., Kimberley TA Davies, Catherine L. Johnson, Stephane Plourde, Kevin A. Sorochan, Robert D. Kenney, Christian Ramp, Jean-Francois Gosselin, Jack W. Lawson, and Charles H. Greene. "Redefining North Atlantic right whale habitat-use patterns under climate change." *Limnology and Oceanography* (2022).

Meynecke, J.O., De Bie, J., Barraqueta, J.L.M., Seyboth, E., Dey, S.P., Lee, S.B., Samanta, S., Vichi, M., Findlay, K., Roychoudhury, A. and Mackey, B., 2021. The role of

environmental drivers in humpback whale distribution, movement and behavior: A review. Frontiers in Marine Science, 8.

Moore, M.J. (2023) Policy enabling North Atlantic right whale reproductive health could save the species. ICES Journal of Marine Science, 80(2), pp.237-242.

National Academies of Sciences, Engineering, and Medicine. 2024. Potential Hydrodynamic Impacts of Offshore Wind Energy on Nantucket Shoals Regional Ecology: An Evaluation from Wind to Whales. Washington, DC: The National Academies Press. https://doi.org/10.17226/27154 (last accessed May 21, 2024).

National Marine Fisheries Service. (NMFS) (2016-2024) Humpback Whale Unusual Mortality Event Along the Atlantic Coast, U.S. Dept. of Commer., NOAA, https://www.fisheries.noaa.gov/national/marine-life-distress/2016-2024-humpback-whale-unusual-mortality-event-along-atlantic-coast (last accessed May 21, 2024).

National Marine Fisheries Service. (NMFS) (2017-2024) North Atlantic Right Whale Unusual Mortality Event, U.S. Dept. of Commer., NOAA, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event (last accessed May 21, 2024).

National Marine Fisheries Service. (NMFS) (2022) North Atlantic Right Whale Draft Stock Assessment Reports, U.S. Dept. of Commer., NOAA, https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-stock-assessments (last accessed May 21, 2024).

National Marine Fisheries Service. (NMFS) Active and Closed Unusual Mortality Events, U.S. Dept. of Commer., NOAA, https://www.fisheries.noaa.gov/national/marine-life-distress/active-and-closed-unusual-mortality-events (last accessed May 21, 2024).

National Marine Fisheries Service. (NMFS) Frequent Questions—Offshore Wind and Whales, Dep't of Commer., NOAA, https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales (last accessed May 21, 2024).

National Marine Fisheries Service. (NMFS) Summary of Atlantic Marine Mammal Stock Assessment Reports for Stocks of Marine Mammal Under NMFS Authority that occupy Waters Under USA Jurisdiction, https://www.fisheries.noaa.gov/s3/2024-01/Draft-2023-MMSARs-Public-Comment.pdf (last accessed May 21, 2024).

Kershaw, F, Chase, A (Jan. 23, 2023) Whale Strandings Emphasize a Need for Practical Solutions, Natural Resources Defense Council, https://www.nrdc.org/bio/francine-kershaw/whale-strandings-emphasize-need-practical-solutions (last accessed May 21, 2024).

Quintana-Rizzo, E., Leiter, S., Cole, T., Hagbloom, M., Knowlton, A., Nagelkirk, P., Brien, O., Khan, C., Henry, A., & Duley, P. (2021). Residency, demographics, and movement

patterns of North Atlantic right whales Eubalaena glacialis in an offshore wind energy development area in southern New England, USA. *Endangered Species Research*, *45*, 251-268.

Redfern, J.V., Becker, E.A. and Moore, T.J., 2020. Effects of variability in ship traffic and whale distributions on the risk of ships striking whales. Frontiers in Marine Science, 6, p.793.

Rockwood, R.C., Adams, J.D., Hastings, S., Morten, J. and Jahncke, J., 2021. Modeling whale deaths from vessel strikes to reduce the risk of fatality to endangered whales. *Frontiers in Marine Science*, *8*, p.649890.

Rutgers Offshore Wind Energy Collaborative, Q&A on Recent Whale Strandings and Offshore Wind Energy Development, Rutgers Univ., https://osw.rutgers.edu/home/recent-whale-strandings/ (last accessed May 21, 2024).

