# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

GREEN OCEANS, et al.,

    *Plaintiffs,*

  v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, et al.,

    *Federal Defendants.*

Civ. No. 1:24-cv-00141-RCL

# FEDERAL DEFENDANTS' OPPOSITION TO
# PLAINTIFFS' MOTION FOR AN ADMINISTRATIVE STAY
# OR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ...................................................................................................1

II.    STATUTORY BACKGROUND ...........................................................................2

    A.     The Endangered Species Act ....................................................................2

    B.     The Clean Water Act and the Rivers and Harbors Act...............................4

III.   FACTUAL BACKGROUND..................................................................................6

    A.     The Revolution Project ..............................................................................6

    B.     Federal Environmental Review and Approvals ..........................................7

        1.     BOEM's Environmental Review................................................7

        2.     Corps' CWA and RHA Permitting.............................................9

        3.     ESA Section 7 Consultation....................................................11

        4.     Approval of the Revolution Project Construction and Operations
            Plan ........................................................................................12

    C.     Construction of the Revolution Project....................................................13

IV.    STANDARD OF REVIEW...................................................................................13

V.     ARGUMENT........................................................................................................15

    A.     Plaintiffs have failed to establish a likelihood of success on the merits. ..............15

        1.     Plaintiffs are unlikely to succeed on the merits of their CWA claim.........15

            a.     Plaintiffs' CWA claim is barred under the FAST Act.......................15

            b.     The Corps complied with the CWA, which does not require analysis
               of impacts on Cox Ledge. .........................................................16

        2.     Plaintiffs are unlikely to succeed on the merits of their ESA claim..........18

            a.     NMFS's environmental baseline analysis in the Biological
               Opinion properly considers the impacts of other offshore wind
               projects. ...................................................................................18

            b.     Plaintiffs' argument regarding proposed wind projects allegedly
               omitted from NMFS's environmental baseline analysis is based on
               a misinterpretation of the ESA's regulations. .............................20

   c. NMFS properly considered the anticipated impacts of all proposed federally authorized projects in the action area that have undergone ESA Section 7 consultation. ....................................21

   d. NMFS's cumulative impacts analysis complies with the ESA and its implementing regulations. .....................................................23

   e. NMFS's Biological Opinion is in line with its North Atlantic Right Whale and Offshore Wind Strategy. ...........................................26

   f. The Biological Opinion properly analyzes the effects of the proposed action within the proposed action time period. ............29

   g. Plaintiffs fail to establish that pile driving activity is being conducted outside the scope of what was considered in the Biological Opinion....................................................................32

B. Plaintiffs have failed to establish irreparable harm................................................32

  1. Plaintiffs' failure to seek injunctive relief until months after construction began belies their claim of irreparable harm........................33

  2. Plaintiffs have not demonstrated any irreparable harm to themselves. ......35

  3. Plaintiffs' general and speculative allegations do not establish concrete affirmative evidence of harm. ....................................................37

  4. Plaintiffs' allegations of irreparable harm are belied by the evidence. .....39

   a. The record rebuts Plaintiffs' claim of ESA-related harm. .........39

   b. The record rebuts Plaintiffs' claim of CWA-related harm.........40

C. The balance of the equities and the public interest weigh against an injunction.........................................................................................................................40

  1. The public interest in developing renewable clean energy weighs against an injunction..................................................................................41

  2. Plaintiffs' mere assertion of an ESA claim does not mean that the public interest weighs in favor of an injunction.....................................42

  3. The public interest in the certainty and reliability of Federal Defendants' permitting and approvals process weighs against an injunction. .................................................................................................43

4.    The public interests that must be considered under the FAST Act weigh against an injunction. ....................................................................44

VI.    CONCLUSION ..........................................................................................................45

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| COP | Construction and Operations Plan |
| ESA | Endangered Species Act |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| ROD | Record of Decision |
| UXO | Unexploded Ordinances/Munitions and Explosives of Concern |

## LIST OF EXHIBITS

Exhibit 1          Final Record of Decision

Exhibit 2          July 2020 Department of Interior Letter to Revolution Wind

Exhibit 3          Excerpts from Final Environmental Impact Statement

Exhibit 4          Corps Permit

Exhibit 5          April 30, 2024, Biological Opinion

Exhibit 6          Excerpts from Conditions of Construction and Operations Plan Approval

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*All. to Protect Nantucket Sound v. U.S. Dep't of the Army,*
   *398* F.3d 105 (1st Cir. 2005).........................................................................6

*Allens Creek/Corbetts Glen Pres. Grp., Inc. v. Caldera,*
   88 F. Supp. 2d 77 (W.D.N.Y. 2000)........................................................43

*ASARCO Inc. v. Kadish,*
   490 U.S. 605 (1989) ................................................................................36

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
   462 U.S. 87 (1983) ..................................................................................39

*Benisek v. Lamone,*
   138 S. Ct. 1942 (2018)............................................................................33

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006).................................................................32

*Clevinger v. Advoc. Holdings, Inc.,*
   No. 23-1159 (JMC), 2023 U.S. Dist. LEXIS 121860 (D.D.C. July 15, 2023) .........................14

*Coleman v. PACCAR, Inc.,*
   424 U.S. 1301 (1976) ..............................................................................42

*Conner v. Burford,*
   848 F.2d 1441 (9th Cir. 1988) .................................................................26

*Ctr. For Biological Diversity v. EPA,*
   56 F.4th 55 (D.C. Cir. 2022).....................................................................30

*Ctr. for Biological Diversity v. Regan,*
   No. CV 21-119 (RDM), 2023 WL 5437496 (D.D.C. Aug. 23, 2023).....................................15

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
   698 F.3d 1101 (9th Cir. 2012) .................................................................25

*Dall. Safari Club v. Bernhardt,*
   453 F. Supp. 3d 391 (D.D.C. 2020)..................................................13, 33

*Def. of Wildlife v. Babbitt,*
   130 F. Supp. 2d 121 (D.D.C. 2001)........................................................19

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
　528 U.S. 167 (2000) ....................................................................................35

*Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*,
　887 F.3d 906 (9th Cir. 2018) ...............................................................17, 18

*In re Kagan*,
　351 F.3d 1157 (D.C. Cir. 2003) ..................................................................16

*La. Wildlife Fed'n, Inc. v. York*,
　761 F.2d 1044 (5th Cir. 1985) ....................................................................18

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992) ..............................................................................36, 37

*Manzanita Band of Kumeyaay Nation v. Wolf*,
　496 F. Supp. 3d 257 (D.D.C. 2020) ............................................................40

*Mazurek v. Armstrong*,
　520 U.S. 968 (1997) ....................................................................................13

*Melone v. Coit*,
　100 F.4th 21 (1st Cir. 2024) ........................................................................22

*Mexichem Specialty Resins, Inc. v. EPA*,
　787 F.3d 544 (D.C. Cir. 2015) ....................................................................32

*Miccosukee Tribe of Indians of Fla. v. United States*,
　566 F.3d 1257 (11th Cir. 2009) ..................................................................25

*Munaf v. Geren*,
　553 U.S. 674 (2008) ....................................................................................13

*Nat'l Parks & Conservation Ass'n v. Hodel*,
　679 F. Supp. 49 (D.D.C. 1987) ...................................................................44

*Nat'l Wildlife Fed'n v. EPA*,
　286 F.3d 554 (D.C. Cir. 2002) ..............................................................15, 39

*Nken v. Holder*,
　556 U.S. 418 (2009) ........................................................................15, 40, 43

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
　898 F.2d 1410 (9th Cir. 1990) ....................................................................42

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,
    636 F. Supp. 3d 33 (D.D.C. 2022) ..................................................................18

*Sabino Canyon Tours, Inc. v. USDA Forest Serv.*,
    298 F. Supp. 3d 60 (D.D.C. 2018) ..................................................................36

*Save Long Beach Island v. U.S. Dep't of Com.*,
    No. 23-1886 (RK) (JBD), 2024 WL 863428 (D.N.J. Feb. 29, 2024) .....................37

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
    Case No. 1:22-cv-11091-IT, 2023 WL 3660689 (D. Mass. May 25, 2023) ............34

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ....................................................................................37

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) ..................................................................33

*Sierra Club v. U.S. Dep't of Interior*,
    990 F.3d 898 (5th Cir. 2021) .......................................................................25

*Singh v. Carter*,
    185 F. Supp. 3d 11 (D.D.C. 2016) ................................................................14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    540 F. Supp. 3d 45 (D.D.C. 2021) ................................................................40

*Sw Ctr. for Biological Diversity v. Babbitt*,
    215 F.3d 58 (D.C. Cir. 2000) .......................................................................26

*Tennessee Valley Authority v. Hill*,
    437 U.S. 153 (1978) ....................................................................................42

*Thomas v. Peterson*,
    753 F.2d 754 (9th Cir. 1985) ..................................................................25, 26

*W. Watersheds Project v. U.S. Bureau of Land Mgmt.*,
    774 F. Supp. 2d 1089 (D. Nev. 2011) ...........................................................41

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ....................................................................................41

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................passim

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ........................................................................................... 37, 38

*Wisconsin v. Illinois*,
    278 U.S. 367 (1929) ................................................................................................................. 6

*Workman v. Bissessar*,
    275 F. Supp. 3d 263 (D.D.C. 2017) ...................................................................................... 14

**Statutes**

5 U.S.C. § 705 ................................................................................................................................. 14

16 U.S.C. § 1362(13) ..................................................................................................................... 21

16 U.S.C. § 1371(a) ....................................................................................................................... 21

16 U.S.C. § 1371(a)(5)(A)(i) ......................................................................................................... 22

16 U.S.C. § 1372(a) ....................................................................................................................... 21

16 U.S.C. § 1532(13) ....................................................................................................................... 3

16 U.S.C. § 1532(19) .................................................................................................................... 3, 4

16 U.S.C. § 1536 ............................................................................................................................ 31

16 U.S.C. § 1536(a)(2) ............................................................................................................ 2, 3, 26

16 U.S.C. § 1536(a)(3) ................................................................................................................... 20

16 U.S.C. § 1536(b) ......................................................................................................................... 3

16 U.S.C. § 1536(b)(4) ................................................................................................................... 3, 4

16 U.S.C. § 1536(o)(2) ................................................................................................................ 4, 12

16 U.S.C. § 1538(a)(1)(B) ............................................................................................................... 3

33 U.S.C. § 403 ............................................................................................................................... 6

33 U.S.C. § 1251(a) ......................................................................................................................... 4

33 U.S.C. § 1311(a) ......................................................................................................................... 5

33 U.S.C. § 1344 ...................................................................................................................... 4, 5, 9

33 U.S.C. § 1344(b)(2) ..................................................................................................17

33 U.S.C. § 1362(7) .......................................................................................................4

33 U.S.C. § 1362(8) .......................................................................................................5

42 U.S.C. § 4370m .........................................................................................................7

42 U.S.C. § 4370m-6(a)(1)(B) ................................................................................14, 15

42 U.S.C. § 4370m-6(b) ..........................................................................................14, 44

43 U.S.C. § 1332(3) ......................................................................................................43

43 U.S.C. § 1333(a) .......................................................................................................6

43 U.S.C. § 1333(e) .......................................................................................................6

43 U.S.C. § 1337(p)(1) .................................................................................................41

**Regulations**

33 C.F.R. Part 320 .....................................................................................................5, 6

33 C.F.R. § 320.1(b) ......................................................................................................6

33 C.F.R. § 320.2(b) ......................................................................................................6

33 C.F.R. § 320.4(a)(1) ..................................................................................................5

33 C.F.R. § 322.3(b) ......................................................................................................6

33 C.F.R. § 328.3 ...........................................................................................................4

33 C.F.R. § 328.4(a) ......................................................................................................5

