## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREEN OCEANS, *et al.*,

       *Plaintiffs,*

   v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

       *Defendants,*

  and

REVOLUTION WIND, LLC,

       *Defendant-Intervenor*

Case No.: 1:24-cv-00141-RCL

## DEFENDANT-INTERVENOR REVOLUTION WIND, LLC'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT ........................................................................................................1

    A.    Plaintiffs' Arguments Do Not Overcome Their Failure to Adequately
Plead Standing for Nearly All Claims ..................................................1

        1.    Plaintiffs Have Not Adequately Pleaded Causation or
Redressability.........................................................................2

        2.    The Opposition Does Not Cure the Standing Defects with Property
Plaintiffs' National Historic Preservation Act and Property-Related
NEPA Claims............................................................................4

        3.    Plaintiffs' Opposition Still Fails to Adequately Plead Causation or
Redressability for OCSLA, NEPA, Endangered Species Act, and
Marine Mammal Protection Act Claims Based on Impacts to Right
Whales.......................................................................................7

        4.    Plaintiffs Fail to Adequately Plead Standing for Any Claim About
Bats or Birds Other Than the Piping Plover ...............................10

        5.    All Claims By Fishing and Recreational Boating Plaintiffs Should
Be Dismissed Because Plaintiffs Still Do Not Adequately Plead
Causation or Redressability .......................................................11

        6.    Plaintiffs Fail to Adequately Plead Organizational Standing ...................15

    B.    Plaintiffs Fail to Plead the Requisite Administrative Process Participation ..........16

        1.    Plaintiffs Waived Their Clean Water Act Claims......................................16

        2.    Plaintiffs Fail to Allege Sufficient Administrative Participation
Under FAST-41 ........................................................................18

    C.    Plaintiffs Concede They Failed to Provide Adequate Notice as to Their
OCSLA Claims Against BOEM ........................................................19

    D.    Plaintiffs Fail to State a Migratory Bird Treaty Act Claim .................................23

    E.    Plaintiffs Fail to State a Coastal Zone Management Act Claim ...........................24

III.   CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Forest Ass'n v. Vilsack*,
 883 F. Supp. 2d 136 (D.D.C. 2012) ..........................................................................5

*Al-Owhali v. Ashcroft*,
 279 F. Supp. 2d 13 (D.D.C. 2003) ............................................................................8

*Amerada Hess Corp. v. DOI*,
 170 F.3d 1032 (10th Cir. 1999) ..............................................................................22

*Arpaio v. Obama*,
 797 F.3d 11 (D.C. Cir. 2015) ....................................................................................2

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ................................................................................................19

*Basel Action Network v. Mar. Admin.*,
 370 F. Supp. 2d 57 (D.D.C. 2005) ..........................................................................21

*Bd. of Supervisors v. United States*,
 84 F.4th 1359 (Fed. Cir. 2023) ...............................................................................25

*Bowden v. United States*,
 106 F.3d 433 (D.C. Cir. 1997) ................................................................................16

*Bowen v. Massachusetts*,
 487 U.S. 879 (1988) ................................................................................................20

*Campaign for Accountability v. U.S. Dep't of Just.*,
 278 F. Supp. 3d 303 (D.D.C. 2017) ..........................................................................8

*City of Sausalito v. O'Neill*,
 386 F.3d 1186 (9th Cir. 2004) .................................................................................25

*Comm. for a Constructive Tomorrow v. U.S. Dep't of Interior*,
 No. 24-774 (LLA), 2024 WL 2699895 (D.D.C. May 24, 2024) ............................10

*\*Dep't of Trans. v. Pub. Citizen*,
 541 U.S. 752 (2004) ...........................................................................................18, 19

*\*Duke Energy Field Services Assets, L.L.C. v. FERC*,
 150 F. Supp. 2d 150 (D.D.C. 2001) ............................................................21, 22, 23

*El Puente v. USACE*,
　100 F.4th 236 (D.C. Cir. 2024)........................................................................................18

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*,
　442 F. Supp. 3d 37 (D.D.C. 2020) ...................................................................................9

*Enos v. Marsh*,
　616 F. Supp. 32 (D. Haw. 1984), *aff'd*, 769 F.2d 1363 (9th Cir. 1985) ................................24

*Env't Working Grp. v. U.S. Food & Drug Admin.*,
　301 F. Supp. 3d 165 (D.D.C. 2018) .................................................................................16

*Fisheries Survival Fund v. Haaland*,
　858 F. App'x 371 (D.C. Cir. 2021).....................................................................................22

*Food & Water Watch, Inc. v. Vilsack*,
　808 F.3d 905 (D.C. Cir. 2015) ..........................................................................................16

*Friends of the Cap. Crescent Trail v. Fed. Transit Admin.*,
　255 F. Supp. 3d 60 (D.D.C. 2017) ...................................................................................23

*George v. Evans*,
　311 F. App'x 426 (2d Cir. 2009) .......................................................................................24

*Gunpowder Riverkeeper v. FERC*,
　807 F.3d 267 (D.C. Cir. 2015) .................................................................................13, 15

*Healthy Gulf v. USACE*,
　81 F.4th 510 (5th Cir. 2023) .............................................................................................18

*Henneghan v. Dist. of Columbia*,
　916 F. Supp. 2d 5 (D.D.C. 2013) .....................................................................................19

*Hunt v. Wash. State Apple Advert. Comm'n*,
　432 U.S. 333 (1977).............................................................................................................5

*Jones v. Bock*,
　549 U.S. 199 (2007)...........................................................................................................17

*Kaempe v. Myers*,
　367 F.3d 958 (D.C. Cir. 2004) ............................................................................................8

*Knaust v. City of Kingston, NY*,
　No. 96-CV-601 (FJS), 1999 WL 31106 (N.D.N.Y. Jan. 15, 1999).......................................24

*Kunaknana v. USACE*,
　23 F. Supp. 3d 1063 (D. Alaska 2014) .............................................................................17

*Lowman v. Federal Aviation Administration*,
    83 F.4th 1345 (11th Cir. 2023) ...................................................................17

*\*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................................................................11

*Mdewakanton Sioux Indians of Minn. v. Bernhardt*,
    464 F. Supp. 3d 316 (D.D.C. 2020) ........................................................17, 18

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011) ...........................................................................15

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ........................................................................4

*Nebraska v. EPA*,
    331 F.3d 995 (D.C. Cir. 2003) ..........................................................................9

*OXY USA, Inc. v. Babbitt*,
    122 F.3d 251 (5th Cir. 1997) ...........................................................................22

*Penn. Prot. & Advoc., Inc. v. Houston*,
    136 F. Supp. 2d 353 (E.D. Pa. 2001) ................................................................1

*Pub. Emps. for Env't Resp. v. Beaudreau*,
    25 F. Supp. 3d 67 (D.D.C. 2014), *appeal dismissed sub nom. Pub. Emps. for
    Env't Resp. v. Cruickshank*, No. 14-5117, 2014 WL 3014869 (D.C. Cir. June
    11, 2014) .........................................................................................................23

*Save Long Beach Island v. U.S. Dep't of Com.*,
    No. 3:23-cv-01886-RK-JBD, 2024 WL 863428 (D.N.J. Feb. 29, 2024)..................1

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
    No. 1:22-CV-11091-IT, 2023 WL 3660689 (D. Mass. May 25, 2023), *appeal
    dismissed*, No. 23-1473, 2023 WL 8259107 (1st Cir. Oct. 20, 2023) ............13, 15

*Seafreeze Shoreside, Inc. v. U.S. DOI*,
    Nos. 23-1853, 23-2051, 2024 WL 4986216 (1st Cir. Dec. 5, 2024) .......................5

*Sebelius v. Cloer*,
    569 U.S. 369 (2013)........................................................................................19

*Serrano-Lopez v. Cooper*,
    193 F. Supp. 2d 424 (D.P.R. 2002)..................................................................13

*Shell Offshore, Inc. v. DOI*,
    997 F. Supp. 23 (D.D.C. 1998) .......................................................................22

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) (superseded on other grounds) ..........................................16

*Sierra v. Hayden*,
    254 F. Supp. 3d 230 (D.D.C. 2017) ..........................................................16, 18

