**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GREEN OCEANS**, *et al.*,<br><br>  *Plaintiffs,*<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF**<br>**THE INTERIOR**, *et al.*,<br><br>  *Defendants,*<br>*and*<br><br>**REVOLUTION WIND, LLC**,<br><br>  *Defendant-Intervenor.* | Case No. 1:24-cv-141-RCL |

<u>**MEMORANDUM OPINION**</u>

　　Forty-five plaintiffs bring this lawsuit to challenge federal agency approvals of the Revolution Wind Farm and Revolution Wind Export Cable Project (the "Project"), which is being developed by Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind"). Specifically, Plaintiffs seek an order reversing and setting aside the approvals issued by the defendants for the Project, alleging violations of the Administrative Procedure Act ("APA"), Outer Continental Shelf Lands Act ("OCSLA"), National Environmental Policy Act ("NEPA"), Endangered Species Act ("ESA"), Marine Mammal Protection Act ("MMPA"), Migratory Bird Treaty Act ("MBTA"), Clean Water Act ("CWA"), Coastal Zone Management Act ("CZMA"), and National Historic Preservation Act ("NHPA").

　　Before the Court is a Motion to Dismiss filed by Defendant-Intervenor Revolution Wind. Broadly, Revolution Wind argues that Plaintiffs lack standing for any of their claims. Secondarily, Revolution Wind argues that Plaintiffs failed to show their requisite participation in the

administrative approval processes for the Project.  And more narrowly, Revolution Wind also brings challenges to Plaintiffs' invocation of several specific statutes: that Plaintiffs failed to provide an adequate notice of intent to sue for their claims under OCSLA; that Plaintiffs have failed to allege any violation of the MBTA; and that Plaintiffs cannot sue under CZMA because it does not provide a private right of action and Plaintiffs have failed to identify any CZMA violation by a federal agency.

For the reasons contained herein, the Court will **GRANT IN PART** and **DENY IN PART** Revolution Wind's Motion to Dismiss.  Regarding the NEPA claims, the Motion to Dismiss will be **DENIED** as to Plaintiffs Chris Brown, Richard Hittinger, William Vanderhoop, and Eric Phillippi, and will be **GRANTED** as to all other Plaintiffs.  Regarding the NHPA claims, the Motion to Dismiss will be **DENIED** as to the property-owning Plaintiffs (identified in the NHPA section below) and will be **GRANTED** as to all other Plaintiffs.  Regarding the ESA and MMPA claims, the Motion to Dismiss will be **DENIED** as to Plaintiffs Alan Shinn, William Vanderhoop, and Elizabeth Knight, and will be **GRANTED** as to all other Plaintiffs.  Regarding the CWA claims, the Motion to Dismiss will be **DENIED** as to Plaintiffs Richard Hittinger, Ralph Craft, Lauren Knight, Murray Danforth, Benjamin Riggs, Eric Phillippi, Michael Lombardi, and William Vanderhoop, and will be **GRANTED** as to all other Plaintiffs.  As for the claims under the OCSLA, MBTA, and CZMA, the Motion to Dismiss will be **GRANTED** in its entirety.

## I.    BACKGROUND

The Revolution Wind Project is a wind energy project located off the coast of Rhode Island. In 2011, the Bureau of Ocean Energy Management ("BOEM"), one of the federal agency defendants in this case, initiated the leasing process for parcels offshore Rhode Island and Massachusetts to develop the Nation's first offshore wind project in federal waters.  In July 2013,

Revolution Wind's predecessor in interest won the lease through an auction process. BOEM and other federal agencies approved the Project on August 21, 2023. Am. Compl. ¶ 64, ECF No. 33.

The Project consists of sixty-five wind turbine generators ("WTGs"), two offshore substations, associated inter-array cabling between the WTGs, and an export cable to bring approximately 304 megawatts ("MW") of offshore wind capacity to Connecticut and approximately 400 MW to Rhode Island. Mot. to Dismiss at 3. The WTGs and offshore substations are located in the Atlantic Ocean approximately 15 miles east of Block Island, Rhode Island, and almost 16 miles from Newport, Rhode Island, in federal waters within the area of the Outer Continental Shelf[1] covered by BOEM Renewable Energy Lease No. OCS-A 0486. *Id.*

Plaintiffs commenced this action on January 16, 2024, against a number of federal agencies involved in the approval of the Project, including BOEM, the Department of the Interior, NMFS, United States Army Corps of Engineers ("USACE"), and the leaders of these organizations in their official capacities.[2] Project construction was already underway when Plaintiffs filed suit. Plaintiffs allege causes of action under nine different statutes: the APA, the OCLSA, the NEPA, the ESA, the MMPA, the MBTA, the CWA, the CZMA, and the NHPA.

On May 15, 2024, Plaintiffs Amended their Complaint. Am. Compl., ECF No. 33. The next day, Plaintiffs moved to stay the effective dates of federal agency approvals for the Project and for the Court to enjoin Revolution Wind from further construction. *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-141-RCL, 2024 WL 3104945, at *1 (D.D.C. June 24, 2024).

---

[1] The Outer Continental Shelf (OCS) is a vast underwater expanse beginning a few miles off the U.S. coast, where states' jurisdiction ends, and extending roughly 200 miles into the ocean, to the seaward limit of the United States' jurisdiction. *Healthy Gulf v. Doug Burgum*, No. 23-cv-604 (APM), 2025 WL 928684, at *1 (D.D.C. Mar. 27, 2025) (citing *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015)).

[2] Plaintiffs also challenged federal approvals concerning another offshore wind project, the South Fork Wind Farm and South Fork Export Cable Project. But the Court has severed all proceedings relating to the South Fork Project. ECF No. 25. In the same Order, the Court granted Revolution Wind's motion to intervene.

Defendants opposed for lack of standing, and Plaintiffs attempted to belatedly establish standing in a reply brief by filing seven additional declarations. *Id.* The Court denied Plaintiffs' Motion because parties are required to demonstrate standing in their opening motion for relief, and Plaintiffs failed to provide any "good cause" for why they should receive a second opportunity to demonstrate standing. *Id.* at *3–5.

On July 19, 2024, Defendant-Intervenor Revolution Wind filed a Motion to Dismiss Plaintiffs' Amended Complaint, which is presently before the Court. Mot. to Dismiss, ECF No. 53. Revolution Wind argues that:

(1) Plaintiffs lack standing for any of their claims;
(2) Plaintiffs fail to plead the requisite participation in the administrative process for certain claims;
(3) Plaintiffs failed to provide an adequate, statutorily required 60-day notice of intent to sue for their claims under OCSLA;
(4) Plaintiffs do not properly allege any violation of the MBTA by Federal Defendants; and
(5) the CZMA does not provide a private right of action, and even if it did, Plaintiffs fail to identify any federal agency action that allegedly violated the CZMA.

Mot. to Dismiss at 1–2. Plaintiffs filed a Response, ECF No. 66 ("Opp'n"), and Revolution Wind filed a Reply, ECF No. 67 ("Reply"). The Motion is now ripe for this Court's review.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(1) Motion to Dismiss and Article III Standing

A defendant in a civil action may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(1) for "lack of subject-matter jurisdiction." Because the Court has an obligation to independently assure itself of its subject-matter jurisdiction, a plaintiff's allegations "'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a [Rule] 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1350 (2d ed. 1987)). One way a court might lack subject-matter jurisdiction is if a plaintiff lacks Article

III standing.  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  The plaintiff bears the burden of establishing standing by demonstrating "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024).

