# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREEN OCEANS, RESPONSIBLE OFFSHORE )
DEVELOPMENT ALLIANCE, SAVE RIGHT )
WHALES COALITION, NEW ENGLAND )
FISHERMEN'S STEWARDSHIP )
ASSOCIATION, BAT WORLD SANCTUARY, )
ACK FOR WHALES, CHRIS BROWN, RALPH )
CRAFT, MURRAY DANFORTH, RICH )
HITTINGER, LAUREN KNIGHT, ELIZABETH )
QUATTROCKI KNIGHT, M.D., PH.D., GARY )
MATARONAS, ERIC PHILIPPI, BENJAMIN )
RIGGS, ALAN SHINN, CORNWALL LODGE )
LLC, LEDGES 66 LLC, 226 OCEAN AVENUE )
MOONWATCH LLC, DEE AND RICHARD )
GORDON, KATHRYN K. AND JEROME R. )
KIRBY, CHARLOTTE DUHAMEL, DOUG AND )
VIRGINIA MARZONIE, ANDREW AND )
KRISTIN MCKEE, BEN AND LEIGH )
CARPENTER, VETER ET NOVA TRUST, )   Case No. 1:24-cv-00141
STEVEN AND KATRINA HAMILTON )
GEWIRZ, KAREN BLANCHARD, MARY )   Hon. Royce C. Lamberth
CUSHING COLEMAN, LISA FOLEY, STEPHEN )
LEWINSTEIN, ALUMNI EAST ASSOCIATES, )
EC PROPERTIES, LLC, WAVES S, LLC, )
PANAGAKIS FAMILY TRUST, PIERONI )
FAMILY REVOCABLE TRUST, ALLISON )
GULBRANDSEN, BETSY AND MICHAEL )
VITTON, )
)
　　　　　　　　　　*Plaintiffs*, )
)
　　　　　　v. )
)
UNITED STATES DEPARTMENT OF THE )
INTERIOR, DEB HAALAND, in her official )
capacity as the Secretary of the Interior, )
BUREAU OF OCEAN ENERGY )
MANAGEMENT, LIZ KLEIN, in her official )
capacity as the Director of the Bureau of Ocean )
Energy Management, NATIONAL MARINE )
FISHERIES SERVICE, JANET COIT, in her )
official capacity as the Administrator of the )
National Marine Fisheries Service, UNITED )
STATES ARMY CORPS OF ENGINEERS, )

LT. GEN. SCOTT SPELLMON, in his official )
capacity as Chief of Engineers and Commanding )
General of the United States Army Corps of )
Engineers, )
                        )
                        *Defendants,* )
                        )
       and )
                        )
REVOLUTION WIND, LLC, )
                        )
              *Defendant-Intervenor.* )
_____ )

## SECOND AMENDED COMPLAINT TO REVERSE
## AND SET ASIDE FINAL AGENCY ACTION

To implement a massive new program to generate electrical energy by constructing thousands of turbine towers offshore on the Atlantic Outer Continental Shelf and laying hundreds of miles of high-tension electrical cables undersea, the United States has shortcut the statutory and regulatory requirements that were enacted to protect our Nation's environmental and natural resources, its industries, and its people.

On August 21, 2023, the United States Bureau of Ocean Energy Management ("BOEM") approved the Construction and Operations Plan for the Revolution Wind Project,[1] an 83,798-acre wind farm to be constructed by Revolution Wind, LLC offshore Rhode Island by issuing a Record of Decision. This final agency approval, together with BOEM's approval of a Final Environmental Impact Statement for the Project[2] and a collection of other various permits from

---

[1] Bureau of Ocean Energy Management, *Revolution Wind Record of Decision* (Aug. 21, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf (Record of Decision).
[2] Bureau of Ocean Energy Management, *Revolution Wind Final Environmental Impact Statement* (July 23, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2.pdf (Revolution Wind Final Environmental Impact Statement).

other federal agencies provides Revolution Wind, LLC, the company that will construct Revolution Wind, authorization to begin construction.

In authorizing this Project, Defendants failed to comply with numerous statutes and their implementing regulations: Administrative Procedure Act,[3] Outer Continental Shelf Lands Act,[4] National Environmental Policy Act,[5] Endangered Species Act,[6] Marine Mammal Protection Act,[7] Migratory Bird Treaty Act,[8] Clean Water Act,[9] Coastal Zone Management Act,[10] and National Historic Preservation Act.[11]

Plaintiffs, Green Oceans et al., ask this Court to invalidate the Government's approval of the Revolution Wind Project as unlawful and in violation of the relevant statutes and regulations.

**Parties**

1.    Plaintiff, Green Oceans, is a Rhode Island-based nonpartisan non-profit, 501(c)(3) corporation comprised of citizens dedicated to combating climate change without sacrificing the ocean's biodiversity and health. Green Oceans believes that "protecting the ocean and biodiversity ensures our own survival"[12] and that "a healthy ocean is one of our best defenses against climate change."[13] Green Oceans aims to prevent irreversible damage to the marine ecosystem and coastal communities. Green Oceans dedicates time to educating the public about risks to the ocean and advocates for more transparency from the government and developers

---

[3] 5 U.S.C. §§ 701-706.
[4] 43 U.S.C. §§ 1331–1337.
[5] 42 U.S.C. §§ 4321–4370h.
[6] 16 U.S.C. §§ 1540(g)(1)(A), (B).
[7] 16 U.S.C. § 1371.
[8] 16 U.S.C. § 703.
[9] 33 U.S.C. § 1365(b).
[10] 16 U.S.C. § 1451.
[11] 54 U.S.C. §§ 300101-307101.
[12] Green Oceans, *About Us*, https://green-oceans.org/ (last visited May 23, 2025).
[13] *Id.*

about both the unknown risks and unproven benefits of industrializing the ocean. Green Oceans'

membership includes commercial fishermen,[14] recreational fishermen and boaters,[15] Indian

Tribes,[16] historic property owners,[17] local business owners, and nature enthusiasts,[18] all of whom

have been injured as a result of the Project's impacts on the marine ecosystem, coastal

communities, safety, and fishing in the Project area. BOEM's approval of the Project directly

injured Green Oceans by frustrating the organizations' purpose in protecting the ocean's

biodiversity and health against massive-scale energy development. Green Oceans has repeatedly

demonstrated its interest in protecting the environmental resources in the Project area. On

October 26, 2023, Green Oceans submitted 1,526 signatures to the National Oceanic and

Atmospheric Administration ("NOAA") supporting NOAA's proposed regulation declaring Cox

Ledge a Habitat Area of Particular Concern. Green Oceans also submitted comments on the

Revolution Wind Draft Environmental Impact Statement, the Draft Strategy for the North

Atlantic Right Whale, and the Incidental Take Requests for the Revolution Wind Project.

    2.    Plaintiff, Responsible Offshore Development Alliance (the "Alliance"), is a

District of Columbia-based nonprofit corporation. The Alliance's mission is to provide a unified

voice for the commercial fishing industry related to the siting and operations of new and

proposed offshore developments to promote seafood sustainability. The Alliance's membership

---

[14] *See, e.g.,* the declarations of Green Oceans members: Decl. of C. Brown, ECF No. 66-1; Decl. of G. Mataronas, ECF No. 66-2; Decl. of R. Craft, ECF No. 66-4; Decl. of A. Shinn, ECF No. 66-5.

[15] *See, e.g.,* the declarations of Green Oceans members: Decl. of E. Quattrocki Knight, ECF No. 66-12; Decl. of L. Knight, ECF No. 66-7; Decl. of M. Danforth, ECF No. 66-8; Decl. of B. Riggs, ECF No. 66-9; Decl. of R. Craft, ECF No. 66-4; Decl. of M. Lombardi, ECF No. 66-10; Decl. of J. Zarba, ECF No. 66-11; Decl. of W. Vanderhoop, ECF No. 66-6.

[16] *See* Decl. of C. Andrews-Maltais, ECF No. 66-14.

[17] See *infra* ¶ 17-22.

[18] *See* Decl. of E. Philippi, ECF No. 66-13.

includes major Atlantic and Pacific fishing associations, dealers, seafood processors, and affiliated businesses, and over 120 fishing vessels in fourteen states operating in over 30 different fisheries. The Alliance directly collaborates with relevant federal and state regulatory agencies (e.g., National Marine Fisheries Service, Bureau of Ocean Energy Management, U.S. Coast Guard, fishery management councils, and state agencies), offshore developers, science experts, and others to coordinate science and policy approaches to managing development of the Outer Continental Shelf in a way that reduces conflicts with existing traditional and historical fishing. On March 25, 2019, the Alliance executed a ten-year Memorandum of Understanding with the National Marine Fisheries Service and the Bureau to collaborate on the science and process of offshore wind energy development on the Atlantic Outer Continental Shelf. BOEM's approval of the Project has directly injured the Alliance and frustrated its purpose by authorizing devastating impacts on commercial fishing, navigational safety, the marine environment, benthic habitats, and fishing stocks in the Project area—which the Alliance works to protect. These impacts have also injured the Alliance's members like Kevin Debbis, a commercial fisherman in the Project area who depends on a healthy marine environment and reliable levels of fish stock to support his commercial fishing operation, which approval of the Project has imperiled.[19]

3.      Plaintiff, Save Right Whales Coalition, is an alliance of grassroots environmental and community organizations, scientists, and conservationists working to protect the North Atlantic Right Whale and other marine life from the industrialization of the ocean habitat through large-scale offshore wind energy development. Their members include Deep Sea Defenders, Defend Brigantine Beach, Fenwick Island Environmental Committee, Green Oceans, Environmental Progress, Keep Our Oceans Ocean, Kent Conservation and Preservation Alliance,

---

[19] *See* Decl. of K. Debbis ¶ 1–8, ECF No. 66-16.

ACK for Whales, Protect Our Coast NJ, Save the Horseshoe Crab, WindAction, and fourteen individuals. Save Right Whales Coalition engages with local stakeholders to advocate for preserving and conserving the North Atlantic Right Whale. BOEM's approval of the Project directly frustrates Save Right Whales Coalition's purpose—to protect the North Atlantic Right Whale in the wild—and injures its members, whose opportunity to see a North Atlantic Right Whale in the wild, and particularly in the waters to be occupied by the Revolution Wind Project, has diminished as a result of the Project's approval.

4.       Plaintiff, New England Fishermen's Stewardship Association, is a nonprofit organization comprised of an alliance of fishermen committed to preserving seafood resources in the waters off New England. The Association is dedicated to educating the public about how best to manage seafood resources through sound science and best conservation practices used by fishermen to promote economic well-being, ecosystem sustainability, and food security. The Association actively engages with local stakeholders, fishing and environmental organizations, and state, local, and federal governments to advocate for fishermen and environmental protection. BOEM's approval of the Project has injured the Association and its members, who depend on a healthy marine environment, safe navigation, and sustainable fish stocks in the Project area—all of which have been adversely impacted by the Project.

5.       Plaintiff, Bat World Sanctuary, is a Texas-based, federally recognized 501(c)(3), non-profit corporation, dedicated to the rescue and protection of non-releasable bats. Founded in 1994, the Bat World Sanctuary has been involved in countless conservation and successful bat rescue efforts, and has provided workshops to bat rehabilitators and collaborated with other bat rescue organizations, including many North American Universities, the U.S. Center of Disease

Control, Idaho Fish and Game, Louisiana Department of Wildlife and Fisheries, Texas Parks and Wildlife, and various state agencies throughout the country.

6.       ACK for Whales is a 501(c)(3) non-profit and grassroots organization that seeks to actively protect the waters off the south shores of Nantucket. ACK for Whales is a membership-based organization of community members committed to protecting the ocean and the abundant and unique marine life that lives within and above, from the negative impacts that will be incurred by industrial turbine installations. ACK for Whales' primary concern includes the protection and conservation of the North Atlantic Right Whale. ACK for Whales' founding member, Vallorie Oliver, is a lifelong resident of Nantucket and enjoys the natural environment that Nantucket offers, especially the rich marine life. Oliver and other members of ACK for Whales regularly observe, and plan to continue observing, marine mammals, including the North Atlantic Right Whale, in the waters around Nantucket. ACK for Whales and its members have been injured by BOEM's approval of the Project. BOEM's approval, which authorized devastating impacts on North Atlantic Right Whales and marine mammals, frustrates ACK for Whales' purpose in protecting the whale and has diminished the opportunity for its members to observe and enjoy these marine mammals in their natural habitat by reducing the number of whales in the project area.

7.       Plaintiff and Green Oceans member, Chris Brown, is a commercial fisherman in Rhode Island. Chris Brown has been fishing for decades and is deeply invested in preserving the ocean and fisheries for future generations. He is a founding member of the Seafood Harvesters of America, which focuses on accountability, stewardship, and sustainability in fishing practices, science, and management. Chris Brown was also recognized in 2016 at the White House with a "Champions of Change" award for sustainable seafood practices. He was also a member of the

Rhode Island Fishermen's Advisory Board. Brown depends on a healthy marine environment, safe navigation, and sustainable fish stock for his commercial fishing business. Brown heavily relies on Cox Ledge, which is "the most important resource fishermen have in southern New England" due to its unique habitat which serves as a spawning ground for many marine species necessary for his commercial fishing business, particularly Atlantic cod.[20] BOEM's approval of the Project directly injured Brown by authorizing development directly over Cox Ledge, degrading the marine environment, reducing the availability of fish stock, and impeding vessel radar and navigational safety through the Project area.

8.      Plaintiff and Green Oceans member, Ralph Craft, is a recreational fisherman and owner of Crafty One Customs, a brick-and-mortar store in Portsmouth, Rhode Island, which builds and creates specialty and custom recreational fishing rods and fishing equipment. Craft depends on a healthy marine environment, safe navigation, and sustainable fish stock to support his recreational fishing and fishing supply business. Craft's business heavily relies on Cox Ledge, which serves as a spawning ground for many marine species necessary for his fishing supply business.[21] BOEM's approval of the Project directly injured Craft by authorizing development directly over Cox Ledge, degrading the marine environment, reducing the availability of fish stock, and impeding vessel radar and navigational safety through the Project area.

9.      Plaintiff and Green Oceans member, Murray Danforth, is a Rhode Island resident and a recreational sailor who sails within the Revolution Wind lease area. Danforth relies on unimpeded radar and safe navigation for his sailing trips. BOEM's approval of the Project

---

[20] Decl. of C. Brown ¶ 7, ECF No. 66-1.
[21] Decl. of R. Craft ¶ 4, ECF No. 66-4.

directly injured Danforth as a result of the Project's adverse impacts on radar and navigational safety, making his trips more dangerous. [22]

10.    Plaintiff and Green Oceans member, Rich Hittinger, is a recreational fisherman in Rhode Island. He serves as the Vice President of the Rhode Island Saltwater Anglers Association and served as a member of the Rhode Island Fishermen's Advisory Board until 2023.[23] Hittinger depends on a healthy marine environment, safe navigation, and sustainable fish stocks in the Project area to support his fishing activities. BOEM's actions have directly injured Hittinger by approving the Project which has damaged the marine environment, added dangerous navigational hazards that interfere with his radar and safe navigation, and reduced the fish stock available in the Project area.

11.    Plaintiff and Green Oceans member, Lauren Knight, is a recreational sailor who sails within the Revolution Wind lease area. She also serves as a volunteer member of the United States Coast Guard. Knight depends on effective radar and safe navigation through the Project area for her sailing activities. Knight has been directly injured by BOEM's approval of the Project. The massive Project turbines interfere with her radar and create navigational hazards for her trips in and around the Project area.[24] These impacts have already rendered Knights trips less safe and less frequent.

12.    Plaintiff, Elizabeth (Lisa) Quattrocki Knight, M.D., Ph.D., owns a home in Little Compton, Rhode Island. She is co-founder and President of Green Oceans, and submitted comments to BOEM regarding Revolution Wind's Draft Environmental Impact Statement.[25]

---

[22] Decl. of M. Danforth ¶ 2–3, ECF No. 66-8.
[23] Decl. of R. Hittinger ¶ 4–5, ECF No. 66-3.
[24] Decl. of L. Knight ¶ 2–7, ECF No. 66-7.
[25] Decl. of E. Quattrocki Knight ¶ 14, ECF No. 66-12.

Quattrocki Knight is a recreational boater who would frequently boat in the Project area to connect with nature and observe the marine mammals that have historically travelled through what is now the Project area.[26] Quattrocki Knight depends on effective radar, safe navigation, and a healthy marine environment for her boating activities, all of which have been adversely impacted by BOEM's approval authorizing the placement of 65 massive turbine structures throughout the Project area.

13.    Plaintiff and Green Oceans member, Gary Mataronas, is a commercial lobster fisherman who operates in Rhode Island. He is a member of the Little Compton Harbor Commission and the Little Compton Town Council. He was also a member of the Rhode Island Fishermen's Advisory Board. Mataronas depends on a healthy marine environment, safe navigation, and sustainable fish stocks for his commercial fishing activities, and heavily relies on Cox Ledge. Cox Ledge is one of the most bountiful fishing areas in all of New England, and the Project's adverse impacts on the fish stock and accessibility of Cox Ledge has already put Mataronas' livelihood at risk.[27]

14.    Plaintiff and Green Oceans member, Eric Philippi, is a resident of Rhode Island and a conservationist and steward of the endangered piping plover, which is an endangered bird that will be adversely affected by the Revolution Wind Project.

15.    Plaintiff and Green Oceans member, Benjamin Riggs, is a Newport, Rhode Island resident and a retired Naval Aviator with a background in aeronautical engineering, who has lectured on environmental issues at a local Rhode Island University. Riggs enjoys recreational activities in the ocean and unimpeded views of the ocean, which will be significantly degraded

---

[26] *Id.* ¶ 26.
[27] Decl. of G. Mataronas ¶ 3, ECF No. 66-2.

by the Revolution Wind Project.[28] Riggs also flies and has flown planes in and around the Revolution Wind lease area. BOEM's approval of the Project has injured Riggs by undermining navigational safety and impeding the viewshed in the Project area.

16.     Plaintiff and Green Oceans member, Alan Shinn, runs Miss Belmar Whale Watching and Fishing Trips, which is a New Jersey corporation. Mr. Shinn has over 40 years of experience as a captain and fisherman fishing in the waters of the mid-Atlantic. Miss Belmar, the company Shinn operates, employs four captains, one naturalist, and operates two ships for whale watching trips, fishing trips, and cruises off the coast of New Jersey and the waters of the mid-Atlantic and New England. Miss Belmar is a member of Whale Sense, which is a voluntary recognition program offered to commercial whale-watching companies that practice responsible ecotourism. Alan Shinn's business is heavily dependent and relies on the health of the ocean and the fish and marine mammals. BOEM's approval of the Project has directly injured Shin by reducing his ability to fish in the Project area and decreasing the number of marine mammals traveling through the Project area. The construction of Revolution Wind over Atlantic cod spawning grounds threatens his ability to offer cod fishing trips,[29] and its location along the Right Whale migration route increases risks to the species—reducing whale sightings and jeopardizing his customer base.[30]

17.     Plaintiffs, Cornwall Lodge LLC, Ledges 66 LLC (Howard G. Cushing III), 226 Ocean Avenue Moonwatch LLC, Richard and Dee Gordon, Kathryn K. and Jerome R. Kirby, and Mary Cushing Coleman, Allison Gulbrandsen, and Betsy and Michael Vitton own properties

---

[28] Decl. of B. Riggs ¶ 2–3.
[29] Decl. of A. Shinn ¶ 7, ECF No. 66-5.
[30] *Id.* ¶ 4–5.

within the Ocean Avenue Historic District in Newport, Rhode Island, otherwise known as "Ocean Drive." Each plaintiff owns property in the landmark district.

18.    Plaintiff, Charlotte DuHamel, owns a property called "the Mill," which is located at 581 West Main Road in Little Compton, Rhode Island. This property is eligible to be placed on the National Register of Historic Places.[31]

19.    Plaintiffs, Doug and Virginia Marzonie, Kristin and Andrew McKee, and Ben and Leigh Carpenter, own properties within the Warren Point Historic District.

20.    Plaintiff, Veter et Nova Trust (Sandra Craig), owns a property within the Stoneybrook Estate Historic District. This property is listed on the National Register of Historic Places.

21.    Plaintiffs, Steven Gewirz and Katrina Hamilton Gewirz, own a property within the Indian Avenue Historic District.

22.    Plaintiffs, Waves S, LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Pieroni Family Revocable Trust (Michael and Paige Pieroni), Karen Blanchard, and the Panagakis Family Trust (Randy Panagakis), own property within the Bellevue Avenue Historic Landmark District.

