# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GREEN OCEANS, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | )    Case No. 1:24-cv-00141-RCL |
| UNITED STATES DEPARTMENT OF THE | ) |
| INTERIOR, et al., | )    Hon. Royce C. Lamberth |
| | ) |
| *Defendants,* | ) |
| | ) |
| and | ) |
| | ) |
| REVOLUTION WIND, LLC, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |
| | ) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
Mollie A. Jackowski, Bar No. 1780535
Marzulla Law, LLC
1150 Connecticut Ave., NW
 Suite 1050
Washington, DC 20036
Tel: (202) 822-6760
roger@marzulla.com
nancie@marzulla.com
mollie@marzulla.com

September 2, 2025                Attorneys for Green Oceans

i

**Table of Contents**

Table of Authorities.......................................................................................................... iv

Glossary ............................................................................................................................ vii

Table of Exhibits ............................................................................................................. viii

Factual Background ............................................................................................................ 1

Procedural Background....................................................................................................... 2

Standard of Review............................................................................................................. 3

Argument ............................................................................................................................ 4

   1.   At Least One Plaintiff Has Standing Under Each Cause of Action, Satisfying the One Plaintiff Rule and Allowing the Court to Determine the Merits of Each Claim........................ 4

   2.   BOEM Has Now Repudiated Its Rationale Under OCSLA for Approving the Revolution Wind Project ................................................................................................................... 5

      A.   BOEM's Decision Not to Ensure Safety, Protection of the Environment, or Consideration of the Use of the Seabed for Fishing and Navigation Invalidates Its Decision Approving Revolution Wind ....................................................................................... 6

      B.   Contrary to the Requirements of OCSLA, This Project Is Causing Long-Term and Irreversible Harm to Commercial and Recreational Fishermen, Boaters Who Navigate in the Areas Near the Project for Recreational and Commercial Purposes, and the Health of the Ocean Environment and the Marine Seabed........................................................................ 7

      C.   One or More of Green Oceans Plaintiffs Has Standing to Bring This Claim..............11

   3.   The Green Oceans Plaintiffs Are Entitled to Summary Judgment on Their Endangered Species Act (ESA) and Marine Mammal Protection Act (MMPA) Claims ............................. 13

      A.   NMFS Failed to Use the Best Available Science to Determine the Project's Impacts on North Atlantic Right Whales ....................................................................................... 15

      B.   Internal Contradictions in the Biological Opinion Render It Arbitrary and Capricious …………………………………………………………………………………23

      C.   Revolution Wind Will Have More Than a Negligible Impact on Right Whales, Violating the MMPA ...................................................................................................... 25

      D.   At Least One Green Oceans Plaintiff Has Standing to Pursue the ESA and MMPA Claims ......................................................................................................................... 26

   4.   The Green Oceans Plaintiffs Are Entitled to Summary Judgment on Their Clean Water Act (CWA) Claims ............................................................................................................. 27

      A.   The Corps Failed to Consider Many of the Pollutant Discharges Caused By This Offshore Wind Project, Including Discharges in or Near a Special Aquatic Site in the Erroneous Belief That It Is Not Located in Navigable Waters ............................................. 28

B.    The Project's Discharge of Dredge and Fill Materials Will Irreversibly Damage Cox Ledge, a Unique, Environmentally Sensitive Habitat and Cod Spawning Ground ............. 29

C.    The Corps Failed to Consider the Cumulative Effects of Other Offshore Wind Projects ............................................................................................................................. 29

D.    At Least One Green Oceans Plaintiff Has Standing to Bring This Claim .................. 30

5.    Green Oceans Plaintiffs Are Entitled to Summary Judgment on Their National Historic Preservation Act Claims ........................................................................................................ 32

A.    BOEM Withheld Accurate Visual Simulations From Consulting Parties and the Public ……………………………………………………………………………………...33

B.    BOEM Failed to Conduct A Good Faith Consultation Under Section 106 ............... 33

C.    BOEM Failed to Consider Feasible Alternatives to Avoid or Minimize Harm and Its Limited Mitigation Measures Are Vague, Incomplete, and Ineffective ................................ 34

D.    BOEM Violated Section 110(f) by Failing to Minimize Harm to National Historic Landmarks ............................................................................................................................... 36

E.    At Least One Green Oceans Plaintiff Has Standing to Bring This NHPA Claim ...... 37

6.    The Government Violated NEPA and the APA By Approving Revolution Wind ............. 39

A.    BOEM Failed to Rigorously Explore Reasonable Alternatives ................................. 39

B.    BOEM Failed to Adequately Assess Cumulative Impacts ......................................... 41

C.    BOEM Approved Revolution Wind Without Taking the Required Hard Look at the Project's Environmental Impacts ........................................................................................... 42

D.    One or More Green Oceans Plaintiffs Have Standing to Bring This Claim ............... 44

Conclusion ...................................................................................................................................... 45

## Table of Authorities

### Cases

*Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259 (4th Cir. 2022) .................. 17

*Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) ................................................................. 5

*Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36 (D.D.C. 2008) .................................................. 3

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) .......................... 4

*Bowsher v. Synar*, 478 U.S. 714 (1986) ...................................................................................... 5

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017) ................................................. 27

*City of Alexandria, Va. v. Slater*, 198 F.3d 862 (D.C. Cir. 1999). .............................................. 39

*City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181 (D.C. Cir. 2007). ............................................ 39

*\*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ..................................................... 27

*Columbia Riverkeeper v. United States Army Corps of Eng'rs*, 706 F. Supp. 3d 1127 (W.D. Wash. 2020) ............................................................................................................................. 41

*Comm. for a Constructive Tomorrow v. United States Dep't of the Interior*, No. CV 24-774 (LLA), 2024 WL 2699895 (D.D.C. May 24, 2024)................................................................ 27

*Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012) ........................................ 25

*\*Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466 (D.C. Cir. 2009) .............. 27

*Defs. of Wildlife v. United States Dep't of the Interior*, 931 F.3d 339 (4th Cir. 2019). ................. 15

*Fisheries Survival Fund v. Jewell*, No. 16-CV-2409 (TSC), 2018 WL 4705795 (D.D.C. Sept. 30, 2018). ............................................................................................................................ 13

*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298 (S.D. Fla. 2005) ......... 30

*Friends of Cap. Crescent Trail v. United States Army Corps of Eng'rs*, 453 F. Supp. 3d 804 (D. Md. 2020)........................................................................................................................ 31

*Georgia River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329 (N.D. Ga. 2003) .. 30

*\*Growth Energy v. EPA*, 5 F.4th 1 (D.C. Cir. 2021)....................................... 13, 14, 27, 31, 39, 45

*Gulf v. Burgum*, 775 F. Supp. 3d 455 (D.D.C. 2025). .......................................... 13, 27, 31, 39, 45

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267 (D.C. Cir. 2015) ............................................... 45

*\*Horne v. Flores*, 557 U.S. 433 (2009)................................................................................... 4, 5

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004).......... 41

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023)........... 4

*Mayo v. Jarvis*, 177 F. Supp. 3d 91 (D.D.C. 2016) ................................................................... 45

*\*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)................................................................................................... 4, 33

*Nat. Res. Def. Council, Inc. v. U.S. Fish & Wildlife Serv.*, 719 F. Supp. 3d 1 (D.D.C. 2023) ........ 3

*Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019). .......................... 13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008)..................... 17

*Neighborhood Ass'n Of The Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50 (1st Cir. 2006). ..................................................................................................................... 37

*Nuclear Energy Inst., Inc. v. Env't Prot. Agency*, 373 F.3d 1251 (D.C. Cir. 2004)....................... 5

*Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766 (9th Cir. 1985) ........................................................ 3

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028
(9th Cir. 2001). ........................................................................................................................ 15

*Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10 (D.D.C. 2021)..... 13, 27, 32, 39, 45

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)......................................... 39

*Sackett v. Env't Prot. Agency*, 598 U.S. 651 (2023). ................................................................. 28

*Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80 (1943) ...................................................... 4

*Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017). ............................................................... 39

*Sierra Club v. Nat'l Marine Fisheries Serv.*, No. CV DLB-20-3060, 2024 WL 3860211
(D. Md. Aug. 19, 2024)......................................................................................................... 20, 21

*Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31 (D.C. Cir. 2015).................................. 39

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009).................................................................. 4, 5

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978).................................................................. 14

*Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66 (D.C. Cir. 2011).................... 39

*TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221 (D.C. Cir. 2024)...................................... 28

*United Keetoowah Band of Cherokee Indians in Oklahoma v. Fed. Commc'ns Comm'n*,
933 F.3d 728 (D.C. Cir. 2019)................................................................................................ 32, 33

*United States v. Am. Trucking Ass'ns*, 310 U.S. 534 (1940). ....................................................... 4

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)............................... 4

*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41(D.D.C. 2019)............................................... 41

## Statutes

16 U.S.C. § 1362(19)(B) ............................................................................................................. 15

16 U.S.C. § 1371(5)(a) ................................................................................................................ 25

16 U.S.C. § 1371(a)(3)(A). .......................................................................................................... 15

16 U.S.C. § 1371(a)(5)(A)(i)(I) .................................................................................................... 25

16 U.S.C. § 1371(a)(5)(A)(i)(I). ................................................................................................... 25

16 U.S.C. § 1371............................................................................................................................ 14

16 U.S.C. § 1390(c)(1)................................................................................................................... 15

16 U.S.C. § 1391(3)(A).................................................................................................................. 15

16 U.S.C. § 1531(b). ................................................................................................................ 13, 20

16 U.S.C. § 1536(a)(2)................................................................................................................... 15

33 U.S.C. § 1344............................................................................................................................ 28

33 U.S.C. § 1362(7). ..................................................................................................................... 28

42 U.S.C. § 4332(2)(E).................................................................................................................. 39

42 U.S.C. § 4332(C)(ii)................................................................................................................. 39

43 U.S.C. § 1332............................................................................................................................. 6

*43 U.S.C. § 1337(p)(4). ................................................................................................................. 6

*5 U.S.C. § 706................................................................................................................................ 4

5 U.S.C. §§ 701-705 ...................................................................................................................... 1

54 U.S.C. § 306107........................................................................................................................ 37

54 U.S.C. § 306107................................................................................................. 32

**Other Authorities**

63 Fed. Reg. 20,496 (Apr. 24, 1998). ..................................................................... 37

73 Fed. Reg. 60,173 (Oct. 10, 2008)....................................................................... 25

86 Fed. Reg. 33,810 (June 25, 2021) ...................................................................... 26

87 Fed. Reg. 806 (Jan. 6, 2022) .............................................................................. 26

88 Fed. Reg. 62,898 (Sept. 13, 2023) ..................................................................... 26

89 Fed. Reg. 11,342 (Feb. 14, 2024)....................................................................... 26

89 Fed. Reg. 4,370 (Jan. 23, 2024) ......................................................................... 26

89 Fed. Reg. 45,292 (May 22, 2024) ...................................................................... 26

89 Fed. Reg. 52,222 (June 21, 2024) ...................................................................... 26

89 Fed. Reg. 75,654 (Sept. 16, 2024). .................................................................... 26

89 Fed. Reg. 7633 (Feb. 5, 2024) ............................................................................. 8

89 Fed. Reg. 77,972 (Sept. 24, 2024) ..................................................................... 26

89 Fed. Reg. 84,674 (Oct. 23, 2024)....................................................................... 26

Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619 (Feb. 1, 2021). ................. 17

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................. 3

**Regulations**

36 C.F.R. § 800.1 .................................................................................................... 32

36 C.F.R. § 800.11(e) ............................................................................................. 32

36 C.F.R. § 800.2(c)(5). .......................................................................................... 32

36 C.F.R. § 800.2(d)(1) ........................................................................................... 32

36 C.F.R. § 800.4(b)(1) ..................................................................................... 32, 33

36 C.F.R. § 800.6(a) ............................................................................................... 34

36 C.F.R. § 800.6(c) ............................................................................................... 34

40 C.F.R. § 1502 ..................................................................................................... 40

