**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GREEN OCEANS, *et al.*,<br><br>      *Plaintiffs,*<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>      *Defendants,*<br><br>   and<br><br>REVOLUTION WIND, LLC,<br><br>      *Defendant-Intervenor* | Case No.: 1:24-cv-00141-RCL<br><br>Hon. Royce C. Lamberth |

## DEFENDANT-INTERVENOR REVOLUTION WIND, LLC'S CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7(h) and 7(n), Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind") respectfully requests that the Court grant Revolution Wind's motion for summary judgment and deny Plaintiffs' motion for summary judgment on the claims at issue in these motions, because: (1) Plaintiffs claims are not justiciable as many of their claims are moot given the current status of project construction and Plaintiffs have not met their burden of establishing standing; (2) Plaintiffs have not satisfied the Outer Continental Shelf Lands Act's ("OCSLA") citizen suit requirements and the administrative record demonstrates that the Bureau of Ocean Energy Management ("BOEM") complied with OCSLA; (3) the administrative record shows that the National Marine Fisheries Services ("NMFS") complied with the Marine Mammal Protection Act ("MMPA") and Endangered Species

Act ("ESA"); (4) Plaintiffs' claim under the Clean Water Act ("CWA") is waived because it was not raised during the U.S. Army Corps of Engineers' ("USACE") administrative process and the claim also fails on the merits; (5) the administrative record demonstrates that BOEM complied with the requirements of the National Historic Preservation Act ("NHPA"); and (6) the administrative record shows that BOEM complied with the National Environmental Policy Act ("NEPA") when reviewing and approving the Construction and Operations Plan for the Revolution Wind Project.  In support of this motion, Revolution Wind provides the accompanying statement of points and authorities and proposed order.

Dated:  February 13, 2026                    Respectfully submitted,

                                              By */s/ Janice M. Schneider*

                                                   Janice M. Schneider (D.C. Bar No. 472037)
                                                   Stacey L. VanBelleghem (D.C. Bar No. 988144)
                                                   Devin M. O'Connor (D.C. Bar No. 1015632)
                                                   LATHAM & WATKINS LLP
                                                   555 11th Street NW, Suite 1000
                                                   Washington, D.C. 20004
                                                   Tel:  (202) 637-2200
                                                   Fax:  (202) 637-2201
                                                   Email: janice.schneider@lw.com
                                                           stacey.vanbelleghem@lw.com
                                                           devin.o'connor@lw.com

                                                   *Counsel for Defendant-Intervenor*
                                                   *Revolution Wind, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GREEN OCEANS, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No.: 1:24-cv-00141-RCL |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | Hon. Royce C. Lamberth |
| *Defendants,* | |
| and | |
| REVOLUTION WIND, LLC, | |
| *Defendant-Intervenor.* | |

**DEFENDANT-INTERVENOR REVOLUTION WIND, LLC'S
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND AND STATEMENT OF FACTS ............................................2

       A.    The Project ..............................................................................................2
       B.    Multi-Year Federal Review Process .......................................................3

             1.    Wind Energy Area, COP, and NEPA Review .............................3
             2.    BOEM's COP Approval and Memorandum Documenting
                   Compliance with OCSLA Section 1337(p)(4)............................4
             3.    Compliance With a Broad Array of Other Federal Laws ............5

       C.    Procedural History ..................................................................................6

III.   LEGAL STANDARD ...........................................................................................6

IV.    ARGUMENT ........................................................................................................7

       A.    Plaintiffs' Fail to Carry Their Burden to Show Justiciability ................7

             1.    Many of Plaintiffs' Claims Are Now Moot ................................8
             2.    Plaintiffs Have Not Shown Redressability for Any Claim .........9

       B.    Plaintiffs' Repleaded OCSLA Claim Fails ...........................................11

             1.    Plaintiffs Again Failed to Provide Adequate Notice Under OCSLA ........11
             2.    The Record Demonstrates That the Project Provides for All
                   Twelve Section 1337(p)(4) Factors .........................................13
             3.    Plaintiffs' Statutory Interpretation Argument Improperly Relies on
                   Post-Decisional Materials and Fails on the Merits ...................18

       C.    The Record Demonstrates That NMFS Complied With the ESA and
             MMPA .....................................................................................................20

             1.    NMFS Relied on the Best Available Science ...........................21
             2.    NMFS Considered Relevant Cumulative Effects Under the ESA............23
             3.    BOEM and NMFS Mitigated Potential Impacts to the NARW................24
             4.    NMFS' BiOp's Analysis Is Entirely Consistent .......................26
             5.    NMFS Reasonable Determined the Project Would Have a
                   Negligible Impact on NARW ...................................................29

       D.    The Record Demonstrates That USACE Complied with the CWA .....................30

             1.    Plaintiffs' CWA Claim Has Been Waived................................30

        2.    USACE Properly Considered Potential Impacts and Permitted the
              Project's Dredge-and-Fill Activities Under Statutory Authorities ............32
        3.    CWA Section 404 Does Not Require a Permit For Cox Ledge................33
        4.    USACE Conducted a Proper Cumulative Effects Analysis......................34

    E.    BOEM Complied with the National Historic Preservation Act............................35

        1.    BOEM Complied with the Requirements of NHPA Section 106..............35
        2.    BOEM Complied with the Requirements of NHPA Section 110(f)..........39

    F.    The Record Demonstrates BOEM's NEPA Compliance.......................................41

        1.    BOEM Adequately Considered Project Alternatives ...............................41
        2.    BOEM Adequately Considered Cumulative Impacts ...............................43
        3.    BOEM Took a "Hard Look" at the Project's Impacts ..............................44

V.    CONCLUSION................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ........................................................................................................8

*Am. Wildlands v. Kempthorne*,
    530 F.3d 991 (D.C. Cir. 2008) .................................................................................7, 14

*Appalachian Voices v. FERC*,
    No. 17-1271, 2019 WL 847199 (D.C. Cir. Feb. 19, 2019) ..........................................36

*Appalachian Voices v. U.S. Army Corps of Eng'rs*,
    134 F.4th 410 (6th Cir. 2025) .....................................................................................34

*Basel Action Network v. Mar. Admin.*,
    370 F. Supp. 2d 57 (D.D.C. 2005) ...............................................................................12

*Black v. LaHood*,
    882 F. Supp. 2d 98 (D.D.C. 2012) ...............................................................................10

*Camp v. Pitts*,
    411 U.S. 138 (1973) ...............................................................................................18, 39

*\*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................................................7, 18

*Ctr. for Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) .......................................................................................29

*Davis v. Latschar*,
    202 F.3d 359 (D.C. Cir. 2000) .....................................................................................38

*Defs. of Wildlife v. Jewell*,
    70 F. Supp. 3d 183 (D.D.C. 2014), *aff'd sub nom. Defs. of Wildlife & Ctr. for
    Biological Diversity v. Jewell*, 815 F.3d 1 (D.C. Cir. 2016) .......................................23

*Defs. of Wildlife v. Norton*,
    No. 99-927, 2003 WL 24122459 (D.D.C. Jan. 7, 2003) ..............................................23

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) .....................................................................................................31

*Duke Energy Field Servs. Assets, LLC v. Fed. Energy Regul. Comm'n*,
    150 F. Supp. 2d 150 (D.D.C. 2001) .............................................................................11

*El Puente v. U.S. Army Corps of Eng'rs,*
100 F.4th 236 (D.C. Cir. 2024)...................................................................31

*Env't Def. Fund, Inc. v. Costle, 657 F.2d 275 (D.C. Cir. 1981)*...................................22

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs,*
62 F. Supp. 3d 1 (D.D.C. 2014)...................................................................9

*Fisheries Survival Fund v. Haaland,*
858 F. App'x 371 (D.C. Cir. 2021)...............................................................12

*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,*
401 F. Supp. 2d 1298 (S.D. Fla. 2005) ........................................................35

*Friends of Animals v. Salazar,*
670 F. Supp. 2d 7 (D.D.C. 2009) ...............................................................12

*Fund for Animals v. Hall,*
448 F. Supp. 2d 127 (D.D.C. 2006).............................................................23

*Georgia River Network v. U.S. Army Corps of Eng'rs,*
334 F. Supp. 2d 1329 (N.D. Ga. 2003) ........................................................35

*Hallstrom v. Tillamook Cnty.,*
493 U.S. 20 (1989)...................................................................................11

*Healthy Gulf v. U.S. Army Corps of Eng'rs,*
81 F.4th 510 (5th Cir. 2023) ....................................................................31

*Huls Am. Inc. v. Browner,*
83 F.3d 445 (D.C. Cir. 1996)....................................................................20

*Izaak Walton League of Am. v. Marsh,*
655 F.2d 346 (D.C. Cir. 1981)..............................................................43, 44

*Knox v. Serv. Emps. Int'l Union, Local 1000,*
567 U.S. 298 (2012)..................................................................................8

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)................................................................................19

*Lujan v. Def. of Wildlife,*
504 U.S. 555 (1992)..................................................................................9

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989)...........................................................................7, 14

*Melone v. Coit,*
100 F.4th 21 (1st Cir. 2024)................................................................29, 30

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) ................................................................36

\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................7

*Nat'l Ass'n of Home Builders of U.S. v. Babbitt*,
    990 F. Supp. 1 (D.D.C. 1997)................................................................9

*Nat'l Tr. for Historic Pres. v. Blanck*,
    938 F. Supp. 908 (D.D.C. 1996)............................................................38

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996)..............................................................7

*Nat'l Wildlife Fed'n v. Norton*,
    332 F. Supp. 2d 170 (D.D.C. 2004) ......................................................35

*Neighborhood Ass'n of the Back Bay v. Fed. Transit Admin.*,
    463 F.3d 50 (1st Cir. 2006)..........................................................38, 40

*Nevada v. DOE*,
    457 F.3d 78 (D.C. Cir. 2006)................................................................31

*O'Reilly v. All State Fin. Co.*,
    No. 22-30608, 2023 WL 6635070 (5th Cir. Oct. 12, 2023) ....................34

*Oceana, Inc. v. Ross*,
    454 F. Supp. 3d 62 (D.D.C. 2020)........................................................22

\*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
    45 F.4th 291 (D.C. Cir. 2022)........................................................7, 14

*Okinawa Dugong (Dugong Dugon) v. Mattis*,
    330 F. Supp. 3d 1167 (N.D. Cal. 2018) ................................................36

*Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*,
    43 F. Supp. 3d 28 (D.D.C. 2014) ........................................................35

*Presidio Hist. Ass'n v. Presidio Tr.*,
    811 F.3d 1154 (9th Cir. 2016) ............................................................40

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    568 F. Supp. 3d 10 (D.D.C. 2021)..........................................................9

*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*,
    651 F.3d 202 (1st Cir. 2011)................................................................38

*Save Long Beach Island v. U.S. Dep't of Com.*,
 794 F. Supp. 3d 273 (D.N.J. 2025) ...................................................................29, 30

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
 123 F.4th 1 (1st Cir. 2024) ...............................................................15, 19, 22, 32

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
 No. 1:22-CV-11091-IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023), *aff'd*,
 123 F.4th 1 (1st Cir. 2024) ...............................................................................35

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
 605 U.S. 168 (2025) ..............................................................................41, 42, 43, 44

*Sierra Club v. U.S. Army Corps of Eng'rs*,
 277 F. App'x 170 (3d Cir. 2008) ...........................................................................9

*Simon v. E. Kentucky Welfare Rts. Org.*,
 426 U.S. 26 (1976) ...............................................................................................9

*Stand Up for California! v. U.S. Dep't of Interior*,
 410 F. Supp. 3d 39 (D.D.C. 2019), *aff'd*, 994 F.3d 616 (D.C. Cir. 2021) ...............7

*TIG Ins. Co. v. Republic of Argentina*,
 110 F.4th 221 (D.C. Cir. 2024) ...........................................................................33

## STATUTES

5 U.S.C. § 706(2) ....................................................................................................7

16 U.S.C.
 § 1371(a)(5)(A) ...............................................................................................29
 § 1536(a)(2) .....................................................................................................26
 § 1536(b)(4) ...............................................................................................24, 25

33 U.S.C.
 § 403 ............................................................................................................32, 33
 § 1344(a) ..........................................................................................................32
 § 1362(7) ..........................................................................................................32
 § 1362(8) ..........................................................................................................32

42 U.S.C.
 § 4332(C)(i) ......................................................................................................43
 § 4332(C)(iii) ...................................................................................................42

43 U.S.C.

§ 1332(3) ........................................................................................................................13

