**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

GREEN OCEANS, et al.,

*Plaintiffs,*

*v.*

UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,

*Federal Defendants*,

*and*

REVOLUTION WIND, LLC,

*Intervenor-Defendant.*

Case No. 1:24-cv-00141-RCL

Hon. Royce C. Lamberth

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

BACKGROUND ..... 1

I. Legal Background ..... 1

A. Renewable Energy Leasing Under the Outer Continental Shelf Lands Act ..... 1

B. National Historic Preservation Act ..... 2

C. Clean Water Act ..... 4

D. Endangered Species Act ..... 4

E. Marine Mammal Protection Act ..... 5

II. Factual Background ..... 6

A. BOEM's Review of the Revolution Wind COP ..... 7

B. The Corps' Issuance of the CWA Permit ..... 9

C. NMFS's Issuance of the Biological Opinion ..... 10

D. NMFS's Issuance of the Letter of Authorization ..... 11

STANDARD OF REVIEW ..... 12

ARGUMENT ..... 12

I. Interior agrees its OCSLA finding warrants re-evaluation. ..... 13

II. Because BOEM's COP approval should be remanded, the Court need not reach Plaintiffs' NEPA and NHPA challenges to that same agency action. ..... 15

III. Plaintiffs' CWA claim lacks merit. ..... 16

A. The Court lacks jurisdiction to hear Plaintiffs' CWA claim. ..... 16

B. Plaintiffs' CWA claim rests on a misunderstanding of the Corps' jurisdiction. ..... 18

C. The Corps conducted a thorough analysis, within a reasonable scope. ..... 19

IV. Plaintiffs' ESA and MMPA claims lack merit. ..... 21

A. NMFS relied on the best available science. ..... 21

1. NMFS's analyses are consistent with its NARW Strategy. ..... 22

2. NMFS considered potential behavioral disturbance impacts from sound exposure. 24

3. NMFS properly considered the impacts of other wind projects in its ESA analysis. 25

4. NMFS considered the risk of turbine failure. 28

5. NMFS considered impacts to the NARW's prey species. 29

B. The Biological Opinion's ITS complies with the ESA. 30

C. NMFS's findings in the Biological Opinion are consistent. 32

D. NMFS's "small numbers" and "negligible impact" determinations under the MMPA are reasonable. 34

CONCLUSION 37

## TABLE OF AUTHORITIES

**Statutes**

*Alaska Wildlife All. v. U.S. & Wildlife Serv.*,
No. 23-35299, 2024 WL 1169411 (9th Cir. Mar. 19, 2024) .................................................. 35

*Already, LLC v. Nike,*
568 U.S. 85 (2013)................................................................................................................ 16

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997)................................................................................................................ 16

*Balt. Gas. & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983)................................................................................................................ 30

*Banner Health v. Price*,
867 F.3d 1323 (D.C. Cir. 2017) ............................................................................................ 16

*Burlington N. R.R. Co. v. Surface Transp. Bd.,*
75 F.3d 685 (D.C. Cir. 1996) ................................................................................................ 16

*Camp v. Pitts*,
411 U.S. 138 (1973).............................................................................................................. 25

*Cap. Area Immigrants' Rights Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................................................ 15

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).............................................................................................................. 28

*City of Las Vegas v. Lujan*,
891 F.2d 927, 933 (D.C. Cir. 1989) ...................................................................................... 22

*Code v. McHugh*,
139 F. Supp. 3d 465 (D.D.C. 2015) ...................................................................................... 14

*CTIA-Wireless Ass'n v. FCC*,
466 F.3d 105 (D.C. Cir. 2006) ................................................................................................ 3

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ................................................................................................ 34

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101 (9th Cir. 2012) .............................................................................................. 27

*Defs. of Wildlife v. Babbitt*,
130 F. Supp. 2d 121 (D.D.C. 2001) ...................................................................................... 26

*EMILY's List v. Fed. Election Comm'n*,
569 F. Supp. 2d 18 (D.D.C. 2008) ........................................ 15

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................ 14

*Finca Santa Elena, Inc., v. U.S. Army Corps of Eng'rs,*
62 F. Supp. 3d 1 (D.D.C. 2014) ........................................ 17

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)........................................ 14

*Friends of the Earth v. Laidlaw Env't Servs.*,
528 U.S. 167 (2000)........................................ 16

*IMS, P.C. v. Alvarez*,
129 F.3d 618 (D.C. Cir. 1997) ........................................ 12

*Keating v. FERC*,
569 F.3d 427 (D.C. Cir. 2009) ........................................ 12

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989)........................................ 30

*Melone v. Coit*,
100 F.4th 21 (1st Cir. 2024)........................................ 35, 37

*Miccosukee Tribe of Indians of Fla. v. United States*,
566 F.3d 1257 (11th Cir. 2009)........................................ 27

*Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)........................................ 12, 19

*Nat'l Fam Planning & Reprod. Health Ass'n v. Sullivan*,
979 F.2d 227 (D.C. Cir. 1992) ........................................ 15

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*,
947 F. Supp. 2d 1031 (D. Alaska 2013) ........................................ 35

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
463 F.3d 50 (1st Cir. 2006) ........................................ 4

*Oceana, Inc. v. Pritzker*,
24 F. Supp. 3d 49 (D.D.C. 2014) ........................................ 15

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
45 F.4th 291 (D.C. Cir. 2022) ........................................ 2

*Preservation Society of Newport County v. Burgum*,
No. 23-cv-03510 (APM), 2026 WL 787910 (D.D.C. Mar. 20, 2026) ..................................... 17

*Presidio Hist. Ass'n v. Presidio Trust*,
811 F.3d 1154 (9th Cir. 2016) ..................................................................................... 3

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)........................................................................................................ 2

*Sackett v. EPA*,
598 U.S. 651 (2023)...................................................................................................... 18

*Save Long Beach Island v. U.S. Dep't of Com.*,
794 F. Supp. 3d 273 (D.N.J. 2025) ......................................................................... 35, 37

*Save Long Beach Island, Inc. v. U.S. Dep't of Com.*,
No. 25-cv-2211 (JMC), 2026 WL 2294613 (D.D.C. Aug. 10, 2026) ...................................... 14

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
123 F.4th 1 (1st Cir. 2024) ...................................................................................... 14, 19

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
Nos. 1:22-cv-11091-IT, 1:22-cv-11172-IT, 2023 WL 6691015 (D.D.C. Oct. 12, 2023).......... 15

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)........................................................................................... 2, 19, 20

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
992 F.3d 1071 (D.C. Cir. 2021) .................................................................................... 30

*Sierra Club v. U.S. Dep't of Interior*,
990 F.3d 898 (5th Cir. 2021)......................................................................................... 27

*Spencer v. Kemna,*
523 U.S. 1 (1998).......................................................................................................... 17

*Sw. Ctr. for Biological Diversity v. Babbitt*,
215 F.3d 58 (D.C. Cir. 2000) ........................................................................................ 22

*Tindal v. McHugh*,
945 F. Supp. 2d 111 (D.D.C. 2013)............................................................................... 12

*Town & County of Nantucket v. Burgum*,
No. 25-cv-906, 2025 WL 3120419 (D.D.C. Nov. 4, 2025) .................................................... 14

*Trongone v. Comm'r of Internal Revenue*,
179 F.4th 1 (D.C. Cir. 2026) ........................................................................................ 14

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
933 F.3d 728 (D.C. Cir. 2019) .......... 3

*United States v. Louisiana*,
470 U.S. 93 (1985) .......... 18

*United States v. Maine*,
420 U.S. 515 (1975) .......... 18

*Wallish v. U.S. Dep't of Def.*,
No. 24-cv-00616, 2025 WL 1580702 (D.D.C. June 4, 2025) .......... 14

*Weaver's Cove Energy LLC, v. R.I. Coastal Res. Mgmt. Council*,
583 F. Supp. 2d 259 (D.R.I. 2008) .......... 18, 19