Sierra Club (Jan. 13, 2023) Unfounded and Premature: Correlating Wind Turbine Construction with Whale Mortalities, https://www.sierraclub.org/new-jersey/blog/2023/01/unfounded-and-premature-correlating-wind-turbine-construction-whale (last accessed May 21, 2024).

University of Rhode Island, School of Oceanography (Mar. 24, 2023) Offshore wind turbines not cause of whale strandings, deaths, says URI ocean engineering professor, https://web.uri.edu/gso/news/offshore-wind-turbines-not-cause-of-whale-strandings-deaths-says-uri-ocean-engineering-professor/#:~:text=News%20%26%20Events-,Offshore%20wind%20turbines%20not%20cause%20of%20whale%20strandings%2C%20deaths,says%20URI%20ocean%20engineering%20professor&text=URI%20expert%20James%20Miller%20says,to%20no%20impact%20on%20whales (last accessed May 21, 2024).

U.S. Department of Energy (Apr. 28, 2023) Addressing Misinformation on Offshore Wind Farms and Recent Whale Mortalities, https://www.energy.gov/articles/addressing-misinformation-offshore-wind-farms-and-recent-whale-mortalities (last accessed May 21, 2024).

Yale Environment 360, The East Coast Whale Die-Offs: Unraveling the Causes (Mar. 8, 2023), https://e360.yale.edu/features/humpback-whale-strandings-u.s.-east-coast (last accessed May 21, 2024).

Vanderlaan, A.S. and Taggart, C.T., 2007. Vessel collisions with whales: the probability of lethal injury based on vessel speed. Marine mammal science, 23(1), pp.144-156.

Winkler, C., Panigada, S., Murphy, S. and Ritter, F., 2020. Global numbers of ship strikes: an assessment of collisions between vessels and cetaceans using available data in the IWC ship strike database. IWC B, 68.

## **Exhibit A**

Curriculum Vitae of Mary Jo Barkaszi



**MARY JO BARKASZI**

**Director, Offshore Wind and Renewable Ocean Energy**
**Marine Mammals Programs Manager**

**Education**

*Master of Science in Biological Oceanography, Florida Institute of Technology, 1990*

*Bachelor of Science in Biology, Wittenberg University, 1986*

Ms. Barkaszi's 30-year career has been integral with the evaluation and mitigation of impacts on marine mammals, sea turtles, and other vulnerable species with implementation of the Marine Mammal Protection Act, Endangered Species Act, and other regulatory guidelines throughout the world. Presently, as a senior scientist with CSA Ocean Sciences, she is the Director of Offshore Wind and Renewable Ocean Energy where she provides clients with science-based solutions for marine species assessment to achieve successful project implementation. Under her guidance, CSA stays at the forefront of marine species issues as they relate to the ever increasing and evolving ocean energy initiatives.

In the past several years, she was the lead for over a dozen Incidental Take Authorizations (ITA) applications for offshore wind development, LNG facilities, seismic surveys, and nearshore construction projects. She is subject matter expert (SME) and contributing author for several Construction and Operation Plans, mitigation plans, and marine species research programs involving the use of novel technology to assist in marine mammal detection and protection.

Ms. Barkaszi has been a member of multiple National Oceanic and Atmospheric Administration (NOAA) science teams for aerial, shipboard, and acoustic marine mammal surveys for which she implemented transect-based population surveys for scientific data collection and species stock assessments. As a member of the Acoustical Society of America (ASA) *American National Standards Institute* (ANSI) Passive Acoustic Monitoring (PAM) Standards Working Group, she has been instrumental in developing the technical standards for PAM implementation for mitigation and monitoring.

Ms. Barkaszi's experience in acoustics includes: the study design, deployment and analysis of long term acoustic recorder data deployed for environmental baseline surveys and mitigation zone verification for project around the world; modeling studies for pile driving in coastal waters and LNG deep water port facilities; project manager for a marine soundscape biodiversity studies for the National Park Service; and acoustic tracking sperm whales as part of the Deepwater Horizon oil spill assessment.