33 C.F.R. § 329.12(a) .................................................................................................5, 6

40 C.F.R. Part 230 .........................................................................................................5

40 C.F.R. § 120.2(a) ......................................................................................................5

40 C.F.R. § 230.10(a) ...............................................................................................5, 17

40 C.F.R. § 230.10(a)(2) ..............................................................................................17

40 C.F.R. § 230.10(a)(3) ................................................................................................5

40 C.F.R. § 230.11 ................................................................................................................5

40 C.F.R. § 230.2 .................................................................................................................17

40 C.F.R. § 230.2(b) .............................................................................................................5

40 C.F.R. § 230.3(m) ........................................................................................................5, 17

40 C.F.R. § 230.3(o) .............................................................................................................5

40 C.F.R. § 230.40-45 ......................................................................................................5, 17

40 C.F.R. § 1508.1(g)(3) .....................................................................................................24

50 C.F.R. § 216.3 .................................................................................................................21

50 C.F.R. § 402 .....................................................................................................................3

50 C.F.R. § 402.01(b) ............................................................................................................2

50 C.F.R. § 402.02 .......................................................................................................passim

50 C.F.R. § 402.07 .................................................................................................................2

50 C.F.R. § 402.11 ...............................................................................................................20

50 C.F.R. § 402.11(a)-(c) ....................................................................................................20

50 C.F.R. § 402.14(a) .................................................................................................2, 28, 31

50 C.F.R. § 402.14(d) ............................................................................................................3

50 C.F.R. § 402.14(g)-(h) ......................................................................................................3

50 C.F.R. § 402.14(g)(2)-(4) .................................................................................................3

50 C.F.R. § 402.14(g)(2) ......................................................................................................19

50 C.F.R. § 402.14(g)(4) ........................................................................................................3

50 C.F.R. § 402.14(g)(7) ........................................................................................................3

50 C.F.R. § 402.14 (i)(1)(ii) ..................................................................................................4

50 C.F.R. § 402.14 (i)(1)(iii) .................................................................................................4

50 C.F.R. § 402.14 (i)(1)(iv)..................................................................................4

50 C.F.R. § 402.14(i)(6) .......................................................................................4

50 C.F.R. § 402.14(j)...........................................................................................30

50 C.F.R. § 402.16 (a)(2)-(3)................................................................................4

**Federal Register**

89 Fed. Reg. 7,633 (Feb. 5, 2024) .......................................................................8

89 Fed. Reg. 31,008 (Apr. 23, 2024)...................................................................21

I.    **INTRODUCTION**

Plaintiffs' request for a preliminary injunction enjoining the ongoing construction activities on the Revolution Wind Farm and Revolution Wind Export Cable Project ("Revolution Project") and staying the federal approvals and authorizations for the project should be denied. Federal Defendants based their approval of the Revolution Project on an extensive environmental review and permitting process that spanned three years, involved the expertise of multiple cooperating federal agencies, and invited and considered robust public comments. The agencies' review culminated in thousands of pages of thorough environmental analysis and yielded a comprehensive suite of measures to avoid and minimize any negative impacts to marine species and habitats.

Plaintiffs fail to demonstrate a likelihood of success on the merits of either of the two claims raised in their motion: their Clean Water Act ("CWA") or Endangered Species Act ("ESA") claim. Plaintiffs' CWA claim necessarily fails because it is barred under the Fixing America's Surface Transportation Act ("FAST Act") and because the U.S. Army Corps of Engineers ("Corps") has fully complied with the CWA. Plaintiffs' ESA claim also fails because the National Marine Fisheries Service's ("NMFS") biological opinion for the Revolution Project meets all requirements under the ESA. Based on its thorough and detailed analysis, NMFS reasonably determined that the Revolution Project is not likely to jeopardize the continued existence of any ESA-listed species, including the endangered North Atlantic right whale ("NARW"). Further, Plaintiffs' attempts to undermine NMFS's analysis are based largely on a series of misinterpretations of the ESA and its implementing regulations.

Plaintiffs also fail to meet their burden of establishing that they will suffer irreparable harm absent an injunction. Plaintiffs' vague and conclusory allegations of harm to their purported interest in marine life are insufficient to establish any actual or concrete injury to Plaintiffs, let

alone an irreparable injury. Additionally, the balance of equities weighs decisively against granting a preliminary injunction, especially given Plaintiffs' unjustifiable delay in bringing their motion, which was filed after construction began and more than a year after the construction schedule became public. Enjoining the agency authorizations associated with the Revolution Project would also hinder the public interest, which will be served by the Revolution Project's capacity to provide 704 megawatts of clean energy to the Connecticut and Rhode Island power grids, providing electrical power for nearly 250,000 homes.

For these reasons, as further demonstrated below, the Court should deny Plaintiffs' request for injunctive relief.

## II.    STATUTORY BACKGROUND

### A.  The Endangered Species Act

ESA Section 7 directs federal agencies to ensure that any action they authorize, fund, or carry out is "not likely to jeopardize the continued existence of" any ESA-listed species or destroy or adversely modify critical habitat that has been designated for such species. 16 U.S.C. § 1536(a)(2).[1] To achieve that objective, if an agency's proposed action "may affect" an ESA-listed species or its critical habitat, the ESA requires the action agency to consult with the relevant "consulting agency." 50 C.F.R. § 402.14(a).[2]

---

[1] Depending on the species in question, either the Secretary of Commerce or the Secretary of the Interior is responsible for implementing the ESA as the consulting agency. *Id*. § 1532(15). The Secretary of Commerce administers the ESA through NMFS and the Secretary of the Interior administers the ESA through the U.S. Fish and Wildlife Service. 50 C.F.R. § 402.01(b).

[2] With respect to the Revolution Project, as relevant to Plaintiffs' motion, there were two action agencies: the Bureau of Ocean Energy Management ("BOEM"), which issued the approval of Revolution Wind's Construction and Operation Plan; and the Corps, which issued a permit for the project. Where, as here, more than one federal agency's action regarding a project "may affect" an ESA-listed species, each action agency must fulfill its obligation to consult, and a "lead action agency" is often identified to fulfil the agencies' consultation responsibilities. *Id.* § 402.07. For this Project, BOEM was the lead action agency for purposes of ESA consultation with NMFS.

Section 7 and its implementing regulations set forth consultation procedures designed to provide action agencies with expert advice to determine the biological effects of their proposed activities. 16 U.S.C. § 1536(b); 50 C.F.R. § 402. "Formal consultation" culminates in the issuance of a "biological opinion" by the consulting agency (here, NMFS). *Id.* § 402.14(g)(2)-(4). The biological opinion evaluates the effects of the proposed action on ESA-listed species and designated critical habitat and opines on whether the action is "likely to jeopardize the continued existence" of any listed species or result in the destruction or adverse modification of critical habitat[3] and, if so, whether "reasonable and prudent alternatives" exist to avoid those outcomes. *Id.* § 402.14(g)-(h). The ESA and its implementing regulations require NMFS to use the "best scientific and commercial data available" in rendering its biological opinion. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

Section 9 of the ESA prohibits the "taking" of any endangered species, 16 U.S.C. § 1538(a)(1)(B), where "take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The ESA's prohibition on taking species applies to all "person[s]," including individuals, corporations, and federal or state agencies. *Id.* § 1532(13). However, take incidental to federal actions that is "reasonably certain to occur" can be exempted from liability as part of the consultation process in an Incidental Take Statement ("ITS") in a final biological opinion that concludes no jeopardy. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(g)(7). The ITS identifies the impact of such taking and must specify "reasonable and prudent measures that [the consulting agency]

---

[3] During the consultation, the consulting agency must: "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate [an] opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).

considers necessary or appropriate to minimize such impact," and terms and conditions to implement those measures. 16 U.S.C. § 1532(19); *id.* § 1536(b)(4); 50 C.F.R. § 402.14 (i)(1)(ii), (iv). "In the case of marine mammals, [the ITS must] specif[y] those measures that are necessary to comply with [S]ection 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking[.]" 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14 (i)(1)(iii).[4]

Under the ESA, where the action agency retains discretionary involvement or control, there is a regulatory process that allows for consideration of changes to the agency action or the discovery of new, relevant information after the ESA Section 7 consultation process has been completed. *See id.* § 402.16(a)(2)-(3) (requiring that consultation be reinitiated if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or if the action is "modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion").

**B.  The Clean Water Act and the Rivers and Harbors Act**

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 404 of the CWA establishes a program to regulate the discharge of dredged or fill material into "navigable waters." *See id.* § 1344 (Section 404 program). "Navigable waters," for purposes of Section 404, means "waters of the United States, including the territorial seas." *Id.* § 1362(7); *see also* 33 C.F.R. § 328.3 (definition of "waters of the United States"). The "territorial seas" generally extend seaward three nautical

---

[4] Under Section 7(o) of the ESA, "any taking that is in compliance with the terms and conditions specified in [an ITS] shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2). "[N]o other authorization or permit under the Act is required." 50 C.F.R. § 402.14(i)(6).

miles from the coast to the open sea but may extend three miles seaward from elsewhere, in the case of bays, inlets or islands. 33 U.S.C. § 1362(8); 33 C.F.R. §§ 328.4(a), 329.12(a).

Section 404 of the CWA authorizes the Secretary of the Army, through the Corps, to issue permits for the discharge of dredged or fill material into waters of the United States when certain conditions are met. 33 U.S.C. §§ 1311(a), 1344. The Corps issues these permits under the guidance and requirements imposed by its regulations, 33 C.F.R. Part 320, as well as the CWA Section 404(b)(1) Guidelines developed by the U.S. Environmental Protection Agency ("EPA") and the Corps, codified at 40 C.F.R. Part 230. The Section 404(b)(1) Guidelines apply only to "waters of the United States." *See* 40 C.F.R. §§ 230.2(b), 230.3(o), 120.2(a). Corps regulations specify that the "decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1). And the Guidelines similarly require the Corps to determine the potential impacts (including cumulative impacts) of proposed discharges on "waters of the United States." 40 C.F.R. § 230.11. The Guidelines also provide that the Corps shall not issue a Section 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." *Id.* § 230.10(a). For proposed discharges in "special aquatic sites," a feature created in the Guidelines, additional requirements apply to the Corps' alternatives analysis. *See, e.g.*, *id.* § 230.10(a)(3); *see also id.* § 230.3(m) (defining "special aquatic sites"); *id.* §§ 230.40-45 (listing the limited areas identified as "special aquatic sites").

In waters beyond three nautical miles from the coast, the Corps may issue permits pursuant to Section 10 of the Rivers and Harbors Act ("RHA"), which prohibits the creation of any obstruction or structure in navigable waters or on the Outer Continental Shelf, absent a permit

from the Corps or congressional permission. 33 U.S.C. § 403; 43 U.S.C. § 1333(a), (e); 33 C.F.R. §§ 320.2(b), 322.3(b), 329.12(a); *All. to Protect Nantucket Sound v. U.S. Dep't of the Army*, 398 F.3d 105, 108-11 (1st Cir. 2005). The Corps issues these permits under the guidance and requirements imposed by its regulations, 33 C.F.R. Part 320. But unlike the CWA, Section 10 of the RHA is not designed to address impacts to water quality or aquatic resources; it instead prohibits unauthorized structures and "unreasonable obstructions to navigation and navigable capacity." *Wisconsin v. Illinois*, 278 U.S. 367, 413 (1929); s*ee also* 33 C.F.R. § 320.1(b). Therefore, the Section 404(b)(1) Guidelines do not apply to the Corps' review of a Section 10 permit application.