*State of Cal. ex rel. Brown v. Watt*,
    683 F.2d 1253 (9th Cir. 1982) ..........................................................................24

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...........................................................................................10

*West v. Lynch*,
    845 F.3d 1228 (D.C. Cir. 2017) ........................................................................25

## STATUTES

5 U.S.C. § 704 ..........................................................................................................20

16 U.S.C. § 1456(c)(3)(A) ........................................................................................24

28 U.S.C. § 2401(a) ....................................................................................................3

33 U.S.C.
    §§ 1601-1604 ......................................................................................................14
    § 1608 ..................................................................................................................14

42 U.S.C. § 4370m-6(a)(1)(B)(i) ...................................................................2, 11, 19

43 U.S.C.
    § 1337(p) ...............................................................................................................3
    § 1337(p)(1)(D) .....................................................................................................3
    § 1337(p)(3) ...........................................................................................................3
    § 1349(a)(1) .........................................................................................................22
    § 1349(a)(2) .........................................................................................................22
    § 1349(a)(2)(A) ...................................................................................................20
    § 1349(a)(6) .........................................................................................................21

## RULES

Fed. R. Evid. 201(b) ...................................................................................................8

## REGULATIONS

15 C.F.R.
    § 930.63 ...............................................................................................................24
    § 930.64 ...............................................................................................................24

33 C.F.R.
  pt. 80 ........................................................................................................................14
  § 329.12 ..................................................................................................................18

## OTHER AUTHORITIES

51 Fed. Reg. 41,251 (Nov. 13, 1986)..........................................................................18

78 Fed. Reg. 33,898 (June 5, 2013) ...............................................................................3

## I.    INTRODUCTION

Plaintiffs fail to overcome the numerous grounds for dismissal of their First Amended Complaint, Dkt. 33 ("FAC"), demonstrated by Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind").  Plaintiffs' submission of 39 standing declarations ("Declarations") with their Opposition, Dkt. 66—many of those Declarations raising new claims not present in the already voluminous FAC—only highlights their failure to adequately plead standing in the FAC.

Revolution Wind respectfully requests that the Court grant Revolution Wind's motion to dismiss, Dkt. 53 ("Motion"), the FAC with prejudice because: (1) Plaintiffs fail to adequately plead standing for nearly all of their claims, despite their new Declarations; (2) Plaintiffs fail to plead the requisite participation in the administrative process for certain claims; (3) Plaintiffs concede their 60-day notices of intent to sue for their claims under the Outer Continental Shelf Lands Act ("OCSLA") were inadequate, and Plaintiffs' new argument that no 60-day notice was required is belied by the FAC and is contrary to this Court's precedent; (4) Plaintiffs do not properly allege any violation of the Migratory Bird Treaty Act ("MBTA") by Federal Defendants; and (5) the Coastal Zone Management Act ("CZMA") does not provide a private right of action, and Plaintiffs fail to identify any federal agency action that allegedly violated the CZMA.

## II.    ARGUMENT

### A.    <u>Plaintiffs' Arguments Do Not Overcome Their Failure to Adequately Plead Standing for Nearly All Claims</u>

The FAC remains deficient on its face and Plaintiffs cannot amend their complaint through declarations.  *See, e.g.*, *Save Long Beach Island v. U.S. Dep't of Com.*, No. 3:23-cv-01886-RK-JBD, 2024 WL 863428, at *10 (D.N.J. Feb. 29, 2024) (dismissing challenge to offshore wind approvals on standing grounds where plaintiffs improperly alleged new facts in response to motions to dismiss); *Penn. Prot. & Advoc., Inc. v. Houston*, 136 F. Supp. 2d 353, 367 (E.D. Pa.

2001) ("[p]laintiff's belated submission of declarations does not correct the Amended Complaint's deficiencies").[1]  But even with the 39 new Declarations Plaintiffs belatedly submitted in an attempt to salvage their lawsuit, Plaintiffs have not adequately pled standing for at least one Plaintiff for each claim.[2]

### 1.    Plaintiffs Have Not Adequately Pleaded Causation or Redressability

Revolution Wind established that Plaintiffs failed to adequately plead causation and redressability.  *See* Mot. at 19-21.  Yet beyond general rule statements, Plaintiffs devote only two sentences to their purported showing of causation, *see* Opp'n at 34-35, and three sentences to redressability, *see id.* at 35-36—without discussing any individual claim or citing any Declaration. As to causation, Plaintiffs have failed to rectify the FAC's threadbare recital of causation (at ¶ 35) because the Opposition (at 34-35) fails to analyze any of the claims by dozens of differently-situated Plaintiffs under nine different statutes, *see also infra* at 4-15, and merely offers conclusory statements that the Court need not credit, *see Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

Plaintiffs assert their claims are redressable because vacatur "could lead to the change of the turbine design, replacement of the turbines blades with more durable blades that will not fall off, relocation of the turbines, and mitigation measures that are demonstrably effective."  Opp'n

---

[1] Unless otherwise indicated, all internal quotation marks and citations are omitted.

[2] Even if Plaintiffs' Opposition salvages Eric Philippi's allegations of standing for his MBTA and National Environmental Policy Act ("NEPA") claims regarding the piping plover at the pleading stage, *see* Opp'n at 14, 30, the entire FAC should still be dismissed because Plaintiffs fail to state a claim under the MBTA, *see infra* Section II.D, and—as a result of the FAST-41 Act's limitation on claims—Mr. Philippi's allegations cannot serve as a basis for standing for Plaintiffs' NEPA claim regarding birds because he did not submit a comment to the agency during the Project's environmental review, *see* Bureau of Ocean Energy Management ("BOEM"), Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement ("FEIS") at L–3–L–7 (July 2023), https://www.boem.gov/sites/default/files/documents/renewableenergy/stateactivities/Revolution_ Wind_FEIS_Vol1-and-2.pdf (incorporated in FAC at 1 n.2) (listing commenters on the Draft Environmental Impact Statement ("DEIS")); 42 U.S.C. § 4370m–6(a)(1)(B)(i); *infra* Section II.B.2.

at 36.   But these conclusory assertions in the Opposition contradict Plaintiffs' FAC and Declarations.   *First,* it is not possible to relocate the turbines *outside* the lease area, 43 U.S.C. § 1337(p),[3] and Plaintiffs do not allege there are places within the lease area where the Project's wind turbine generators ("WTGs") could be moved to redress the alleged harms.   *Second,* there is not a single allegation in the FAC about WTG blade failure, much less about standing for such a claim.   *Third*, Plaintiffs effectively admit the harm they allege is attributable not to the construction and operation approvals at issue here, but rather (at best) to BOEM's July 2013 decision to make the Project site available for offshore wind.[4]   *See*, *e.g.*, Dkt. 66-15 ¶ 10 (claiming harm from BOEM's selection of the Project's "lease area"); Dkt. 66-20 ¶¶ 3-4 (claiming harm to "NEFSA members who traditionally fish in and around the Revolution Wind *lease area*" (emphasis added)). Finally, while Plaintiffs now assert that BOEM omitted "mitigation measures that are demonstrably effective," Opp'n at 36, nothing in the FAC, Opposition, or Declarations identifies any mitigation Plaintiffs have advocated short of removal of the WTGs.

Because Plaintiffs' Opposition has not identified any new facts in support of causation or redressability, Revolution Wind's causation and redressability arguments remain unrebutted.   *See* Mot. at 19-21.   In addition, as explained below, even Plaintiffs' new factual assertions fail to meet their burden of adequately pleading all three elements of standing for each of their claims.

---

[3] Offshore wind facilities must be placed within leases, easements, or rights-of-way issued by BOEM, and OCSLA typically requires competitive leasing.  43 U.S.C. § 1337(p)(1)(D), (p)(3). BOEM delineated the relevant Wind Energy Area following public comment in 2012, and held the lease auction in 2013.  78 Fed. Reg. 33,898 (June 5, 2013).

[4] A challenge to BOEM's July 2013 decision is now time-barred.  *See* 28 U.S.C. § 2401(a).