If a procedural requirement was "designed to protect some threatened concrete interest of the plaintiff," then "a plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement"—in other words, the plaintiff may have a procedural injury.  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (internal quotations omitted).  "To demonstrate injury sufficient for standing, plaintiffs must do more than invoke '[t]he mere violation' of a procedural requirement, 'generalized harm' to the environment, and 'some day intentions' to visit the area impacted by the challenged action."  *Healthy Gulf v. Doug Burgum*, No. 23-cv-604 (APM), 2025 WL 928684, at *5 (D.D.C. Mar. 27, 2025) (first quoting *Florida Audubon Soc'y*, 94 F.3d at 664, then quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)).  Instead, "[a] procedural injury claim . . . must be tethered to some concrete interest adversely affected by the procedural deprivation."  *WildEarth Guardians*, 738 F.3d 298, 305 (D.C. Cir. 2013).  "Under longstanding precedent, this requirement is satisfied where plaintiffs 'aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'"  *Healthy Gulf*, 2025 WL 928684, at *5 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs.*, 528 U.S. 167, 183 (2000)) (internal quotations omitted).

"[C]ausation in the context of a procedural injury requires a showing of two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may

have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.'" *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 184 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668). A plaintiff must show that "the procedural step was connected to the substantive result" and that there is a "substantial probability" that the procedural mistake will create an adverse effect. *Id.* at 184–85 (first quoting *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002), then quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000) (per curiam)).

The redressability requirement in the context of an alleged procedural injury is "relaxed." *Comm. for a Constructive Tomorrow v. U.S. Dep't of the Interior*, No. CV 24-774 (LLA), 2024 WL 2699895, at *4 (D.D.C. May 24, 2024). "A procedural-rights plaintiff need not show that 'court-ordered compliance with the procedure would alter the final [agency decision].'" *Ctr. for Biological Diversity*, 861 F.3d at 185 (quoting *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005)). Rather, all a plaintiff must show is that a "revisitation" would redress the injury "because [the agency] *could* reach a different conclusion." *Id.*

### i.    Standing for an Organization

There are two ways that an organization can have standing to sue in federal court. *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776 (CKK), 2025 WL 27162, at *7 (D.D.C. Jan. 3, 2025) (citing *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006)). First, an organization can have standing "on its own behalf," which is called "organizational standing." *Id.* Second, an organization can have standing to advance a claim "on behalf of its members," which is called "associational standing." *Id.*

6

To show organizational standing, the organization must make "the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Id.* (citing *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). Specifically, regarding injury-in-fact, the organization must establish that "the agency's action or omission to act injured the organization's interest and . . . [that] the organization used its resources to counteract that harm." *Ctr. for Biological Diversity v. Bernhardt*, 490 F. Supp. 3d 40, 46 (D.D.C. 2020) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (alteration adopted).

To show associational standing, an organization must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977). Moreover, the organization must have the "indicia of a traditional membership association"; "it is not enough for putative members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page." *Viasat, Inc. v. Fed. Commc'ns Comm'n*, 47 F.4th 769, 781 (D.C. Cir. 2022).

### B.  Rule 12(b)(6) Motion to Dismiss

A defendant in a civil action may also move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face if it "pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court evaluating a Rule 12(b)(6) motion "presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor." *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 40 (D.D.C. 2018). However, "[a] court need not accept a plaintiff's legal conclusions as true . . . nor must a court presume the veracity of legal conclusions that are couched as factual allegations." *Id.* (citation omitted).

In considering a 12(b)(6) motion to dismiss, the Court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

i.    *The APA and the "Zone of Interests" Test*

"An APA claimant must establish that the claim arguably falls within the zone of interests to be protected or regulated by the underlying statute." *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 20 (1st Cir. 2024). Although this "zone of interests" inquiry was once treated as a justiciability doctrine under the umbrella of "prudential standing," the D.C. Circuit has explained that "'prudential standing' is a misnomer" because the zone of interests analysis asks whether "this particular class of persons ha[s] a right to sue under this substantive statute." *Ass'n of Battery Recyclers, Inc. v. EPA,* 716 F.3d 667, 675–76 (D.C. Cir. 2013). And the Supreme Court has since clarified that the zone of interests test is not jurisdictional but rather goes to whether the claimant has stated a viable claim. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 127, 134 (2014).

The zone of interests test "is not meant to be especially demanding." *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 955 (D.C. Cir. 2000) (citation omitted). A plaintiff "who is not itself the subject of the agency action is outside the zone of interests only if its interests are 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (citation omitted).

## III.    DISCUSSION

Revolution Wind brings a myriad of challenges against Plaintiffs for each of the nine causes of action at issue. Across the board, Revolution Wind argues that Plaintiffs, including both the individual plaintiffs and the organizational plaintiffs, have failed to establish standing for any of their claims. Mot. to Dismiss at 12. Revolution Wind begins by arguing that Plaintiffs have failed to identify the constitutional standing requirement of injury-in-fact—this case has forty-five plaintiffs, and yet, there is a "scarcity of allegations identifying or tracing an alleged injury to any of them." *Id.* at 13. Revolution Wind also highlights that in the Amended Complaint, only one of the nine claims (the NHPA claim, the ninth cause of action listed in the Amended Complaint) actually refers to any particular plaintiff. *Id.* at 21.[3]

In an apparent attempt to salvage their Amended Complaint, Plaintiffs devote nearly half of their Opposition briefing to the constitutional injury-in-fact requirement of standing, as well as the zone of interests inquiry under the APA, and attach thirty-nine new declarations in support. As a threshold matter, the Court concludes that it may consider the Plaintiffs' submitted declarations, attached to their Opposition, to determine whether they have established standing.

---

[3] In an attempt to provide some organization to Plaintiffs' Complaint, Revolution Wind groups Plaintiffs into three buckets by potential type of injury: (1) Wildlife Plaintiffs, with purported injuries related to interests in wildlife (whales, fish, lobster, bats, and birds); (2) Recreation Plaintiffs, with purported injuries related to recreational activities (sailing and aviation); and (3) Property Plaintiffs, with purported injuries related to ownership of historic properties. Mot. to Dismiss at 13–14. Plaintiffs' Opposition lists, for the first time, which plaintiffs are tied to which claims, so the Court will not use Revolution Wind's proffered grouping of plaintiffs.

*See Kalorama Citizens Ass'n v. SunTrust Bank Co.*, 18-cv-528 (BAH), 2020 WL 5653695, at *5 n.3 (D.D.C. Sept. 23, 2020) (considering plaintiffs' affidavits, filed with the Opposition, from individual members of organizations "describing concrete and particularized injuries" after defendants challenged plaintiffs' standing); *The Humane Soc'y of U.S. v. Dep't of Com.*, 432 F. Supp. 2d 4, 12 n.6 (D.D.C. 2006).[4]

But the Court, nonetheless, is in a difficult position facing this deluge of new filings. Plaintiffs' Opposition "fails to analyze any of the claims by dozens of differently situated plaintiffs under nine different statutes," Reply at 2, and reads as a rambling list of alleged injuries with haphazard tethers to the various causes of action. The Court is left trying to work backwards, piecing together alleged injuries to each plaintiff and then tying those plaintiffs to the various claims in the Amended Complaint. Faced with this disorganized briefing landscape, the Court will proceed through the nine causes of action and determine which, if any, of the plaintiffs have standing to sue and, if applicable, which plaintiffs have brought a claim within the zone of interests protected by each respective statute.[5] Then, the Court will proceed to address any other challenges that Revolution Wind brings regarding that specific cause of action.