23.    Defendant, the United States of America, is a republic with powers that are defined and limited by the Constitution and statutes of the United States. The United States acts through its various departments, agencies, instrumentalities, and officials.

24.    Defendant, the United States Department of the Interior, is an agency of the federal Government that plays a central role in how the United States stewards its public lands

---

[31] State of Rhode Island Historic Property Search, *Search: 581 West Main Road*, https://www.ri.gov/preservation/search/view.php?idnumber=LTCO00042 (last visited Jan. 11, 2024).

and waters, increases environmental protections, and pursues environmental justice. The agency's mission is to protect and manage the Nation's natural resources and provide scientific and other information about those resources. The Department of the Interior prioritizes investing in climate research and environmental innovation to incentivize the rapid deployment of clean energy solutions while reviewing existing programs to restore balance on America's public lands and waters to benefit current and future generations. The Department of the Interior is authorized to grant a lease, easement, or right-of-way on the Outer Continental Shelf for activities that produce or support the production of energy from oil, gas, and other sources.[32]

25.    Defendant, Deb Haaland, is the Secretary of the United States Department of the Interior and is responsible for overseeing the Nation's Outer Continental Shelf lands and oceans, including those selected for offshore wind projects. Secretary Haaland oversees BOEM and is responsible for the decisions taken by BOEM. Secretary Haaland is sued in her official capacity as Secretary of the Interior.

26.    Defendant, Bureau of Ocean Energy Management ("BOEM"), is a federal agency within the Department of the Interior established in 2010 to oversee the energy development of the Outer Continental Shelf. BOEM's mission is "to manage [the] development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."[33] BOEM evaluates the resources of the Outer Continental Shelf and is responsible for issuing leases in the Outer Continental Shelf. BOEM also supervises and approves any oil, gas, or renewable energy projects under these leases.

---

[32] 16 U.S.C. § 1337(p)(1)(C).
[33] U.S. Department of the Interior: Bureau of Ocean Energy Management, *About Us,* https://www.boem.gov/about-boem (last visited Apr. 3, 2024).

27.     Defendant, Liz Klein, is the Director of BOEM. She issued the final agency decisions challenged here—the approval of Revolution Wind's Construction and Operations Plan. Director Klein is sued in her official capacity as Director of the Bureau of Ocean Energy Management.

28.     Defendant, the National Marine Fisheries Service, is a federal agency within the National Oceanic and Atmospheric Administration ("NOAA"). The Service oversees national marine resources, conserves fish species, and manages fisheries, promoting sustainability and preventing overfishing, species decline, and habitat destruction. The Service also implements and enforces the Endangered Species Act regarding marine organisms and authorizes the incidental take and harassment of listed species. NOAA also administers the Marine Mammal Protection Act and authorizes the incidental harassment of whales and other marine mammals.

29.     Defendant, Janet Coit, is the Administrator of the National Marine Fisheries Service. She is responsible for the Biological Opinion, Incidental Take Statement, Letter of Authorization, and Incidental Harassment Authorization challenged here. Administrator Coit is sued in her official capacity as Director of the Service.

30.     Defendant, United States Army Corps of Engineers (the "Corps"), is a division of the United States Department of the Army for administering Section 404 of the Clean Water Act, which includes the issuance of permits to discharge and dredge fill material into the waters of the United States, including the Outer Continental Shelf.

31.     Defendant, Lieutenant General Scott A. Spellmon, is the Chief of Engineers and Commanding General of the United States Army Corps of Engineers. He oversees the Army Corps of Engineers and is responsible for all aspects of the Corps' Civil Works program, including programs for conservation and development of the Nation's water and wetland

resources, flood control, navigation, and aquatic ecosystem restoration, and permitting decisions. Lieutenant General Spellmon is being sued in his official capacity as Chief of Engineers and Commanding General.

**Jurisdiction and Venue**

32.     The United States has waived its sovereign immunity, and this Court has jurisdiction of this case under the Administrative Procedure Act,[34] Outer Continental Shelf Lands Act,[35] National Environmental Policy Act,[36] Endangered Species Act,[37] Marine Mammal Protection Act,[38] Migratory Bird Treaty Act,[39] Clean Water Act,[40] Coastal Zone Management Act,[41] and National Historic Preservation Act.[42]

33.     The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. § 702 (Administrative Procedure Act or "APA").

34.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(2) because all of the Federal Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

35.     Plaintiffs have exhausted all administrative remedies, the agency actions challenged in this suit are final and ripe for review, and Plaintiffs have standing because they are injured in fact by the federal Defendants' actions or omissions, and this court has the power to redress those injuries.

---

[34] 5 U.S.C. §§ 701-706.
[35] 43 U.S.C. §§ 1331-1337.
[36] 42 U.S.C. §§ 4321-4370h.
[37] 16 U.S.C. §§ 1540(g)(1)(A), (B).
[38] 16 U.S.C. § 1371.
[39] 16 U.S.C. § 703.
[40] 33 U.S.C. § 1365(b).
[41] 33 U.S.C. § 1365(b).
[42] 54 U.S.C. §§ 300101-307101.

36.     An actual, justiciable case or controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201 because Defendants' approval of Revolution Wind's Construction and Operations Plan, the issuance of the Incidental Harassment Authorization and incidental take permits, approval of the Final Environmental Impact Statement for the Project, and grant of an easement are final agency actions under the Administrative Procedure Act.

**Statement of Facts**

37.     Rhode Island's coast includes more than one hundred square miles of estuarine and marine shoreline waters.[43] These waters are home to several transitional zones from freshwater to salt water, which are "highly productive ecosystems that provide nursery habitat for important commercial and recreational fisheries."[44] The health of these estuaries and coastal waters is important because "[m]ore than 70% of Rhode Island's recreationally and commercially important finfish species depend on estuaries for a portion of their life cycle."[45] Narragansett Bay, which lies in the center of Rhode Island, is an estuary that covers 147 square miles and is a "vital natural resource [that] supports a diversity of recreational activities and is integral to [Rhode Island's] economy including commercial fisheries, tourism, transportation, and industry."[46]

38.     The residents of Rhode Island, including Plaintiffs, depend heavily on a healthy marine habitat and ocean for their financial well-being. A 2020 report funded by the University

---

[43] Department of Environmental Protection, *Bay and Coastal Waters*, https://dem.ri.gov/environmental-protection-bureau/water-resources/waters-wetlands/bay-and-coastal-waters (last visited Apr. 3, 2024).
[44] *Id.*
[45] *Id.*
[46] *Id.*

of Rhode Island, and incorporated into several reports by NOAA,[47] found that $2.8 billion of Rhode Island's GDP and 45,494 jobs relate to the ocean.[48] Of that, $1.7 billion came from tourism and recreation, $128.9 million came from commercial fishing, aquaculture, fish hatcheries, and seafood markets; $22.4 million came from beach nourishment and harbor dredging; $304.6 million came from deep sea freight, marine passenger transportation, pipeline transportation, search and navigation equipment, and warehousing; $40.6 million came from oil and gas exploration and sand and gravel mining; and $591 million came from ship and boat building and repair.[49]

39.      Residents of Rhode Island, including Plaintiffs, have a long-standing history of commercial and recreational fishing that spans hundreds of years.[50] With 22 active fishing ports, Rhode Island is home to some of the highest-producing and highest-value ports on the East Coast.[51] Commercial fisheries harvest dozens of species each year, including longfin squid, shortfin squid, Atlantic sea scallop, American lobster, quahog, scup, summer flounder, black sea bass, whelk, silver hake, Atlantic herring, little skate, winter skate, and Atlantic mackerel.[52] Commercial fishing vessels in Rhode Island are diverse and include trawl, rod and reel, pot, gill net, fix net, dredge, and other gear types. These commercial vessels make about 30,000 annual trips into Rhode Island and federal waters from Rhode Island ports.[53]

---

[47] National Oceanic and Atmospheric Administration, *Valuing Rhode Island's Blue Economy*, https://coast.noaa.gov/digitalcoast/stories/blue-economy.html (last visited May 23, 2025).
[48] McCann, et. al., *The Value of Rhode Island's Blue Economy* (Mar. 2020) at I-5, https://web.uri.edu/wp-content/uploads/sites/916/BE-Executive-Summary-BLEEDS.pdf.
[49] *Id.*
[50] Rhode Island Department of Environmental Management Division of Marine Fisheries, *Rhode Island Annual Fisheries Report 2022* (June 30, 2023) at 5, https://dem.ecms.ri.gov/sites/g/files/xkgbur861/files/2023-07/AnnualRpt_2022.pdf.
[51] *Id.* (citing NOAA 2022 Report).
[52] *Id.*
[53] *Id.* at 30.

40.     Recreational and for-hire fishing are also popular in Rhode Island, with the state issuing over 35,000 licenses in 2022.[54] In 2022 alone, 2,732,516 recreational fishing trips were taken into Rhode Island and federal waters from Rhode Island ports. These trips included trips from the shore, party boats, charter boats, and private/rental boats. Recreational fishermen caught millions of fish in 2022, including scup, black sea bass, tautog, striped bass, fluke, bluefish, cod, and winter flounder.[55]

41.     Residents of Rhode Island, including plaintiffs, enjoy the coastal waters of Rhode Island, which are home to critical marine habitats, notably Cox Ledge, which is off the coast of Rhode Island, where the Revolution Wind Project is cited. Cox Ledge is an area with extensive "complex benthic habitat that supports several commercially and recreationally important species."[56] Cox Ledge is known for the "spawning activity for Atlantic cod, [which is] a species of biological, ecological, economic, and cultural significance to this region."[57] This population of cod stock is reproductively isolated from the rest of New England's cod stock. Cox Ledge has been recognized as essential for all life stages of Atlantic cod, herring, scallops, monkfish, skates, winter flounder, and red hake.[58] Cox Ledge is also important habitat for finfish, shellfish, crustaceans, marine mammals, sea turtles, and birds, as recognized by the Rhode Island Coastal

---

[54] *Id.* at 45.
[55] *Id.* at 4.
[56] Revolution Wind Final Environmental Impact Statement *supra* note 2 at 3.13-75; *see also id.* at 3.13-61 ("Cox Ledge, is known to support cod spawning aggregations.").
[57] *Id.* at Appendix L-164, Comment BOEM-2022-0045-0100 (National Marine Fisheries Service Comment).
[58] *Id.* at 27; *see also* Revolution Wind Final Environmental Impact Statement *supra* note 2 at Appendix L, Comments BOEM-2022-0045-0110 (National Wildlife Federation, Natural Resources Defense Council, Conservation Law Foundation, and National Audubon Society Comments).

Resources Management Council, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries.[59]

42.     The New England Fishery Management Council has designated Cox Ledge as a habitat management area and a Habitat Area of Particular Concern to help protect the high-value cod habitat in the area. The National Marine Fisheries Service and the National Oceanic Atmospheric Administration have recognized the importance of Cox Ledge for cod spawning habitats and complex habitats in their rule designating Cox Ledge, and the entire Rhode Island/Massachusetts Wind Energy Area, as a Habitat Area of Particular Concern.[60]

43.     Most of the waters where the Revolution Wind Project will be constructed, including export cables and internal cables, are in waters designated as Essential Fish Habitat. Essential Fish Habitat includes "waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity."[61]

44.     The waters offshore Rhode Island also provide habitat for many species listed under the Endangered Species Act, including the blue, fin, sei, sperm, and North Atlantic Right Whales and the Northwest Atlantic Distinct Population Segment (DPS) of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley or leatherback sea turtles, shortnose

---

[59] Rhode Island Coastal Resources Management Council, *Coastal Effects for South Fork Wind* (May 2021) at 4, http://www.crmc.ri.gov/meetings/2021_0525semipacket/2021_0525_CoastalEffectsAnalysis_SFW.pdf.
[60] *Fisheries of the Northeastern United States; Framework Adjustments to Northeast Multispecies, Atlantic Sea Scallop, Monkfish, Northeast Skate Complex, and Atlantic Herring Fisheries; Southern New England Habitat Area of Particular Concern Designation*, 89 Fed. Reg. 7633 (Feb. 5, 2024); *see also Fisheries of the Northeastern United States Framework Adjustments to Northeast Multispecies, Atlantic Sea Scallop, Monkfish, Northeast Skate Complex, and Atlantic Herring Fisheries; Southern New England Habitat Area of Particular Concern Designation*, 88 Fed. Reg. 65,944 (Sept. 26, 2023).
[61] 50 C.F.R. § 660.75.

sturgeon, the five DPSs of Atlantic sturgeon, corals, the Gulf of Maine DPS of Atlantic salmon, Gulf sturgeon, Nassau Grouper, the Northeast Atlantic DPS of loggerhead sea turtles, Oceanic whitetip shark, and smalltooth sawfish. These waters are also home to critical habitat designated for the North Atlantic Right Whale and the Northwest Atlantic DPS of loggerhead sea turtles.

45.    Rhode Island also has many federal and state-recognized historic property districts, properties, and landmarks, many of which are owned by Plaintiffs. Newport, Rhode Island is home to more than a dozen National Historic Landmarks and Districts, including the Bellevue Avenue Historic District and the Ocean Avenue Historic District. The Ocean Avenue Historic District is a National Landmark and is one of the most iconic Historic Districts in the Country. The Bellevue Avenue Historic District is along Bellevue Avenue in Newport, Rhode Island, and includes several historic gilded-age mansions. Little Compton, Rhode Island is home to seven properties on the National Register of Historic Places and several properties eligible for listing on the National Register. Little Compton is also home to the Warren's Point Historic District, which is recognized by the State of Rhode Island. Middletown, Rhode Island, is home to the noted Indian Avenue Historic District and the Stoneybrook Historic District.

**Federal Offshore Wind Program**

46.    Congress enacted the Outer Continental Shelf Lands Act (OCSLA) in 1953, authorizing the Secretary of the Interior to oversee mineral exploration and development on the Outer Continental Shelf by granting oil and gas leases through a competitive bid process managed by the Department of the Interior.[62] The Act "establishe[d] a procedural framework

---

[62] 43 U.S.C. §§ 1331–1337.

under which Interior may lease areas of the [Outer Continental Shelf] for purposes of exploring and developing the oil and gas deposits of the [Outer Continental Shelf] submerged lands."[63]

47.    In 2005, Congress amended OCSLA, placing regulatory authority for renewable energy projects with the Minerals Management Service (BOEM's predecessor agency), an agency within the Department of the Interior, and authorizing the Minerals Management Service to grant leases for offshore renewable energy projects,[64] and setting the overall policy for the Service:

> It is hereby declared to be the policy of the United States that . . . this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected; . . . the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs; . . . since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments. . . .[65]

48.    In 2007, the Department of the Interior issued a "Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf."[66] Published before any leases were granted, the Programmatic Environmental Impact Statement, "examine[d] the potential impacts of alternative energy and alternate use activities that could result from implementation" of OCSLA's new

---

[63] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).
[64] *See* § 1337(p)(1)(C); 76 Fed. Reg. 64,432, 64,434, 64,459 (Oct. 18, 2011).
[65] 43 U.S.C. § 1332.
[66] Bureau of Ocean Energy Management, *Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf* (Oct. 2007), https://www.boem.gov/renewable-energy/guide-ocs-alternative-energy-final-programmatic-environmental-impact-statement-eis.

authority.[67] The proposed actions analyzed included offshore wind, wave, and ocean current energy capture technologies.

49.      BOEM listed New York, Connecticut, Rhode Island, and Massachusetts as areas where offshore wind projects could be built. But the Programmatic Environmental Impact Statement also set forth the agency's evaluation and analysis of how offshore development could affect the environment and threaten endangered species. The agency specifically noted the threat to the North Atlantic Right Whale.[68]

50.      In 2011, the Minerals Management Service (BOEM's predecessor agency) revised its offshore wind energy leasing regulations to implement the "Smart from the Start" policy to "accelerate"[69] leasing on the Outer Continental Shelf and "speed offshore wind energy development off the Atlantic Coast."[70] These revisions streamlined the review and approval of leases, letting BOEM's predecessor bypass the multiple, public-comment periods otherwise required. Before the revisions, the issuance of a lease and approval of development had four phases: (1) Planning and analysis, (2) lease issuance, (3) Site Assessment Plan approval, and (4) Construction and Operation Plan approval. The 2011 revisions merged the first three steps into one, leaving only one opportunity for public comment and removing any pre-bid opportunities for public comment on lease locations, on-site evaluations of environmental impacts, or reasonable uses before lease issuance. These new regulations allowed for most details of these projects—lease location, size, distance from land—to be determined before the release of the

---

[67] *Id.* at ES-2.

[68] *Id.* at 4-57.

[69] U.S. Dept. of Interior, Press Release: *Salazar Launches 'Smart from the Start Initiative to Speed Offshore Wind Energy Development off the Atlantic Coast* (Nov. 23, 2020), https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.

[70] *Id.*

project information and before any notice and comment, depriving impacted communities and industries of the ability to comment.

51.     Following the release of the Programmatic Environmental Impact Statement and the change in OCSLA's regulations, the Interior Department began identifying possible future offshore wind projects.[71]

**Selection of Deepwater Wind Turbine Project Area, Assignment of Lease Portions of South Fork and Revolution Wind, and Orsted's Acquisition of the Entire Lease Area**

52.     In July 2013, BOEM leased 97,498 acres offshore of Rhode Island and Massachusetts to Deepwater Wind New England, LLC for construction of a wind turbine project. In 2018, Deepwater Wind informed BOEM that it planned to construct the project in two phases.[72]

53.     In 2018, Orsted North America, LLC acquired all entities and components of Deepwater Wind New England, LLC..

54.     In 2020, Deepwater Wind (now owned by Orsted) asked BOEM to assign 13,700 acres from its lease area to its wholly owned subsidiary, Deepwater Wind South Fork, LLC, and 83,798 acres to its other wholly owned subsidiary, Deepwater Wind Revolution 1, LLC.

55.     Later in 2020, Orsted sold half of its interest in the Deepwater Wind Projects to Eversource Energy. These two companies own South Fork Wind, LLC and Revolution Wind, LLC in a 50-50 joint venture. When construction is completed, there will be no gap or distinction

---

[71] Bureau of Ocean Energy Management, *Lease OCS-A 0486 Environmental Assessment* (May 22, 2013) at 1-9, https://web.archive.org/web/20230119210131/https://www.boem.gov/sites/default/files/uploaded Files/BOEM/Renewable_Energy_Program/State_Activities/BOEM%20RI_MA_Revised%20EA _22May2013.pdf (Environmental Assessment).

[72] South Fork Wind, *South Fork Wind Farm Construction and Operations Plan* (June 29, 2018) at ES-1, https://www.boem.gov/sites/default/files/documents/renewable-energy/South-Fork-Construction-Operations-Plan.pdf.

between the 12 turbines constructed first as South Fork Wind and the 65 turbines constructed second as Revolution Wind.

**The Revolution Wind Project**

56.    In 2019, Rhode Island and Connecticut approved power purchase agreements for power generated from an offshore wind project, Revolution Wind.

57.    In 2020, following the lease segregation and the assignment to Deepwater Wind Revolution 1, LLC, Deepwater Wind Revolution 1, LLC changed its name to Revolution Wind, LLC.

58.    Revolution Wind submitted a Construction and Operations Plan in March 2020 and revised it several times in 2021, 2022, and 2023.

59.    On April 29, 2021, BOEM published a Notice of Intent to prepare an Environmental Impact Statement for Revolution Wind's proposed facility.[73] BOEM corrected the notice in June because the original notice misstated the energy capacity of the wind farm and its distance from the shore.[74]

60.    BOEM published the Revolution Wind Project Draft Environmental Impact Statement for public review and comment on September 2, 2022.[75]

61.    On July 21, 2023, NMFS issued a Biological Opinion considering the effects of the Revolution Wind Project on Endangered Species Act listed species and critical designated habitat.[76] NMFS concluded that Revolution Wind would not jeopardize any Endangered Species Act listed species.

---

[73] 86 Fed. Reg. 22972.
[74] Revolution Wind Record of Decision *supra* note 1 at 3.
[75] 87 Fed. Reg. 54248.
[76] 88 Fed. Reg. 41171.

23

62.     On July 21, 2023, BOEM published its Notice of Availability of a Final Environmental Impact Statement for the Revolution Wind Project and released the Final Environmental Impact Statement.