40 C.F.R. § 1502.2(f) .............................................................................................. 40

40 C.F.R. § 1506.1(a) .............................................................................................. 40

40 C.F.R. § 1508.7 .................................................................................................. 41

40 C.F.R. § 230.1(c). ............................................................................................... 29

40 C.F.R. § 230.1(d). ............................................................................................... 29

40 C.F.R. § 230.11(d) .............................................................................................. 30

40 C.F.R. § 230.11(d). ............................................................................................. 30

40 C.F.R. § 230.11(g) .............................................................................................. 29

50 C.F.R. § 402.02.................................................................................................. 15

**Glossary**

| Abbreviation | Definition |
| --- | --- |
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| COP | Construction and Operations Plan |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| MMPA | Marine Mammal Protection Act |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| OCSLA | Outer Continental Shelf Lands Act |
| RODA | Responsible Offshore Development Alliance |
| ROD | Record of Decision |
| TTS | Temporary Threshold Shift |

**Table of Exhibits**

| Exhibit No. | Description |
|---|---|
| Ex. 1 | Summary of Plaintiffs' Standing |
| Ex. 2 | Solicitor's Opinion M-37059, *Withdrawal of Solicitor's Opinion M-37067* |
| Ex. 3 | Secretarial Order 3437, *Ending Preferential Treatment for Unreliable Foreign Controlled Energy Sources Department Decision-Making* |
| Ex. 4 | Declaration of Cheryl Andrews-Maltais (Chairwoman of Green Oceans Member, Wampanoag Tribe of Gay Head Aquinnah) |
| Ex. 5 | Declaration of Dilip Advani (226 Ocean Avenue, Moonwatch LLC) |
| Ex. 6 | Declaration of Karen Blanchard |
| Ex. 7 | Declaration of Chris Brown |
| Ex. 8 | Declaration of Barbara Chapman (Cornwall Lodge LLC) |
| Ex. 9 | Declaration of Ralph Craft |
| Ex. 10 | Declaration of Sandra Craig (Veter et Nova Trust) |
| Ex. 11 | Declaration of Howard Cushing III (Ledges 66 LLC) |
| Ex. 12 | Declaration of Murray Danforth |
| Ex. 13 | Declaration of Kevin Debbis (Member of Responsible Offshore Development Alliance) |
| Ex. 14 | Declaration of Charlotte DuHamel |
| Ex. 15 | Declaration of Lisa Foley |
| Ex. 16 | Declaration of Katrina Gewirz |
| Ex. 17 | Declaration of Dee Gordon |
| Ex. 18 | Declaration of Allison Gulbrandsen |
| Ex. 19 | Declaration of Richard Hittinger |
| Ex. 20 | Declaration of Lane Johnston |
| Ex. 21 | Declaration of Jerome R. Kirby |
| Ex. 22 | Declaration of Lauren Knight |
| Ex. 23 | Declaration of Elizabeth Quattrocki Knight (Herself and Green Oceans) |
| Ex. 24 | Declaration of Stephen Lewinstein (Himself, Waves S LLC, Alumni East Associates, EC Properties) |
| Ex. 25 | Declaration of Michael Lombardi (Green Oceans Member) |
| Ex. 26 | Declaration of Gary Mataronas |
| Ex. 27 | Declaration of Randy Panagakis (Panagakis Family Trust) |

Ex. 28     Declaration of Eric Philippi

Ex. 29     Declaration of Michael Pieroni (Pieroni Revocable Family Trust)

Ex. 30     Declaration of Benjamin Riggs

Ex. 31     Declaration of Alan Shinn

Ex. 32     Declaration of Elizabeth Vitton (B2 LLC)

Ex. 33     Declaration of William Vanderhoop (Green Oceans Member)

Ex. 34     Declaration of John Zarba (Green Oceans Member)

This is an action brought under the Administrative Procedure Act (APA),[1] challenging the U.S. Bureau of Ocean Energy Management's (BOEM) final agency actions—issuance of the Record of Decision (ROD) and approval of the Construction and Operations Plan (COP) for the Revolution Wind Project (the Project) offshore Rhode Island. The Project is approximately 75% complete and is slated to be fully operational in mid-2026, with 65 whirling turbines visible from onshore during the day and blinking lights visible during the night.[2] Plaintiffs, Green Oceans et al. (collectively, Green Oceans),[3] file this motion for summary judgment because BOEM violated key environmental and historic preservation laws in approving this Project.[4]

**Factual Background**

In March 2021, the administration launched an unprecedented push to industrialize the Outer Continental Shelf along the Atlantic coast.[5] Labeled as a "bold" initiative,[6] the program includes construction and operation of over 30 massive offshore wind projects stretching from Maine to Virginia. Revolution Wind, a 65-turbine complex covering 83,798 acres (about 131 square miles) of federal waters offshore Rhode Island,[7] is one part of an extensive Federal

---

[1] 5 U.S.C. §§ 701-705.

[2] Orsted, *Revolution Wind Project Timeline*, https://revolution-wind.com/construction-updates (last visited Aug. 22, 2025).

[3] Plaintiffs are Green Oceans, Responsible Offshore Development Alliance, Chris Brown, Gary Mataronas, Ralph Craft, Alan Shinn, Richard Hittinger, Lauren Knight, Murray Danforth, Benjamin Riggs, Elizabeth Quattrocki Knight, Eric Philippi, Dee and Richard Gordon, Kathryn K. and Jerome R. Kirby, Mary Cushing Coleman, Allison Gulbrandsen, Elizabeth and Michael Vitton, Cornwall Lodge LLC, Howard G. Cushing III, 226 Ocean Avenue, Moonwatch LLC, Waves S LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Page Pieroni, Karen Blanchard, Randy Panagakis, Charlotte DuHamel, Steven Gewirz and Katrina Hamilton Gerwirz, Veter et Nova Trust.

[4] Order Granting Mot. for Leave to Amend, ECF No. 81 (July 11, 2025).

[5] BOEMGO_204756. The Government produced three separate administrative records. We cite to each administrative record using the acronyms given them by the agencies: BOEMGO_, NMFS_, and USACE_AR_.

[6] BOEMGO_204756.

[7] BOEMGO_3188–BOEMGO_3190.

offshore wind program with plans for more than 30 projects along the Outer Continental Shelf.[8] Most will be concentrated off the coasts of New York, Rhode Island, Massachusetts, and Maine, displacing traditional fishing and navigation and disrupting the established marine environment supporting endangered whales, migratory birds, and vital fish stocks.

On August 21, 2023, BOEM signed its ROD approving construction and operation of the sprawling Revolution Wind Project.[9] BOEM fast-tracked approval of four adjacent offshore wind projects[10] that together span about 430,557 acres of ocean—an area ten times the size of Washington, DC—and represent the largest coordinated transformation of federal waters in U.S. history. While over two dozen additional projects are pending at BOEM,[11] recent Administration developments call the future of offshore wind into question.

On August 22, 2025, BOEM's Director issued a stop work order for the Project, halting all construction activities until BOEM completes "its necessary review," citing concerns including protection of national security interests and preventing interference with reasonable uses of U.S. waters under the Outer Continental Shelf Lands Act (OCSLA).[12]

**Procedural Background**

Green Oceans filed this APA challenge on January 16, 2024,[13] and amended its

---

[8] BOEMGO_204756.

[9] BOEMGO_74739–BOEMGO_74937.

[10] Vineyard Wind (March 2021), South Fork Wind (January 2022), Empire Wind (November 2023), and Sunrise Wind (March 2024).

[11] BOEM, *BOEM Interactive Lease Statistics Dashboard*, https://www.boem.gov/regions/gulf-america-ocs-region/leasing-and-plans/boem-interactive-lease-statistics-dashboard (last visited Aug. 21, 2025).

[12] Department of the Interior, *Director's Order* (Aug. 22, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf?VersionId=VO3AWAHsV_kDvT048xf8dG7A.Rsj6HZJ.

[13] Compl., ECF No. 1 (Jan. 16, 2024).

2

Complaint on May 13, 2024.[14] Following the Court's ruling on Defendant-Intervenor's,
Revolution Wind, LLC (the Company), Motion to Dismiss, Green Oceans filed the operative
Second Amended Complaint on July 15, 2025.[15] The Government filed its Answer to the First
Amended Complaint on July 19, 2024,[16] and moved to dispense with filing an Answer to the
Second Amended Complaint,[17] which the Court granted on August 1, 2025.[18]

The Company moved to dismiss Green Oceans' First Amended Complaint,[19] which the
Court granted in part on March 31, 2025.[20] The Company filed its Answer to the Second
Amended Complaint on July 29, 2025.[21]

On July 11, 2025, the Court ordered the parties to file cross-motions for summary
judgment and set a briefing schedule.[22]

**Standard of Review**

Summary judgment is the proper mechanism for determining, "as a matter of law,
whether an agency action is supported by the administrative record and consistent with the APA
standard of review."[23] "[T]he court's role is to 'determine whether or not as a matter of law the
evidence in the administrative record permitted the agency to make the decision it did.'"[24]

Under the APA, agency decisions under the Outer Continental Shelf Lands Act (OCSLA),
Endangered Species Act (ESA), Marine Mammal Protection Act (MMPA), Clean Water Act

---

[14] Amend. Compl., ECF No. 33 (May 13, 2024).
[15] Sec. Amend. Compl., ECF No. 82 (July 15, 2025).
[16] Gov's Answer, ECF No. 54 (July 19, 2024).
[17] Gov's Mot. for Relief from Obligation of Filing Answer, ECF No. 83 (July 28, 2025).
[18] Order Granting Mot. for Relief, ECF No. 85 (Aug. 1, 2025).
[19] Def.-Inv. Mot. to Dismiss, ECF No. 53 (July 19, 2024).
[20] *See* Order, ECF No. 69 (Mar. 31, 2025); *see also* Opinion, ECF No. 70 (Apr. 1, 2025).
[21] Def.-Inv's Answer to Sec. Amend. Compl., ECF No. 84 (July 29, 2025).
[22] *See* Order Granting Mot. for Leave and Setting Schedule, ECF No. 81 (July 11, 2025).
[23] *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008); *see* Fed. R. Civ. P. 56(c).
[24] *Nat. Res. Def. Council, Inc. v. U.S. Fish & Wildlife Serv.*, 719 F. Supp. 3d 1, 10 (D.D.C. 2023)
(quoting *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769–70 (9th Cir. 1985)).

(CWA), National Historic Preservation Act (NHPA), and National Environmental Policy Act (NEPA) must be "set aside" if the Court finds the actions "to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"[25] And because "the interpretation of the meaning of statutes"[26] is "exclusively a judicial function,"[27] courts must overturn agency action where the "agency has misconceived the law."[28]

This arbitrary and capricious standard is designed to ensure the agency's decision "'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"[29] Agency action must be overturned when the agency, as here,

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[30]

## Argument

### 1.    At Least One Plaintiff Has Standing Under Each Cause of Action, Satisfying the One Plaintiff Rule and Allowing the Court to Determine the Merits of Each Claim

Standing asks whether a plaintiff has "'alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'"[31] Where there are multiple plaintiffs in an action, the one-plaintiff rule holds that one plaintiff with standing satisfies Article III for that claim, eliminating the need to examine every plaintiff's standing.[32]

---

[25] 5 U.S.C. § 706.

[26] *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 544 (1940).

[27] *Id.*

[28] *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597–598 (D.C. Cir. 2023).

[29] *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

[30] *Id.*

[31] *Horne v. Flores*, 557 U.S. 433, 445 (2009) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 491–494 (2009)).

[32] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977).

"[N]umerous decisions by the D.C. Circuit and Supreme Court have treated a showing that a single plaintiff has standing as sufficient" for jurisdictional purposes and the court therefore "need not evaluate standing on a plaintiff-by-plaintiff basis."[33] In *Horne v. Flores*,[34] the Supreme Court stated that, to have jurisdiction, the court need only find that one plaintiff has standing for each claim.[35]

This Court previously found at the motion to dismiss stage that at least one Plaintiff has standing under ESA, MMPA, CWA, NHPA, and NEPA.[36] Plaintiffs amended their Complaint to add an OCSLA claim,[37] and neither the Government nor the Company moved to dismiss that claim for lack of standing. Here, Green Oceans supports Plaintiffs' standing with supporting declarations, as discussed in each substantive section.[38]

## 2. BOEM Has Now Repudiated Its Rationale Under OCSLA for Approving the Revolution Wind Project

There is no dispute that BOEM issued its ROD and COP based on an interpretation of OCSLA that the agency has since repudiated. On that basis alone, this Court should grant Green Oceans' motion for summary judgment on the OCSLA claim.