§ 1333(a), (e) ..................................................................................................................33

§ 1337(p) ........................................................................................................................13

§ 1337(p)(1)(C) ..............................................................................................................13

§ 1337(p)(4) ............................................................................4, 13, 14, 16, 18, 19

§ 1337(p)(4)(I) ..........................................................................................................19, 20

§ 1349(a)(2) ....................................................................................................................11

§ 1349(a)(2)(A) ..............................................................................................................12

54 U.S.C.

§ 306107 .........................................................................................................................40

§ 306108 .........................................................................................................................36

# REGULATIONS

33 C.F.R.

§ 320.2(b) .......................................................................................................................32

§ 322.3(a) ........................................................................................................................32

§ 322.3(b) ..................................................................................................................32, 33

§ 328.4(a) ........................................................................................................................32

§ 329.12 ...........................................................................................................................32

§ 329.12(a) ......................................................................................................................33

36 C.F.R.

§ 800.2 .............................................................................................................................36

§ 800.2(b) .......................................................................................................................36

§ 800.2(c) ........................................................................................................................36

§ 800.2(d) .......................................................................................................................36

§ 800.3 .............................................................................................................................36

§ 800.6 .............................................................................................................................36

§ 800.6(c) ..................................................................................................................38, 39

§ 800.10 ...........................................................................................................................40

§ 800.10(b) .....................................................................................................................41

§ 800.10(c) ......................................................................................................................41

40 C.F.R.

§ 230.11(g) ......................................................................................................................34

§ 1502.14 (2023) ............................................................................................................42

§ 1508.1(g)(3) (2023) ....................................................................................................43

50 C.F.R.

§ 402.02 ....................................................................................................................23, 24

§ 402.14(i) .......................................................................................................................24

§ 402.14(g) ......................................................................................................................23

§ 402.14(j) .......................................................................................................................26

## I.    INTRODUCTION

Plaintiffs challenge federal approvals for the Revolution Wind Farm and Revolution Wind Export Cable Project ("Project"), an offshore wind energy project that has been under construction for more than two years and is more than 87% complete.  The Project will generate enough reliable energy to power over 350,000 homes in Rhode Island and Connecticut.  In their Motion for Summary Judgment, Dkt. 87 ("Motion"), Plaintiffs seek an order vacating and setting aside the approvals issued by Federal Defendants[1] for the Project, alleging violations of the Administrative Procedure Act ("APA"), Outer Continental Shelf Lands Act ("OCSLA"), National Environmental Policy Act ("NEPA"), Endangered Species Act ("ESA"), Marine Mammal Protection Act ("MMPA"), Clean Water Act ("CWA"), and National Historic Preservation Act ("NHPA").

*First*, Plaintiffs' claims are not justiciable:  many of their claims are now moot given the current status of Project construction and Plaintiffs fail to meet their burden of establishing standing.  *Second*, Plaintiffs' OCSLA claim fails because they have not satisfied OCSLA's citizen-suit requirements and also fails on the merits as the extensive administrative record demonstrates that Defendant BOEM complied with OCSLA.  *Third*, the administrative record demonstrates Defendant NMFS complied with the ESA and MMPA.  *Fourth*, Defendant USACE complied with the CWA in issuing the Project's Section 404 permit.  Plaintiffs' CWA claim is waived because it was not raised during the agency's public administrative process and fails on the merits in any event as Plaintiffs misconstrue the geographic scope of USACE's CWA Section 404 permitting authority.  *Fifth*, BOEM complied with NHPA Sections 106 and 110(f), concluding in a Memorandum of Agreement ("MOA") signed by BOEM and relevant historic preservation

---

[1] "Federal Defendants" are the U.S. Department of the Interior, Secretary of the Interior, Bureau of Ocean Energy Management ("BOEM"), Director of BOEM, National Marine Fisheries Service ("NMFS"), Administrator of NMFS, U.S. Army Corps of Engineers ("USACE"), and Commanding General of USACE.

officials. *Sixth*, BOEM complied with NEPA by considering feasible project alternatives, analyzing cumulative impacts, and taking the required "hard look" at potential environmental impacts.

Defendant-Intervenor Revolution Wind, LLC ("Revolution Wind") respectfully asks the Court to deny Plaintiffs' motion for summary judgment and grant Revolution Wind's cross-motion for summary judgment.

## II.    BACKGROUND AND STATEMENT OF FACTS

### A.    <u>The Project</u>

The Project involves the construction and operation of an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility with 65 wind turbines, two offshore substations, associated inter-array cabling between the wind turbines, and an export cable that will bring approximately 304 MW of offshore wind capacity to Connecticut and approximately 400 MW to Rhode Island. BOEMGO 2887-88, 2901.[2] In reliance on the Project's approvals, construction of the Project has been underway for more than two years, and construction is more than 87% complete. Third Declaration of Paul Murphy, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL, Dkt. 48-2 ("Third Murphy Decl.") ¶¶ 5-6 (D.D.C. filed Jan. 2, 2026). Installation is now complete on all of the Project's monopile foundations, approximately 90% of the wind turbines, the two offshore substations, the two export cables, the interlink export cable connecting the offshore substations, and all of the Project's inter-array cables. *Id*.

The Project's turbines are located in federal waters in the Atlantic Ocean on the Outer Continental Shelf ("OCS") within BOEM Renewable Energy Lease No. OCS-A 0486 (held by Revolution Wind), approximately 15 miles east of Block Island, Rhode Island, and approximately

---

[2] Federal Defendants produced administrative records in this case by BOEM, NMFS, and USACE. Administrative record citations herein are prefaced by each agency's administrative record name.

15.7 miles from Newport, Rhode Island.  BOEMGO 43.  Revolution Wind will deliver electricity to the New England regional electric transmission system.  BOEMGO 2887-88.  The Project will soon generate enough reliable energy to power hundreds of thousands of homes under power purchase agreements ("PPAs") executed with utilities in Rhode Island and Connecticut.  *See, e.g.*, BOEMGO 106091.

**B.    Multi-Year Federal Review Process**

**1.    Wind Energy Area, COP, and NEPA Review**

BOEM's review of the lease area and the Project dates back to nearly 16 years ago when the agency conducted a review and environmental assessment of potential wind energy areas offshore Massachusetts and Rhode Island.  BOEMGO 2881.  After issuing a draft environmental assessment and soliciting public comments, BOEM issued a final environmental assessment in May 2013, concluding that leasing and site assessment activities in the proposed lease sale area would result in no significant environmental effects.  *See* BOEMGO 171018.  Revolution Wind and its affiliates obtained the BOEM lease in 2013 and subsequently worked to develop the Project for nearly ten years.  BOEMGO 2882-83, 3048-49.  After extensive environmental surveys and site assessment, Revolution Wind submitted a detailed Construction and Operations Plan ("COP") to BOEM in March 2020, which Revolution Wind updated during the review process.[3]

In April 2021, BOEM issued a Notice of Intent to prepare an Environmental Impact Statement ("EIS") under NEPA.  BOEMGO 17360.  That began a more than two-year period of federal environmental and safety review of the Project (to say nothing of state proceedings) involving twelve federal agencies (the Bureau of Safety and Environmental Enforcement ("BSEE"), Department of War (then called the Department of Defense), Department of the Navy,

_____

[3] *See, e.g.*, BOEMGO 76793-77586, 134425-5296.

Environmental Protection Agency, USACE, U.S. Fish and Wildlife Service ("USFWS"), National Oceanic and Atmospheric Administration, North American Aerospace Defense Command, United States Air Force, U.S. Coast Guard, Federal Aviation Administration, and National Park Service), three state cooperating agencies, and consultation with an extensive array of other stakeholders, including American Indian tribes, local community members, historic preservation organizations, and members of the fishing industry. BOEMGO 827-30, 835-43, 2609, 2695-710, 2973-74, 3060. BOEM held five public meetings and solicited written comments on its August 2022 draft EIS. BOEMGO 32321-4706; BOEMGO 2911. BOEM published the final EIS ("FEIS") on July 21, 2023. BOEMGO 1-2876.

### 2. BOEM's COP Approval and Memorandum Documenting Compliance with OCSLA Section 1337(p)(4)

On August 21, 2023, BOEM issued a Record of Decision documenting the Department of the Interior's decision to approve the Project's COP, with some modifications. BOEMGO 2877-3075. On November 17, 2023, BOEM issued the Project's COP approval letter. BOEMGO 3076-202. The COP's Conditions of Approval mandate extensive measures to, among other things, address safety, protected species and their habitats, and commercial fisheries and for-hire and recreational fishing. *See* BOEMGO 3077-3202. And, the Project's Record of Decision documents BOEM's determination that the COP complies with OCSLA and BOEM's regulations implementing it, and that approval of the COP with modifications and the Conditions of Approval "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the OCS are carried out in a manner that provides for the factors in subsection 8(p)(4) [43 U.S.C. § 1337(p)(4)] of OCSLA." BOEMGO 3071. In Record of Decision Appendix B, BOEM detailed its compliance review for the Project's COP under each of the Section 1337(p)(4)

factors, including with respect to safety, environmental protection, and prevention of interference with reasonable use of the OCS.  BOEMGO 3055-69.

### 3.    Compliance With a Broad Array of Other Federal Laws

The Project also underwent extensive review and obtained permits pursuant to numerous other federal laws.  Notably, BOEM consulted with NMFS and USFWS under the ESA and, as part of these consultation processes, both agencies issued Biological Opinions ("BiOp") for the Project.  BOEMGO 2883, 55478-543; NMFS 2670-3383.  NMFS also reviewed the Project under the MMPA and promulgated a five-year Incidental Take Regulation ("ITR") and issued an associated Letter of Authorization ("LOA") authorizing Revolution Wind's incidental non-lethal "take" of small numbers of marine mammals during the construction of the Project.  BOEMGO 2905-07; NMFS 62840-951, 63484-526.  BOEM completed Section 106 consultation under the NHPA, which concluded with the execution of a MOA agreed to by BOEM, the federal Advisory Council on Historic Preservation ("Advisory Council"), and the State Historic Preservation Officers ("SHPOs") of four states: Connecticut, Massachusetts, New York, and Rhode Island.  BOEMGO 2903, 74581-74657.  Measures that resolve adverse effects to historic properties include more than $11 million in mitigation funding and the 35% reduction in the number of wind turbine generators required by BOEM.  BOEMGO 74487-506, 74566-74.  BOEM completed Essential Fish Habitat consultation with NMFS under the Magnuson-Stevens Fishery Conservation and Management Act.  BOEMGO 2939.  Revolution Wind obtained permits from USACE under CWA Section 404 and Rivers and Harbors Act of 1899 ("RHA") Section 10.  USACE 66985-67183.  As part of its review, BOEM also coordinated with the Department of Defense Military Aviation and Installation Assurance Siting Clearinghouse ("DOD Clearinghouse") to develop measures necessary to safeguard against the Project's potential impacts on DOD activities and national security, including potential radar interference, which

resulted in a requirement that Revolution Wind enter into a mitigation agreement with the DOD Clearinghouse.  BOEMGO 3061.

      C.    **Procedural History**

On January 5, 2024, Plaintiffs sent a "Sixty-Day Notice of Intent to Sue" letter to certain of the Federal Defendants, alleging violations of OCSLA, ESA, and CWA regarding the Project ("January 5 Notice").  Dkt. 33-1.  Only 11 days later, on January 16, 2024, Plaintiffs filed a complaint jointly challenging approvals for the South Fork Wind Project and Revolution Wind Project.  Dkt. 1.  On February 16, 2024, Plaintiffs sent a purported "supplement" to their January 5 Notice, alleging additional violations of OCSLA and the ESA ("February 16 Notice").  Dkt. 33-2.  Federal Defendants moved to sever Plaintiffs' claims challenging South Fork Wind approvals from claims challenging Revolution Wind approvals, which motion this Court granted on April 10, 2024.  Dkt. 25.  On April 30, 2024, and June 24, 2024, respectively, this Court denied Plaintiffs' two motions for stay or preliminary injunction after both motions were opposed by Revolution Wind and Federal Defendants.  Dkts. 32, 49, 50.