**Statutes**

5 U.S.C. § 706 .......... 26, 29

5 U.S.C. § 706(2)(A) .......... 12

16 U.S.C. § 1371(a)(3)(A) .......... 23

16 U.S.C. § 1371(a)(5)(A)(i)(II) .......... 6

16 U.S.C. § 1362(13) .......... 5

16 U.S.C. § 1362(18)(A)(i) .......... 5

16 U.S.C. § 1362(18)(A) .......... 5

16 U.S.C. § 1362(18)(A)(ii) .......... 5

16 U.S.C. § 1371(a) .......... 5

16 U.S.C. § 1371(a)(5)(A) .......... 23

16 U.S.C. § 1371(a)(5)(A)(i) .......... 6, 24, 36, 38

16 U.S.C. § 1371(a)(5)(A)(i)(I) .......... 36

16 U.S.C. § 1371(a)(5)(A)(i)-(i)(I) .......... 6

16 U.S.C. § 1372(a)(1) .......... 5

16 U.S.C. § 1532(19) .......... 5, 32

16 U.S.C. § 1536(a)(2) .......... 4

16 U.S.C. § 1536(b)(4) ........ 5, 32

16 U.S.C. § 1536(b)(4)(C)(ii) ........ 32, 33

16 U.S.C. § 1536(b)(4)(C)(iii) ........ 32

16 U.S.C. § 1536(o) ........ 5

16 U.S.C. § 1538(a)(1)(B) ........ 32

16 U.S.C. § 1532(15) ........ 4

33 U.S.C. § 1344 ........ 9

33 U.S.C. § 1344(a) ........ 17

33 U.S.C. § 1344(b)(1) ........ 4

33 U.S.C. § 1344(f)(1)(B) ........ 18

33 U.S.C. § 1362(7) ........ 19

42 U.S.C. § 4332(2)(C) ........ 2

43 U.S.C. § 1337(p)(1)(C) ........ 1

43 U.S.C. § 1337(p)(4) ........ 14

43 U.S.C. § 1337(p)(4)(A)-(L) ........ 2

43 U.S.C. § 1337(p)(8) ........ 1

54 U.S.C. § 300308 ........ 2

54 U.S.C. § 300320 ........ 2

54 U.S.C. § 306107 ........ 3

54 U.S.C. § 306108 ........ 2

**Code of Federal Regulations**

30 C.F.R. pt. 585 ........ 1

30 C.F.R. § 585.102(a) ........ 2

30 C.F.R. § 585.200(a)(1) ........ 1

30 C.F.R. § 585.210 ........ 1

30 C.F.R. § 585.211 .......... 1

30 C.F.R. § 585.215 .......... 1

30 C.F.R. § 585.216 .......... 1

30 C.F.R. § 585.600 .......... 1

30 C.F.R. §§ 585.605-585.613 .......... 1

30 C.F.R. §§ 585.620-585.628 .......... 1, 7

33 C.F.R. § 320.1-320.4 .......... 9

33 C.F.R. § 320.4(a)(1) .......... 4, 17

33 C.F.R. § 329.12 .......... 20, 21

33 C.F.R. § 329.12(a) .......... 19

36 C.F.R. Part 800 .......... 3

36 C.F.R. § 800.2-800.6 .......... 3

36 C.F.R. § 800.3 .......... 3, 16

36 C.F.R. § 800.4 .......... 3, 16

36 C.F.R. § 800.5 .......... 3, 16

36 C.F.R. § 800.6 .......... 3, 16

36 C.F.R. § 800.6(c) .......... 16

36 C.F.R. § 800.6(c)(1) .......... 9

36 C.F.R. § 800.6(c)(3) .......... 9

40 C.F.R. § 230.1 .......... 4, 17

40 C.F.R. § 230.1-230.98 .......... 10

50 C.F.R. § 216.102(a) .......... 23

50 C.F.R. § 216.104(c) .......... 23

50 C.F.R. § 216.105 .......... 6

50 C.F.R. § 216.105(b) .......... 6

50 C.F.R. § 216.106 .......... 6

50 C.F.R. § 216.106(a) .......... 6

50 C.F.R. § 216.106(b) .......... 6

50 C.F.R. § 216.3 .......... 5

50 C.F.R. § 402 .......... 27

50 C.F.R. § 402.01(b) .......... 4

50 C.F.R. § 402.02 .......... 27

50 C.F.R. § 402.14 .......... 4

50 C.F.R. § 402.14(a)-(b) .......... 24

50 C.F.R. § 402.14(g) .......... 27

50 C.F.R. § 402.14(g)(2)-(5) .......... 4

50 C.F.R. § 402.14(g)(7) .......... 32

50 C.F.R. § 402.14(g)(8) .......... 23

50 C.F.R. § 402.14(g)-(h) .......... 5

50 C.F.R. § 402.14(i)(1)-(4) .......... 32

50 C.F.R. § 402.14(i)(1)(ii) .......... 5, 32, 33

50 C.F.R. § 402.14(i)(1)(iv) .......... 5, 32

50 C.F.R. § 402.14(i)(5) .......... 32

**Federal Register**

51 Fed. Reg. 19926 (June 3, 1986) .......... 27

74 Fed. Reg. 19638 (Apr. 29, 2009) .......... 1

86 Fed. Reg. 22972 (Apr. 30, 2021) .......... 7

87 Fed. Reg. 54248 (Sept. 2, 2022) .......... 7

**Legislative History**

H.R. Rep. No. 97-228 (1981), as reprinted in 1981 U.S.C.C.A.N. 1458, 1469 .......... 36

The Court should remand the Department of the Interior's approval of the Construction and Operations Plan ("COP") for Revolution Wind so that Interior can re-evaluate its compliance with the Outer Continental Shelf Lands Act ("OCSLA"). Given that remand, the Court need not reach Plaintiffs' other claims challenging the COP approval. Summary judgment should be granted in favor of Federal Defendants on Plaintiffs' claims against the National Marine Fisheries Service and the U.S. Army Corps of Engineers.

## BACKGROUND

### I. Legal Background

#### A. Renewable Energy Leasing Under the Outer Continental Shelf Lands Act

Offshore wind development on the Outer Continental Shelf ("OCS") occurs under OCSLA. Congress amended OCSLA in 2005 to authorize the Secretary of the Interior to issue leases to "support production, transportation, storage, or transmission of energy from sources other than oil and gas," which includes wind energy. Energy Policy Act of 2005, 43 U.S.C. § 1337(p)(1)(C). Regulations promulgated by the Bureau of Ocean Energy Management ("BOEM"), located within the Department of the Interior ("Interior"), govern offshore renewable energy development.[1] 43 U.S.C. § 1337(p)(8); 74 Fed. Reg. 19638 (Apr. 29, 2009); 30 C.F.R. Part 585. After identifying wind energy areas for leasing, 30 C.F.R. §§ 585.210-585.211, Interior may offer the identified areas or portions of those areas for lease sale via auction. *Id.* §§ 585.215-585.216. Development of a lease, however, can only occur if Interior approves a site assessment plan and, later, a COP. *Id.* §§ 585.200(a)(1), 585.600, 585.605-585.613 (site assessment plan requirements), 585.620-585.628 (COP requirements).

[1] Secretary's Order 3451 established the Marine Minerals Administration ("MMA"), which replaced BOEM. The transition from BOEM to the MMA is ongoing. This brief refers to BOEM in describing past agency actions to avoid confusion in reviewing the administrative record.

When approving a project under OCSLA, Interior must ensure that "any activity" that it authorizes is "carried out in a manner that provides for" twelve enumerated requirements, including: "safety;" "protection of the environment;" "conservation of the natural resources of the [OCS];" "prevention of interference with reasonable uses (as determined by the Secretary)" of the OCS; and consideration of other uses of the sea and seabed, including the use of the area for fishing and marine navigation. 43 U.S.C. § 1337(p)(4)(A)-(L); 30 C.F.R. § 585.102(a).

### A. National Environmental Policy Act

The National Environmental Policy Act ("NEPA") is a procedural statute that serves the dual purpose of informing agency decision-makers of the environmental consequences of their proposed actions and ensuring that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA does not mandate particular results. *Id.* NEPA requires preparation of an environmental impact statement ("EIS") for "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must examine, among other things, "alternatives to the proposed agency action," and the action's "reasonably foreseeable" impacts. *Id.* § 4332 (2)(C)(i)-(iii). "[T]he central principle of judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179 (2025).

### B. National Historic Preservation Act

Two provisions of the National Historic Preservation Act ("NHPA") are relevant to this case. The first is Section 106, which "requires an agency, 'prior to the issuance of any license, [to] take into account the effect of the undertaking on any historic property.'" *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 296 (D.C. Cir. 2022) (alteration in original) (quoting 54 U.S.C. § 306108). Like NEPA, Section 106 is procedural in nature and does not impose substantive preservation requirements. *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 106-07 (D.C.

Cir. 2006). A "historic property" is one included on, or eligible for inclusion on, the National Register of Historic Places. 54 U.S.C. § 300308. As relevant here, an "undertaking" is defined broadly to include any "project, activity, or program" that requires a federal permit. *Id.* § 300320.

Regulations promulgated by the Advisory Council on Historic Preservation ("ACHP") govern federal agencies' compliance with Section 106. *See* 36 C.F.R. Part 800. The regulations generally set forth a four-step process: (1) initiation (*Id.* § 800.3); (2) identification of historic properties potentially affected, which requires determining an undertaking's area of potential effects (*Id.* § 800.4); (3) assessment of effects, including adverse effects that may impact the "characteristics of a historic property that qualify the property for inclusion in the National Register" (*Id.* § 800.5); and (4) efforts to resolve any adverse effects (*Id.* § 800.6). *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 745 (D.C. Cir. 2019). Agencies are to consult with the identified consulting parties in the second, third, and fourth steps. 36 C.F.R. §§ 800.2-800.6. Importantly, "resolution" in this context does not refer to the elimination of adverse effects or to a certain degree of reduction in adverse effects. Rather, it refers to the agreement of certain parties identified by regulation on how to move forward. *Id.* § 800.6.

The second relevant provision of the NHPA is Section 110(f), which concerns National Historic Landmarks ("NHLs"). NHLs are "historic and archaeological sites, buildings, and objects which possess exceptional value as commemorating or illustrating the history of the United States." BOEMGO_355 (internal quotations omitted). For any project "directly and adversely affect[ing] any [NHL]," Section 110(f) requires that an agency, to "the maximum extent possible[,] undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107. Like Section 106, Section 110(f) does not impose substantive preservation requirements. *See Presidio Hist. Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1169 (9th Cir. 2016);

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 64 (1st Cir. 2006). Instead, it sets a heightened procedural standard for considering potential impacts to NHLs.

**C. Clean Water Act**

Section 404 of the Clean Water Act ("CWA") provides that the U.S. Army Corps of Engineers ("Corps") may issue a permit for dredge and fill activities with potentially significant impacts in the navigable waters of the United States after a period of notice and comment. 33 U.S.C. § 1344(b)(1). The Corps' decision to issue the permit is based on the probable impact of the proposed activity after "a careful weighing" of the expected benefits and the reasonably foreseeable detriments that balances numerous environmental concerns, navigation, energy needs and public welfare. 33 C.F.R. § 320.4(a)(1) (General policies for evaluating permit applications). When dredge and fill material requires discharge, the regulations further require the Corps to "maintain the chemical, physical, and biological integrity of waters of the United States," and determine there is no "unacceptable adverse impact" on aquatic ecosystems. 40 C.F.R. § 230.1.

**D. Endangered Species Act**

Section 7 of the Endangered Species Act ("ESA") directs federal agencies to ensure that any action they authorize, fund, or carry out is "not likely to jeopardize the continued existence of" any ESA-listed species or destroy or adversely modify critical habitat that has been designated for such species. 16 U.S.C. § 1536(a)(2).[2] To achieve that objective, if an agency's proposed action may affect and is likely to adversely affect an ESA-listed species or critical habitat, the agency must engage in formal consultation with the consulting agency (here, NMFS). 50 C.F.R. § 402.14.

---

[2] Depending on the species in question, either the Secretary of Commerce or the Secretary of the Interior is responsible for implementing the ESA as the consulting agency. 16 U.S.C. § 1532(15). The Secretary of Commerce administers the ESA through the National Marines Fisheries Service ("NMFS") and the Secretary of the Interior administers the ESA through the U.S. Fish and Wildlife Service. 50 C.F.R. § 402.01(b).