Ms. Barkaszi completed a BOEM contract to assess mitigation compliance and effectiveness of vessel-based observer data in the Gulf of Mexico collected during deepwater geophysical surveys conducted between 2002 and 2015. This is the largest and most comprehensive assessment of seismic mitigation data in the United States.

In addition to U.S.-focused work Ms. Barkaszi has been an invited speaker to international regulatory agencies including Brazil (Brazilian Institute of Environment and Renewable Natural Resources [IBAMA]), South Africa (Department of Environmental Affairs [DEA]), and Suriname (National Institute for Environment & Development [NIMOS]), to provide instruction on acoustic impact assessment and mitigation specific to each region.



**MARY JO BARKASZI**

## KEY PROJECT EXPERIENCE

**2012 to Present: CSA Ocean Sciences Inc.**

- Technical lead for vessel strike risk model development for large whales and sea turtles in the Atlantic OCS

- Technical lead for thermal camera technology applications for vessel strike avoidance on global vessel fleets

- Technical lead for BOEM-contracted passive acoustic monitoring algorithm development to determine localization effectiveness of towed acoustic systems for low frequency whales

- Technical lead for Joint Industry Programme-funded acoustic analysis development for determining the effective range of species call detections from hydrophones within a PAMguard software module

- Lead the completion of white papers assessing the acoustic impacts from parametric subbottom profilers and UXO removals associated with offshore wind farm activities

- Subject matter expert for marine mammals, sea turtles, and ESA-listed fish species for BOEM/NMFS/USFWS NEPA consultation documents.

- Technical Lead for incidental take applications for offshore wind development and assist with authoring the marine mammal sections of the client's Construction and Operation Plan (COP) for BOEM.

- Project manager and technical lead for acoustic modeling and impact analysis for the construction and operation of the Delfin LNG and LNG-21 offshore port facilities, Gulf of Mexico.

- Project manager and technical lead for data analysis for 12 years of visual and acoustic mitigation monitoring for protected species during seismic surveys in the Gulf of Mexico under a BOEM-funded contract.

- Project manager and technical lead for NOAA IHA application for decommissioning of the Neptune LNG deepwater port, Massachusetts Bay.

- Project Manager for marine soundscape biodiversity study for the National Park Service, Dry Tortugas National Park, for long-term assessment marine habitat quality using autonomous acoustic recorders.

- Project Manager for an observer data quality assurance program, agency comment procurement, and administrative record delivery during the 2015 Shell Alaska Venture in the Chukchi Sea.

- Project Manager for the BOEM Pressure Wave and Acoustic Study which collected and analyzed underwater measurements of pressure produced by explosive decommissioning of oil platforms.

- Member of American Acoustical Society standards task force researching passive acoustic monitoring systems used for mitigation and monitoring.

- Project Manager for acoustic tracking of sperm whales in the Northern Gulf of Mexico. This program was completed under contract to Oregon State University.

- Primary Author for a publication of mitigation standards assessment for Africa, Europe, and the Middle East under contract to the International Association of Geophysical Contractors (IAGC).

**2010 to 2012: ECOES Consulting, Inc. – Protected Species Specialist**

- Technical lead for program to acoustically track short-finned and long-finned pilot whales in the U.S. Mid-Atlantic outer continental shelf

- Aerial Marine Mammal Observer for NOAA Atlantic Marine Assessment Program for Protected Species (AMAPPS) program in the Northeast region.

- Marine species consultant for shuttle launch pad multi-user environmental assessment. Innovative Health Applications, Kennedy Space Center, Florida.

- Co-Investigator/marine mammal and turtle specialist for Normandeau Associates/BOEM pilot study of aerial high-definition surveys for seabirds, marine mammals, and sea turtles on the Atlantic outer continental shelf.

- Marine Mammal Protection Act / Endangered Species Act compliance and mitigation monitoring for Neptune LNG deepwater port construction and maintenance, Massachusetts Bay.

- Subject matter expert (subcontractor) for BOEM-funded study comparing digital aerial surveys, vessel surveys, and manned aerial surveys for conduction marine mammal and sea turtle assessment in wind energy areas.

**2008 to 2010: RPS Energy – Vice President of Protected Species Compliance and Global MMO Coordinator**

- Developed web-based conservation and compliance modules for an interactive database to formulate best practices methodologies for oil and gas exploration in developing countries and under-represented oceans.