## III.    FACTUAL BACKGROUND

### A.  The Revolution Project

The Revolution Project is an offshore wind development project, located within a Renewable Energy Lease Area on the Outer Continental Shelf off the coast of Rhode Island, which is leased by the Bureau of Ocean Energy Management ("BOEM") to Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind"). Final Record of Decision, Ex. 1 at 3, 8.[5] The project will provide 704 megawatts of clean energy to the Connecticut and Rhode Island power grids, providing electrical power for nearly 250,000 homes. *Id.* at 8, 34. It is needed to help Connecticut meet its mandate of 2,000 megawatts of offshore wind energy and to help Rhode Island meet its goal of 100% renewable energy, both by 2030. *Id.*

---

[5] With respect to citations to the exhibits attached to this brief, pin cites refer to the page number of the decision document that that is attached, not the ECF page number.

**B. Federal Environmental Review and Approvals**

Because the Revolution Project is a covered project under the FAST Act, the government's environmental review and permitting processes are coordinated in accordance with 42 U.S.C. § 4370m. *See* July 2020 Department of Interior Letter to Revolution Wind, Ex. 2. BOEM and multiple other cooperating federal agencies, including the Corps and NMFS, conducted an extensive, multi-year environmental review. This review was designed to ensure the soundness of the project and to comply with multiple federal statutes, including the National Environmental Policy Act ("NEPA"), the CWA, the RHA, the ESA, the Marine Mammal Protection Act ("MMPA"), the Migratory Bird Treaty Act, the Coastal Zone Management Act, the National Historic Preservation Act, and the Outer Continental Shelf Lands Act ("OCSLA").

While the Amended Complaint challenges Federal Defendants' compliance under several of these statutes, *see* Am. Compl., ECF No. 33, Plaintiffs' motion seeks injunctive relief based on only their CWA claim (Seventh Cause of Action) and ESA claim (Fourth Cause of Action), *see* Pls.' Mem. In Supp. of Mot. for Stay of Final Agency Action ("Pls.' Br."), ECF No. 35-1 at 14-18, 19-31.

**1. BOEM's Environmental Review**

In March 2020, Revolution Wind submitted a proposed Construction and Operations Plan for the project to BOEM. Ex. 1 at 3. BOEM then initiated the NEPA process, pursuant to which it conducted an environmental review that spanned three years and included eight public meetings. BOEM's environmental review is documented in a Draft Environmental Impact Statement (made

publicly available in August 2022) and a Final Environmental Impact Statement (issued in July 2023), each of which is thousands of pages in length.[6]

In its Draft Environmental Impact Statement, BOEM considered 18 action alternatives, then added three additional alternatives based on public comments. Ex. 1 at 9. In its Final Environmental Impact Statement, BOEM ultimately analyzed seven different alternatives. *Id.* at 9-13. BOEM considered and balanced a wide range of environmental concerns, including impacts on animal populations and habitats, air quality, commercial fisheries, cultural resources, demographics, environmental justice, land use, marine use, and wetlands. *Id.* at 14-19 (Table 3.2: Comparison of Alternatives and Overall Cumulative Impacts). As relevant to the CWA claim on which Plaintiffs base their motion for preliminary injunction, BOEM's analysis included consideration of impacts on Cox Ledge, which is a spawning ground for cod.[7] *See* Ex. 1 at 20; *see also* excerpts from the July 2023 Final Environmental Impact Statement, Ex. 3 at 3.6, 3.13-1-2.

Ultimately, the agencies authorized the activities evaluated in Alternative G, which proposed 65 wind turbines, instead of Revolution Wind's Proposed Action (Alternative B), which proposed 100 turbines. They made this choice in part because the agency actions associated with Alternative G would "minimize impacts to visual resources and benthic habitat," including Cox Ledge, while also ensuring that the Project would be viable. Ex. 1 at 20-22, 36-37. Per the selected alternative, approximately 155 miles of cables will connect the 65 turbines to two offshore substations, some of which will require protective cable cover (scour protection), consisting

---

[6] BOEM, Revolution Wind, https://www.boem.gov/renewable-energy/state-activities/revolution-wind (last visited May 21, 2024); BOEM, Final Environmental Impact Statement, https://www.boem.gov/renewable-energy/state-activities/revolution-wind-final-eis (last visited May 21, 2024).

[7] *See* Southern New England Habitat Area of Particular Concern Framework at 29, https://perma.cc/N9EJ-A3X9 (last visited May 21, 2024); *see also* 89 Fed. Reg. 7,633 (Feb. 5, 2024) (designating the area generally around Cox Ledge as Habitat Area of Particular Concern).

primarily of rock and/or concrete mattresses. *Id*. at 31. The work area for the project will include a 42-mile offshore export cable corridor extending from the lease area into Rhode Island Sound and the West Passage of Narragansett Bay, making landfall near Quonset Point in North Kingstown, Rhode Island. *Id*. at 29-30.

Based on BOEM's Final Environmental Impact Statement, on August 21, 2023, BOEM, NMFS, and the Corps issued the Record of Decision ("ROD") for the Revolution Project, which summarizes the agencies' respective environmental analyses and prospective decisions.

### 2. Corps' CWA and RHA Permitting

On October 2, 2023, the Corps issued a permit to Revolution Wind pursuant to both Section 404 of the CWA and Section 10 of the RHA ("Corps permit"). Corps Permit, Ex. 4. Relevant here, the Corps permit authorized Revolution Wind to deposit a limited amount of fill on the ocean floor to secure transmission cables. *Id*. The Corps documented its permitting analysis in the ROD and adopted BOEM's Final Environmental Impact Statement, including Appendices F and K. Ex. 1 at 29-63.

The Corps' role under CWA Section 404 was limited to issuing a permit for the portion of the Revolution Wind Project that required depositing fill into "navigable waters." 33 U.S.C. § 1344. The Corps determined that up to 23 miles of the offshore export cable corridor would be located in "waters of the United States" regulated by the Corps under the CWA. Ex. 1 at 30, 37. The three-mile limit of the territorial seas subject to CWA jurisdiction is measured from the coastline. Thus, the portion of the project subject to Section 404 permitting requirements is limited to the part of the transmission cable corridor that extends from Rhode Island to the dotted boundary shown in the figure below. Ex. 4 at 1; Ex. 1 at 37; Ex. 3 at 1-4 (Table reproduced below).



Figure 1.1-1. Project overview.

In the area requiring Section 404 review, Revolution Wind proposed to install up to two export cables using technology that would not result in a discharge and therefore would not require a CWA permit. Ex. 1 at 39. To protect the cable, however, Revolution Wind proposed to place a protective cable cover, or scour protection, over approximately 5 to 10% of the export cables, which would require fill in the form of rock berm, concrete mattresses, and/or rock bags. *Id.*

The Corps conducted its Section 404 review and considered practicable alternatives, including nine other cable corridor routes. *Id.* at 37-44. Ultimately, the Corps recommended the least environmentally impactful practicable alternative, which was adopted. *Id.* at 44. The Corps estimated that the fill material regulated under the CWA would impact approximately 33 acres of "waters of the United States." *Id.* at 45. The Corps concluded that none of the proposed fill would convert aquatic habitat to uplands or would impact special aquatic sites. *Id.*[8]

---

[8] The Corps also evaluated impacts from work and structures on the Outer Continental Shelf and in project areas outside of the three-mile limit under Section 10 of the RHA and its regulations. *Id.* at 34-37; 52-59. The Corps completed a public interest review of Alternative G and estimated that the work and structures regulated under the RHA would impact approximately 730 acres of waters due to boulder relocation, cable laying, and scour protection. *Id.* at 31-32.

During the environmental review process, no Plaintiff submitted any comments regarding the Corps' compliance with the CWA. *See generally* Final Environmental Impact Statement, App'x L (compiling comments); Ex. 1 at 32-34 (compiling comments).

### 3. ESA Section 7 Consultation

BOEM and NMFS also engaged in formal ESA Section 7 consultation to analyze the potential effects of the proposed agency actions associated with the Revolution Project on ESA-listed species, including the NARW, and designated critical habitat.

BOEM requested initiation of ESA Section 7 consultation with NMFS in August 2022 as the lead action agency on behalf of itself and other action agencies, including the Corps. On July 21, 2023, NMFS issued an extensive Biological Opinion ("2023 Biological Opinion"), concluding the Section 7 consultation process. In the 2023 Biological Opinion, NMFS determined that federal authorization of the Revolution Project is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of critical habitat.[9]

A few months later, two of the federal action agencies (BOEM and NMFS's Office of Protected Resources) used the ESA's regulatory process to request reinitiation of consultation with the NMFS Greater Atlantic Regional Fisheries Office (i.e., the consulting agency, which is referred to in this brief as "NMFS") on two narrow bases. *See* ECF Nos. 28-3, 28-4.[10] NMFS's Greater

---

[9] NMFS, 2023 Biological Opinion at 424, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev-Wind-BiOp.pdf.

[10] The bases for reinitiating consultation included: (1) BOEM proposed a minor modification to the sea turtle monitoring zone (reducing it from 500 meters to 200-300 meters) based on new information regarding the effectiveness of monitoring after dark; and (2) NMFS's Office of Protected Resources authorized "take by harassment" of an additional small number of individual fin and sei whales (4 fin whales and 5 sei whales) as a result of pile driving and Unexploded Ordinances/Munitions and Explosives of Concern ("UXO") detonations based on new information received during the public comment period on its proposed incidental take authorization under the MMPA. ECF Nos. 28-3, 28-4.

Atlantic Regional Fisheries Office then reinitiated the ESA Section 7 consultation process, taking into account the new information and proposed project modification on which consultation was reinitiated. On April 30, 2024, NMFS issued a new Biological Opinion for the Revolution Project that superseded and replaced the 2023 Biological Opinion (the operative 2024 Biological Opinion is referred to from here forward as the "Biological Opinion"). Biological Opinion, Ex. 5.[11] The Biological Opinion includes an ITS, which sets forth mandatory measures and implementing terms and conditions to avoid and minimize the impacts of incidental take of ESA-listed species caused by authorization of the Revolution Project. Ex. 5 at 469-501. No incidental take of NARW is anticipated to cause injury, serious injury, or mortality; it is related to harassment by short-term behavioral disturbance only. *Id.* at 445-47. Incidental taking that occurs in compliance with the terms and conditions of the ITS is exempted from the take prohibition of ESA Section 9. 16 U.S.C. § 1536(o)(2).

### 4.    Approval of the Revolution Project Construction and Operations Plan

On November 17, 2023, BOEM issued its final approval of Revolution Wind's Construction and Operations Plan for the Revolution Project.[12] BOEM's approval was subject to its Conditions of Construction and Operations Plan Approval ("Conditions of COP Approval"), which it issued the same day. *See* excerpts from the Conditions of COP Approval, Ex. 6. BOEM's Conditions of COP Approval include, among other things, mandatory conditions to avoid and minimize the potential impacts to species and marine life. Additionally, the Conditions of COP Approval incorporate by reference all of the 2023 Biological Opinion's ITS minimization

---

[11] Notably, Plaintiffs do not challenge any aspect of the Biological Opinion that was impacted by the reinitiated ESA consultation. *See* Pls.' Br. 19-31.

[12] BOEM, COP Approval Letter for Revolution Project, https://perma.cc/9HBR-R8T5 (last visited May 21, 2024).

measures and their implementing terms and conditions, as well as any measures and terms and conditions resulting from any reinitiated ESA consultation (including those required by the new Biological Opinion's ITS). Ex. 6 ¶¶ 5.14.8, 1.4.

### C. Construction of the Revolution Project

Revolution Wind's anticipated construction schedule for the Revolution Project has been publicly available on BOEM's website since March 2023.[13] In line with this schedule, onshore construction for the project began in September 2023 and offshore construction operations began in January 2024.[14]

Per the terms of the Biological Opinion's ITS and BOEM's Conditions of COP Approval, Revolution Wind was required to submit and receive approval of several monitoring and mitigation plans to implement protections for NARW before it could begin pile driving. As of May 9, 2024, Revolution Wind has received the necessary plan approvals to conduct pile driving.