2.    **The Opposition Does Not Cure the Standing Defects with Property Plaintiffs' National Historic Preservation Act and Property-Related NEPA Claims**

Plaintiffs' Opposition fails to address Revolution Wind's specific arguments regarding why Plaintiffs failed to adequately plead standing for property-related claims, *see* Mot. at 17-19 (injury-in-fact), 20-21 (causation and redressability), so those arguments remain unrebutted. Plaintiffs' concerns about property value remain entirely speculative, *e.g.*, Opp'n at 21; Dkt. 66-39 ¶ 19 (asserting that offshore wind projects will reduce property value "by over 50%"), and are too conjectural to plead injury-in-fact.[5] *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).[6] Indeed, Plaintiffs' new Declarations expose some *additional* defects as to injury-in-fact for specific Plaintiffs' property-related claims (*e.g.*, some admit the Project is not visible from their property but rather from *nearby*,[7] and others assert historic preservation

---

[5] Indeed, a 2019 study of the Block Island Wind Farm, cited in the FEIS, found increased nightly reservations, occupancy rates, and monthly revenues for rental properties in Block Island during the peak-tourism months of July and August. FEIS at 3.18-26 (citing Carr-Harris & Lang, *Sustainability and tourism: The effect of the United States' first offshore wind farm on the vacation rental market*, Resource and Energy Economics, 57:51–67 (2019)). Academic studies have also found that views of the Block Island Wind Farm—which is far closer to land than Revolution Wind is to the Newport properties—had no impact on local property values. L. Dong and C. Lang, *Do views of offshore wind energy detract? A hedonic price analysis of the Block Island wind farm in Rhode Island*, Energy Policy (2022), https://digitalcommons.uri.edu/enre_facpubs/65/.

[6] To the extent the Court may find that any Declarations provide a sufficient basis for some of Plaintiffs' claims to overcome the dismissal standard, Revolution Wind reserves the right to provide additional evidence relevant to the more demanding summary judgment standard, including that Property Plaintiffs have not demonstrated injury-in-fact to meet the more demanding summary judgment standard. For instance, in summary judgment briefing in a challenge by many of the same historic property owners to the South Fork Wind project, Defendant-Intervenor South Fork Wind, LLC provided expert rebuttal testimony that concluded the zoom levels used in many of the plaintiffs' photographs overstate the scale of the South Fork Wind project's WTGs by a factor of close to 600%. *See Pres. Soc'y of Newport Cnty. v. Haaland*, 1:23-cv-03510-APM, Expert Rebuttal Decl. of Gordon Perkins in Supp. of South Fork Wind, LLC's Reply in Supp. of Cross Mot. for Summ. J., Dkt. 58-1 ¶¶ 18-21.

[7] Dkt. 66-22 ¶ 14 ("All our neighbors . . . have unimpeded views"); *id.* ("About 100 yards up the street, there are unimpeded Atlantic Ocean views"); *id.* ("Our property values will be negatively impacted . . . since we will no longer be 'steps away' from the unimpeded . . . views").

claims as to houses that are *new construction*[8] and even built via demolition of the original, historic structures, *see* Dkt. 66-27 ¶ 2).

Relatedly, Green Oceans cannot bring property-related claims based on representational standing, which requires that "the interests [the organization] seeks to protect are germane to the organization's purpose . . . ." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Green Oceans is an environmental group that "strives to protect the Ocean and the biodiverse life it sustains." Dkt. 66-12 ¶ 2; *see also* Opp'n at 8. Contrary to its conclusory assertion (at 8), neither historic properties, nor the vast majority of the terrestrial, economic, archaeological, and/or cultural interests asserted by the various Declarants who happen to be Green Oceans members, *see* Dkts. 66-2, 66-6, 66-9, 66-10, 66-11, 66-14, are germane to the group's stated goal to "preserve the marine ecosystem." Dkt. 66-12 ¶ 2. *See, e.g.*, *Alaska Forest Ass'n v. Vilsack*, 883 F. Supp. 2d 136, 146 (D.D.C. 2012) (building industries association did not have representational standing to assert members' recreational interests); *Seafreeze Shoreside, Inc. v. U.S. DOI*, Nos. 23-1853, 23-2051, 2024 WL 4986216, *13 (1st Cir. Dec. 5, 2024) (in challenge to another offshore wind project, Plaintiff RODA lacks standing because aesthetic and recreational interests in right whales are not germane to RODA's commercial fishing mission).

Moreover, like Plaintiffs' other alleged harms, the harm Property Plaintiffs allege is neither caused by this Project, nor can be redressed by a decision in Plaintiffs' favor in this litigation. Plaintiffs' FAC and Declarations make clear that the harm Plaintiffs allege is the loss of *pristine*, "unindustrialized" views. *See, e.g.*, FAC ¶ 143 ("BOEM's approval . . . destroys *pristine* visual and scenic resources" (emphasis added)); Opp'n at 7 ("Revolution Wind has destroyed their *open ocean* views." (emphasis added)); Dkt. 66-36 ¶ 9 ("our home's value . . . comes from the

---

[8] *See* Dkts. 66-38 ¶ 3, 66-36 ¶ 2, 66-25 ¶ 2, 66-26 ¶ 2 (homes are 15, 20, 35, and 42 years old).

unimpeded, unindustrialized ocean views"). The speculative property value allegations and the aesthetic interest Property Plaintiffs allege in their properties are binary: so long as *any* WTGs (or other modern sights) are visible, the alleged injury—a view that is *at all* "impeded" or "industrialized"—will remain. *See*, *e.g.*, Opp'n at 19-21 (injury from loss of "unimpeded, pristine ocean views"); *id.* at 32 ("have now *lost* the unimpeded view" (emphasis added)); Dkt. 66-21 ("The installation of 10 of these massive turbines has already *destroyed* my historic, previously unimpeded view" (emphasis added)); Dkt. 66-27 ¶ 8. In their own words, the only way to redress the injury Property Plaintiffs allege is to restore their "unimpeded", "unindustrialized" views.[9] Opp'n at 17, 19-20; Dkt. 36 ¶ 9.

But the reality is that no ocean view in this area is "unimpeded" or free from evidence of modernity, as one frequently sees commercial activity on the seas from the shore, be it fishing boats, recreational boats, tankers, large container ships with cargo stacked high, dredging activities and beach renourishment, as well as all manner of coastal development such as marinas, condos, restaurants, piers, aircraft and other commercial uses. Critically, even as to WTGs, Plaintiffs' alleged harms from "twelve projects" and "hundreds of wind turbines", FAC ¶ 168, are not traceable to this Project, and it is not possible for this Court to redress Plaintiffs' alleged harms— to restore their "unimpeded", "unindustrialized" views—because this litigation does not include the existing South Fork Wind Farm or other offshore wind projects being developed in the vicinity. *See*, *e.g.*, Dkt. 66-21 ¶ 8 ("The construction of the twelve South Fork Wind turbines has already diminished the ocean views."); Dkt. 66-29 ¶ 15 ("That view has already been severely damaged by South Fork"); Dkt. 66-22 ¶ 15 ("The offshore development slated off the coast of Newport and Rhode Island—Revolution Wind, South Fork Wind, and Sunrise Wind—has already destroyed the

---

[9] Plaintiffs do not identify any mitigation that would redress their concerns.

ocean views.").[10]  Nor can other commercial uses of the coastline and seas (which also are not traceable to the Project) be removed.  The Court cannot provide Plaintiffs a "pristine", "unindustrialized" view, or even a view free from WTGs, because Plaintiffs did not have such a view before the Project's construction began, and would not have it even in the Project's absence.