---

[4] Revolution Wind contests this course of action, arguing that Plaintiffs cannot amend their Complaint through declarations. Reply at 1. It cites two cases from the Third Circuit that hold as much. *See Save Long Beach Island v. U.S. Dep't of Com.*, No. 23-cv-01886-RK-JBD, 2024 WL 863428, at *10 (D.N.J. Feb. 29, 2024); *Penn. Prot. & Advoc., Inc. v. Houston*, 136 F. Supp. 2d 353, 367 (E.D. Pa. 2001). However, the cases Revolution Wind cites are persuasive authority from a different Circuit, which this Court is not bound to follow.

The Court's decision to consider Plaintiffs' declarations is not in conflict with the Court's earlier denial of Plaintiffs' Motion for Stay or Preliminary Injunction, in which the Court concluded that Plaintiffs have "failed to show good cause to grant them a second opportunity to show standing." *Green Oceans*, 2024 WL 3104945, at *1. In so holding, this Court relied on the fact that courts "have declined to consider tardy affidavits when . . . it would be unfair for the court to address these late additions when Defendants have had no opportunity to respond." *Id.* at *3 (internal quotations and citations omitted). But the different procedural posture at the motion to dismiss stage counsels a different result. At the motion to dismiss stage, the defendant *does* have an opportunity to respond to new affidavits by filing a reply brief—as Revolution Wind has done here. Thus, the Court will consider the attached declarations in Plaintiffs' Opposition to the motion to dismiss.

[5] The Court notes that constitutional standing is a different inquiry than the APA zone of interests inquiry. As explained *supra*, although the zone of interests test was once treated as part of "prudential standing," the Supreme

### A. National Environmental Protection Act (NEPA)

The NEPA "'declares a broad national commitment to protecting and promoting environmental quality,' and brings that commitment to bear on the operations of the federal government." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)). "At the heart of NEPA is the procedural requirement that federal agencies prepare, and solicit public comment on, an Environmental Impact Statement (EIS) whenever they propose a 'major Federal action significantly affecting the quality of the human environment.'" *Healthy Gulf*, 2025 WL 928684, at *4 (quoting *id.*); 42 U.S.C. § 4332(c).

NEPA does not contain a citizen-suit provision and is instead enforced through the judicial review provisions of the APA, implicating the zone of interests test. *See Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 102 (1st Cir. 2012). NEPA's zone of interests extends to "protecting the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983). "[A]esthetic and environmental interests in the quality of public lands" where one "hikes, camps, fishes, etc.," are "plainly within the zone of interests protected by NEPA." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996). "The kinds of interests not plainly within NEPA's zone of interests, by contrast, are 'purely economic' interests and those in 'avoiding unnecessary delays, regulatory uncertainty, and considerable cost to their members.'" *Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151, 163 (D.D.C. 2024) (quoting *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1287 (D.C. Cir. 2005)).

---

Court has since abandoned that categorization. However, the Court will address the standing and zone of interests inquiries together, as threshold inquiries to bringing a claim under the relevant cause of action, and if these hurdles are cleared, the Court will then proceed to addressing the statute-specific reasons for dismissal that Revolution Wind brings.

Here, Plaintiffs allege numerous violations of NEPA, mostly in terms of deficiencies in the Environmental Impact Statement (EIS). As an overview of Plaintiffs' alleged NEPA challenges, Plaintiffs argue that the EIS fails to take a hard look at the cumulative impacts of the Project with the other nearby offshore wind projects; that the EIS fails to adequately analyze alternatives to the Project, including the "no-action alternative"; that the defendants impermissibly postponed the EIS; and that the EIS fails to take a hard look at the environmental impacts and climate change effects of the Project. Am. Compl. ¶¶ 165–94.

### 1. Threshold NEPA Requirements: Standing and APA Zone-of-Interests

According to Plaintiffs' Opposition, the following Plaintiffs are alleging an injury under NEPA:

- Chris Brown (commercial fisherman), Richard Hittinger (recreational fisherman), William Vanderhoop (whale watching and fishing trip company owner), who have all "experienced fewer fish in . . . the Project area." Opp'n at 12.

- The Responsible Offshore Development Alliance (the "Alliance") and New England Fishermen's Stewardship Association ("NEFSA"), whose members "fish on [the Project area], have been excluded from their fishing grounds, suffered from reduced catches, and experienced navigational issues." Opp'n at 12–13.

- Recreational mariners Lauren Knight, Murry Danforth, and Benjamin Riggs, who have experienced reduced navigational safety and increased boat traffic. Opp'n at 13.

- The organization ACK for Whales, whose members "regularly observe, and plan to continue observing, marine mammals . . . in the waters around Nantucket." Opp'n at 13.

- The organization Save Right Whales Coalition, which has members who observe the North Atlantic Right Whale in the waters where the Project is being built.  Opp'n at 13.

- The organization Bat World Sanctuary, which has wildlife professionals who will be involved in rescue efforts for any bats that could be injured by the Project.  Opp'n at 14.

- Eric Phillipi, a conservationist with a particular interest in the endangered Piping Plover bird, who observes the Piping Plover "[e]very year."  Opp'n at 14.  He alleges that these birds fly in areas where the wind turbines are located and will be directly injured. Opp'n at 30.

- Wampanoag Tribe of Gay Head, with "aesthetic, cultural, and religious interests" in the area impacted by the project.  Opp'n at 14.

The Court concludes that several of these Plaintiffs have alleged an injury under NEPA. The fishermen—Chris Brown, Richard Hittinger, and William Vanderhoop—have alleged an environmental injury-in-fact, cognizable under NEPA, because they allege that the fish population is decreasing in areas where they routinely fish.[6]  Eric Phillipi, the conservationist with an interest in the Piping Plover, has identified a cognizable harm under NEPA by alleging harm to an endangered migratory bird that he observes every season.

However, several other Plaintiffs have not identified an environmental harm under NEPA. The recreational mariners Lauren Knight, Murry Danforth, and Benjamin Riggs do not identify an environmental injury because they focus only on navigational difficulties.  *See Mashack v. Jewell*,

---

[6] The commercial fishermen also allege an economic injury, which is not cognizable under NEPA, but a plaintiff can nevertheless satisfy NEPA's zone of interests requirement even "if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'"  *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 990–91 (9th Cir. 2023) (internal citations and quotations omitted).

149 F. Supp. 3d 11, 22 (D.D.C. 2016) ("[P]laintiffs' general recreational interests in boating and sailing along the waterways adjacent to the marina are . . . insufficient to confer prudential standing under NEPA.").