63.     On August 21, 2023, BOEM, NMFS, and the Army Corps of Engineers issued a Record of Decision approving the Revolution Wind Project.[77]

**First Cause of Action**
**Violation of the Administrative Procedure Act**

64.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

65.     The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[78] The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[79]

66.     An agency's action is arbitrary and capricious within the meaning of the Administrative Procedure Act if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[80]

---

[77] Revolution Wind Record of Decision *supra* note 1.
[78] 5 U.S.C. § 702.
[79] 5 U.S.C. § 706.
[80] *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983).

67.    BOEM's November 17, 2023 approval of the Revolution Wind Construction and Operations Plan is arbitrary, capricious, and not in accordance with law for all the reasons stated in this Complaint, including violations of the National Environmental Policy Act,[81] Endangered Species Act,[82] Marine Mammal Protection Act,[83] Migratory Bird Treaty Act,[84] Outer Continental Shelf Lands Act,[85] Clean Water Act,[86] and the National Historic Preservation Act. [87]

68.    The National Marine Fisheries Service's decision to publish its final Incidental Take Regulations and issue a Letter of Authorization for the Revolution Wind Project on August 21, 2023, and its subsequent publication of the Letter of Authorization and Incidental Take Regulations on October 20, 2023, were arbitrary, capricious, and not in accordance with the law, as more fully described in Plaintiffs' Third and Fourth Causes of Action.

69.    This Court should therefore reverse and set aside these approvals and permits and remand this matter to the agencies for further consideration in accordance with the relevant statutes and the Administrative Procedure Act.

## Second Cause of Action
### Violation of the Outer Continental Shelf Lands Act and Administrative Procedure Act

70.    Plaintiffs, Chris Brown, Gary Mataronas, Richard Hittinger, Ralph Craft, Lauren Knight, Murray Danforth, Benjamin Riggs, Elizabeth Quattrocki Knight, Alan Shinn, Green Oceans, and the Responsible Offshore Development Alliance, bring this action due to injuries-in-fact caused by the Government's issuance of a Record of Decision approving the Revolution

---

[81] 42 U.S.C. §§ 4321-4370h.
[82] 16 U.S.C. §§ 1531-1544.
[83] 16 U.S.C. §§ 1361-1423(h).
[84] 16 U.S.C. § 703.
[85] 43 U.S.C. § 1337(p)(4)
[86] 33 U.S.C. § 1365(b).
[87] 54 U.S.C. §§ 300101-307101.

Wind Project. These injuries fall within the zone of interest of the Outer Continental Shelf Lands Act,[88] are caused by the Government's issuance of the Record of Decision for the Revolution Wind Project, and are remediable by an order of this Court setting aside that Government action under the Administrative Procedure Act.[89]

71.      Plaintiffs reallege and incorporate by reference their previous allegations and further allege as follows:

**The Government's Authority to Approve Offshore Wind Projects Is Limited By the Requirements of the Outer Continental Shelf Lands Act**

72.      Section 1337(p)(4) of the Outer Continental Shelf Lands Act ("OCSLA"), governing offshore wind activities, states that the Secretary of Interior "shall ensure that any activity under this subsection is carried out in a manner that provides for[,]" among others, "[s]afety;" "protection of the environment;" "conservation of the natural resources of the outer Continental Shelf;" and "consideration of . . . any other use of the sea or seabed, including use for a fishery . . . or navigation."[90] "[T]his subchapter shall be construed in such a manner that . . . the right to navigation and fishing therein shall not be affected."[91]

73.      In approving the Revolution Wind Project,[92] the Secretary of Interior, acting through BOEM, disregarded the requirements of Section 1337(p)(4). In its Record of Decision, BOEM incorrectly asserts that Section 1337(p)(4)'s requirements are not mandatory, but constitute mere "goals,"[93] and that OCSLA "does not require the Secretary to ensure that the goals are achieved to a particular degree, and [the Secretary] retains wide discretion to determine

---

[88] 43 U.S.C. §§ 1331-1337.
[89] 5 U.S.C. §§ 701-706.
[90] 43 U.S.C. § 1337(p)(4).
[91] 43 U.S.C. § 1332.
[92] Record of Decision, *supra* note 1.
[93] *Id.* at 5.

the appropriate balance between two or more goals that conflict or are otherwise in tension."[94] BOEM's disregard of the requirements of the Outer Continental Shelf Lands Act for offshore wind approval is arbitrary, capricious, and otherwise not in accordance with law.

74.    On May 1, 2025, the Interior Department repudiated the interpretation of Section 1337(p)(4) that BOEM used to approve the Revolution Wind Project,[95] formally withdrawing the former Solicitor's Opinion BOEM relied on as its authority for approving the Revolution Wind Project. The May 1, 2025 Solicitor's Opinion states that because the legal analysis BOEM relied on "conflicts with the best reading of OCSLA," it "is hereby withdrawn . . . and any other Departmental action taken in reliance on the now withdrawn M-Opinion 37067, should be re-evaluated in light of this Memorandum."[96]

## BOEM's Approval of the Revolution Wind Project Violates OCSLA Section 1337(p)(4)

### A.    BOEM Failed to Ensure Safety

75.    OCSLA requires that, before approving or permitting any development activity on the Outer Continental Shelf, the Secretary "shall ensure that any activity under [43 U.S.C. § 1337] is carried out in a manner that provides for . . . safety[.]"[97] But the administrative record reveals that BOEM failed to ensure safety by approving the Revolution Wind Project that endangers vessels traversing the project area by creating navigational hazards and interfering with the critical radar that vessels depend on for safe navigation, particularly in dense fog, stormy weather, and nighttime conditions.[98]

---

[94] *Id.* at 5-6.
[95] *See id.* at Appendix B-2, n.1.
[96] United States Dep't of the Interior, *Solicitor's Opinion M-37086, Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059* (May 1, 2025), https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.
[97] 43 U.S.C. § 1337(p)(4)(A).
[98] *See* Revolution Wind Final Environmental Impact Statement, *supra* note 2, at 3.16-17.

76.     As BOEM's analysis admits, the Project's 65 giant generator turbines will interfere with radar and act as physical obstacles,[99] reducing the effectiveness of maritime navigation[100] and search-and-rescue operations.[101] Without reliable radar, vessels will be unable to reliably detect nearby traffic or hazards, particularly in low visibility or bad weather, greatly increasing the risk of collisions for those who routinely traverse the Project area. These safety hazards are not hypothetical: in 2019, a Coast Guard rescue mission near the Block Island wind project had to be aborted due to turbine-related hazards and poor weather, resulting in two fatalities.[102]

77.     The Project's significant navigational hazards and interference with the critical radar functions directly injures commercial and recreational fishermen and boaters who routinely fish and sail in the Project area, undermining their ability to fish and navigate through the Project area safely. These safety risks imposed by the Project directly result in a loss of revenue for commercial fishermen and boaters who operate businesses that rely on fishing in and around the Project area, such as Plaintiffs and Green Oceans' members, Chris Brown, Gary Mataronas, Ralph Craft, and Alan Shinn, as well as the Alliance, through its member Kevin Debbis. The safety risks imposed by the Project also directly result in the loss of enjoyment and use of the Project area for recreational fishermen and boaters who would—but for the Project—routinely

---

[99] *See id.*

[100] National Academies of Sciences, Engineering, and Medicine, *Wind Turbine Generator Impacts on Marine Vessel Radar* (2022) at 5, https://nap.nationalacademies.org/catalog/26430/wind-turbine-generator-impacts-to-marine-vessel-radar.

[101] Revolution Wind Final Environmental Impact Statement, *supra* note 2, at Appendix E-2, 3.18-25, 3.17-20.

[102] *See* Decl. of L. Knight ¶ 4, ECF No. 66-7; *see also* Lowen M. Hobbs, *Offshore Wind Energy: A Rising Challenge to Coast Guard Operations*, U.S. Naval Institute (July 2023), Offshore Wind Energy: A Rising Challenge to Coast Guard Operations | Proceedings - July 2023 Vol. 149/7/1,445.

traverse the Project area, including Plaintiffs and Green Oceans' members, Lauren Knight,

Benjamin Riggs, Murray Danforth, and Elizabeth Quattrocki Knight. BOEM's approval of the

Revolution Wind Project has injured, and will continue to injure, these commercial and

recreational fishing and boating Plaintiffs absent an order from this Court vacating the Project

approvals.

78.     For commercial fishermen such as Plaintiff and Green Oceans' member, Gary

Mataronas, who has fished in the Project area since 1963, "the placement and height of the

turbines serve as dangerous obstructions to navigation and make fishing in the area impossible,"

and "[t]he scour protection and the cables installed for the Project have permanently altered the

ocean terrain, making lobster fishing, which uses traps placed on the ocean floor where the

turbines are being built . . . nearly impossible and dangerous."[103] Mataronas notes that if he is

"caught near [the Project] in a time of low visibility or a storm, the turbines' interference with

[his] boat's radar will impair [his] ability to safely navigate and increase the risk that [he] will

collide with a turbine or another boat."[104] For Plaintiff and Green Oceans' member, Chris

Brown, the Project is a "navigational and safety hazard[,]" which has already forced him "to

choose alternative locations to fish and alternative routes" due to the dangerous conditions the

Project poses to his trawl fishing operations.[105]

79.     For recreational fisherman such as Plaintiff, Richard Hittinger, who has fished in

the Project area, including Cox Ledge, for over 50 years, the Project has interrupted his ability to

fish in the area and has created dangerous conditions "for navigation during reduced visibility

---

[103] Decl. of G. Mataronas ¶ 5, ECF No. 66-2.
[104] *Id.* ¶ 8.
[105] Decl. of C. Brown ¶ 11, ECF No. 66-1.

times."[106] For Ralph Craft, an avid recreational fisherman in the Project area who owns and operates an onshore custom fishing rod business, avoiding the Project's turbines is "costly, time-consuming, and dangerous" because "anything that prolongs a fishing trip makes it more dangerous."[107]

80.     For recreational sailors and boaters such as Plaintiff and Green Oceans' member, Lauren Knight, who would frequently sail over the Project area and rely on radar for safe navigation, the Project has directly injured their ability to navigate through the Project area safely.[108] According to Knight, radar interference from the Project can cause "smaller vessels and stationary objects [to] become hidden, increasing the chances of collision and other emergencies, especially in bad weather or fog."[109] The Project also directly injures Knight's ability to safely travel through the Project area due to the "hazards to search and rescue missions" caused by the massive Project turbines.[110] As Knight explains, the impediment these turbines pose to search and rescue operations is not hypothetical: "[W]hen a fishing boat needed rescuing near Block Island, which has only 5 turbines, the Coast Guard could not help them because of the placement of the turbines, and two people died."[111] Other Green Oceans' members who boat and sail in the Project area have echoed similar concerns.[112]

81.     These injuries to Green Oceans' members also injure Green Oceans and the interests it seeks to protect, including its interest in preventing irreversible damage to the marine

---

[106] Decl. of R. Hittinger ¶ 6, ECF No. 66-3; *see id.* ¶ 2.
[107] Decl. of R. Craft ¶ 9, ECF No. 66-4; *see id.* ¶ 2.
[108] Decl. of L. Knight ¶ 2–3, ECF No. 66-7.
[109] *Id.* ¶ 3.
[110] *See id.* ¶ 4.
[111] *Id.*
[112] *See* Decl. of M. Danforth ¶ 2–4, ECF No. 66-8; *see also* Decl. of B. Riggs ¶ 3, 5–6; *see also* Decl. of E. Knight ¶ 26.

ecosystem and coastal communities. Because these Green Oceans' members, including commercial and recreational fishermen and boaters, have standing to sue in their own right and neither the claims asserted nor the relief requested in this case require their individual participation, Green Oceans has standing to sue on their behalf.

82.    The Alliance has standing to sue on its own behalf and through its members who are injured as a result of BOEM's approval of the Project. The Government's failure to provide for the safety of those who routinely boat and do business in the Project area directly injures the Alliance by undermining its core mission: Improving the compatibility of new offshore development with the businesses of the fishermen and fishing organizations they seek to protect.[113] BOEM's failure to ensure safety for those who depend on safe navigation and unimpeded radar when traversing the Project area frustrates the Alliance's purpose and has required the Alliance to dedicate resources towards opposing the Project's insufficient safety measures for fishermen. The Alliance also has standing to sue on behalf of its member, Kevin Debbis, a commercial fisherman who has been excluded from the Project area, which he used to routinely fish in, due to the safety and navigational hazards imposed by the Project. The injury to Debbis is germane to the Alliance's purpose and directly injures the interests the Alliance seeks to protect. Because Debbis has standing to sue in his own right and neither the claims asserted nor the relief requested in this case require his individual participation, the Alliance has standing to sue on behalf of Debbis.

---

[113] *See* Responsible Offshore Dev. Alliance, *About Us*, https://rodafisheries.org/about-us-2/ (last viewed May 22, 2025).

**B.      BOEM Failed to Ensure Protection of the Environment**

83.      Under 43 U.S.C. § 1337(p)(4)(B), before approving or permitting any

development activity on the Outer Continental Shelf, the Secretary "shall ensure that any activity

. . .  is carried out in a manner that provides for . . . protection of the environment[.]"[114] But the

administrative record demonstrates that BOEM failed to ensure protection of the environment

when it approved the Revolution Wind Project. Among the environmental harms caused by the

Revolution Wind Project:

- Even after the National Marine Fisheries Service warned BOEM that this Project would

    have ecosystem-wide impacts due to the destruction of the bottom-dwelling benthic

    organisms in the area,[115] and knowing that the Project will irreparably damage Cox

    Ledge, a federally recognized Habitat Area of Particular Concern[116] and "an area of

    complex benthic habitat that supports several commercially and recreationally important

    species,"[117] BOEM approved this Project.

- Even after the National Marine Fisheries Service warned that BOEM's approval of this

    Project will cause "regional-scale adverse impacts to [in]habitants on Cox Ledge and

    population-level impacts to Atlantic cod in Southern New England," and the Project will

---

[114] 43 U.S.C. § 1337(p)(4)(B).

[115] National Oceanic and Atmospheric Administration, *Revolution Wind Essential Fish Habitat Consultation* (June 16, 2023) at 47, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/NMFS-EFH-Letter-Revolution-Wind.pdf.

[116] *Fisheries of the Northeastern United States; Framework Adjustments to Northeast Multispecies, Atlantic Sea Scallop, Monkfish, Northeast Skate Complex, and Atlantic Herring Fisheries; Southern New England Habitat Area of Particular Concern Designation*, 89 Fed. Reg. 7633 (Feb. 5, 2024).

[117] Revolution Wind Final Environmental Impact Statement, *supra* note 2, at 3.13-75; *see id.* at 3.13-61 ("Cox Ledge, is known to support cod spawning aggregations.").

"not protect Atlantic cod spawning" and other species of fish within the lease area,[118] BOEM approved the Project without protecting these vital environmental amenities.

- Revolution Wind's 65 turbines will contain a total of 208,260 gallons of coolants, fuels, oils, and lubricants,[119] and each substation will store an additional 132,400 gallons of fuels, oils, and lubricants.[120] Yet, BOEM approved the Project without requiring a transparent spill response plan. BOEM also failed to disclose or evaluate the potential use sulfur hexafluoride ($SF_6$)[121]—a potent greenhouse gas banned in offshore use in parts of Europe—in Revolution Wind's turbines and related infrastructure.[122]

- BOEM approved Revolution Wind even though it knew that the Project will expose vulnerable and endangered marine mammals—including the critically endangered North Atlantic Right Whale—to construction noise, entanglement, vessel strikes, and habitat disruption.[123] Construction activities will involve thousands of vessel trips, pile driving, and underwater detonations,[124] causing behavioral disturbance, displacement from key feeding and migratory areas, and increased likelihood of fatal strikes and entanglements of the whales.[125] BOEM's mitigation measures (such as passive acoustic monitoring and

---

[118] *Id.* at Appendix L-164, Comment BOEM-2022-0045-0100 (National Marine Fisheries Service Comment).

[119] *Id.*

[120] *Id.*

[121] McGrath, *Climate Change: Electrical Industry's 'Dirty Secret' Boosts Warming*, BBC News (Sept. 13, 2019), https://www.bbc.com/news/science-environment-49567197.

[122] Mavrokefalidis, *Gas Leak at Scotland's 'Largest' Wind Farm Lead to Evacuation of Workers*, Energy Live News (Nov. 9, 2022), https://www.energylivenews.com/2022/11/09/gas-leak-at-scotlands-largest-wind-farm-lead-to-evacuation-of-workers/.

[123] Revolution Wind Final Environmental Impact Statement, *supra* note 2, at I-2; *id.* at 3.15-37 (BOEM estimates that 62 North Atlantic Right Whales, or 18.3% of the entire North Atlantic Right Whale population, will experience behavioral effects from construction-related activities for the Project's first five years); *id.* at 3.15-40.

[124] *Id.* at 3.15-43; *id.* at 3.15-59.

[125] *Id.* at 3.15-33.

bubble curtains) are scientifically inadequate and BOEM has failed to show that the mitigation will be effective in preventing significant harm or mortality.[126]

84.    By failing to ensure protection of the environment and by building the Project directly above Cox Ledge, a designated essential marine habitat, the Government has directly injured commercial fishermen, including Plaintiffs and Green Oceans' members, Chris Brown, Gary Mataronas, and Alan Shinn, and Plaintiff, the Responsible Offshore Development Alliance, through its member Kevin Debbis, all of whom depend on the ability to fish in Cox Ledge to support their livelihoods. These commercial fishing Plaintiffs are already feeling the impacts of the Project [127]

85.    Recreational fishermen, such as Plaintiffs and Green Oceans' members, Richard Hittinger and Ralph Craft, also rely on a healthy marine environment in the Project area. Hittinger and Craft, who both fish in and around Cox Ledge and the Project area, have been injured by the Project's environmental impacts. Hittinger personally observed "that fishing for bottom fish such as black sea bass, cod, fluke and others has been the worst that I have ever experienced in the areas near the Revolution Wind construction area."[128] Craft, who saw his routine fishing in the Project area as "an opportunity to find peace and tranquility in the remoteness of the offshore ocean environment," can no longer enjoy the peace and tranquility

---

[126] Davis et al., *Upcalling Behavior and Patterns in North Atlantic Right Whales, Implications for Monitoring Protocols During Wind Energy Development*, ICES Journal of Marine Science (Nov. 3, 2023), https://academic.oup.com/icesjms/advance-article/doi/10.1093/icesjms/fsad174/7341838?login=false; BOEM, *Renewable Energy Program Update: Briefing for the Mid-Atlantic Fisheries Management Council* (Feb. 11, 2021) at 21, https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/602d7bbd49ee2d06d9db12c4/1613593539206/05a_BOEM+Renewables+Program+Update+2021-02.pdf.
[127] *See, e.g.*, Decl. of C. Brown ¶ 9, ECF No. 66-1; *see also* Decl. of G. Mataronas ¶ 2, 6, ECF No. 66-2; *see also* Decl. of A. Shinn ¶ 4–8, ECF No. 66-5; *see also* Decl. of K. Debbis ¶ 6–8, ECF No. 66-16.
[128] Decl. of Richard Hittinger ¶ 6, ECF No. 66-3.

due to the presence and noise from the enormous construction ships and the emissions they produce, as well as the massive turbines that tower over the formerly unimpeded ocean view.[129]

86.    BOEM's failure to protect the environment has also directly injured those who observe, study, recreate in, and enjoy the Rhode Island coastline, including Plaintiffs and Green Oceans' members, Elizabeth Quattrocki Knight, Lauren Knight, Murray Danforth, and Benjamin Riggs, by permitting the formerly open sea to be transformed into rows of wind turbines, degrading the marine ecosystems that these Plaintiffs depend on for their aesthetic enjoyment and usage of the environment. Elizabeth Quattrocki Knight often sails through the Project area "hoping to observe a North Atlantic Right Whale and other marine species," but due to the Project's devastating impacts on the North Atlantic Right Whale and other marine mammals the chances that she will be "able to view a whale or a dolphin on these trips is declining."[130]

87.    Green Oceans has standing to sue on its own behalf and through its members who were injured as a result of BOEM's approval of the Project. The Government's failure to protect the environment directly injures Green Oceans by undermining its core mission, which is to prevent irreversible damage to the marine ecosystem and coastal communities. As a result, Green Oceans has dedicated substantial resources towards community outreach and engagement to inform the communities impacted by the Project of its devastating environmental consequences. But for the Government's approval of the Project, Green Oceans could have used these resources to further its mission by supporting viable solutions to climate change without sacrificing the ocean's biodiversity and health. Green Oceans has standing to sue on behalf of its members,

---

[129] Decl. of R. Craft ¶ 7, ECF No. 66-4.
[130] Decl. of E. Quattrocki Knight ¶ 26, ECF No. 66-12; *see also* Decl. of L. Knight ¶ 5–8, ECF No. 66-7; *see* Decl. of M. Danforth ¶ 2–3, ECF No. 66-8; *see also* Decl. of B. Riggs ¶ 5, ECF No. 66-9.