Section 1337(p)(4), governing offshore wind activities, requires that the Secretary of the Interior "ensure that any activity under this subsection is carried out in a manner that provides for," among others, "[s]afety," "protection of the environment;" "conservation of the natural resources of the outer Continental Shelf;" and "consideration of . . . any other use of the sea or

---

[33] *Bauer v. DeVos*, 325 F. Supp. 3d 74, 91 (D.D.C. 2018); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

[34] *Horne v. Flores*, 557 U.S. 433 (2009).

[35] *Id.* at 445 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 491–494 (2009)).

[36] *See* Order, ECF No. 69 (Mar. 31, 2025); *see also* Opinion, ECF No. 70 (Apr. 1, 2025).

[37] Order Granting Mot. for Leave to Amend and Setting Schedule for Summary Judgment, ECF No. 81 (July 11, 2025); Sec. Amend. Compl., ECF No. 82 (July 15, 2025).

[38] *See* Ex. 1, Summary Chart of Plaintiffs' Standing.

seabed, including use for a fishery . . . or navigation."[39] OCSLA also declares that "this subchapter shall be construed in such a manner that . . . the right to navigation and fishing therein shall not be affected."[40]

BOEM's ROD incorrectly asserts that the requirements of Section 1337(p)(4) of OCSLA are not mandatory, but constitute discretionary "goals"[41] to be balanced, and that OCSLA does not require the Secretary to ensure that the goals are "'achieved to a particular degree[.]'"[42]

But the Interior Department has recently repudiated the erroneous legal analysis of OCSLA on which BOEM relied in its ROD. On May 1, 2025, the Interior Department issued Solicitor's Opinion M-37086, formally withdrawing the Solicitor's Opinion BOEM cited and relied on as its authority for approving the Project.[43] The May 1, 2025 Solicitor's Opinion states that, because the legal analysis BOEM relied on "conflicts with the best reading of OCSLA," that interpretation "is hereby withdrawn . . . and any other Departmental action taken in reliance on the now withdrawn M-Opinion 37067, should be re-evaluated in light of this Memorandum."[44]

### A. BOEM's Decision Not to Ensure Safety, Protection of the Environment, or Consideration of the Use of the Seabed for Fishing and Navigation Invalidates Its Decision Approving Revolution Wind

In approving the Project, BOEM cited and relied on a 2021 Solicitor's Opinion interpreting OCSLA's "shall ensure" provision to require only a mere "rational balance" among

---

[39] 43 U.S.C. § 1337(p)(4).
[40] 43 U.S.C. § 1332.
[41] ROD at 5 (BOEMGO_2884)
[42] BOEMGO_2884 (quoting BOEMGO_207484); BOEMGO_3047 (quoting BOEMGO_207484).
[43] *See* Ex. 2, Solicitor's Opinion M-37086.
[44] *See id.* at 3.

the various "shall ensure" factors.[45] Applying this "balancing" test,[46] BOEM acknowledged serious adverse impacts to fishing and transit but treated them as acceptable tradeoffs.[47] This unlawful interpretation allowed BOEM to prioritize offshore wind over the commercial fishing uses Congress sought to protect in the Act.

On July 29, 2025, the Secretary of the Interior issued a Secretarial Order describing BOEM's prior offshore wind approvals as being "egregious misinterpretations" of the law and that the "prior Department's leadership chose to misapply section [1337(p)(4)] of OCSLA when making decisions to approve . . . offshore wind energy projects," and "[r]ather than recognizing that each section [1337(p)(4)] criterion constitutes an independent, affirmative obligation," the prior Department "operated under the erroneous assumption that it could meet some criteria while ignoring or minimizing others."[48]

### B. Contrary to the Requirements of OCSLA, This Project Is Causing Long-Term and Irreversible Harm to Commercial and Recreational Fishermen, Boaters Who Navigate in the Areas Near the Project for Recreational and Commercial Purposes, and the Health of the Ocean Environment and the Marine Seabed

This Project presents the very type of "unreasonable interference" Congress intended for OCSLA to prevent. The COP and the Final Environmental Impact Statement (EIS) identify "major adverse impacts," to commercial and recreational fishing, including permanent displacement of fisheries, navigational hazards, gear loss, and diminished safety.[49] The Project lease area overlaps with historic and economically critical cod, squid, scallop, and mixed-use fishing grounds.[50]

---

[45] *See* BOEMGO_207480–BOEMGO_207484.
[46] BOEMGO_2884–BOEMGO_2885 (quoting BOEMGO_207484).
[47] BOEMGO_2885; BOEMGO_2904.
[48] *See* Ex. 3, Secretary Order 3437 at 2–3.
[49] BOEMGO_338; BOEMGO_318; BOEMGO_750; BOEMGO_754–BOEMGO_755.
[50] BOEMGO_40670; BOEMGO_40657–BOEMGO_40660.

The Project is built atop one of the most commercially productive and ecologically valuable fishing grounds along the mid-Atlantic and New England coasts. The turbines and cables are built on Cox Ledge, a federally recognized Habitat Area of Particular Concern[51] with extensive, "complex benthic habitat that supports several commercially and recreationally important species."[52] Cox Ledge is among the most important spawning grounds for Atlantic cod, as well as lobster, sea scallop, monkfish, summer flounder, and numerous other federally managed species.[53] Cox Ledge's complex benthic habitats, from boulder-strewn seafloor to large-grained sand and soft-bottom areas, provides the structural diversity essential for spawning, juvenile development, and foraging for many fish species.[54] Fish that spawn and thrive in Cox Ledge disperse throughout New England and the Mid-Atlantic, replenishing stocks and sustaining commercial and recreational fisheries far beyond the immediate area.[55]

The Project will be built in waters that support a regional fishing industry that generates billions of dollars each year.[56] The nearby port of New Bedford is the nation's top-earning fishing port, accounting for roughly 40% of the commercial fishing revenue in the mid-Atlantic and New England.[57] From 2008 through 2019, an average of 289 federally permitted commercial vessels fished in the lease area, 96% of which were small businesses.[58] For many vessels, the lease area provides a critical share of annual revenue—in some cases more than 38% of total income—and sustains high-value fisheries that are foundational to the region's economy.[59]

---

[51] 89 Fed. Reg. 7633 (Feb. 5, 2024); *see generally* BOEMGO_215466–BOEMGO_215545.
[52] BOEMGO_586.
[53] BOEMGO_512–BOEMGO_513.
[54] *See* BOEMGO_160.
[55] BOEMGO_213–BOEMGO_214.
[56] *See* BOEMGO_264.
[57] BOEMGO_264.
[58] BOEMGO_273.
[59] BOEMGO_334.

The Project's destruction of Cox Ledge and vital fishing grounds will continue to cause extensive disruption to commercial, for-hire, and recreational fishing. BOEM's own analyses and National Marine Fisheries Service (NMFS) input recognize major adverse impacts to commercial and recreational fishing,[60] and long-term, even permanent alteration of benthic habitats from foundations, scour protection, and cables.[61] The turbines, construction vessels, and offshore substations create space conflicts, navigational hazards, and increased risks of collisions, allisions, gear loss, and damage to the life-cycle of multiple species.[62] Combined, the construction and operation of the Project will result in fewer catches and lower revenues in an area that supports intensive commercial and recreational use.[63]

NMFS warned BOEM that the Project would likely cause abandonment of fishing areas and increased conflict with turbines,[64] yet BOEM approved the Project anyway under its impermissible policy-based balancing test. And instead of preventing interference, as OCSLA requires, BOEM arranged for the developer to administer a fisheries compensation fund for lost revenue.[65] OCSLA does not authorize approval that tolerates ongoing interference with fisheries in exchange for post hoc payments.

Finally, BOEM approved the Project without a specific, enforceable decommissioning plan and allowed a 15-year deferral of financial assurance, leaving removal and site-clearance obligations unsecured for most of the Project's life.[66] Such deferral does not ensure long-term environmental protection or conservation of Outer Continental Shelf resources.

---

[60] *See* BOEMGO_2896; BOEMGO_15.
[61] BOEMGO_196; BOEMGO_1995.
[62] BOEMGO_345.
[63] BOEMGO_323.
[64] BOEMGO_338; BOEMGO_318; BOEMGO_750; BOEMGO_3066.
[65] BOEMGO_3027–BOEMGO_3028.
[66] *See* BOEMGO_103–104; BOEMGO_2647; BOEMGO_2648; BOEMGO_3070.

**1. BOEM Failed to Ensure Navigational Safety by Approving a Plan That Conflicts With the Coast Guard's Approved Turbine Grid**

The U.S. Coast Guard recommended that, to protect navigational safety and search-and-rescue corridors, turbines be sited one mile apart, on a 1×1-nautical-mile aligned grid.[67] Yet BOEM has allowed the Project to use "micrositing" deviations from the grid of 500 feet, to avoid seabed features—undermining grid coherence critical to collision avoidance and search-and-rescue protocols.[68] As BOEM admits, Coast Guard Search and Rescue will be compromised, even with a uniform grid, stating that "the presence and layout of large numbers of" wind turbines will lead "to less effective search patterns" and cause "otherwise avoidable loss of life due to maritime incidents."[69]

**2. BOEM Did Not Ensure Consideration of Other Uses of the Sea and Seabed When It Authorized Major Adverse Impacts to the National Oceanic and Atmospheric Administration's Fishery-Independent Surveys**

The ROD states that the Project "is anticipated to have major adverse impacts to NMFS Northeast Fisheries Science Center . . . scientific surveys[.]"[70] These surveys form the foundation for catch limits, fisheries management, and broader scientific understanding. Yet mitigation for this acknowledged major impact rests on a deferred plan that, nearly two years after the ROD, remains unresolved. BOEM's approval failed to ensure environmental protection or conservation of Outer Continental Shelf resources in light of permanent benthic alteration, known data gaps, and deferred decommissioning funds and planning.

The record confirms permanent alteration of benthic habitats and long-term effects that may outlast the Project itself.[71] Turbine foundations and scour protection will permanently alter

---

[67] BOEMGO_753.
[68] *See* BOEMGO_2887.
[69] BOEMGO_1398.
[70] BOEMGO_2903.
[71] BOEMGO_196; BOEMGO_198; BOEMGO_239; BOEMGO_2924–BOEMGO_2925.

approximately 3,419,460 square feet of seafloor and temporarily disturb another 32,909,580 square feet—amounting to roughly 4,009 acres of temporary disturbance and 139 acres of permanent loss.[72] BOEM also acknowledged critical data gaps on stock dynamics, seasonal use, and regional-scale effects, including hydrodynamic "wake" changes flagged by National Oceanic and Atmospheric Administration (NOAA) and its own reliance on a single, non-peer-reviewed study.[73]

BOEM further noted that wind wake effects from the Project could alter current magnitude, disrupt temperature stratification, and diminish wave height–conditions that could affect water oxygenation levels, primary productivity, species development, foraging behavior, and even local climate effects[74]—yet BOEM relied on a single in-house study and did not analyze site-specific implications or adopt measures to avoid or minimize those effects.[75]

Despite these gaps, BOEM approved the Project without enforceable measures either to ensure environmental protection or conservation of Outer Continental Shelf resources or prevent the disruption of NOAA's scientific surveys.

### C.    One or More of Green Oceans Plaintiffs Has Standing to Bring This Claim

Green Oceans Plaintiffs—including Chris Brown, Richard Hittinger, Lauren Knight, and members of Green Oceans and the Responsible Offshore Development Alliance (RODA)—rely on the waters affected by Revolution Wind for their commercial, recreational, and conservation interests.