On May 13, 2024, Plaintiffs filed their First Amended Complaint, Dkt. 33, and on July 19, 2024, Revolution Wind moved to dismiss, Dkt. 53.  On March 31, 2025, the Court partially granted Revolution Wind's Motion to Dismiss as to certain of Plaintiffs' claims, including the OCSLA, Migratory Bird Treaty Act, and Coastal Zone Management Act claims.  Dkts. 69, 70.  After Plaintiffs filed their Second Amended Complaint ("SAC"), Dkt. 82, and Revolution Wind answered, Dkt. 83, Plaintiffs moved for summary judgment on September 2, 2025, Dkt. 87.  Following the extensions granted by this Court, Dkts. 90, 92, Revolution Wind now timely files its cross-motion for summary judgment and opposition to Plaintiffs' Motion.

**III.    LEGAL STANDARD**

Motions for summary judgment in challenges to agency action are reviewed under the

APA, which limits judicial review to the administrative record.  *See Stand Up for California! v. U.S. Dep't of Interior*, 410 F. Supp. 3d 39, 46 (D.D.C. 2019), *aff'd*, 994 F.3d 616 (D.C. Cir. 2021); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Under the APA, a court may not set aside an agency action, finding, or conclusion unless it is arbitrary and capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2).  "The court is not empowered to substitute its judgment for that of the agency," *Citizens to Pres. Overton Park*, 401 U.S. at 416, and must consider "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  "Under these standards, [a court does] not supplant an agency's 'technical judgments and predictions' so long as the agency's decision is 'reasoned and rational.'"  *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022) (citation omitted).  Review is particularly deferential where, as here, "the agency is evaluating scientific data within its technical expertise."  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008).  A court's "scope of review under the 'arbitrary and capricious' standard is narrow" and courts "will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (citation omitted).  Federal Defendants' determinations in the approvals challenged here are entitled to deference under the APA.  *See id.*

## IV.    ARGUMENT

### A.    Plaintiffs' Fail to Carry Their Burden to Show Justiciability

"[T]o give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing [and] . . . mootness[.]"  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir.

1996) (citation omitted).  Plaintiffs' claims are not justiciable because many of those claims are now moot given the current status of Project construction and also because Plaintiffs have not demonstrated standing.

### 1.    Many of Plaintiffs' Claims Are Now Moot

Plaintiffs' MMPA, ESA, and CWA claims have become moot since they filed this case in January 2024.  "A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer 'live'[.]"  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks and citation omitted).  Any claims based on completed construction work are moot because it is impossible for the Court to grant "any effectual relief" to Plaintiffs.  *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (citation omitted).

For the MMPA and ESA claims, pile driving during monopile foundation installation and other underwater construction noise are the primary basis of Plaintiffs' claims of harm to species.  *See* Mot. at 20, 23-24.  While Plaintiffs claim injury from "'loud noise from the Revolution Wind pile driving' . . . 'throughout the day,'" Mot. at 38, all of the Project's pile driving is complete.  Third Murphy Decl. ¶ 5.  For the CWA claims, Plaintiffs focus on OCS construction and assert harm from seabed disturbing activities.  Mot. at 28.  But monopile foundation and offshore substation installation is complete and the export cables, interlink export cable, and inter-array cables have been laid.  *See supra* at Section II.A.  And, in any event, as described *infra* at Section D.2, this work is outside of USACE's CWA Section 404 permitting jurisdiction, meaning that no effectual relief would be available.  *E.g.*, Mot. at 28, 30; Third Murphy Decl. ¶ 5 (describing completed work).[4]

---

[4] The challenged approvals imposed conditions to minimize impacts, and Plaintiffs do not claim further study or mitigation will redress this harm, nor that further mitigation is possible.  *See, e.g.,*

Thus, the MMPA, ESA and CWA claims are moot because of the substantial extent they are tied to construction that is now complete.  Third Murphy Decl. ¶¶ 5-6; *see Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 3-5 (D.D.C. 2014) (finding CWA challenges moot where construction had been completed on a challenged project).  In any event, given the very advanced stage of Project completion, the Court should find that Plaintiffs' claims are prudentially moot.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 277 F. App'x 170, 172 (3d Cir. 2008) (holding NEPA, CWA and APA challenge prudentially moot where construction was substantially complete).

## 2.    Plaintiffs Have Not Shown Redressability for Any Claim

Plaintiffs fail to identify—let alone satisfy—their burden of establishing standing to support summary judgment.  *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Nat'l Ass'n of Home Builders of U.S. v. Babbitt*, 990 F. Supp. 1, 4 (D.D.C. 1997).  Plaintiffs' Motion has a single sentence on redressability for each set of claims.  *See* Mot. at 13, 27, 30-31, 39, 45.  And the one case Plaintiffs cite (five times) for redressability does not discuss standing.[5]  This showing is facially deficient.  Redressability exists only where the requested relief would remedy a plaintiff's alleged injury directly.  *See Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38 (1976).  Plaintiffs' Motion and declarations reveal that the requested relief—vacatur of approvals—would not redress their harms.

For the OCSLA and CWA claims, the fishing and boating Plaintiffs assert harm from offshore wind at large, not features of the Project's design.  *E.g.,* Mot. at 13 (claiming harm from

---

Dkt. 87-9 at ¶ 11.  The Motion's suggestion (at 21) of mitigation such as "restricted pile-driving periods … micrositing, and sequencing construction" is now impossible, because pile driving is done and the Project is largely completed.  Third Murphy Decl. ¶ 5.
[5] *See* Mot. at 13, 27, 32, 39, 45 (inexplicably citing *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 27 (D.D.C. 2021) (granting order entry of final judgment and injunction)).

"the presence of turbine foundations"). They claim injury from *any* turbines in the lease area. *E.g.*, *id.* at 7, 8. Indeed, Plaintiffs allege the impact claimed in each declaration had occurred by the time the first 10 turbines had been installed in 2024. *Id.* at 11-13, 31. These harms are not traceable to the Project's approvals but to BOEM's prior decision to make Lease No. OCS-A 0486 available for offshore wind, which is not challenged here. *See Black v. LaHood*, 882 F. Supp. 2d 98, 106 (D.D.C. 2012) ("The concrete injuries alleged by Plaintiffs, conversely, stem not from the decision to create a pedestrian and cycling trail along Klingle Road, but rather from the (separate and) earlier decision to close the road to motor vehicles.").

The NHPA Plaintiffs assert (at 38) harm from any "visible" wind turbine. While the Motion claims Plaintiffs can "*now*" see "'*every* turbine and monopole'" and "'signal lights from *all 65 turbines*'"(emphasis added), the declarations concede that "only around 10 of the 65 turbines ha[d] been installed" at the time the declarations were executed in November 2024. Dkt. 87-8 ¶ 8. Exaggerations further damage Plaintiffs' credibility: despite claims of viewshed "destruction," the few photos Plaintiffs offer either show wind turbines small on the horizon, *see*, *e.g.*, Dkt. 87-16 at 7; Dkt. 87-18 at 5, or are manipulated to enlarge the image by factors of up to 687% and include South Fork Wind turbines in the images.[6] These alleged harms (which do not rise to injury in fact[7]) will not be redressed by the relief sought even if the Project remains "visible". *E.g.,* BOEMGO 2562.

For the ESA and MMPA claims, Plaintiffs fail to show redressability (or causation, particularly given the scientific consensus that marine mammal mortalities are not caused by

---

[6] *See* Expert Rebuttal Declaration of Gordon Perkins, Ex. 1 hereto, ¶¶ 10-22.

[7] Plaintiffs have not established that their dissatisfaction with the view from their oceanfront property rises to injury in fact.

offshore wind[8]) because they admit right whale populations were already declining before the Project began, and there is no evidence this trend would halt, much less reverse, were the Project's approvals vacated. *See, e.g.*, Dkt. 87-25 ¶ 27 (describing a "spike in whale deaths … since 2016," long before Project construction began); Dkt. 87-33 ¶ 5. Moreover, the only alleged impacts to right whales other than from pile driving (which is now complete) are from vessel traffic and "operational noise," Mot. at 20-21, but the Motion does not assert further mitigation is possible; to the contrary, Plaintiffs state "operational noise … cannot be mitigated." *Id.* at 21. Vessel traffic (including from vessels unconnected to the Project) and operational noise are unavoidable. And, Plaintiffs ignore that the BiOp evaluated this issue and concluded that the "effects of operational noise are likely to be insignificant." NMFS 2915. Plaintiffs have, therefore, not shown redressability for any of these claims.

### B.    Plaintiffs' Repleaded OCSLA Claim Fails

When granting Revolution Wind's Motion to Dismiss Plaintiffs' OCSLA claim, this Court held that "Plaintiffs offered insufficient notice" under OCSLA's citizen-suit provision. Dkt. 70 at 25-27. The Court should grant summary judgment to Revolution Wind on Plaintiffs' repleaded OCSLA claim in the SAC for the same reason. Additionally, Plaintiffs' OCSLA claim lacks merit.

### 1.    Plaintiffs Again Failed to Provide Adequate Notice Under OCSLA

OCSLA requires that, before filing a citizen suit, a plaintiff must send a 60-day notice to the defendant agency describing its claims. *See* 43 U.S.C. § 1349(a)(2). Notice "is a mandatory, not optional, condition precedent for suit." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26 (1989) (interpreting similar notice provision in Resource Conservation and Recovery Act). The statute requires the notice to be sufficiently detailed and be "under oath." *See, e.g.*, Dkt. 70 at 25; *Duke*

---

[8] *See* Expert Decl. of Mary Jo Barkaszi in Supp. of Def.-Intervenor Revolution Wind's Opp. to Pls.' Mot. For Stay, Dkt. 29-2, ¶¶ 100-101.

*Energy Field Servs. Assets, LLC v. Fed. Energy Regul. Comm'n*, 150 F. Supp. 2d 150, 154-55 (D.D.C. 2001). Inadequate notice under OCSLA requires dismissal of the claims. *See, e.g., Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 373-74 (D.C. Cir. 2021); Dkt. 70 at 25.

Plaintiffs failed to meet OCSLA's citizen-suit requirements. Plaintiffs' January 5 Notice and February 16 Notice did not satisfy OCSLA's statutory requirement that notice be given "in writing under oath" at least 60 days before filing this lawsuit. *See* Dkt. 1 (complaint filed Jan. 16, 2024 alleging OCSLA claim)[9]; Dkt. 33-1 (Jan. 5, 2024 notice); Dkt. 33-2 (Feb. 16, 2024 notice). And a plaintiff's failure to provide the statutorily required notice 60 days *before* filing a suit cannot be cured by filing an amended complaint after the 60 days have passed. *See, e.g., Friends of Animals v. Salazar*, 670 F. Supp. 2d 7, 13-14 (D.D.C. 2009).

Though Plaintiffs characterize their SAC as containing a "revised" version of their OCSLA claim, Dkt. 74-1 at 1, 5, and 7, Plaintiffs have not meaningfully changed the OCSLA claim already rejected by this Court.[10] Plaintiffs expressly allege that "BOEM's Approval of the Revolution Wind Project *Violates OCSLA Section 1337(p)(4)*." SAC at 27 (heading) (emphasis added). Plaintiffs have argued that their OCSLA claims could proceed under the APA, *see* Dkt. 74-1 at 5-6, but this Court already held that "Plaintiffs cannot now change course to shoehorn their OCSLA citizen-suit claim into the APA." Dkt. 70 at 26; *see also id*. at 26-27 ("Where plaintiffs may otherwise proceed under the citizen suit provision, they should not be allowed to bypass the explicit requirements of the Act established by Congress through resort to . . . the APA." (quoting *Basel*

---

[9] Plaintiffs' complaint specifically averred that "Defendants failed to comply" with OCSLA and that Plaintiffs "sent a 60-day notice of their intent to sue under OCSLA . . . and will amend this Complaint to add these causes of action when the 60 days expires." *See* Dkt. 1, Original Compl. at 4 n.6, ¶ 75 n.79, ¶ 77 n.85; *see also id*. ¶ 31 n.26 (jurisdiction and venue relying on OCSLA citizen suit provision at 43 U.S.C. § 1349(a)(2)(A)).

[10] *Compare* Dkt. 33, First Am. Compl. ("FAC") ¶¶ 78-160, *with* SAC ¶¶ 77-104.

*Action Network v. Mar. Admin.*, 370 F. Supp. 2d 57, 76 (D.D.C. 2005)).