Formal consultation culminates in the issuance of a "biological opinion" by the consulting agency. *Id.* § 402.14(g)(2)-(4). The biological opinion evaluates the status of ESA-listed species and designated critical habitat, the environmental baseline within the action area, the effects and cumulative effects of the agency's proposed action on those species, and includes the consulting agency's opinion as to whether the action is "likely to jeopardize the continued existence" of any listed species or result in the destruction or adverse modification of critical habitat. *Id.* § 402.14(g)-(h). If incidental "take" is anticipated, the biological opinion must include an incidental take statement ("ITS") that specifies the extent or amount of incidental take and specifies "reasonable and prudent measures . . . necessary or appropriate to minimize such impact," and terms and conditions to implement those measures. 16 U.S.C. §§ 1532(19), 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(ii), (iv). Any incidental take that occurs consistent with the specified measures in an ITS is exempt from ESA Section 9's prohibition on take of listed species. 16 U.S.C. § 1536(o).

**E. Marine Mammal Protection Act**

Subject to certain exceptions, the Marine Mammal Protection Act ("MMPA") prohibits the "taking and importation of marine mammals." 16 U.S.C. §§ 1371(a), 1372(a)(2)(A). The term "take" is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13); 50 C.F.R. § 216.3. The MMPA identifies two types of "harassment": "Level A" and "Level B". 16 U.S.C. § 1362(18)(A); 50 C.F.R. § 216.3. Level B harassment—the type at issue here—is defined as "any act of pursuit, torment, or annoyance" which has the "potential to disturb" a marine mammal by causing "disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18)(A)(ii), 18(D). By contrast, Level A harassment is defined as having the "potential to injure" a marine mammal." *Id.* § 1362(18)(A)(i).

The MMPA includes an exception under which, upon request "by [U.S. citizens] who

engage in a specified activity . . . within a specified geographical region, [NMFS] shall allow . . . the incidental, but not intentional, taking . . . of small numbers of marine mammals of a species or population stock if [NMFS] . . . finds that the total of such taking . . . will have a negligible impact on such species or stock[.]" *Id.* § 1371(a)(5)(A)(i)-(i)(I).[3] If granted, an Incidental Take Regulation ("ITR"), together with a Letter of Authorization ("LOA"), may authorize such incidental take for a period of up to five years. *Id.* § 1371(a)(5)(A)(i); 50 C.F.R. §§ 216.105, 216.106.[4] When NMFS approves a request for an ITR, it must prescribe: (1) the "permissible methods of taking" pursuant to the applicant's specified activity; (2) "other means of effecting the least practicable adverse impact" on the affected species or stock and its habitat; and (3) "requirements pertaining to the monitoring and reporting" of the authorized take. 16 U.S.C. § 1371(a)(5)(A)(i)(II); 50 C.F.R. § 216.105(b).

## II. Factual Background

The Revolution Project is an offshore wind energy project off the coast of Rhode Island. BOEMGO_7. The Project as approved consists of 65 wind turbine generators, submarine cables between the turbines, two offshore substations, two submarine export cables to shore, an onshore substation, and interconnection circuits facilitating connection to the electric grid. BOEMGO_2892, 28901-28904. Revolution Wind required permits or approvals from BOEM, the Corps, and NMFS for various aspects of project development and eventual operation.

---

[3] The Secretary of Commerce has delegated authority to the NMFS Office of Protected Resources to implement the MMPA. *See* Department of Commerce Organizational Orders (DOO) 25-5 § 6.04 (May 4, 2015).

[4] An ITR does not authorize take. Rather, an applicant must apply for and obtain an LOA to conduct identified activities pursuant to the ITR. 50 C.F.R. § 216.106(a). To issue an LOA, NMFS must determine that the level of taking expected from the activities identified in the LOA application will be consistent with the findings made for the total taking allowable under the ITR. *Id.* § 216.106(b).

BOEMGO_2880. BOEM, the Corps, and NMFS issued a joint Record of Decision ("ROD") in August 2023 for their respective permits and approvals. BOEMGO_2877-3075.

### A. BOEM's Review of the Revolution Wind COP

Under BOEM regulations, Revolution Wind could not develop its lease unless BOEM approved a COP. 30 C.F.R. §§ 585.620-585.628. Revolution Wind submitted an initial COP for the Project to BOEM in 2020 and an updated COP in April 2021. BOEMGO_2882. Shortly thereafter, BOEM published a notice of intent to prepare an EIS for the proposed project. BOEMGO_17360 (86 Fed. Reg. 22972 (Apr. 30, 2021)). The notice described the Project as proposed in Revolution Wind's COP—consisting of up to 100 turbines, submarine cables, up to two offshore substations, transmission cables making landfall in Rhode Island, onshore transmission circuits, and an onshore substation. BOEMGO_17360-61. BOEM's process of reviewing the Revolution Wind COP included review under NEPA, the NHPA, and OCSLA.

BOEM's April 2021 notice commenced the NEPA process and also announced that BOEM would use the NEPA process to initiate and inform NHPA Section 106 consultation for the Project. BOEMGO_17361-62. The notice began the public scoping process "for identifying issues and potential alternatives for consideration" in the EIS regarding the Project's COP. BOEMGO_17362. In addition to taking written comments, BOEM held three public meetings during the scoping period where it received comments and answered questions. BOEMGO_17362; BOEMGO_17486-579; BOEMGO_17671-761; BOEMGO_17770-877. BOEM published a draft EIS in September 2022. BOEMGO_215546 (87 Fed. Reg. 54248 (Sept. 2, 2022)). Appendix A to the final EIS describes the process BOEM undertook to solicit and receive input from interested parties on the draft EIS. BOEMGO_823-46. There was a 45-day public comment period on the draft EIS. BOEMGO_843. BOEM also held three in-person public hearings and two virtual public hearings during the public review and comment period. BOEMGO_843.

BOEM published the final EIS in July 2023. BOEMGO_3. The purpose of the EIS was to assess the reasonably foreseeable impacts that could result from the construction and installation, operation and maintenance, and conceptual decommissioning of the Project. The EIS analyzed a "No Action" alternative, the Project as proposed by Revolution Wind, and five other action alternatives. BOEMGO_9-13. For each alternative, the EIS considered the potential impacts on a variety of resources. BOEMGO_15-19; BOEMGO_55-144. BOEM ultimately designated a habitat and viewshed minimization hybrid alternative (also referred to as Alternative G) as its preferred alternative. BOEMGO_58-59.

BOEM also began the NHPA Section 106 consultation process for the Project in April 2021. BOEMGO_17361-62. The same notice that began the NEPA scoping process sought "public comment and input regarding the identification of historic properties within the [Project's] area of potential effects and the potential effects" the Project may have on historic properties. BOEMGO_17363. BOEM invited 127 parties to participate in Section 106 consultation for the Project; 53 either accepted BOEM's invitation or were subsequently added as consulting parties by BOEM. BOEMGO_2032-39.

Following consultation with consulting parties, consideration of public input, and review of a series of technical reports, BOEM published its Section 106 Finding of Adverse Effect in June 2023. The Finding described the Project's area of potential effects, how BOEM identified historic properties, BOEM's assessment of adverse effects to historic properties, and potential avoidance, minimization, and mitigation measures. BOEMGO_2007-2146. BOEM found that there were 101 historic properties within the Project's visual area of potential effects that would be adversely affected by the Project and other reasonably foreseeable offshore wind energy projects. BOEMGO_2014, 20147. Because BOEM found that five NHLs were among the adversely

affected properties, BOEM notified the National Park Service and ACHP of its Finding of Adverse Effect. BOEMGO_2072.

To resolve adverse effects under the NHPA, BOEM and consulting parties developed a Memorandum of Agreement regarding the Project. BOEMGO_74483-74574. The signatories included BOEM; the State Historic Preservation Officers of Connecticut, Rhode Island, New York, and Massachusetts; ACHP; and Revolution Wind. BOEMGO_74516-74522; *see also* 36 C.F.R. § 800.6(c)(1). The Corps and the Town of Aquinnah also signed. BOEMGO_74531-74532; *see also* 36 C.F.R. § 800.6(c)(3). The Memorandum of Agreement identified binding avoidance, minimization, and mitigation measures to resolve adverse effects to historic properties.

Following publication of the Final EIS for the Project and execution of the Section 106 Memorandum of Agreement, BOEM published its ROD approving, with modifications, the COP for the Project. BOEMGO_2877-904. Pursuant to the ROD, Revolution Wind was permitted to construct only 65 turbines rather than the 100 proposed. BOEMGO_2901.

**B. The Corps' Issuance of the CWA Permit**

In April 2021, BOEM invited the Corps to consult on the NEPA review process for the Revolution Wind site, USACE_AR_0000015-23, and the Corps agreed to participate as a cooperating agency. USACE_AR_0000066-68. Then on December 22, 2021, the Corps received an application from Revolution Wind LLC for an individual permit pursuant to Section 404(b)(1) of the CWA, authorizing cable protection and fill for two pits. USACE_AR_0000090-126; 33 U.S.C. § 1344 (Section 404); 33 C.F.R. § 320.1-320.4 (implementing regulations). The Corps reviewed that application, with tens of thousands of pages of attachments, and participated in public notice and comment. *See* Dkt. No. 59-6 at 1-8 (showing the application spans from 0000090-0052307); *id.* at 9, 12, USACE_AR_0055957-56037 (showing Corps public notice); USACE_AR_0056045-111, 0056113-229, 0056230-359 (Corps participation in BOEM public

hearings); USACE_AR_0067019-21 (summarizing public comments and responses). After reviewing, the Corps provided multiple factual determinations, weighing the impacts of the proposed cable protection and pit filling. *See* USACE_AR_0067016-50; 40 C.F.R. § 230.1-230.98 (Section 404(b)(1) Guidelines). With respect to environmental conditions, the Corps conducted an analysis of the cumulative effects of the project on aquatic ecosystems in waters of the United States and determined that the long-term effects would be minor. USACE_AR_0067037-38. The Corps further explained that the work permitted under Section 404 would have no effect on water circulation, fluctuation, salinity, and contaminants; that work would cause only minor short-term effects on turbidity; and, in the long-term, the work would have minor effects on the physical substrate and aquatic ecosystem. USACE_AR_0067037. Not all of the ecosystem effects were negative. Some aquatic life preferred the rockier habitat and artificial reef conditions created by the construction. USACE_AR_0067035 (404(b)(1) Guidelines evaluation), 0067040-45 (Public Interest Review). With respect to navigation and commercial fishing, the Corps found more significant impacts. USACE_AR_0067044. Yet, overall, the benefits of the permitted activity outweighed these adverse impacts, such that the permit was not contrary to the public interest and met Section 404(b)(1) requirements. USACE_AR_0067035. On October 2, 2023, the Corps validated the permit subject to specific conditions that would mitigate adverse impacts. USACE_AR_0068433-56.