- Responsible for visual and acoustic protected species observer programs throughout the U.S. and global regions covered by RPS Energy. Coordinated closely with other RPS observer offices to develop global pool (200+) of trained protected species observers.

**2002 to 2008: GEOCet, LLC – Founder, Co-Owner and Protected Species Manager**

- Grew the offshore oil and gas division of ECOES and established a separate corporation, GeoCet LLC, designed strictly to meet the needs of oil and gas exploration federal compliance requirements.

- Responsible for protected species observer programs in federal U.S. waters working on seismic vessels, pile driving, wind farm construction, explosive removals and MMS lease surveys throughout U.S. and its territories. Responsible for approximately 100 personnel.

- Conducted offshore migratory bird censuses for oil and gas structures and developed PAM techniques for marine mammals throughout the Gulf of Mexico.

- Developed PAM techniques for Gulf of Mexico marine mammals.

**2001 to 2008: ECOES Consulting, Inc. – Founder, Owner, Ecologist**

- Project Manager, Protected Species Program. Northeast Gateway LNG deepwater port construction and early-alert auto acoustic buoy test program



**MARY JO BARKASZI**

- Marine mammal/turtle specialist for biological characterization of borrow sites offshore East Florida and West Florida Coasts for the Mineral Management Service.

- Project Manager, Protected Species Program. Various explosive severance projects in deep water Gulf of Mexico. Included aerial, platform and acoustic monitoring

- Project Manager, Protected Species Program. U.S. Army Corps of Engineers Miami Harbor Deepening (Phase II) Project.

- Project Manager, Protected Species Program, Massachusetts Hubline Construction Project.

- Founded ecology-based consulting firm focusing on listed and imperiled species assessment and protection. Grew company as a woman-owned small business working closely with agencies and clients to reconcile practical needs with rigorous environmental protection. Specific projects include:

  - Development, implementation and coordination of aerial and boat observers for the protected marine species watch plan for the film industry using regulated waters in the Miami area.

  - Development, implementation and coordination of all observer activities for protected marine species during sub aqueous blasting in Boston Harbor HubLine per specifications under the Northeast Region of the National Marine Fisheries Service (NMFS).

  - Project manager and primary (aerial) observer for listed species protection program and provided all observers for the protected marine species watch plan (marine mammals, turtles and anadromous fish) for 2-year U.S. Army Corps of Engineers (USACE) expansion project in the Cape Fear River Estuary, Wilmington, North Carolina.

  - Development, implementation, and coordination of all observer activities for protected marine species during bridge demolition using explosives: USACE Palm Valley Bridge Project, Florida Department of Transportation (DOT) Fuller-Warren Bridge, and Georgia DOT Sydney-Lanier Bridge Projects.

  - Migratory bird nesting surveys for USACE Jacksonville District construction and dredging operations.

  - Drafted and produced education plan and educational materials for USACE to be used during construction and dredging activities that could potentially impact gopher tortoises and Eastern indigo snakes. The education plan and materials have become part of the Corp's specifications on selected projects.

  - Project manager for St. Johns River Water Management District public education contract for a five-county, four-basin area project concerning watershed issues.

  - Lead ecologist for Florida Communities Trust faunal surveys for sites in Cocoa Beach, Cape Canaveral, and Thousand Islands.

  - Project manager and primary observer for listed species protection program. Provided all observers for the protected marine species watch plan (marine mammals, turtles and anadromous fish) in the Cape Fear River Estuary, Wilmington, North Carolina.

  - Project manager for Florida Fish and Wildlife Conservation Commission's Florida Advisory Council on Environmental Education Grant involving public education about non-point source pollution, seagrass, and the manatee in Brevard County, Florida.

- o Environmental services including Phase 1 assessment, protected species surveys, land management plans, cultural resource surveys, hydrological analysis and technical writing for the City of Cocoa, Mud Lake Restoration Project.
- o NMFS-approved protected species protection program coordinator and observer coordinator for blasting and dredging operations in San Juan Harbor, San Juan, Puerto Rico.
- o Department of Environmental Protection (DEP) Endangered Species watch coordinator and primary (aerial) protected species observer for Volusia County Mosquito Control District impoundment restoration.
- o DEP Endangered Species watch coordinator and primary (aerial) protected species observer for blasting activities at Atlantic Dry Dock, Jacksonville, Florida.
- o Ecologist for Port Canaveral Environmental Services.