## IV.    STANDARD OF REVIEW

Injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Dall. Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 397 (D.D.C. 2020) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). A court may only grant the extraordinary remedy "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) (citation omitted), and should do so sparingly, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). A plaintiff seeking a preliminary injunction must demonstrate four elements: (1) a likelihood of irreparable harm absent injunctive relief; (2) a

---

[13] Revolution Wind Construction and Operations Plan and Appendices (updated March 2023) at 62, https://perma.cc/X3QY-GXWV (Figure 3.2-1, Revolution Wind Indicative Construction Schedule) (last visited May 21, 2024).

[14] *See id.*

likelihood of success on the merits; (3) a balance of hardships that tips in their favor; and (4) that

the public interest weighs in favor of granting the injunction. *Winter,* 555 U.S. at 20 (citations

omitted). The movant bears the burden of establishing that four factors weigh in its favor, which

includes a "burden of producing credible evidence sufficient to demonstrate her entitlement to

injunctive relief[.]" *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017) (citation

omitted).[15]

Because the Revolution Project is a "covered project" under the FAST Act, Plaintiffs bear

additional burdens to obtain injunctive relief. The statute bars judicial review of claims—such as

Plaintiffs' claims—arising out of "covered projects" with a NEPA review if the party bringing suit

did not comment *in detail* during the environmental review process so as to put the lead agency on

notice of their claim. 42 U.S.C. § 4370m-6(a)(1)(B). Further, "[i]n addition to considering any

other applicable equitable factors," when weighing whether to grant a "preliminary injunction

against an agency . . . in connection with review or authorization of a covered project," a court

must "(1) consider the potential effects on public health, safety, and the environment, and the

potential for significant negative effects on jobs resulting from an order or injunction; and (2) not

presume that the harms described in paragraph (1) are reparable." *Id.* § 4370m-6(b).[16]

---

[15] Plaintiffs' proposed "sliding scale" approach, Pls.' Br. 13, "is highly questionable . . . in light of
the Supreme Court's holding in *Winter* . . . that a court may not issue 'a preliminary injunction
based only on a possibility of irreparable harm [since] injunctive relief [is] an extraordinary remedy
that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Singh
v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (quoting *Winter*, 555 U.S. at 22). *See also
Clevinger v. Advoc. Holdings, Inc.*, No. 23-1159 (JMC), 2023 U.S. Dist. LEXIS 121860, at *11
n.2 (D.D.C. July 15, 2023).

[16] Plaintiffs' alternative request for injunctive relief under the Administrative Procedure Act
("APA") Section 705 should be denied. APA Section 705 is intended to "*postpone* the effective
date of an agency action" or "*preserve* status[.]" 5 U.S.C. § 705 (emphasis added). Here, the federal
agencies issued a Joint ROD for the Revolution Project on August 21, 2023, BOEM approved
Revolution Wind's Construction and Operations Plan on November 17, 2023, and offshore

## V.    ARGUMENT

### A.  Plaintiffs have failed to establish a likelihood of success on the merits.

Plaintiffs' motion is based on only two of the claims in their Amended Complaint: their CWA claim (Seventh Cause of Action) and their ESA claim (Fourth Cause of Action). *See* Pls.' Br. 14-18, 19-31; Am. Compl. ¶¶ 253-281, 195-226. Both claims are unlikely to succeed on their merits, and Plaintiffs have failed to demonstrate otherwise. The Court should deny Plaintiffs' motion on this ground alone.

### 1.  Plaintiffs are unlikely to succeed on the merits of their CWA claim.

#### a.  Plaintiffs' CWA claim is barred under the FAST Act.

Plaintiffs' CWA claim is barred under the FAST Act, which provides that "a claim arising under Federal law seeking judicial review of any authorization issued by a Federal agency for a covered project shall be barred" if the claim is filed by a party that failed to submit a "comment during the environmental review" that was "sufficiently detailed" to put the lead agency on "notice of the issue on which the party seeks judicial review." 42 U.S.C. § 4370m-6(a)(1)(B). Because none of the Plaintiffs commented during the environmental review in a sufficiently detailed manner to notify BOEM, the lead agency, of any concerns regarding compliance with the CWA or the Corps' consideration of impacts to Cox Ledge, their CWA claim is barred. *Id.*; *see also Nat'l*

---

construction began in January 2024. In other words, Plaintiffs are not seeking to preserve the status quo by staying the effective date of an agency rule or action; they are seeking to change it. *See, e.g.*, *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2023 WL 5437496, at *5 (D.D.C. Aug. 23, 2023) (finding that the ability to "'postpone the effective date' of a rule ends when the rule takes legal effect").

To the extent the Court considers Plaintiffs' alternative request for relief, the standard is the same as the standard for seeking a preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 433 (2009). In reviewing such a request, the court should consider that the public is "generally entitled to the prompt execution" of an agency action "that the legislature has made final[,]" so a stay "is not a matter of right, even if irreparable injury might otherwise result[.]" *Id.* at 427 (citation omitted).

*Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002), *supplemented sub nom. In re Kagan*, 351 F.3d 1157 (D.C. Cir. 2003) (per curiam) (addressing general doctrine of waiver in administrative context).

      **b.**  **The Corps complied with the CWA, which does not require analysis of impacts on Cox Ledge.**

      Plaintiffs' CWA claim will also fail because the Corps complied with the statute, which does not require the agency to analyze impacts on Cox Ledge. Plaintiffs assert that the Corps did not properly review impacts on Cox Ledge, a purported special aquatic site. *See* Pls.' Br. 17-18. But the Corps' CWA analysis relates to discharges *into* "waters of the United States," here the territorial seas and tidal waters in Narragansett Bay, which extend three nautical miles from shore. *See supra* III.B.2. And as Plaintiffs acknowledge in their Amended Complaint, Cox Ledge is located within the Revolution Wind lease area, which is entirely beyond the three-mile limit and outside of "waters of the United States" regulated by the Corps under the CWA.[17] *See* Am. Compl. ¶ 259, 263; *see also* Ex. 1 at 29-32, 38; Ex. 3 at 1-4. Because Cox Ledge is not located within the Corps' CWA jurisdiction, the Section 404(b)(1) Guidelines alternatives analysis, including any

---

[17] Fundamentally, Plaintiffs misunderstand the scope of the Corps' CWA and RHA review. *See* Pls.' Br. 17-18. Plaintiffs presume that, because the Corps permit authorized certain work associated with the Project, the CWA governs the entire lease area. But the Corps issued its permit under *both* the RHA and the CWA and duly complied with both statutes, which resulted in different analyses in different portions of the Project. *See* Ex. 4 at 1-2; *see also* Ex. 1 at 7, 30-31. While Cox Ledge does fall within the Corps' RHA authority, that authority is different in scope than its CWA authority, and Plaintiffs do not challenge the Corps' compliance with the RHA. And even if Plaintiffs did so, the Corps (along with BOEM and other agencies) reasonably considered impacts on Cox Ledge. Indeed, BOEM and the Corps ultimately chose Alternative G as the preferred alternative, in part to balance concerns regarding preserving Cox Ledge while also allowing for the minimum number of turbines to meet the project's purpose and need. *Id.* at 20-24, 36-37. In addition, the Corps adopted additional protective measures (App'x F to Final Environmental Impact Statement). *Id.* at 37. The Corps also adopted numerous permit conditions including conservation recommendations intended to mitigate environmental impacts and enhance safety. *Id*. at 59-60, App'x A.

consideration of special aquatic sites, does not apply there. *See* Ex. 1 at 7 (explaining Corps authority under the CWA and RHA); 40 C.F.R. § 230.2. And because special aquatic sites are a feature of the Section 404(b)(1) Guidelines, Cox Ledge does not qualify as a special aquatic site. *See id*. 38 (determining that no proposed activity involves discharge into a special aquatic site)*; see also id.* §§ 230.3(m), 230.40-45.

In any event, the Corps complied with the CWA's requirements, where appropriate. Under the Corps' CWA regulations, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." *Id.* § 230.10(a); *see also* 33 U.S.C. § 1344(b)(2). Here, the Corps undertook extensive alternatives analyses, considering various other cable routes and onshore work. Ex. 1 at 37-44. Indeed, the Corps adopted the cable route with the least environmental impacts. *Id*. at 44.

Plaintiffs fault the Corps' CWA analysis for failing to consider alternative source of energy production like fossil fuel or nuclear plants or onshore renewable projects, but these are plainly not alternatives to what the Corps permit authorized—the proposed fill. Even if Plaintiffs had presented practicable alternatives, they wholly ignore the entire purpose of the project, which is to build an offshore wind facility. *Id.* at 38. Under the Section 404(b)(1) Guidelines, "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). "To determine whether an alternative is practicable, the Corps must first define the 'overall project purpose.'" *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018). Here, the Corps determined that the "overall project purpose" was "a commercial-scale offshore wind energy project, including all associated export cables, for renewable energy

generation and distribution to the Connecticut and Rhode Island energy grids[,]" and analyzed whether alternatives were practicable in light of that purpose. Ex. 1 at 37-44. Given the central role offshore wind plays in defining Revolution Project's purpose, "it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *Friends of the Santa Clara River*, 887 F.3d at 912 (quoting *La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985) (per curiam)). Under such circumstances, the Corps' discussion of practicable alternatives was reasonable and appropriate. *See Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d. 33, 67 (D.D.C. 2022) (upholding alternatives analysis based on overall project purpose).

## 2. Plaintiffs are unlikely to succeed on the merits of their ESA claim.

### a. NMFS's environmental baseline analysis in the Biological Opinion properly considers the impacts of other offshore wind projects.

Plaintiffs do not dispute the adequacy of NMFS's scientific analysis in the Biological Opinion supporting its conclusion that the Revolution Project is not likely to jeopardize the continued existence and recovery of the NARW. *See* Pls.' Br. 20-21 (arguing that "the Biological Opinion's flaws 'are legal in nature'") (citation omitted). Instead, Plaintiffs argue that the Biological Opinion is inadequate because it impermissibly "exclude[s] from its analysis the effects [of] 22 other offshore wind projects along the [NARW]'s annual migration path" on the species. *Id.* at 20. But as required by the clear terms of the ESA's implementing regulations, the Biological Opinion properly includes analysis of the impacts of approved offshore wind projects that have completed Section 7 consultation and excludes the effects of planned and future projects that have yet to undergo Section 7 consultation. Plaintiffs' suggestion that a different approach should have been taken contradicts the plain language of the ESA's regulations, well-recognized agency guidance, and long-standing agency practice.

NMFS properly assessed the effects of other offshore wind projects on ESA-listed species, including NARWs, as part of its analysis of the "environmental baseline." *See* Ex. 5 at 154-76 (Biological Opinion "Environmental Baseline" section on "Consideration of Federal, State and Private Activities in the Action Area"). The ESA Section 7 regulations require NMFS to "[e]valuate the current status and environmental baseline of the listed species or critical habitat." 50 C.F.R. § 402.14(g)(2). The regulations define "environmental baseline" to include "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area *that have already undergone formal or early Section 7 consultation*, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.* § 402.02 (emphasis added); *see also Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 (D.D.C. 2001) (interpreting the ESA's regulations to mean that the "environmental baseline" analysis is the appropriate place to account for "other federal activities in the action area that impact [the species]").

In line with the ESA's regulations, NMFS provides a clear and cogent explanation of how it considered the effects of existing offshore wind projects in a subsection of the Biological Opinion's environmental baseline section devoted to "Offshore Wind Development[.]" *See* Ex. 5 at 165. NMFS explains that it "consider[ed] the past and present impacts of all federal, state, or private activities and the anticipated impacts of all proposed federal actions that have already undergone Section 7 consultation[.]" *Id.* at 165. This means that NMFS evaluated the effects of site assessment and characterization surveys, *see id.* at 165-66, as well as seven other offshore wind projects approved for construction, operation, and decommissioning, *see id.* at 166-67.