### 3.    Plaintiffs' Opposition Still Fails to Adequately Plead Causation or Redressability for OCSLA, NEPA, Endangered Species Act, and Marine Mammal Protection Act Claims Based on Impacts to Right Whales

Nothing in the Opposition (at 21-23) or Declarations rectifies the causation and redressability defects relating to right whales identified in Revolution Wind's Motion.  *See* Mot. at 19-20.  To the contrary, Plaintiffs now admit right whale populations were already low and declining before the Project began, and there is no allegation that trend would halt, much less reverse, were the Project's approvals vacated.  *See* Opp'n at 9-10; *e.g.*, Dkt. 66-12 ¶ 27 (describing a "spike in whale deaths . . . since 2016," long before Project construction began); Dkt. 66-19 ¶ 9 (citing decreasing numbers); *id.* ¶¶ 11-12 (cataloguing mortality events around the country, far from the Project).  Indeed, the FAC concedes that the increase in right whale deaths was designated in 2017 by expert agencies as an Unusual Mortality Event ("UME")—well before the challenged Project approvals.  *See* FAC ¶ 238 (citing UME designation).  Therefore, the Project's approvals cannot be the cause of the UME, which began in 2017 and extends from Newfoundland to Florida.  Rather, the National Marine Fisheries Service ("NMFS") website the FAC cites identifies the cause of this UME as entanglements (with fishing gear) and vessel strikes.[11]

---

[10] Plaintiffs now assert (at 35) that courts "have the power" to "order the removal of projects," but Plaintiffs did not request that relief in the FAC.  *See* FAC at 111-12 (Prayer for Relief).
[11] *See* NMFS, *2017–2024 North Atlantic Right Whale Unusual Mortality Event,* https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event#counts-of-north-atlantic-right-whale-ume-mortality,-serious-injury,-and-morbidity-(sublethal-injury-or-illness)-cases (last accessed Dec. 6, 2024) (cited in FAC ¶ 238 n.360).

Furthermore, in resolving this jurisdictional dispute regarding causation and redressability, the Court can and should take judicial notice of the fact that three expert federal agencies have explicitly found there is no evidence of Plaintiffs' jurisdictional averments about the cause of harm to right whales, which contradict not only the Project's approvals (which were incorporated in the FAC) but also published agency findings. The Court may take judicial notice of both types of documents. *See* Fed. R. Evid. 201(b); *Campaign for Accountability v. U.S. Dep't of Just.*, 278 F. Supp. 3d 303, 309 n.5 (D.D.C. 2017) (taking judicial notice of material that had been posted to a government website); *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (A court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice.").[12] Those agency findings are: (1) "There are no known links between large whale mortalities and ongoing offshore wind surveys";[13] (2) "Despite several reports in the media, there is no evidence to link these strandings to offshore wind energy development";[14] and (3) "[T]here is no evidence to support speculation that noise resulting from wind development-related site characterization surveys could potentially cause mortality of whales, and no specific links between recent large whale mortalities and currently ongoing

---

[12] A Court does not convert a motion to dismiss pursuant to Rule 12(b)(1) into a motion for summary judgment by considering documents outside the pleadings. *See, e.g.*, *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003) ("[T]he plain language of Rule 12(b) permits only a 12(b)(6) motion to be converted into a motion for summary judgment . . . when documents extraneous to the pleadings are considered by a court.").

[13] NOAA Fisheries, *Frequent Questions—Offshore Wind and Whales*, https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales (last accessed Dec. 6, 2024).

[14] Marine Mammal Commission, *Update on Strandings of Large Whales along the East Coast* (Feb. 21, 2023), https://www.mmc.gov/wp-content/uploads/Update-on-Strandings-of-Large-Whales-along-the-East-Coast-2.21.2023.pdf.

surveys."[15]  In fact, Plaintiff Save Right Whales Coalition ("SRWC") even admits that federal investigators have attributed right whale deaths to other causes (and the actions of third parties). *See* Dkt. 66-19 ¶ 15.  As the website cited in Plaintiffs' FAC establishes, the causes of right whale mortality are fishing gear entanglement and vessel strikes.[16]

And the Court should not credit Plaintiffs' speculative and spurious allegation of inferred injury from unidentified floating fin and humpback whale carcasses found in the vicinity of *a different project*.  *See* Dkt. 66-19 ¶¶ 14-15; *see also* Dkt. 66-5 ¶ 6.  Revolution Wind is required to have trained lookouts for protected species detection to monitor all potentially impactful activities as a condition of BOEM's approval of the Project's Construction and Operations Plan ("COP").  *See* Conditions of COP Approval § 5.9.2.[17]  It is also well documented that the place where a floating whale carcass is found drifting in ocean currents is rarely where the animal actually died.[18]

Plaintiffs also erroneously allege injury from operations and maintenance vessels servicing the Project traveling at speeds in excess of 15 knots.  *See* Opp'n at 22 (citing FAC ¶ 97 and Dkt.

---

[15] U.S. Department of Energy, *Addressing Misinformation on Offshore Wind Farms and Recent Whale Mortalities* (Apr. 28, 2023), https://www.energy.gov/articles/addressing-misinformation-offshore-wind-farms-and-recent-whale-mortalities.

[16] NMFS, *2017–2024 North Atlantic Right Whale Unusual Mortality Event*, *supra* note 11.

[17] BOEM, Conditions of Construction and Operations Plan Approval Lease Number OCS-A 0486 (Nov. 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev%20Wind%20Cond%20of%20COP.pdf.  Plaintiffs challenge BOEM's November 17, 2023 approval of the Revolution Wind Construction and Operations Plan.  FAC ¶¶ 68 (APA), 78, 117-26 (OCSLA).  The Court may take judicial notice of the information included in the challenged federal approvals.  *See, e.g., Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir. 2003); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 442 F. Supp. 3d 37, 43 n.2 (D.D.C. 2020).

[18] NOAA Fisheries, *2016-2024 Humpback Whale Unusual Mortality Event Along the Atlantic Coast*, https://www.fisheries.noaa.gov/national/marine-life-distress/2016-2024-humpback-whale-unusual-mortality-event-along-atlantic-coast ("Floating carcasses . . . may be initially sighted or reported nearest one state although the mortality may have occurred elsewhere.") (last accessed Dec. 6, 2024).

66-19); *see also* Dkt. 66-17 ¶ 9 ("[m]ost of these trips will be made by crew transfer vessels traveling in excess of 15 knots").  But the challenged approvals cited in the FAC include vessel-related speed restrictions of 10 knots, in the absence of special species monitoring, for all vessels, regardless of size, when operating in areas NMFS has designated as management areas for the protected species.  *See* Conditions of COP Approval § 5.4.7.  Plaintiffs' faulty jurisdictional averments contradict the documents and facts they rely on, and fail to adequately allege causation or redressability for claims about right whales.[19]

### 4.    Plaintiffs Fail to Adequately Plead Standing for Any Claim About Bats or Birds Other Than the Piping Plover

Plaintiffs' Opposition argues standing for NEPA and CZMA claims based on bats, *see* Opp'n at 18, 43, and standing for NEPA and MBTA claims based on the piping plover, *see id.* at 14, 30-31.[20]  These claims related to bats should be dismissed because Bat World Sanctuary—the only Plaintiff who asserts an interest in bats—lacks standing as to the Project.[21]  Bat World Sanctuary, located in Texas, claims it "is involved in *worldwide* rescue as well as the training and funding for wildlife rehabilitators *across North America*."  Dkt. 66-18 ¶ 6 (emphasis added).  Yet it does not purport to have ever conducted any activity near or related to this Project, or to have concrete plans to do so in the future.  *See generally* Dkt. 66-18; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Rather, its Declaration asserts, "[t]he construction and operation of the

---

[19] Plaintiffs also erroneously assert a SRWC member, Committee for a Constructive Tomorrow ("CFACT"), has standing to challenge the Project because a court found it pled standing to challenge a wind project off the Virginia coast.  Opp'n at 10 (citing *Comm. for a Constructive Tomorrow v. U.S. Dep't of Interior*, No. 24-774 (LLA), 2024 WL 2699895, at *3 (D.D.C. May 24, 2024)).  But that court found CFACT had adequately alleged *representational* standing— based on a member's plans to whale watch near that Virginia project.  This does not support CFACT's standing as to *this* Project (approximately 350 miles from the Virginia project).

[20] The Opposition states that the northern log-eared bat and piping plover are endangered, but does not argue ESA standing for either Bat World Sanctuary or Eric Philippi.  *See* FAC ¶¶ 196- 226; Opp'n at 21-23.

[21] Bat World Sanctuary does not claim any members, so it cannot have representational standing.