The rest of the NEPA Plaintiffs are organizations or entities and fail to demonstrate either organizational or associational standing. The Alliance, NEFSA, ACK for Whales, Save Right Whales Coalition, the Wampanoag Tribe of Gay Head, and Bat World Sanctuary appear to be alleging associational standing by referencing the injuries to their members.[7] Opp'n at 12–14. However, to allege associational standing, "it is not enough to aver that unidentified members have been injured. Rather, the [plaintiff] must specifically identify members who have suffered the requisite harm." *U.S. Chamber of Com. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011). "'[A] mere interest in a problem, no matter how long-standing the interest and no matter how qualified the organization is in evaluating the problem,' is not sufficient to confer standing." *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991) (citing *Sierra Club v. Morton*, 405 U.S. 727, 729 (1972)). The organizations have not identified any members by name in regard to their NEPA claims, and therefore do not have associational standing to bring a claim under NEPA. Thus, among the plaintiffs listed, the Court concludes that Chris Brown, Richard Hittinger, William Vanderhoop, and Eric Phillipi have alleged environmental injury-in-fact within the zone of interests of NEPA.

To establish standing, these plaintiffs must also allege causation and redressability. For the four plaintiffs identified, these elements are established. Regarding causation, they allege that NMFS's failure to consider cumulative effects and alternative courses of action resulted in a

---

[7] To the degree any of these organizations wish to establish organizational standing rather than representational standing, their showings plainly fail, for none of them even attempt to address the requirements of organizational standing.

deficient EIS, leading to approval of a project that will hinder their abilities to observe impacted wildlife. This is sufficient to show causation at this stage. *See Comm. for a Constructive Tomorrow*, 2024 WL 2699895, at *3 (finding that causation was sufficiently alleged because the plaintiff contended that NMFS's failure to consider cumulative effects resulted in a deficient Biological Opinion under the ESA, leading to approval of a project that will hinder the plaintiff's ability to observe the Right Whale). And redressability is established because an order requiring the defendants to consider additional factors in the EIS could cause the agencies to reach a different conclusion. *See id.* The Court concludes that Chris Brown, Richard Hittinger, William Vanderhoop, and Eric Phillipi have standing to bring their claims under NEPA.

### 2.    Participation in the Administrative Process: FAST-41 and NEPA

Revolution Wind raises a second argument for dismissal of the NEPA claims: the Project is a "covered project" under Title 41 of the Fixing America's Surface Transportation Act ("FAST-41"), and Revolution Wind argues that any plaintiff seeking to bring a NEPA claim must have submitted comments to BOEM during the NEPA process for the Project. As context, on August 24, 2023, BOEM and NMFS published in the Federal Register a Notice of Availability of the Record of Decision for the Revolution Wind Project ("FAST-41 NOA"). 88 Fed. Reg. 57,967 (Aug. 24, 2022); *see* Am. Compl. ¶ 234. The FAST-41 NOA provided notice of final agency action on the authorization for the Project and documented the Department of the Interior's decision to approve the Project's Construction and Operations Plan with certain modifications. *Id.* at 57,968. Here, Plaintiffs only allege that two named plaintiffs submitted comments to BOEM during the NEPA process for the Project. *See* Am. Compl. ¶¶ 1 (Green

Oceans), 12 (Elizabeth Quattrocki Knight).[8]  In Revolution Wind's view, FAST-41 bars claims

from all other plaintiffs who did not submit a comment during the Project's environmental

review.  Mot. to Dismiss at 24 (citing 42 U.S.C. § 4370m-6(a)(1)(B)(i)).

It is true that in order to bring a claim under the APA for a violation of the NEPA,

plaintiffs must show that they have exhausted available administrative remedies prior to bringing

an action in federal court.  *Winnemem Wintu Tribe v. U.S. Dep't of Interior*, 725 F. Supp. 2d

1119, 1139 (E.D. Cal. 2010) (citing *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965

(9th Cir. 2002)); *see also Thompson v. Drug Enf't Admin.*, 492 F.3d 428, 438 (D.C. Cir. 2007)

(noting that "even when failure to exhaust is treated as an affirmative defense, it may be invoked

in a Rule 12(b)(6) motion if the complaint somehow reveals the exhaustion defense on its face").

However, the Court is not aware of any case law specifically analyzing the NEPA exhaustion

requirement in the context of FAST-41, and Revolution Wind offers none.  The Court is not

inclined to adopt Revolution Wind's restrictive reading of FAST-41—particularly when faced

with discrepancies as to which plaintiffs actually commented.  The Court will therefore allow the

claims under NEPA by Chris Brown, Richard Hittinger, William Vanderhoop, and Eric Phillipi

to proceed.

### B.  National Historic Preservation Act (NHPA)

NHPA declares "that it is a national policy to preserve for public use historic sites,

buildings and objects of national significance for the inspiration and benefit of the people of the

United States."  16 U.S.C. § 461.  The NHPA requires that federal agencies consider the effect of

the "undertaking" on any historic property—and here, the Project is one such "undertaking."  Am.

---

[8] Revolution Wind observes a discrepancy—the final EIS only shows comments from Plaintiffs Elizabeth Quattrocki Knight, Responsible Offshore Development Alliance, and Benjamin Riggs.  Mot. to Dismiss at 24–25 (citing the final EIS).

Compl. ¶ 302; 54 U.S.C. § 306108.  The statute and its regulations expressly provide that members of the public, interested in the impacts of a federal license on a historic property, are to have a reasonable opportunity to participate in the consultation process.  *Pye v. United States*, 269 F.3d 459, 470 (4th Cir. 2001).  NHPA does not contain a citizen-suit provision but is a relevant statute under the APA for the purposes of applying the zone of interests test.  *Id.*  "Preservation of historic and cultural resources is within the zone of interests protected by [NHPA]."  *Pres. Coal. of Erie Cnty. v. Fed. Transit Admin.*, 129 F. Supp. 2d 551, 561 (W.D.N.Y. 2000).

Plaintiffs allege that BOEM failed to identify "all of the historic properties" that will be adversely affected by the Project, failed to conduct a proper consultation, and failed to adequately identify ways to minimize harm to various national historic landmarks.  Am. Compl. ¶ 304–11.

### 1.  Threshold NHPA Requirements: Standing and APA Zone of Interests

According to the Complaint[9] and Opposition, the following Plaintiffs are all property owners alleging an injury within the zone of interest of the NHPA:

- Dee and Richard Gordon, Kathryn K. and Jerome R. Kirby, Mary Cushing Coleman, Allison Gulbrandsen, Elizabeth and Michael Vitton, Cornwall Lodge LLC, Howard G. Cushing III, 226 Ocean Avenue, Moonwatch LLC, Waves S LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Page Pieroni, Karen Blanchard, Randy Panagakis, Charlotte DuHamel, Steven Gerwirz and Katrina Hamilton Gerwirz, Veter et Nova Trust, and the Wampanoag Tribe of Gay Head.  Opp'n at 15–21.

---

[9] As noted *supra*, the NHPA is the only cause of action in the Complaint that actually names which Plaintiffs, of the forty-five in this case, are bringing the action.  Am. Compl. ¶ 291.

All of these individuals and entities allegedly own historic properties located within BOEM's identified Areas of Potential Effects. Am. Compl. ¶ 291. The Court does not explain the details of each Plaintiff's concrete injury because they are all in the same vein: namely, the impediment of ocean views and the concomitant anticipated decline in the historic and cultural value of their properties. The Court concludes that these injuries fall within the NHPA's zone of interest—indeed, property owners concerned with the aesthetic effect of an undertaking on a historic site "next to and on their property" appear to fall squarely within the group the NHPA is designed to protect. *See Pye*, 268 F.3d 459, 470.