Chris Brown, Gary Mataronas, Richard Hittinger, Ralph Craft, Alan Shinn, Elizabeth Quattrocki Knight, Lauren Knight, Murray Danforth, and Benjamin Riggs, commercial and recreational fishermen and boaters who rely on a healthy marine ecosystem and environment. Because these Green Oceans' members have standing to sue in their own right and neither the claims asserted nor the relief requested in this case require their individual participation, Green Oceans has standing to sue on behalf of its members.

88.     The Alliance has standing to sue on its own behalf and through its members who were injured as a result of BOEM's approval of the Project. The Government's failure to protect the environment directly injures the Alliance by undermining its core mission—improving the compatibility of new offshore development with the businesses of the fishing industry associations and fishing companies whose interests the Alliance represents. By harming the marine ecosystem and reducing the stock of marine species on which the Alliance's members depend, BOEM's failure to ensure the protection of the environment has frustrated the Alliance's purpose, requiring the Alliance to dedicate resources away from its core mission. The Alliance also has standing to sue on behalf of its member, Kevin Debbis, a commercial fisherman who relies on a healthy marine environment and stable fish stocks to support his commercial fishing operation. Debbis's injury is germane to the Alliance's purpose and directly injures the interests the Alliance seeks to protect. Because Debbis has standing to sue in his own right and neither the claims asserted nor the relief requested in this case require his individual participation, the Alliance has standing to sue on behalf of Debbis.

## C.     BOEM Failed to Prevent Waste and Conserve the Natural Resources of the Outer Continental Shelf

89.     Under 43 U.S.C. § 1337(p)(4)(D), before approving or permitting any development activity on the Outer Continental Shelf, the Secretary "shall ensure that any activity

. . . is carried out in a manner that provides for . . . conservation of the natural resources of the outer Continental Shelf[.]"[131] In approving the Revolution Wind Project, the Secretary of Interior and BOEM failed to take measures to conserve the natural resources of the Outer Continental Shelf. Revolution Wind's Final Environmental Impact Statement recognizes that construction activities—the installation of large turbines, pile driving, and increased vessels in the area—operation and maintenance, and decommissioning will have devastating impacts on marine mammals, including the North Atlantic Right Whale, finfish and invertebrates, benthic resources, fishery habitats, and birds and bats.[132] Yet the Construction and Operations Plan was approved, and the mitigation measures in the Record of Decision will not effectively mitigate the impacts to these natural resources.

90.    Revolution Wind's 65 turbines and two offshore substations will hold hundreds of thousands of gallons of fuels, oils, and lubricants.[133] Yet in approving the Revolution Wind Project, BOEM failed to include protocols and protections for when spills or accidental releases occur.

91.    BOEM also failed to prevent waste and conserve the natural resources of the Outer Continental Shelf by failing to require a bond from the Developer for the removal of the Project's components and the restoration of the Project area and by failing to require that all Project components be removed from the Outer Continental Shelf after the Project's 35-year lifespan.

---

[131] 43 U.S.C. § 1337(p)(4)(D).

[132] *See* Revolution Wind Final Environmental Impact Statement, *supra* note 2, at 3.15; *see also id*. at 3.13; *id*. at 3.5-3.7; *id*. at 3.9; and *id*. at 3.13.

[133] Revolution Wind Final Environmental Impact Statement, *supra* note 2, at 3.21-15.

92.     BOEM's failure to prevent waste and conserve the natural resources of the Outer

Continental Shelf has injured Plaintiff Green Oceans and Green Oceans' members, Chris Brown,

Gary Mataronas, Richard Hittinger, Ralph Craft, Alan Shinn, as well as the Wampanoag Tribe of

Gay Head (Aquinnah), a non-party Green Oceans' member, and Plaintiff, the Responsible

Offshore Development Alliance, through its member Kevin Debbis. Leaks and spills from

turbines and substations threaten water quality, fish and marine mammal populations, and

essential habitats—resources critical to Plaintiffs' and members' livelihoods, recreation, and

cultural practices. These harms impair fishing operations, research, and marine stewardship

central to the missions of both Green Oceans and the Alliance.

93.     Commercial fishermen, such as Plaintiffs and Green Oceans' members, Chris

Brown and Gary Mataronas, and Plaintiff, the Alliance, and its member, Kevin Debbis, have

already experienced the impacts of the Project on the natural resources in the Outer Continental

Shelf. Chris Brown "served on Rhode Island's Coastal Resource Management Commission's

Fisheries Advisory Board until August 2023" when he, "along with the other members of the

Board, resigned following the Commission's approval of the Revolution Wind" Project.[134] As

Brown explains, "Cox Ledge, and the area where Revolution Wind is being built, is the most

important resource fishermen have in southern New England, and it is a habitat and spawning

ground for many marine species necessary for [his] commercial fishing business, particularly

Atlantic cod."[135] Likewise, for Plaintiff and Green Oceans' member, Alan Shinn, who owns and

operates Miss Belmar Whale Watching and Fishing Trips in the Project area, "construction over

the primary Atlantic cod spawning location on Cox Ledge" directly impacts his business because

---

[134] Decl. of C. Brown ¶ 5, ECF No. 66-1.
[135] Decl. of C. Brown ¶ 7, ECF No. 66-1.

if Atlantic cod stock becomes further reduced, he "will lose customers that want to fish for Atlantic cod[.]"[136] The Project's impacts on marine mammals, including the North Atlantic Right Whale, directly impact Shinn because any whale death or "change [in] their migration route . . . to areas where they will not encounter offshore wind" will result in less business when people cannot count on seeing whales on their tours.[137]

94.     Recreational fishermen, such as Plaintiffs and Green Oceans' members, Richard Hittinger and Ralph Craft, have also been injured by BOEM's failure to prevent waste and conserve the natural resources of the Outer Continental Shelf. Hittinger has "tried fishing at some of [his] previously productive spots near the project but found that there were no cod or sea bass close to the turbines."[138]

95.     Green Oceans has standing to sue on its own behalf and through its members who were injured as a result of BOEM's approval of the Project. The Government's failure to prevent waste and conserve the natural resources of the Outer Continental Shelf directly injures Green Oceans by undermining its core mission, which is to prevent irreversible damage to the marine ecosystem and coastal communities. Green Oceans has dedicated substantial resources towards community outreach and engagement to inform the communities impacted by the Project of its harmful impacts on the natural resources of the Outer Continental Shelf. But for the Government's approval of the Project, Green Oceans could have used these resources to further its mission by supporting viable solutions to climate change without sacrificing the ocean's biodiversity and health. Green Oceans also has standing to sue on behalf of its members, commercial and recreational fishermen and boaters who rely on the sanctity of the Outer

---

[136] Decl. of A. Shinn ¶ 7, ECF No. 66-5.
[137] *Id.* ¶ 5.
[138] Decl. of R. Hittinger ¶ 5–6, ECF No. 66-3; *see* Decl. of R. Craft ¶ 6, ECF No. 66-4.

Continental Shelf's natural resources and who are directly impacted by the waste produced as a result of the Project. The injury to Green Oceans' members is germane to Green Oceans' purpose and directly injures the interests Green Oceans seeks to protect. Because these Green Oceans' members have standing to sue in their own right and neither the claims asserted nor the relief requested in this case require their individual participation, Green Oceans has standing to sue on behalf of its members.

96.     The Alliance has standing to sue on its own behalf and through its members who were injured as a result of BOEM's approval of the Project. The Government's failure to prevent waste and conserve the natural resources of the Outer Continental Shelf directly injures the Alliance by undermining its core mission of improving the compatibility of new offshore development with the businesses of the fishing industry associations and fishing companies whose interests the Alliance represents. By harming the marine ecosystem and reducing the stock of marine species on which the Alliance's members depend, BOEM's failure to conserve the natural resources of the Outer Continental Shelf has frustrated the Alliance's purpose, requiring the Alliance to dedicate resources towards opposing the Project's insufficient protections for fishermen. But for BOEM's failure, the Alliance could have directed these resources towards efforts to facilitate development in a way that reduces conflicts with existing traditional and historical fishing. The Alliance also has standing to sue on behalf of its member, Kevin Debbis, a commercial fisherman who depends on a healthy marine environment and reliable levels of fish stock to support his commercial fishing operation. Debbis's injury is germane to the Alliance's purpose and directly injures the interests the Alliance seeks to protect.[139] Because Debbis has

---

[139] *See* Decl. of K. Debbis ¶ 1–8, ECF No. 66-16; *see also* Decl. of L. Johnston ¶ 10–13, ECF No. 66-15.

standing to sue in his own right, and because neither the claims asserted nor the relief requested

in this case require his individual participation, the Alliance has standing to sue on his behalf.

## D.    BOEM Failed to Prevent Interference with Reasonable Uses of the Outer Continental Shelf and to Consider the Use of the Sea and the Seabed for Fishing

97.    Under 43 U.S.C. § 1337(p)(4)(I), before approving or permitting any development

activity on the Outer Continental Shelf, the Secretary "shall ensure that any activity under [43

U.S.C. § 1337] is carried out in a manner that provides for . . . prevention of interference with

reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas,

and the territorial seas[.]"[140] But BOEM failed to meet this statutory requirement in approving

the Revolution Wind Project. Rather than ensure the prevention of interference with reasonable

uses, like fishing, on the Outer Continental Shelf, BOEM has instead relied on compensatory

mitigation such as developer-funded payments or offsets to ostensibly comply with this statutory

requirement. Mere monetary compensation for lost fishing gear, however, fails to satisfy this

statutory requirement.

98.    BOEM approved the Revolution Wind Project knowing that it would cause

severe, unavoidable impacts on commercial fishing, for-hire fishing, and recreational fishing.

The Project disrupts port access and harvesting activities,[141] causes space conflicts, navigational

hazards, increased risks of collisions and allisions, and gear loss and damage for fishing vessels

of all types.[142] The Project has permanently altered fish habitats in the lease area, including Cox

Ledge, which the Government has designated as a Habitat Area of Particular Concern.[143] And the

---

[140] 43 U.S.C. § 1337(p)(4)(I).

[141] Revolution Wind Final Environmental Impact Statement, *supra* note 2, at Appendix I-1.

[142] *Id.* at 3.9-88.

[143] *Fisheries of the Northeastern United States; Framework Adjustments to Northeast Multispecies, Atlantic Sea Scallop, Monkfish, Northeast Skate Complex, and Atlantic Herring Fisheries; Southern New England Habitat Area of Particular Concern Designation*, 89 Fed. Reg.

construction activities will crush and kill over one billion fish eggs in the lease area and destroy

critical spawning habitats and complex benthic organism habitats.[144]

99.     The administrative record also shows that the Atlantic cod population found in

Cox Ledge is reproductively isolated, vital to cod stocks throughout New England, and is "a

species of biological, ecological, economic, and cultural significance to this region."[145] NMFS

identified adverse impacts on Essential Fish Habitats and recommended that BOEM limit

construction over Cox Ledge,[146] but BOEM approved the Project over Cox Ledge without

considering the population-level impacts that could occur from the destruction of the Essential

Fish Habitats in the area.

100.     BOEM's failure to prevent interference with reasonable uses of the Outer

Continental Shelf, including fishing, has injured Plaintiff Green Oceans and Green Oceans'

members, Chris Brown, Gary Mataronas, Richard Hittinger, Ralph Craft, and Alan Shinn, as

well as other Green Oceans' members, William Vanderhoop, John Zarba, and Susan Zarba, and

Plaintiff, the Responsible Offshore Development Alliance, through its member Kevin Debbis.

BOEM's approval of the Revolution Wind Project has injured these commercial and recreational

fishing Plaintiffs by excluding them from their traditional fishing grounds, threatening fish and

---

7633 (Feb. 5, 2024); *see Fisheries of the Northeastern United States Framework Adjustments to Northeast Multispecies, Atlantic Sea Scallop, Monkfish, Northeast Skate Complex, and Atlantic Herring Fisheries; Southern New England Habitat Area of Particular Concern Designation*, 88 Fed. Reg. 65,944 (Sept. 26, 2023).

[144] Revolution Wind Final Environmental Impact Statement, *supra* note 2, at 3.13-55.

[145] *Id.*

[146] National Oceanic and Atmospheric Administration, *Revolution Wind Essential Fish Habitat Consultation* (June 16, 2023) at 26, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/NMFS-EFH-Letter-Revolution-Wind.pdf.

marine populations, and reducing access to the ports and navigational routes they depend on to support their fishing activities.

101.    Commercial fishermen, such as Plaintiffs and Green Oceans' members, Chris Brown and Gary Mataronas, as well as Plaintiff, the Alliance, and its member, Kevin Debbis, have already been injured by BOEM's failure to prevent interference with fishing when it approved the Project. As Chris Brown explains, "Cox Ledge, and the area where Revolution Wind is being built, is the most important resource fishermen have in southern New England and it is a habitat and spawning ground for many marine species necessary for my commercial fishing business, particularly Atlantic cod."[147] Likewise, for Plaintiff and Green Oceans' member, Gary Mataronas, the Project's siting over Cox Ledge, "which is one of the most bountiful fishing areas in all of New England, adversely impacts [his] ability to fish and will therefore directly put [his] continued livelihood . . . at risk."[148] For Plaintiff, the Alliance, and its member, Kevin Debbis, "Cox Ledge, and the area where Revolution Wind Project is being built, is the most important resource fishermen have in southern New England, and it is a habitat and spawning ground for many marine species necessary for [his] commercial fishing business."[149]

102.    Recreational fishermen, such as Plaintiffs and Green Oceans' members, Richard Hittinger and Ralph Craft, have also been injured by BOEM's failure to prevent interference with recreational fishing in the Project area. Craft explains that damage to Cox Ledge directly injures his livelihood because Cox Ledge is "a spawning ground for many marine species

---

[147] Decl. of C. Brown ¶ 7, ECF No. 66-1.
[148] Decl. of G. Mataronas ¶ 3, ECF No. 66-2.
[149] Decl. of K. Debbis ¶ 4, ECF No. 66-16.

necessary for [his] fishing supply business."[150] And according to Hittinger, "since Project construction started, lobster and cod are no longer in those areas."[151]

103.    Green Oceans has standing to sue on its own behalf and through its members who were injured as a result of BOEM's approval of the Project. The Government's failure to prevent interference with reasonable uses of the Outer Continental Shelf, including fishing, directly injures Green Oceans by undermining its core mission, which is to prevent irreversible damage to the marine ecosystem and coastal communities. In response to this failure, Green Oceans has dedicated substantial resources towards community outreach and engagement to inform the communities impacted by the Project of its interference with commercial and recreational fishing and boating in the Project area. But for the Government's approval of the Project, Green Oceans could have used these resources to further its mission by supporting viable solutions to climate change without sacrificing important alternative uses of the Outer Continental Shelf. Green Oceans also has standing to sue on behalf of its members, commercial and recreational fishermen and boaters who rely on unimpeded use and access to the Project area to support their livelihoods and passions. This injury to Green Oceans' members is germane to Green Oceans' purpose and directly injures the interests Green Oceans seeks to protect. Because these Green Oceans' members have standing to sue in their own right and neither the claims asserted nor the relief requested in this case require their individual participation, Green Oceans has standing to sue on behalf of its members.

104.    The Alliance also has standing to sue on its own behalf and through its members who were injured as a result of BOEM's approval of the Project. The Government's failure to

---

[150] Decl. of R. Craft ¶ 4, ECF No. 66-4.
[151] Decl. of R. Hittinger ¶ 6, ECF No. 66-3.

prevent interference with reasonable uses of the Outer Continental Shelf, including fishing, directly injures the Alliance by undermining its core mission of improving the compatibility of new offshore development with the businesses of the fishing industry associations and fishing companies whose interests the Alliance represents. By failing to prevent interference with fishing in the Project area, BOEM has frustrated the Alliance's purpose, requiring the Alliance to dedicate resources towards opposing the Project's virtual exclusion of fishermen from the Project area. But for BOEM's failure, the Alliance could have directed these resources towards efforts to facilitate development in a manner that reduces conflicts with existing traditional and historical fishing practices. The Alliance also has standing to sue on behalf of its member, Kevin Debbis, a commercial fisherman who depends on a healthy marine environment and reliable levels of fish stock to support his commercial fishing operation. Debbis's injury is germane to the Alliance's purpose and directly injures the interests the Alliance seeks to protect. Because Debbis has standing to sue in his own right and neither the claims asserted, nor the relief requested in this case require his individual participation, the Alliance has standing to sue on behalf of Debbis.

**Third Cause of Action**
**Violation of the National Environmental Policy Act**
**and the Administrative Procedure Act**

105.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

106.    NEPA serves as our "basic national charter for the protection of the environment"[152] and requires "the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private

---

[152] 40 C.F.R. § 1500.1(a).

actions" like the Revolution Wind Project.[153] NEPA achieves its purpose by "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences" of their proposed actions.[154] NEPA's "hard look" requires federal agencies to analyze and consider "any reasonably foreseeable adverse environmental effects which cannot be avoided."[155] To comply with NEPA, agencies must consider "[b]oth short- and long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate Federal . . . law protecting the environment."[156]

107.    Under NEPA, agencies must "identify and develop methods and procedures . . . which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations[.]"[157] Specifically, NEPA requires federal agencies to prepare a "detailed statement [for all major agency actions] significantly affecting the quality of the human environment,"[158] known as an Environmental Impact Statement.

108.    The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects.[159] NEPA

> ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to

---

[153] *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015).
[154] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).
[155] 42 U.S.C. § 4332(C)(ii).
[156] 42 U.S.C. § 4332(C)(ii).
[157] 42 U.S.C. § 4332(B).
[158] 42 U.S.C. § 4332(C).
[159] *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *Weinberger v. Cath. Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 143 (1981).

the larger audience that may also play a role in both the decision-making process and the implementation of that decision.[160]

**Defendants Have Violated NEPA by Impermissibly Segmenting the Multiple Areas of the Offshore Wind Program and Ignoring the Cumulative Environmental Impacts of Thousands of Turbines on Millions of Acres of Ocean that BOEM has Approved and Will Approve in the Near Future**

109.    NEPA regulations require that an Environmental Impact Statement include an analysis of "[c]umulative actions [that] when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement"[161] and "[s]imilar actions [that] when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together."[162] This cumulative impact requirement ensures that agencies consider the collective effects of individually minor but related actions over time when analyzing the environmental impacts of a proposed government action.[163]

110.    NEPA regulations define cumulative effects as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."[164]

111.    Cumulatively, the United States plans to approve the construction of thousands of offshore wind turbines covering millions of acres of ocean floor. In 2021, the White House announced:

---

[160] *Robertson*, 490 U.S. at 349.
[161] 40 C.F.R. § 1508.25(a)(2).
[162] 40 C.F.R. § 1508.25(a)(3).
[163] 40 C.F.R. § 1508.7.
[164] *Id*.

DOI's Bureau of Ocean Energy Management . . . plans to advance new lease sales and complete review of at least 16 Construction and Operations Plans (COPs) by 2025, representing more than 19 GW[gigawatts]  of new clean energy for our Nation. . . . Achieving this target also will unlock a pathway to 110 GW by 2050. . . ."[165]

112.     Revolution Wind is one of twelve projects slated to be constructed off the coasts of Rhode Island and Massachusetts and two of 35 within the East Coast. Combined, these projects will include hundreds of wind turbines off the coast of these two states, costing the United States taxpayer over $100 billion that will raise electricity rates[166] without providing an overall positive impact on climate change.[167]

113.     But the final Environmental Impact Statement prepared for the Revolution Wind Project fails to take a hard look at the cumulative impacts of the Revolution Wind Project in combination with the other nearby projects offshore Rhode Island and Massachusetts—not to mention the dozens of additional offshore wind projects planned for other locations up and down the nation's east and west coasts.[168] By failing to analyze the cumulative effects of their massive offshore wind program, Defendants have failed to comply with the requirements of the National Environmental Policy Act, rendering their permits and approvals of Revolution Wind arbitrary, capricious, and not in accordance with law.