Chris Brown, a commercial fisherman, explains that Revolution Wind's construction has

---

[72] BOEMGO_63–BOEMGO_64; BOEMGO_190; BOEMGO_195.
[73] BOEMGO_187–BOEMGO_188; BOEMGO_213–BOEMGO_214.
[74] BOEMGO_587; BOEMGO_157.
[75] *See* BOEMGO_2639.

caused a "devastating impact" on his operations, and the permanent alteration of Cox Ledge has

reduced his "ability and opportunity to catch Atlantic cod."[76] Richard Hittinger, a recreational

fisherman, describes fishing in the Project area since construction began as the "worst that [he]

ha[s] ever experienced," depriving him of his use and enjoyment of those waters.[77] Lauren

Knight, a recreational boater, has experienced "increased boat traffic [from] construction and

support vessels" in the lease area, making navigation challenging and adding miles to her trips,

just to avoid active construction.[78]

     Green Oceans has associational standing through its members, including Brown,

Hittinger, Knight, and William Vanderhoop—the owner of a local fishing and whale watching

charter business.[79] Vanderhoop reports that fishing in Cox Ledge has become "truly awful" since

construction began, and that after such a poor season he "know[s] [his] customers will not return

next year."[80] These injuries fall squarely within Green Oceans' core purpose of protecting the

coastal waters of Rhode Island and Massachusetts from industrialization and safeguarding Cox

Ledge as vital fish habitat.[81] The injuries to Vanderhoop are germane to Green Oceans' mission,

and the relief sought—vacatur of the approvals—does not require individual participation.[82]

     The Responsible Offshore Development Alliance (RODA), too, has associational

standing.[83] RODA member Kevin Debbis, a trawl and dredge commercial fisherman, has fished

---

[76] Ex. 7, Decl. of C. Brown ¶ 8.
[77] Ex. 19, Decl. of R. Hittinger ¶ 6.
[78] Ex. 22, Decl. of L. Knight ¶ 5.
[79] *See* Ex. 23, Decl. of E. Knight ¶ 8; Ex. 33; Decl. of W. Vanderhoop ¶ 1; Ex. 26, Decl. of G. Mataronas ¶ 1; Ex. 9, Decl. of R. Craft ¶ 1; Ex. 12, Decl. of M. Danforth ¶ 1; Ex. 30, Decl. of B. Riggs ¶ 1; Ex. 25, Decl. of M. Lombardi ¶ 1; Ex. 34; Decl. of J. Zarba ¶ 1; Ex. 28, Decl. of E. Philippi ¶ 1.
[80] Ex. 33, Decl. of W. Vanderhoop ¶ 3.
[81] Ex. 23, Decl. of E. Knight ¶ 2–3, 7-8.
[82] *See Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 141 (D.D.C. 2012).
[83] Ex. 20, Decl. of L. Johnson ¶ 10; Ex. 13, Decl. of K. Debbis ¶ 1–2.

in the lease area for over 30 years.[84] He attests that Revolution Wind's construction and the presence of turbine foundations has made his traditional fishing grounds "unprofitable" and "dangerous," driving him from the area.[85] RODA's Executive Director, Lane Johnston, identifies its member, Debbis,[86] as someone who can no longer fish in the Cox Ledge area. RODA's member, Debbis, has suffered injury in fact because the construction of the Project has "already forced" him "to abandon [his] traditional fishing routes" and interfered with his ability to safely navigate in the area, and has had a "devastating impact" on his commercial fishing operation.[87] Debbis's injuries are germane to RODA's mission of protecting the interests of the commercial fishing industry.[88]

These injuries fall within the interests protected by OCSLA,[89] satisfy injury-in-fact, and are fairly traceable to federal approvals authorizing the Project.[90] Redressability is met because vacating those approvals would require a new review to ensure both compliance with OCSLA and measures to avoid or mitigate harm.[91]

### 3.    The Green Oceans Plaintiffs Are Entitled to Summary Judgment on Their Endangered Species Act (ESA) and Marine Mammal Protection Act (MMPA) Claims

The ESA requires all federal agencies to "conserve endangered species and threatened species," and to "utilize their authorities in furtherance of the purposes" of the Act,[92] purposes

---

[84] Ex. 13, Decl. of K. Debbis ¶ 1–2.
[85] Ex. 13, Decl. of K. Debbis ¶ 7; *see also id.* ¶ 5.
[86] Ex. 20, Decl. of L. Johnson ¶ 10.
[87] Ex. 13, Decl. of K. Debbis ¶ 5–6.
[88] Ex. 20, Decl. of L. Johnston ¶ 5.
[89] *Fisheries Survival Fund v. Jewell*, No. 16-CV-2409 (TSC), 2018 WL 4705795, *5–6 (D.D.C. Sept. 30, 2018).
[90] *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021); *Gulf v. Burgum*, 775 F. Supp. 3d 455, 470 (D.D.C. 2025).
[91] *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021).
[92] 16 U.S.C. § 1531(b).

which the Supreme Court has described as to "to halt and reverse the trend toward species extinction, whatever the cost."[93] The MMPA similarly mandates conservation of marine mammal populations and, with limited exceptions, prohibits the "take" of marine mammals, including harassment or killing.[94]

The ESA and MMPA form a protective legal wall around the North Atlantic Right Whale, which is one of the most endangered marine mammals in the world. Fewer than 360 individuals remain alive,[95] including only about 70 females capable of reproduction.[96] Recently, as NMFS reports, the Right Whale has suffered an "overall abundance decline between 2011 and 2020 of 23.5%,"[97] and that between December 2022 and August 2023, the population had decreased to 338 individuals.[98] BOEM and NMFS have concluded that "the loss of *even one* individual a year . . . may reduce the likelihood of species recovery."[99]

In 2017, there were 17 observed Right Whale mortalities, and by July 3, 2023, there were 36 confirmed mortalities, 34 serious injuries, and 51 sublethal injuries or illnesses.[100] NMFS estimates that 42% of the population is in reduced health.[101] In addition, calving rates have slowed from one calf per female every three to four years to one calf per female every seven to ten years.[102]

---

[93] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978); *see also Growth Energy v. EPA*, 5 F.4th 1, 26 (D.C. Cir. 2021).
[94] 16 U.S.C. § 1371.
[95] NMFS_0000002731.
[96] NMFS_0000002731; BOEMGO_218417.
[97] NMFS_0000002733.
[98] BOEMGO_217957; *see also* NMFS_0000002333.
[99] NMFS_0000092945 (emphasis added).
[100] *See* NMFS_0000092945.
[101] *See* NMFS_0000092945.
[102] *See* NMFS_0000092945.

### A. NMFS Failed to Use the Best Available Science to Determine the Project's Impacts on North Atlantic Right Whales

The ESA and the MMPA require the Government agencies to use the best available science in analyzing the effects a Government action (here, approval of the Project) will have on the shrinking population of North Atlantic Right Whales.[103] The ESA required NMFS to use "the best scientific and commercial data available" in preparing its biological opinion on whether the Project would jeopardize the existence of the Right Whale,[104] meaning "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[105] The MMPA requires that the Secretary's decision on the issuance of any permit, authorization, or exception to the moratorium on the taking of marine mammals be made "on the basis of the best scientific evidence available."[106] An agency's failure to use the best available scientific information renders its decision invalid under the APA's arbitrary-and-capricious and clear-error-in-judgment standards.[107]

### 1. The Agencies Ignored Their Own North Atlantic Right Whale Strategy

In their haste to approve this Project, NMFS and BOEM ignored the trove of scientific information contained in their own jointly prepared "North Atlantic Right Whale and Offshore Wind Strategy," a document created for the express purpose of "protect[ing] and promot[ing] the recovery of [the Right Whale] while responsibly developing [Offshore Wind] energy."[108]

---

[103] 16 U.S.C. § 1536(a)(2); 16 U.S.C. § 1362(19)(B); 16 U.S.C. § 1390(c)(1); 16 U.S.C. § 1391(3)(A).
[104] 16 U.S.C. § 1536(a)(2).
[105] 50 C.F.R. § 402.02; *Defs. of Wildlife v. United States Dep't of the Interior*, 931 F.3d 339, 354 (4th Cir. 2019).
[106] 16 U.S.C. § 1371(a)(3)(A).
[107] *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001).
[108] NMFS_00000092938.

Included in this joint NMFS and BOEM report—and not considered by the agencies here—was available (but ignored) scientific information that "[a]s of September 2023, there [were] 30 renewable energy lease areas in the Atlantic Outer Continental Shelf (OCS) with an installed [offshore wind] capacity of 42 megawatts."[109] The report concluded that "[t]he activities associated with [offshore wind] development would introduce or further contribute to existing stressors in the environment that affect [North Atlantic Right Whales]."[110] These stressors include "exposure to noise and/or pressure (particularly from construction activities),"[111] resulting in "hearing impairment, masking of [North Atlantic Right Whale] vocal communication, physiological impacts (e.g., stress), and/or behavioral disturbance, as well as mortality and injury. . . ."[112] According to BOEM's and NMFS's own (ignored) analysis, the Right Whale faces a "high risk of extinction" and its population is small enough that "the loss of even one individual a year" reduces the likelihood of recovery.[113]

NMFS also ignored or minimized the importance of studies demonstrating that exposure to intermittent or continuous anthropogenic noise has the potential to induce a state of chronic stress in marine mammals.[114] Chronic stress can have adverse health consequences on marine mammals, including higher mortality and morbidity, reduced reproductive success, immuno-suppression, heart disease, depressed reproductive rates, physical malformations, and birth defects.[115] Chronic stress induced by exposure to anthropogenic sound can have a detrimental

---

[109] NMFS_0000092942.
[110] NMFS_0000092949; *see also* BOEMGO_218269.
[111] NMFS_0000092949; *see also* BOEMGO_218269.
[112] NMFS_0000092949; *see also* BOEMGO_218269.
[113] NMFS_0000092945.
[114] *See* J.W. Wright et al., *Concerns Related to Chronic Stress in Marine Mammals*, IWC SCI. COMM. DOC. IWC/SC/61/E16 (2009).
[115] *See* A.J. Wright et al., *Do marine mammals experience stress related to anthropogenic noise?*, 20 Int'l J. Comparative Psychology 274 (2007).

impact on marine mammal populations by affecting fertility, mortality and growth rates.[116] NMFS cites no scientific evidence to support its conclusion that the Project is not expected "to produce conditions of long-term and continuous exposure to noise leading to long-term physiological stress responses in marine mammals that could affect reproduction or survival."[117]

BOEM and NMFS also ignored the combined effects of the other 30 Atlantic Coast offshore wind facilities that the Government has either authorized or expects to authorize under its plan to produce 30,000 megawatts of wind energy by 2030, covering millions of acres of ocean.[118]

BOEM/NMFS's own studies state that the North Atlantic Right Whale has a "range [that] overlaps with the area proposed for [offshore wind] development. . . ."[119] Yet BOEM and NMFS interpreted the ESA as not requiring the agencies to consider the contributing negative effects of other known and planned offshore wind projects along the Right Whale's migratory path.[120] The agencies' decision to ignore evidence that the development of these planned, coordinated projects dooms the Right Whales to migrating along a "'path to destruction'" is in violation of the ESA and MMPA.[121]

NMFS also restricts its analysis of "cumulative effects" in the Biological Opinion to future non-federal actions, refusing to consider the foreseeable impacts of future federal

---

[116] *See id.*; *see also* NMFS_0000061688.
[117] NMFS_0000062924.
[118] Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7619 (Feb. 1, 2021); *see also* BOEMGO_218262.
[119] BOEMGO_218263.
[120] NMFS_000003063.
[121] *Appalachian Voices v. United States Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008)).

actions—such as other planned offshore wind projects—in its analysis.[122] This restriction

unlawfully fragments its analysis and failing to evaluate the interactive, additive, or synergistic

effects of regional offshore wind buildout on ESA-listed species. Although the Environmental

Baseline section includes a few other wind projects for which consultation is complete, this

approach omits the substantial, reasonably foreseeable future actions known at the time of

project approval.[123]

NMFS also acknowledges studies indicating that "as the scale of offshore wind

development in southern New England and the greater Mid-Atlantic Bight region increases and

the number of [turbines] and [offshore substations] increases, . . . the scope and scale of potential

hydrodynamic impacts may also increase,"[124] but states that these effects are *not analyzed*

because the Project is "small" relative to the regional build-out.[125]

NMFS also pays only cursory treatment to state, private, and non-federal activities,

describing them generally with no substantive treatment of how these actions may compound

federal project effects, especially combined with climate change or ongoing ocean warming,

which is also largely excluded from ESA cumulative impacts by a narrow regulatory

definition.[126] NMFS completed its cumulative effects analysis with its regulatory blinders snugly

in place, ignoring the risk of population-level jeopardy from compounding regional changes,

interactive stressors, or the full scope of foreseeable project development.[127]

### 2.  The Agencies Ignored the Known Risks of Catastrophic Blade Failure

There is significant evidence the agencies should have considered in determining whether

---

[122] NMFS_0000003062; NMFS_0000003063.
[123] NMFS_0000002798–NMFS_0000002799; *see* NMFS_0000002834.
[124] NMFS_0000003032.
[125] *See* NMFS_0000003032.
[126] *See* NMFS_0000003063.
[127] *See* NMFS_0000003064.

to approve the Project as proposed, such as the known and certain risk of catastrophic blade failure happening at many offshore wind sites. On July 13, 2024, a sunny day with minimal wind, a large portion of a 350-foot, 57-ton fiberglass, polyvinyl chloride, and polyethylene terephthalate blade broke off a newly constructed turbine in the Vineyard Wind Project, scattering thousands of shards across the ocean's surface. Within days, more pieces of the blade also fell into the ocean. The Coast Guard sealed off the area from ship transit, and the developer of that project tried to remove shards of the shattered blade from the ocean. Thousands of pounds of debris washed ashore not only in Nantucket fifteen miles away—closing its beaches—but were also carried many miles away to Martha's Vineyard, Cape Cod, the beaches of Rhode Island, and the shores of Long Island.[128] A year later, a significant and unknown percentage of the blade remains at the bottom of the sea, potentially contaminating the marine ecosystem. Later, a blade on one of the turbines at the Dogger Bank wind project off the coast of England failed—the second blade failure at that facility in three months.[129]

Globally, there are about 3,800 turbine blade failures each year.[130] The Project's COP approved by BOEM does not consider this risk and has no contingency plan for responding to blade failure emergencies.