> **2.    The Record Demonstrates That the Project Provides for All Twelve Section 1337(p)(4) Factors**

Even if Plaintiffs had properly given notice under OCSLA's citizen-suit provision (they did not), Plaintiffs' OCSLA claim would still fail on the merits. The administrative record demonstrates that BOEM thoroughly considered all twelve Section 1337(p)(4) factors, and correctly concluded the Project provides for every factor. OCSLA governs energy development on the OCS. In 2005, Congress amended the statute to add Section 1337, which authorizes the Department of the Interior to grant OCS leases for alternate energy sources, including offshore wind. 43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746. The Secretary is required to "ensure that any activity under [§ 1337(p)] is carried out in a manner that provides for" twelve enumerated goals. 43 U.S.C. § 1337(p)(4). OCSLA encourages "expeditious and orderly development [of the OCS], subject to environmental safeguards." *Id*. § 1332(3). When amending OCSLA to provide for U.S. offshore wind development, Congress sought "to enhance the energy security of the United States," to "decrease dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

Before approving the COP for Revolution Wind, BOEM thoroughly considered all twelve Section 1337(p)(4) factors and determined the Project "will be carried out in a manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in [Section 1337(p)(4)] of OCSLA." BOEMGO 3047. After careful analysis of each factor throughout its multi-year review and consultation processes, BOEM summarized the Project's provision for every one of the Section 1337(p)(4) factors in Appendix B of its Record of Decision approving the Project's COP. *See* BOEMGO 3055-69. BOEM's Record of Decision therefore

13

explains the reasonable basis for BOEM's conclusions with respect to each of the specific Section 1337(p)(4) factors Plaintiffs reference in their Motion—(1) safety, (2) protection of the environment, (3) conservation of the natural resources of the OCS, (4) prevention of interference with reasonable uses of the OCS, and (5) consideration of other uses of the sea or seabed including for a fishery or navigation. *See* Mot. at 7-11; BOEMGO 3055-68 (BOEM's reasoned conclusions as to why each of these factors is satisfied). And the robust administrative record illustrates how BOEM's years-long review and consultations with numerous other agencies confirms that BOEM's determination that the Project "provides for" each factor was reasonable. *See Marsh*, 490 U.S. at 378 (1989) (courts must consider "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment") (internal quotation marks and citation omitted).

Plaintiffs' mischaracterizations cannot overcome the robust administrative record supporting BOEM's technical judgments in the Project's Record of Decision. *See Oglala Sioux Tribe,* 45 F.4th at 299 (courts "do not supplant an agency's 'technical judgments and predictions' so long as the agency's decision is 'reasoned and rational'") (citation omitted); *Am. Wildlands*, 530 F.3d at 1000.

With respect to safety, Plaintiffs claim (at 7) that "BOEM acknowledged serious adverse impacts to . . . transit but treated them as acceptable tradeoffs" and argue (at 10) that micrositing turbines undermines "grid coherence critical to collision avoidance and search-and-rescue protocols." BOEM identified "moderate" adverse navigational impacts—not "serious" impacts, BOEMGO 2896, reviewed a navigation risk assessment showing "that it is technically feasible to navigate and maneuver fishing vessels and mobile gear through the Lease Area," BOEMGO 3064,

coordinated extensively with U.S. Coast Guard, BOEMGO 832-33[11], and described the measures that would "mitigate impacts the Project is expected to have on commercial fisheries and for-hire fishermen and will prevent unreasonable interference with said fishing interests[.]"  BOEMGO 3067.  The wind turbines are spaced in a 1 × 1-nautical mile grid (approximately 6,000 feet apart), BOEMGO 2887, and Plaintiffs offer no evidence that allowing a 500-foot deviation (if needed) from this layout on a case-by-case basis would render the Project area unnavigable.  *See* BOEMGO 3064 (describing how Project layout provides navigational lanes).

Plaintiffs also claim that "Coast Guard Search and Rescue will be compromised" because "'the presence and layout of large numbers of' wind turbines will . . . cause 'otherwise avoidable loss of life due to maritime incidents.'"  Mot. at 10 (quoting BOEMGO 1398).  Plaintiffs mispresent BOEM's analysis and ignore the numerous measures mitigating potential risks to search-and-rescue operations, *see* BOEMGO 2935, 2953, 2971, and BOEM's determination that the Project's layout substantially mitigates any possible search-and-rescue safety risk.  *See* BOEMGO 1617, 3064; BOEMGO 149998 (U.S. Coast Guard "supports" the Project and determined that BOEM "sufficiently evaluate[d] the impacts to navigation safety of waterway users and our missions, resulting in minor to moderate adverse impacts.").  While OCSLA obligates "BOEM to ensure that . . . projects be carried out in a manner that provides for safety, . . . [it] cannot be read to prohibit project approval simply because one could imagine the project being involved in an accident."  *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1, 25-26 (1st Cir. 2024).[12]

---

[11] The U.S. Coast Guard supported the 1 x 1 nautical mile spacing.  BOEMGO 149998.

[12] Plaintiffs cite no record evidence supporting their claim (at 43) that a search and rescue mission near the Block Island Wind Farm was halted due to the hazard of the nearby wind turbines.  And the extra-record journal article Plaintiffs cite for that claim in the SAC (at ¶ 76 n.2), states the U.S. Coast Guard "ended up suspending the search due to **weather concerns**" and "determined that the

Plaintiffs' claims regarding the Section 1337(p)(4) factors related to protection of the environment, conservation of the natural resources of the OCS, and prevention of interference with reasonable uses of the OCS blur together, in an unsupported effort to argue that BOEM applied the wrong legal standard to all three factors.  *See* Mot. at 6-10.  Plaintiffs' core allegations are that the Project will purportedly cause the "destruction of Cox Ledge and vital fishing grounds" and will cause "extensive disruption to commercial, for-hire, and recreational fishing."  Mot. at 9.[13] Both claims are incorrect.  The Project will not "destroy" Cox Ledge.  In fact, after stakeholder consultation, BOEM excluded "70 square miles of Cox Ledge . . . from the RI/MA [Wind Energy Area]" after concluding that it "is important to for-hire recreational fishing and commercial fisheries."  *See* BOEMGO 294, 272; BOEMGO 3048 ("BOEM removed high value fishing areas off of Cox Ledge from the originally identified area").  Alternative G was also selected, in part, because it "would reduce impacts to complex habitat on Cox Ledge."  BOEMGO 2899.

Plaintiffs also overstate the economic impacts to commercial fisheries.  To begin with, "the . . . Project would not limit the right to navigate or fish within the Project Area."  BOEMGO 3066.  Although temporary safety zones may be established during construction, once operational, fishing

---

sinking was not attributed to the wind turbines."  *See* Lowen M. Hobbs, *Offshore Wind Energy: A Rising Challenge to Coast Guard Operations*, U.S. Naval Institute, Vol. 149/7/1,445 (July 2023), https://www.usni.org/magazines/proceedings/2023/july/offshore-wind-energy-rising-challenge-coast-guard-operations (emphasis added).

[13] The FEIS did not identify "major adverse impacts" to commercial and recreational fishing, as Plaintiffs wrongly claim (at 7), but rather the FEIS found Alternative G's impacts to "Commercial fisheries and for-hire recreational fishing" would range from "Negligible to major adverse" and "minor beneficial[.]"  BOEMGO 142.  The FEIS concluded that cumulative impacts would be "Major adverse[,]" BOEMGO 142, but explained that "[i]f BOEM's recommendations related to project siting, design, navigation, access, safety measures, and financial compensation are implemented across all offshore wind energy projects, adverse impacts on commercial fisheries due to the presence of structures could be reduced[,]" BOEMGO 346.  As part of its Section 1337(p)(4) review, BOEM described how these measures were implemented and "would mitigate impacts the Project is expected to have on commercial fisheries and for-hire fisherman and will prevent unreasonable interference with said fishing interests."  BOEMGO 3067.

and transit is permitted throughout the Project area. *Id.* BOEM recognized that "some larger vessel size classes and/or vessels towing fishing gear may choose to avoid foundations due to operational concerns" but "anticipated that vessel operators that choose to avoid the area will fish or transit in other locations." *Id.* As BOEM, explained, "NMFS data from 2008 to 2019 shows that most fisheries source less than 1 percent of their income from the Project Area, with exception of the skate fishery which sources 1.3%." *Id.* The record presents estimates for the "exposure" of fishing revenue to localized displacement of fish stocks due to Project construction and operation, which is "the fishing revenue that would be foregone if fishing vessel operators cannot capture that revenue in a different location." BOEMGO 325. For commercial fishing, "the annual exposed revenue represents 0.15% of the average annual revenue for all . . . fisheries in the Mid-Atlantic and New England regions and 0.99% of the average annual revenue for all . . . fisheries in the [regional fisheries area]." *Id.* And upon completion, "Project structures are likely to generate artificial reef effects that lead to *increased* abundance of commercially and recreationally desirable fish and shellfish within wind farm boundaries[,]" which BOEM identifies for the potential to increase fishing catch and revenues. BOEMGO 1414 (emphasis added). In addition, Revolution Wind has established more than $18 million in direct compensation funds (if needed) and other fisheries mitigation funds to cover "(1) financial compensation for lost income and gear loss as a result of the Project's construction and operation; and (2) programs to support future compatibility of offshore wind facilities and fishing activity." BOEMGO 3067.

With respect to consideration of other uses of the sea and seabed, Plaintiffs focus (at 10-11) on impacts NMFS surveys.. But Plaintiffs ignore that "NMFS and BOEM have developed the NOAA Fisheries and BOEM Federal Survey Mitigation Implementation Strategy – Northeast U.S. Region (Hare et al. 2022) to address the adverse impacts." BOEMGO 3067. The Project's

approval also includes conditions that Revolution Wind reach a survey mitigation agreement with NMFS or otherwise submitting a Survey Mitigation Plan to BOEM and NMFS.  BOEMGO 3032. When describing total acres of disturbed seafloor, Plaintiffs also cite figures in the FEIS for the wrong project alternative (Alternative B, which was not approved) and therefore overstate the impacts of the reduced Project reflected in the approved Alternative G.  *See* Mot. at 10-11 (citing BOEMGO 63-64, 190, 195).[14]  Based on all of the technical findings it was reasonable for BOEM to conclude the Section 1337(p)(4) factors were satisfied when approving the Project.

### 3.     Plaintiffs' Statutory Interpretation Argument Improperly Relies on Post-Decisional Materials and Fails on the Merits

Plaintiffs (at 5-6) rest their OCSLA claim (which is barred, as discussed in Section IV.B.1) on a post-decisional, extra-record May 1, 2025 memorandum from the Acting Solicitor of the Department of the Interior ("Zerzan Opinion")[15] withdrawing an April 2021 legal opinion expressing the Principal Deputy Solicitor's interpretation of Section 1337(p)(4) ("Anderson Opinion")[16] and reinstating a December 2020 legal interpretation from the Solicitor ("Jorjani Opinion").[17]  This impermissible extra-record material that post-dates BOEM's decision should be given no weight.  *See Citizens to Preserve Overton Park*, 401 U.S. at 419-20 (limiting review to "the full administrative record that was before the [decisionmaker] at the time he made his decision") (emphasis added); *Camp v. Pitts*, 411 U.S. 138, 142 (1973).[18]  Also, the Jorjani Opinion

---

[14] Plaintiffs argue that BOEM did not adequately consider the Project's hydrodynamic effects and "relied on a single in-house study and did not analyze site-specific implications or adopt measures to avoid or minimize those effects."  Mot. at 11.  It is unclear what study Plaintiffs are referring to, but the FEIS contains a robust discussion of the hydrodynamic effects of wind turbines on species that cites multiple studies.  BOEMGO 185-88, 554-56, 587-89.

[15] https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[16] https://www.doi.gov/sites/default/files/m-37067.pdf.

[17] https://www.doi.gov/sites/default/files/m-37059.pdf.

[18] Plaintiffs also rely (at 7) on a July 29, 2025 Secretarial Order, which is similarly impermissible extra-record material.

addressed a single factor ("prevention of interference with reasonable uses" under Subsection 1337(p)(4)(I)), and therefore could not be the basis for—as Plaintiffs suggest (at 6)—invalidating the entirety of BOEM's analysis of the Section 1337(p)(4) factors.  In any event, because BOEM's decision that the Project "provided for" the enumerated factors in Section 1337(p)(4) is supported under any plausible reading of Section 1337(p)(4), Plaintiffs' argument fails in any event.[19]  And Plaintiffs' interpretation of OCSLA fails as a matter of law.