### C. NMFS's Issuance of the Biological Opinion

BOEM engaged with NMFS's Greater Atlantic Regional Fisheries Office (the consulting agency, referred to in this brief as "NMFS") in a formal ESA Section 7 consultation to analyze the potential effects of the Project on ESA-listed species, including the North Atlantic right whale ("NARW"), and designated critical habitat. BOEM initiated consultation in August 2022 as the lead action agency on behalf of itself, the Corps, and NMFS's Office of Protected Resources. In

July 2023, NMFS issued a biological opinion in which it determined that federal authorization of the Project is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of critical habitat. NMFS_1659-2315. Several months later, BOEM and NMFS's Office of Protected Resources requested reinitiation of consultation with NMFS on two narrow bases. NMFS_3384-86. NMFS reinitiated the consultation process and, in April 2024, issued a new biological opinion that superseded and replaced the prior 2023 biological opinion (the operative 2024 biological opinion is referred to in this brief as the "Biological Opinion"). NMFS_2670-3383. The Biological Opinion, again, concluded that the Project is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of critical habitat.

### D. NMFS's Issuance of the Letter of Authorization

Revolution Wind also sought and received an LOA from NMFS under the MMPA, authorizing the take of small numbers of marine mammals incidental to its construction of the Project. With respect to the NARW, Revolution Wind sought authorization of take by Level B harassment only; it did not seek authorization for take by mortality or serious injury of any marine mammal. NMFS_61427-29. Upon publishing a notice of receipt of Revolution Wind's application, NMFS provided a thirty-day public comment period. *Id.*

NMFS then published a proposed ITR that would govern the issuance of Revolution Wind's requested LOA, NMFS_605-706, and opened another public comment period. NMFS_93014. After consideration of public comments on the proposed rule, NMFS issued a final ITR in October 2023, NMFS_2376-487, and an LOA to Revolution Wind in November 2023, NMFS_2496-538. In November 2023, NMFS issued a correction to the ITR, NMFS_62961-63, and, in April 2024, NMFS issued a modified LOA, superseding and replacing the prior LOA (the operative 2024 LOA

is referred to in this brief as the "LOA"), NMFS_63484-526.[5] The LOA governs Revolution Wind's incidental taking of marine mammals during construction of the Project for a five-year period, from November 20, 2023 to November 19, 2028. NMFS_63484. Per the terms of the LOA, "[t]ake by mortality or serious injury of any marine mammal species is not authorized." NMFS_63485.

## STANDARD OF REVIEW

Plaintiffs' claims are governed by the APA's standard of review, under which an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is narrow, asking only whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009). In making this determination, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Review is limited to the administrative record, which consists of "materials that were before the agency at the time its decision was made" and were directly or indirectly considered by agency decision makers. *Tindal v. McHugh*, 945 F. Supp. 2d 111, 123 (D.D.C. 2013) (quoting *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997)).

## ARGUMENT

Plaintiffs assert claims under OCSLA, NEPA, the NHPA, CWA, ESA, and MMPA.[6] Second Am. Compl. to Reverse and Set Aside Agency Action, Dkt. No. 82 ("SAC"); Pls.' Mem.

---

[5] NMFS determined that the modification to the LOA, requested by Revolution Wind, did "not change the findings made for the [ITR] and [did] not result in any change in the total estimated number of takes of marine mammals." NMFS_63482.

[6] The Court dismissed the Migratory Bird Treaty Act ("MBTA") and Coastal Zone Management Act ("CZMA") claims in Plaintiffs' First Amended Complaint. Dkt. No. 69. However, Plaintiffs retained the MBTA and CZMA claims in their Second Amended Complaint following the Court's

in Supp. of Mot. for Summ. J. 5-45, Dkt. No. 87-1 ("Pls.' Br."). Interior agrees that its OCSLA finding warrants re-evaluation, and the Court should accordingly remand BOEM's COP approval to the agency. Given that remand, the Court need not reach Plaintiffs' NEPA and NHPA claims challenging the COP approval. Summary judgment should be granted in Federal Defendants' favor on Plaintiffs' remaining claims against the Corps and NMFS under the CWA, ESA, and MMPA.

## I. Interior agrees its OCSLA finding warrants re-evaluation.

This Court previously found that Plaintiffs failed to provide the requisite pre-suit notice under 43 U.S.C. § 1349 for their OCSLA claim. Dkt. No. 70 at 26. Plaintiffs attempted to cure that deficiency by re-pleading the claim under the APA. SAC ¶¶ 67, 73; *see also* Pls.' Mem. in Supp. of Mot. for Leave to File a Second Am. Compl. 7, Dkt. No. 74-1. Regardless of the validity of that effort, however, Interior believes its prior OCSLA analysis for the Revolution Project warrants reevaluation. Decl. of Michael D. Olsen ¶¶ 5-6 (Oct. 9, 2026). BOEM found that its preferred alternative was "expected to have major impacts to commercial fisheries and for-hire recreational fishing; cultural resources; other marine uses: scientific research and surveys; and visual resources." BOEMGO_3070-3071. Despite these findings, BOEM approved the COP. BOEMGO_2877-904. And in its ROD, BOEM stated that "[a] decision that balances the[] goals" in OCSLA Section 1337(p)(4) "where they conflict and does not hold one as controlling over all others is consistent with the duties required under" Section 1337(p)(4). BOEMGO_2904.

Interior agrees that the Court should remand the COP approval to the agency for further review. Interior believes the decision documents for BOEM's COP approval do not adequately

---

dismissal decision to "preserv[e] those claims for appellate review." Pls.' Reply in Supp. of Mot. for Leave to File a Second Am. Compl. 8, Dkt. No. 78. In moving for leave to amend, Plaintiffs stated that the Second Amended Complaint "does not revive or amend" Plaintiffs' MBTA or CZMA claims. *Id.* at 7. Those claims are thus not at issue here. *See generally* Pls.' Br. (advancing no argument under either statute).

explain how Revolution Wind's potential moderate to major adverse impacts to other uses of the OCS are consistent with the mandate in Section 1337(p)(4) to "ensure that any activity" carried out under that subsection "is carried out in a manner that provides for" for the twelve enumerated criteria. 43 U.S.C. § 1337(p)(4); *see also* Olsen Decl. ¶ 5. Where the administrative record does not support the agency's determination, the ordinary course is remand to the agency for further evaluation or explanation. *Trongone v. Comm'r of Internal Revenue*, 179 F.4th 1, 6 (D.C. Cir. 2026) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

Further, absent a specific statutory limitation, agencies have inherent authority to reconsider past decisions and to revise or replace them. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Wallish v. U.S. Dep't of Def.*, No. 24-cv-00616, 2025 WL 1580702, at *2 (D.D.C. June 4, 2025). Remand is appropriate where, as here, an agency has identified a "substantial and legitimate" concern about a prior decision. *Code v. McHugh*, 139 F. Supp. 3d 465, 468 (D.D.C. 2015). Indeed, two other judges in this District have granted motions for voluntary remand of offshore wind COP approvals to allow Interior to address similar concerns. *Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, No. 25-cv-2211 (JMC), 2026 WL 2294613, at *5 (D.D.C. Aug. 10, 2026); *Town & Cnty. of Nantucket v. Burgum*, No. 25-cv-906, 2025 WL 3120419, at *2 (D.D.C. Nov. 4, 2025).

The First Circuit's opinion in *Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*, 123 F.4th 1 (1st Cir. 2024), does not call for a conclusion affirming BOEM's prior COP approval. The First Circuit affirmed a district court decision upholding a COP approval for a different project. The Circuit described the district court decision as "proceed[ing] from the premise that [] BOEM must ensure that 'each criterion is met' in a manner that is 'not to the detriment of the other criteria'" in Section 1337(p)(4). *Id.* at 25 (quoting *Seafreeze Shoreside, Inc. v. U.S. Dep't of the*

*Interior*, Nos. 1:22-cv-11091-IT, 1:22-cv-11172-IT, 2023 WL 6691015, at *22 (D. Mass. Oct. 12, 2023)). The holding affirmed by the First Circuit was "only that [] BOEM must have 'discretion' in considering whether each statutory criterion is satisfied, and that [] BOEM must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide." *Id.* at 25-26. Interior does not argue to the contrary here. Rather, Interior believes it previously exercised that discretion in a way that was inconsistent with OCSLA's direction to ensure that the twelve criteria identified by Section 1337(p)(4) are provided for. Olsen Decl. ¶ 5. The Court should remand Interior's COP approval for further consideration under OCSLA.

## II. Because BOEM's COP approval should be remanded, the Court need not reach Plaintiffs' NEPA and NHPA challenges to that same agency action.

Given the need to remand BOEM's COP approval to Interior to re-evaluate its OCSLA compliance, the Court need not reach Plaintiffs' NEPA or NHPA challenges to BOEM's COP approval.[7] *See, e.g.*, *Capitol Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 37 (D.D.C. 2020) (citing *Nat'l Fam. Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 241 (D.C. Cir. 1992)). The Revolution Wind Project will unquestionably have adverse impacts on the environment, historic properties, and NHLs. But Federal Defendants' position that remand of the COP approval eliminates the need to address Plaintiffs' NEPA and NHPA claims is not an endorsement of arguments made by other parties about the requirements of NEPA or the NHPA.