**1990 to 1995: NASA Life Sciences Contract – Conservation Biologist**

- ■ Conservation biologist for the NASA life sciences support contract on John F. Kennedy Space Center (KSC). Responsibilities include collection, monitoring, and interpretation of wildlife data for utilization in environmental assessments, long term monitoring, and management activities. Operated GIS (ArcInfo) software to implement conservation planning and to monitor threatened and endangered species habitat. Produced educational programs for all class levels as well as for teachers. Conducted extensive field work and data analysis concerning State- and Federally-listed species.

**1987 to 1990: Florida Institute of Technology – Graduate Research Assistant**

- ■ Performed research and teaching duties in the Oceanography/Ocean Engineering/Environmental Sciences Department.

- ■ Master's Thesis: Comparisons in macrofaunal habitat use between the seagrass, *Halodule wrightii,* and the macroalga, *Caulerpa prolifera*.

- ■ Chief Scientist (1989) for research and teaching duties for baseline oceanographic data collection throughout continental shelf, Gulf Stream and Bahaman Bank ecosystems for ocean-going research cruises.

- ■ Coordinator for the marine mammal stranding network, east-central Florida region.

- ■ Provided extensive assistance to studies involving the use of oil ash blocks as artificial reefs and manatee scar pattern recognition studies at winter refugia.

**1986 to 1987: Mote Marine Laboratory – Biological Technician**

- ■ Field collection and data analysis for the following projects: zooplankton and ichthyoplankton entrainment studies for fine mesh screen instrumentation at the Tampa Electric Company; submerged aquatic vegetation mapping at Crystal River power plant and Myakka River estuary; marine mammal aerial surveys and stranding response; benthic fauna sorting and identification; and Snook/Redfish capture and captive breeding stock maintenance.



**MARY JO BARKASZI**

## PUBLICATIONS

Barkaszi, M. J., M. Fonseca, T. Foster, A. Malhotra, and K. Olsen. "Risk Assessment to Model Encounter Rates Between Large Whales and Vessel Traffic from Offshore Wind Energy on the Atlantic OCS." *Sterling (VA): US Department of the Interior, Bureau of Ocean Energy Management. OCS Study BOEM* 34 (2021): 54.

Thode A, Abadie S, Barkaszi MJ. 2021. Optimization of towed passive acoustic monitoring (PAM) array design and performance study (passive acoustic monitoring study). Sterling (VA): U.S. Department of the Interior, Bureau of Ocean Energy Management. 32 p. Report No.: OCS Study BOEM 2021-086.

Barkaszi, M.J. and C.J. Kelly. 2018. Seismic survey mitigation measures and protected species observer reports: synthesis report. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. Contract No.: M17PD00004. OCS Study BOEM 2019-012.220 pp.

Barkaszi, M.J., A. Frankle, J. Martin, and W. Poe. 2016. Pressure wave and acoustic properties generated by the explosive removal of offshore structures in the Gulf of Mexico. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2016-019. 69 pp.

Barkaszi, M.J., M. Butler, R. Compton, A. Unietis, and B. Bennet. 2012. Seismic survey mitigation measures and marine mammal observer reports. U.S. Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2012-015. 28 pp + apps.

Barkaszi, M.J. and D. Epperson. 2009. Six-year compilation of cetacean sighting data collected during commercial seismic survey mitigation observations throughout the Gulf of Mexico, USA. Poster presentation to Society for Marine Mammalogy annual conference. Quebec, Canada.

Barkaszi, M.J. and M. Smith. 2009. BHP Billiton Multi-Vessel Survey: A case study for the commercial application of Passive Acoustic Monitoring (PAM) for regulatory compliance in the Gulf of Mexico, USA. In: Workshop on the Status and Applications of Acoustic Mitigation and Monitoring Systems for Marine Mammals. (http://www.acousticmonitoring.org/materials/index.html).