In sum, Plaintiffs' argument that NMFS excluded consideration of other offshore wind projects fails because it entirely ignores NMFS's environmental baseline analysis. Per the ESA's

implementing regulations, this is where NMFS properly considered the "past and present impacts" of other existing federally authorized wind projects and the "anticipated impacts" of other proposed federal authorizations for wind projects "that have already undergone . . . Section 7 consultation." 50 C.F.R. § 402.02.

       **b. Plaintiffs' argument regarding proposed wind projects allegedly omitted from NMFS's environmental baseline analysis is based on a misinterpretation of the ESA's regulations.**

Plaintiffs' other environmental baseline-related argument also fails. Plaintiffs contend that NMFS "violated its own regulation by excluding from consideration four projects that have already undergone formal consultation or are in early section 7 consultation[,]" Pls.' Br. 27, but they base this contention on a significant misunderstanding of the cited regulation.

The regulation Plaintiffs cite defines "environmental baseline" and addresses what must be included in NMFS's environmental baseline analysis. *See* 50 C.F.R. § 402.02. As discussed above, the regulation provides that "[t]he environmental baseline includes . . . the anticipated impacts of all proposed Federal projects in the action area *that have already undergone formal or early section 7 consultation*[.]" *Id.* § 402.02 (emphasis added). Plaintiffs argue that, based on this regulation, NMFS should have analyzed four proposed wind projects that are "in the early stages of consultation" in the Biological Opinion's environmental baseline analysis. Pls.' Br. 27-28. But Plaintiffs erroneously conflate consultation that is in its "early stages" with a separate formal process of "early consultation" authorized by a different Section of the ESA and implemented by separate regulatory provisions. *See* 16 U.S.C. § 1536(a)(3); 50 C.F.R. § 402.11. "Early consultation" is a discretionary process, formally requested in writing, that "occurs prior to the filing of an application for a Federal permit or license." *Id.* § 402.11(a)-(c).

With respect to the four projects Plaintiffs reference, Pls.' Br. 27-28, no applicant has even requested initiation of "early consultation," let alone "already undergone" the process. 50 C.F.R. § 402.02. Nor has formal consultation under Section 7(a)(2) been completed for any of the four projects. Indeed, as Plaintiffs acknowledge, Section 7 consultation either was just initiated or has not yet been initiated for each of those projects. *See* Pls.' Br. 27-28.[18] And, in line with the ESA's implementing regulations, all projects for which Section 7 consultation has been completed *are* included in NMFS's environmental baseline analysis. *See* Ex. 5 at 165-76 (Biological Opinion environmental baseline analysis of "Federal, State and Private Activities in the Action Area").

In sum, NMFS should not have and did not consider the four proposed projects referenced by Plaintiffs in its environmental baseline analysis. Plaintiffs' flawed interpretation of the ESA and its implementing regulations fails to undermine the Biological Opinion.

### c.    NMFS properly considered the anticipated impacts of all proposed federally authorized projects in the action area that have undergone ESA Section 7 consultation.

Without providing any explanation as to its relevance to their ESA claim, Plaintiffs include a paragraph in their brief which purports to add the number of Level B takes NMFS has authorized under the MMPA for "six offshore wind projects" along the East Coast. Pls.' Br. 29-30.[19] But

---

[18] Plaintiffs allege that "NMFS reinitiated Section 7 consultation before April 23, 2024" for Phase 2 of the Vineyard Wind project. Pls.' Br. 28 (citing 89 Fed. Reg. 31008, 31064 (Apr. 23, 2024)). However, NMFS has not received a formal request for reinitiation of consultation; thus, consultation for the project has not been reinitiated. The biological opinion for Vineyard Wind 1 that was issued in 2021 remains effective and is included in the Biological Opinion's environmental baseline analysis for the Revolution Project. Ex. 5 at 166.

[19] The MMPA generally prohibits "take" of marine mammals (which is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill"). 16 U.S.C. §§ 1371(a), 1372(a), 1362(13); 50 C.F.R. § 216.3. Under an exception to this general prohibition, NMFS may, upon request by U.S. citizens who engage in a specified activity within a specified geographical region, issue an incidental take authorization, which may authorize "the incidental, but not intentional, taking . . . of small numbers of marine mammals of a species or population stock if [NMFS] . . .

NMFS considered the effects of these projects, including the authorized Level B takes, in the Biological Opinion's environmental baseline analysis. *See supra* V.A.2.a.; Ex. 5 at 166-72. Moreover, Plaintiffs' sheer addition of these numbers in a vacuum without any analysis is meaningless.

The environmental baseline analysis in the Biological Opinion expressly considers the amounts and types of Level B take authorized for each of the seven "offshore wind projects that [NMFS has] completed consultation on that are within the [Revolution Project] action area[.]" Ex. 5 at 163; *see id.* at 165-69 (charts summarizing take numbers associated with each project). For example, NMFS considered that foundation installation for the Revolution Project may occur during the same period as another wind project, but determined that, "given the large geographic separation between the projects, no additive effects are anticipated (i.e., the sound fields would not overlap in space or time)." *Id.* at 164-65. NMFS further considered that "a number of geotechnical and geophysical surveys to support wind farm siting have occurred and will continue to occur in the action area." *Id.* at 163. The effects of these activities were analyzed as part of a programmatic ESA consultation with BOEM (attached to the Biological Opinion as Appendix C and incorporated by reference), in which NMFS determined that they "are not likely to adversely affect any ESA listed species if implemented in accordance with the applicable [best management practices] and [project design criteria]." *Id.* at 164.

Plaintiffs' arbitrary addition of the Level B take numbers from each of these separate projects fails to undermine NMFS's analysis. *See, e.g.*, *Melone v. Coit*, 100 F.4th 21, 33 (1st Cir. 2024) (rejecting similar argument asserted under the MMPA that "NMFS failed to consider the

---

finds that the total of such taking . . . will have a negligible impact on such species or stock[.]" 16 U.S.C. § 1371(a)(5)(A)(i). Take by "harassment" is classified in two levels: Level A and Level B.

cumulative effect on [NARWs] resulting from other activities" because NMFS "consider[ed] the effects of ongoing and past anthropogenic activities aside from [the challenged] project as part of its 'negligible impact' analysis, which analyzes the species' density, distribution, population size, growth rate, and other relevant stressors").

> **d. NMFS's cumulative impacts analysis complies with the ESA and its implementing regulations.**

Under the ESA's implementing regulations, it is impermissible for NMFS to evaluate the effects of future federally authorized offshore wind projects that have not already undergone Section 7 consultation. Plaintiffs incorrectly assert that, in addition to the existing projects analyzed in NMFS's environmental baseline analysis, NMFS should have analyzed 22 other proposed and future offshore wind projects as part of its "cumulative effects" analysis. Pls.' Br. 21-22. But this argument is at odds with the ESA's regulations, which unambiguously state that "[c]umulative effects are those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02 (emphasis added).

All of the future wind projects identified by Plaintiffs will involve federal approvals, permits, and authorizations—or, in other words, they will involve "federal activities." These projects therefore plainly fall outside the definition of "cumulative effects" under the ESA's regulations. Like the Revolution Project, these projects will each require separate formal ESA Section 7 consultation. Excluding such projects from the ESA Section 7 cumulative effects analysis is not only in line with the ESA's regulations, it is also consistent with the well-recognized framework governing sequential Section 7 reviews for federally authorized projects. As explained in the Biological Opinion, if a future action may affect an ESA-listed species and consultation is therefore required, the project's effects will be analyzed against the new "environmental baseline"

23

which, as discussed above, takes into account the effects of all federally authorized existing and proposed wind projects that have previously undergone Section 7 consultation (which would include the Revolution Project). *See* Ex. 5 at 394 ("[I]n each successive consultation, the effects on listed species of other offshore wind projects under construction or completed would be considered to the extent they influence the status of the species and/or environmental baseline according to the best available scientific information.").

Plaintiffs ask the Court to ignore the clear text of the ESA's implementing regulations concerning cumulative effects and instead apply the broader "cumulative effects" approach provided by NEPA's implementing regulations. *See* Pls.' Br. 21 (arguing that NMFS "[r]eject[ed] the parallel cumulative impacts analysis required for Environmental Impact Statements"). But NEPA is a separate and distinct statute with its own implementing regulations, which do not apply to ESA Section 7 consultation. In contrast to the ESA regulations addressing cumulative impacts, 50 C.F.R. § 402.02, NEPA's "cumulative effects" definition more broadly includes "past, present, and reasonably foreseeable actions *regardless of what agency (Federal or non–Federal)* or person undertakes such other actions[,]" 40 C.F.R. § 1508.1(g)(3) (emphasis added).[20]

Indeed, the distinction between the two statutes' regulations is recognized by the *ESA Consultation Handbook (March 1998)*, which suggests that "the broader NEPA discussion of cumulative effects" can be referenced by consulting agencies when gathering information to apply

---

[20] Not only is the NEPA regulation defining cumulative effects legally inapplicable in the ESA context, it deviates from the ESA regulation in several meaningful ways. For example, the NEPA regulation mandates the consideration of federal activities, it does not specify a geographic "action area," and it relies on a separate standard for identifying actions for evaluation (i.e., actions that are "reasonably foreseeable" versus those that are "reasonably certain to occur"). *Compare* 40 C.F.R. § 1508.1(g)(3) *with* 50 C.F.R. § 402.02.

to "the [ESA]'s narrower cumulative effects definition."[21] The Eleventh Circuit has also recognized that "[f]ederal actions, and those involving federal agencies, are excluded from cumulative effects analysis because they are subject to their own [ESA Section 7] consultation process." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009) (finding that projects within the jurisdiction of a federal agency were "exempt from consideration in the [biological opinion's] cumulative effects analysis"). Similarly, the Fifth Circuit has held that a project was "properly excluded from the cumulative effects analysis because, at the time of the [biological] opinion, the [excluded] project was a *federal* action subject to its own consultation." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021) (citations omitted); *see also Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1113 (9th Cir. 2012) ("'[C]umulative effects' are 'those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation.'") (citation omitted).

Further, none of the cases Plaintiffs cite support their argument that NMFS "ignore[d] known threats to endangered species" by excluding future federally authorized wind projects from its cumulative impacts analysis. Pls.' Br. 22. In relying on *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985), Plaintiffs continue to conflate the requirements of the ESA and NEPA. Pls.' Br. 24. The *Thomas* court's statements about "cumulative actions," "cumulative environmental effects," and

---

[21] ESA Consultation Handbook (Mar. 1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf at 4-32, https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf. The ESA Consultation Handbook explains: "The concept of cumulative effects is frequently misunderstood as it relates to determining likely jeopardy or adverse modification. Cumulative effects include effects of future State, tribal, local, and private actions, not involving a Federal action, that are reasonably certain to occur within the action area under consideration. Future Federal actions requiring separate consultation (unrelated to the proposed action) are not considered in the cumulative effects section." *Id.* at 4-31.

"cumulative impacts" were all related to NEPA claims and did not pertain to any holding under the ESA. *See Thomas*, 753 F.2d at 759-61. Plaintiffs' reliance on *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), is also misplaced. Pls.' Br. 22-23. The court in *Conner* found that, in a biological opinion addressing the sale of oil and gas leases on a national forest, the consulting agency should have also considered post-leasing activities, because: "[T]he 'agency action' encompassed the entire leasing project, from the issuance of the leases through post-leasing development and production[.] . . . Thus, section 7 of the ESA . . . requires the [consulting agency] to consider all phases of the agency action . . . in its biological opinion." *Conner*, 848 F.2d at 1453. In contrast, here, Plaintiffs are arguing that NMFS should have considered entirely separate federally authorized projects that are unquestionably not future "phases" of the Revolution Project.