Revolution Wind Project will cause more bats to become injured in that area, increasing the toll on our organization in both *training wildlife professionals*, and *funding the rescue efforts* for the bats injured by the Revolution Wind Project." Dkt. 66-18 ¶ 6 (emphasis added). But there is no allegation (or permissible inference) that Bat World Sanctuary is actually conducting any training or funding any rescue efforts *near or related to the Project* or that any group is attempting or has concrete plans to attempt to rescue injured bats near the Project. At best, Bat World Sanctuary asserted an "animal nexus" that is not sufficient to establish standing for any claim. *See* Mot. at 16-17; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566-67 (1992). As to birds, Plaintiffs did not allege or argue any Plaintiff's standing for any bird beyond piping plovers, *see* Opp'n at 7, 14, 30-31, and all piping plover claims should be dismissed on other grounds. *See supra* n.2; *infra* Section II.B.2. Plaintiffs have not adequately alleged standing for any claim about any other bird.[22]

     **5.**    **All Claims By Fishing and Recreational Boating Plaintiffs Should Be Dismissed Because Plaintiffs Still Do Not Adequately Plead Causation or Redressability**

          **a.**    **Plaintiffs Have Not Alleged Standing Under the Clean Water Act**

The U.S. Army Corps of Engineers' ("USACE") authority under Clean Water Act ("CWA") Section 404 extends only three miles from shore. *See* Mot. at 8-9, 23. In their Declarations, Plaintiffs do not allege any injury caused by the Project that could be redressable by this Court because their allegations do not appear to pertain to activities within CWA jurisdiction (*i.e.*, within three nautical miles from shore), as opposed to the location of construction activities related to the cables and the WTGs on the Outer Continental Shelf ("OCS") (Cox Ledge) located

---

[22] Neither Green Oceans nor Eric Philippi submitted comments on the DEIS during the Project's NEPA review and Plaintiffs' standing for bird-related claims is based on Mr. Philippi individually and/or as a member of Green Oceans. *See* Opp'n 7, 14, 30-31; FEIS, App'x L. Consequently, those claims are barred by the FAST-41 Act. *See* 42 U.S.C. § 4370m–6(a)(1)(B)(i).

well beyond that three-mile limit.  *See* Opp'n at 28-30; *id*. at 28 (describing alleged harms to "organizations whose members recreationally use the ocean waters where the Revolution Wind Project turbines are being constructed").

> **b.     Plaintiffs' Allegations Regarding the Project's Impacts on Fish and Fishing Fail to Meet Plaintiffs' Burden**

Plaintiffs' fishing-related allegations of harm from the Project are insufficient.  *See* Opp'n at 4-5, 9-10, 12-13, 23-26, 28.  The Project's lease area was selected after lengthy stakeholder and scientific review to identify and exclude "high-value" fishing grounds.  FEIS at 3.9-15.[23]  Among alternative configurations within the lease area, BOEM approved Alternative G, which reduced the number of WTGs from the 100 (as proposed) to 65, ROD at 36, and requires micrositing "to avoid or minimize impacts to complex habitat," Conditions of COP Approval § 5.5.3.[24]  BOEM also consulted with NMFS regarding conservation recommendations to protect essential fish habitat.  *See* ROD at B-13.  And if, despite the careful siting and extensive mitigation, a fisherman were to lose gear or income, the Project also provides for well over $20,000,000 in Direct Compensation Funds for fishing interests.  *See* Conditions of COP Approval § 6.1.1(c).  A claim for lost or damaged fishing gear can also be filed with Ørsted (one of Revolution Wind's corporate

---

[23] "BOEM specifically selected the lease area 'to reduce potential use conflicts between the wind energy industry and fishermen[,]' since the area does not have high revenue intensity compared to nearby waters."  BOEM, Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan Record of Decision ("ROD") at B-18–B-19 (Aug. 21, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf (incorporated in FAC at 1 n.1).

[24] While construction impacts are temporary, BOEM found that the "beneficial impacts for some for-hire recreational fishing operations due to the artificial reef effect."  FEIS at 3.9-89.  In fact, "[i]n a meta-analysis of studies on wind farm reef effects, Methratta and Dardick (2019) observed an increase in the abundance of epibenthic and demersal fish species."  *Id*. at 3.13-75; *see also id*. at 3.13-24.

parents) directly, regardless of the fishing vessel's home port.[25]   Moreover, Plaintiffs fail to account for the other identified causes of fishing impacts, "including climate change, port development and expansion, navigation dredging, and continued recreational and commercial fishing activity."  FEIS at 3.13-46.  Plaintiffs have not shown that their alleged harm was or will be caused by the Project rather than these existing impacts.  Therefore, Plaintiffs have failed to carry their burden to adequately plead standing for Plaintiffs asserting fishing interests.[26]

### c.    Plaintiffs' Allegations Regarding Safety and Navigation Are Speculative

Plaintiffs allege the Project creates navigational and safety hazards for boaters and fisherman.  *See, e.g.*, Opp'n at 4-6.  But each WTG stands on a steel monopile no larger than 39 feet in diameter, *see* Conditions of COP Approval § 5.10, which are spaced in a uniform grid with one-by-one nautical mile between WTGs, as recommended by the Coast Guard, *see* ROD at B-6. Plaintiffs do not explain why they cannot safely steer between two monopiles spaced approximately one nautical mile apart.  Additionally, the blades on the Project's 11 MW WTGs

---

[25] *See* Ørsted, *Instructions: Lost or Damaged Fishing Gear Claim*, https://orstedcdn.azureedge.net/-/media/www/docs/corp/us/mariners/marine-affairs_lost-or-damaged-fishing-gear-c.pdf (describing Ørsted compensation program for lost or damaged fishing gear) (last accessed Dec. 6, 2024).

[26] In any event, even if alleged harms related to fishing were not speculative, Plaintiffs' economic interests are not in the zone of interests protected by three of the environmental statutes—NEPA, CWA, and CZMA—that fishing Plaintiffs invoke here for standing.  *See, e.g.*, *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015) (interest in protecting property rights fall outside of zone of interest of NEPA and CWA; "Pursuant to the most recent teaching of the Supreme Court, we presume that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.") (cleaned up); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, No. 1:22-CV-11091-IT, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023), *appeal dismissed*, No. 23-1473, 2023 WL 8259107 (1st Cir. Oct. 20, 2023) (finding plaintiff fisherman lacked standing to challenge offshore wind project under NEPA where they "claim[ed] that their ability to generate revenue from fishing activity will be harmed by the Project"); *Serrano-Lopez v. Cooper*, 193 F. Supp. 2d 424, 434 (D.P.R. 2002) ("The zone of interests regulated by the CZMA includes a state's protection of their coastal zones and not an individual's attempt to seek further protection once the CZMA requirements have been complied with.").

reach no lower than approximately 120 feet above the water level, *see* FEIS at 2-15, meaning vessels below this height physically cannot collide with an operational WTG blade either. To further enhance navigational safety, BOEM also required that the WTGs have markings and lighting visible to nearby vessels, and that their locations be charted on maps. *See* Conditions of COP Approval § 3.1.1; *see also* FEIS at 2-12, 3.16-26.

Plaintiffs also allege there will be decreased radar functionality, *e.g.*, Opp'n at 4-5, but that does not necessarily cause harm to Plaintiffs because there are other navigational tools and practices that would still allow for safe navigation through and around the Project.[27] For example, Revolution Wind will install an Automatic Identification System ("AIS")[28] to mark the corners of the Revolution Wind Farm to assist in safe navigation. *See* FEIS at F-13. More fundamentally, however, mariners on the "high seas", which includes the Project area, are required to exercise diligence in the operation of their vessels consistent with International Regulations adopted by the United States.[29] These Navigation Rules are also known as 72 COLREGS and "aid mariners in

---

[27] To the contrary, BOEM concluded that while "[s]ome fishing vessels operating in or near offshore wind facilities could experience radar clutter and shadowing . . . [the structures] do not render radar inoperable." FEIS at 3.9-61, 3.16-19 to 3.16-20; *see also id*. at 3.17-32 (describing U.S. Coast Guard analysis concluding "general mitigation measures, such as properly trained radar operators, properly installed and adjusted vessel equipment, marked wind turbines, and the use of AIS, all enable safe navigation with minimal loss of radar detection").