Revolution Wind argues that Plaintiffs' concerns about property value remain "entirely speculative" and "too conjectural to plead injury-in-fact." Reply at 4. The Court disagrees—the Plaintiffs have supplied individualized declarations stating the negative effect of the Project on their property, and this is enough to overcome the dismissal standard. As Revolution Wind notes, at the summary judgment stage, Defendant may challenge the severity of Plaintiffs' alleged harm to their properties. Reply at 4 n.6 ("To the extent the Court may find that any Declarations provide a sufficient basis for some of Plaintiffs' claims to overcome the dismissal standard, Revolution Wind reserves the right to provide additional evidence relevant to the more demanding summary judgment standard, including that Property Plaintiffs have not demonstrated injury-in-fact . . . ."). But at the motion to dismiss stage, Plaintiffs need only plead sufficient facts to make out a plausible claim for relief, which they have done.

Revolution Wind also argues that Plaintiffs fail to show causation and redressability because other offshore projects are already contributing to their alleged injuries and "the only way to redress the injury these Plaintiffs allege is to restore their 'unimpeded', 'unindustrialized' views." Reply at 6 (quoting declarations). And because other offshore wind projects are already

being developed in this vicinity, their argument goes, Plaintiffs will not receive "unimpeded" views even if this specific Project were discontinued.  Reply at 6 (citing declarations).  But the Court is not persuaded by this argument.  Plaintiffs allege injury in the form of reduced value of their own property and an impeded view, and this Project is allegedly contributing to that harm— and one fewer Project would redress that incremental harm.  And if the agencies had undergone the consultation procedure that Plaintiffs believe was necessary, then this Project may not have been approved—that is, "the procedural step [is] connected to the substantive result" of Project approval, and there is a "substantial probability" that the alleged procedural mistake under the NHPA will create an adverse effect to Plaintiffs.  *Ctr. for Biological Diversity*, 861 F.3d at 184.  These property-owning Plaintiffs have therefore established causation and redressability, and the Court concludes that their claim under the NHPA may proceed to the next stage of this litigation.

## C.  Endangered Species Act (ESA) and Marine Mammals Protection Act (MMPA)

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of" those species.  16 U.S.C. § 1531(b).  The MMPA was enacted in response to a decline in marine mammal populations.  *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 627 F. Supp. 2d 16, 19 (D.D.C. 2009).  Both the ESA and the MMPA prohibit the "take"[10] of endangered whales.  *See* 16 U.S.C. § 1538(a)(1)(B) (ESA); 16 U.S.C. § 1372(a)(2)(A) (MMPA); *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 587 (D.C. Cir. 2023) (addressing claims by organization that brought ESA and MMPA claims together).

---

[10] The ESA defines "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19). The MMPA defines "take" as "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."  16 U.S.C. § 1362(13)

The ESA contains a citizen-suit provision.  16 U.S.C. § 1540(g).  The MMPA does not contain a citizen-suit provision and is instead enforced through the judicial review provisions of the APA, implicating the zone of interest test.  *Seafreeze Shoreside*, 123 F.4th at 11.  The MMPA "zone of interests" extends to any party with "conservationist, aesthetic, recreational, or economic interests" in marine mammal protection, "who would be adversely affected or aggrieved by the failure of a party to procure a permit that is required under the MMPA." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1203 (9th Cir. 2004).

Plaintiffs allege that NMFS violated the ESA because the Biological Opinion (BiOp), issued by the NMFS after consultation with BOEM and required under Section 7 of the ESA, is inadequate.  As context, the NMFS first issued a BiOp for the Project on July 21, 2023.  Am. Compl. ¶ 213.  But in March 2024, NMFS informed BOEM that the consultation required under ESA Section 7 must be reopened because the first BiOp failed to consider certain effects on the impacted species.  *Id.* ¶ 215.  Following the reopened consultation, NMFS issued a second BiOp on April 29, 2024.  *Id.* ¶ 216.  But Plaintiffs allege that the 2024 BiOp is still deficient under the ESA for numerous reasons, including failure to consider the effects of twenty other approved offshore wind projects, and the provision of inadequate mitigation measures for endangered whales.  *Id.* ¶¶ 217–26.

Plaintiffs allege that NMFS violated the MMPA by authorizing the take and harassment of a "substantial" number of marine mammals.  Am. Compl. ¶¶ 228–47.  As context, under the MMPA, the Secretary of the Interior can issue a permit to authorize the incidental taking of "small" numbers of marine mammals if the Secretary, after a period of notice and comment, finds that the total amount of such taking will have a negligible impact on those species or stock of marine mammals.  16 U.S.C. § 1371(a)(5)(A).  Here, Plaintiffs allege that the Secretary

authorized the take of more than a small number of marine mammals and underestimated the actual extent of the take that will occur by failing to consider factors such as anthropogenic noise and habitat displacement.  Am. Compl.  ¶¶ 240–47.

### 1.   Threshold ESA and MMPA Issues: Standing and MMPA Zone-of-Interests

According to Plaintiffs' Opposition, the following Plaintiffs are alleging an injury cognizable under the ESA and MMPA:

- ACK for Whales and Save the Right Whales Coalition, "organizations with conservational, recreational, and aesthetic interests in protecting marine mammals, and whose members recreationally observe marine mammals in the waters near the Project." Opp'n at 22.

- Alan Shinn and William Vanderhoop, individuals who own whale watching companies that operate in the Project area, noted that they have observed fewer whales which hurts their business.  Opp'n at 22–23.

- Elisabeth Quattrocki Knight, a boater who "regularly goes boating to look for dolphins, North Atlantic Right Whales, and other whales" in the Project area.  She alleges that the Project has "impair[ed] Knight's ability to view these animals and harm[ed] her ability to enjoy her aesthetic interests in these animals."  Opp'n at 23.

- Wampanoag Tribe of Gay Head, a Green Oceans member, alleges that "the Project has devastating impacts on the North Atlantic Right Whale—a species that is sacred and a vital part of the Tribe's history, customs, and culture."  Opp'n at 23.

The Court observes several separate standing deficiencies with these allegations.  The organizational plaintiffs, ACK for Whales and Save the Right Whales, fail to allege associational standing because "it is not enough to aver that unidentified members have been injured.  Rather,

the [plaintiff] must specifically identify members who have suffered the requisite harm." *U.S. Chamber of Commerce v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011).  The Wampanoag Tribe of Gay Head does not reference the interests of any members, but rather, the interest of the Tribe as a whole.  But "'a mere interest in a problem, no matter how long-standing the interest and no matter how qualified the organization is in evaluating the problem,' is not sufficient to confer standing." *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991) (citing *Sierra Club*, 405 U.S. at 729).    And none of these organizations contend with the requirements for organizational standing.

The remaining plaintiffs—Alan Shinn, William Vanderhoop, and Elisabeth Quattrocki Knight—have identified a concrete and particularized injury for both their ESA and MMPA claims.  It is undisputed that "the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562-63 (1992).  And the economic injuries alleged by Alan Shinn and William Vanderhoop, as owners of whale watching companies, fall within the zone of interests of the MMPA. *See City of Sausalito*, 386 F.3d at 1203.  Regarding causation and redressability, these individuals have met their burden by showing that "the procedural step [is] connected to the substantive result" of Project approval, and there is a "substantial probability" that the alleged procedural mistake under the ESA and MMPA will create an adverse effect to Plaintiffs. *Ctr. for Biological Diversity*, 861 F.3d at 184.  That is all that is required at this stage.  Therefore, Plaintiffs Alan Shinn, William Vanderhoop, and Elisabeth Quattrocki Knight may proceed on their ESA and MMPA claims.