---

[165] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (March 29, 2021), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[166] Jonathan Lesser, *The False Economic Promises of Offshore Wind*, REGULATION (2024), https://www.cato.org/regulation/spring-2024/false-economic-promises-offshore-wind#auctions-and-the-winner-s-curse.

[167] Bureau of Ocean Energy Management, *Vineyard Wind Final Environmental Impact Statement* (Mar. 2021) at A-66, https://www.boem.gov/renewable-energy/state-activities/vineyard-wind-1-feis-volume-2.

[168] *Id.*

**Defendants Failed to Properly Analyze the No-Action Alternative**

114.    NEPA requires that the final Environmental Impact Statement include analysis of the "No-Action alternative," which NEPA regulations define as either "no ground-disturbance" or "no project."[169] NEPA regulations also state that the consideration of alternatives is "the heart of the environmental impact statement."[170]

115.    But, even though Defendants determined in their Final Environmental Impact Statement for Revolution Wind that the No-Action Alternative was an environmentally preferrable alternative that "causes the least damage to the biological and physical environment and best protects, preserves, and enhances historical, cultural, and natural resources,"[171] they summarily rejected the no-action alternative without further analysis on the erroneous grounds that "it would not allow for the development of DOI-managed resources and would not meet the purpose and need" of the Revolution Wind Project.[172]

116.    Defendants thus impermissibly limited their analysis of reasonable alternatives to the proposed Revolution Wind Project "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives" and "craft[ed] a purpose and need statement so narrowly drawn as to foreordain approval of" a project proposed by a private party.[173]

117.    Defendants' failure to adequately analyze the no-action alternative, as required by NEPA, was arbitrary, capricious, and not in accordance with law.

---

[169] 43 C.F.R. § 46.30.
[170] 40 C.F.R. § 1502.
[171] 43 C.F.R. § 46.30.
[172] Revolution Wind Record of Decision *supra* note 1 at 23.
[173] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

**Defendants Failed to Properly Analyze Less Environmentally Damaging Alternatives to the Proposed Project**

118.    NEPA regulations require that the Environmental Impact Statement provide a detailed statement of alternatives to the proposed action[174] and that the agency "[s]tudy, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[175] The Statement must also consider "[a]lternatives, which include the no-action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action)."[176]

119.    In their Final Environmental Impact Statement for Revolution Wind, Defendants admitted that the Project will cause severe, adverse environmental impacts, including:

- Significant adverse impacts to benthic habitats and organisms, including significant adverse impacts to Cox Ledge;

- Significant adverse impacts to finfish and spawning habitats;

- Significant adverse impacts to commercial fisheries and for-hire recreational fishing;

- Significant adverse impacts to more than 100 identified cultural and historic resources;

- Significant adverse impacts to the North Atlantic Right Whale and other marine mammals;

- Significant adverse impacts on safety, navigation, and Coast Guard Search and Rescue operations; and

---

[174] 42 U.S.C. § 4332(c).
[175] *Id.* § 4332(2)(E).
[176] 40 C.F.R. § 1501.9(E)(2).

- Significant adverse impacts on research and surveys.

120.    But, even though there were alternatives for the Revolution Wind Project that would have significantly reduced these negative environmental impacts, Defendants rejected these alternatives out-of-hand on the erroneous grounds that these alternatives would not meet the terms of the contracts that the project developers had signed. So, instead of analyzing reasonable alternatives that would avoid, minimize, reduce, and compensate for the environmental impacts of the Project as proposed, Defendants opted to exclude all alternatives other than those that would allow the Developers to satisfy the terms of their electricity supply contracts—regardless of negative environmental impacts.

121.    Defendants' failure to consider alternatives that would avoid, minimize, or mitigate impacts caused by the Revolution Wind Project was arbitrary, capricious, and contrary to law.

**Defendants' Postponement of Environmental Analysis Until After Leases and Contracts Had Been Signed Impermissibly Limited the Consideration of Reasonable Alternatives**

122.    NEPA regulations require that an Environmental Impact Statement "shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made."[177] For the Revolution Wind Project, however, Defendants failed to prepare a draft Environmental Impact Statement until after they had chosen the location of wind energy areas where they would offer offshore wind leases and entered into an offshore wind lease agreement with Deepwater Wind New England, LLC covering more than 100,000 acres of ocean where the Revolution Wind Project is to be constructed.

---

[177] 40 C.F.R. § 1502.5.

123.    As a result of postponing environmental analysis until immediately before issuing

permits and approvals for Revolution Wind, Defendants excluded from consideration less

environmentally damaging alternatives that might have been located elsewhere, alternative ways

of generating electrical power, and all other alternatives that did not strictly comply with the

terms of the contracts Orsted/Eversource (previously Deepwater) had entered into with Rhode

Island and Connecticut. Defendants' postponement of Environmental Impact Study preparation

until after leases and contracts had been entered into impermissibly limited the available

reasonable alternatives to the Project and predetermine the outcome of their review.

124.    Defendants' exclusion of reasonable alternatives resulting from their

postponement of analysis of environmental impacts was arbitrary, capricious, and not in

accordance with law.

**Defendants Failed to Analyze Revolution Wind's Impacts on the Environment**

125.    The July 21, 2023 Final Environmental Impact Statement prepared by Defendants

for the Revolution Wind Project was incomplete, inaccurate, and failed to comply with multiple

requirements of NEPA. Defendants failed to comply with NEPA by failing to fully analyze and

take a hard look at the environmental impacts that will arise from the construction, operations

and maintenance, and decommissioning of the Revolution Wind Project.

126.    Defendants failed to adequately analyze Revolution Wind's impacts on benthic

habitats and invertebrates. When Defendants were drafting the Environmental Impact Statement,

the New England Fishery Management Council had designated the area where the Revolution

Wind Project was planned as a Habitat Area of Particular Concern. This designation was meant

to further protect the ecologically important habitats within the area. Defendants' Environmental

Impact Statement failed to include any analysis on how the Project would not damage this

designated habitat. The area also sits on top of Cox Ledge, which is recognized locally and

nationally as an important spawning area and benthic habitat for Atlantic cod and other species.

Defendants failed to analyze the full extent of impacts on Cox Ledge and the benthic habitats in

the region. Defendants failed to analyze or include any analysis on how electromagnetic fields,

sound pressure, and particle motion effects would impact benthic organisms and invertebrates.[178]

Defendants failed to analyze the "long-term effects of changes in biological productivity

resulting from the creation of new habitat types [turbines and cables] on the" Outer Continental

Shelf.[179] BOEM also failed to analyze "secondary synergistic effects, such as changes in diet and

predator-prey interactions resulting from habitat modifications."[180] Defendants also failed to

analyze or examine "the nature, extent, and significance of potential spillover effects on broader

ecosystem functions, such as larval dispersal."[181] Defendants also failed to analyze the long-term

impacts of the secondary cable protection in the form of concrete mattresses and boulders that it

placed on the ocean floor.

     127.    Defendants failed to adequately analyze the Revolution Wind's impacts on birds.

Defendants utilized data from onshore wind facilities to make their conclusions regarding birds

and failed to examine how offshore bird mortality rates would differ from onshore bird mortality

rates.[182] Defendants also failed to analyze and estimate mortality rates based on different species

present in the area and the life history and behavior of the species.[183]

---

[178] Revolution Wind Final Environmental Impact Statement *supra* note 2 at C-2.

[179] *Id.* at C-3.

[180] *Id.*

[181] *Id.*

[182] *Id.* at C-3, C-4.

[183] *Id.*

128.    Defendants failed to adequately analyze Revolution Wind's impacts on commercial fisheries and for-hire recreational fishing. Defendants based their analysis on the impacts to commercial fisheries and for-hire recreational fishing, which are substantial, on "an incomplete understanding of fish stock dynamics and effects of environmental factors on fish populations."[184]

129.    Defendants failed to adequately analyze Revolution Wind's impacts on finfish and Essential Fish Habitat. The entire area where Revolution Wind will be built, and most of where the export cables and inter-array cables will be, is a designated Essential Fish Habitat. Defendants failed to analyze the "long term effects of changes in biological productivity resulting from the creation of new habitat types."[185] Defendants also failed to analyze and discover the "spatial and temporal occurrence of finfish and essential fish habitat" throughout the lease area[186] and failed to analyze the movements of commercial fish species, like Atlantic cod, in Cox Ledge.[187] Defendants also did not analyze the full extent of how operational noises would impact the behavior of Atlantic cod and other species during spawning.[188] Additionally, as discussed in the OCSLA Cause of Action, the National Marine Fisheries Service found that BOEM's Essential Fish Habitat Assessment was deficient and highlighted BOEM's failures to analyze the impacts on Essential Fish Habitat in a letter weeks before the issuance of the Final Environmental Impact Statement.[189] Based on NMFS's review of BOEM's analysis, BOEM did

---

[184] *Id.* at C-4.
[185] *Id.* at C-6.
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] National Oceanic and Atmospheric Administration, *Revolution Wind Essential Fish Habitat Consultation* (June 16, 2024) at 1, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/NMFS-EFH-Letter-Revolution-Wind.pdf.

not "fully consider or evaluate the direct, indirect, individual, and synergistic adverse effects to [essential fish habitat] or the sensitive and vulnerable resources in the project area that are likely to occur from" Revolution Wind.[190]

130.    Defendants failed to adequately analyze Revolution Wind's impacts on marine mammals. Defendants failed to fully analyze the "temporal distribution of marine mammals and periods during which they might be especially vulnerable to Project disturbance."[191] Defendants also failed to understand the impacts on marine mammals from electromagnetic frequencies and failed to "examine the effects of altered [electromagnetic frequencies] on marine mammals."[192] Defendants also failed to adequately understand the "cumulative acoustic impacts associated with pile-driving activities,"[193] and operational noise.[194] It is unclear to Defendants whether "marine mammals would cease feeding and when individuals would resume normal feeding, migrating, breeding, etc., behaviors once daily pile-driving activities cease, or if secondary indirect impacts would persist."[195] Defendants also failed to analyze and determine what the potential impacts would be from the "long-term presence of offshore wind structures in the environment."[196] Defendants failed to analyze or determine "how large whales will respond to the presence of extensive networks of novel offshore structures" in the Outer Continental Shelf.[197]

---

[190] *Id.*
[191] Revolution Wind Final Environmental Impact Statement *supra* note 2 at C-7.
[192] *Id.* at C-8.
[193] *Id.*
[194] *See* Exhibit 3 to Am. Compl., ECF No. 33-3 (May 13, 2024).
[195] *Id.*
[196] *Id.*
[197] *Id.*

131.    Defendants failed to adequately analyze Revolution Wind's impacts on navigation and vessel traffic. Defendants failed to fully analyze how these turbines will impact navigation. Defendants failed to mention and consider how turbines near the lease area have caused fishing vessels to sink.[198] In 2019, a fishing vessel sank off the Block Island wind farm, and search and rescue operations were halted due to an inability to maneuver around the turbines. Defendants fail to mention this incident and analyze how adding 65 turbines will impact navigation and vessel traffic.

132.    Defendants failed to adequately analyze Revolution Wind's impacts on recreation and tourism. Defendants failed to analyze the impacts to recreational not-for-hire fishing in the area. Defendants also failed to analyze how rental property values and property values would change due to the presence of this Project.

133.    Defendants failed to adequately analyze Revolution Wind's impacts on sea turtles. Defendants failed to analyze and understand how electromagnetic frequencies impact sea turtles, even though sea turtles use the earth's magnetic fields to navigate.[199] Defendants also failed to analyze how "sea turtles would interact with long-term changes in biological productivity and community structure resulting from the development of an extensive network of artificial reefs across the geographic analysis area."[200]

---

[198] *See* Sinking of the Mistress Report *supra* note 93.
[199] Revolution Wind Final Environmental Impact Statement *supra* note 2 at C-11.
[200] *Id.* at C-12.

**Failure to Adequately Analyze Climate Change Effects of Constructing and Operating the Project**

134.     The Final Environmental Impact Statement does not sufficiently evaluate the Revolution Wind Project's impacts on greenhouse gas emissions and climate change. The analysis focuses on partial, project-specific climate impacts in the nearby geographic area but attempts to quantify only emissions offsets from the Project, with limited qualitative descriptions of emissions generated from construction.

135.     There is no evaluation of the activities associated with the supply chain, such as minerals sourcing, component fabrication, and eventual disposal of turbine components in landfills, which would not occur under the No Action Alternatives and differ among other alternatives Defendants did or should have considered.

136.     The Final Environmental Impact Statement only compares the Project's climate benefits with "fossil-fuel power generating stations[,]" and does not compare the Project's climate impacts with other alternative renewable energy sources or project locations and designs.

137.     Nor is there any cumulative-level analysis of climate impacts (positive or negative) associated with the proposed scale of offshore wind development.

138.     Because Defendants' Environmental Impact Statement fails to adequately analyze the impacts on the human environment of the Revolution Wind Project, Defendants' authorizations and permits that rely on those Environmental Impact Statements are arbitrary, capricious, and otherwise not in accordance with law, and therefore should be declared unlawful and set aside.

### Fourth Cause of Action
### Violation of the Endangered Species Act and
### the Administrative Procedure Act

139.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

140.    The Endangered Species Act (ESA) provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and provides] a program for the conservation of such endangered species and threatened species."[201] The Act requires all federal departments and agencies to "conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the Act.[202] Congress's intent in enacting the ESA "was to halt and reverse the trend toward species extinction, whatever the cost[,]"[203]—even when doing so is inconvenient or counter to Government-created goals.

141.    Section 7 of the ESA requires that

[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species. . . .[204]

142.    In the words of the Supreme Court, Section 7 is a plain, affirmative command that admits of no exception:

One would be hard-pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to [e]nsure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an

---

[201] 16 U.S.C. § 1531(b).

[202] *Id.*

[203] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

[204] 16 U.S.C. § 1536(a).

endangered species or "result in the destruction or modification of habitat of such species. . . ." This language admits of no exception.[205]

143.    The regulations promulgated to implement ESA Section 7 require that prior to taking an action, the agency—here, BOEM and the Corps—first must determine whether the action "may affect" an endangered or threatened species.[206] If so, the action agency must consult with the National Marine Fisheries Service, which has responsibility for marine species under the ESA.[207] The Section 7 consultation concludes when NMFS issues a Biological Opinion determining whether the proposed action does or does not jeopardize the species: "[T]he Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."[208]

144.    NMFS must use "the best scientific and commercial data available" when preparing a biological opinion.[209]

145.    During the Section 7 consultation, the parties are prohibited from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures."[210]

---

[205] *Tennessee Valley Auth.*, 437 U.S. at 173 (quoting 16 U.S.C. § 1536 (1976)).
[206] 50 C.F.R. § 402.14(a).
[207] *Id.*
[208] 16 U.S.C. § 1536(d).
[209] 16 U.S.C. § 1536(a)(2).
[210] 16 U.S.C. § 1536(d).

**Fin, Sei, and Sperm Whales**

146.    Sei and Fin whales are found in the Revolution Wind Lease Area.[211] Both whales are both listed as endangered due to past commercial whaling that caused a steep decline in populations, and both species are listed as depleted under the MMPA.[212] Like other endangered whales, these species are threatened by vessel strikes, reduced prey availability, an anthropogenic sound, and human-caused mortality[213]—making offshore wind activity a serious threat. The Government's original Biological Opinion claimed that these whales were not usually present in the Revolution Wind area in the summer months (and so not affected by pile driving). However, consultation was reinitiated, in part, because during the summer months of 2023, when South Fork construction was underway, fin and sei whales were regularly observed in and around Revolution Wind's lease area.[214] According to NMFS, those sightings indicated "that these species may be more likely to be exposed to noise during times when activities may be in the area and remaining in the area which increases the potential for" permanent damage.[215]

147.    The endangered Sperm whale is also found in the lease area. "Sperm whales are the largest of the toothed whales and have one of the widest global distributions of any marine mammal species."[216]

---

[211] National Marine Fisheries Service, *Revolution Wind Biological Opinion* (Apr. 30, 2024) at 133, 137 (Revolution Wind April 30, 2024 Biological Opinion).
[212] *Sei Whale*, NOAA Fisheries (last updated Nov. 26, 2024), https://www.fisheries.noaa.gov/species/sei-whale/overview; *Fin Whale (Balaenoptera physalus): Western North Atlantic Stock*, NOAA Fisheries (May 2022), https://media.fisheries.noaa.gov/2022-08/Fin%20Whale-West%20N%20Atl%20Stock_SAR%202021.pdf.
[213] Revolution Wind April 30, 2024 Biological Opinion *supra* note 298.
[214] *See* Exhibit 4 to Am. Compl., ECF No. 33-4 (May 13, 2024).
[215] *Id.*
[216] *Sperm Whale*, NOAA Fisheries (last updated Nov. 26, 2024), https://www.fisheries.noaa.gov/species/sperm-whale.

148.     As with sei and fin whales, NMFS has erroneously dismissed the threat to Sperm whales on the grounds that the animals are simply migrating through the area.[217] However, a recent study, authored by several biologists from NMFS, that documented the presence of Sperm whales in and near the Revolution Wind lease area and Cox Ledge using passive acoustic records found that sperm whales were present in the area year-round, with a majority of the acoustic occurrences of sperm whales occurring between May and August.[218] The study also found that sightings occurred in Cox Ledge and the Revolution Wind lease area.[219]

149.     The Biological Opinion minimized and failed to adequately analyze the jeopardy caused by these whales' presence in the lease area and the impact that this Project will have on these endangered whales.

**North Atlantic Right Whale**

150.     The North Atlantic Right Whale is one of the most endangered marine mammals in the world, with fewer than 350 individuals remaining alive, including only about 70 breeding females capable of reproduction.[220] The Service reports an "overall abundance decline between 2011 and 2020 of 23.5%" and estimates that between December 2022 and August 2023, the population decreased to 338 individuals.[221]

---

[217] Revolution Wind April 30, 2024 Biological Opinion *supra* note 298 at 460.
[218] Westell, et al., *Acoustic Presence and Demographics of Sperm Whales (Physeter macrocephalus) off Southern New England and Near a US Offshore Wind Energy Area*, ICES CIEM (Jan. 26, 2024).
[219] *Id.* at 5.
[220]   *See* BOEM and NOAA's Strategy on the North Atlantic Right Whale and Offshore Wind (Jan. 2024) at 7, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf.
[221] National Marine Fisheries Service, *U.S. Atlantic and Gulf of Mexico Marine Mammal Stock Assessments 2022* (June 2023) at 2, https://media.fisheries.noaa.gov/2023-08/Final-Atlantic-and-Gulf-of-Mexico-SAR.pdf.

151.    The species has low genetic diversity and is not resilient.[222] Calving rates have slowed from one calf per female every three to four years to one calf per female every seven to ten years.[223]

152.    There is a decrease in prey abundance, which may be caused by survey activity killing food sources,[224] which is directly linked to health, reproduction, and survival.[225] The Biological Opinion admits that decreased prey abundance has "contributed to concern for the species' persistence."[226]

153.    Although they are migratory, right whales occupy the Revolution Wind project area nearly full time: "Right whales have been observed nearly year round in the area south of Martha's Vineyard and Nantucket, with highest sightings rates between December and May,"[227] and "acoustic detections [in the area] occurred during all months, with peak number of detections between December and late May."[228]

154.    BOEM and NMFS describe the threat to the species created by offshore wind development in their North Atlantic Right Whale and Offshore Wind Strategy, in which they state: "Due to the declining status of NARWs [North Atlantic Right Whales], the resilience of

---

[222] *See* BOEM and NOAA's Strategy on the North Atlantic Right Whale and Offshore Wind (Jan. 2024) at 7,
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf.

[223] *Id.*

[224] *See* McCauley et al., *Widely Used Marine Seismic Survey Air Gun Operations Negatively Impact Zooplankton*, Nature Ecology & Evolution (June 22, 2017).

[225] *See* BOEM and NOAA's Strategy on the North Atlantic Right Whale and Offshore Wind (Jan. 2024) at 7,
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf.

[226] Revolution Wind April 30, 2024 Biological Opinion *supra* note 298 at 460.

[227] *Id.* at 438.

[228] *Id.* at 132.

this population to stressors affecting their distribution, abundance, and reproductive potential is low. The species faces a high risk of extinction."[229] "[T]he loss of even one individual a year may reduce the likelihood of recovery and of the species' achieving optimum sustainable population."[230] Consequently, BOEM and NMFS have determined that offshore wind "development (from siting to decommissioning) must be undertaken responsibly. . . . OSW [offshore wind] development must be carried out in a way that avoids or minimizes the potential for introducing effects to the species and the ecosystem on which it depends."[231] Here, in preparing their Biological Assessments and Biological Opinions for Revolution Wind, BOEM and NMFS completely ignore (and do not mention) this best available science determined by their own agency Right Whale experts.