---

[128] Matt Schooley, *Vineyard Wind Shut Down After Turbine Failure Sends "Sharp Fiberglass Shards" Onto Nantucket Beaches* (July 17, 2024), https://www.cbsnews.com/boston/news/nantucket-beaches-closed-vineyard-wind/.
[129] *Second GE Vernova Turbine Blade Reportedly Fails at UK's Dogger Bank Wind Farm*, Offshore (Aug. 23, 2024), https://www.offshore-mag.com/renewable-energy/article/55135538/second-ge-vernova-turbine-blade-reportedly-fails-at-uks-dogger-bank-wind-farm.
[130] Leon Mishnaevsky, Jr., *Root Causes and Mechanisms of Failure of Wind Turbine Blades: Overview*, National Library of Medicine (Apr. 19, 2022) at 1, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9101399/pdf/materials-15-02959.pdf.

### 3. The Agencies Failed to Utilize Their Authorities to Mitigate Threats to the Right Whale

The Administrative Record shows that, even after the application of the agencies' mitigation measures, the Project will have moderate and major adverse impacts on the North Atlantic Right Whale,[131] and that the agencies do not know whether the Project can effectively mitigate the harms to whales[132]—contrary to their statutory obligations to "utilize their authorities in furtherance of the purposes" of the ESA.[133]

What is known by the agencies, however, is that construction and operation of this Project within the Right Whale's migration path exposes this imperiled species to multiple stressors, including increased vessel traffic, vessel density, pile driving, construction and operational noise, and reduced prey availability—each of which can harm their health and reduce their ability to avoid danger and death.[134] Noise from pile driving, vessel traffic, and turbine operations overlaps with the whales' hearing range (7 Hz to 35 kHz)[135] and can cause behavioral changes such as reduced calling rates, frequency shifts, increased call amplitude, masking of communication, and temporary avoidance of critical habitat.[136] The Project's construction and operation noises impact every part of the whales' ability to communicate and navigate throughout the ocean.[137] BOEM's primary mitigation measure for pile driving and underwater construction noises—bubble curtains—offers no protection from the low-frequency sounds

---

[131] BOEMGO_2896.
[132] *See* NMFS_0000002854; NMFS_0000003028; NMFS_0000003025; *see also Sierra Club v. Nat'l Marine Fisheries Serv.*, No. CV DLB-20-3060, 2024 WL 3860211, at *28 (D. Md. Aug. 19, 2024).
[133] 16 U.S.C. § 1531(b).
[134] NMFS_0000092949.
[135] NMFS_0000002865.
[136] NMFS_0000002866–NMFS_0000002875.
[137] NMFS_0000092949.

(<200 Hz) most harmful to the North Atlantic Right Whale.[138] Operational noise, which will last

for decades, presents an even greater challenge and harm to the North Atlantic Right Whale

because it cannot be mitigated. As NMFS's Chief of Protected Species advised BOEM,

"oceanographic impacts from installed and operating turbines cannot be mitigated for the 30-year

lifespan of the project, unless they are decommissioned."[139]

Many mitigation measures, such as shutdown protocols, minimum zone monitoring, and

restricted pile-driving periods, depend on the future preparation and approval of plans— e.g., the

Company's plans for anchoring, micrositing, and sequencing construction to avoid cod spawning

or impacts to sensitive habitats.[140] These plans, however, require only agency review for

"concurrence," and no real oversight of the proposal.[141] Other critical mitigation that is proposed

is premised on yet-to-be-developed collaborative or regional research, deferring effective action

against "major adverse" impacts, such as interruption to key NMFS surveys and broader

cumulative effects, to unknown future undertakings.[142] Lacking in NMFS's mitigation plan is

any evidence that these proposed measures will effectively avoid jeopardy to listed species.[143]

Many of the agencies' prescribed "Reasonable and Prudent Measures" and "Terms and

Conditions" are focused on administrative requirements—requiring plans, periodic reporting,

and post hoc assessment—without imposing substantive, preemptive curtailments when actions

---

[138] BOEM, *Renewable Energy Program Update: Briefing for the Mid-Atlantic Fisheries Management Council* at 21 (Feb.11, 2021), https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/602d7bbd49ee2d06d9db12c4/1613593539206/05a_BOEM+Renewables+Program+Update+2021-02.pdf.

[139] BOEMGO_218417.

[140] *See* NMFS_0000003145–NMFS_0000003172.

[141] NMFS_0000003145; NMFS_0000003148; NMFS_0000003149; NMFS_0000003152.

[142] *See* NMFS_0000003145–NMFS_0000003172.

[143] *See* NMFS_0000003145–NMFS_0000003172; *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. CV DLB-20-3060, 2024 WL 3860211, at *28 (D. Md. Aug. 19, 2024).

causing mortality or serious take are expected.[144] The Biological Opinion's conservation recommendations, which would support stronger regional monitoring, construction changes, and improved detection technologies are characterized as "discretionary agency activities."[145] The lack of an analysis or imposition of more stringent mitigation, such as extended seasonal restrictions, more severe vessel speed limits, or compensatory offset for unavoidable take, further exemplifies the Government's failure to take all necessary steps to avoid jeopardy to listed species.

The ROD also repeatedly admits that cumulative impacts—particularly to Right Whales—are "major adverse" even after all considered mitigation is imposed,[146] with no record demonstration that the Project meets ESA requirements for avoiding jeopardy or adverse modification of critical habitat.

### 4. NMFS Ignored the Critical Negative Effects of the Project on the Right Whale's Nutritional State and Its Ability to Forage for Food

Because Right Whales feed exclusively on zooplankton,[147] their health—and, in turn, their ability to reproduce, survive, and recover as a species[148]—depends on the abundance, concentration, and distribution of zooplankton.[149] Right Whales forage extensively in the waters of the Wind Development Area precisely because those waters provide a reliable source of zooplankton.[150]

NMFS's Biological Opinion completely ignores the best available scientific data, which shows that (1) impulsive noise, even at levels less than the noise produced by pile driving and

---

[144] *See* NMFS_0000003145–NMFS_0000003172.
[145] NMFS_0000003170.
[146] BOEMGO_2896.
[147] *See* NMFS_0000002999.
[148] *See* NMFS_0000002999; NMFS_0000003061.
[149] *See* NMFS_0000003061; BOEMGO_2896.
[150] *See* NMFS_0000003018.

equivalent to that resulting from seismic surveys can cause zooplankton mortality two to three orders of magnitude (100 to 1000 times) than predicted (McCauley, 2017);[151] NMFS states, "[w]e are not aware of any evidence that pile driving noise, [High-Resolution Geophysical] surveys, or the other noise sources considered here are likely to result in the mortality of zooplankton[;]"[152] (2) offshore wind development alters ocean currents, wave heights, and thermal stratification–all hydrodynamic changes that could impact copepod growth, development and density;[153] and (3) boulder removal, scour protection, and the presence of high voltage cables will permanently alter Cox Ledge,[154] one of the primary foraging habitats for the Right Whale.

### B. Internal Contradictions in the Biological Opinion Render It Arbitrary and Capricious

NMFS's no-jeopardy determination is contradicted by specific findings of the Biological Opinion, such as "[t]he [Right Whale] faces a high risk of extinction and the population size is small enough for the death of any individual to have measurable effects in the projections on its population[;]"[155] pile driving and unexploded ordnance detonations will adversely impact 34 individual Right Whales;[156] the North Atlantic Right Whale is "more susceptible to vessel collisions[;]"[157] NMFS "expect[s] an increase in risk [to the Right Whale] proportional to the increase in vessel traffic;"[158] and NMFS found that construction of the Project alone will generate an additional 1,404 vessel trips,[159] not to mention the many thousands of additional

---

151 *See* NMFS_0000077539.
152 *See* NMFS_0000002958.
153 *See* NMFS_0000003029.
154 *See* NMFS_0000003011.
155 NMFS_0000003110.
156 NMFS_0000003114.
157 NMFS_0000002973.
158 NMFS_0000002977.
159 NMFS_0000002960.

vessel trips required for the construction, operation, and maintenance of the dozens of other planned offshore wind projects. The presence of structures also decreases the available open space Right Whales may need to avoid collisions.

NMFS's Biological Opinion acknowledges that detonating unexploded ordnances and pile driving will cause 34 Right Whales to experience temporary hearing loss, described as temporary threshold shift (TTS).[160] NMFS anticipates that the effects of TTS could persist for at least a week.[161] NMFS then minimizes the noise from unexploded ordnance detonation and pile driving as lasting only for the stimuli itself—stating that detonation would generate a one-second startle response, and that pile driving would affect behavior only during a few hours of exposure. [162] NMFS never reconciles these conflicting assessments, an omission that underscores the arbitrary and capricious nature of its analysis.

Although NMFS acknowledges that the Project may cause the displacement of North Atlantic Right Whales from the Project area and its surrounding vicinity,[163] it ignores the population-level impact of such a displacement on the species. Instead, NMFS baldly asserts that the affected individuals will use another habitat.[164] This assertion directly contradicts NMFS's statement that "[t]he project area both spatially and temporally overlaps" with migratory and feeding grounds for the North Atlantic Right Whale and "areas of biological significance" to the North Atlantic Right Whale.[165]

NMFS also ignored the established scientific fact that entanglement with fishing lines is

---

[160] NMFS_0000003108.
[161] NMFS_0000003109.
[162] NMFS_0000003110.
[163] *See* NMFS_0000061740.
[164] *See* NMFS_0000061740.
[165] NMFS_0000061674–NMFS_0000061675.

one of the principal reasons for whale deaths and injuries,[166] and that "[t]he presence of [offshore wind] structures could also concentrate recreational fishing around foundations, potentially increasing the risk of marine mammal entanglement in both lines and nets and increasing the risk of injury and mortality due to infection, starvation, or drowning (Moore and van der Hoop 2012)."[167]

The Project also overlaps with a Seasonal Management Area that was established to reduce the risk of vessel strikes on North Atlantic Right Whales.[168] Populations like the North Atlantic Right Whale that are resident or seasonally resident to a particular area are highly vulnerable to population-level effects as a result of the cumulative nature of the noise exposure and the additional harm that may be caused by habitat displacement.[169]

### C.    Revolution Wind Will Have More Than a Negligible Impact on Right Whales, Violating the MMPA

In 2018, Congress enacted a general moratorium on the take of marine mammals without a permit.[170] The only exception to this moratorium is the MMPA's provision that NMFS may authorize take of a small number of marine mammals for activities that will have no more than a "negligible impact" on marine mammal populations.[171] But, far from the "small number" of takes authorized under the MMPA,[172] here NMFS has authorized the take of up to 44 Right Whales in any one year and 56 overall, ignoring that an annual death rate over 0.7% would be

---

[166] NMFS_0000003110.
[167] BOEMGO_660.
[168] 73 Fed. Reg. 60,173 (Oct. 10, 2008).
[169] *See* K.A. Forney et al., *Nowhere to go: noise impact assessments for marine mammal populations with high site fidelity*, 32 ENDANGERED SPECIES RES. 391 (2017).
[170] 16 U.S.C. § 1371(a)(1); 16 U.S.C. § 1371(5)(a).
[171] *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 903 (9th Cir. 2012) (quoting 16 U.S.C. § 1371(a)(5)(A)(i)(I)).
[172] 16 U.S.C. § 1371(a)(5)(A)(i)(I).

catastrophic for the species.[173] So far NMFS has approved the take of 362 North Atlantic Right Whales in its final approvals to construct ten offshore wind projects along the North Atlantic Right Whale's migration path.[174]

NMFS failed to assess how construction noise, vessel traffic, prey loss, and hydrodynamic changes interact as stressors on a small North Atlantic Right Whale stock. Instead, BOEM segmented consultations and relied on monitoring conditions. The analysis ignores deteriorating body condition, longer calving intervals, and prey risk, and offers no mitigation that measurably reduces exposure. This failure to apply the best available science under the jeopardy standard is unlawful.