As a threshold matter, the only consideration for this Court is the interpretation the Court "concludes is best."  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).  The Jorjani Opinion and Zerzan Opinion are entitled to no deference.  Interpreting Section 1337(p)(4), another court, the First Circuit, rejected an "absolutist" interpretation, explaining that "[a] statute encouraging the development of offshore wind projects but obligating the BOEM to ensure that such projects be carried out in a manner that provides for safety, for example, cannot be read to prohibit project approval simply because one could imagine the project being involved in an accident."  *Seafreeze Shoreside*, 123 F.4th at 26.  The First Circuit upheld the district court's interpretation that "BOEM must have 'discretion' in considering whether each statutory criterion is satisfied, and must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide."  *Id.* at 25-26.

Even if Plaintiffs' interpretation was the "best" interpretation of Section 1337(p)(4) (it is not), it would not invalidate BOEM's well-supported conclusion that "approval of the COP—as modified by Alternative G and the proposed technical, and navigational and aviation safety terms and conditions included with the ROD—would . . . ensure that all the activities on the OCS are

---

[19] Given the 2025 Zerzan Opinion post-dates both of Plaintiffs' Notices (Jan. 5, 2024, Dkt. 33-1, and Feb. 16, 2024, Dkt. 33-2), this claim is also barred because it was not raised prior to Plaintiffs commencing suit.  *See supra* at Section IV.B.1.

carried out in a manner that provides for the factors in subsection 8(p)(4) of OCSLA." BOEMGO 3071; *see supra* Section IV.B.2. And, as noted above, the interpretation of the Jorjani Opinion, on which Plaintiffs now rely, is focused on a single factor: "(I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas." Jorjani Opinion at 1. Even the Jorjani Opinion recognizes that "interpreting [Section 1337(p)(4)(I)] to require prevention of 'any and all interference' . . . would be overly proscriptive when the statutory provision is read in context and in light of established canons of statutory interpretation." *Id*. at 2. Instead, the Jorjani Opinion interprets Section 1337(p)(4)(I) to require prevention of "*unreasonable interference*, but not the type of interference that would be described as *de minimis* or reasonable." *Id*. at 2 (emphasis added). Here, BOEM explained that "[t]he numerous consultations performed under various Federal statutes, as well as the analysis in the FEIS and the mitigation measures included with the ROD, indicate that approval of Alternative G would not result . . . *in unreasonable interference* with other OCS uses." BOEMGO 3071 (emphasis added). While the First Circuit decision is the better read of the statute, BOEM's decision is supported by the administrative record under either interpretation of OCSLA.

### C.    The Record Demonstrates That NMFS Complied With the ESA and MMPA

Plaintiffs assert (at 13-26) that NMFS violated the ESA and MMPA for a litany of reasons, all of which are refuted by the administrative record. NMFS evaluated each of the issues alleged, engaged in a scientific assessment, and provided a reasoned basis for its decisions. NMFS complied with the ESA and MMPA, and the Court should decline Plaintiffs' invitation to second-guess the agency's scientific judgments. *See Huls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) (Courts "will give an extreme degree of deference to the agency when it 'is evaluating scientific data within its technical expertise.'").

20

### 1.    NMFS Relied on the Best Available Science

Contrary to Plaintiffs' claims (at 15-23), NMFS relied on the "best available science" when carrying out its duties under the ESA and MMPA.  Plaintiffs' argument (at 15-16) that BOEM and NMFS ignored information contained in the "North Atlantic Right Whale and Offshore Wind Strategy" document ("NARW Strategy") is wrong.   What Plaintiffs attempt to cast as new information from the NARW Strategy was in fact considered in NMFS' consultation that culminated in the BiOp the agency issued for the Project.  *Compare* Mot. at 16, with NMFS 2835-2841 (impacts of other offshore wind projects), NMFS 2863-918 (Project noise impacts on ESA-listed whales), NMFS 3110 (risk of North Atlantic right whale ("NARW") extinction and potential population effects).[20]

Although Plaintiffs claim (at 16-17) that NMFS "ignored or minimized" information regarding effects of exposure to anthropogenic noise on marine mammals, the BiOp extensively addressed this topic.  NMFS 2863-918, 2842-43.  Plaintiffs rely (at 16-17) on two studies cited in Green Oceans' comment letter on the Project's proposed ITR (NMFS 62239), but NMFS responded to these comments, explaining how its assessment that the authorized take would have a negligible impact on all marine mammal species and stocks, including the NARW, was based on the best available science.  NMFS 62860-862, 62936.  NMFS also acknowledged studies reporting high stress levels in individual NARWs, with implications on reproductive success and calf survival.  NMFS 62928.  Plaintiffs' claim that "NMFS cites no evidence to support its conclusion that the Project is not expected 'to produce conditions of long-term and continuous exposure to noise leading to long-term physiological stress responses in marine mammals that could affect

---

[20] Moreover, the NARW Strategy is a non-binding guidance document that is not "intended to modify or amend any Federal statutes, regulations, permits, or leases, nor create any rights or cause of action".  NMFS 92938.

reproduction or survival."' Mot. at 17 (citing NMFS 62924). This is simply incorrect. *See* NMFS 62924 (citing studies). NMFS' conclusion is also supported by the BiOp, which explained that "the available literature suggests these acoustically induced stress responses will be of short duration . . . , and not result in a chronic increase of stress that could result in physiological consequences to the animal." NMFS 3114.

Plaintiffs erroneously claim that BOEM and NMFS "ignored" the "known and certain risk of catastrophic blade failure happening at many offshore wind sites," relying exclusively on extra-record and post-decisional evidence regarding failures of blades (supplied by a different manufacturer from Revolution Wind's) at two other offshore wind projects in July and August 2024. Mot. at 18-19.[21] The Court's review is limited to the record before the agency at the time of its decision, and Plaintiffs' evidence should be given no weight. *See Oceana, Inc. v. Ross*, 454 F. Supp. 3d 62, 67-68 (D.D.C. 2020); *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285-86 (D.C. Cir. 1981).[22] Moreover, NMFS *did* address the risk of turbine failure and debris in the BiOp, *see, e.g.*, NMFS 3053-56 (potential impacts of "catastrophic failure"). And Plaintiffs are wrong to claim (at 19) that BOEM lacks a plan for responding to blade failure emergencies because the COP Conditions require procedures for debris removal and reporting. NMFS 2580-83.

Plaintiffs' claims (at 22-23) regarding NMFS' assessment of potential impacts on NARW

---

[21] Plaintiffs also cite (at 19) an impermissible extra-record study, claiming 3,800 "turbine blade failures each year." However, this figure represents approximately 0.5% of the estimated 700,000 blades in operation globally, nor is there any suggestion in the report that each of these blade failures are catastrophic or result in significant debris. *See* Leon Mishnaevsky, Jr., *Root Causes and Mechanisms of Failure of Wind Turbine Blades: Overview*, National Library of Medicine (Apr. 19, 2022) at 1, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9101399/pdf/materials-15-02959.pdf.

[22] The First Circuit found that the Vineyard Wind turbine failure incident, "occurring after the challenged agency decisions, are not relevant to the arguments made in these appeals." *Seafreeze Shoreside*, 123 F.4th at 27.

nutrition and foraging are similarly flawed.  Plaintiffs rely on an airgun study (McCauley et al. (2017)), ignoring that the BiOp explicitly responded to this study, explaining why it was not relevant to the Project, which would not use airguns.  NMFS 2958.  Plaintiffs also claim that the BiOp "completely ignores the best available scientific data" showing how "offshore wind development alters ocean currents, wave heights, and thermal stratification" but Plaintiffs fail to identify any data that was allegedly "ignored" regarding impacts to NARW prey.  Mot. at 22-23. Indeed, the BiOp included extensive analysis and review of scientific literature.  *See* NMFS 3011-14, 3025-32.  NMFS' determination of the best available science is entitled to deference.  *See Defs. of Wildlife v. Jewell,* 70 F. Supp. 3d 183, 194 (D.D.C. 2014), *aff'd sub nom. Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, 815 F.3d 1 (D.C. Cir. 2016).

## 2.    NMFS Considered Relevant Cumulative Effects Under the ESA

Plaintiffs' argument (at 17-18) that NMFS' cumulative effects analysis failed to consider "best available science" ignores well-settled law defining relevant ESA cumulative effects—which the record demonstrates NMFS considered.  In its formal consultation, NMFS was required to consider the effects of the "action and cumulative effects" in addition to the "environmental baseline."  50 C.F.R. § 402.14(g).[23]  The regulations define "cumulative effects" to exclude Federal activities.  50 C.F.R. § 402.02.  Therefore, possible or planned offshore wind projects—Federal activities subject to future ESA Section 7 consultations—are excluded from NMFS' consideration of cumulative effects.  *See, e.g.*, *Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 136 (D.D.C. 2006) ("the ESA only requires agencies to consider the cumulative impacts of non-federal actions"); *Defs. of Wildlife v. Norton*, No. 99-927, 2003 WL 24122459, at *5-6 (D.D.C. Jan. 7, 2003).

Moreover, the BiOp's environmental baseline includes a detailed analysis of the offshore

---

[23] The 2019 version of the ESA regulations apply to the BiOp.  NMFS 2680.  All citations to the ESA regulations herein are to the 2019 version of the regulations.

wind projects for which NMFS had completed an ESA consultation before the BiOp, including Ocean Wind 1 (2023), South Fork Wind (2021), Vineyard Wind 1 (2021), Coastal Virginia Offshore Wind (2016 and 2023), Block Island (2014), Empire Wind (2023), Sunrise Wind (2023), Atlantic Shores South (2023), and New England Wind (2023).  NMFS 2834-2841.  Contrary to Plaintiffs' claim (at 18), NMFS fulfilled its duty to consider the anticipated impacts of the environmental baseline, which includes "all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation."  *See* 50 C.F.R. § 402.02.

Plaintiffs erroneously claim (at 18) that NMFS "pays only cursory treatment to state, private, and non-federal activities" and ignores effects of climate change and ocean warming.  However, NMFS' environmental baseline analysis includes extensive discussion of climate change effects, NMFS 3059-3062, and the impacts of fishing activities, vessel operations, scientific surveys, noise, pollution, and other stressors in the action area, NMFS 2823-45.

### 3.    BOEM and NMFS Mitigated Potential Impacts to the NARW

Plaintiffs argue (at 20) that the Project's NARW-related mitigation falls short of the agencies' "statutory obligations to 'utilize their authority in furtherance of the purposes' of the ESA."  However, Plaintiffs fail to demonstrate any violation of the ESA or MMPA.

When NMFS concludes that an action causing incidental take of listed species will not violate ESA Section 7(a)(2), and, in the case of marine mammals, where the taking is authorized pursuant to Section 101(a)(5) of the MMPA, NMFS must provide with the BiOp an incidental take statement ("ITS") that "[s]pecifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact of incidental taking on the species" and "[i]n the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the [MMPA] and applicable regulations with regard to such taking."  50 C.F.R. § 402.14(i); 16 U.S.C. § 1536(b)(4).  Here, NMFS concluded that its ITS "includes all measures

necessary to comply with the authorization." NMFS 3139. As required, the ITS describes the "reasonable and prudent measures, and terms and conditions to implement the measures" to minimize impacts of ESA-listed species. NMFS 3143-70. The reasonable and prudent measures that NMFS identified are also incorporated as Conditions to the COP Approval. BOEMGO 3026; NMFS 2552, 2634-35.

Plaintiffs do not argue that the ITS fails to specify "reasonable and prudent measures" or "measures that are necessary to comply with [the MMPA] with regard to" take of NARWs. *See* 16 U.S.C. § 1536(b)(4). Instead, Plaintiffs inaccurately claim (at 20) that bubble curtains are the "primary mitigation measure for pile driving and underwater construction" and purportedly fail to protect NARWs. In fact, the "most significant measure to minimize impacts to individual North Atlantic right whales is the seasonal moratorium on all foundation installation activities" when "North Atlantic right whale abundance in the Project Area is expected to be highest." NMFS 62929. Plaintiffs also disregard that "[p]ile driving and UXO/MEC detonations may only begin in the absence of North Atlantic right whales (based on visual and passive acoustic monitoring)." NMFS 62930. In any event, the bubble curtains, soft starts, clearance and shutdown zones, and other measures required during pile driving are highly effective. *See* NMFS 2851-53.