---

[7] Plaintiffs' complaint asserts their NEPA claim against Defendants generally, but their motion for summary judgment only argues that BOEM violated NEPA. Pls.' Br. 39-45. To the extent that the NEPA claim pleaded in Plaintiffs' complaint was also targeted at the Corps and/or NMFS, Plaintiffs have waived NEPA claims against those agencies by failing to assert them in their motion for summary judgment. *See Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014) (citing *EMILY's List v. FEC*, 569 F. Supp. 2d 18, 25 n.6 (D.D.C. 2008), *rev'd on other grounds*, 581 F.3d 1 (D.C. Cir. 2009)).

**III. Plaintiffs' CWA claim lacks merit.**

Section 404 of the CWA provides that the Corps may issue a permit for dredge and fill activities with potentially significant impacts in the navigable waters of the United States after a period of notice and comment. 33 U.S.C. § 1344(a). The Corps' decision to issue the permit is based on the probable impact of the proposed activity after "a careful weighing" of the expected benefits and the reasonably foreseeable detriments that balances numerous environmental concerns, navigation, energy needs and public welfare. 33 C.F.R. § 320.4(a)(1) (General policies for evaluating permit applications). The applicable regulations further require the Corps to "maintain the chemical, physical, and biological integrity of waters of the United States," and determine there is no "unacceptable adverse impact" on aquatic ecosystems. 40 C.F.R. § 230.1.

**A. The Court lacks jurisdiction to hear Plaintiffs' CWA claim.**

Article III of the Constitution requires that a plaintiff establish it has "'suffered an injury in fact' that 'is fairly traceable to the challenged action of the defendant'" and that it is "'likely . . . that the injury will be redressed by a favorable decision'" from the court. *Banner Health v. Price*, 867 F.3d 1323, 1333-34 (D.C. Cir. 2017) (quoting *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000)). Moreover, that traceable and redressable interest must continue through all stages of the litigation, or the matter becomes moot. *Already, LLC v. Nike,* 568 U.S. 85, 90-91 (2013). For this reason, mootness is often described as "the doctrine of standing set in a time frame." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997). A claim is moot "where intervening events make it impossible to grant the prevailing party effective relief." *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996).

With respect to their CWA claim, none of Plaintiffs' alleged harms arises from the cable protection and pit filling activities that are within the scope of the Section 404 permit. *Compare* Pls.' Br. 4, 30-32 (asserting fishing and navigational difficulties as well as habitat destruction from

wind turbines rather than dredge-and-fill discharges), *with* USACE_AR_0000090, 104-5 (scope of permitted activities). In any event, the construction is complete. *See* Def. Intervenor's Mot. at 8, Dkt. No. 95 (describing completed construction work). Indeed, Plaintiffs' own declarations describe the impacts of completed construction. *See, e.g.*, Decl. of Richard Hittinger Decl. ¶¶ 2, 6 (Nov. 12, 2024), Dkt. No. 87-21 (describing the impacts of turbines constructed in 2024). And, although the permit mentions maintenance, USACE_AR_0068433-56 (Final Validated Permit), Plaintiffs have not shown that they will suffer any harm associated with maintenance work. Nor does such maintenance work require authorization under Section 404. *See* 33 U.S.C. § 1344(f)(1)(B). Instead, Plaintiffs assert that "[r]edressability is met because vacating those approvals would require a new review" of the permit. Pls.' Br. at 31. But, to be redressable, judicial relief must still be able to address the asserted injury. *Spencer v. Kemna,* 523 U.S. 1, 7 (1998). A new review of the approvals for completed construction will do nothing to ease Plaintiffs' alleged problems with navigation, fishing, or wildlife viewing.

A recent decision in this District involving another already-constructed wind farm off the New England coast is instructive. *Preservation Society of Newport County v. Burgum*, No. 23-cv-03510 (APM), 2026 WL 787910 (D.D.C. Mar. 20, 2026). In that case, the court held that all claims related to the authorization of construction were moot. *Id.* at *12. Plaintiffs could only survive past the motion to dismiss stage on claims for harm caused by the annual dredging permitted by that permit. *Id.* at *11-12. Here, the Plaintiffs have not shown, or even hypothesized, any harm they would suffer due to maintenance. Instead, they focus on getting a "new review" for the construction approvals, despite "a long line of cases. . . holding environmental challenges to completed construction projects to be moot." *See Finca Santa Elena, Inc., v. U.S. Army Corps of Eng'rs,* 62 F. Supp. 3d 1, 5 (D.D.C. 2014) (summarizing the case law and finding mootness).

**B. Plaintiffs' CWA claim rests on a misunderstanding of the Corps' jurisdiction.**

Plaintiffs base their CWA challenge on their assertion that the Corps should have included waters beyond three nautical miles from shore in its permit analysis. *See, e.g.*, Pls.' Br. at 27-30; SAC ¶¶ 202-209. That assertion disregards the language of the CWA, which incorporates traditional international sea borders by defining "navigable waters" in the ocean to be the "territorial seas" extending three nautical miles from shore. 33 U.S.C. § 1362(7)-(8); *see also United States v. Louisiana*, 470 U.S. 93, 98-99 (1985) (traditional international divisions of navigable sea). To reach farther than three miles, Plaintiffs argue that the Corps' authority over waters should extend over the entire Continental Shelf, Pls.' Br. 27, or alternatively, cover all "navigable water" in the ocean regardless of national borders, *id.* at 28 (citing *Sackett v. EPA*, 598 U.S. 651, 672 (2023)). But those arguments both fail. First, the Continental Shelf is submerged land that does not follow the laws for jurisdiction over water. *See United States v. Maine*, 420 U.S. 515, 526 (1975) (rights to the seabed are not limited to the territorial seas); 33 C.F.R. § 329.12(a) (jurisdiction is "wider" over the continental shelf than navigable waters). Second, the Supreme Court's decision in *Sackett* involved limiting the CWA's jurisdiction over wetlands—not ocean water. *See* 598 U.S. at 651. It does not support the proposition that all the world's oceans are "waters of the United States" simply because they are navigable.

Moreover, Plaintiffs do not address the regulations that address the Corps' regulatory jurisdiction over the ocean, which also limit the Corps' authority over waters of the United States to a zone of three geographic miles. *See* 33 C.F.R. § 329.12 ("Geographic and jurisdictional limits of oceanic and tidal waters"). Here, litigation over another dredging project off the coast of Rhode Island is instructive. In *Weaver's Cove Energy LLC, v. Rhode Island Coastal Resources Management Council*, an energy company proposed disposing of dredged material approximately nine miles south of Point Judith, Rhode Island. 583 F. Supp. 2d 259, 278 (D.R.I. 2008). Applying

33 C.F.R. § 329.12, the court found the Corps' regulatory authority over navigable waters ended three miles from shore. *Weaver's Cove Energy*, 583 F. Supp. 2d at 278.

According to technical reports for the Project, Cox Ledge is on the Continental Shelf underneath the Atlantic Ocean more than three nautical miles from shore. *See, e.g.,* USACE_AR_0055964 (maps showing the dotted boundary line of U.S. territorial seas, three nautical miles from shore and Cox Ledge further out in the bottom middle). That means Cox Ledge is outside the Corps' Section 404 jurisdiction, *see* 33 C.F.R. § 329.12, and Cox Ledge could not be included in the analysis for a Section 404 permit.

Moreover, Plaintiffs waived this argument when they failed to raise it with the Corps during the administrative process. It is a long-settled principle of judicial review that a plaintiff cannot seek judicial relief unless it first raises its concern in the administrative process. *See Seafreeze Shoreside*, 123 F.4th at 24 n.10 ("[Appellant] did not raise this concern with the Corps during its public comment process. It therefore cannot now seek to establish that the Corps acted arbitrarily or capriciously on this basis."). Yet, during the administrative process for Revolution Wind's permit, no one raised concerns about the three-mile limit or suggested that Cox Ledge should be included in the Corps' analysis. *See* USACE_AR_0067019-21; USACE_AR_0055957-56037-62, 563361-62, 56364-79, 56556-64 and 56570-80 (public comments received during notice-and-comment with none raising the three-mile issue). Such arguments are waived now.

**C. The Corps conducted a thorough analysis, within a reasonable scope.**

The Corps' decision to issue a permit is grounded in agency expertise and should not be overturned when there is a rational basis for the decision, considering the relevant factors within the agency's authority. *State Farm*, 463 U.S. at 42-43; *see also Seven Cnty.*, 605 U.S. at 169-70 (assessing the "broad zone of reasonableness" in a NEPA case). Here, prior to issuing the permit, the Corps reasonably analyzed the specific project impacts on the aquatic ecosystems within waters

of the United States. *See* USACE_AR_0067024-39 (404(b)(1) Guidelines Evaluation). Plaintiffs do not argue otherwise. Instead, Plaintiffs belatedly argue that the Corps' analysis should be expanded to include aquatic impacts in international waters and future impacts from a dozen "other projects planned for the region." Pls.' Br. at 30. But that broad-reaching analysis is not required for an individual project's permit. To the contrary, regarding geographic boundaries, the CWA regulatory analysis is explicitly limited to a zone within three miles from shore, 33 C.F.R. § 329.12, and the Corps reasonably kept its analysis within the bounds of its regulatory jurisdiction, *see* USACE_AR_0067017 (USACE Authority and Jurisdictional Activities).

Regarding future projects, the law is also clear that agencies have wide latitude to define the relevant project scope. Indeed, the Supreme Court recently explained that, in a similar analysis under NEPA, "the fact that other projects might foreseeably be built or expanded in the wake of the current project does not, by itself, make the agency responsible for addressing the environmental effects of those other projects." *Seven Cnty.*, 605 U.S. at 189. Instead, "[t]he agency may draw what it reasonably concludes is a manageable line." *Id.* at 190 (internal quotation omitted).

Plaintiffs incorrectly assert that the Corps "did not even mention" other projects. Pls.' Br. 30. In fact, the Corps considered the placement of seven existing cables from past projects, and it anticipated needing to evaluate alternative cable routes to avoid sensitive areas "on future cable projects as well" in its cumulative effects analysis. *See* USACE_AR_0067037-38. The Corps also considered "past, present, and reasonably foreseeable future offshore wind projects" throughout its consideration of the public interest factors, *see* USACE_AR_0067040-45. The Corps did not include extensive details for other projects, but that was reasonable given that the Revolution Wind

permit was the only one being approved. The Court should grant summary judgment in favor of the Federal Defendants on the CWA claim.