Barkaszi, M.J. 2008. Northeast Gateway Construction Marine Mammal Sightings and Take Summary Report. In: Request for the Taking of Marine Mammals Incidental to the Operation of Northeast Gateway Deepwater Port and Algonquin Pipeline Lateral. Petition to NMFS for Incidental Harassment Authorization (IHA) pursuant to Section 101(a)(5) of the Marine Mammal Protection Act.

Zarillo, G., J. Reidenauer, K. Zarillo, T. Shinskey, E. Reyier, M. Barkaszi, J. Shenker, M. Verdugo, and N. Hodges. 2008. Biological characterization/numerical wave model analysis within borrow sites offshore West Florida Coast. MMS 2008-005 (BP).

Zarillo, G., J. Reidenauer, K. Zarillo, T. Shinskey, E. Reyier, M. Barkaszi, J. Shenker, M. Verdugo, and N. Hodges. 2008. Biological characterization/numerical wave model analysis within borrow sites offshore West Florida Coast: Volume II Appendices A-C. MMS 2008-005. (BP).

Barkaszi, M.J. 2004. Marine Mammal Mitigation. In: Hutchinson, D.R. and P.E Hart. 2004. Cruise Report for G1-03-GM USGS Gas Hydrates Cruise, R/V *Gyre*, 1-14 May 2003, Northern Gulf of Mexico. U.S. Geological Survey Open-File Report OF 03-474. 103 pp.

Barkaszi, M.J. 2004. A whale of a tale: results from the first year of mitigation with the marine mammal observer program during seismic acquisition in the Gulf of Mexico. SEG Expanded Abstracts 23, 61 (2004): doi: 10.1190/1.1842415.

Barkaszi, M.J., S. Tyson, and E. Bouthiller. 1999. Final Report for the Endangered Species Watch Program for Blasting Activities at Atlantic Dry Dock, Duval County, Jacksonville, Florida. FDEP Division of Protected Species, Tallahassee, FL.

Breininger, D.R., M.J. Barkaszi, R.B. Smith, D.M. Oddy, and J.A. Provancha. 1997. Prioritizing wildlife taxa for biological diversity conservation at the local scale. Environmental Management.

Breininger, D.R., V.L. Larson, R.B. Smith, D.M. Oddy, and M.J. Barkaszi. 1997. Florida scrub jay demography in periodically burned scrub on Merritt Island. Auk.

Smith, R.B., M.J. Barkaszi, D.R. Breininger, and T.M.Burke. 1994. Florida scrub jay study at Playalinda Beach access road crossing: final report. Submitted to Nation Park Service Headquarters, Boulder, CO.

Hinkle, C.R., B. Engle, M.J. Barkaszi, C.R. Hall, W.M. Knott III, and B.R. Summerfield. 1994. Mapping analysis and planning system for John F. Kennedy Space Center, FL. Technology 2004.

Breininger, D.R., M.J. Barkaszi, R.B. Smith, D.M. Oddy, and J.A. Provancha. 1994. Endangered and potentially endangered wildlife on John F. Kennedy Space Center and faunal integrity as a goal for maintaining biological diversity. NASA Technical Memorandum 109204.

Breininger, D.R., R.B. Smith, and M.J. Barkaszi. 1993. Florida scrub jay study at Playalinda Beach access road crossing: recommendations for habitat management. Submitted to National Park Service Headquarters, Boulder, Colorado.

**PUBLICATIONS (NASA Technical)**

Barkaszi, M.J., R.B. Smith, J.A. Provancha, C.R. Hall, D.M. Oddy, R. Schaub, V.L. Larson, and R.A Reddick. 1993. Biological assessment for the Banana River dredging spoil sites on John F. Kennedy Space Center.

Barkaszi, M.J. and R.A. Reddick. 1993. Biological assessment for the components refurbishment facility on John F. Kennedy Space Center.

Barkaszi, M.J. 1992. Biological assessment for the non-hazardous waste storage facility on John F. Kennedy Space Center.

Barkaszi, M.J. and R. Schaub. 1992. Biological assessment for the proposed landfill at Schwartz Rd. John F. Kennedy Space Center.