As Plaintiffs suggest, their challenge to NMFS's cumulative effects analysis in the Biological Opinion boils down to a question of what is "the proper interpretation of the Endangered Species Act[.]" Pls.' Br. 23. The answer to that question is clear: "[c]umulative effects are those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area[.]" 50 C.F.R. § 402.02 (emphasis added). Thus, future federally authorized projects should not be addressed in the Biological Opinion's cumulative effects analysis (and existing federally authorized projects that have undergone ESA consultation are properly addressed in the environmental baseline, *see supra* V.A.2.a.).

### e. NMFS's Biological Opinion is in line with its North Atlantic Right Whale and Offshore Wind Strategy.

The Biological Opinion also fully complies with the ESA's best scientific and commercial data available requirement, 16 U.S.C. § 1536(a)(2), which "merely prohibits [NMFS] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Sw Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000). Plaintiffs appear

to argue that NMFS and BOEM ignored "available scientific information" presented in their joint *North Atlantic Right Whale and Offshore Wind Strategy* issued in January 2024 ("NARW Strategy").[22] *See* Pls.' Br. 24-26. To the extent this strategy document constitutes a scientific document, the Biological Opinion did not ignore it. In fact, many mitigation measures contemplated in the Biological Opinion are in line with those envisioned by the NARW Strategy.

The NARW Strategy is a nonbinding, "living" guidance document that provides for coordination across the federal government to achieve a common vision of protecting and promoting the recovery of NARWs while responsibly developing offshore wind energy to address the climate crisis.[23] By way of example, the NARW Strategy includes a list of potential mitigation measures that the agencies agree "may have potential to avoid and minimize impacts to NARWs from [offshore wind] activities . . . that regulatory agencies and project proponents should consider for individual projects."[24] Many of those suggested measures are required in the Biological Opinion as terms or conditions of the ITS or as part of the proposed action. For example:

- Protected Species Observers ("PSOs"). The NARW Strategy recommends that the agencies require the use of trained, third-party PSOs and suggests that three PSOs be stationed at each platform during pile driving.[25] In line with this recommendation, the Biological Opinion provides that "clearance zones will be monitored by at least three PSOs at the pile driving platform and at least three PSOs on each of at least two dedicated PSO vessels located[.]"[26]

- Clearance Zones. The NARW Strategy recommends the use of clearance zones, wherein detecting a NARW triggers a delay in starting certain construction activities.[27] In line with

---

[22] NARW Strategy, https://perma.cc/52YZ-2V4W (last visited May 21, 2024).

[23] *See* NOAA, BOEM Announce Final North Atlantic Right Whale and Offshore Wind Strategy, NOAA Fisheries (Jan. 25, 2024), https://www.fisheries.noaa.gov/media-release/noaa-boem-announce-final-north-atlantic-right-whale-and-offshore-wind-strategy.

[24] NARW Strategy at 41, https://perma.cc/52YZ-2V4W (last visited May 21, 2024).

[25] *Id*. at 45.

[26] Ex. 5 at 213.

[27] NARW Strategy at 45, https://perma.cc/52YZ-2V4W (last visited May 21, 2024).

this recommendation, the Biological Opinion provides detailed requirements for clearance, including visual observers and passive acoustic monitoring, which must be satisfied before pile driving or UXO detonation may commence.[28]

- <u>Shutdown Zones</u>. The NARW Strategy suggests the use of shutdown zones, consisting of "an area around a pile (or other activity) that is monitored by PSOs, wherein a detection (visual or acoustic) of a NARW triggers a stop of the activity."[29] In line with this recommendation, the Biological Opinion provides detailed procedures for the shutdown of operations if a marine mammal is observed entering or within a shutdown zone. [30]

- <u>Sound field verification ("SFV")</u>. The NARW Strategy recommends conducting SFV for construction activities including but not limited to pile driving and UXO detonation, and that developers should "conduct Thorough SFV Monitoring . . . for the first three foundations of a project[.]"[31] In line with this recommendation, the Biological Opinion provides that BOEM and the Corps "must require Revolution Wind to implement Thorough SFV . . . for at least the first three monopiles installed and for any additional piles installed that may produce louder sound fields than those previously measured[.]"[32]

Despite the many measures adopted by the Biological Opinion that are consistent with the recommendations made in the NARW Strategy, Plaintiffs suggest that NMFS has overlooked scientific evidence simply because the strategy recognizes that the species' range "overlaps with the area proposed for [offshore wind] development" and the activities associated with such development may "introduce or further contribute to existing stressors in the environment that affect [NARWs]." Pls.' Br. 24-25 (citing NARW Strategy at 12). But the Biological Opinion did not overlook impacts to the NARW from offshore wind development. Indeed, those anticipated impacts are why the agencies engaged in ESA Section 7 consultation to begin with. *See* 50 C.F.R. § 402.14(a) (requiring Section 7 consultation if the agency proposing an action determines that the action "may affect" ESA-listed species or critical habitat).

---

[28] Ex. 5 at 40.

[29] NARW Strategy at 45, https://perma.cc/52YZ-2V4W (last visited May 21, 2024).

[30] Ex. 5 at 41.

[31] NARW Strategy at 45-46, https://perma.cc/52YZ-2V4W (last visited May 21, 2024).

[32] Ex. 5 at 477.

Contrary to Plaintiffs' cursory suggestions, the Biological Opinion provides a thorough analysis of the impacts that the Revolution Project is expected to have on NARWs. *See, e.g.*, Ex. 5 at 441-47. Based on this analysis, NMFS determined that "the only adverse effects to [NARWs] expected to result from the [Revolution Project] are [] temporary behavioral disturbance and/or temporary threshold shift (minor and temporary hearing impairment), inclusive of masking and stress, as a result of exposure to noise during impact pile driving and UXO detonations[.]" *Id.* at 445. In other words, while short-term incidental take by harassment is anticipated, "[n]o injury (auditory or other), serious injury, or mortality is expected due to exposure to any aspect of the proposed action during the construction, operations, or decommissioning phases of the project." *Id.* Thus, based on NMFS's consideration of "the endangered status of [NARWs], the effects of the action, other stressors that individuals are exposed to within the action area as described in the *Environmental Baseline and Cumulative Effects* section of [the Biological Opinion], and any anticipated effects of climate change on the abundance, reproduction, and distribution of right whales in the action area[,]" NMFS concluded that the Revolution Project is not likely to jeopardize the survival and recovery of the species. *Id.* at 447.

Plaintiffs' citations to broad statements from the NARW Strategy about the status of the species and the anticipated impacts of offshore wind development fail to undermine NMFS's reasoned analysis in the Biological Opinion.

### f. The Biological Opinion properly analyzes the effects of the proposed action within the proposed action time period.

Without appearing to assert any actual argument, Plaintiffs include a section in their brief that simply remarks that the Biological Opinion recognizes that NARWs are observed in the vicinity of the project area "nearly year round . . . with highest sighting rates between December and May[,]" which means that NARWs may be present "during that construction period." Pls.' Br.

30 (citation omitted). Per the terms of the proposed action analyzed in the Biological Opinion, pile driving may only be conducted between May 1 and December 31. Ex. 5 at 16. The Biological Opinion also includes a discretionary conservation recommendation to avoid impact pile driving in May and December. *Id.* at 501. Contrary to Plaintiffs' suggestions, neither of these facts support the merits of Plaintiffs' ESA claim.

      To the extent that Plaintiffs are arguing that the Biological Opinion has somehow been invalidated simply because Revolution Wind began pile driving in May, and thus presumably did not adopt NMFS's conservation recommendation, Plaintiffs' argument fails. Per the ESA's implementing regulations, the consulting agency (here, NMFS) "may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force." 50 C.F.R. § 402.14(j). Thus, unlike with the reasonable and prudent measures and terms and conditions imposed by the Biological Opinion's ITS (which, "[i]n order for the take exemption to be effective . . . are nondiscretionary for the action agencies and applicant," Ex. 5 at 475), it is not mandatory for an action agency or applicant to adopt conservation recommendations. *See also Ctr. For Biological Diversity v. EPA*, 56 F.4th 55, 63 (D.C. Cir. 2022) ("[I]f the [biological] opinion concludes the action is likely to harm listed species or critical habitat, it also . . . includes a statement concerning 'incidental take' of covered species and discretionary conservation recommendations.") (citations omitted).[33]

---

[33] While not mandatory, it is worth noting that the action agencies and Revolution Wind have adopted a number of NMFS's conservation recommendations in the Biological Opinion. *See* Ex. 5 501-03. For example, BOEM's Conditions of COP Approval call for Revolution Wind to conduct long-term monitoring of ambient noise and baleen whales by either implementing its own plan or making contributions to BOEM's efforts to accomplish that goal. *Compare* Ex. 5 at 502-03 (Conservation Recommendation Nos. 4 and 13), *with* Ex. 6 ¶ 5.4.6; *see also* Ex. 6 ¶ 5.5.5(a) (requiring Revolution Wind to prepare a sequencing plan that describes, "how the construction

To the extent that Plaintiffs are suggesting that the Biological Opinion is inadequate merely because NARWs may be present in the action area during construction, this argument also fails. The Biological Opinion's analysis expressly considered the construction period. *See* Ex. 5 at 16-17 ("Installation of the WTG monopiles is expected to be completed in a single 5-month campaign between May 1 and December 31. No pile driving for foundation installation will occur between January 1 and April 30. The OSS foundation installation is expected to occur within a 1- to-2-week period also between May 1 and December 31."). And, as Plaintiffs acknowledge, the Biological Opinion also considers the likelihood that NARWs will be present in the project area during that period. *See, e.g.*, Ex. 5 at 135 ("Aerial survey results indicate that [NARWs] begin to arrive in the [project area] in December and remain in the area through April. However, acoustic detections occurred during all months, with peak number of detections between December and late May[.]") (citation omitted). Indeed, if NARWs were not anticipated to be present during the project construction period, Section 7 consultation likely would not have even been required. *See* 16 U.S.C. § 1536 (if the consulting agency finds that an ESA-protected species "may be present" in the action area, the action agency must "conduct a biological assessment" to identify whether the species is "likely to be affected" by the project); 50 C.F.R. § 402.14(a) (consultation is not required unless the action agency determines that its action "may affect" an ESA-listed species or critical habitat).

In sum, the fact that NARWs will likely be present in the action area during the period of construction operations does not undermine NMFS's reasoned conclusion that the Revolution Project is not likely to jeopardize the survival of the species. Ex. 5 at 447.

---

schedule is designed to the extent technically feasible to avoid any pile driving in the lease area between November 1 and December 31 each year").

### g.  Plaintiffs fail to establish that pile driving activity is being conducted outside the scope of what was considered in the Biological Opinion.

Plaintiffs' assertion that Revolution Wind has two pile-driving vessels stationed at the project site similarly does nothing to undermine NMFS's Biological Opinion or Revolution Wind's compliance with it. It is correct that the proposed action analyzed by the Biological Opinion was limited to "installation of [no] more than one pile at a time[,]" as concurrent pile driving was "not planned or anticipated to occur." Ex. 5 at 181. Thus, "the effects of concurrent pile driving [would be] outside the scope" of the Biological Opinion. *Id.* But Plaintiffs' purported observation that there are two vessels located at the project site in no way establishes that Revolution Wind is using those vessels to conduct concurrent pile driving outside the scope of the Biological Opinion and in violation of BOEM's Conditions of COP Approval. *See* Ex. 6 ¶ 1.1 (Revolution Wind must conduct all activities as proposed in its approved Construction and Operations Plan).