[28] AIS technology is an "[a]utomatic tracking system used on vessels to monitor ship movements and avoid collision." FEIS at B-96.

[29] *See* 33 U.S.C. §§ 1601-1604 (applying to all public and private vessels subject to jurisdiction of the United States beyond demarcation lines of inland waters); *id*. § 1608 (penalties); 33 C.F.R. part 80 (COLREGS Demarcation Lines); NOAA Marine Cadastre, *COLREGS Demarcation Lines*, https://hub.marinecadastre.gov/datasets/noaa::colregs-demarcation-lines/explore?location=41.119517%2C-71.697215%2C9.00 (last updated April 24, 2024); Int'l Maritime Org., *COLREG - Preventing Collisions at Sea*, https://www.imo.org/en/OurWork/Safety/Pages/Preventing-Collisions.aspx (last accessed Dec. 6, 2024).

safe navigation, just as driving laws aid vehicles in safe driving."[30]  Accordingly, Plaintiffs must: (1) maintain proper look-outs by sight and hearing, COLREGS Rule 5; (2) proceed at a safe speed, COLREGS Rule 6; and (3) take action to avoid collision, COLREGS Rules 7 and 8.[31]  Mariners have operated safely for decades in the vicinity of energy infrastructure, including in the Gulf of Mexico (oil and gas infrastructure) and in Europe (offshore wind infrastructure), and will be able to do so here.  Plaintiffs' speculative claims regarding safety and navigation are insufficient to support standing.

Plaintiffs' conclusory assertions about the risk of gear or anchor entanglement, *see* Dkt. 66-15 ¶¶ 9-10; 66-16 ¶ 5; Dkt. 66-20 ¶ 7, are also inadequate to demonstrate standing.  Plaintiffs themselves admit that the Project's cables are buried four to six feet below the sea floor, *see* FAC ¶¶ 86, 257, and ignore that compensation is available nonetheless, *see supra* at 12-13 and n.25.  In any event, these economic claims are insufficient to support prudential standing for their NEPA and CWA claims.  *See, e.g., Gunpowder Riverkeeper*, 807 F.3d at 273; *Seafreeze Shoreside, Inc.*, 2023 WL 3660689, at *3.

### 6.    Plaintiffs Fail to Adequately Plead Organizational Standing

Although Plaintiffs describe the missions of the various organizational Plaintiffs and allege impacts related to topics of organizational concern, *see, e.g.*, Opp'n at 8, Plaintiffs fail to meet their burden to plead organizational standing,[32] which requires: (1) concrete harm to an

---

[30] U.S. Coast Guard, *Rules of the Road: International Regulations for Prevention of Collisions at Sea, 1972 (72COLREGS) and U.S. Inland Navigation Rules*, https://www.dco.uscg.mil/NavRules/ (last accessed Dec. 6, 2024).

[31] U.S. Coast Guard, *Navigation Rules and Regulations Handbook* (Aug. 8, 2024), https://www.navcen.uscg.gov/sites/default/files/pdf/navRules/Handbook/Nav%20Rules%20Handbook_Corrected_08-12-2024.pdf.

[32] Nor do Plaintiffs' submission of comments during environmental review, *e.g.*, Dkt. 66-12 ¶ 14, suffice.  *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (concluding that time and money spent "submitting comments to the EPA" does not suffice to establish an injury-in-fact).

organizational activity (not ideological goal); and (2) resources expended to counteract that harm. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); Mot. at 13, 16-17, n.13. No organizational Plaintiff adequately alleges either of these two elements. *See generally* Dkts. 66-12 (Green Oceans), 66-15 (RODA), 66-17 (ACK for Whales), 66-18 (Bat World Sanctuary), 66-19 (SRWC), 66-20 (NEFSA). At most, the organizational Declarations describe their missions and/or allege harm to their ideological goals. *See* Dkts. 66-12 ¶¶ 2, 23, 66-17 ¶¶ 2, 10, 66-18 ¶ 6, 66-19 ¶¶ 1, 17, 66-20 ¶ 2. But that is not enough to allege a cognizable injury. *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (superseded on other grounds) (general harm to a group's ideological goal is not sufficient to establish organizational standing); *Food & Water Watch*, 808 F.3d at 920 (same); *see also Env't Working Grp. v. U.S. Food & Drug Admin.*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018) (organizations merely conducting the advocacy or educational work they were created to perform does not confer standing). Plaintiffs fail to explain how the Project's approvals thwarted organizational activities,[33] and never describe any resources expended to counteract any purported harm. *See Food & Water Watch*, 808 F.3d at 919.

**B.  Plaintiffs Fail to Plead the Requisite Administrative Process Participation**

**1.  Plaintiffs Waived Their Clean Water Act Claims**

Contrary to Plaintiffs' argument (at 36-37), Defendants may bring a motion to dismiss based on an affirmative defense. *See, e.g.*, *Sierra v. Hayden*, 254 F. Supp. 3d 230, 236-37 (D.D.C. 2017) ("Defendants can meet their burden of pleading and proving a failure to exhaust at the motion-to-dismiss stage by using the pleadings and undisputed documents in the record" and "documents to which [the court] can take judicial notice") (citing *Bowden v. United States*, 106

---

[33] For example, Green Oceans is, in its own words, "a research and educational organization" that is dedicated to research, education, and advocacy. Dkt. 66-13 ¶¶ 6-7. Neither the FAC nor the Declarations support an inference that any of Green Oceans' research, analysis, or educational activities have been thwarted by the Project's approvals.

F.3d 433, 437 (D.C. Cir. 1997)); *Mdewakanton Sioux Indians of Minn. v. Bernhardt*, 464 F. Supp. 3d 316, 321-23 & n.4 (D.D.C. 2020) (concluding in an Administrative Procedure Act ("APA") case that "[b]ecause the facts supporting Defendants' administrative exhaustion argument are apparent from the face of the complaint, the Court may consider them on a motion to dismiss").[34]

Plaintiffs (at 37) rely on *Kunaknana v. USACE*, but that court applied the well-accepted rule that "an issue can form the basis of a legal challenge to an agency action in federal court *only* if that issue was first brought to the attention of the agency with clarity sufficient to allow the agency the opportunity to consider the issue and to rectify the violations alleged." 23 F. Supp. 3d 1063, 1087-88 (D. Alaska 2014) (emphasis added). Here, Plaintiffs do not dispute that not a single Plaintiff—*or anyone else*—raised Plaintiffs' CWA claims to the USACE during the agency's public comment period. *See* Opp'n at 36-38; Mot. at 23-24; ROD at 32-34. Instead, Plaintiffs argue that they were not required to raise their arguments to the USACE because "the issue was known or should have been known by the agency." Opp'n at 37. Plaintiffs provide no basis of support for this bald claim, which simply admits they failed to raise the argument before the USACE. Plaintiffs (at 38 n.273) cite to *Lowman v. Federal Aviation Administration*, 83 F.4th 1345, 1358 (11th Cir. 2023), but in that case the plaintiffs participated in the administrative process, and provided general comments opposing the NEPA review at issue—and the agency was required under its own rules to analyze cumulative impacts and did not. In contrast, here, Plaintiffs did not participate in the USACE administrative proceedings at all, *see* ROD at 32-34, and the arguments they have pled under the CWA are far from obvious given the agency's decades-long interpretation. *E.g.*, FAC ¶ 258 (challenging USACE's definition of "navigable waters" and

---

[34] Plaintiffs (at 36 n.262) cite to *Jones v. Bock*, but the Supreme Court in that case recognized that a motion to dismiss can be an appropriate procedure to raise affirmative defenses. *See* 549 U.S. 199, 215 (2007).

USACE's interpretation of its permitting jurisdiction); 51 Fed. Reg. 41,251 (Nov. 13, 1986) (adopting 33 C.F.R. § 329.12, which includes definition of USACE's jurisdiction as "three geographic (nautical) miles seaward" of shore).  And Plaintiffs (at 37 n.270) argue that *Department of Transportation v. Public Citizen*, 541 U.S. 752, 765 (2004), created an obviousness exception that they say should be applicable here; but the D.C. Circuit has held "the exception for 'obviousness' is narrow."  *El Puente v. USACE*, 100 F.4th 236, 249 (D.C. Cir. 2024) (neither the D.C. Circuit nor the Supreme Court "has ever used the 'so obvious' language from *Public Citizen* to revive a forfeited argument").