### D. Outer Continental Shelf Lands Act (OCSLA)

The OCSLA was enacted "to govern the development of offshore oil and gas resources in [the Outer Continental Shelf], while recognizing the crucial need to balance resource development with the protection of the human, marine, and coastal environments." *Env't Def. Ctr. v. BOEM*, 36 F.4th 850, 864 (9th Cir. 2022). The OCSLA "provides for the right of coastal states to participate in decisions concerning the Outer Continental Shelf 'to the extent consistent with the national interest.'" *Id.* (quoting 43 U.S.C. 1332(4)(C)). It contains a citizen-suit provision. 43 U.S.C. § 1349(a)(1).

Plaintiffs bring a host of challenges under OCSLA. They allege that BOEM violated the "safety requirement" of Section 1337(p)(4) of the OCSLA by "approving designs . . . that significantly endanger working commercial fishermen, recreational fishermen, boaters, and sailors operating in the Project area." Am. Compl. ¶ 80. They also allege that BOEM violated Section 1337(p)(4)(B) by failing to "ensure protection of the environment" by failing to protect bats, migratory birds, benthic organisms and habitats, coastal habitats and fauna, finfish, invertebrates, essential fish habitats, and whales and other marine mammals. Am. Compl. ¶¶ 87–131. They additionally allege that BOEM "failed to protect the national security interests of the United States," *id.* ¶¶ 132–37, and "failed to ensure a fair return to the United States for the lease area" for the Project under Section 1337(p)(2). *Id.* ¶¶ 138–41. Plaintiffs also allege that BOEM "failed to prevent interference with reasonable uses of the Outer Continental Shelf," including fishing, tourism, navigation, national security uses, and aesthetic purposes. *Id.* ¶¶ 142–57. Finally, Plaintiffs allege that BOEM "failed to consider the use of the sea and the seabed for fishing." *Id.* ¶¶ 158–68.

### 1. Threshold OCSLA Issue: Standing

According to Plaintiffs' Opposition, the following Plaintiffs are alleging an injury cognizable under OCSLA:

- Chris Brown, Gary Mataronas, the Alliance, and NEFSA, who have all been allegedly injured as a result of the Project "damaging the most valuable fishing area off Rhode Island, Cox Ledge," and "creating navigational hazards . . . ."  Opp'n at 24.

- The Alliance, specifically Alliance member Kevin Dibbs—though Dibbs is not a Plaintiff in this action, so presumably Plaintiffs are attempting to establish associational standing on his behalf.  Opp'n at 24.

- Unnamed members of NEFSA.  Opp'n at 25.

- Recreational fishermen Hittinger and Craft, who "recreationally and commercially" fish in the Rhode Island Sound, particularly Cox Ledge.  Opp'n at 25–26.

- Vanderhoop and Shinn, owners of whale watching companies and for-hire fishing charters.  Opp'n at 26.

- Recreational sailors and boaters L. Knight, Danforth, Riggs, and E. Knight, "who use the Revolution Wind lease area" and have experienced navigational difficulties.  Opp'n at 27.

The Court is now faced with a slew of concerns under OCSLA regarding all types of wildlife, boating activities, and national security interests, all of which are untethered to any specific plaintiff.  And moreover, the Court cannot actually discern what the alleged OCSLA procedural mistake is even supposed to be.  Candidly, the Court has searched in vain for the thread to establish standing, or a stated claim, for any of these plaintiffs.  "Courts have often dismissed

complaints that contain bloated and disorganized allegations . . . for violations of Rule 8." *Spence v. United States Dep't of Veterans Affs.*, 19-cv-1947 (JEB), 2022 WL 3354726, at *11 (D.D.C. Aug. 12, 2022), *aff'd*, 109 F.4th 531 (D.C. Cir. 2024).  Here, "the disorganized and convoluted nature of the allegations" under OCSLA counsel dismissal.  *See id.* at *12; *see also Nichols*, 828 F. Supp. 2d at 252 ("'[U]necessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.'").  Thus, the Court dismisses Plaintiffs' OCSLA claims.

Should Plaintiffs seek further amendment of their pleadings, as indicated in their Opposition, *see* Opp'n at 45, the Court admonishes Plaintiffs make every effort to clearly establish standing by tying the injuries to the actions of the defendants, as is their responsibility.  *See Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 190 (D.D.C. 2007) ("A party invoking federal jurisdiction bears the burden of demonstrating standing to bring suit . . . . The plaintiff must demonstrate standing separately for each form of relief sought.").

## 2. Sixty-Day "Under Oath" Notice under OCSLA

Even if Plaintiffs were to shore up their deficient Complaint for their OCSLA claims, Revolution Wind observes another flaw.  The OCSLA requires that, before filing a citizen suit, a plaintiff must first send a sixty-day notice to the defendant federal agency describing its claims.  *See* 43 U.S.C. § 1349(a)(2).  The notice must be submitted sixty days before filing the lawsuit and it must be sufficiently detailed.  *See, e.g.*, *Duke Energy Field Servs. Assets, LLC v. Fed. Energy Regul. Comm'n*, 150 F. Supp. 2d 150, 154-55 (D.D.C. 2001).  An inadequate notice requires dismissal.  *See, e.g., id.* (dismissing OCSLA claim because plaintiffs' purported notice failed to comply with OCSLA's "under oath" notice requirements).

Here, Plaintiffs submitted two notices of intent to sue Federal Defendants over the Project's approvals—one on January 5, 2024, and one on February 16, 2024. *See* January 5 Notice, ECF No. 33-1; February 16 Notice, ECF No. 33-2. Revolution Wind observes that both notices fail to satisfy OCSLA's statutory requirement that the notice be "in writing under oath" because neither letter is notarized by a notary public nor proffers information under penalty of perjury. Mot. to Dismiss at 26. Thus, this failure to comply with the statutory "under oath" requirement of OCSLA requires dismissal of all of Plaintiffs' OCSLA claims. *Id.*

Plaintiffs argue that this requirement does not apply to them because they are not suing under OCLSA's citizen suit provision, but rather, under the APA, which does not require notice before filing suit. Opp'n at 40 ("[B]ecause this is not a suit to compel compliance with OCSLA, but a suit to reverse and set aside agency actions under the APA," the sixty-day notice provision is inapplicable). However, this argument is belied by the explicit language in the Amended Complaint and both notices of intent to sue attached to the Amended Complaint. In their Amended Complaint, Plaintiffs rely on the OCSLA citizen suit provision for jurisdiction, Am. Compl. ¶ 32 n.18, and noted "Plaintiffs have sent a 60-day notice of their intent to sue under OCSLA and the Clean Water Act and will amend this Complaint to add the OCSLA and CWA causes of action when the 60 days expire," *id.* ¶ 68 n.68. The notice letters themselves are also unambiguous about their intent to "sue under the citizens' suit provisions of the Outer Continental Shelf Act." Notice Letters, ECF No. 33-1 at 2.