155.    The North Atlantic Right Whale breeds in the waters offshore New England and then migrates annually along the Atlantic coast to give birth, traversing many of the other areas where the Government has approved or planned to approve offshore wind projects.[232] Consequently, NMFS has designated coastal New England as a critical habitat for the North Atlantic Right Whale.[233] Yet, in erroneously determining that Revolution Wind poses no jeopardy to this species, the Service has arbitrarily limited its analysis to the lease areas of these two projects, ignoring the cumulative threats Right Whales encounter as they migrate through

---

[229] *See* BOEM and NOAA's Strategy on the North Atlantic Right Whale and Offshore Wind (Jan. 2024) at 8, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW _0.pdf.
[230] *Id.*
[231] *Id.* at 2–3.
[232] *Id.* at 10.
[233] *Id.*

multiple, successive offshore wind projects—each of which is or will be authorized to commit multiple takes of the species.

156.    NMFS's determinations that the Revolution Wind Project will not jeopardize the continued existence of the North Atlantic Right Whale are contradicted by the Biological Opinions on which they are based, which state:

- "The species faces a high risk of extinction, and the population is small enough for the death of any individual to have measurable effects in the projections on its population status, trend, and dynamics[;]"[234]

- "The resilience of [North Atlantic Right Whales] to stressors that would impact the distribution, abundance, and reproductive potential of the population is low."[235]

- "[T]he North Atlantic Right Whale, seem generally unresponsive to vessel sounds, making them more susceptible to vessel collisions[;]"[236]

- NMFS "expect[s] an increase in risk proportional to the increase in vessel traffic."[237]

**NMFS Issues Two Biological Opinions**

157.    On July 21, 2023, the National Marine Fisheries Service issued its first Biological Opinion for the Revolution Wind Project, finding that the Project would not jeopardize the continued existence of the North Atlantic Right Whale and other endangered species.[238] NMFS regulations provide that "[j]eopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of

---

[234] Revolution Wind April 30, 2024 Biological Opinion *supra* note 298 at 438.
[235] *Id.*
[236] *Id.* at 301.
[237] *Id.* at 305.
[238] National Marine Fisheries Service, *July 21, 2023 Biological Opinion* (July 21, 2023), https://www.fisheries.noaa.gov/s3/2023-08/Rev-Wind-BiOp-Final-072123-508-Compliant.pdf.

both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[239]

158.    In that first Biological Opinion, NMFS announced that it authorized Revolution Wind to take 56 North Atlantic Right Whales over the first five years of the Project. "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[240]

159.    But on March 12, 2024, NMFS informed BOEM that the consultation required by Section 7 of the Endangered Species Act must be reopened and a new biological opinion issued because the first Biological Opinion failed to

> consider changes to the proposed actions that may affect listed species in a manner or to an extent not considered in our July 2023 Biological Opinion, as well as the availability of new information that reveals effects of the action that may affect listed species in a manner or to an extent not previously considered.[241]

160.    Following this reopened consultation, on April 29, 2024, NMFS issued a new, second Biological Opinion for the Revolution Wind Project. NMFS's consultation leading to the issuance of the 2024 Biological Opinion was hurried so that construction could be "available before the seasonal window for pile driving opens on May 1."[242]

**NMFS Failed to Consider All Available Scientific and Commercial Information In Its 2024 Biological Opinion**

161.    Although ESA requires NMFS to consider all available scientific and commercial information to determine whether an action will jeopardize the continued existence of an endangered species, in conducting its 2024 Section 7 consultation and issuing its 2024

---

[239] 50 C.F.R. § 402.02.
[240] 16 U.S.C. § 1532(19).
[241] *See* Exhibit 5 to Am. Compl., ECF No. 33-5 (May 13, 2024) (citing 50 C.F.R. 402.16(a)(2)-(3)).
[242] *Id.*

Biological Opinion for the Revolution Wind Project, NMFS intentionally excluded from consideration relevant scientific information regarding numerous planned offshore wind projects that are likely to be approved constructed along the Right Whale's migration route. The 2024 Biological Opinion explains that NMFS did not consider reasonably foreseeable future federal actions:

> It is important to note that, while there may be some overlap, the ESA definition of cumulative effects is not equivalent to the definition of "cumulative impacts" as described in the Revolution Wind DEIS.  Under NEPA, "cumulative effects…are the impact on the environment resulting from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.  While the effects of past and ongoing Federal projects within the action area for which consultation has been completed are evaluated in both the NEPA and ESA processes (Section 6.0 *Environmental Baseline*), reasonably foreseeable future actions by federal agencies must be considered (see 40 CFR 1508.7) in the NEPA process but not the ESA Section 7 process.[243]

162.    Although BOEM has issued 28 offshore wind project leases and has already approved or is in the process of approving 25 of those projects, NMFS intentionally excluded from its analysis of jeopardy in its 2024 Biological Opinion for the Revolution Wind Project the effects of 20 of those offshore wind projects, most of which lie along the migration route of the North Atlantic Right Whale, and jeopardize the species in much the same way Revolution Wind does. The Biological Opinion here considers only eight of these projects.

163.    In these projects, none of which the Service considered in the cumulative impacts or the environmental baseline, NMFS has approved the take of at least an additional 17 whales through the construction of the projects,[244] and the developers have requested the takes of at least

---

[243] Revolution Wind April 30, 2024 Biological Opinion *supra* note 298 at 390–391.
[244] 89 Fed. Reg. 504, 552 (Jan. 4, 2024) (10 during US Wind); 89 Fed. Reg. 31008, 31042 (Apr. 23, 2024) (7 additional takes during the final phase of Vineyard Wind 1).

216 whales during the construction of SouthCoast Wind.[245] The developer for Beacon Wind, the third project in the early stages of Section 7 consultation that the Service failed to include, has yet to request the take of any North Atlantic Right Whales, but its application should be filed in the near future. To date, NMFS has approved and proposed the take of 244 Right Whales in at least 11 projects[246]—many of which were not considered by NMFS in this Biological Opinion. And NMFS is likely to approve hundreds of additional takes (as demonstrated in the developer's request in SouthCoast Wind) of the Right Whale in the projects that have not yet reach final permitting—takes that NMFS failed to consider in its Revolution Wind 2024 Biological Opinion.

164.    The adverse effects of these additional projects will impact the right whale in ways that NMFS failed to analyze in its 2024 Biological Opinion.

**NMFS Violated Its Own Regulations By Ignoring the Anticipated Effects of All Proposed Federal Projects That Have Already Undergone Formal or Early Section 7 Consultation**

165.    NMFS's own ESA regulations require it to consider "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."[247]

---

[245] South Coast, *Petition for Incidental Take Regulations for the Construction and Operations of the Mayflower Wind Project* (Sept. 2022) at 100, https://media.fisheries.noaa.gov/2022-10/MayflowerWindNewEng_2022ITA_App_OPR1.pdf.

[246] 89 Fed. Reg. 11,342, 11,392 (Feb. 14, 2024) (29 during Empire Wind construction); 89 Fed. Reg. 4370, 4424 (Jan. 23, 2024) (17 during Dominion Wind construction); 88 Fed. Reg. 72,562 (Oct. 10, 2023) (56 during Revolution Wind construction); 88 Fed. Reg. 62,898, 62,953 (Sept. 13, 2023) (14 during Ocean Wind 1 construction); 87 Fed. Reg. 806, 848 (Jan. 6, 2022) (13 during South Fork Wind construction); 86 Fed. Reg. 33,810, 33,836 (June 25, 2021) (20 during Vineyard Wind construction); 88 Fed. Reg. 37,606 (June 8, 2023) (10 during New England Wind); 88 Fed. Reg. 8996, 9057 (Feb. 10, 2023) (47 during Sunrise Wind); 89 Fed. Reg. 504, 552 (Jan. 4, 2024) (10 during US Wind); 88 Fed. Reg. 65,430, 65,485 (Sept. 22, 2023) (21 during Atlantic Shores South); 89 Fed. Reg. 31,008, 31,042 (Apr. 23, 2024) (7 additional takes during the final phase of Vineyard Wind 1).

[247] 50 C.F.R. § 402.02.

166.    NMFS violated this regulation by excluding four projects that have already undergone formal consultation or were in early section 7 consultation as of April 29, 2024: US Wind Energy, Beacon Wind, South Coast Wind Energy, and Phase Two of the Vineyard Wind 1 Project. Additionally, NMFS did not include or incorporate Level B harassments from 10 active or in-process consultation for site characterization surveys that overlap with the action area and the North Atlantic Right Whale's migratory routes: TerraSond, Atlantic Shores HRG, Bluepoint HRG, Park City HRG, Ørsted MA-NY HRG, Vineyard North East HRG, Ocean Wind II HRG, Invenergy HRG, Community Offshore Wind HRG, Attentive Energy HRG. The term action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.[248]

**NMFS's Mitigation Measures Are Inadequate**

167.    The mitigation measures provided for in the Biological Opinion are inadequate and will fail to protect and conserve the endangered North Atlantic Right Whale.

168.    The primary mitigation measure, Passive Acoustic Monitoring, will not be effective in identifying nearby whales. As currently approved, Revolution Wind will deploy Passive Acoustic Monitoring in the construction area at a minimum of one hour before commencing pile-driving activities to determine whether marine mammals are in the area.[249] A recent study found that detections of marine mammals, in particular the North Atlantic right whale, sei whale, fin whale, and sperm whales, decrease as monitoring time decreases.[250] This study found that monitoring for only one hour before pile driving—the requirement prescribed

---

[248] *Id.*
[249] Revolution Wind April 30, 2024 Biological Opinion *supra* note 298 at 210.
[250] Davis et al., *Upcalling Behavior and Patterns in North Atlantic Right Whales, Implications for Monitoring Protocols During Wind Energy Development*, ICES Journal of Marine Science (Nov. 3, 2023), https://academic.oup.com/icesjms/advance-article/doi/10.1093/icesjms/fsad174/7341838?login=false.

for Revolution Wind—provides only a 4% likelihood of detecting the presence of a North

Atlantic right whale,[251] while 24 hours prior monitoring raises the likelihood to 100%, and

monitoring for 18 hours provides a 74% likelihood of detecting (and thus avoiding injury to) the

Right Whale.

169.    Another mitigation measure—the use of bubble curtains[252]—will also fail at

protecting marine mammals because they do not work at reducing underwater noise for all types

of marine mammals.[253] A bubble curtain is a grouping of artificially made bubbles created

around a source of underwater noise, such as a pile driver. These bubble curtains only work on

high-frequency noises and do not reduce low-frequency sounds below 200 Hz.[254] BOEM and

NMFS recognize that bubble curtains do not reduce noises that baleen whales, such as the North

Atlantic Right Whale, fin whale, and sei whale, find harmful.[255]

170.    NMFS's failure to require mitigation measures that protect the North Atlantic

Right Whale is arbitrary and capricious and violates the ESA.

**Fifth Cause of Action**
**Violation of the Marine Mammal Protection Act**
**and the Administrative Procedure Act**

171.    Plaintiffs reallege and incorporate by reference all of their previous allegations

and further allege as follows:

---

[251] *Id.*

[252] Revolution Wind April 30, 2024 Biological Opinion *supra* note 298 at 480.

[253] *See* BOEM, *Renewable Energy Program Update: Briefing for the Mid-Atlantic Fisheries Management Council* at 21 (Feb. 11, 2021), https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/602d7bbd49ee2d06d9db12c4/1613593539206/05a_BOEM+Renewables+Program+Update+2021-02.pdf.

[254] *Id.*

[255] *Id.*

172.    The Marine Mammal Protection Act (MMPA) was the first national legislation to mandate an ecosystem-based approach to marine resource management. Under the Marine Mammal Protection Act, Congress directed that the primary objective of marine mammal management should be to maintain the health and stability of the marine ecosystem and, when consistent with that primary objective, to obtain and maintain optimum sustainable populations of marine mammals. In 2018, Congress enacted a general moratorium on the take of marine mammals without a permit: "There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases. . . ."[256]

173.    The permit exception to this moratorium provides that "upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population stock" if the Secretary "finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock. . . ."[257]

174.    The Marine Mammal Protection Act also prohibits persons or vessels subject to the jurisdiction of the United States from taking any marine mammal in waters or on lands under the jurisdiction of the United States or on the high seas.[258] The baseline under the MMPA is that

---

[256] 16 U.S.C. 1371(a)(1).
[257] 16 U.S.C. § 1371(5)(a).
[258] 16 U.S.C. § 1372(a)(l)-(2).

"no permit may be issued for the taking of any marine mammal."[259] That said, the Service is permitted to authorize the incidental take of only "small numbers of marine mammals of a species or population stock."[260] Under the MMPA, "take" means to "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."[261]

175.    The National Marine Fisheries Service has further defined "harassment" as consisting of two types: Level A harassment, which "means any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild"; and Level B harassment, which "means any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns . . . but which does not have the potential to injure a marine mammal or marine mammal stock in the wild."[262]

176.    Exposure of marine mammals to anthropogenic underwater sound may constitute "take" if the pressure level of the received sounds has the potential to cause injury or behavioral disturbance and the Service predicts that "marine mammals are likely to be behaviorally harassed in a manner considered to be Level B harassment when exposed to underwater anthropogenic noise" above one of two criteria thresholds, depending on the source sound category.[263] Continuous sound sources like vibratory pile driving or drilling are considered as takes when the root-mean-square sound pressure level is above 120 dB.[264] Intermittent sound sources are considered takes when the sound pressure level is above 160 dB.[265]

---

[259] 16 U.S.C. § 1371.
[260] *Id.*
[261] 16 U.S.C. § 1362(13).
[262] 50 C.F.R. § 216.3.
[263] 87 Fed. Reg. 79,072, 79,110 (Dec. 23, 2022).
[264] *Id.*
[265] *Id.*

177.    In deciding whether to issue an Incidental Take Authorization under the Marine
Mammal Protection Act, the Secretary of Commerce is required to "give full consideration to all
factors which may affect the extent to which such animals may be taken[,]"[266] including:

> (1) [E]xisting and future levels of marine mammal species and
> population stocks;
> *     *     *
> (3) [T]he marine ecosystem and related environmental considerations;
> (4) [T]he conservation, development, and utilization of fishery
> resources; and
> (5) [T]he economic and technological feasibility of implementation.[267]

178.    On August 23, 2023, the National Marine Fisheries Service issued its Record of
Decision, and on September 15, 2023, issued its final Incidental Take Regulations and Letter of
Authorization, authorizing the take and harassment of North Atlantic Right Whales, blue whales,
fin whales, humpback whales, sei whale, mink whales, sperm whale, Atlantic white-sided
dolphin, Atlantic spotted dolphin, common bottlenose dolphin, long-finned pilot whale, Risso's
dolphin, Short-beaked common dolphin, harbor porpoise, gray seal, and harbor seal for the
Revolution Wind Project. These takes also included Level A takes, the type that can permanently
injure, even to the point of death, although death is not necessarily expected, for species on the
endangered list (fin whales = 4 Level A takes; sei whales = 5 Level A takes). Any authorization
of a Level A take for an listed species increases the impact level to more than the "minor"
designation determined in the FEIS, indicating that BOEM's decision was both arbitrary and
capricious, and was not supported by logic or reasoned decision making.

---

[266] 16 U.S.C. § 1373(b).
[267] 16 U.S.C. § 1373(b)(1), (3)-(5).

**The Service Authorized the Take of More Than a Small Number of Marine Mammals**

179.    For the Revolution Wind Project, the Service authorized a maximum of 13,929 harassment takes in any one year and 19,301 takes over the course of the five-year permit.[268] Of the marine mammals where harassment takes were authorized, five are species listed under the Endangered Species Act: North Atlantic right, blue, fin, sei, and sperm whales. For the North Atlantic Right Whale, the Service authorized a maximum of 44 annual takes a year and 56 overall.[269] The Service also approved annual takes of 8,119 common dolphins, 1,263 harbor porpoises, and 2,325 gray seals. Even though the maximum number of harassments is several in the thousands, the Service classifies these incidental harassments as small.

180.    The Service's final decisions to issue a Letter of Authorization and implementing Regulations in Revolution Wind was arbitrary, capricious, and not in accordance with law because they fail to comply with the Marine Mammal Protection Act and its implementing regulations, allow the take of a substantial, non-negligible, number of marine mammals, including North Atlantic Right Whales, bottlenose dolphins, and harbor seals; fail to use the best available science; fail to analyze the cumulative effects of other approved and proposed offshore wind projects; fail to analyze the vessel strikes caused by the Project's obstructions; and fail to analyze take resulting from interference with migration routes, breeding, feeding, and calving.

---

[268] 88 Fed. Reg. 72,628 (Oct. 20, 2023).
[269] 88 Fed. Reg. 72,630 (Oct. 20, 2023).

181.    The Environmental Impact Statements supporting the Service's final decisions

state in addition to the temporary impacts of pile driving noise from the Project, the placement of

structures in the Project would have a long-term, negative impact on marine mammals, including

the endangered North Atlantic Right Whale. In particular, Revolution Wind's Environmental

Impact Statement states that "[t]he presence of structures could also concentrate recreational

fishing around foundations, potentially increasing the risk of marine mammal entanglement in

both lines and nets and increasing the risk of injury and mortality due to infection, starvation, or

drowning (Moore and van der Hoop 2012)."[270]

182.    Since 2017, the North Atlantic Right Whale has been experiencing an Unusual

Mortality Event, which are "stranding[s] that is unexpected; involves a significant die-off of any

marine mammal population; and demands immediate response."[271] As of October 2023, "this

event has includes a total of 121 documented animals: 36 dead stranded NARWs, 34 seriously

injured free-swimming NARWs, and 51 sublethal injuries/illness (i.e., morbidity)."[272] 2024 has

already seen four dead North Atlantic Right Whales and two others with severe injuries from

vessel strike and entanglement.[273]

183.    By authorizing the take of 56 North Atlantic Right Whales over five years in

Revolution Wind—a species whose population has dwindled in the last two years from 368 to

---

[270] Revolution Wind Final Environmental Impact Statement *supra* note 2 at 3.15-23.
[271] 16 U.S.C. § 1361.
[272] *See* BOEM and NOAA's Strategy on the North Atlantic Right Whale and Offshore Wind (Jan. 2024) at 8,
https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_NARW_OSW_0.pdf.
[273] National Marine Fisheries Service, *2017–2024 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2024-north-atlantic-right-whale-unusual-mortality-event#counts-of-north-atlantic-right-whale-ume-mortality,-serious-injury,-and-morbidity-(sublethal-injury-or-illness)-cases (last visited May 7, 2024).

338—during construction for a Project that is anticipated to have significant adverse impacts to the North Atlantic Right Whale, the Service failed to ensure that the level of takes will "have a negligible impact" on North Atlantic Right Whales, in violation of the Marine Mammal Protection Act and Administrative Procedure Act. Defendants' purported authorizations of these takes of marine mammals is arbitrary, capricious, and otherwise not in accordance with law and should be ruled unlawful and set aside.

**The Service Failed to Accurately Account for the Impacts of Anthropogenic Noise on Marine Mammal Stress**

184.    While the Incidental Take Regulations for Revolution Wind discuss the potential for temporary or permanent hearing damage due to Revolution Wind's construction over five years, the Service makes the arbitrary and capricious assumption that the Project will not induce stress because the noise will be intermittent.

185.    Recent research demonstrates that exposure to intermittent or continuous anthropogenic noise has the potential to induce a state of chronic stress in marine mammals.[274] Chronic stress can have adverse health consequences on marine mammals, including higher mortality and morbidity, reduced reproductive success, immuno-suppression, heart disease, depressed reproductive rates, physical malformations, and birth defects.[275] By extension, chronic stress induced by exposure to anthropogenic sound can have a detrimental impact on marine mammal populations by affecting fertility, mortality and growth rates.[276]

---

[274] *See* J.W. Wright et al., *Concerns Related to Chronic Stress in Marine Mammals*, IWC SCI. COMM. DOC. IWC/SC/61/E16 (2009).

[275] *See* A.J. Wright et al., *Do marine mammals experience stress related to anthropogenic noise?*, 20 *Int'l J. Comparative Psychology* 274 (2007).

[276] *See id.*; *see also* 87 Fed. Reg. at 79,102 ("Chronic disturbance can cause population declines through reduction of fitness (e.g., decline in body condition) and subsequent reduction in reproductive success, survival, or both.").