### D.    At Least One Green Oceans Plaintiff Has Standing to Pursue the ESA and MMPA Claims[175]

Green Oceans Plaintiffs, Alan Shinn and Elizabeth Quattrocki Knight (Plaintiff and President of Plaintiff, Green Oceans), rely on the same ocean areas where the Project is to be built for their commercial, recreational, and conservation interests in protected marine species.[176]

Alan Shinn owns and runs Miss Belmar Whale Watching and Fishing Trips, which "charter[s] hundreds of trips each year," and whose "business is directly tied to the health of the

---

[173] NMFS_0000002442.

[174] Takes per project: 29 for Empire Wind; 17 for Coastal Virginia Offshore Wind Project; 56 for Revolution Wind; 14 for Ocean Wind 1; 13 for South Fork; 126 for New England Wind; 45 for Sunrise Wind; 10 for US Wind; 25 for Atlantic Shores South; and 27 for Vineyard Wind. *See*, *e.g.*, 89 Fed. Reg. 11,342, 11,391 (Feb. 14, 2024); 89 Fed. Reg. 4,370, 4,424 (Jan. 23, 2024); NMFS_0000062906; 88 Fed. Reg. 62,898, 62,952 (Sept. 13, 2023); 87 Fed. Reg. 806, 848 (Jan. 6, 2022); 89 Fed. Reg. 52,222, 52,271 (June 21, 2024); 89 Fed. Reg. 45,292, 45,359 (May 22, 2024); 89 Fed. Reg. 84,674, 84,691 (Oct. 23, 2024); 89 Fed. Reg. 77,972, 78,024 (Sept. 24, 2024); 86 Fed. Reg. 33,810, 33836 (June 25, 2021); 89 Fed. Reg. 75,654, 75679 (Sept. 16, 2024).

[175] The Court held that Green Oceans did not have standing under the ESA/MMPA, but that its member, William Vanderhoop, did have standing under the ESA/MMPA. *See* Memorandum Opinion at 22, ECF No. 69 (Apr. 1, 2025).

[176] *See* Memorandum Opinion at 22, ECF No. 69 (Apr. 1, 2025).

ocean, marine mammals, and fish."[177] Shinn's tours depend on whales migrating through the waters where Revolution Wind is being constructed, and "if people cannot reliably see whales on tours, they will not book those tours and [his] business will suffer financially."[178] Elizabeth Quattrocki Knight is an avid boater in Rhode Island waters whose ability to view dolphins and North Atlantic Right Whales is impaired by the Project's increased risks to these species and their reduced presence.[179]

Plaintiffs' injuries fall within the interests protected by the ESA and MMPA,[180] constitute injury-in-fact, and are fairly traceable to federal approvals authorizing the Project.[181] Redressability is met because vacating those approvals would invalidate construction of the project.[182]

## 4.    The Green Oceans Plaintiffs Are Entitled to Summary Judgment on Their Clean Water Act (CWA) Claims

The U.S. Army Corps of Engineers issued a dredge-and-fill permit for this Project in violation of the Clean Water Act. Under its truncated analysis, the Corps failed to consider the substantial impacts that will result from the discharges of dredged and fill material associated with the installation of turbines, inter-array cables, and 19 miles of export cables throughout the affected "navigable waters." Having excluded from its analysis all discharges of pollution on the Outer Continental Shelf beyond the territorial sea, the Corps failed to regulate pollution

---

[177] Ex. 31, Decl. of A. Shinn ¶ 2, 4.
[178] Ex. 31, Decl. of A. Shinn ¶ 4–5.
[179] Ex. 23, Decl. of E. Knight ¶ 26.
[180] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1203 (9th Cir. 2004); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017); *Comm. for a Constructive Tomorrow v. United States Dep't of the Interior*, No. CV 24-774 (LLA), 2024 WL 2699895, at *3 (D.D.C. May 24, 2024).
[181] *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021); *Gulf v. Burgum*, 775 F. Supp. 3d 455, 470 (D.D.C. 2025).
[182] *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021).

discharges on Cox Ledge, a designated "special aquatic site" containing irreplaceable habitat for numerous fish and crustacean species. The Corps also failed to consider the cumulative impacts of the offshore wind program.

> **A.    The Corps Failed to Consider Many of the Pollutant Discharges Caused By This Offshore Wind Project, Including Discharges in or Near a Special Aquatic Site in the Erroneous Belief That It Is Not Located in Navigable Waters**

The CWA prohibits the discharge of dredge or fill material (e.g., sand, rock) into navigable waters without a Corps permit,[183] and defines "navigable waters" as "waters of the United States, including the territorial seas[.]"[184] The Corps erroneously interpreted this provision to require a permit only for discharges into the territorial seas—reading entirely out of the CWA the term "waters of the United States" that includes, but is not limited to, the territorial seas.[185]

The Supreme Court has often held that "'the waters of the United States' principally refers to traditional navigable water[.]"[186] It has not held that "waters of the United States" includes only territorial seas—nor that it excludes open ocean beyond the three-mile limit of the territorial seas. The installation of the turbines and the scour protection surrounding each foundation will permanently disrupt 3,419,460 sq. ft. of the seafloor and temporarily disrupt 32,909,580 sq. ft.,[187] none of which the Corps considered in issuing the Section 404 permit for the Project because these structures fall outside of the Corps' self-limiting three-mile limit interpretation.

The Corps' determination that discharges of dredged and fill material from the Project

---

[183] 33 U.S.C. § 1344.
[184] 33 U.S.C. § 1362(7).
[185] *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 232 (D.C. Cir. 2024).
[186] *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 672 (2023).
[187] USACE_AR_0068466.

beyond three miles offshore do not require a CWA permit, and BOEM's November 17, 2023 approval of the COP without such a permit, were arbitrary, capricious, and unlawful under the CWA.

**B.    The Project's Discharge of Dredge and Fill Materials Will Irreversibly Damage Cox Ledge, a Unique, Environmentally Sensitive Habitat and Cod Spawning Ground**

The Corps may issue a Section 404 dredge and fill permit only if it determines that "a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."[188] For Section 404 permits, the Corps' "guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources."[189]

The record identifies numerous unacceptable adverse impacts that will result from the dredging and fill authorized under this Project,[190] yet the Corps failed to require a permit for those discharges. The Final EIS notes, for example, that discharge of dredged material from "[a]nchoring and cable emplacement activities during construction would therefore likely result in direct impacts on larval, juvenile, and adult Atlantic cod"[191] associated with Cox Ledge, a special aquatic site within the lease area of the Project.[192]

**C.    The Corps Failed to Consider the Cumulative Effects of Other Offshore Wind Projects**

Before issuing any Section 404 permit, the Corps "shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem,"[193] and

---

[188] 40 C.F.R. § 230.1(c).
[189] 40 C.F.R. § 230.1(d).
[190] *See* BOEMGO_2924–BOEMGO_2925; BOEMGO_2927.
[191] BOEMGO_564.
[192] *See* BOEMGO_512; BOEMGO_572; BOEMGO_217766–BOEMGO_217817.
[193] 40 C.F.R. § 230.11(g).

"determine the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms."[194] The Corps did not complete the far-reaching cumulative impacts analysis of the proposed project required under its regulations.[195]

      The Corps' abbreviated analysis of the cumulative effects on the aquatic ecosystem never even mentions the impacts from the twelve other projects planned for the region,[196] nor does it mention or consider the added adverse effects of discharges associated with the installation of turbines, inter-array cables, and 19 miles of export cables for the Project. Here, the Corps considered only the "cumulative" effects on the aquatic ecosystem for the narrow portion of this Project's cable route that falls within three miles of the coast,[197] ignoring all the other cumulative effects of the discharges authorized under the Project for construction of the turbines, substations, and much of the undersea cable—i.e., everything outside the three-mile limit.[198]

### D.   At Least One Green Oceans Plaintiff Has Standing to Bring This Claim[199]

      Green Oceans Plaintiffs, Richard Hittinger, Ralph Craft, Lauren Knight, Murray Danforth, Benjamin Riggs, and Eric Philippi, are all individuals who "regularly use areas affected by the Project," whose use of those waters is impacted by the Government's approval of

---

[194] *Id.*

[195] *See* 40 C.F.R. § 230.11(d); *see also Georgia River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1341 (N.D. Ga. 2003).

[196] *See* BOEMGO_2929–BOEMGO_2930; *see also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1313 (S.D. Fla. 2005).

[197] *See* BOEMGO_2930; BOEMGO_1405; BOEMGO_1417; BOEMGO_804.

[198] 40 C.F.R. § 230.11(d).

[199] The Court found that Green Oceans did not have associational standing, but held that Green Oceans Members Michael Lombardi and William Vanderhoop had standing to bring CWA claims. *See* Memorandum Opinion at 29, ECF No. 70 (Apr. 1, 2025).

the Project.[200] These Plaintiffs use the waters for recreational fishing,[201] sailing,[202] and observing and studying the endangered Piping Plover.[203]

Richard Hittinger, who has fished in the Project area for more than fifty years, now experiences the worst fishing conditions he has ever encountered since construction began in 2024.[204] Ralph Craft can no longer safely navigate near Cox Ledge and faces worsening hazards as turbines are built.[205] Lauren Knight, Murray Danforth, and Benjamin Riggs, who regularly enjoy boating and sailing in the Project area, now must deal with diminished navigational safety: Knight has been forced to reroute her boating trips due to increased construction vessel traffic;[206] Danforth has abandoned his traditional sailing routes because of safety concerns;[207] and Riggs no longer sails in the area because of unsafe conditions.[208] Eric Philippi, a longtime bird advocate, suffers aesthetic and recreational injury because the Project's turbines threaten endangered Piping Plovers that he has studied and enjoys observing in its native habitat.[209]

These injuries also fall within the interests protected by the CWA,[210] satisfy injury-in-fact, and are fairly traceable to federal approvals authorizing the Project.[211] Redressability is met because vacating those approvals would require a new review to ensure compliance with CWA

---

[200] *See* Memorandum Opinion at 29, ECF No. 70 (Apr. 1, 2025).
[201] Ex. 19, Decl. of R. Hittinger ¶ 2, 6–7 ; Ex. 9, Decl. of R. Craft ¶ 5.
[202] *See* Ex. 22, Decl. of L. Knight ¶ 2 ; Ex. 30, Decl. of B. Riggs ¶ 2; Ex. 12, Decl. of M. Danforth ¶ 2.
[203] Ex. 28, Decl. of E. Philippi ¶ 8-11.
[204] Ex. 19, Decl. of R. Hittinger ¶ 2, 6.
[205] Ex. 9, Decl. of R. Craft ¶ 8.
[206] Ex. 22, Decl. of L. Knight ¶ 5.
[207] Ex. 12, Decl. of M. Danforth ¶ 2.
[208] Ex. 30, Decl. of B. Riggs ¶ 3, 5.
[209] Ex. 28, Decl. of E. Philippi ¶ 8–11.
[210] *Friends of Cap. Crescent Trail v. United States Army Corps of Eng'rs*, 453 F. Supp. 3d 804, 815 (D. Md. 2020).
[211] *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021); *Gulf v. Burgum*, 775 F. Supp. 3d 455, 470 (D.D.C. 2025).

and measures to avoid or mitigate harm.[212]

### 5.    Green Oceans Plaintiffs Are Entitled to Summary Judgment on Their National Historic Preservation Act Claims

Plaintiffs own many significant historic properties constructed as oceanfront mansions during the Gilded Age.[213] Under Section 106 of the NHPA, BOEM was required to evaluate the potential direct, indirect, and cumulative impacts on these and other historic properties affected by this Project.[214] If adverse effects are found, BOEM was required, in a consultation process, to develop and consider alternatives or changes that could avoid, minimize, or mitigate those adverse effects.[215]

BOEM's Section 106 determination disregarded feasible alternatives or mitigation measures and did not rationally explain the measures it adopted. BOEM's visual impacts assessment was also flawed—BOEM limited the scope of impacts it considered and presented the public with analyses that understated the turbines' visibility from shore.[216] These deficiencies violated Section 106's requirement to make a "reasonable and good faith effort" to identify historic properties, assess potential adverse effects, and to apprise the public of any impacts on historic properties before approval.[217] BOEM's approval of the Project also violated Section 110(f), which requires agencies to take steps "to the maximum extent possible" to minimize harms to National Historic Landmarks.[218] The APA independently requires federal agencies to

---

[212] *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021).