Contrary to Plaintiffs' claims, "shutdown protocols, minimum zone monitoring, and restricted pile-driving periods" are clearly defined restrictions and requirements. *See* NMFS 2617-18 (defining clearance and shutdown zones); NMFS 2616-17 (imposing strict requirements on species observers and passive acoustic monitoring); NMFS 2614 (establishing seasonal and daily pile driving restrictions). Plaintiffs are also incorrect (at 21) that there is "no real oversight" over the plans included in the COP Conditions. NMFS 2597-98 (Anchoring Plan requiring BOEM and BSEE sign-off); NMFS 2598-99 (Micrositing Plan requiring same); NMFS 2600-01 (Sequencing

Plan requiring same); NMFS 2589-90 (Pile Driving Passive Acoustic Monitoring Plan requiring same); NMFS 2590-92 (Sound Field Verification Plan requiring BSEE, NMFS, and BOEM coordination for ongoing sound modelling and measurements).  To the extent some mitigation measures require future coordination with NMFS or other agencies, Plaintiffs offer no explanation of how this falls short of NMFS' duties under the ESA.  Plaintiffs' claim (at 21) that "[l]acking in NMFS's mitigation plan is any evidence that these proposed measures will effectively avoid jeopardy to listed species," is also baseless given that the BiOp's detailed analysis demonstrates how these measures relate to NMFS' no-jeopardy determination.  *See, e.g.*, NMFS 3111.  And Plaintiffs' claim (at 21) that many of NMFS' "Reasonable and Prudent Measures" and "Terms and Conditions" are purely "administrative" is also incorrect, as they compel specific activities to minimize effects to listed species through actionable requirements.  NMFS 3145-70.[24]

### 4.    NMFS' BiOp's Analysis Is Entirely Consistent

The ESA required NMFS to ensure that any action it authorizes is not likely to jeopardize the continued existence of that listed species or result in the destruction or adverse modification of its critical habitat.  16 U.S.C. § 1536(a)(2).  Based on an extensive record, the best available science, and the agency's expertise, NMFS concluded that the Project is not likely to jeopardize the continued existence of any ESA-listed species under NMFS' jurisdiction, including the NARW, and will not destroy or adversely modify the critical habitat designated for the NARW or other ESA-listed species.  NMFS 3138, 3110-16.

Each of Plaintiffs' claims (at 23) that "NMFS's no-jeopardy determination is contradicted by specific findings of the Biological Opinion" fails.  While NMFS acknowledged that the death

---

[24] Plaintiffs' challenge (at 22) to the BiOp's "Conservation Recommendations," as "'discretionary agency activities,'" also fails because conservation recommendations are, by definition "discretionary."  *See* 50 C.F.R. § 402.14(j) ("discretionary conservation recommendations . . . . are advisory and are not intended to carry any binding legal force").

of an individual NARW could have population effects, NMFS "do[es] not expect any harm, injury

(auditory or otherwise), serious injury, or mortality of any right whale to result from the proposed

action." NMFS 3115. Likewise, Plaintiffs ignore the detailed analysis in the BiOp explaining the

required measures, such as vessel speed restrictions, protected species observers, and passive

acoustic monitoring, which "support [NMFS'] determination that any potential increase in vessel

strike due to increases in vessel transit caused by the proposed action will not occur." NMFS 2979,

2980-2984.[25] Project vessels must also adhere to speed restrictions above and beyond existing

regulations. NMFS 62852, 62910.

Plaintiffs conflate the concepts of behavioral changes with temporary loss of hearing

sensitivity (at 24), and there is nothing inconsistent in the BiOp's description of these topics.

Based on conservative assumptions, NMFS determined that the Project could cause a temporary

threshold shift ("TTS")—which is a temporary loss of hearing sensitivity—and/or behavioral

disturbance to a maximum of 22 NARW during pile driving and to a maximum of 12 NARW

during the detonation of unexploded ordnance ("UXO"). NMFS 2892-2900, 3142, 2909-3143.

The BiOp explains TTS is expected to be temporary, "with normal behaviors resuming quickly

after the noise ends" and "is not expected to affect the health of any whale or its ability to

migrate, forage, breed, or calve." NMFS 3111. Because TTS and behavioral disturbance are

different effects, the fact that their respective durations may vary is not inconsistent.

Plaintiffs misrepresent (at 24) what NMFS' ITR stated regarding alleged "displacement"

of NARW. NMFS' ITR explained that any "behavioral harassment of North Atlantic right whales

---

[25] Plaintiffs' allegation (at 24) regarding the presence of structures ignores the BiOp's finding that "[b]ased on the spacing of the foundations (1 x 1 nm grid) relative to the sizes of the listed species that may be present in the WFA, we do not anticipate that the foundations would create a barrier or restrict the ability of any listed species to move through the area freely." NMFS 3010.

incidental to the specified activities would not result in changes to their migration patterns or foraging success, as only temporary avoidance of an area during construction is expected to occur." NMFS 62929. Although Plaintiffs rely on proposed ITR statements regarding overlap with migratory routes and "areas of biological significance," the final ITR explained, that although the Project "would be constructed within the North Atlantic right whale migratory corridor [Biologically Important Area]," the lease area comprises only approximately 339 km$^2$ of the 269,448 km$^2$ migratory corridor and, "the overall North Atlantic right whale migration is not expected to be impacted by the proposed activities." NMFS 62929. There is no contradiction between the ITR and the BiOp's no-jeopardy determination.

Plaintiffs claim that "NMFS also ignored the established scientific fact that entanglement with fishing lines is one of the principal reasons for whale deaths and injuries," inexplicably citing a portion of the BiOp addressing precisely that point. Mot. at 25 (citing NMFS 3110). Plaintiffs also erroneously claim (at 25) that the BiOp, "ignored" potential changes to the distribution of recreational fishing around the Project's foundations with respect to marine mammal entanglement, despite an entire BiOp section considering "potential shifts or displacement of fishing activity" caused by the Project. NMFS 3048-52. Based on this detailed analysis, NMFS concluded that the risk of entanglement due to any shifts in fishing activity from the Project are "so small that they cannot be meaningfully measured, evaluated, or detected; therefore, effects to listed species are insignificant." NMFS 3052.

Plaintiffs also fail to identify any inconsistency in the BiOp with their reference (at 25) of the Project's overlap with a Seasonal Management Area intended to reduce the risk of vessel strikes on the NARW. Indeed, the BiOp addresses that topic. *See* NMFS 2974-75.

### 5.   NMFS Reasonable Determined the Project Would Have a Negligible Impact on NARW

Under the MMPA, NMFS may authorize the take of a small number of marine mammals if it "finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock" and prescribes regulations setting forth "methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat" and "requirements pertaining to the monitoring and reporting of such taking."  16 U.S.C. § 1371(a)(5)(A).  Based on its extensive analysis in the ITR, NMFS found "that small numbers of marine mammals would be taken relative to the population size of the affected species or stocks."  These findings are entitled deference.  NMFS 62936; *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009).

Plaintiffs erroneously argue (at 25) that the Project will have more than a negligible impact because it will result in the "take" of more than a "small number" of NARW.  But the MMPA does not define "small numbers" quantitatively.  *See* NMFS 62936; *Melone v. Coit*, 100 F.4th 21, 30-32 (1st Cir. 2024); *Save Long Beach Island v. U.S. Dep't of Com.*, 794 F. Supp. 3d 273, 322-23 (D.N.J. 2025).  The ITR explained that within any one year relative to the best available population abundance "[w]hen the predicted number of individuals to be taken is less than one third of the species or stock abundance, the take is considered to be of small numbers."  NMFS 62936.  Here, the ITR authorizes a maximum annual non-lethal allowable Level B harassment take of 44 and no more than 56 over the five year duration, which is approximately 13% and 16%, respectively, of the NARW stock abundance, if each take were considered to be of a different individual NARW.  NMFS 62928.  Plaintiffs fail to "meet their heavy burden to show that NMFS's take estimates were arbitrary and capricious under the 'small numbers' requirement."  *See Save Long Beach Island*, 794 F. Supp. 3d at 328.

While Plaintiffs claim (at 25-26) that NMFS "ignore[ed] that an annual death rate over 0.7% would be catastrophic for the species," the ITR explicitly acknowledges that "the loss of even one individual could significantly impact the population" and that "[n]o mortality, serious injury, or injury of North Atlantic right whales as a result of the project is expected or authorized." NMFS 62928.

Plaintiffs also wrongly rely (at 26) on the cumulative authorized takes from ten other offshore wind projects, contrary to the requirements of the MMPA and implementing regulations. Recent federal court decisions have rejected this exact argument. In *Save Long Beach Island*, the court held that neither the MMPA nor NMFS' implementing regulations require an assessment of cumulative takes across disparate authorizations under the "small numbers" provision. Rather, the MMPA restricts the take assessment of "small numbers of marine mammals" to applicants engaged in a specified activity within a specific geographic region. 794 F. Supp. 3d at 326, 329-30. The First Circuit came to the same conclusion in *Melone v. Coit*, finding the MMPA does not mandate NMFS to analyze activities beyond the scope of an individual LOA application and Congress intended to avoid a broad assessment outside the specified activity. 100 F.4th at 32-33.

### D.    The Record Demonstrates That USACE Complied with the CWA

Plaintiffs argue (at 27-31) that USACE violated CWA Section 404 when it issued the Project's permit after allegedly excluding analysis of activities beyond the territorial sea's three-nautical mile limit that are outside USACE's jurisdiction for that particular permit. As an initial matter, Plaintiffs' CWA claim is waived as they failed to raise these concerns during USACE's administrative process. Furthermore, Plaintiffs' CWA claim fails on the merits of their erroneous legal interpretations and based on the administrative record in this case.

### 1.    Plaintiffs' CWA Claim Has Been Waived

Plaintiffs have waived all of their CWA arguments because they failed to raise these

alleged concerns during USACE's public comment period for the Project's Section 404 permit. *See, e.g.*, *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004) (by failing to raise "particular objections" to agency action during administrative process, plaintiffs "forfeited any objection" on those grounds). Here, USACE only received four comments in response to its public notice—none from any of the Plaintiffs and none that raise the arguments that Plaintiffs make in their Motion (at 27-30) or SAC ¶¶ 197-225. *See* USACE 67019-21; USACE 55957-56037, 56361-62, 56364-79, 56556-64, 56570-80 (USACE public notice and comments in response from a law firm representing local towns, preservation organizations, and historic properties owners (none are Plaintiffs here), U.S. Coast Guard, NMFS, and the Environmental Protection Agency); Dkt. 59-6 at 9-10; *infra* Section IV.D.2-4. By failing to raise the issues—on which they now challenge USACE's permit for the Project—during the agency's administrative process, Plaintiffs have waived their entire CWA claim. *See Nevada v. DOE*, 457 F.3d 78, 88-89 (D.C. Cir. 2006); *see also Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 521-22 (5th Cir. 2023).

Plaintiffs previously did not dispute that their arguments were not raised to USACE during the public comment period but instead seemingly relied on the "obvious-flaw" exception by arguing that raising their arguments was not required because "the issue was known or should have been known by the agency[.]" *See* Dkt. 66 at 36-38l; *see Pub. Citizen*, 541 U.S. at 765 (outlining "obvious-flaw" exception). However, "the exception for 'obviousness' is narrow" and "neither [the D.C. Circuit] nor the Supreme Court has ever used the 'so obvious' language from *Public Citizen* to revive a forfeited argument." *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 249 (D.C. Cir. 2024); *see also* Dkt. 70 at 29-30. In any event, Plaintiffs' CWA arguments are far from obvious given the agency's decades-long interpretation. *See infra* Section IV.D.2.

2.    **USACE Properly Considered Potential Impacts and Permitted the Project's Dredge-and-Fill Activities Under Statutory Authorities**

Plaintiffs' CWA arguments in their Motion (at 27-30) are entirely premised on their erroneous interpretation of the geographic scope of CWA Section 404 authority.  Plaintiffs mischaracterize USACE's permitting authority, ignoring that the Project's activities beyond three nautical miles from shore are permitted under RHA Section 10, which—unlike the CWA— provides for the agency to "issue permits to authorize the installation of structures in navigable U.S. waters more than three nautical miles from the coast." *Seafreeze Shoreside*, 123 F.4th at 11; *see* 33 U.S.C. § 403; 33 C.F.R. §§ 320.2(b) & 322.3(a)-(b).