## IV. Plaintiffs' ESA and MMPA claims lack merit.

Plaintiffs' cursory arguments about NMFS's ESA and MMPA analyses cram together unsubstantiated allegations about two distinct agency actions: NMFS's issuance of the Biological Opinion under the ESA; and NMFS's issuance of the ITR/LOA under the MMPA. NMFS's Biological Opinion is a comprehensive analysis of the Project's anticipated effects on ESA-listed species and critical habitat, in which NMFS concluded that the Project is not likely to jeopardize the survival and recovery of the NARW, as the Project is anticipated to result only in the short-term behavioral disturbance of up to 34 NARWs, and no injury (auditory or otherwise) or mortality. NMFS_3114-16. Separately, NMFS's LOA issued under the MMPA, together with the ITR that governs it, authorizes "Level B" harassment of a small number of NARWs that is incidental to Revolution Wind's construction activities which, based on NMFS's fulsome analysis, will have no more than a negligible impact on the species. NMFS_2376-487. Plaintiffs' arguments fail to meaningfully engage, let alone undermine, NMFS's reasoned analyses under either statute.

### A. NMFS relied on the best available science.

Plaintiffs frame a smattering of misguided arguments as falling under an overarching argument that NMFS "failed to use the best available science to determine the Project's impacts on North Atlantic Right Whales[.]" Pls.' Br. 15-23. But the administrative record overwhelmingly demonstrates that NMFS complied with the ESA and MMPA, as it provided detailed, well-supported analyses using the best available scientific information for its issuance of the Biological Opinion and ITR/LOA. *See* 50 C.F.R. § 402.14(g)(8) (NMFS "will use the best scientific and commercial data available" to formulate a Biological Opinion); *id.* §§ 216.102(a), 216.104(c) (NMFS evaluates each incidental take request to determine, based on the "best available scientific

evidence," whether the taking will have a negligible impact);[8] *see also Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (The ESA's best available science requirement "merely prohibits [NMFS] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." (quoting *City of Las Vegas v. Lujan*, 891 F.2d 927, 933 (D.C. Cir. 1989)).

**1. NMFS's analyses are consistent with its NARW Strategy.**

Plaintiffs' argument that NMFS ignored scientific information in its *North Atlantic Right Whale and Offshore Wind Strategy*, issued jointly with BOEM in 2024 ("NARW Strategy"), Pls.' Br. 15 (citing NMFS_92938), is blatantly inaccurate. As an initial matter, the NARW Strategy is a non-binding, "living" guidance document that is not "intended to modify or amend any Federal statutes, regulations, permits, or leases, nor create any rights or cause of action[.]" NMFS_92938. In other words, it is not intended to bind the agencies in any project-level decision-making and associated permitting. Regardless, NMFS did not ignore that "activities associated with offshore wind development would introduce or further contribute to existing stressors in the environment that affect NARWs." Pls.' Br. 16 (cleaned up). Indeed, anticipated impacts to NARWs are *why* NMFS needed to issue the Biological Opinion and ITR/LOA. *See* 50 C.F.R. § 402.14(a)-(b) (requiring formal Section 7 consultation if the action agency determines its proposed action "may affect" and is likely to adversely affect ESA-listed species or critical habitat); 16 U.S.C. § 1371(a)(5)(A)(i) (requiring NMFS to "allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking . . . of small numbers of marine mammals"

[8] Plaintiffs cite the wrong MMPA standard. *See* Pls.' Br. 15 n.106 (citing 16 U.S.C. § 1371(a)(3)(A)). The MMPA provision Plaintiffs cite pertains to a waiver of the moratorium on taking and importing marine mammals and marine mammal products; it does not govern incidental take authorizations. *Compare* 16 U.S.C. § 1371(a)(3)(A), *with id*. § 1371(a)(5)(A).

when certain conditions are met). Thus, even though the NARW Strategy does not purport to be a scientific document, NMFS's Biological Opinion and ITR/LOA are consistent with it.[9]

Contrary to Plaintiffs' suggestions, the Biological Opinion and ITR extensively analyze the impacts the Project is expected to have on NARWs. *See, e.g.*, NMFS_2842-3053, 3110-16; NMFS_2464-66. While the Biological Opinion's effects analysis explains the Project is likely to cause adverse effects to NARWs, the anticipated effects are limited to "temporary behavioral disturbance and/or temporary threshold shift (minor and temporary hearing impairment), inclusive of masking and stress, as a result of exposure to noise during impact pile driving and UXO detonations[.]" NMFS_3114.[10] In other words, while short-term incidental take by harassment is anticipated, "[n]o injury (auditory or other), serious injury, or mortality is expected due to exposure to any aspect of the proposed action during the construction, operations, or decommissioning phases of the project." *Id.* Thus, based on NMFS's consideration of "the endangered status of [NARWs], the effects of the action, other stressors that individuals are exposed to within the action area as described in the *Environmental Baseline* and *Cumulative Effects* section of [the Biological Opinion], and any anticipated effects of climate change on the abundance, reproduction, and distribution of right whales in the action area[,]" it concluded that the Project is not likely to jeopardize the survival and recovery of the species. NMFS_3116.

---

[9] The NARW Strategy includes a list of measures that "may have potential to avoid and minimize impacts to NARWs from [offshore wind] activities." NMFS_92978. The Biological Opinion and LOA adopt many of those suggested measures, including, for example: protected species observers (*see* NMFS_2882; NMFS_63504-17); clearance zones (*see* NMFS_2709; NMFS_63492-94, 63498-99, 63523-26, Tbls. 2-6); shutdown zones (*see* NMFS_2710; NMFS_63493, Tbls. 2-4, 6); and sound field verification (NMFS_3146; NMFS_63494).

[10] UXO detonation refers to the intentional explosion of old military bombs, mines, or torpedoes found on the seabed, in order to destroy them, before building wind turbines or laying cables.

Similarly, in the ITR, NMFS concluded that "Revolution Wind's activities are not expected to result in impacts on the reproduction or survival of any individual[] [NARWs], much less affect annual rates of recruitment or survival." NMFS_2466. With respect to serious injury or mortality of NARWs, NMFS determined that, based on the "characteristics of the [acoustic] signals . . . planned for use, Level A harassment is [not] anticipated (even absent mitigation)[.]" NMFS_2439. And with respect to anticipated Level B harassment, NMFS found that, "any behavioral harassment of [NARWs] incidental to the specified activities would not result in changes to their migration patterns or foraging success, as only temporary avoidance of an area during construction is expected to occur." NMFS_2465. Thus, the take authorized by the ITR/LOA is expected to have only "a negligible impact on the [NARW]." NMFS_2466.

Plaintiffs' cherry-picked statements from the NARW Strategy about generally anticipated impacts of offshore wind development fail to undermine NMFS's thorough analyses and reasoned conclusions in the Biological Opinion and ITR/LOA.

### 2. NMFS considered potential behavioral disturbance impacts from sound exposure.

Plaintiffs' argument that NMFS "ignored or minimized the importance of [two] studies demonstrating that exposure to intermittent or continuous anthropogenic noise has the potential to induce a state of chronic stress in marine mammals" also lacks merit. Pls.' Br. 16, n.114-115. Indeed, Plaintiffs cited those same two studies in their comment letter on the proposed ITR, *see* NMFS_62239, which NMFS considered and responded to, *see* NMFS_62860-62, 62936. Plaintiffs are also plainly incorrect in stating that "NMFS cites no scientific evidence to support its conclusion that the Project is not expected 'to produce conditions of long-term and continuous exposure to noise leading to long-term physiological stress responses in marine mammals that could affect reproduction or survival.'" Pls.' Br. 17 (citing NMFS_62924). On the contrary, the

record shows that NMFS cited at least seventeen studies in its analysis of behavioral disturbance impacts caused by noise exposure from the Project. *See* NMFS_62924-25.

In any event, the two studies Plaintiffs cite, Pls.' Br. 16 n.114-115, are not themselves part of NMFS's administrative record in this case and should be disregarded by the Court. At the outset of this lawsuit, Plaintiffs agreed in a joint filing that they would "notify Federal Defendants whether they believe the administrative records are complete or require[] supplementation with additional materials, whether they believe any exceptions to record review are applicable, and/or whether they believe there is a need for judicial review of extra-record materials by September 9, 2024." Dkt. No. 57 at 7. The Court then specifically ordered that any "[m]otions regarding disputes about the administrative record" be filed by October 4, 2024. *See* October 1, 2024 Minute Order. Plaintiffs never notified Federal Defendants of a belief that these studies should be included in NMFS's administrative record. Nor did Plaintiffs include the studies in the list of materials in their motion to supplement the record filed on October 4, 2024. *See* Dkt. No. 62. Plaintiffs' reliance on these studies disregards the Court's scheduling order and well-settled principles of administrative law, under which judicial review of agency actions must be limited to "the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

**3. NMFS properly considered the impacts of other wind projects in its ESA analysis.**

NMFS did not ignore the effects of other "Atlantic Coast offshore wind facilities that the Government has either authorized or expects to authorize[,]" or unlawfully "restrict its analysis of 'cumulative effects' in the Biological Opinion to future non-federal actions" as Plaintiffs contend. Pls.' Br. 17-18. Plaintiffs' argument ignores NMFS's environmental baseline analysis in the

Biological Opinion, which includes a detailed assessment of the impacts of other offshore wind projects for which NMFS has completed ESA consultation. NMFS_2834-41. Further, Plaintiffs disregard well-established law specifically defining "cumulative effects" under the ESA to exclude the effects of planned and future projects that have yet to undergo Section 7 consultation.

ESA consultation regulations require NMFS to consider cumulative effects as part of the analysis of the agency action that is subject to ESA consultation. 50 C.F.R. § 402. "Cumulative effects are those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* § 402.02 (emphasis added). As explained in the preamble to the ESA consultation regulations, future federal actions—such as proposed offshore wind projects—are not analyzed as cumulative effects because they are speculative prior to federal approval, and because, if approved, they will be subject to their own ESA consultation process. 51 Fed. Reg. 19926, 19933 (June 3, 1986). The impacts of such projects will be fully considered at that time. NMFS does, however, consider the effects of other, *previously authorized* federal offshore wind projects as part of the "environmental baseline," as provided in 50 C.F.R. § 402.14(g).