Kehl, M.J. and R.B. Smith. 1991. Biological assessment for a payload spin test facility on John F. Kennedy Space Center.

Breininger, D.R., M.J. Kehl, and D.M. Oddy. 1990. Florida scrub jay study at Titan launch complexes 40 and 41 on Cape Canaveral Air Force Station.



**MARY JO BARKASZI**

## PUBLICATIONS (Presentations)

Barkaszi, M.J., V.L. Larson, R.A. Reddick, and B.A. Engel. 1995. Beyond launching rockets: merging environmental management and conservation priorities on John F. Kennedy Space Center. Abstract and presentation to Society for Conservation Biology, Ft. Collins, CO.

Barkaszi, M.J., R.B. Smith, and D.R. Breininger. 1995. Home range characteristics of the eastern indigo snake (*Drymarchon corais couperi*) on John F. Kennedy Space Center, FL. Abstract and presentation to the Society for the Study of Amphibians and Reptiles. Boone, NC.

Barkaszi, M.J., V.L Larson, and R.A. Reddick. 1994. Mapping analysis and planning system: a conservation strategy regarding space. Abstract and presentation to the Natural Areas Association Conference, Palm Beach, FL.

Barkaszi, M.J. 1993. Wildlife Research on John F, Kennedy Space Center, FL. Abstract and presentation to the American Association for Laboratory Animal Science, Florida Branch. Melbourne, FL.

Breininger, D.R., M.J. Barkaszi, R.B. Smith, D.M. Oddy, J.A. Provancha, and V.L. Larson. 1992. Identification of species considerations for the maintenance of biological diversity along the Atlantic coast of Florida. Abstract and Presentation to the Ecological Society of America, Honolulu, Hawaii.

Breininger, D.R., P.A. Schmalzer, V.L. Larson, R.B. Smith, M.J. Barkaszi, and D.M. Oddy. 1992. The spatial distribution of habitat and species of conservation concern in scrub dominated landscapes on Kennedy Space Center and its surroundings. Abstract and paper presented at Archbold Biological Station Florida Scrub Workshop.

Kehl, M.J., R.B. Smith, and D.R. Breininger. 1991. Using Geographic Information Systems (GIS) as a research tool in the conservation of the eastern indigo snake, (*Drymarchon corais couperi*) on John F. Kennedy Space Center, Florida. Abstract and poster presentation for the Society for Conservation Biology, Madison, WI.

Kehl, M.J., R.B. Smith, and D.R. Breininger. 1991. Radiotelemetry studies of eastern indigo snakes (*Drymarchon corais couperi*). Abstract and presentation to the American Society of Ichthyology and Herpetology, New York, NY.

Breininger, D.R., R.B. Smith, and M.J. Kehl. 1991. Methods used for monitoring and environmental impact assessment involving the Florida scrub jay on John F. Kennedy Space Center. Abstract and presentation to the Society for Conservation Biology, Gainesville, FL.

Kehl, M.J. 1989. Comparisons in macrofaunal habitat use between the seagrass *Halodule wrightii* and the macroalga *Caulerpa prolifera* in the Banana River, Florida. Abstract and presentation to the Florida Academy of Sciences, St. Petersburg, FL.

Kehl, M.J. 1987. Patterns in bottlenose dolphin (*Tursiops truncatus*) abundance during aerial surveys of Tampa Bay and Sarasota Bay, Florida, 1984-1987. Abstract and presentation to the Florida Academy of Sciences, Tampa, FL.



**MARY JO BARKASZI**

## PROFESSIONAL CERTIFICATIONS

Trainer for MMS/BOEM/BSEE NTL 2007-G07 through NTL 2012-G02 observer candidates
FWC Level 4/aerial observer and trainer
NMFS unconditional permit for implementing protected species plans during underwater blasting, dredging, and construction
NMFS letter of authorization for marine mammal stranding response
USFWS Florida Scrub Jay banding permit (expired research permit)
FWC gopher tortoise relocation permit (expired research permit)
USFWS indigo snake handling permit (expired research permit)
Passive Acoustic Monitoring – course completion and co-trainer
Capture, tagging and DNA sampling for shortnose sturgeon
Handling and DNA sampling of marine turtles for preemptive trawling and relocation