### B.  Plaintiffs have failed to establish irreparable harm.

Even if Plaintiffs had shown a likelihood of success on the merits, they fail to demonstrate that they are likely to suffer any harm, let alone irreparable harm, absent an injunction. To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief[.]" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks and citation omitted). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The Supreme Court likewise has made clear that this standard is a rigorous test, and that an injunction may be granted on nothing less than a showing "that irreparable injury is *likely* in the absence of an injunction[.]" *Winter*, 555 U.S. at 22; *see also* 11A C. Wright, A. Miller, & M. Kane,

Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995) ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury.").

Because Plaintiffs have failed to establish irreparable harm, the Court should deny Plaintiffs' motion on this basis. *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) ("[A] court may refuse to issue an injunction without considering any other factors when irreparable harm is not demonstrated.") (quotation marks and citation omitted).

    **1.**   **Plaintiffs' failure to seek injunctive relief until months after construction began belies their claim of irreparable harm.**

Plaintiffs' months' long delay in seeking injunctive relief demonstrates their lack of irreparable harm, which, alone, is grounds to deny Plaintiffs' motion. *Bernhardt*, 453 F. Supp. 3d at 403; *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) ("[A] party requesting a preliminary injunction must generally show reasonable diligence" in seeking emergency relief.); *see also* Charles Alan Wright & Arthur R. Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d ed. 2023) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). Here, Plaintiffs allege that, "[o]nce pile-driving activities start, the harm caused by the relocation of boulders and concrete, trenching for the laying of cables, and the pile-driving to install monopiles and cables cannot easily be reversed and may never be undone." Pls.' Br. 36. But all of those activities began *before* Plaintiffs brought their motion, which seeks to disturb the status quo by halting offshore construction that is already well underway. *See id.* at 1 (seeking an injunction enjoining Revolution Wind from "conducting any in-water work related to its offshore wind energy facility . . . until the merits of this lawsuit are resolved").

Indeed, Plaintiffs brought their motion four months after offshore construction activities began in January 2024, and five days after pile driving began on May 9, 2024. Meanwhile,

Plaintiffs were on notice of Revolution Wind's anticipated construction schedule for over a year, as it has been publicly available on BOEM's website since March 2023.[34] Plaintiffs have therefore not shown reasonable diligence in seeking injunctive relief, which belies the irreparability of any alleged harm. Their motion should be denied on this basis.[35]

Other courts have denied injunctive relief under very similar circumstances. For instance, the Massachusetts District Court denied a motion for preliminary injunction seeking to halt construction of another offshore wind project based on the plaintiffs' delay in seeking injunctive relief until shortly after pile-driving construction began. *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, Case No. 1:22-cv-11091-IT, 2023 WL 3660689, at *5 (D. Mass. May 25, 2023). The court noted that the project's construction schedule had been publicly available on BOEM's website for months before they sought an injunction. *Id.* ("Plaintiffs did not file their Motion for a Stay . . . until May 10, 2023, despite knowing for months that installation of the monopiles would commence in May 2023 and that installation of cables and scour protection had already commenced.") (citation omitted). Based on this, the court concluded that "Plaintiffs' substantial delay in seeking preliminary relief is fatal to their claim of irreparable harm." *Id.* at *4. Here, the Revolution Project construction schedule has been publicly available for even longer than in *Seafreeze*. Thus, the lateness of Plaintiffs' request for injunctive relief—which was also made after pile driving began—likewise indicates a lack of irreparable harm. Plaintiffs' motion should also

---

[34] Revolution Wind Farm Construction and Operations Plan and Appendices (updated March 2023), https://perma.cc/X3QY-GXWV (last visited May 21, 2024).

[35] Plaintiffs do not even attempt to explain their delay in bringing their motion. To the extent that Plaintiffs might allege that their delay is somehow attributed to the agencies' reinitiated ESA consultation, such an argument would fail, as none of the issues that Plaintiffs raise regarding their ESA claim, *see* Pls.' Br. 19-32, are unique to the new Biological Opinion issued on April 30, 2024, as opposed to the previously operative 2023 Biological Opinion. With respect to Plaintiffs' CWA claim, the CWA Section 404 permit that Plaintiffs challenge was issued over seven months ago, on October 2, 2023.

be denied on this basis.

> **2.  Plaintiffs have not demonstrated any irreparable harm to themselves.**

Setting aside their delay, Plaintiffs have not alleged that *they* will suffer any harm. They allege only that certain marine life will suffer harm but fail to demonstrate any way in which that alleged injury will cause concrete injury to Plaintiffs' alleged interests. But harm to the environment alone cannot constitute irreparable harm for purposes of injunctive relief. It must be *the movant* that is likely to suffer irreparable harm. *Winter*, 555 U.S. at 20 (requiring plaintiff to establish "that *he* is likely to suffer irreparable harm") (emphasis added)); *accord Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000) (to demonstrate standing, a plaintiff must show that the harm "is not injury to the environment but injury to the plaintiff").

In their motion, Plaintiffs allege that only the following three Plaintiffs will suffer irreparable harm: (1) Save Right Whales Coalition, Pls.' Br. 32-33; (2) Green Oceans*, id.* at 34-36; and (3) Dr. Elizabeth Quattrocki Knight, an individual Plaintiff and President of Green Oceans, *id.* For each of these Plaintiffs, Plaintiffs' allegations of harm are insufficient to even establish an "injury in fact" capable of supporting standing and are far less sufficient to obtain the "extraordinary remedy" of injunctive relief. *Winter*, 555 U.S. at 24.

For Save Right Whales Coalition, Plaintiffs allege that the organization has submitted comments and sent letters highlighting its "concerns that the protective mitigation measures adopted by NOAA and BOEM to reduce whale injury and mortality . . . are inadequate." Pls.' Br. 33. They also attempt to establish irreparable harm through the organization's President, Ms. Linowes. Plaintiffs assert that Ms. Linowes "has been involved in the research and analysis of wind energy" and "has testified before Congress on environmental issues relating to wind energy production." *Id.* at 33 (citing Decl. of Lisa Linowes ("Linowes Decl."), ECF No. 35-3 ¶ 3).

Plaintiffs then broadly conclude that, because Ms. Linowes—who does not appear to have any background in biology—has conducted research that purportedly shows a correlation between an "increase in whale and large marine mammal deaths" and "the start of the offshore wind [] program[,]" the Revolution Project therefore "threatens marine mammals and endangered whales in Revolution Wind's lease area." *Id.* (citing Linowes Decl. ¶¶ 5-12).

Putting aside Ms. Linowes' lack of qualifications to draw such a conclusion, Ms. Linowes' and Save Right Whales Coalition's general interest in and concern for whales does not establish that they will suffer an actual, concrete injury, let alone an irreparable one. A "general concern for the environment is simply not sufficient" to establish a "concrete particularized injury[.]" *Sabino Canyon Tours, Inc. v. USDA Forest Serv.*, 298 F. Supp. 3d 60, 74 (D.D.C. 2018); *see also ASARCO Inc. v. Kadish*, 490 U.S. 605, 616 (1989) ("[G]eneralized grievances brought by concerned citizens . . . are not cognizable [injuries] in the federal courts."). Indeed, to establish an "injury in fact," Plaintiffs must show, "through specific facts, not only that listed species [are] in fact being threatened [by the challenged action], but also that one or more of [Plaintiffs'] members would thereby be 'directly' affected apart from their 'special interest' in th[e] subject.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) (citations omitted).

Similarly, with respect to Plaintiffs Green Oceans and Dr. Knight, Plaintiffs allege that "Green Oceans and [Dr. Knight] are deeply troubled by the impact offshore wind, particularly the Revolution Wind Project, will have on marine mammals [and] the marine environment[.]" Pls.' Br. 34 (citing Decl. of Elizabeth Quattrocki Knight ("Knight Decl."), ECF No. 35-4 ¶ 5). The only actual harm that Plaintiffs even arguably allege Green Oceans will suffer is that construction of the Revolution Project will cause its members to "have issues fishing, boating, and enjoying the unindustrialized ocean." *Id.* at 35 (quoting Knight Decl. ¶ 10). But not only do Plaintiffs fail to

specify what "issues" Green Oceans' members will allegedly suffer from, they fail to draw any connection between the alleged harm and any ESA-listed species, and fail to specify where in the entirety of the "unindustrialized ocean" the alleged harm will occur.

Indeed, Plaintiffs' motion and supporting declarations are devoid of any allegation that Ms. Linowes or Dr. Knight (or any other members of Save Right Whales Coalition or Green Oceans) has ever observed or plans to observe any ESA-listed species in the project area. Plaintiffs therefore fail to establish that they will suffer any legally recognizable or irreparable injury absent the requested injunction. *See Sierra Club v. Morton*, 405 U.S. 727, 735, 739 (1972) (plaintiff lacked standing because it failed to allege that "it or its members would be affected in any of their activities or pastimes by the [challenged] development"); *Lujan*, 504 U.S. at 566-67 ("It goes beyond the limit . . . and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a [] project affecting some portion of that species with which he has no more specific connection."); *Save Long Beach Island v. U.S. Dep't of Com.*, No. 23-1886 (RK) (JBD), 2024 WL 863428, at *9 (D.N.J. Feb. 29, 2024) (dismissing claims challenging federal approvals for an offshore wind project because plaintiffs "fail[ed] to allege harm to themselves resulting from any harm to marine mammals" and "finding standing based on Plaintiffs' worry about the harm that may befall marine mammals would 'transform[ ] [the Court] into no more than a vehicle for the vindication of the value interests of concerned bystanders'").

### 3. Plaintiffs' general and speculative allegations do not establish concrete affirmative evidence of harm.

Even if Plaintiffs' allegations of harm to marine life could constitute irreparable injury to Plaintiffs, they fall far short of the affirmative evidence of "certain" and "actual" harm that Plaintiffs must establish for an injunction. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.

Cir. 1985) (per curiam). "Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time[.]'" *Id.* (citation omitted). Here, Plaintiffs' allegations of harm fail for the additional reason that they are entirely general and speculative.

With respect to Plaintiffs' ESA-related allegations, Plaintiffs allege that, absent an injunction, Plaintiff Save the Right Whales Coalition will be harmed because the "ongoing and planned construction threatens marine mammals and endangered whales in Revolution Wind's lease area." Pls.' Br. 33 (citing Linowes Decl. ¶¶ 5-12). The only support Plaintiffs provide for this conclusory allegation is that Ms. Linowes (the President of Save the Right Whales) has conducted "research regarding the increase in whale and large marine mammal deaths in recent years," which allegedly shows a "strong[] correlate[ion] with the start of the offshore wind—program including surveying, sonar, site assessment mapping, and construction." Pls.' Br. 33. But Plaintiffs fail to demonstrate how this alleged correlation of whale deaths (which Federal Defendants dispute in any event) translates to some concrete harm that the Save the Right Whales organization will suffer as a result of the continued construction of the Revolution Project. Similarly, Plaintiffs provide no evidence for their broad speculation that continued construction of the Revolution Project will harm members of Plaintiff Green Oceans by causing "issues fishing, boating, and enjoying the unindustrialized ocean." *Id*. at 35 (quoting Knight Decl. ¶ 10).

Additionally, with respect to Plaintiffs' CWA claim, their declarations are almost entirely devoid of any mention of Cox Ledge. Only one declaration mentions Cox Ledge and then only in passing, without any additional detail or reference to the Corps Permit. *See* Knight Decl. ¶¶ 5-6. This falls far short of meeting Plaintiffs' burden to "substantiate the claim that irreparable harm is 'likely' to occur" with affirmative "proof," not just "[b]are allegations of what is likely to occur." *Wisconsin Gas Co.*, 758 F.2d at 674.