Additionally, Plaintiffs argue they raised the alleged CWA violations in their 60-day notice letter.  Opp'n at 38.  But Plaintiffs' letter is dated January 5, 2024, Dkt. 33-1 (exhibit to FAC), which was over two years *after* USACE's public comment period and more than a year after USACE issued the permit.  *See* ROD at 32-34; FAC ¶ 257 n.389; *see also Healthy Gulf v. USACE*, 81 F.4th 510, 522-24 (5th Cir. 2023) (observing that "untimely arguments are not generally available on judicial review" when petitioners sent an email to the agency six months after the public comment period closed).  Thus, Plaintiffs' 60-day notice letter did not put the agency on notice or avoid forfeiture of Plaintiffs' CWA claims in the FAC.  Because no commenters raised Plaintiffs' "particular objections" under the CWA to the USACE during the administrative process, Plaintiffs "forfeited any objection" on those grounds.  *See Pub. Citizen*, 541 U.S. at 764-65.

### 2.     Plaintiffs Fail to Allege Sufficient Administrative Participation Under FAST-41

Plaintiffs argue that "neither the [FAST-41] Act nor Fed. R. Civ. P. 12 requires every Plaintiff to allege that he/she/it filed NEPA comments."  Opp'n at 38.  But again, even if failure to comment is an affirmative defense, Revolution Wind can raise it in a motion to dismiss.  *See, e.g.*, *Sierra*, 254 F. Supp. at 236-37; *Mdewakanton Sioux Indians of Minn.*, 464 F. Supp. 3d at 321-

23 & n.4.  Of the forty-five Plaintiffs in this case, only three submitted comments to the agencies on the DEIS.  FEIS at L-3–L-7 (listing commenters on DEIS which, among Plaintiffs, only included Elizabeth Quattrocki Knight, Responsible Offshore Development Alliance, and Benjamin Riggs).  The language of the statute is clear: "a claim arising under Federal law seeking judicial review of any authorization issued by a Federal agency for a covered project shall be barred unless . . . (i) the claim is filed by *a party that submitted a comment during the environmental review*."  42 U.S.C. § 4370m-6(a)(1)(B)(i) (emphasis added).  FAST-41 bars claims from all other Plaintiffs that did not submit a comment during the Project's environmental review.[35]  *See Sebelius v. Cloer*, 569 U.S. 369, 381 (2013) ("[W]hen a statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." (cleaned up)); 42 U.S.C. § 4370m-6(a)(1)(B)(i); *Pub. Citizen*, 541 U.S. 752 at 764-65; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### C.    Plaintiffs Concede They Failed to Provide Adequate Notice as to Their OCSLA Claims Against BOEM

Plaintiffs' Opposition (at 39-41) fails to address and thus concedes that Plaintiffs' January 5, 2024, and February 16, 2024, Notices of Intent to Sue did not satisfy OCSLA's statutory requirement that notice be given "in writing under oath" at least 60 days before filing the lawsuit.  *See* Mot. at 25-26; *Henneghan v. Dist. of Columbia*, 916 F. Supp. 2d 5, 9 (D.D.C. 2013).  Instead of defending their insufficient notices, Plaintiffs now claim (at 39-41) that notice was never required because their claims were brought under the APA—not OCSLA's citizen suit provision.  This argument is belied by the explicit language in the Plaintiffs' Original Complaint, FAC, and January 5, 2024, and February 16, 2024, "Notice of Intent to Sue Under the Outer Continental

---

[35] For instance, this includes Plaintiffs' NEPA claims regarding alleged failure to adequately consider impacts to birds (FAC ¶ 183) because no plaintiff who has standing to brings that claim filed comments during the NEPA review.  *See supra* nn.2, 22.

Shelf Lands, Clean Water Act, and Endangered Species Act" letters attached to Plaintiff's FAC. *See* Dkts. 33-1, 33-2.

In each of these documents, Plaintiffs expressly reference the citizen suit provision of OCSLA—not the APA. In the Original Complaint, Dkt. 1, Plaintiffs cited the OCSLA citizen suit provision when claiming that "this Court has jurisdiction of this case under the . . . Outer Continental Shelf Lands Act." Original Compl. ¶ 31 n.26 (citing 43 U.S.C. § 1349(a)(2)(A), which requires plaintiffs to file a 60-day notice "in writing under oath"). Plaintiffs state twice in their Original Complaint that they "have sent a 60-day notice of their intent to sue under OCSLA, the Clean Water Act, and the Endangered Species Act and will amend this Complaint to add these causes of action when the 60 days expire." Original Compl. at 4 n.6; *id.* at ¶ 75 n.79. In their FAC, Plaintiffs relied on the OCSLA citizen suit provision for jurisdiction, FAC ¶ 32 n.18,[36] and noted "Plaintiffs have sent a 60-day notice of their intent to sue under OCSLA and the Clean Water Act and will amend this Complaint to add the OCSLA and CWA causes of action when the 60 days expire," *id.* ¶ 68 n.68. Plaintiffs' defective 60-day notice letters are also unambiguous about their intent to "sue *under the citizens' suit provisions* of the Outer Continental Shelf Act," *see* Dkt. 33-1 at 2 (FAC Ex. 1) (emphasis added); *see also* Dkt. 33-2 at 2 (FAC Ex. 2).

Plaintiffs cannot evade the 60-day citizen suit notice requirements by now disclaiming the Court's jurisdiction asserted under OCSLA and retroactively restyling their FAC as one strictly asserting APA claims. To begin with, "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also* 5 U.S.C. § 704 (Under the APA, "[a]gency action made reviewable

---

[36] *See also* FAC at 2 n.4 (alleging that Defendants failed to comply with OCSLA and citing OCSLA 60-day notice citizen suit provision).

by statute and final agency action for which *there is no other adequate remedy in a court* are subject to judicial review." (Emphasis added)).  As a result, this Court has found that "[w]here plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit requirements of the Act established by Congress through resort to . . . the APA." *Basel Action Network v. Mar. Admin.*, 370 F. Supp. 2d 57, 76 (D.D.C.  2005).

This Court has rejected the type of sleight of hand that Plaintiffs now attempt with respect to OCSLA.  OCSLA is clear that, with limited exceptions not applicable here, "all suits challenging actions or decisions allegedly in violation of, or seeking enforcement of, the provisions of [OCSLA], or any regulation promulgated under [OCSLA], or the terms of any permit or lease issued by the Secretary under [OCSLA], shall be undertaken in accordance with the procedures described in this subsection," which includes a 60-day notice requirement.  43 U.S.C. § 1349(a)(6).  In *Duke Energy Field Services Assets, L.L.C. v. FERC*, defendants sought to dismiss plaintiffs' OCSLA claims for failure to comply with the "under oath" requirement of 43 U.S.C. § 1349(a)(2). 150 F. Supp. 2d 150, 154 (D.D.C. 2001).  Plaintiffs argued that, "even if the requirements of section 1349(a)(2) [had] not been met, the plaintiffs' claims may still proceed under the Court's APA jurisdiction." *Id.* at 155.  The court rejected this argument, explaining that "[i]t is well-settled that the APA does not confer any independent jurisdiction on the district courts."  *Id.*  Plaintiffs argue (at 40) that *Duke Energy* was a "Title 43 citizens' suit, not an APA action like this."  But *Duke Energy* involved a challenge to an agency order for allegedly violating OCSLA.  *See* 150 F. Supp. 2d at 152-56.  Like the plaintiffs in *Duke Energy*, Plaintiffs cannot evade OCSLA's 60-day notice requirements by instead relying solely on the APA.