Plaintiffs cannot now change course to shoehorn their OCSLA citizen-suit claim into the APA. "Where plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit requirements of the Act established by Congress through resort to . . . the APA." *Basel Action Network v. Mar. Admin.*, 370 F. Supp. 2d 57, 76 (D.D.C. 2005)

(quoting *Oregon Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842 (9th Cir. 1987) (discussing the sixty-day notice requirement in the Toxic Substances Control Act). Therefore, for the additional reason that Plaintiffs offered insufficient notice, the Court will dismiss their OCSLA claims.

### E. Clean Water Act (CWA)

The CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 404(a) of the CWA grants the USACE authority to issue permits for "the discharge of dredged or fill material into the navigable waters"—aptly known as a dredge-and-fill permit. 33 U.S.C.A. § 1344(b). The CWA defines "navigable waters" as "waters of the United States including territorial seas," and the "territorial seas" are the waters generally extending seaward three nautical miles from the coast in direct contact with the open sea. *Id.*; see also 33 U.S.C. § 1362(8). The CWA contains a citizen-suit provision which authorizes any "person . . . having an interest which is or may be adversely affected" to "commence a civil action on his own behalf against any person . . . who is alleged to be in violation of" the CWA. 33 U.S.C. § 1365(a), (g); *Seafreeze Shoreside*, 123 F.4th at 11.

On January 18, 2022 and on October 3, 2023, USACE issued dredge-and-fill permits that authorized construction and operation of the Project. Am. Compl. ¶ 259. Plaintiffs allege numerous deficiencies with the issuance of these dredge-and-fill permits. *Id.* ¶¶ 253–81. First, the Plaintiffs note that USACE issued these permits based on the determination that any discharges of dredge and fill material from the Project, occurring greater than three miles from the coastline, was permissible—and all discharges from the Project would occur at the Project site, around fifteen miles from the coastline. But Plaintiffs allege that this was erroneous, and that USACE should have considered *impacts* of dredge-and-fill beyond the three-mile limit. *Id.* ¶¶ 260–61. Plaintiffs

27

further allege that USACE granted dredge-and-fill permits without considering whether there were practicable alternatives to building atop the Cox Ledge special aquatic site.  *Id.* ¶ 265.  The dredge-and-fill practice, Plaintiffs allege, will "have unacceptable, adverse impacts on fisheries, shellfishing, and the aquatic ecosystem in violation" of the CWA and relevant regulations.  *Id.* ¶ 267.

### 1. Threshold CWA Issue: Standing

According to Plaintiffs' Opposition, the following Plaintiffs are alleging an injury under the CWA:

- The Alliance, NEFSA, and Green Oceans, whose members "boat, fish, and enjoy watching migratory birds and the open sea vista" in the Project area.  Opp'n at 28.

- Richard Hittinger, Ralph Craft, Lauren Knight, Murray Danforth, Benjamin Riggs, Eric Phillippi, and Green Oceans members Michael Lombardi and William Vanderhoop, who are all "individuals who use the waters of the Revolution Wind Project and nearby coastal areas affected by the Revolution Wind Project for recreational fishing, sailing, observing protected marine mammals, and observing and studying protected species of migratory birds in the area."  Opp'n at 29.

- ACK for Whales and Save Right Whales Coalition, "whose members['] aesthetic interests in whale watching depend directly on clean and healthy ocean water."  Opp'n at 29.

Once again, the Court observes that the organizational plaintiffs fail to identify members for associational standing, save for Green Oceans, which has identified Michael Lombardi and William Vanderhoop as members.  But for Green Oceans to establish associational standing, it

must demonstrate *all* requirements for associational standing, and Green Oceans makes no attempt to engage with these requirements in its briefing.

However, the individuals identified as persons who regularly use areas affected by the Project have met the requirements for standing. They identified a concrete and particularized injury by declaring their regular use of the waters in the Project area that would be impacted by a CWA violation. *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 313 (D.C. Cir. 1987) (accepting declarations from various individuals as sufficient to show particularized, discrete injuries for persons who regularly use areas affected by the defendants' program for specific activities and pastimes). And as with Plaintiffs' NEPA, NHPA, ESA, and MMPA claims, causation and redressability are established because "the procedural step [is] connected to the substantive result" of Project approval, and there is a "substantial probability" that the alleged procedural mistake under the CWA will create an adverse effect to Plaintiffs. *Ctr. for Biological Diversity*, 861 F.3d at 184. The Court concludes that Richard Hittinger, Ralph Craft, Lauren Knight, Murray Danforth, Benjamin Riggs, Eric Phillippi, Michael Lombardi, and William Vanderhoop have sufficiently shown standing to bring CWA claims.

## 2. Participation in the CWA Administrative Process

Revolution Wind raises an independent reason for dismissal: Plaintiffs did not raise their CWA claims to the USACE during the agency's public comment period. Mot. to Dismiss at 23. Indeed, as Plaintiffs note, "[i]t does not appear that a single Plaintiff—or anyone else—raised Plaintiffs' CWA claims to the USACE during the agency's public comment period. *See* Opp'n at 36–38. But Plaintiffs argue that they were not required to raise their arguments to the USACE because "the issue was known or should have been known by the agency." Opp'n at 37.

Plaintiffs are relying on the "obvious-flaw" exception to the administrative exhaustion requirement, articulated by the Supreme Court, that "flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004). "Under the obvious-flaw exception, the question is whether the flaw is so evident that there is no need for it to be pointed out at all during the public comment period." *Healthy Gulf v. United States Army Corps of Eng'rs*, 81 F.4th 510, 524 (5th Cir. 2023).

The D.C. Circuit recently explained that "the exception for 'obviousness' is narrow," and moreover, that "neither [the D.C. Circuit] nor the Supreme Court has ever used the 'so obvious' language from *Public Citizen* to revive a forfeited argument." *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 249 (D.C. Cir. 2024). Given how restricted the obvious-flaw exception is, it seems unlikely that it will apply in this case. But at this juncture, the Court will reserve a final determination on that question—determining whether the "obvious-flaw" exception applies would require an examination of what is "obvious" to an agency in a niche and fact-intensive permit-issuing process.[11] The Court believes that such question is better suited for summary judgment and will therefore allow Plaintiffs' CWA challenge to proceed.

### F. Migratory Bird Treaty Act (MBTA)

The MBTA prohibits the killing or taking of any migratory bird, unless and except as permitted by regulations promulgated pursuant to the MBTA by the Secretary of the Interior. 16 U.S.C. § 703(a). The MBTA is technically a criminal statute enforced by the Department of the Interior's Fish and Wildlife Service. *Friends of Boundary, Mountains v. U.S. Army Corps of*

---

[11] Indeed, the procedural posture of *El Puente*, in which the D.C. Circuit explained the contours of the "obvious-flaw" exception (and concluded that it did not apply in that case), was an appeal from a summary judgment decision. *El Puente*, 100 F.4th at 228.

*Eng'rs*, 24 F. Supp. 3d 105, 113 (D. Me. 2014).  It does not contain a citizen-suit provision, however, under the APA, "courts have recognized requests for injunctive relief in actions where an agency is alleged to have acted in violation of the MBTA."  *Id.*

Plaintiffs allege that because of BOEM's failure, the Project will result in the take of migratory birds in violation of the MBTA.  Am. Compl. ¶ 251.