186.    Even though the Service recognizes that chronic stress has adverse population effects, it asserts that the Project is not expected "to produce conditions of long-term and continuous exposure to noise leading to long-term physiological stress responses in marine mammals that could affect reproduction or survival."[277] This assertion lacks any rational basis and is contrary to the best available science that suggests that lower-level sounds generated by pile-driving, even when "intermittent," can still mask communications and "cause distraction, limiting detection of biologically relevant communication or predator sounds."[278] These effects are known to induce chronic stress in marine mammals.[279]

187.    Even with these known effects, the Incidental Take Regulations fail to meaningfully consider the fact that even the purportedly intermittent noise from impact pile driving may cause stress beyond a Level B take. The Incidental Take Regulations underestimate the actual extent of the take and fail to consider a factor that is highly relevant to the Service's determination to issue a permit.

**The Service's Incidental Take Regulations and Permit Fail to Examine the Effects of Habitat Displacement on the North Atlantic Right Whale**

188.    North Atlantic Right Whales habituate in the Project area year-round and their habitat will be impacted by the Project in ways that the Service failed to address. The habitat in the Project area is vital to the North Atlantic Right Whale's life history functions, which include feeding and migration[280] and the Project overlaps with a Seasonal Management Area which was

---

[277] 88 Fed. Reg. 72,646 (Oct. 20, 2023).
[278] T. Aran Mooney et al., *Acoustic Impacts of Offshore Wind Energy on Fishery Resources: An Evolving Source and Varied Effects Across a Wind Farm's Lifetime*, 33 OCEANOGRAPHY 82 (2020).
[279] *See* OCEANOGRAPHY 82 (2020). These effects are known to induce chronic stress in marine mammals. Rosalind M. Rolland et al., *Evidence that ship noise increases stress in right whales*, PROCEEDINGS OF THE ROYAL SOCIETY B: BIOLOGICAL SCIENCES (2012).
[280] 87 Fed. Reg. 79,088-89 (Dec. 23, 2022).

established to reduce the risk of vessel strikes.[281] The best available science establishes that the North Atlantic Right Whale is extremely sensitive to low-frequency continuous noise and the impacts of masking.[282] Populations that are resident or seasonally resident to a particular area, like the North Atlantic Right Whale, are intensely vulnerable to population-level effects as a result of the cumulative nature of the noise exposure and the additional harm that may be caused by habitat displacement.[283] In fact, even temporary displacement increases energetic costs as the whales search for new (and possibly less productive) foraging areas and in turn, "could lead to increased susceptibility to other stressors (e.g., a shift in distribution can change the overlap with vessel traffic and fishing activities)."[284]

189.    Here, the Service acknowledges that Revolution Wind may result in the displacement of North Atlantic Right Whales from the Project area and its surrounding vicinity,[285] yet fails to engage in any meaningful quantitative or qualitative analysis of the effects of such displacement. Instead, the Service simply asserts that the affected individuals will use another habitat. This cursory statement does not equate to an evaluation of the effects on individuals and the population that may result from the abandonment of *this* habitat.

190.    The Service does not analyze how the whales' abandonment of the habitat in the Revolution Wind lease area would push the species further into a vessel traffic corridor, thereby

---

[281] 73 Fed. Reg. 60,173 (Oct. 10, 2008).

[282] Christopher W. Clark et al., *Comments on Arctic Ocean Draft EIS* (Feb. 28, 2012) at 2, available at https://tinyurl.com/5fsfmwst.

[283] *See* K.A. Forney et al., *Nowhere to go: noise impact assessments for marine mammal populations with high site fidelity*, 32 ENDANGERED SPECIES RES. 391 (2017).

[284] *See* BOEM and NOAA's Draft Strategy on the North Atlantic Right Whale and Offshore Wind, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NARW_OSW_Strategy.pdf.

[285] 87 Fed. Reg. at 79,154 (Dec. 23, 2022).

elevating the risk to the species. Nor does the Service consider the additive effects of the Project and other planned activities—including the exponential expansion of wind energy development—expected to occur throughout the region and impacting the same North Atlantic Right Whales. Taken together, Revolution Wind and other planned activities may result in widespread displacement—or even abandonment—of important habitat in the region, which would have devastating impacts on the viability and resilience of North Atlantic Right Whales.

191.    Defendants' actions are arbitrary, capricious, and contrary to law, and have deprived the Plaintiffs of the procedural and substantive protections of the Marine Mammal Protection Act and threaten to irreparably harm the Plaintiffs' interests.

**Sixth Cause of Action**
**Violation of the Migratory Bird Treaty Act**
**and Administrative Procedure Act**

192.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

193.    The Migratory Bird Treaty Act[286] prohibits the take—the killing, capturing, selling, trading, and transportation—of protected migratory bird species.[287] The Act applies broadly to the killing of any migratory bird "at any time, by any means or in any manner."[288]

194.    The lease area of Revolution Wind sits within the Atlantic Flyway, which "is an important migratory pathway for up to 164 species of waterbirds."[289] Rhode Island is also home to the Norman Bird Sanctuary and the Sachuest Point National Wildlife Refuge—both located only 15 miles away from this lease area—which provide vital stopovers and wintering areas for

---

[286] 16 U.S.C. § 703.
[287] *Id.*
[288] 16 U.S.C. § 703(a).
[289] Revolution Wind Final Environmental Impact Statement *supra* note 2 at 3.7-21.

migratory birds. Over 55 species of birds, including four endangered species (Piping Plover, Red Knot, Roseate Tern, and Black Capped Petrel) and two threatened eagle species (the Golden Eagle and the Bald Eagle), will encounter turbines in the lease area, causing increases in bird mortality, decreases in fitness, and other adverse health effects through the "the accidental release of fuel, hazmat, and trash and debris from vessels associated with construction and installation."[290]

195.    In approving the Construction and Operations Plan, BOEM failed to adequately consider the impact the Revolution Wind Project will have on migratory birds, consider and adopt mitigation measures, and alter the Project to avoid injuring or killing migratory birds. As such, the decision to approve the Construction and Operations Plans was arbitrary, capricious, and not in accordance with the law.

196.    Because the Revolution Wind Project will take migratory birds, in clear violation of the Migratory Bird Treaty Act, Defendants' approval of the Project is arbitrary, capricious, and not in accordance with the law. This approval should therefore be invalidated and set aside.

**Seventh Cause of Action**
**Violation of the Clean Water Act and**
**Administrative Procedure Act**

197.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

198.    Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[291] The Clean Water Act prohibits the "discharge of any pollutant by any person"[292] into navigable waters without a

---

[290] *Id.* at 3.7-25.
[291] 33 U.S.C. § 1251(a).
[292] 33 U.S.C. § 1311(a).

permit, and violations are punishable by substantial civil and criminal fines or imprisonment.[293] While the authority to issue permits for the discharge of most pollutants is vested in the EPA,[294] Section 404 of the Clean Water Act authorizes the U.S. Army Corps of Engineers to issue permits for "the discharge of dredged or fill material into the navigable waters."[295] The Clean Water Act defines "dredged material" as "material that is excavated or dredged from waters of the United States,"[296] and "fill material" as "material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of waters of the United States with dry land; or (ii) Changing the bottom elevation."[297] Fill material includes rock, sand, clay, plastics, and construction debris but does not include trash or garbage.[298] The Corps has adopted regulations for the issuance of these Section 404 permits.[299]

199.    Clean Water Act dredge-and-fill permits help to ensure that the "natural structure and function of ecosystems [are] maintained."[300] In the Clean Water Act, Congress addressed the effects of pollutants—such as discharges from dredge and fill activities—and created "broad federal authority to control pollution, for '[w]ater moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source.'"[301]

200.    Because construction of the Revolution Wind Project will discharge tons of sand and rock into navigable waters, these discharges of pollutants into the marine ecosystem require

---

[293] 33 U.S.C. § 1319(c)(1); 33 C.F.R. § 326.6.
[294] 33 U.S.C. § 1344(a).
[295] *Id.*
[296] 33 C.F.R. § 323.2(c).
[297] 33 C.F.R. § 323.2(e).
[298] *Id.*
[299] *See* 33 C.F.R. §§ 203-385.
[300] *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (quoting H.R .Rep. No. 92–911, p. 76 (1972)).
[301] *Id.* (quoting S. Rep. No. 92–414, p. 77 (1972)).

a Section 404 permit from the Corps. The installation of turbines, inter-array cables, export cables, scour protection, and cable protection will permanently damage thousands of acres of the seafloor, destroying and disturbing habitats, fish, and protected species. Constructing the windfarm components involves significant excavation of the seafloor over many miles and, in some instances, requires the use of explosive devices. The laying of scour and cable protection, in the form of concrete mattresses (8 feet by 20 feet), rock bags, etc., along the export and inter-array cables further disrupts the seafloor, crushing and liquifying the organisms on the seafloor.

201.    The Revolution Wind project includes 65 turbines, two offshore substations, 155 miles of inter-array cables, two export transmission cables within a 42-mile cable corridor, and 56.7 acres of scour protection and secondary cable protection. The installation of the turbines and the scour protection surrounding each foundation will permanently disrupt 3,419,460 ft$^2$ of the seafloor and temporarily disrupt 32,909,580 ft$^2$.[302] The installation of inter-array cables, buried in the seafloor between four to six feet deep, will permanently disrupt 74.1 acres and temporarily disrupt 2,471 acres of the seafloor.[303] The installation and burial of the export cable will permanently disrupt 17.8 acres of the seafloor.[304]

**The Corps Failed to Consider Many of the Pollutant Discharges Caused By This Offshore Wind Project in the Erroneous Belief That It Is Not Located in Navigable Waters**

202.    Although the Clean Water Act requires a Corps permit for "the discharge of dredged or fill material into the navigable waters,"[305] and defines "navigable waters" as "waters

---

[302] United States Army Corps of Engineers, *Revolution Wind Army Corps Permit* (Oct. 2, 2023) at 3, https://www.nae.usace.army.mil/Portals/74/docs/regulatory/2023%20Permits/20231003_Final_Signed_USACE_Permit.pdf?ver=gz46GRCgrUd_G-Kibeiwrg%3d%3d.
[303] *Id.* at 27.
[304] *Id.* at 33.
[305] 33 U.S.C. § 1344.

of the United States, including the territorial seas."[306] The Corps of Engineers erroneously interprets this provision to allow unpermitted discharges into navigable waters that occur more than three miles from the coastline.[307]

203.    On January 18, 2022 and on October 3, 2023, the Corps of Engineers issued dredge-and-fill permits that authorized construction and operation of the Revolution Wind Project without analyzing or considering the considerable discharges caused by construction of the turbines (all of which are beyond the three-mile limit) and the many miles of buried cable and substation facilities that are to be constructed beyond the three-mile limit.[308]

204.    Although the Revolution Wind project will require the installation of an additional 65 wind turbines, each twice the height of the Washington Monument, and each resting on a foundation with hundreds of square feet of scour protection, together with two offshore substations, 155 miles of inter-array cables, and 42 miles of export cables, the Corps analyzed only impacts that would occur within the three miles of territorial seas before issuing the Clean Water Act permit for this project. The Corps did not analyze and did not issue a permit for the discharge of dredge and fill past the three-mile territorial seas, which includes all 65 turbines, the two offshore substations, and most of the export and inter-array cables, claiming no permit is required for the pollutants that will be discharged into navigable waters by this construction.

205.    The Corps' determination that discharges of dredge and fill material from Revolution Wind Project occurring beyond three miles from the coastline do not require a permit, and the Corps' failure to analyze or consider those discharges before issuing the January 18, 2022 and October 2, 2023 dredge-and-fill permits to the developers of Revolution Wind was

---

[306] 33 U.S.C. § 1362(7).
[307] Revolution Wind Record of Decision *supra* note 1 at 30.
[308] *Id.*

arbitrary, capricious, unsupported by the record, and not in accordance with the statutory requirements of the Clean Water Act. BOEM's November 17, 2023 approvals of the Construction and Operations plan for the Revolution Wind facilities without Clean Water Act permits authorizing all discharges of all dredge and fill material was also arbitrary, capricious, and otherwise not in accordance with the law.

**The Corps Erroneously Failed to Apply Its Regulations for Cox Ledge, a Special Aquatic Site**

206.    Corps regulations require that, where a dredge-and-fill permit is sought for an activity that includes a "special aquatic site," the Corps must presume that practicable alternatives are available,[309] and all "practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise."[310] Corps regulations define "special aquatic site" as "geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region."[311]

207.    Cox Ledge is a special aquatic site, located within the Revolution Wind lease area. The National Marine Fisheries Service has designated Cox Ledge as a "habitat Area of Particular Concern," because it is an area that is "particularly vulnerable to human impact,"[312] serves an important ecological function, is sensitive to human-induced environmental

---

[309] 40 C.F.R. § 230.10(a)(3).
[310] Revolution Wind Record of Decision *supra* note 1.
[311] 40 C.F.R. § 230.3(m).
[312] *Id.*

degradation, will undergo stress from development activities.[313] In designating Cox Ledge as a Habitat Area of Particular Concern, NMFS identified "important cod spawning grounds and areas of complex [benthic] habitat that are known to serve important habitat functions to federally managed species within and adjacent to offshore wind development areas."[314] And NMFS instructed that Cox Ledge's new status "should lead to special attention regarding potential adverse effects on habitats within areas of particular concern from various activities."[315]

208.    Other federal agencies have also recognized the importance of Cox Ledge's benthic habitats and fish habitats for years. In June 2021, the New England Fishery Management Council voted to establish a new Habitat Area of Particular Concern.[316] The Habitat Area overlapped with the nine offshore energy lease sites in southern New England and included the Revolution Wind and South Fork Wind lease areas.[317]

209.    But, in violation of 40 C.F.R. § 230.40 to 230.45 and 40 C.F.R. § 230.3(m), the Corps granted dredge-and-fill permits for Revolution Wind without considering or analyzing whether practicable alternatives to building atop the Cox Ledge special aquatic site exist. The Corps' actions were arbitrary, capricious, and not in accordance with the Clean Water Act and the Corps' own regulations, including 40 C.F.R. § 230.40 to 230.45 and 40 C.F.R. § 230.3(m).

---

[313] *Id.*

[314] *Id.*

[315] *Id.*

[316] New England Fishery Management Council, *Press Release: Council Approves HAPC For Southern New England; Previews Northeast Regional Habitat Assessment Explorer* (July 18, 2022), https://s3.us-east-1.amazonaws.com/nefmc.org/NEFMC-Approves-HAPC-for-Southern-New-England-Previews-Northeast-Regional-Habitat-Assessment-Data-Explorer.pdf.

[317] *Id.*

**The Project's Discharge of Dredge and Fill Materials Will Cause Unacceptable Adverse Impacts in Navigable Waters**

210.    Corps regulations allow the Corps to issue a Section 404 dredge-and-fill permit only where "it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."[318] And Corps regulations go on to give examples of those unacceptable adverse impacts, including losses and damages to fisheries, fish, fish habitat, wildlife habitats, shellfishing, and recreational areas.

211.    The Record of Decision shows that the dredge and fill activities authorized by the Corps for the Revolution Wind Project on October 2, 2023,[319] will have unacceptable, adverse impacts on fisheries, shellfishing, and the aquatic ecosystem in violation of 40 C.F.R. § 231.2(e) and Section 404 of the Clean Water Act. In addition to the unacceptable adverse impacts to nearly all natural resources identified in the Environmental Impact statements for the Revolution Wind Project, the Corps identified additional, unacceptable adverse impacts on navigable waters including:

- Discharge of dredge material will impact "recreational and commercial fisheries," and "it is expected that benthic organisms such as non-mobile larvae and eggs would either be disturbed or die[,]" negatively impact fishing stocks;[320]

- The modification of 32.9 acres of substrate due to secondary cable construction[321] and the conversion of 32.9 acres of soft-bottom sea floor to "hard bottom habitat as a result of the secondary cable protection placement[;]"[322]

---

[318] 40 C.F.R. § 230.1(c).
[319] Notice of Final Federal Agency Action on the Authorization for the Revolution Wind Farm and Revolution Wind Export Cable Project Offshore Rhode Island, 89 Fed. Reg. 15,982 (Mar. 6, 2024).
[320] *Id.*
[321] Revolution Wind Record of Decision *supra* note 1 at 45.
[322] *Id.* at 46.

- "[I]mpacts to mollusks, fish, and crustaceans in the project area. The discharge of fill in the form of rock, concrete mattresses, fronded mattresses, or rock bags for secondary cable protection would result in the smothering of any sessile species present on the substrate[;]"[323]

- "[P]lacement of fill material has the potential to have adverse effects on egg and larval stages of fish and crustaceans that may be present in the area but are unable to avoid smothering due to their inability to relocate[;]"[324]

- Direct impacts to fish, crustaceans, and mollusks from secondary cable protection and secondary effects on seals and sea birds; and

- "[A]dverse impacts on recreational and commercial fisheries. Fish may be negatively affected by the discharge of fill, as non-mobile larvae and eggs cannot disperse to avoid smothering."[325]

212.    In addition, areas of the seabed that will be excavated to construct this Project are contaminated with high levels of forever chemicals and other contaminants that will cause unacceptable adverse impacts to the navigable waters. For example, samples taken within 1,000 feet of the Revolution Wind project demonstrated elevated levels of lead, arsenic, chromium, copper, nickel, and zinc.[326]

213.    The Corps' failure to adequately consider these adverse impacts, and approval of the dredge-and-fill permits despite these unacceptable adverse impacts, violates the Clean Water Act and the Corps' own regulations, is arbitrary, capricious, and otherwise not in accordance with law.

---

[323] *Id.* at 47.
[324] *Id.*
[325] *Id.* at 48.
[326] *See* Revolution Wind, *Application for State Water Quality Certification and Marine Dredging and Associated Activities* (July 31, 2021), http://www.crmc.ri.gov/windenergy/revolution/2021-07-005_WQCandMarineDredging.pdf.

**The Corps Failed to Consider Practicable Alternatives to the Revolution Wind Proposal**

214.    Corps regulations require that the Corps consider practicable alternatives before issuing a dredge-and fill permit,[327] and those regulations define practicable alternatives as "[a]ctivities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters,"[328] and

> an alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant that could reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity may be considered.[329]

215.    Additionally, when an activity, like electric power generation, is not water dependent, and a special aquatic site like Cox Ledge is included in the project, practicable alternatives that do not involve special aquatic sites are presumed to be available unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.[330]

216.    Yet, in authorizing discharge of dredge-and-fill into the aquatic environment for the Revolution Wind Project, the Corps failed to analyze practicable alternatives like traditional fossil fuel plants, nuclear power plants, modular nuclear small-scale generators, onshore wind turbines, and solar panels, and efforts to improve energy efficiency and conservation—all of

---

[327] 40 C.F.R. § 230.5(c).
[328] *Id.* § 230.10(a)(1)(i).
[329] *Id.* § 230.10(a)(2).
[330] *Id.* § 230.10(a)(3).

which can contribute to the electric power grid. Offshore wind is not the sole or unique source of power generation.

217.    But the Record of Decision proves that the Corps analyzed no alternatives other than minor variations of the Developer's proposed plans for the Revolution Wind Project. And since the production of any type of electricity is not water-dependent, the Corps violated regulatory requirements by failing to demonstrate that no practicable alternative exists for the production of electricity, renewable or otherwise, that did not require the discharge of dredge or fill material into a special aquatic site. The Corps' approval of dredge-and-fill permits for the Revolution Wind project was therefore arbitrary, capricious, and contrary to law (including Corps regulations).