[213] Ex. 17, Decl. of D. Gordon ¶ 2; Ex. 18, Decl. of A. Gulbrandsen ¶ 2; Ex. 32, Decl. of E. Vitton ¶ 2.

[214] 36 C.F.R. § 800.4(b)(1); *see also United Keetoowah Band of Cherokee Indians in Oklahoma v. Fed. Commc'ns Comm'n*, 933 F.3d 728, 741–742 (D.C. Cir. 2019).

[215] 36 C.F.R. § 800.1; 36 C.F.R. § 800.2(c)(5).

[216] BOEMGO_53553; BOEMGO_53555; BOEMGO_53545.

[217] 36 C.F.R. § 800.2(d)(1); 36 C.F.R. § 800.11(e).

[218] 54 U.S.C. § 306107.

"examine the relevant data and articulate a satisfactory explanation" for its decision.[219]

### A. BOEM Withheld Accurate Visual Simulations From Consulting Parties and the Public

BOEM's public simulations released for public review in the Appendix U3 presented lower-fidelity renderings that reduce turbine visibility from shore,[220] whereas the confidential U2 appendix (not available to the public) contains higher-fidelity simulations of the same viewpoints under identical conditions in which dozens of turbines are significantly more visible from shore.[221] The difference between the public and confidential simulations understated the Project's true visual impacts, preventing meaningful evaluation and comment on adverse effects to National Historic Landmarks (Ocean Drive and Bellevue Avenue) as required by Sections 106 and 110(f).

By releasing inaccurate simulations of the visibility of the turbines from the shore, BOEM deprived the public and stakeholders of the ability to see and comment on the true extent of the harm, frustrating the core purpose of Section 106.[222]

### B. BOEM Failed to Conduct A Good Faith Consultation Under Section 106

BOEM's outreach to historic property owners was arbitrary and capricious. Many owners of nationally recognized or eligible properties were never contacted, while others were inconsistently notified for the Sunrise Wind project but ignored for Revolution Wind—a closer project with greater visual impacts.[223] BOEM itself identified 501 Indian Ave., owned by

---

[219] *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).
[220] BOEMGO_53553; BOEMGO_53555; BOEMGO_53545.
[221] BOEMGO_39038; BOEMGO_39040; BOEMGO_39030.
[222] 36 C.F.R. § 800.4(b)(1); *see also United Keetoowah Band of Cherokee Indians in Oklahoma v. Fed. Commc'ns Comm'n*, 933 F.3d 728, 744 (D.C. Cir. 2019).
[223] Ex. 8, Decl. of B. Chapman ¶ 19; Ex. 32, Decl. of E. Vitton ¶ 16; Ex. 17, Decl. of D. Gordon ¶ 10; Ex. 24, Decl. of S. Lewinstein ¶ 11.

Plaintiff Sandra Craig, as a significant historic property in the Draft EIS[224] and Memorandum of Agreement, [225] yet failed to consult with her.[226] Despite multiple Historic Landmarks in Newport, Rhode Island, BOEM held no public meetings there, and its online sessions were poorly advertised and inaccessible during COVID-19 lockdowns. These omissions and disparate treatment demonstrate both arbitrary decision-making and a failure to make the good-faith effort Section 106 requires.[227]

### C.   BOEM Failed to Consider Feasible Alternatives to Avoid or Minimize Harm and Its Limited Mitigation Measures Are Vague, Incomplete, and Ineffective

BOEM approved this Project without adopting any measure to reduce turbine visibility, and its centerpiece mitigation fund remains undefined in scope, process, and implementation— with no administrator appointed.[228] Section 106's implementing regulations require that when an agency determines an undertaking will have adverse effects on historic properties, it must consult "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties" before issuing its approval.[229] That consultation culminates in a memorandum of agreement that "evidences the agency official's compliance with Section 106 and [these regulations] shall govern the undertaking and all of its parts."[230]

BOEM's findings confirm that this Project will cause significant adverse effects to Plaintiffs' historic properties. For the Ocean Drive Historic District and the Bellevue Avenue

---

[224] BOEMGO_33992; BOEMGO_34428; BOEMGO_34449.
[225] BOEMGO_2016.
[226] Ex. 10, Decl. of S. Craig ¶ 18.
[227] 36 C.F.R. §§ 800.4(a)(1)-(a)(2); 36 C.F.R. § 800.16(d); 36 C.F.R. § 800.1(a).
[228] *See* BOEMGO_2168.
[229] 36 C.F.R. § 800.6(a).
[230] 36 C.F.R. § 800.6(c).

Historic District, BOEM found that the Project "would alter characteristics of the setting for" these districts "that qualify" them "for inclusion in the [National Register of Historic Places], in a manner that will diminish the integrity of the property."[231] BOEM also acknowledged that "[a]spects of the historic setting of [these] historic propert[ies] are attributable to [the] relationship[s] to, and views of, the sea[.]"[232]

BOEM recognized that the homes along Ocean Drive were "specifically constructed to take advantage of ocean views" and that those "open ocean views would be unobstructed" from the Project's turbines.[233] BOEM found that the "visual effects to [the Ocean Drive Historic District] would be adverse" and that "[t]he visibility of [turbines] and lighting has the greatest potential to affect the integrity of setting of this historic district."[234] BOEM further determined that 47 turbines would be visible in the background, with "another 515 [turbines] fading over the horizon . . . appear[ing] clustered across the sea and horizon . . . in the daytime and with nighttime lighting."[235]

For homes on Bellevue Avenue, BOEM found that "the views of the ocean were essential to the planning and construction of the contributing buildings"[236] and that "[o]pen ocean views would be unobstructed" from Revolution Wind's turbines, with 43 turbines visible and another 500 fading over the horizon.[237] BOEM concluded that for both districts, "visual effects … would be adverse" and that cumulative visual effects would also be adverse.[238]

---

[231] BOEMGO_53954; BOEMGO_53955.
[232] BOEMGO_53954; BOEMGO_53955.
[233] BOEMGO_53954.
[234] BOEMGO_53954.
[235] BOEMGO_53954.
[236] BOEMGO_53955.
[237] BOEMGO_53955.
[238] BOEMGO_53954; BOEMGO_53955.

Yet, BOEM took no steps to avoid or minimize harm. BOEM approved Revolution Wind in the exact location selected by the Company, without meaningfully evaluating alternative siting, design, or operational measures that would reduce the turbines' visibility from Green Oceans' historic properties. BOEM admitted that the destruction of open ocean views would eliminate the qualities that make the historic districts in which the Green Oceans' properties are located eligible for the National Register,[239] yet it approved the Project with no measure that would preserve those defining characteristics. BOEM's minimization measures such as painting turbines white or installing a lighting system that may be used in the future do nothing to address the impacts. And while BOEM portrays the lighting system as adequately mitigating visual impacts, it ignores the constant nighttime navigation lighting that will intrude upon and degrade historic seascapes from nearby historic properties and landmarks, and it offers no reasoned explanation for why this measure adequately mitigates the destruction of those views.

That BOEM created a "mitigation fund" does not eliminate its violation of the Act because, under the Department of Interior's own policy, offsite compensatory mitigation "is disfavored" because "it does not lessen the adverse effects" to historic properties.[240] The fund identified in the Memorandum of Agreement contains no defined criteria or a transparent process for how funds will be awarded or used,[241] and BOEM has yet to appoint a fund administrator.[242]

### D.   BOEM Violated Section 110(f) by Failing to Minimize Harm to National Historic Landmarks

Section 110(f) of the NHPA imposes a heightened, substantive duty for federal agencies

---

[239] BOEMGO_53954; BOEMGO_53955.
[240] Secretary of the Interior, *Secretary Order No 3389: Coordinating and Clarifying National Historic Preservation Act Section 106 Review* (Dec. 22, 2020), https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3389.pdf.
[241] *See* BOEMGO_2168.
[242] BOEMGO_2168.

when an undertaking may directly and adversely affect a National Historic Landmark, which include the Ocean Drive and the Bellevue Avenue Historic Districts where Plaintiffs own properties.[243] Section 110(f) requires BOEM to "consider all prudent and feasible alternatives to avoid an adverse effect" on the landmark,[244] and if avoidance is impossible, to adopt every possible measure to minimize harm.[245]

BOEM acknowledged that the Project will directly and adversely affect two National Historic Landmarks—the Ocean Drive and Bellevue Avenue Historic Districts—yet approved the Project without adopting any measures to reduce turbine visibility or preserve the open-ocean views that give these landmarks their historic value. BOEM could have selected alternatives E1 or E2 to minimize impacts to historic landmarks,[246] with E1 also benefiting commercial fishermen.[247] BOEM dismissed both alternatives without reasoned justification, contrary to its statutory duty and instead chose to rely on a "mitigation fund" that is undefined in scope, process, and implementation.[248] BOEM identifies no other meaningful mitigation measures to mitigate the destruction of this historic viewshed.[249]

### E.    At Least One Green Oceans Plaintiff Has Standing to Bring This NHPA Claim

Many of the Green Oceans Plaintiffs own historic properties in the Ocean Drive,[250]

---

[243] 54 U.S.C. § 306107.

[244] 63 Fed. Reg. 20,496, 20,503 (Apr. 24, 1998).

[245] *See Neighborhood Ass'n Of The Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 63–64 (1st Cir. 2006).

[246] *See* BOEMGO_32629–BOEMGO_32630.

[247] *See* BOEMGO_32591; BOEMGO_308.

[248] BOEMGO_53954; BOEMGO_53955.

[249] *See* BOEMGO_2168.

[250] Dee and Richard Gordon, Cornwall Lodge LLC (Duncan and Barbara Chapman), Howard G. Cushing III, 226 Ocean Avenue, Moonwatch LLC, Kathryn K. and Jerome R. Kirby, Mary Cushing Coleman, Allison Gulbrandsen, and Elizabeth and Michael Vitton (through B2B LLC).

Bellevue Avenue,[251] Indian Avenue,[252] and Stonybrook Estate Historic Districts,[253] as well as other eligible historic properties,[254] all of which have unimpeded ocean views central to their historic and cultural value.[255] BOEM approved the ROD and COP, allowing Project construction to proceed—75% of the turbines are built and full operation is expected by mid-2026.[256] Even in its current state, owners of historic properties face obstructed ocean views dominated by turbines, monopiles, and construction vessels by day, and constant blinking lights by night.