USACE issued the Project's permit under two distinct statutory authorities: CWA Section 404 and RHA Section 10.  USACE 68435, 68437; 67017-18.  CWA Section 404 limits USACE permitting authority to the portion of the Project involving covered activities in "navigable waters," 33 U.S.C. § 1344(a), which are defined these purposes as "waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7); *see also* 33 C.F.R. § 328.4(a); USACE AR 0068435 [USACE Section 404 Permit at 1].  The "territorial seas," are the waters generally extending seaward three nautical miles from the coast in direct contact with the open sea.  33 U.S.C. § 1362(8); 33 C.F.R. §§ 328.4(a), 329.12(a); 51 Fed. Reg. 41,253 (Nov. 13, 1986) (adopting 33 C.F.R. § 329.12, which includes definition of USACE's jurisdiction as "three geographic (nautical) miles seaward" of shore).  The Revolution Wind federal lease area on the OCS—where Plaintiffs argue USACE improperly excluded analysis of Project activities under Section 404, *see* Mot. at 27-29—lies approximately 13 nautical miles (15 miles) east of Block Island, Rhode Island, well beyond three nautical miles from shore and USACE's CWA Section 404 permitting authority.

*See* BOEMGO 43; USACE 67035. Plaintiffs cite no authority arguing to the contrary.[26]

In contrast, USACE's RHA Section 10 authority extends to the OCS. 33 U.S.C. § 403 (RHA applying to "waters of the United States"); 43 U.S.C. § 1333(a), (e); USACE 66994; *see also* 33 C.F.R. §§ 322.3(b), 329.12(a). In particular, while RHA Section 10 applies to any obstruction or structure "in the navigable waters of the United States", Congress expressly "extended" the provision to apply to "installations and other devices permanently or temporarily attached to the seabed" on the OCS. 43 U.S.C. § 1333(a), (e). USACE thoroughly explained its basis for issuing the Project's permit under RHA Section 10, *see* USACE 66994, 67018-19, 68435, 68437, and Plaintiffs have not challenged that.[27] Consistent with federal law, USACE permitted Revolution Wind's installation of the Project's turbines, inter-array cables, and 19 miles of export cables on the OCS, under RHA Section 10 authority. USACE 68435, 68437. USACE reasonably concluded activities "in the Lease Area [on the OCS] do not involve any discharge of dredged or fill material into waters of the United States and are not subject to the requirements of the 404(b)(1) Guidelines." USACE 67035.

### 3.    CWA Section 404 Does Not Require a Permit For Cox Ledge

Plaintiffs wrongly assert (at 29) that CWA Section 404—including implementing regulations governing special aquatic sites—extends to an offshore area that they refer to as Cox Ledge. But even based on where Plaintiffs assert Cox Ledge is located, *see* Mot. at 29 n.192 (citing BOEMGO 512, 572, 217766-817), that is well beyond USACE's Section 404 permitting authority (which only extends) three nautical miles offshore, *see supra* at Section IV.D.2. As a result, Cox

---

[26] Plaintiffs' reliance on *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 232 (D.C. Cir. 2024) is misplaced given the absence of any discussion of the CWA or "waters of the United States" in that case, which instead involves interpretation of the Foreign Sovereign Immunities Act.

[27] Plaintiffs did not challenge the USACE's determination under RHA Section 10 either in their Motion or in their SAC. *See* Dkts. 82, 87-1.

Ledge cannot be a "special aquatic site" under CWA Section 404 regulations, as Plaintiffs allege, because it is not subject to Section 404 of the CWA at all.[28]

### 4.    USACE Conducted a Proper Cumulative Effects Analysis

Plaintiffs erroneously argue (at 29-30) that USACE was obligated to consider the cumulative effects of other offshore wind projects or various Project activities on the OCS in its CWA Section 404 analysis.  Not so.  Again, these areas are not within CWA Section 404 jurisdiction, so the argument fails as a matter of law.  In any event, Plaintiffs misconstrue the cumulative effects analysis required under the CWA Section 404's implementing regulations.  *See, e.g.*, *O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 WL 6635070, at *8 (5th Cir. Oct. 12, 2023) (distinguishing CWA cumulative assessment requirements from NEPA).[29]  In CWA Section 404 review, USACE must determine the cumulative effects on the aquatic system, and these effects are defined as "changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material."  40 C.F.R. § 230.11(g); *see also Appalachian Voices v. U.S. Army Corps of Eng'rs*, 134 F.4th 410, 422 (6th Cir. 2025).  Here, USACE determined with respect to the areas within their Section 404 jurisdiction that "cumulatively there would be long-term minor impacts to the aquatic ecosystem" as "impacts from cable protection . . . do not cause a loss of waters of the United States" and "[d]ue to state coastal management plans, future development within the three nautical mile limit of jurisdiction involving loss of waters of the United States would be extremely limited."  BOEMGO 74791-92.  These reasoned determinations by USACE, consistent with other permits that courts have

---

[28] USACE consulted with NMFS and adopted conservation measures regarding Cox Ledge as part of the Essential Fish Habitat consultation under USACE's RHA Section 10 authority.  BOEMGO 74762, 74778, 74801, 74920; USACE 68445-46, 68450-51; USACE 68570-71.

[29] USACE was a cooperating agency in BOEM's EIS, which included an extensive cumulative effects analysis under NEPA as described *infra* at Section IV.F.2.

sustained, should be upheld.  *See, e.g.*, *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 186-87 (D.D.C. 2004); *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, No. 1:22-CV-11091-IT, 2023 WL 6691015, at *17-18 (D. Mass. Oct. 12, 2023), *aff'd*, 123 F.4th 1 (1st Cir. 2024) (rejecting claim that USACE was required to consider cumulative impacts of an offshore wind project and other future projects under its CWA Section 404 authority).[30]

### E.    BOEM Complied with the National Historic Preservation Act

Plaintiffs' litany of alleged NHPA violations (at 32-39) are all belied by the administrative record.  BOEM complied with the NHPA, concluding in a MOA, agreed to by BOEM, the Advisory Council, and the SHPOs for Connecticut, Massachusetts, Rhode Island, and New York. BOEMGO 74940-75020.  BOEM required extensive avoidance, minimization, and mitigation measures to resolve adverse effects (including visual effects) to historic properties, including a 35% reduction in the number of wind turbine generators and more than $11 million in funding for historic property mitigation.  BOEMGO 74487-506, 74566-74; BOEMGO 2901.  Plaintiffs have not even come close to meeting their burden on summary judgment.

### 1.    BOEM Complied with the Requirements of NHPA Section 106

As an initial matter, Plaintiffs erroneously allege (at 33) that BOEM "release[ed] inaccurate simulations of the visibility of the turbines from the shore[,]" claiming distinctions between confidential and public visual simulations.  However, Plaintiffs ignore that BOEM's public website provided the high-resolution visual simulation images to the public.[31]

---

[30] Plaintiffs' reliance (at 30 nn.195, 196) on *Georgia River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1341 (N.D. Ga. 2003) and *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1313 (S.D. Fla. 2005) is inapposite as both of those decisions describe and rely on the cumulative impact analysis required under NEPA.

[31] *See*  https://www.boem.gov/renewable-energy/state-activities/revolution-wind.    As public records, these images are subject to judicial notice.  *See Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014).

Plaintiffs also erroneously challenge (at 33-34) BOEM's Section 106 outreach arguing that several private landowners were excluded as consulting parties during the NHPA consultation, that BOEM failed to hold public meetings in Newport, Rhode Island, and that BOEM's "online sessions were poorly advertised and inaccessible." None of Plaintiffs' allegations are supported by the text of NHPA Section 106, its implementing regulations, or the administrative record.

Section 106 requires that federal agencies take into account the effects of their undertakings on historic properties. 54 U.S.C. § 306108. Section 106 implementing regulations entitle the Advisory Council, relevant SHPOs, Indian tribes, the applicant for federal approval, and certain local governments to participate as consulting parties in the Section 106 process. 36 C.F.R. § 800.2(b), (c). The regulations also require BOEM to provide public notice and seek comments but allow BOEM to use its NEPA procedures. *Id*. § 800.2(d). Contrary to Plaintiffs' claims (at 34), there is no requirement for BOEM to hold public meetings in a particular location or notify specific property owners, nor have Plaintiffs identified such a requirement.[32] *See, e.g.*, 54 U.S.C. § 306108; *see also* 36 C.F.R. §§ 800.3-800.6. And neither Section 106 nor its implementing regulations entitle property owners to be invited as consulting parties. *See* 54 U.S.C. § 306108; 36 C.F.R. § 800.2; *see, e.g., Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *3 (D.C. Cir. Feb. 19, 2019); *see also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 553 (8th Cir. 2003); *Dugong Dugon*, 330 F. Supp. 3d at 1187-88.

Here, BOEM initially invited 127 potential consulting parties, including the Advisory Council, SHPOs, Tribal Nations (including Plaintiff Wampanoag Tribe of Gay Head Aquinnah

---

[32] Plaintiffs also fail to identify any additional argument or recommendation they would have made that is different from others who consulted with BOEM. *See Okinawa dugong (Dugong Dugon) v. Mattis*, 330 F. Supp. 3d 1167, 1188 (N.D. Cal. 2018) (absence of prejudice under the NHPA where Plaintiffs failed to "identif[y] any additional information that they would have provided to supplement or broaden [the government's] analysis.").

(Aquinnah Wampanoag), the City of Newport, the Town of Little Compton, the Town of Middletown, the Town of Tiverton Historic Preservation Advisory Board, the Newport Historical Society, the Newport Restoration Foundation, the Norman Bird Sanctuary, the Preservation Society of Newport County, and others.[33]   BOEMGO 56081-86.   Additional consulting parties were invited throughout the consultation process as they were identified.  BOEMGO 36871-950, 56081-82.  Furthermore, Revolution Wind posted public notices about the consultation in newspapers and at local libraries and post offices.  BOEMGO 17896-98, 31901-07, 56082.

BOEM convened five consultation meetings between December 2021 and June 2023, and held a December 14, 2022 meeting on National Historic Landmarks ("NHLs").  BOEMGO 56088-89, 74486; *see also* BOEMGO 19838-48 (Dec. 17, 2021 meeting), 25062-76(Apr. 8, 2022 meeting), 31963-87 (Sept. 27, 2023 meeting summary), 35893-99 (Dec. 14, 2022 meeting), 53999-54008 (Apr. 7, 2023 meeting), 55797-812 (June 7, 2023 meeting); *see also* BOEMGO 18742-43 (consultation meeting with Wampanoag Tribe of Gay Head Aquinnah Chairwoman Andrews-Maltais).  BOEM also sought and considered the public's views regarding the NHPA process through the NEPA process in scoping meetings and through the DEIS.  BOEMGO 56081, 74487.

Moreover, contrary to Plaintiffs' claims (at 34-36), BOEM did not fail to take steps "to avoid or minimize harm" to historic properties.[34]  The record shows that BOEM, the Advisory

---

[33] Certain Plaintiffs should have been aware of the Section 106 consultation given their claimed involvement in local organizations that were consulting parties. *See* Dkt. 87-10 at 10 (Plaintiff claiming involvement in Preservation Society of Newport County, the Newport Restoration Foundation, and the Norman Bird Sanctuary); Dkt. 87-7 (Plaintiff claiming involvement in Preservation Society of Newport County); Dkt. 87-18 at 3 (same).

[34] Contrary to Plaintiffs' assertions (at 36), BOEM considered project alternatives with varying numbers of turbines and ultimately approved Alternative G up to 65 turbines (a 35% reduction from the proposed project), which BOEM determined would reduce visual impacts to historic properties, including NHLs in mainland Rhode Island.  BOEMGO 56125; BOEMGO 12, 2574; BOEMGO 414-15 (analyzing reduced visual impacts to Marble House, The Breakers, and Bellevue Historic District, among others, under the Preferred Alternative).

Council and the SHPOs for Connecticut, Rhode Island, Massachusetts, and New York executed the MOA, agreeing that execution and implementation of the MOA is "evidence that BOEM has taken into account the effects of this undertaking on historic properties and afforded the [Advisory Council] an opportunity to comment." BOEMGO 74515; *see also* 36 C.F.R. § 800.6(c). BOEM's resolution of adverse effects in consultation with the consulting parties is afforded a substantial degree of deference by a reviewing court—especially where, as here, that process culminated in a MOA concurred in by expert historic preservation agencies, such as the federal Advisory Council and SHPOs. *See, e.g.*, *Neighborhood Ass'n of the Back Bay v. Fed. Transit Admin.*, 463 F.3d 50, 59 (1st Cir. 2006).

Contrary to Plaintiffs' claim, the NHPA does not mandate a particular result or specific types of mitigation to resolve adverse effects to historic properties. *See, e.g.*, *Davis v. Latschar*, 202 F.3d 359, 370 (D.C. Cir. 2000); *Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 918 (D.D.C. 1996) (Section 106 does not require agencies "to engage in any particular preservation activities per se."); *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. FAA*, 651 F.3d 202, 207, 216-17 (1st Cir. 2011) (allowing agency to demolition of historic hangar).