In line with the ESA's regulations, NMFS properly assessed the impacts of other authorized offshore wind projects on ESA-listed species as part of its environmental baseline analysis. 50 C.F.R. § 402.14(g); *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 (D.D.C. 2001) (interpreting the ESA's regulations to mean that the "environmental baseline" analysis is the appropriate place to account for "other federal activities in the action area that impact [the species]"). NMFS's environmental baseline analysis included an assessment of the impacts of other projects including Ocean Wind 1, South Fork Wind, Vineyard Wind 1, Coastal Virginia Offshore Wind, Block Island, Empire Wind, Sunrise Wind, Atlantic Shores South, and New

England Wind. NMFS_2834-41.[11]

Plaintiffs incorrectly assert that, in addition to analyzing the impacts of these projects, NMFS should have analyzed "future federal actions" in its "cumulative effects" analysis of the Biological Opinion. Pls.' Br. 17-18. As explained above, this argument is at odds with the ESA's regulations. It is also inconsistent with the well-recognized framework governing sequential Section 7 reviews for federally authorized projects. As explained in the Biological Opinion, if a future action may affect an ESA-listed species, that project's effects will be analyzed against the new "environmental baseline," which takes into account the effects of all federally authorized projects that have previously undergone Section 7 consultation. *See* NMFS_3063; *see also, e.g., Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009) (recognizing that "[f]ederal actions, and those involving federal agencies, are excluded from cumulative effects analysis because they are subject to their own [ESA Section 7] consultation process"); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021) (finding that a project was "properly excluded from the cumulative effects analysis because, at the time of the [biological] opinion, the [excluded] project was a *federal* action subject to its own consultation" (citation and footnote omitted)); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1113 (9th Cir. 2012) ("'[C]umulative effects' are 'those effects of future State or private activities, *not involving Federal activities*, that are reasonably certain to occur within the action area of the Federal action subject to consultation.'" (citation omitted)).

For these reasons, NMFS's consideration of cumulative effects was appropriate and the Court should reject Plaintiffs' arguments to the contrary.

---

[11] Contrary to Plaintiffs' suggestions, Pls.' Br. 18, NMFS's environmental baseline analysis also included an analysis of other anticipated impacts, including from climate change, NMFS_3059-3062, and non-federal activities, NMFS_2823-45.

**4. NMFS considered the risk of turbine failure.**

The Court should decline to consider Plaintiffs' improperly raised argument regarding post-decisional turbine failures, which relies on extra-record materials that were not before NMFS's decisionmakers when issuing the Biological Opinion and ITR/LOA. Pls.' Br. 18-19 n.128-130. It is well-settled that in cases like this—where a plaintiff seeks judicial review under the APA, 5 U.S.C. § 706—the scope of review is limited to the administrative record that was before the agency at the time it made the challenged decisions. *See, e.g.*, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."). Post-hoc information about turbine failures after the challenged decisions were issued is simply not relevant under the APA.

Further, while these post-decisional factual developments could not have been considered, NMFS *did* consider the potential risk of turbine failure and resulting debris in the Biological Opinion. *See* NMFS_3053-56. Specifically, NMFS determined that, because a catastrophic failure would require conditions that are extremely unlikely to occur, "any associated potential impacts to listed species resulting from foundation failure and associated debris and/or release or oil or other chemicals, as well as the strike of a listed species by a failing structure, are [] extremely unlikely and therefore, discountable." NMFS_3056. NMFS based this determination on a detailed analysis of the design criteria of the turbines and electrical substation platforms, including 10-minute, 50-year, and 100-year wind-speed and ocean-force design standards, historic weather and ocean conditions at the nearest weather monitoring buoy, as well as an assessment of data on the frequency and magnitude of seismic activity in the area and the distance between the project area

and local fault lines. *See id.* Thus, Plaintiffs are incorrect that NMFS "ignored" the "risks of catastrophic blade failure." Pls.' Br. 18 (cleaned up).[12]

### 5. NMFS considered impacts to the NARW's prey species.

Plaintiffs' argument that NMFS allegedly ignored the "effects of the Project on the [NARW]'s nutritional state and its ability to forage for food" lists several considerations that NMFS purportedly did not consider, followed by citations to the administrative record where NMFS expressly considered those issues. *See* Pls.' Br. 22-23 n.147-154. Thus, it appears that Plaintiffs' issue is not that NMFS did not consider issues involving impacts to the NARW's prey (zooplankton), but rather that Plaintiffs do not agree with NMFS's conclusions.

For example, Plaintiffs argue that "impulsive noise, even at levels less than the noise produced by pile driving and equivalent to that resulting from seismic surveys can cause zooplankton mortality two to three orders of magnitude (100 to 1000 times) than predicted[.]" Pls.' Br. 22-23 (citing McCauley, 2017). However, NMFS explicitly addressed this study in the Biological Opinion and found that the study "documented mortality of juvenile krill exposed to seismic airguns" and, although airguns would not be used for the Project, conclusions could be drawn about the impacts from UXO detonations, but not about noise from pile driving or HRG surveys. NMFS_2958. Specifically, based on the available data, NMFS concluded:

> [W]e expect the mortality of zooplankton to be limited to exposure to the 13 UXO detonations and that losses will be limited due to the small number of detonations (13) and the extremely short duration of the explosion (one second). *Effects to marine mammals due to disturbance of prey are expected to be so small that they cannot be meaningfully measured, detected, or evaluated and are therefore insignificant.* No take is anticipated to occur.

---

[12] Plaintiffs also incorrectly allege that BOEM's "COP approv[al] . . . does not consider this risk and has no contingency plan for responding to blade failure emergencies." Pls.' Br. 19. Not only do Plaintiffs fail to provide any explanation as to how this allegation amounts to a violation of the ESA or MMPA, but it is also inaccurate, as BOEM's COP Approval requires procedures for debris removal and reporting. *See* NMFS_2580-83.

*Id.* (emphasis added). While Plaintiffs apparently believe that the airgun study supports a different conclusion (i.e. that pile driving and HRG surveys will cause zooplankton mortality), Plaintiffs' differing views do not undermine the agency's reasoned judgment.

Plaintiffs fail to identify any "clear error of judgment" rendering NMFS's determinations arbitrary and capricious, or otherwise contrary to law. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (Under the APA, courts look at whether an agency considered the relevant factors and whether it made a "clear error of judgment."). The Court's review should be especially deferential where, as here, the agency made a "scientific determination, as opposed to simple findings of fact." *Balt. Gas. & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). Thus, the Court should decline to substitute Plaintiffs' views for that of the agency. *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1090 (D.C. Cir. 2021) ("[W]e review scientific judgments of the agency . . . exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." (citation modified)).

### B. The Biological Opinion's ITS complies with the ESA.

Plaintiffs' arguments about mitigation measures merely reiterate anticipated impacts from underwater noise to NARWs—impacts that are analyzed and addressed in NMFS's Biological Opinion—and make conclusory assertions that the Biological Opinion's mitigation measures are insufficient. *See* Pls.' Br. 20-22. Plaintiffs do not demonstrate any violation of the ESA.[13]

Under the ESA, when NMFS determines that an agency's action (here, BOEM's authorization of the Project) is not likely to jeopardize the continued existence of ESA-listed species or result in the destruction or adverse modification of critical habitat, but is "reasonably

[13] Plaintiffs limit this argument to allegations about compliance with the ESA; they do not mention the MMPA or the ITR/LOA. *Id.*

certain" to result in the incidental take of listed species, such take can be exempted from liability in the Biological Opinion through an ITS. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).[14] The ITS must identify the impact of such taking and specify "reasonable and prudent measures that [NMFS] considers necessary or appropriate to minimize such impact," and provide terms and conditions to implement those measures. 16 U.S.C. § 1536(b)(4)(i)-(iv); 50 C.F.R. § 402.14(i)(1)(ii), (iv). In the case of marine mammals, the ITS must specify "those measures that are necessary to comply with [the MMPA] with regard to such taking[.]" 16 U.S.C. § 1536(b)(4)(iii). The ITS must also require the action agency to monitor incidental take by reporting progress of the action and its impact on listed species. 50 C.F.R. § 402.14(i)(1)-(4). If the amount of take specified in the ITS is exceeded, the action agency must reinitiate ESA consultation with NMFS. *Id.* § 402.14(i)(5).

Here, the ITS provides numerous terms and conditions requiring the adoption of robust mitigation measures, NMFS_3145-65, which are also incorporated as conditions to BOEM's COP Approval, BOEMGO_3026, NMFS_2552, 2634-35. Some of the required measures include:

- Seasonal restrictions on installation: Revolution Wind is prohibited from conducting Impact pile driving January 1 through April 30," NMFS_63491, as the "best available data provides NMFS confidence that [NARWs] are expected in the WDA predominantly from January [to] April[,]" NMFS_2887 (citations omitted).

- Protected Species Observers (PSOs): Revolution Wind must use "multiple PSOs to visually observe for marine mammals (with any detection within specifically designated zones that would trigger delay or shutdown)[.]" NMFS_2463; NMFS_2882.

- Clearance zones. "Pile driving and UXO/MEC detonations may only begin in the absence of [NARWs] (based on visual and passive acoustic monitoring)." NMFS_62930.

- Shutdown zones. Detection (visual or acoustic) of a NARW within the shutdown zone triggers the mandatory stop of construction activities. NMFS_2710, 3148.

[14] Section 9 of the ESA prohibits the "tak[ing]" of endangered species. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19).

- Sound field verification. Revolution Wind "must conduct sound field verification (SFV) measurements during pile driving activities . . . [which] must continue until at least three consecutive piles demonstrate noise levels are at or below those modeled, assuming 10-decibels (dB) of attenuation." NMFS_2477; NMFS_3146.