**4. Plaintiffs' allegations of irreparable harm are belied by the evidence.**

Plaintiffs' conclusory allegations of harm are also belied by the thorough environmental analyses conducted by the federal agencies in approving the Revolution Project.

**a. The record rebuts Plaintiffs' claim of ESA-related harm.**

Plaintiffs "concerns that the protective mitigation measures adopted by NOAA and BOEM to reduce whale injury . . . are inadequate," Pls.' Br. 33, cannot be construed as a harm. But even if they could, NMFS's analysis in its extensive Biological Opinion disproves a finding of irreparable harm. *See* Ex. 5; *id.* at 441-69 (determining that the Revolution Project is unlikely to appreciably reduce the likelihood of survival and recovery of ESA-listed whales). Plaintiffs' concerns and unsupported allegations fail to undermine NMFS's scientific findings, which are entitled to substantial deference.[36] *Nat'l Wildlife Fed'n*, 286 F.3d at 560 ("[P]articular deference is given by the court to an agency with regard to scientific matters in its area of technical expertise.") (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

Indeed, the multitude of mitigation measures included in NMFS's Biological Opinion and required by BOEM's Conditions of COP Approval, *see supra* V.A.2.e., alone are evidence that

---

[36] *See, e.g.*, Ex. 5 at 249 (analyzing the impacts of High-Resolution Geophysical Surveys on ESA-listed whales, finding that: "[T]he potential for substantial disruption to activities such as feeding (including nursing), resting, and migrating is extremely unlikely given the very brief exposure to any noise (given that the source is traveling and the area ensonified at any given moment is so small). Any brief interruptions of these behaviors are not anticipated to have any lasting effects. Additionally, given the extremely short duration of any measurable behavioral disruption and the very small distance any animal would have to swim to avoid the noise it is extremely unlikely that the behavioral response would increase the risk of exposure to other threats including vessel strike or entanglement in fisheries gear. Thus, while we anticipate effects to be discountable as explained above, even in the extremely unlikely event that such effects were to occur, we anticipate the effects of these temporary behavioral changes to be so minor as to be insignificant. Insignificant and discountable effects are not adverse effects and thus cannot result in ESA take by harassment or otherwise")

irreparable harm is unlikely.[37] *See Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 264–65 (D.D.C. 2020) (finding plaintiff's irreparable-harm argument "undermined by . . . measures in place" to "mitigate" any such harm, including surveys, re-surveys, consultation, and additional protocol); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45 (D.D.C. 2021) (response plans to mitigate and remediate hypothetical spill reduced likelihood of irreparable injury).

### b.  The record rebuts Plaintiffs' claim of CWA-related harm.

Plaintiffs' irreparable injury claims relate to Cox Ledge and are completely untethered from the Corps' CWA analysis and Section 404 permit. *See supra* V.A.1.b. Even if the Court enjoins the CWA Section 404 permit, the authorized activities in Cox Ledge would not be enjoined because the Section 404 permit did not authorize those activities. The Corps' CWA analysis was confined to analyzing adverse environmental impacts of the proposed fill in "waters of the United States," which, by statute, do not extend more than three miles past the shore. *Id*. Cox Ledge, which is many miles from the shore in the offshore lease area, is not located in "waters of the United States" under the CWA. *Id*. Thus, any purported deficiencies in the Corps' CWA analysis could not affect Cox Ledge. And even if Plaintiffs had adequately demonstrated injury to Cox Ledge, any such injury would not be caused by the Corps' issuance of a CWA permit. *Id*.

### C.  The balance of the equities and the public interest weigh against an injunction.

The third and fourth factors of the preliminary injunction test—balancing the equities and the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

---

[37] Per BOEM's Conditions of COP Approval, "all reasonable and prudent measures and implementing terms and conditions included in the [Biological Opinion]'s ITS . . . are incorporated by reference[,]" Ex. 6 ¶ 5.14.8, and all activities authorized by the COP approval are "subject to any terms and conditions and reasonable and prudent measures resulting from any BOEM-reinitiated consultation for the Project's NMFS [Biological Opinion,]" *id.* ¶ 1.4.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) (If an injunction "will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.") *Id.* at 327 (citation omitted). Here, these considerations tilt decisively in Federal Defendants' favor.

**1. The public interest in developing renewable clean energy weighs against an injunction.**

The Court should deny Plaintiffs' motion because allowing the Revolution Project to proceed is in the public interest. In Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad," the President recognized that "[t]he United States and the world face a profound climate crisis." Exec. Order 14,008, 86 Fed. Reg. 7,619 (Jan 27, 2021). As one part of the federal government's response to that crisis, Executive Order 14,008 announced an objective to increase renewable energy production on the Outer Continental Shelf "with the goal of doubling offshore wind by 2030 while ensuring robust protection for our lands, waters, and biodiversity and creating good jobs." *Id.* § 207. Congress, too, has taken steps to encourage renewable energy development, including by enacting the Energy Policy Act of 2005, which expressly authorized the Secretary of the Interior to approve renewable energy projects on the Outer Continental Shelf. 43 U.S.C. § 1337(p)(1). In doing so, "Congress has articulated the public policy that our nation should incorporate clean energy as a necessary part of America's future and it is essential to securing our nation's energy independence and decreasing greenhouse emissions." *W. Watersheds Project v. U.S. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103 (D. Nev. 2011), *aff'd,* 443 F. App'x 278 (9th Cir. 2011) (citing the Energy Policy Act of 2005).

The Revolution Project furthers these important public interests. With the capacity to generate 704 megawatts of clean energy, the project has the potential to supply enough renewable energy to power nearly 250,000 homes.[38] By the same token, enjoining the Revolution Project even temporarily would undermine the public interest and "harm federal renewable energy goals." *Id.* (holding that the balance of equities disfavored enjoining an agency's authorizations of wind energy facility); *see also Coleman v. PACCAR, Inc.,* 424 U.S. 1301, 1307 (1976) ("Thus, even if the stay ordered by the Court of Appeals is ultimately dissolved and the Secretary's decision upheld on the merits, the goals of the federal motor vehicle safety program will have been dealt a serious setback.").[39]

### 2. Plaintiffs' mere assertion of an ESA claim does not mean that the public interest weighs in favor of an injunction.

Plaintiffs' reliance on *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978) for their argument that the balance of the equities tips in their favor is misplaced. In *Tennessee Valley*, the Supreme Court found that a federal dam project should be enjoined because, after engaging in ESA Section 7 consultation, the consulting agency "determined that operation of the dam would eradicate an endangered species[.]" *Id.* at 156. By contrast, here, Section 7 consultation led NMFS to determine that the Revolution Project will not jeopardize any ESA-listed species. Ex. 5 at 396-469. *See, e.g.*, *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,* 898 F.2d 1410, 1418 (9th Cir. 1990) ("In [*Tennessee Valley*], it was indisputable that the challenged agency action,

---

[38] *See* BOEM, Revolution Wind, https://www.boem.gov/renewable-energy/state-activities/revolution-wind (last visited May 21, 2024).

[39] Plaintiffs misconstrue a quote from BOEM's Final Environmental Impact Statement to mean that the Revolution Project will not have positive impacts on climate change. Pls.' Br. 38 (citing Final Environmental Impact Statement at 3.10-25). However, the actual meaning of the quoted language is that, while offshore wind development will positively impact climate change to an unknown degree, it will have negligible negative impacts on climate change.

'would result in total destruction of the snail darter's habitat.' Here, the [agency] predicts no such grave danger.") (citation omitted). Thus, Plaintiffs' ESA claim does not override other public interest considerations based on the Court's reasoning in *Tennessee Valley*.

In sum, preliminarily enjoining the Revolution Project or staying Federal Defendants' approvals of the project would threaten more harm to the combined interests of the government and public, *see Nken*, 556 U.S. at 435, than Plaintiffs have shown that they will suffer absent an injunction. Plaintiffs have not carried their burden to show that the balance of equities favor an injunction. The Court should therefore deny Plaintiffs' motion.

### 3. The public interest in the certainty and reliability of Federal Defendants' permitting and approvals process weighs against an injunction.

Given that Plaintiffs delayed bringing their motion until six months after BOEM approved the Construction and Operations Plan and four months after offshore construction began, granting an injunction would pose significant harm to the public's interest in the certainty and reliability of Federal Defendants' permitting and approvals process. Where, as here, a developer has complied with agency rules and satisfied federal statutory requirements, it should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity. OCSLA recognizes that interest. *See* 43 U.S.C. § 1332(3) ("[T]he [O]uter Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs[.]").

Courts have also recognized that "[t]he integrity of the permit process and the value of [a federal agency's] review and approval is substantially undermined if challenges may be mounted indefinitely[.]" *Allens Creek/Corbetts Glen Pres. Grp., Inc. v. Caldera*, 88 F. Supp. 2d 77, 85

43

(W.D.N.Y. 2000), *aff'd*, 2 F. App'x. 162 (2d Cir. 2001) (holding that the government was prejudiced by plaintiffs' delay in challenging federal approvals under the CWA for a project that was already underway); *see also Nat'l Parks & Conservation Ass'n v. Hodel,* 679 F. Supp. 49, 54 (D.D.C. 1987) ("A number of actions have been taken by defendants which plaintiffs might have been successful at preventing before the fact had plaintiffs brought this suit in a timely manner."). Here, as in *Allens Creek*, granting Plaintiffs' request for injunctive relief after offshore construction has been underway for months would undermine the respective permitting processes of the federal agencies and the public's strong interest in the reliability of those processes.

In sum, Plaintiffs' motion should be denied, as granting their untimely request for preliminary injunctive relief would prejudice important public interests.

### 4. The public interests that must be considered under the FAST Act weigh against an injunction.

Plaintiffs do not even mention the FAST Act factors for injunctive relief, let alone address them. Because the Revolution Project is a "covered project" under the FAST Act, in weighing the equities, the Court must "(1) consider the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction; and (2) not presume that the harms described in paragraph (1) are reparable." 42 U.S.C. § 4370m-6(b). Thus, in considering the public interest in renewable energy and the certainty of the permitting process, the Court should not presume that the harm to those interests resulting from an injunction would be reparable. Further, in accordance with the FAST Act, the Court must also weigh the potential loss of jobs that may result from granting Plaintiffs' requested injunctive relief. Federal Defendants defer to Revolution Wind to expand upon any impact that an injunction would have on jobs (as well as the negative economic consequences that would result from a halt of project activities). *See, e.g*., ECF No. 29 at 10 ("The Revolution Wind Project will create more

than 4,100 full-time equivalent jobs . . . during construction and an estimated 236 fulltime equivalent jobs annually for the Project's operations and maintenance work."); *id.* at 2 ("Any delay in offshore construction . . . would cause Revolution Wind to incur additional costs of more than $1 million per day beginning on May 1, 2024 and increasing to $3 million per day if the delay extended into and beyond late July 2024.")

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs fail to meet their heavy burden to demonstrate irreparable harm, a likelihood of success on the merits, or that the balance of the harms or public interest favors Plaintiffs. Therefore, the Court should deny Plaintiffs' motion.

Respectfully submitted this 21st day of May, 2024.

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Michelle M. Spatz*
MICHELLE M. SPATZ
Trial Attorney
Wildlife and Marine Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Tel: 202-598-9741
michelle.spatz@usdoj.gov

SARAH IZFAR
Senior Trial Attorney
Environmental Defense Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Tel: 202-305-0498
sarah.izfar@usdoj.gov

AMANDA K. RUDAT
Trial Attorney
MATTHEW MARINELLI
Senior Attorney
Natural Resources Section
United States Department of Justice

P.O. Box 7611
Washington, D.C. 20044
Tel: 202-532-3201
Tel: 202-305-0293
amanda.rudat@usdoj.gov
matthew.marinelli@usdoj.gov