The cases cited by the Plaintiffs in their Opposition (at 39-41) do not compel a different result.  Unlike the circumstance here, in both *Shell Offshore* and *OXY USA, Inc.*, courts rejected

plaintiffs' attempted use of the OCSLA citizen suit provision to plead around the APA's requirement that judicial review be limited to final agency actions, when no final agency action existed.  *See Shell Offshore, Inc. v. DOI*, 997 F. Supp. 23, 34-35 (D.D.C. 1998); *OXY USA, Inc. v. Babbitt*, 122 F.3d 251, 257-58 (5th Cir. 1997).  Neither *Shell Offshore* nor *OXY USA, Inc.* address the issue at hand: Plaintiffs' attempt to use the APA to bypass OCSLA's 60-day notice requirements where a final agency action exists.  The other out-of-circuit case Plaintiffs cite, *Amerada Hess Corp. v. DOI*, 170 F.3d 1032, 1033, 1035 (10th Cir. 1999), is also inapposite here, where Plaintiffs allege explicit violations of OCSLA, which must be brought under the citizen suit provisions.  *See Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 373-74 (D.C. Cir. 2021) (dismissing plaintiffs' OCSLA challenge to BOEM's issuance of a lease for an offshore wind project where plaintiffs "failed to satisfy OCSLA's pre-suit notice provision").

Plaintiffs argue that "a challenge to final agency actions is not a suit alleging 'violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease.'"  Opp'n at 40 (quoting 43 U.S.C. § 1349(a)(1)).  But that is incorrect as a matter of law.  *See, e.g.*, *Duke Energy*, 150 F. Supp. 2d at 153, 154-56.  And in any event, Plaintiffs unambiguously allege violations of OCSLA.  *See, e.g.*, FAC ¶ 78 ("In approving the Revolution Wind Construction and Operations Plan, Defendants violated Section 1337(p)(4) of [OCSLA] in numerous respects."); *id.* ¶¶ 80, 91, 94, 102, 103, 104, 112, 116, 128, 143 (expressly alleging specific violations of OCSLA).  OCSLA's citizen suit provision "plainly bars *all cases* which do not comply with the provision: 'No action [alleging non-compliance with OCSLA] may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation'."  *Duke Energy*, 150 F. Supp. 2d at 156 (quoting 43 U.S.C. § 1349(a)(2)) (emphasis in original).

That notice must be in writing under oath.  *Id.* at 155.  Therefore, Plaintiffs' OCSLA claims should be dismissed.

###    D.    Plaintiffs Fail to State a Migratory Bird Treaty Act Claim

Plaintiffs do not dispute that this Court has held that the MBTA's take prohibition does not extend to a federal agency's approval of a third-party activity that may result in take of a migratory bird.  *See* Mot. at 26-27.  Instead, Plaintiffs (at 42) assert that the cases are "not so cut-and-dried" and unsuccessfully seek to distinguish the cases.  Contrary to Plaintiffs' assertion (at 42), the court in *Public Employees for Environmental Responsibility*, squarely rejected the argument that an agency violates the MBTA "by merely approving a project that, if ultimately constructed, might result in the taking of migratory birds."  *See Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 117 (D.D.C. 2014), *appeal dismissed sub nom. Pub. Emps. for Env't Resp. v. Cruickshank*, No. 14-5117, 2014 WL 3014869 (D.C. Cir. June 11, 2014).  The Court hypothesized that "even if it is necessary for the BOEM to apply for a permit from the FWS, it is not clear that the BOEM is required to do so prior to when the Cape Wind project becomes operational."  *Id.* at 118.  But that was not the Court's holding and even this conjecture does not salvage Plaintiffs' MBTA claims, because Plaintiffs clearly challenge BOEM's approval of the Project rather than a post-approval failure to obtain a permit.  *See* FAC ¶ 252.

Likewise, Plaintiffs mischaracterize *Friends of the Capital Crescent Trail*, asserting (at 42) that potential injury to migratory birds in that case "was too attenuated to require compliance with the MBTA."  On the contrary, the plaintiffs there alleged that the project "will likely lead to many deaths of migratory birds protected by the MBTA."  *Friends of the Cap. Crescent Trail v. Fed. Transit Admin.*, 255 F. Supp. 3d 60, 75 (D.D.C. 2017).    Regardless of Plaintiffs' mischaracterization, the case forecloses their MBTA argument here and mandates dismissal.  *See id.* ("[t]he Court is unaware of any decision in our Circuit holding that the MBTA's take

prohibition extends to a federal agency that authorizes third-party activity that may allegedly cause 'take'").

    **E.**    <u>**Plaintiffs Fail to State a Coastal Zone Management Act Claim**</u>

Plaintiffs suggest (at 44-45) that because they allege BOEM's approval of the Project "violates Rhode Island's Special Area Management Plan[,] . . . the Court should deny [Revolution Wind's] motion to dismiss [the CZMA Claim]."  Not so.  Plaintiffs fail to state a claim for a CZMA violation under the APA because Plaintiffs fail to identify any *federal* agency action that violated the CZMA.  *See* FAC ¶¶ 282-89; *see, e.g., George v. Evans*, 311 F. App'x 426, 429 (2d Cir. 2009) (affirming dismissal of plaintiff's "ill-defined" CZMA claim under the APA for failure to identify a federal agency action that could be subject to judicial review); *Enos v. Marsh*, 616 F. Supp. 32, 63-64 (D. Haw. 1984) ("there can be no violation of the CZMA when the consistency determination is approved by the state"), *aff'd*, 769 F.2d 1363 (9th Cir. 1985); *see also* 15 C.F.R. §§ 930.63, 930.64; 16 U.S.C. § 1456(c)(3)(A).  Indeed, as Plaintiffs effectively concede (at 45) in asking the Court to "reject the state's CZMA consistency determination," Plaintiffs show the glaring jurisdictional infirmity in their case: there is no private right of action to challenge consistency certification concurrences from the states.  Because Plaintiffs fail to state a claim upon which relief can be granted under the CZMA, their CZMA claim must be dismissed.

Plaintiffs' cited cases (at 43-44, nn.309, 319) address standing and are irrelevant to whether they have stated a claim upon which relief can be granted under the CZMA (they have not, as described above).  *See Knaust v. City of Kingston, NY*, No. 96-CV-601 (FJS), 1999 WL 31106, at *7 n.7 (N.D.N.Y. Jan. 15, 1999) (questioning whether plaintiffs "demonstrated a concrete and particularized harm" or were within the zone of interests for the CZMA, but ultimately dismissing on mootness grounds); *see also State of Cal. ex rel. Brown v. Watt*, 683 F.2d 1253, 1270 (9th Cir.

1982) (addressing standing); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1201 (9th Cir. 2004) (addressing standing).

## III.    CONCLUSION

For the foregoing reasons, Revolution Wind respectfully requests that the Court dismiss Plaintiffs' FAC with prejudice.  The Complaint has already been amended once and dismissal with prejudice is appropriate when amendment would be futile.  *See West v. Lynch*, 845 F.3d 1228, 1235 n.8 (D.C. Cir. 2017) (upholding dismissal of NEPA claim without leave to amend where "amending the complaint would only delay the inevitable").[37]  Here, each of Plaintiffs' causes of action is subject to dismissal for at least one reason that could not possibly be cured through amendment.  As such, Plaintiffs' FAC should be dismissed with prejudice.

Dated:  December 6, 2024                          Respectfully submitted,

                                                      By */s/ Janice M. Schneider*

                                                          Janice M. Schneider (D.C. Bar No. 472037)
                                                          Stacey L. VanBelleghem (D.C. Bar No. 988144)
                                                          Devin M. O'Connor (D.C. Bar No. 1015632)
                                                          LATHAM & WATKINS LLP
                                                          555 11th Street NW, Suite 1000
                                                          Washington, D.C. 20004
                                                          Tel:  (202) 637-2200
                                                          Fax:  (202) 637-2201
                                                          Email: janice.schneider@lw.com
                                                                   stacey.vanbelleghem@lw.com
                                                                   devin.o'connor@lw.com

                                                          *Counsel for Defendant-Intervenor*
                                                          *Revolution Wind, LLC*

---

[37] The case cited by Plaintiffs deals with a very specific procedural posture that is irrelevant here and does not support granting leave to amend.  *See Bd. of Supervisors v. United States*, 84 F.4th 1359, 1370 (Fed. Cir. 2023).