### 1.  Threshold MBTA Issue: Standing and APA Zone-of-Interests

According to Plaintiffs' Opposition, Eric Phillipi is the only plaintiff alleging an injury cognizable under MBTA.  As explained *supra*, Eric Phillipi has established constitutional standing and has demonstrated an interest within the MBTA's zone of interests based on his regular observation of the Piping Plover.  *See Atl. States Legal Found. v. Babbitt*, 140 F. Supp. 2d 185, 189 (N.D.N.Y. 2001) ("Aesthetic injury is [] sufficient to confer standing in MBTA cases.").

### 2.  Failure to State a Claim under the MBTA

The Court struggles to identify what, exactly, Phillippi's allegation of wrongdoing under the MBTA is.  The Amended Complaint simply states: "[i]n approving the Construction and Operations Plan, BOEM failed to adequately consider the impact the [Project] will have on migratory birds, consider and adopt mitigation measures, and alter the Project to avoid injuring or killing migratory birds"; thus, Phillippi argues that "the decision to approve the Construction and Operations Plans was arbitrary, capricious, and not in accordance with the law."  Am. Compl. ¶ 251.  But in its Motion to Dismiss, Revolution Wind correctly observes that it is not a violation of the MBTA when a federal agency (here, BOEM) approves of a third-party activity (here, the Revolution Wind Project) that may ultimately result in the "take" of migratory birds.  Mot. to Dismiss at 26–27 (citing *Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 117 (D.D.C. 2014)) ("BOEM did not violate the [MBTA] by merely approving a[n offshore wind] project that,

if ultimately constructed, might result in the taking of migratory birds."); *see also Friends of the Cap. Crescent Trail v. Fed. Transit Admin.*, 255 F. Supp. 3d 60, 75 (D.D.C. 2017) ("The Court is unaware of any decision in our Circuit holding that the MBTA's take prohibition extends to a federal agency that authorizes third-party activity that may allegedly cause 'take.'").  Thus, a general allegation that the federal agencies' approval of the Revolution Wind Project will cause a "take" of migratory birds does not state a claim for relief under the MBTA, and as such, Phillippi's MBTA claim is dismissed.

### G.  Coastal Zone Management Act (CZMA)

The purpose of the CZMA is to "preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations."  16 U.S.C. § 1452(1).  The CZMA requires that the federal agencies' activities "within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone" must be consistent with approved state management programs.  16 U.S.C. § 1456(c)(1).  As is relevant here, the State of Rhode Island has adopted the "Rhode Island Ocean Special Area Management Plan," which sets forth a list of requirements for all developments in Rhode Island's offshore waters.  Am. Compl. ¶¶ 284–86.  Plaintiffs argue that BOEM's approval of the Project is inconsistent with the requirements of Rhode Island's Special Area Management Plan for a slew of reasons, *see* Am. Compl. ¶ 287, making BOEM's actions arbitrary and capricious under the APA. *Id.* ¶ 289.

### 1.  CZMA Standing, and the Lack of a Private Right of Action

According to Plaintiffs' Opposition, the following Plaintiffs are alleging an injury cognizable under CZMA:

- Green Oceans, Responsible Offshore Development Alliance, ACK for Whales, and Save Right Whales—all organizations that "have a direct interest in protecting the coastal areas where their members live, work, and enjoy recreational activities such as whale watching in the ocean areas immediately offshore affected by the construction within the Outer Continental Shelf."  Opp'n at 32.

The same basic problem arises here as with many of Plaintiffs other challenges: Plaintiffs do not identify a member of each of these groups that has been harmed, as is required to allege associational standing, and also fail to address the other associational or organizational standing requirements.  *U.S. Chamber of Commerce*, 642 F.3d at 199–200.

But beyond this standing deficiency, Plaintiffs suffer from another fundamental problem: the CZMA does not provide a private right of action.  *See*, *e.g.*, *George v. NYC Dep't of City Planning*, 436 F.3d 102, 103-04 (2d Cir. 2006) (the CZMA "affords no private right of action"); *George v. Evans*, 311 F. App'x 426, 428 (2d Cir. 2009) ("The CZMA does not entitle plaintiffs to assert a private cause of action against the federal, state, city, or private defendants.").  Plaintiffs cannot shoehorn their gripes into an APA claim here, because Plaintiffs fail to actually identify any federal agency action that allegedly violated the CZMA.  *See, e.g.*, *George*, 311 F. App'x at 429 (affirming dismissal of plaintiff's "ill-defined" CZMA claim under the APA for failure to identify a federal agency action that could be subject to judicial review); *Enos v. Marsh*, 616 F. Supp. 32, 63-64 (D. Haw. 1984) ("[T]here can be no violation of the CZMA when the consistency determination is approved by the state . . . ."), *aff'd*, 769 F.2d 1363 (9th Cir. 1985).  By asking the Court to "reject the state's CZMA consistency determination," Opp'n at 45, Plaintiffs fail to state a claim because under the CZMA, there is no private right of action to challenge consistency certification concurrences from the states.  Plaintiffs' CZMA claims are dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendant-Intervenor Revolution Wind's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.  Regarding the NEPA claims, the Motion to Dismiss will be **DENIED** as to Chris Brown, Richard Hittinger, William Vanderhoop, and Eric Phillippi, and will be **GRANTED** as to all other Plaintiffs.  Regarding the NHPA claims, the Motion to Dismiss will be **DENIED** as to the property-owning Plaintiffs and will be **GRANTED** as to all other Plaintiffs. Regarding the ESA and MMPA claims, the Motion to Dismiss will be **DENIED** as to Alan Shinn, William Vanderhoop, and Elizabeth Knight, and will be **GRANTED** as to all other Plaintiffs.  Regarding the CWA claims, the Motion to Dismiss will be **DENIED** as to Richard Hittinger, Ralph Craft, Lauren Knight, Murray Danforth, Benjamin Riggs, Eric Phillippi, Michael Lombardi, and William Vanderhoop, and will be **GRANTED** as to all other Plaintiffs.  The Motion to Dismiss will be **GRANTED** as to the OCSLA, MBTA, and CZMA claims.

In sum, the following claims may proceed to the next phase of litigation:

- NEPA claims brought by Chris Brown, Richard Hittinger, William Vanderhoop, and Eric Phillippi;

- NHPA claims brought by Dee and Richard Gordon, Kathryn K. and Jerome R. Kirby, Mary Cushing Coleman, Allison Gulbrandsen, Elizabeth and Michael Vitton, Cornwall Lodge LLC, Howard G. Cushing III, 226 Ocean Avenue, Moonwatch LLC, Waves S LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Page Pieroni, Karen Blanchard, Randy Panagakis, Charlotte DuHamel, Steven Gerwirz and Katrina Hamilton Gerwirz, Veter et Nova Trust, and the Wampanoag Tribe of Gay Head;

- ESA and MMPA claims brought by Alan Shinn, William Vanderhoop, and Elizabeth Knight; and

- CWA claims brought by Richard Hittinger, Ralph Craft, Lauren Knight, Murray Danforth, Benjamin Riggs, Eric Phillippi, Michael Lombardi, and William Vanderhoop.

A separate Order consistent with this Opinion shall issue.

Date: <u>   March 31, 2025   </u>

_____
Royce C. Lamberth
United States District Judge