**The Secretary of the Army and the Corps Failed to Consider the Cumulative Effects of Other Offshore Wind Projects**

218.    Before issuing a Section 404 permit, the Secretary of the Army and the Corps "shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem,"[331] and consider this information during the decision-making process.[332]

> (1) Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

> (2) Cumulative effects attributable to the discharge of dredged or fill material in waters of the United States should be predicted to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making

---

[331] *Id.* § 230.11(g).
[332] *Id.*

process concerning evaluating individual permit applications, issuing a general permit, and monitoring and enforcing existing permits.[333]

219.    Using this information on cumulative impacts, Corps regulations require the Corps to conduct a cumulative impacts analysis that includes:

(1)    [T]he area in which the effects of the proposed project will be felt;

(2)    [T]he impacts that are expected in that area from the proposed project;

(3)    [O]ther actions - past, present, and reasonably foreseeable proposed that have had or are expected to have impacts in the same area;

(4)    [T]he impacts or expected impacts from these actions; and

(5)    [T]he overall impact that can be expected if the individual impacts are allowed to accumulate.[334]

220.    Since 2021, the Federal Government has implemented a policy of jumpstarting and rapidly approving Offshore Wind Energy. As of January 2024, 35 federal offshore wind projects are in various stages of development off the eastern coast of the United States. Twelve of those projects are in waters off Rhode Island and Massachusetts. When combined, these twelve projects will add hundreds, if not thousands, of turbines to the ocean and will include 2,289 miles of export cables and 2,350 miles of inter-array cables.[335]

221.    In the process of approving the dredge-and-fill permits for the Revolution Wind project, however, the Corp simply adopted the inadequate cumulative impacts analysis BOEM had prepared in the Environmental Impact Statement, and made no cumulative impacts analysis of its own, in violation of the Corps' own regulations. The Corps' failure to consider this

---

[333] 40 C.F.R. § 230.11(g).
[334] *Ga. River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1341 (S.D. Ga. Mar. 19, 2012), aff'd, 517 F. App'x 699 (11th Cir. 2013).
[335] Revolution Wind Final Environmental Impact Statement *supra* note 2 at Appendix E-3.

important part of the dredge-and-fill analysis was arbitrary, capricious, and otherwise not in

accordance with law.

**The Corps Approved Permits that Will Significantly Degrade the Waters of the United States**

222.    Clean Water Act regulations flatly prohibit the issuance of a Section 404 permit

that would result in significant degradation of the waters of the United States—" no discharge of

dredged or fill material shall be permitted which will cause or contribute to significant

degradation of the waters of the United States."[336] Significant degradation includes:

(1)    Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

(2)    Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

(3)    Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy. . . .[337]

223.    The Corps' own analysis highlights how the discharges will degrade the

environment:

•    The modification of 32.5 acres of substrate due to secondary cable construction[338] and the conversion of 32.9 acres of soft-bottom sea floor to "hard bottom habitat as a result of the secondary cable protection placement[;]"[339]

•    "[I]mpacts to mollusks, fish, and crustaceans in the project area. The discharge of fill in the form of rock, concrete mattresses, fronded mattresses, or rock bags for secondary cable protection would result in the smothering of any sessile species present on the substrate[;]"[340]

---

[336] 40 C.F.R. § 230.1.

[337] *Id.* § 230.11(c).

[338] Revolution Wind Record of Decision *supra* note 1 at 45.

[339] *Id.* at 46.

[340] *Id.* at 47.

- "[P]lacement of fill material has the potential to have adverse effects on egg and larval stages of fish and crustaceans that may be present in the area but are unable to avoid smothering due to their inability to relocate[;]"[341]

- Direct impacts to fish, crustaceans, and mollusks from secondary cable protection and secondary effects on seals and sea birds; and

- "[A]dverse impacts on recreational and commercial fisheries. Fish may be negatively affected by the discharge of fill, as non-mobile larvae and eggs cannot disperse to avoid smothering."[342]

224.    The Environmental Impact Statement for Revolution Wind also indicates that this Project, during construction, operations and maintenance, and decommissioning will degrade almost every environmental and marine resource in the lease area.[343]

225.    The discharges from Revolution Wind will significantly and adversely affect the health of the aquatic ecosystem, the marine mammals and fish that habituate in the area, and the fishing and shellfishing grounds where the turbines, platforms, cables, and associate structures will be located—and these adverse impacts will be multiplied as new offshore projects area approved and constructed up and down the Atlantic Outer Continental Shelf. The Army Corps of Engineers violated the Clean Water Act when it issued the Section 404 permit for the Revolution Wind Project because this permit allows for the discharge of dredge and fill material that will significantly degrade the waters of the United States.

**Eighth Cause of Action**
**Violation of the Coastal Zone Management Act**
**and Administrative Procedure Act**

226.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

---

[341] *Id.*
[342] *Id.* at 48.
[343] Revolution Wind Final Environmental Impact Statement *supra* note 2.

227.    The Coastal Zone Management Act ("CZMA") requires that "[e]ach federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs."[344] The Coastal Zone Management Act further requires that, for federal activities in the Outer Continental Shelf, "all federal license or permit activities . . . which affect any coastal use or resource are conducted in a manner consistent with approved management programs."[345] Violations of the CZMA by Federal agencies are reviewed under the Administrative Procedure Act.

228.    The State of Rhode Island has adopted, and the federal government has approved, the Rhode Island Ocean Special Area Management Plan as a comprehensive state coastal management plan under CZMA. The Plan is a comprehensive set of regulations to control and evaluate uses and development involving 1,500 square miles of Rhode Island and federal waters. Those regulations promote and enhance existing uses of cultural and historic resources, fisheries, recreation, tourism, and marine transportation.[346]

229.    The Ocean Special Area Management Plan's purpose is to "foster a properly functioning ecosystem that is both ecologically sound and economically beneficial[,]"[347] and the Plan ensures a rigorous review of all ocean development so that Rhode Island and its agencies meet their public trust responsibilities.[348] Any evaluation of ocean development in Rhode Island must include consideration of ecology, global climate change, cultural and historic resources,

---

[344] 16 U.S.C. § 1456(c)(1).
[345] 15 C.F.R. § 930.70.
[346] *See* 650 RICR 20-05-11.9(A).
[347] Rhode Island, *Ocean Special Area Management Plan* (May 4, 2011) at 6, https://seagrant.gso.uri.edu/oceansamp/pdf/samp_crmc_revised/RI_Ocean_SAMP.pdf
[348] *See* 650 RICR 20-05-11.9(A).

commercial and recreational fisheries, recreation and tourism, and—only when consistent with the state's Special Area Management Plan goals—renewable energy.[349]

230.  Rhode Island's Special Area Management Plan sets forth the following requirements for all developments in the waters offshore Rhode Island:

- "Offshore developments shall not have a significant adverse impact on the natural resources or existing human uses of the Rhode Island coastal zone, as described in the Ocean SAMP."[350] This evaluation must consider whether "there is an overall net benefit to the Rhode Island marine economic sector from the development of the project or if there is an overall net loss[;]"[351]

- "Large-scale offshore developments shall avoid areas designated as Areas of Particular Concern,"[352] which includes areas with "unique or fragile physical features, or important natural habitats," "areas of high natural productivity," "areas with features of historical significance or cultural value," "areas of substantial recreational value," "areas important for navigation, transportation, military and other human uses; and," "areas of high fishing activity[;]"[353]

- Offshore Development shall be prohibited if it "result[s] in significant long-term negative impacts to Rhode Island's commercial or recreational fisheries. Long-term impacts are defined as those that affect more than one or two seasons[;]"[354]

---

[349] 650 RICR 20-05-11.9.1—11.9.7.
[350] 650 RICR 20-05-11.10.1(C).
[351] *Id.*
[352] 650 RICR 20-05-11.10.1(B).
[353] 650 RICR 20-05-11.10.2(A)(1)-(6).
[354] 650 RICR 20-05-11.10.1(E).

- "[P]otential adverse impacts of offshore developments and other uses on commercial or recreational fisheries [shall] be evaluated, considered, and mitigated. . . ."[355] "Mitigation shall be negotiated between the Council staff, the [Fisheries Advisory Board], the project developer, and approved by the Council[;]"[356]

- Projects that create significant adverse impacts to moraine edges must be modified or denied;[357] and

- Sensitive fish, shellfish, and crustacean habitats shall be protected.[358]

231.    The Revolution Wind Project, as approved by BOEM, fails to comply with Rhode Island's Special Area Management Plan, and is inconsistent with the state's coastal management plan, in numerous respects, including:

- The Project does not provide a net benefit to the State of Rhode Island and will irreversibly damage the marine ecosystem.

- The Project will disrupt the natural functions of fish and marine mammals and there will be mortality to eggs, larvae, fish, shellfish, and benthic species at each turbine foundation, adversely impacting the fishery resources in the lease area.[359]

- The Project will create a net loss to existing Rhode Island Marine businesses, shoreside businesses, like fish markets, distribution, processing, recreational fishing licenses, bait and gear sales, boat repairs, hotels, restaurants, shoreside fish sales, fuel, and travel, that profit from fishery resources within the Project area.

---

[355] 650 RICR 20-05-11.10.1(F).
[356] 650 RICR 20-05-11.10.1(G).
[357] 650 RICR 20-05-11.10.1(F).
[358] 650 RICR 20-05-11.10.1(I).
[359] *See* Rhode Island, Staff Report (Apr. 12, 2023) at 20.

- The Project will create major, long-term adverse impacts on commercial and for-hire fishing and drastically limit access to the lease area and the fishery resources available for commercial fishing and processing.[360]

- There will be mortality to eggs, larvae, fish, shellfish, and benthic species at each foundation, adversely impacting the fishery resources in the lease area.[361]

- The Project's turbines, offshore substations, and export cables will degrade Cox Ledge, the glacial moraine, and benthic habitats in the lease area, regardless of the so-called mitigation measures required by the Coastal Resources Management Board.

- The Project will diminish the ability of boaters and fishermen to safely travel through the lease area and productively fish.

- The Fisheries Advisory Board did not agree with and did not approve the mitigation measures for commercial and for-hire fishery impacts.

232.    Although Rhode Island's Coastal Resources Management Council issued a consistency determination for the Project, that determination is not supported by the record and has been challenged in state court. In protest of the Council's determination, all nine members of Rhode Island's Fishery Advisory Board—who were supposed to be consulted during consistency review and mitigation negotiations—resigned due to the Coastal Resources Management Council's failure to follow the Special Area Management Plan and protect fishing interests.

233.    Because BOEM's approval of the Revolution Wind Project is inconsistent with the requirements of Rhode Island's Special Area Management Plan, the approval constitutes

---

[360] *Id.* at 32.
[361] *See id.*

final agency actions that is arbitrary, capricious, and otherwise not in accordance with the law.

BOEM's approval should therefore be invalidated and set aside by this Court.

**Ninth Cause of Action**
**Violation of the National Historic Preservation Act**
**and Administrative Procedure Act**

234.    Plaintiffs reallege and incorporate by reference all of their previous allegations

and further allege as follows:

235.    Plaintiffs Dee and Richard Gordon, Cornwall Lodge LLC, Howard G. Cushing

III, 226 Ocean Avenue Moonwatch LLC, Kathryn K. and Jerome R. Kirby, Mary Cushing

Coleman, Doug and Virginia Marzonie, Kristin and Andrew McKee, Allison Gulbrandsen,

Michael and Betsy Vitton, Ben and Leigh Carpenter, Charlotte DuHamel, Sandra Craig, Steven

Gewirz and Katrina Hamilton Gewirz, Waves S, LLC, Alumni East Associates, EC Properties,

Stephen Lewinstein, Lisa Foley, Michael and Paige Pieroni, Karen Blanchard, and Randy

Panagakis own historic properties located within BOEM's identified Areas of Potential Effects.

Many of these properties are located within federal or State recognized historic property districts

in Newport, Middletown, and Little Compton, Rhode Island, are listed on the National Register

as historic properties or landmarks, or are eligible for listing on the National Register.

236.    Newport, Rhode Island, is home to more than a dozen National Historic

Landmarks, including the Bellevue Avenue Historic District, the Southern Thames Historic

District, and the Ocean Avenue Historic District, as well as dozens of properties listed on the

National Register. Numerous other properties in Newport are eligible to be placed on the

National Register.

237.    The Ocean Avenue Historic District in Newport, otherwise known as "the Ocean

Drive," is a roadway that bounds the city of Newport. Ocean Avenue is bordered on one side by

beaches, ocean inlets, and cliffs and on the other side by ponds, swamps, fields, and sizeable residences. Ocean Avenue is listed as a national landmark.[362] Plaintiffs, Dee and Richard Gordon, Cornwall Lodge LLC, Howard G. Cushing III, 226 Ocean Avenue Moonwatch LLC, Kathryn K. and Jerome R. Kirby, Mary Cushing Coleman, Allison Gulbrandsen, and Betsy and Michael Vitton, own properties in the Ocean Avenue Historic District.

238.    The Bellevue Avenue Historic District is located along Bellevue Avenue in Newport, Rhode Island, and includes several historic gilded-age mansions. The District was declared a National Historic Landmark in 1976.[363] Plaintiffs, Waves S, LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Paige Pieroni, Karen Blanchard, and Randy Panagakis, own properties in the Bellevue Avenue Historic District.

239.    The town of Little Compton, Rhode Island, is home to seven properties on the National Register. The town is also home to several properties that are eligible to be placed on the National Register. Plaintiff, Charlotte DuHamel, owns the Mill at 581 West Main Road in Little Compton, which is eligible to be placed on the National Register.[364] Little Compton is also home to the Warren Point Historic District, which is recognized in the State of Rhode Island,[365] and eligible for listing on the National Register. Plaintiffs, Doug and Virginia Marzonie, Kristin

---

[362] *Id.*

[363] *See* State of Rhode Island Historical Preservation & Heritage Commission, *National Historic Landmarks*, https://preservation.ri.gov/historic-places/national-historic-landmarks (last visited Jan. 11, 2024).

[364] State of Rhode Island Historic Property Search, *Search: 581 West Main Road*, https://www.ri.gov/preservation/search/view.php?idnumber=LTCO00042 (last visited Jan. 11, 2024).

[365] Rhode Island Historical Preservation Commission, *Historic and Architectural Resources of Little Compton, Rhode Island* (1990), https://preservation.ri.gov/sites/g/files/xkgbur406/files/pdfs_zips_downloads/survey_pdfs/little_compton.pdf.

and Andrew McKee, and Ben and Leigh Carpenter, own properties within the Warren Point Historic District.

240.    Middletown, Rhode Island, is home to the Indian Avenue Historic District, which has been given a determination of eligibility for the National Register.[366] Plaintiffs, Steven Gewirz and Katrina Hamilton Gewirz, own property within the Indian Avenue Historic District. The town is also home to the Stoneybrook Estate Historic District, which comprises 501 Indian Avenue to 521 Indian Avenue. The Stoneybrook Estate was placed on the National Register in 2009. Plaintiff, Sandra Craig, owns property within the Stoneybrook Estate Historic District.

**Violation of Section 106 of the National Historic Preservation Act**

241.    Section 106 of the National Historic Preservation Act[367] requires federal agencies to consider and take into account the effect of federal undertakings, permits, and projects on any historic property prior to approval of the undertaking.[368] Section 106 prevents federal agencies from approving any undertaking unless the agency takes into account the effects on historic properties and resolves the adverse effects on those properties.[369]

242.    As part of this consideration, the acting federal agency—in this case, BOEM— must give interested parties and the public a chance to weigh in on how the federal projects— Revolution Wind—will impact historic properties.

243.    The Section 106 consultation involves a four-step process: (1) Initiation, where the agency determines whether the action is an undertaking subject to review; (2) Identification

---

[366] State of Rhode Island Historic Property Search, *Search: Indian Avenue Historic District*, https://www.ri.gov/preservation/search/view.php?idnumber=MIDL00008 (last visited Jan. 11, 2024).
[367] 54 U.S.C. §§ 300101 to 307101.
[368] 54 U.S.C. § 306108.
[369] *Id.*

of historic properties in the Area of Potential Effects; (3) Assessment of whether the action would cause adverse effects to historic properties; and (4) Resolution between the parties on steps to address adverse effects.

244.    Once an agency determines that the action is an undertaking that triggers a Section 106 Consultation, the agency identifies an Area of Potential Effects, which sets the scope of review. Once this area is set, the agency identifies historic properties within the Area of Potential Effects. These include properties that are listed on the National Register and those that could be eligible for the National Register.

245.    The agency must also identify parties to consult with, which include local governments, tribal nations, or other parties with a demonstrated interest in the undertaking,[370] and make a "[r]easonable and good faith effort" to identify historic properties.[371] That effort may include "background research, consultation, oral history interviews, sample field investigation, and field survey. . . . The agency official should also consider other applicable professional, State, tribal, and local laws, standards, and guidelines."[372]

246.    The Revolution Wind Project is an undertaking that is subject to Section 106 of the National Historic Preservation Act.

247.    During its historic property review, BOEM identified three Areas of Potential Effects: (1) Marine Area of Potential Effects consisting of "all offshore areas where seafloor disturbing activities from [turbines and offshore substation] foundation construction IAC trenching and installation, boulder relocation, and vessel anchoring could occur[;]"[373] (2)

---

[370] 36 C.F.R. § 800.2(c).
[371] 36 C.F.R. § 800.4(b)(1); *see also United Keetoowah Band of Cherokee Indians in Oklahoma v. Federal Communications Commission*, 933 F.3d 728 (D.C. Cir. 2019).
[372] 36 C.F.R. § 800.4(b)(1).
[373] Revolution Wind Final Environmental Impact Statement *supra* note 2 at Appendix J-12.

Terrestrial Area of Potential Effects consisting of a 20-acre landfall work area; and (3) a visual Area of Potential Effects which consists of Connecticut, New York, Rhode Island and Massachusetts coastal areas and includes a radius of 40 miles for offshore components and a radius of three miles for onshore components.[374]

248.    BOEM failed to identify all of the historic properties that the Revolution Wind Project will adversely affect and failed to identify all of the historic properties within the Areas of Potential Effects. Failing to identify these properties was neither reasonable nor done in good faith, and it impermissibly narrowed the scope of BOEM's review of historic properties.

249.    In approving this project without taking into account the impacts on historic properties and without conducting a proper Section 106 consultation, BOEM failed to comply with the National Historic Preservation Act in the following ways:

- BOEM failed to assess and resolve the project's adverse direct, indirect, and cumulative effects and adverse economic effects on the Plaintiffs' historic properties.

- BOEM failed to adequately consult, or to consult at all, with interested parties with historic properties in the Areas of Potential Effects, including Plaintiffs. In recognition of its own failures in this regard, BOEM dramatically changed their approach with subsequent projects like Sunrise Wind. Official notices were sent out to homeowners informing them of the project and the schedule for time and place for impacted parties to provide feedback. This was not the case for Revolution Wind.

---

[374] *Id.* at J-14.

- BOEM failed to consult with property owners, including Plaintiffs, regarding mitigation measures, resulting in drastically inadequate proposals that do not provide mitigation for all the historic properties that will be affected by the project.

250.    Authorizing the Revolution Wind Project without a proper Section 106 consultation and without Section 106 compliance was arbitrary, capricious, and contrary to law.

**BOEM also Violated Section 110(f) of the National Historic Preservation Act**

251.    Section 110(f) of the National Historic Preservation Act requires BOEM to minimize harm to National Historic Landmarks.[375] Section 110(f) contemplates a higher level of scrutiny requiring that "[p]rior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark."[376]

252.    BOEM failed to comply with Section 110(f)'s heightened standard of review by failing to engage in all possible planning to minimize harm to National Historic Landmarks, which include the Bellevue Avenue Historic District, the Ocean Avenue Historic District, the Newport Historic District, Southern Thames Historic District, town of Little Compton, and the Indian Avenue Historic District, among others.[377]

253.    BOEM failed to conduct adequate visual simulations, assess adverse effects, and resolve the adverse effects to the National Historic Landmarks.

---

[375] 54 U.S.C. § 306107.
[376] *Id.*
[377] *See* State of Rhode Island Historical Preservation & Heritage Commission, *National Historic Landmarks*, https://preservation.ri.gov/historic-places/national-historic-landmarks (last visited Jan. 11, 2024).

254.    BOEM also failed to properly consult with the National Park Service and the Advisory Council to identify adequate ways to minimize harm to the National Historic Landmarks. Instead, BOEM relied on mitigation measures it identified and developed during its NEPA review and Section 106 consultation, which fail to meet the stringent standards in Section 110(f).

255.    Authorizing the Revolution Wind without using all possible planning to minimize harm to the National Historic Landmarks at issue in this case violates Section 110(f) and was arbitrary, capricious, and contrary to law.

**Prayer for Relief**

Plaintiffs, Green Oceans et al., ask the Court for the following relief:

1.    An order holding unlawful, vacating, and setting aside Defendants' November 17, 2023, decision approving the Construction and Operations Plan for the Revolution Wind Project, Incidental Harassment Authorization, and Clean Water Act permits as arbitrary, capricious, and otherwise not in accordance with law;

2.    Reasonable attorneys' fees and costs for bringing this suit; and

3.    Such other and further relief as the Court deems appropriate.

Respectfully submitted,

s/ Roger J. Marzulla
Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
(202) 822-6760
roger@marzulla.com
nancie@marzulla.com

Dated: July 15, 2025                                    Counsel for Plaintiffs