On Ocean Drive, Howard Cushing III's Ledges—built in 1860 with "over 180-degree views of the Atlantic Ocean"—now has "monopiles clearly visible" and "signal lights from all 65 turbines" at night.[257] Dee Gordon, owner of High Tide, describes her property's "unimpeded views of the ocean" as "utterly destroyed."[258] In the Bellevue Avenue Historic District, every turbine and monopile is visible from the Waves, a 1926 John Russell Pope design, and "loud noise from the Revolution Wind pile driving" carries "throughout the day."[259] Along Indian Avenue, Plaintiffs at the Stonybrook Estate say its "quintessential" open-ocean view is now marred by "massive, industrial wind turbine farms,"[260] while at 225 Indian Avenue, turbines have "destroyed that pristine view."[261] In Little Compton, Charlotte DuHamel's Windmill now

---

[251] Waves S, LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Paige Pieroni, Karen Blanchard, and Randy Panagakis.
[252] Steven Gewirz and Katrina Hamilton Gewirz.
[253] Veter et Nova Trust (Sandra Craig).
[254] Charlotte DuHamel.
[255] *See* Memorandum Opinion at 17-19, ECF No. 70 (Apr. 1, 2025).
[256] Orsted, *Revolution Wind Project Timeline*, https://revolution-wind.com/construction-updates (last visited Aug. 22, 2025).
[257] Ex. 11, Decl. of H. Cushing III ¶ 2, 5, 10, 12.
[258] Ex. 17, Decl. of D. Gordon ¶ 7–9.
[259] Ex. 24, Decl. of S. Lewinstein ¶ 12; Ex. 6, Decl. of K. Blanchard ¶ 10; Ex. 15, Decl. of L. Foley ¶ 10; Ex. 29, Decl. of M. Pieroni ¶ 10; Ex. 27, Decl. of R. Panagakis ¶ 10.
[260] Ex. 10, Decl. of S. Craig ¶ 2, 5, 8, 14.
[261] Ex. 16, Decl. of K. Gewirz ¶ 1, 7.

endures "pile driving and construction activities" by day and bright, blinking lights at night.[262]

These injuries fall within the interests protected by the NHPA,[263] satisfy injury-in-fact, and are fairly traceable to federal approvals authorizing the Project.[264] Redressability is met because vacating those approvals would require new review to ensure compliance with the NHPA and measures to avoid or mitigate harm.[265]

**6.    The Government Violated NEPA and the APA By Approving Revolution Wind**

NEPA requires the "federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions" like the Project.[266] To comply, agencies must take a "hard look" at environmental consequences,[267] "short- and long-term effects[,]" "beneficial and adverse effects[,]" "[e]ffects on public health and safety[,]" and "[e]ffects that would violate" federal laws that protect the environment.[268]

**A.    BOEM Failed to Rigorously Explore Reasonable Alternatives**

NEPA requires agencies to "rigorously explore and objectively evaluate all reasonable alternatives" to a proposed action[269] and requires that the agency "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[270] This alternatives

---

[262] Ex. 14, Decl. of C. DuHamel ¶ 5, 7, 10, 11.

[263] *See City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1185–87 (D.C. Cir. 2007)*.*

[264] *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021); *Gulf v. Burgum*, 775 F. Supp. 3d 455, 470 (D.D.C. 2025).

[265] *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021).

[266] *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015).

[267] 42 U.S.C. § 4332(C)(ii).

[268] 40 C.F.R. § 1501.3; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); *see also Sierra Club v. FERC*, 867 F.3d 1357, 1374–75 (D.C. Cir. 2017).

[269] *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 69 (D.C. Cir. 2011); *see also City of Alexandria, Va. v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999).

[270] 42 U.S.C. § 4332(2)(E).

analysis is "the heart" of the EIS.[271] Here, BOEM confined its review of alternatives to offshore

wind projects in the same lease area without evaluating siting, design, or scaling alternatives that

would have avoided or minimized impacts to essential fish habitat and navigation.[272]

The Administrative Record shows that NMFS specifically warned BOEM that the

Project's placement over Cox Ledge would cause "regional-scale adverse impacts" to cod and

"population-level impacts to Atlantic cod in Southern New England."[273] Despite these red flags,

BOEM rejected consideration of alternatives that would have relocated or reduced the Project's

footprint to avoid Cox Ledge, one of the most environmentally sensitive cod habitats on the East

Coast. BOEM admitted as such in the Final EIS by conceding that it excluded any alternatives

allowing for development outside of the lease area because such development is "not allowed

under the terms of the lease; would not be responsive to Revolution Wind's goals to construct

and operate a commercial-scale offshore wind energy facility in the Lease Area; and would not

meet BOEM's purpose and need to respond to Revolution Wind's proposal,"[274] which was also

rooted in approving the Company's "plans to construct and operate a commercial-scale offshore

wind energy facility within the Lease Area."[275]

By eliminating alternatives based on policy objectives and the constraints of a lease

already issued, BOEM foreclosed a meaningful examination of other siting options. NEPA's

regulations explicitly forbid agencies from limiting the choice of alternatives before completing

the EIS process.[276] Yet, BOEM did precisely that: predetermined the outcome by treating the

---

[271] 40 C.F.R. § 1502; *see* 40 C.F.R. § 1506.1(a).
[272] *See* BOEMGO_2901–BOEMGO_2902; BOEMGO_2913.
[273] *See* BOEMGO_2770.
[274] BOEMGO_132.
[275] BOEMGO_8.
[276] *See* 40 C.F.R. § 1506.1(a); 40 C.F.R. § 1502.2(f).

developer's chosen site as the only viable option.

### B.    BOEM Failed to Adequately Assess Cumulative Impacts

NEPA regulations require agencies to evaluate "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."[277] Courts have emphasized that an agency cannot satisfy NEPA with generic acknowledgments; it must provide quantified or detailed information demonstrating how impacts will combine and what those cumulative effects mean for the environment.[278]

BOEM's cumulative impacts analysis of the Project was, at best, truncated.[279] Although BOEM acknowledged that dozens of projects are planned, the Final EIS reduced cumulative impacts to broad generalizations[280] rather than providing the required "useful analysis of the cumulative impacts of past, present, and future projects."[281]

BOEM asserts in the Final EIS that displaced fishermen "could find suitable alternative fishing locations and continue to earn revenue,"[282] even while conceding that costs may rise and yields may fall.[283] BOEM never evaluates how multiple offshore wind projects, located adjacent or nearly adjacent to each other, will eliminate or restrict alternative fishing locations, or how the cumulative loss of all feasible fishing grounds threatens the viability of commercial fishing operations. In its navigation impacts analysis, BOEM claims impacts will be "short term

---

[277] 40 C.F.R. § 1508.7; *see WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 64 (D.D.C. 2019).
[278] *See Columbia Riverkeeper v. United States Army Corps of Eng'rs*, 706 F. Supp. 3d 1127, 1137 (W.D. Wash. 2020).
[279] BOEMGO_955; *see* BOEMGO_767; BOEMGO_140.
[280] BOEMGO_53; BOEMGO_2076; BOEMGO_772; BOEMGO_778.
[281] *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (external quotation marks and citations excluded).
[282] BOEMGO_318.
[283] *See* BOEMGO_329.

negligible to moderate adverse"[284] and asserts that mariners can "avoid[] wind farms altogether."[285] BOEM never analyzes or considers how thousands of turbines across adjacent or nearby lease blocks will constrain or eliminate feasible navigation to commercially viable fishing grounds or for recreational boating. BOEM also simply assumes that "migratory animals would likely be able to proceed from structures unimpeded,"[286] or shift to other habitats, but never explains how the construction of thousands of turbines in adjacent areas will leave any migration corridors or habitats intact. While acknowledging that the Project will cause displacement impacts,[287] BOEM dismisses any cumulative effects by suggesting, with no supporting evidence, that those affected will adapt,[288] ignoring any comments to the contrary.[289]

Despite recognizing "uncertainty"[290] and that "up to 3,110 new structures" could be constructed across the Atlantic Outer Continental Shelf under the cumulative scenario, with "potential synergistic effects" on whale movement, foraging, and interactions with vessels, BOEM concluded it had "no basis to conclude" that these impacts would be significant, in violation of NEPA.[291]

### C. BOEM Approved Revolution Wind Without Taking the Required Hard Look at the Project's Environmental Impacts

In its Final EIS, BOEM repeatedly concedes that essential data was missing or incomplete, but approved the Project while leaving fundamental environmental and safety questions unanswered.

---

[284] BOEMGO_17.
[285] BOEMGO_2821.
[286] BOEMGO_1089.
[287] BOEMGO_318; BOEMGO_329.
[288] BOEMGO_1089; BOEMGO_340; BOEMGO_301.
[289] BOEMGO_2702.
[290] BOEMGO_963.
[291] BOEMGO_963.

BOEM downplayed impacts on commercial fisheries and Essential Fish Habitat. Although the entire lease area for this Project is Essential Fish Habitat, BOEM acknowledged that its analysis rested on "an incomplete understanding of fish stock dynamics and effects of environmental factors on fish populations."[292] BOEM did not account for the "spatial and temporal occurrence of finfish and essential fish habitat" in the lease area or analyze the effects of operational noise on cod during spawning.[293] As NMFS advised BOEM just weeks before the Final EIS issued, BOEM had not "fully consider[ed] or evaluate[d] the direct, indirect, individual, and synergistic adverse effects to [Essential Fish Habitat] or the sensitive and vulnerable resources in the project area that are likely to occur from" the Project.[294]

BOEM brushed aside navigation and safety impacts. BOEM assumed turbine spacing would facilitate maritime safety,[295] but never analyzed radar interference, emergency response, or accident scenarios. BOEM did not even mention the 2019 sinking of a fishing vessel at the nearby Block Island wind farm, where search-and-rescue was halted due to the hazard of the nearby wind turbines. Nor did BOEM seriously assess turbine or blade failure, dismissing such risks as "highly unlikely" without any probability modeling or contingency planning.

BOEM failed to take the required "hard look" at impacts to marine mammals. BOEM repeatedly acknowledged "uncertainty . . . regarding the temporal distribution of marine mammals and periods during which they might be especially vulnerable to Project disturbance,"[296] yet approved construction anyway. BOEM admitted that "no scientific studies have been conducted to examine the effects of altered EMF on marine mammals," even though

---

[292] BOEMGO_958.
[293] BOEMGO_961.
[294] BOEMGO_217766.
[295] BOEMGO_964.
[296] BOEMGO_961.

"marine mammals are sensitive to and can detect small changes in magnetic fields."[297] BOEM also conceded "uncertainty regarding the cumulative acoustic impacts associated with pile-driving activities," including whether whales "would cease feeding and when individuals would resume normal feeding, migrating, breeding. . . ." or whether "secondary indirect impacts would persist."[298] For the Right Whale, whose "specialized feeding strategies . . . appear to be sensitive to disruption," the Final EIS explicitly recognizes that "short-term behavioral disturbance could contribute to energy deficits that ultimately lead to reduced fitness."[299]

### D.   One or More Green Oceans Plaintiffs Have Standing to Bring This Claim[300]

Plaintiffs, Brown, Hittinger, and Philippi commercially and recreationally fish in the Cox Ledge region and the waters where the Project is being built and observe birds near the Project area.[301] The Project has destroyed critical fish habitat, diminished catches for commercial and recreational fishermen, created navigational hazards, and harmed protected wildlife.

Chris Brown, a commercial fisherman, has seen a "devastating impact" on his fishing operations since Revolution Wind's construction over Cox Ledge began, and the permanent alteration has reduced his "ability and opportunity to catch Atlantic cod."[302] Richard Hittinger, a recreational fisherman, describes fishing in the Project area since construction began as the "worst that [he] ha[s] ever experienced," depriving him of his longstanding use and enjoyment of those waters.[303] Eric Philippi, a lifelong conservationist and bird watcher, has worked with the

---

[297] BOEMGO_962.
[298] BOEMGO_962.
[299] BOEMGO_962.
[300] The Court found that Green Oceans did not have associational standing to bring a NEPA claim, but held that Green Oceans member William Vanderhoop had standing to bring a NEPA claim. *See* Memorandum Opinion at 14, ECF No. 70 (Apr. 1, 2025).
[301] *See* Memorandum Opinion at 13, ECF No. 70 (Apr. 1, 2025).
[302] Ex. 7, Decl. of C. Brown ¶ 8.
[303] Ex. 19, Decl. of R. Hittinger ¶ 6.

Nature Conservancy for more than 40 years to protect Piping Plovers on his family's property and "look[s] forward to the arrival of these amazing creatures each early Spring," but the Project threatens their nesting and migration patterns, which he currently enjoys observing.[304]

These injuries fall within the interests protected by NEPA,[305] satisfy injury-in-fact, and are fairly traceable to federal approvals authorizing the Project.[306] Redressability is met because vacating those approvals would require a new review to ensure compliance with NEPA and measures to avoid or mitigate harm.[307]

**Conclusion**

Green Oceans asks this Court to hold that the Government's approvals of the Revolution Wind Project were arbitrary, capricious, and contrary to law, and to reverse, remand, and vacate those approvals.

Respectfully submitted,

s/ Roger J. Marzulla
Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
Mollie A. Jackowski, Bar No. 1780535
Marzulla Law, LLC
1150 Connecticut Ave., NW
 Suite 1050
Washington, DC 20036
Tel: (202) 822-6760
roger@marzulla.com
nancie@marzulla.com
mollie@marzulla.com

September 2, 2025                    Attorneys for Green Oceans

---

[304] Ex. 28, Decl. of E. Philippi ¶ 7.
[305] *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015); *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 129–30 (D.D.C. 2016).
[306] *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021); *Gulf v. Burgum*, 775 F. Supp. 3d 455, 470 (D.D.C. 2025).
[307] *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021).