Nonetheless, the Project's MOA required extensive measures to resolve adverse effects to historic properties. BOEMGO 74487-89, 74492-506. The MOA required avoidance measures, BOEMGO 74487-88, and to further minimize adverse effects to historic properties, including each of the adversely affected NHLs, the MOA required: (1) reducing the number of Project turbines to be installed by approximately 35 percent, to a maximum of 65; (2) the use of uniform turbine design, placement, speed, height, and rotor diameter to reduce visual contrast and decrease visual clutter; (3) painting turbines a specific color to reduce visual contrast during daytime hours; and (4) installation of an Aircraft Detection Lighting System and meeting standards and guidance to

reduce light intrusion.  BOEMGO 74495-96.[35]

The MOA also requires as conditions of COP approval significant mitigation for historic properties.  BOEMGO 74492-506  (MOA Stipulation III.C); *see also* BOEMGO 67393-447.  In fact, the MOA requires that Revolution Wind provide more than $11 million "to support avoidance, minimization, and mitigation of all adverse effects from the Project as described in the MOA at Stipulation III," BOEMGO 74567, which includes a $3,873,000 mitigation fund to resolve visual adverse effects to more than 60 historic properties, including each of the adversely affected NHLs at issue here: the Ocean Drive Historic District NHL and Bellevue Avenue Historic District NHL.  BOEMGO 74502-06, 74570-71.[36]  The MOA also requires funding to develop updates to the NHL nominations for Ocean Drive Historic District NHL and Bellevue Avenue Historic District NHL at the recommendation of the Rhode Island SHPO.  BOEMGO 35270, 74569.  These measures consider the nature, scope, and magnitude of adverse effects caused by the Project and the qualifying characteristics of each historic property that would be affected.  *See, e.g.*, BOEMGO 74504.  And the MOA signatories, including the Advisory Council and relevant SHPOs, agreed that the MOA fulfilled Section 106 requirements to resolve adverse effects.  *See* BOEMGO 74486; 36 C.F.R. § 800.6(c).

## 2.    BOEM Complied with the Requirements of NHPA Section 110(f)

Contrary to Plaintiffs' claim (at 36-37), the record demonstrates that BOEM gave heightened consideration to the Project's potential adverse effects on NHLs, following the process required under NHPA Section 110(f) and the NHPA implementing regulations.

---

[35] The lights are estimated to be active for only approximately three hours and 35 minutes over the course of the year (*i.e.*, less than 1%).  BOEMGO 806.

[36] Contrary to Plaintiffs' claim (at 36), BOEM appointed a fund administrator.  And post-decision implementation of the MOA is not before the Court.  *See, e.g.*, *Camp*, 411 U.S. at 142.

NHPA Section 110(f) requires, prior to approving an undertaking that "may directly and adversely affect" an NHL, "to the *maximum extent possible* [to] undertake such planning and actions as may be necessary to *minimize harm to*" the NHL and afford the Advisory Council a reasonable opportunity to comment. 54 U.S.C. § 306107 (emphasis added); 36 C.F.R. § 800.10. Like Section 106, Section 110(f) does not mandate substantive outcomes. *See, e.g.*, *Presidio Hist. Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1170 (9th Cir. 2016) ("Section 110(f) does not impose a substantive obligation"); *Neighborhood Ass'n of the Back Bay*, 463 F.3d at 63-64 (same).

Plaintiffs' allegation (at 37) that BOEM approved the Project "without adopting any measures to reduce turbine visibility" for the Ocean Drive and Bellevue Avenue Historic Districts is contradicted by the record. The Finding of Adverse Effect and the MOA make clear BOEM's compliance with Section 110(f) for each of the adversely affected NHLs, including those Historic Districts. BOEMGO 56120-22, 74484-86, 74488-89, 74492-506; *see also* BOEMGO 34711-804 (2022 NHL supplemental documentation with additional visual simulations). Although BOEM determined that all feasible alternatives would result in adverse visual effects to the adversely affected NHLs, BOEM concluded that alternatives for reduction in turbine numbers, including the Preferred Alternative G[37] adopted here, would reduce visual effects on the NHLs because fewer turbines would be constructed and visible from the properties. BOEMGO 56122-23.

Contrary to Plaintiffs' assertion (at 36), BOEM planned and undertook a variety of actions to minimize and mitigate effects to the adversely affected NHLs through measures adopted in the MOA and Conditions of COP Approval, including a $3,873,000 mitigation fund. *See supra* Section IV.E.1; BOEMGO 74488-89 (Stipulation II.C.1); BOEMGO 74492-506 (Stipulation

---

[37] Contrary to Plaintiffs' assertion (at 37), BOEM concluded alternatives E1 and E2 were technically and economically infeasible. BOEMGO 2585, 74764.

III.C); BOEMGO 3076-202, 67393-447.

BOEM also considered and applied the Secretary of the Interior's Standards and Guidelines requirements for Section 110(f) analysis, describing in detail the agency's compliance with Section 110(f).  BOEMGO 56121-22; *see also The Secretary of the Interior's Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to the National Historic Preservation Act* ("Standards and Guidelines"), U.S. Department of the Interior, Standard 4, 63 Fed. Reg. 20,496, 20,503 (Apr. 24, 1998).  BOEM fulfilled its responsibilities to give a higher level of consideration to minimizing harm to NHLs, as required by Section 110(f).  And consistent with the NHPA implementing regulations, 36 C.F.R. § 800.10(b)-(c), BOEM requested that the Advisory Council participate in this consultation to resolve adverse effects on NHLs, notified the National Park Service of the consultation involving an NHL, and invited the National Park Service to participate in the consultation.  BOEMGO 74484, 86, 147862-69, 148165-72, 148141-48. BOEM complied with the NHPA, and Plaintiffs' claims should therefore be rejected.

## F.    The Record Demonstrates BOEM's NEPA Compliance

Plaintiffs claim that BOEM violated NEPA by failing to explore project alternatives, assess cumulative impacts, and take the requisite "hard look" at the Project's environmental impacts. Mot. at 39-44.  Plaintiffs are wrong on both the facts and the law.  "The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 185 (2025).

### 1.    BOEM Adequately Considered Project Alternatives

Plaintiffs (at 39-40) mischaracterize the legal standard for consideration of alternatives under NEPA.  Congress amended NEPA to require consideration of "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and

meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii)."[38] When assessing "feasible alternatives" under NEPA, "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182-83.    Under the relevant Council on Environmental Quality's ("CEQ") NEPA implementing regulations,[39] the agency was required to "evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination," and to limit their consideration to a "reasonable number of alternatives." 40 C.F.R. § 1502.14 (2023).  The record makes clear that BOEM satisfied the standard.  *See, e.g.*, BOEMGO 55-130 (alternatives considered in detail); BOEMGO 131-38 (rationale for eliminating certain alternatives); BOEMGO 141-45 (comparing environmental impacts across alternatives).

NEPA does not require that BOEM consider project alternatives outside Revolution Wind's lease area, as Plaintiffs (at 40) argue.  Indeed, the statute only requires BOEM to consider alternatives "that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C)(iii).  BOEM appropriately concluded that "locating the proposed wind energy facility outside the Lease Area is not allowed under the terms of the lease; [and] would not be responsive to Revolution Wind's goals to construct and operate a commercial scale offshore wind energy facility in the Lease Area."  BOEMGO 132.

---

[38] *See* Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, div. C, tit. III, § 321(a), 137 Stat. 38 (2023).

[39] The FEIS was prepared under the CEQ NEPA regulations in place when BOEM approved the Project in August 2023.  BOEMGO 43.  The CEQ NEPA regulations have since been rescinded in their entirety.  *See* 91 Fed. Reg. 618 (Jan. 8, 2026).  Throughout their brief, Plaintiffs, incorrectly cite the 1978 version of the CEQ regulations that were modified and not in place in 2023.  *See* 85 Fed. Reg. 43,304 (July 16, 2020).  All CEQ regulatory cites here are to the 2023 regulations unless otherwise indicated.

And contrary to Plaintiffs' claim (at 40), BOEM considered project alternatives that would have "avoided or minimized impacts to essential fish habitat and navigation." *See* BOEMGO 107-109 (FEIS consideration of Alternative C to reduce fish habitat impacts), 122 (FEIS consideration of Alternative F to potentially reduce navigation risks); *see also* BOEMGO 2890, 2892. BOEM ultimately selected Alternative G because it "reduce[s] benthic habitat impacts in areas deemed critical by NOAA NMFS"[40] and "minimize[s] navigation risks and conflicts with other competing space uses," BOEMGO 2899-2900. BOEM clearly satisfied its duty to consider "feasible alternatives." *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 181-83.

## 2.    BOEM Adequately Considered Cumulative Impacts

NEPA requires consideration of "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C)(i). BOEM satisfied applicable regulations with respect to consideration of "cumulative effects." *See* 40 C.F.R. § 1508.1(g)(3) (2023); BOEMGO 147, 1001-02 (FEIS explaining its approach to cumulative analysis). BOEM's analysis is not "truncated" as Plaintiffs argue. *See* BOEMGO 141-822, 1219-562. BOEM considered more than 30 active and future offshore wind projects, BOEMGO 1001-05, which are evaluated throughout Chapter 3 of the FEIS. BOEMGO 147 (*see* Appendix E as defining scope).

BOEM did not "assume[] migratory animals would likely be able to proceed from structures unimpeded," as Plaintiffs suggest (at 42), but rather observed that "[t]here is no evidence to suggest that structures pose a barrier to migratory animals." BOEMGO 1089; *see also* BOEMGO 694, 1273, 1311.[41] And contrary to Plaintiffs' arguments (at 41-42), BOEM thoroughly

---

[40] The NMFS comment Plaintiffs cite (at BOEMGO 2770) was submitted prior to BOEM fully or partially adopting 19 of the 22 conservation recommendations that resulted from NMFS' Essential Fish Habitat Consultation with BOEM. BOEMGO 3058.

[41] BOEM's acknowledgement of uncertainty, BOEMGO 963, does not mean its analysis was deficient. *See Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C. Cir. 1981).

considered potential cumulative impacts related to commercial fishing, recreational fishing and vessel navigation. *See* BOEMGO 749-51, 754-56, 757-59 (navigation), BOEMGO 1441-46, 1453-55 (tourism, including recreational fishing); BOEMGO 314-22, 337-40, 343-44, 345-46 (commercial fishing, including navigation); *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 181 ("whether a particular report is detailed enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court").

### 3.    BOEM Took a "Hard Look" at the Project's Impacts

Plaintiffs cherry pick statements from the FEIS to claim (at 42-43) that BOEM "concedes that essential data was missing or incomplete" and erroneously rely on FEIS Appendix C to assert the FEIS was based on incomplete scientific information. Plaintiffs misstate what NEPA requires. *Izaak Walton League*, 655 F.2d at 377; *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180. BOEM prepared the FEIS in compliance with regulatory requirements to identify "incomplete or unavailable information." BOEMGO 955-72. And throughout Appendix C, the FEIS explains the robust data supporting BOEM's conclusions, despite the unavailability of certain information. BOEMGO 958-62.

Finally, the FEIS did not "brush[] aside navigation and safety impacts" nor did it fail to "analyze[] radar interference, emergency response, or accident scenarios" as Plaintiffs claim (at 43). *See, e.g.*, BOEMGO 735-64 (navigation and vessel traffic, including radar interference); BOEMGO 1396-415 (military and national security, including search and rescue). And Plaintiffs are wrong to claim (at 43) that the FEIS did not "seriously assess turbine or blade failure." *See, e.g.*, BOEMGO 139, 1226, 2648-52. Here, BOEM satisfied its procedural obligation to prepare "an adequate report". *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180-81.

## V.    CONCLUSION

For the foregoing reasons, Revolution Wind respectfully asks the Court to deny Plaintiffs'

motion for summary judgment and grant Revolution Wind's cross-motion for summary judgment.

Dated:  February 13, 2026                    Respectfully submitted,

By */s/  Janice M. Schneider*

Janice M. Schneider (D.C. Bar No. 472037)
Stacey L. VanBelleghem (D.C. Bar No. 988144)
Devin M. O'Connor (D.C. Bar No. 1015632)
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, D.C. 20004
Tel:  (202) 637-2200
Fax:  (202) 637-2201
Email: janice.schneider@lw.com
        stacey.vanbelleghem@lw.com
        devin.o'connor@lw.com

*Counsel for Defendant-Intervenor*
*Revolution Wind, LLC*