Plaintiffs fail to provide any evidence or legal analysis indicating that the Biological Opinion's suite of mitigation measures do not comply with the ESA. Plaintiffs argue that the ITS's required use of bubble curtains during pile driving is the "primary mitigation measure" and is inadequate to protect NARWs from underwater construction noises. Pls.' Br. 20-21. This is simply incorrect. Not only are bubble curtains effective, but they are also just one element of a comprehensive collection of protective measures. NMFS_2851-53. Plaintiffs' vague claims that some of the required measures involve "no real oversight," are based on "yet-to-be-developed" research and are merely "administrative" similarly lack merit. Pls.' Br. 21. On the contrary, NMFS required the development of detailed implementation plans for each measure—which must be approved by NMFS—to ensure the measures are effectively carried out. *See* NMFS_2706-11; 3140-63. In line with the requirements of the ESA, NMFS reasonably determined that each measure was "necessary or appropriate to minimize [the] impact" of the incidental take of listed species. 16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. § 402.14(i)(1)(ii).

**C. NMFS's findings in the Biological Opinion are consistent.**

Plaintiffs' hodgepodge of arguments regarding alleged "contradictions" in the Biological Opinion should be rejected as they misconstrue key context in NMFS's analyses. Pls.' Br. 23-25.

First, Plaintiffs' argument that the Biological Opinion contains "conflicting assessments" about the impacts of loud noise on NARWs is based on a confused understanding of two concepts. *Id.* at 24. Plaintiffs fail to appreciate the distinction between: (1) a physical condition NMFS recognized that NARWs may experience called "temporary threshold shift" (TTS), which is a temporary reduction in the sensitivity of a whale's hearing; and (2) disturbance to a whale's

behavior, such as its foraging or breeding. *Id.* Based on its analysis, NMFS determined that no more than 22 NARWs would experience "TTS and/or temporary behavioral disturbance." NMFS_3111. NMFS's analysis explains that, while the physical condition of TTS will resolve within a maximum of one week from exposure to the noise, any actual behavioral disturbance is expected to be limited to the "very short duration of exposure to [the] noise[.]" *Id.*

Plaintiffs' argument regarding the displacement of NARWs also fails to appreciate the basic factual landscape underlying NMFS's analysis. Plaintiffs appear to argue that the Biological Opinion contains an inconsistency because, on one hand, it acknowledges that the Project may cause the temporary "displacement" of NARWs from the Project area and, on the other hand, it acknowledges that "the project area both spatially and temporally overlaps with migratory and feeding grounds for the [NARW]." Pls.' Br. 24 (cleaned up). But both of these expectations easily coexist. With respect to any displacement, NMFS determined that the result of a NARW being exposed to noise above the MMPA's Level B harassment threshold "would be, at worst, temporary avoidance of the area with underwater noise louder than this threshold[.]" NMFS_3333; *see also* NMFS_62929 ("behavioral harassment of [NARW]s incidental to the [Project] activities would not result in changes to their migration patterns or foraging success, as only temporary avoidance of an area during construction is expected to occur."). Given the massive size of the NARW's migratory and feeding grounds, it is not surprising that NMFS found that any such temporary displacement would be extremely unlikely to disrupt "activities such as breeding, feeding (including nursing), resting, and migrating" and there would be "no lasting biological consequences." NMFS_3333. Indeed, NMFS reasonably concluded that, given Revolution Wind's "Lease Area is relatively small compared with the migratory [area] (approximately 339 $km^2$ . . .

versus . . . 269,448 km$^2$) . . . the overall [NARW] migration is not expected to be impacted by the proposed activities." NMFS_62929.

Plaintiffs' arguments regarding NMFS's consideration of entanglements and fishing similarly fall flat. Plaintiffs claim that NMFS "ignored" the risk of whale entanglements with fishing lines and the possibility of recreational fishing becoming concentrated around turbine foundations. Pls.' Br. 24-25. Plaintiffs' argument is somewhat remarkable considering they cite a part of the Biological Opinion specifically analyzing the risk of NARW entanglement with fishing gear, *id*. at 25 n.166 (citing NMFS_3110), and that an entire section of the Biological Opinion is expressly dedicated to analyzing "potential shifts or displacement of fishing activity," NMFS_3048-52. Based on NMFS's thorough assessment of these risks, it determined that "the risks of entanglement . . . due to any shifts or displacement of recreational or commercial fishing activity caused by the proposed Project [are expected] to be so small that they cannot be meaningfully measured, evaluated, or detected; therefore, effects to listed species are insignificant." NMFS_3052. Nothing about NMFS's analysis is inconsistent.

### D. NMFS's "small numbers" and "negligible impact" determinations under the MMPA are reasonable.

While Plaintiffs frame their argument to NMFS's MMPA authorization as a challenge to its "negligible impact" determination, Pls.' Br. 25, they conflate the MMPA's negligible impact requirement with the separate "small number[s]" requirement. *Id.* at 25-26. Under the MMPA, the "small numbers" requirement concerns the *number* of marine mammals for which take is authorized, 16 U.S.C. § 1371(a)(5)(A)(i), while the "negligible impact" requirement concerns the *impact* of that take, *id.* § 1371(a)(5)(A)(i)(I); *see, e.g.*, *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 907 (9th Cir. 2012) (recognizing that NMFS's "small numbers" and "negligible impact" determinations are analyzed under "distinct, separate standard[s]"). Both NMFS's "small

numbers" and "negligible impact" determinations for the ITR/LOA comply with the MMPA and were neither arbitrary nor capricious.

Plaintiffs appear to argue that NMFS violated the small numbers requirement by "authoriz[ing] the take of up to 44 [NARWs] in any one year and 56 overall[.]" Pls.' Br. 25. This amounts to an authorization of incidental take (by non-lethal Level B harassment only) of up to 13% of the NARW stock abundance in any given year, and no more than 16% total over the five-year duration of the LOA. NMFS_62928. Plaintiffs fail to meet their "heavy burden" to show these take authorizations are "arbitrary and capricious under the 'small numbers' requirement." *Save Long Beach Island v. U.S. Dep't of Com.*, 794 F. Supp. 3d 273, 328 (D.N.J. 2025) (rejecting challenge to NMFS's small number analyses for similar offshore wind MMPA take authorizations). As the First Circuit has recognized, the MMPA's small numbers requirement "is not capable of being expressed in absolute numerical limits." *Melone v. Coit*, 100 F.4th 21, 30 (1st Cir. 2024) (quoting H.R. Rep. No. 97-228, at 19 (1981), as reprinted in 1981 U.S.C.C.A.N. 1458, 1469). Thus, NMFS has adopted a "proportional approach"—which it applied here—"whereby it 'compares the number of individuals taken to the most appropriate estimation of abundance of the relevant species' to determine whether the authorized take is limited to 'small numbers' of that species." *Id.* (upholding NMFS's proportional approach and rejecting challenge to a small numbers determination for another offshore wind take authorization); NMFS_2472; *see also, e.g., Alaska Wildlife All. v. U.S. Fish & Wildlife Serv.*, No. 23-35299, 2024 WL 1169411, at *4-5 (9th Cir. Mar. 19, 2024) (finding that an LOA's authorization of take through Level B harassment of 10.14% of polar bears annually or 48.84% over five years was reasonable under the MMPA's small numbers requirement); *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1053 (D. Alaska 2013) (upholding NMFS's determination that Level B Harassment of 30 beluga

whales, amounting to 10% of the population, over the course of a year was a "relatively limited or small portion" of the population). Plaintiffs fail to prove that NMFS's small numbers determination is unreasonable.

Plaintiffs' allegation that NMFS ignored that "an annual death rate over 0.7% would be catastrophic for the species" is inaccurate. Pls.' Br. 25-26. NMFS specifically considered the precarious population status of NARWs and the potential consequences of NARW deaths. *See* NMFS_2464 (ITR analysis recognizing that "the loss of even one individual could significantly impact the population"). Further, Plaintiffs' emphasis of these numbers is a red herring, as the ITR specifically provides that "[n]o mortality, serious injury, or injury of [NARWs] . . . is expected or authorized. Any disturbance to [NARWs] due to [the Project] is expected to result [only] in temporary avoidance of the immediate area of construction." *Id.* NMFS also adopted numerous mitigation measures, such as those discussed *supra*, to ensure that the authorized incidental take will have the least practicable adverse impact. *See* ITR at 72660-67.

Finally, the Court should reject Plaintiffs' attempt to save their "small number[s]" argument by improperly aggregating take numbers from separate MMPA authorizations issued to other developers for different offshore wind projects along the Atlantic Coast. Pls.' Br. 26 (arguing that "NMFS has approved the take of 362 [NARWs] . . . to construct ten offshore wind projects along the [NARW]'s migration path."). The plain language of the MMPA does not contemplate a cumulative analysis of incidental take from the activities of different LOA-holders in different locations during different specified periods. *See* 16 U.S.C. § 1371(a)(5)(A)(i) (limiting the authorization of take to take that is incidental to the applicant's "*specified activity* . . . within a *specified geographical region*," within a period of "not more than five consecutive years[,]" and only while the applicant is "engaging in *that* activity within *that* region") (emphasis added). Courts

have agreed that the MMPA "does not require [NMFS] to consider takes resulting from all activities proposed by all citizens undertaking similar activities, but rather only those citizens who submit the [LOA] request." *Melone*, 100 F.4th at 32 (emphasis in original); *Save Long Beach Island*, 794 F. Supp. 3d at 326 ("There is nothing in the MMPA or NMFS's regulations requiring NMFS to assess take numbers based on activities outside of the scope of each individual [LOA] application."). Thus, Plaintiffs' arbitrary addition of authorized Level B harassment numbers from separate projects along the Atlantic Coast fails to undermine NMFS's small numbers analysis.

## CONCLUSION

Interior agrees that its COP approval should be remanded so that Interior can re-evaluate its OCSLA compliance. In light of that remand, the Court need not reach Plaintiff's NHPA and NEPA claims concerning Interior's COP approval. The Court should grant summary judgment in Federal Defendants' favor on Plaintiff's claims against NMFS and the Corps.

Dated: October 9, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy & Natural Resources Division

*s/ Amanda K. Rudat*
AMANDA K. RUDAT
Trial Attorney
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
202-532-3201
amanda.rudat@usdoj.gov

MICHELLE M. SPATZ
Trial Attorney
D.C. Bar No. 1044400
Wildlife and Marine Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
202-598-9741
michelle.spatz@usdoj.gov

SARAH WILLIAMS
Trial Attorney
D.C. Bar No. 1006622
Environmental Defense Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
202-598-9728
sarah.williams@usdoj.gov